**IN THE UNITED STATES COURT**
**OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **SEVENSON ENVIRONMENTAL SERVICES, INC.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**THE UNITED STATES,**<br><br>**Defendant.** | ) | **Case No.: 05-1075C**<br>**Judge Thomas C. Wheeler** |

**Electronically Filed November 8, 2006**

**PLAINTIFF SEVENSON ENVIRONMENTAL SERVICES, INC.'S**
**MEMORANDUM ON CLAIM CONSTRUCTION**

**McDERMOTT WILL & EMERY LLP**
Brian E. Ferguson
600 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 756-8000

**WEBSTER SZANYI LLP**
Kevin A. Szanyi
Nelson Perel
1400 Liberty Building
Buffalo, New York 14202
(716) 842-2800

*Attorneys for Plaintiff*
*Sevenson Environmental Services, Inc.*

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ..... iv

I. EXECUTIVE SUMMARY ..... 1

II. OVERVIEW OF THE TECHNOLOGY ..... 3

A. The Background of the Inventions ..... 3

B. The Sevenson Patented Technology ..... 4

III. BACKGROUND OF THE LITIGATION ..... 7

IV. THE SEVENSON PATENTS-IN-SUIT ..... 9

A. The '982 Patent ..... 9

B. The '367 Patent ..... 12

C. The '123 Patent ..... 12

D. The '608 Patent ..... 13

E. The '485 Patent ..... 14

V. PROSECUTION HISTORY OF THE PATENTS-IN-SUIT ..... 15

A. Prosecution History of the Non-Asserted '936 Patent ..... 15

B. Prosecution History of the '982 Patent ..... 16

C. Prosecution History of the '367 Patent ..... 17

D. Prosecution History of the '123 Patent ..... 18

E. Prosecution History of the '608 Patent ..... 18

F. Prosecution History of The '485 Patent ..... 19

VI. THE GUIDING LEGAL PRINCIPLES ..... 19

A. Patent Principles ..... 19

B. Patent Infringement ..... 20

C. Claim Construction ..... 21

**TABLE OF CONTENTS**
(continued)

**Page**

1. Intrinsic Evidence ....... 23
   a. Claims ....... 23
   b. Specification ....... 24
   c. Prosecution History ....... 24
2. Permissible Deviation from the Ordinary Meaning of Claim Terms ....... 25
   a. Explicit Definition for the Claim Term ....... 25
   b. Expressions of Manifest Exclusion in the Specification Representing a Clear Disavowal of Claim Scope ....... 26
   c. Clear and Unmistakable Disavowal in the Prosecution History ....... 26
3. Extrinsic Evidence ....... 27

VII. ANALYSIS OF THE DISPUTED TERMS ....... 28

A. The “Separate and Distinct Compound” Claim Terms ....... 31

B. The “Compound” Limitation Claim Terms ....... 37

1. The “Compound” Limitation is not Supported By Intrinsic Evidence ....... 37
2. The Extraneous “Compound” Limitation is Contrary to the Ordinary Meaning ....... 40

C. The Government Attempts to Read in Limitations from the Specification ....... 42

1. The “technical grade phosphoric acid (TGPA)” claim term ....... 43
2. The “TCLP Test Criteria” Limitation ....... 44
3. The Containing Leachable Radionuclides and Radioactive Compounds” Limitation ....... 47

D. Ordinary Meaning is Apparent in Certain Claim Terms ....... 49

E. Disputed Ordinary Meaning ....... 55

1. The Term “Substance” Has a Distinct Meaning ....... 55

**TABLE OF CONTENTS**
(continued)

**Page**


2. Other "Compound" Limitations ........................................................56

3. The "Aqueous Phosphate" Claim Terms ..............................................57

4. The "Solution Form" Claim Term.......................................................58

F. Government's Construction is Contingent Upon Adoption of Other Disputed Claim Term Definitions..................................................................59

VIII. CONCLUSION ..................................................................................60

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363 (Fed. Cir. 2003) ....22

*Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*, 98 F.3d 1563 (Fed. Cir. 1996) ....17

*Autogiro Co. of Am. v. United States*, 384 F.2d 391 (Ct. Cl. 1967) ....20

*CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359 (Fed. Cir. 2002) ....25

*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349 (Fed. Cir. 2006) ....26

*CVI/Beta Ventures, Inc. v. Tura L.P.*, 112 F.3d 1146 (Fed. Cir. 1997) ....23

*Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998). ....22

*Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335 (Fed. Cir. 1998) ....54

*Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364 (Fed. Cir. 2001) ....27

*E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430 (Fed. Cir. 1988) ....24, 42

*Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358 (Fed. Cir. 2001) ....44

*Fonar Corp. v. Johnson & Johnson*, 821 F.2d 627 (Fed. Cir. 1987) ....23

*Gart v. Logitech, Inc.*, 254 F.3d 1334 (Fed. Cir. 2001) ....33

*Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766 (Fed. Cir. 1996). ....21

*Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352 (Fed. Cir. 2004) ....11

*In re Vamco Mach. & Tool, Inc.*, 752 F.2d 1564 (Fed. Cir. 1985) ....20

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111 (Fed. Cir. 2004) ....22

*Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357 (Fed. Cir. 2003). ....22

*Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323 (Fed. Cir. 2001) ....22

*Jonsson v. Stanley Works*, 903 F.2d 812 (Fed. Cir. 1990) ....25

*LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364 (Fed. Cir. 2006) ....25, 54

*Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361 (Fed. Cir. 2004) ....26

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995................................*passim*

*NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282 (Fed. Cir. 2005) .............................*passim*

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003) .......................................26

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)..................................................*passim*

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298 (Fed. Cir. 1999)........................23, 27

*Prima Tek II, LLC v. Polypap*, 318 F.3d 1143 (Fed. Cir. 2003)................................................25

*Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123 (Fed. Cir. 2006).......................26, 54

*Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336 (Fed. Cir. 2001)............................................54

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337
(Fed. Cir. 2001)..................................................................................................26, 44

*Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570 (Fed. Cir. 1995) ................................23

*SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985)......................24

*Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357
(Fed. Cir. 2002)..........................................................................................................25

*Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313 (Fed. Cir. 2002) ......................................26

*Univ. of W. Va. v. VanVoorhies*, 278 F.3d 1288 (Fed. Cir. 2002) ...............................................9

*Vitronics Corp. v. Conceptronic Inc.*, 90 F.3d 1076 (Fed. Cir. 1996) ................................*passim*

*Wang Labs., Inc. v. American Online, Inc.*, 197 F.3d 1377 (Fed. Cir. 1999).............................21

**Statutes**

28.U.S.C. § 1498.........................................................................................................5

35 U.S.C. § 112..........................................................................................................20

35 U.S.C. § 113..........................................................................................................20

35 U.S.C. § 121..........................................................................................................17

35 U.S.C. § 154(a)(1)..................................................................................................19

35 U.S.C. § 271(a). ....................................................................................................20

**Miscellaneous**

American Heritage Dictionary, 2d Coll.Ed (Houghton Mifflin Co. 1982) .................................36

Hawley's Condensed Chemical Dictionary, 11th Ed. (Van Nostrand Reinhold Co., Inc. 1987) ..........................................................................................................36, 41

Superfund Act (CERCLA) ........................................................................................................5

Superfund Amendments Reauthorization Act (SARA) ..............................................................5

Title 35 of the United States Code ...........................................................................................20

Pursuant to the Court's Scheduling Order, plaintiff Sevenson Environmental Services, Inc. ("Sevenson") submits this opening *Markman* brief[1] in support of its construction of the disputed claim terms.

## I. EXECUTIVE SUMMARY

This is a patent case. Sevenson is the owner by assignment of several patents that are fundamental to the treatment of contaminated soil and other environmental media – five of those are currently being asserted against Defendant The United States (the "Government") in this litigation. The asserted patents are directed to methods for treating soil contaminated with lead, or other heavy metal and radioactive compounds, using a treatment process having ***at least one phosphate*** and ***at least one sulfate***. Specifically, the asserted patents disclose and claim the use of ***phosphoric acid***, which acts as a source of both phosphate and sulfate, to treat contaminated soil.

The Defendant Government is violating Sevenson's exclusive rights to the technology disclosed and claimed in the Sevenson patents by and through its contractor, the Shaw Group, Inc. ("Shaw"), acting on behalf of and for the benefit of the Government.[2] Shaw is using Sevenson's patented methods commercially, with full knowledge of Sevenson's patents and without Sevenson's permission to do so. Moreover, no right to use Sevenson's patented methods has been granted to the Government or to the Government's contractor, Shaw, acting on behalf

---

[1] In *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), the Federal Circuit held that claim construction was the exclusive province of the Court. Briefs in support of claim construction have become known, in patent parlance, as *Markman* briefs.

[2] Sevenson previously sued Shaw for patent infringement in the Western District of New York. The Court there granted Shaw summary judgment on Shaw's Section 1498 "authorization or consent" defense. Sevenson has appealed that decision to the Court of Appeals for the Federal Circuit. Through the arguments presented herein, Sevenson does not in any way concede that Shaw acted for or on behalf of the Government.

of and for the benefit of the Government. Although Sevenson offered Shaw and its predecessor the opportunity to license the Sevenson patents and lawfully use the technology claimed therein, Shaw largely ignored Sevenson and continued with its infringing conduct for Government purposes.

Sevenson sets forth herein its proposed constructions for the various terms appearing in the claims of the patents-in-suit and, and the evidentiary support therefor. Consistent with the Federal Circuit's precedent, Sevenson's claim construction is based on the "common and ordinary" meaning of the terms to the person of skill in the art to which the patents are directed. Moreover, the specification of the patents, and the record of correspondence[3] between the inventors and the U.S. Patent and Trademark Office ("PTO"), fully supports the Court's application of the "common and ordinary" meaning to the claim terms at issue.

Conversely, the Government's anticipated proposed constructions do not rely on ordinary meaning. One fundamental tenant of patent law is that claims are not to be redrafted to incorporate extraneous limitation without textual support. The Government imposes a "separate and distinct" limitation and a "compound" limitation to many claim terms that has no foundation in the claims, specification or prosecution history.

Another fundamental tenant of patent law is that the claims are not to be limited to a preferred embodiment of the specification. Yet, that is exactly what the Government attempts to do here regarding the Sevenson patents. For example, the Government imports a limitation on the weight percentages of sulfate impurities directly from the patent specification for the term

[3] This record is commonly called the "file history" or "prosecution history" of the patent in question.

"*technical grade phosphoric acid (TGPA)*," even though the claims themselves contain no such specific weight percentages.

In addition, Federal Circuit precedent establishes that claim terms are to be construed consistently within a patent and among related patents. To the contrary, the Government construes the claim terms in a manner which results in multiple definitions and inconsistent uses within the same patent and among the asserted patents. For example, as the Government proposes, the disputed term "*mixture*" has nine distinct definitions.

For all these reasons, and as set forth more fully herein, Sevenson respectfully requests the Court adopt Sevenson's proposed constructions, which are based on the common and ordinary meaning of the terms used in the claims, and reject the Government's attempt to inject artificial, unclaimed and unnecessary limitations into the Sevenson patent claims.

* * *

This Memorandum is divided as follows. Part II includes an overview of Sevenson's patented technology. The history of this litigation and the underlying Buffalo litigation is set forth in Section III. A detailed review of the patents-in-suit and a review of the prosecution history for each asserted patent is found in Sections IV and V, respectively. The guiding legal principles for patent infringement cases and claim construction analysis are set forth in detail in Section VI, followed by the analysis of the disputed claim terms in Section VII.

## II. OVERVIEW OF THE TECHNOLOGY

### A. The Background of the Inventions

Contaminated soil and groundwater are serious problems. The disposal or dumping of chemicals, metals, and radioactive materials can cause highly adverse conditions in the environment, threatening human health and the ecosystem generally. Such waste disposal may result in, for example, contaminates and toxins leaking into groundwater that feeds local water

supplies. There have been many publicized cases involving contaminated water and associated human health risks. The social and economic costs associated with such problems are enormous.

As technology has advanced, environmental engineers have been better able to understand the causes of contaminated soil and water, and thus the United States Environmental Protection Agency ("EPA") has enacted strict rules and regulations regarding the manner in which materials containing potentially harmful components may be disposed. However, there exist many areas throughout the United States (landfills, foundries, incinerators, abandoned factory sites, etc.) that remain threats to the environment, due to the earlier disposal of contaminated materials in and around these areas.

The Sevenson patents are directed to methods for cleaning, or "remediating" such contaminated sites. Of particular import to the present case, the Sevenson patents claim and disclose methods that treat soil and other environmental media (referred to herein generically as "soil") that have been contaminated by the presence of toxic materials, such as lead and radionuclides. Sevenson's patented methods treat the soil such that the contaminates are rendered non-hazardous according to levels acceptable to the EPA. The treated soil may then be used for other purposes, such as road construction or landfill, or disposed of as non-hazardous waste. Moreover, the formerly contaminated site is then available for development or other use.

**B. The Sevenson Patented Technology**

There are five patents-in-suit, all of which are owned by Sevenson and ultimately stem from a single patent application filed March 16, 1990. Over the course of several years, Sevenson filed multiple applications claiming priority to that original March 16, 1990 application. Sevenson is asserting five of those patents against the Government.

As set forth above, for purposes of this case the Sevenson Patents teach a technology for treating lead and, in addition, radionuclides found in solid wastes such as soil and other

environmental media.[4] One way in which a solid waste is also considered to be a hazardous waste is if it exhibits the characteristics of either ignitability, corrosivity, reactivity, or toxicity as determined by the Toxicity Characteristic Leaching Procedure (TCLP) (U.S. EPA Method 1311). Effective November 8, 1990, the EPA established the modern-day treatment standard for lead-bearing wastes, and particularly for lead contaminated soils and solid wastes. Any solid waste that contains leachable TCLP lead levels in excess of 5 milligrams per liter (mg/l) is considered toxic and hence hazardous. Such hazardous waste must be treated to remove and/or reduce the amount of lead to a level below 5 mg/l before land disposal is permitted.

The methods claimed in the Sevenson patents are directed to methods for meeting the EPA standards regarding lead-bearing soils. Although there were techniques in existence prior to the Sevenson inventions that attempted to address the problem of hazardous lead-bearing soil, those techniques all suffered various shortcomings. For example, one technique involved washing the contaminated soil with water or other solutions. This technique was undesirable because it resulted in vast quantities of toxic waste water that itself required treatment and disposal. Another technique involved encapsulating the contaminated soil in a cement-like material, which is then removed. This technique, however, greatly increased the volume and weight of the treated soil, which increased the expense of both removing the material from the site and the proper disposal of it.

Thus, prior to the Sevenson patented invention, there existed no technology that solved the problem of treating lead-contaminated soils to levels below the EPA TCLP Standard of 5

[4] The problem of soils contaminated with lead and other toxins was considered so serious that federal legislation, such as the Superfund Act (CERCLA) and the Superfund Amendments Reauthorization Act (SARA) require the remediation of sites containing lead-toxic soils and solid wastes.

mg/l while generating no waste-water or other by-products, and further did not increase the volume of the treated material.

The Sevenson inventions were the solution the industry needed. The patented technology is based on bonding reactions involving lead and radionuclides with sulphates and phosphates. By contacting the contaminated soil with the sulphate and phosphate treatment material, the amount of lead is reduced to below 5 mg/l pursuant to the TCLP test approved by the EPA, allowing for disposal of the lead containing material as a non-hazardous waste. Moreover, the Sevenson inventions accomplish this without generating any potentially hazardous by-products, and the inventive methods further maintain or reduce the volume of the treated soil, which allows for easier removal and ultimate disposal.

The Sevenson Patents teach that the combination of sulfates and phosphates will render lead containing wastes non-hazardous in all situations. The source of sulphates and phosphates and the amount of sulphates and phosphates depends on a variety of factors including the nature of the material treated, leachable lead content, total lead among other factors. For example, certain waste materials may be treated successfully with a one step mixture or additive such as phosphoric acid. Phosphoric acid contains phosphates and sulphates (among other chemicals) as impurities. In other situations, phosphoric acid may be supplemented by a second step involving the use of a separate material for introducing additional sulphates into the process.

The Sevenson Patents claim a one-step or two-step process involving the mixing of the lead containing material with a mixture or additive comprising a first component supplying at least one ion of sulphate (and possibly other chemicals not relevant in this case) and a second component supplying at least one ion of phosphate. Phosphoric acid, for example, is a mixture that contains both sulphate and phosphate ions. The Sevenson Patents contain documented

examples showing that phosphoric acid may be sufficient to treat lead contaminated materials successfully under the TCLP test.

## III. BACKGROUND OF THE LITIGATION

Sevenson commenced this action asserting patent infringement based on the Government's use, by and through its contractor Shaw, of phosphoric acid to treat lead (and radionuclide) containing materials at the Colonie FUSRAP site near Albany, New York. The Colonie site is owned by the United States Government and has been designated for remediation for site contamination under the Government's FUSRAP program. The FUSRAP program was previously administered by the Department of Energy, but the management and supervisory responsibilities for the program were assumed by the United States Army Corps of Engineers ("ACOE").

The ACOE solicited proposals from contractors to treat various sites, including the Colonie site, containing soil and other materials contaminated by various toxic and hazardous materials including lead. The contaminated soil resulted from activities conducted at the Colonie site from 1930 until the 1980s. The contract to perform the remediation work at the Colonie site was awarded by the ACOE to ICF Kaiser Engineers, Inc. ("ICF Kaiser"). ICF Kaiser hired Kiber Environmental Services, Inc. ("Kiber") to conduct a treatability study for treating the lead contaminated materials at the Colonie site. In March 1999, Kiber produced a final report containing the results of its treatability study. In its report, Kiber recommended the use of phosphoric acid after evaluating a number of potential treatment alternatives.

In or about April 1999, the Colonie site remediation contract was acquired by the IT Group, Inc. from ICF Kaiser. IT Corporation ("IT") then acquired the contract from the IT Group, Inc. and performed remediation work at the site with the authorization and consent of the ACOE. In or about June 1999, IT decided to implement Kiber's recommendation to use

phosphoric acid to treat lead containing materials at the Colonie site. The record shows that IT was under a tight deadline with the ACOE and proceeded aggressively in order to start treating the materials by September or October. In August 1999, Sevenson learned of these plans and advised IT that the use of phosphoric acid would infringe the Sevenson Patents. IT then performed a treatability study of its own to identify feasible alternatives and, in addition, negotiated with Sevenson to obtain a license to use Sevenson's patented technology. In September 1999, IT abruptly terminated negotiations and advised the ACOE that it planned to use phosphoric acid to treat lead containing materials at the Colonie site. In October 1999, IT began treating this material with phosphoric acid. Sevenson thus filed suit against IT in May 2000 for patent infringement in the United States District Court for the Western District of New York (Buffalo Division).

In 2002 IT filed for bankruptcy. Shaw obtained IT's assets from bankruptcy and continued with the infringing methods at Colonie. In July 2002, Sevenson filed suit, again in Buffalo, against Shaw. Shaw thereafter moved for summary judgment pursuant to 28 U.S.C. § 1498, asserting that its actions were done with the authorization or consent of the Government. To protect its rights, in October 2005 Sevenson filed the instant action against the Government. In March 2006, the Buffalo Court granted Shaw's motion for summary judgment and entered final judgment for Shaw. That decision is currently on appeal to the Court of Appeals for the Federal Circuit.

Issues of claim construction in this case should be uncomplicated. The claims in the Sevenson Patents use words that are ordinary and customary. They reflect the fundamental technology using sulfates and phosphates developed by the inventors to treat heavy metals such as lead.

## IV. THE SEVENSON PATENTS-IN-SUIT

Sevenson is asserting five patents, all of which are related, against the Government. The asserted patents are U.S. Patent No. 5,527,982 ("the '982 patent"), U.S. Patent No. 5,732,367 ("the '367 patent"), U.S. Patent No. 5,916,123 ("the '123 patent"), U.S. Patent No. 5,994,608 ("the '608 patent"), and U.S. Patent No. 6,139,485 ("the '485 patent"). These patents are attached hereto as Exhibits 1-5.

### A. The '982 Patent

The '982 patent issued on June 18, 1996 from application serial number 08/031,461 ("the '461 application"), which was filed on March 15, 1993. The '461 application is a continuation-in-part[5] of U.S. Patent No. 5,193,936 ("the '936 patent"), which is a continuation-in-part of the ultimate parent application, application serial number 07/494,774 ("the '774 application"), which was filed on March 16, 1990. The '982 patent contains 31 claims, of which Sevenson is asserting claims 1-5 and 9.

Claims 1-5 and 9 of the '982 patent cover a one-step mixing involving "a metal bearing material" and a "first mixture comprising a first component and a second component." The metal bearing material may include "lead." The "first component" includes "sulphates" (or other listed chemicals). The "second component" includes "phosphates." After mixing, there is a curing step "such that TCLP metal level for said leachable metal in the cured material is below 5.0 mg/l and no secondary waste streams are generated."

The '982 patent contains examples showing that phosphoric acid may be used in a one-step application to supply the sulphates and phosphates necessary to practice Sevenson's

[5] "A continuation-in-part application is just what its name implies. It partly continues subject matter disclosed in a prior application, but it adds new subject matter not disclosed in the prior application." *Univ. of W. Va. v. VanVoorhies*, 278 F.3d 1288, 1297 (Fed. Cir. 2002).

invention. Example 1 is titled "Single Step Mixing of Treatment Chemicals." Table III in Example 1 shows a series of single-step test runs involving different chemicals. Test Run XII shows that a single-step application of phosphoric acid reduced leachable lead content to 3.6 mg/l under TCLP testing. Example 4 is titled "Wide Range of Applications and Process Flexibility in Curing Time, Moisture Content and Treatment Operations." Table VI in Example 4 shows a number of single-step applications of phosphoric acid to a variety of lead-bearing materials reducing the amount of leachable lead in those materials to below 5.0 mg/l under TCLP testing. The materials include "Old Dirt", "Slag Lead Smelter", "Carbon with Lead Dross", "Wire Fluff" and "Filter Cake".

Examples 1 and 4 demonstrate that a one-step application of phosphoric acid may supply a sufficient amount of sulphates and phosphates to render leachable lead non-hazardous under TCLP testing of a variety of lead-bearing materials. In addition, the specification of the '982 patent describes re-treatment of material to lower leachable lead content below 5.0 mg/l. Example 3 specifically shows that certain treated material that did not pass the TCLP regulatory criteria of 5.0 mg/l "was retreated . . . using sufficient amounts of phosphoric acid . . . to lower the TCLP lead to 2.4 mg/l and 2.5 mg/l, respectively." This second step mixing of phosphoric acid would have supplied additional phosphates and/or sulphates that were necessary to satisfy the regulatory criteria for lead and heavy metals.

The '774 patent application describes the fundamental invention of using sulphate ions and phosphate ions to treat the contaminated soil. In the preferred embodiment set forth in the '774 application, two separate mixing steps take place. One of the mixing steps supplied at least one sulphate ion and the other supplied at least one phosphate ion. The source of the sulphate could be liquid or dry, already mixed with the waste material and/or separately introduced by

using gypsum or another sulphate source. The '774 patent application claimed that the sulphate/phosphate treatment method rendered leachable lead non-hazardous under the now-obsolete EP Tox testing.

During the prosecution of the '774 patent application, the EPA switched from EP Tox to the current TCLP Standard. In April 1991, the '774 patent application was abandoned. In July 1991, the patent application leading to the '936 patent was filed as a continuation-in-part to the '774 patent application. The claims of the '936 patent were directed to a two-step mixing method supplying sulphates and phosphates respectively passed regulatory criteria based on TCLP.

Following the allowance of the '936 patent, the Sevenson inventors filed the application leading to the '982 patent. While the '982 patent adds more testing examples, the fundamental invention – the treatment of contaminated media with an application of sulphate and phosphate ions – is the same. Recognizing that the earlier '936 patent claims were limited to a two-step process, the inventors sought to expand the scope of their claim coverage in the '982 application. The '982 patent is thus the first patent claiming that a one-step mixing process involving a first mixture, such as phosphoric acid, may supply the sulphates and phosphates necessary to render leachable lead in the waste material below 5 mg/l under TCLP testing.[6]

In summary, Examples 1, 3 and 4 and Tables III, V and VI in the '982 patent demonstrate that phosphoric acid may be used in a one-step application to satisfy the regulatory criteria using

---

[6] As the Federal Circuit recognized in *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004), multiple patents stemming from a single application often result in later patents having broader claim scope. "This progression [in claim language] . . . shows that [the patentee] sought in the [later patent] claim scope broader than [the earlier patent's claim language]. Absent a clear disavowal or contrary definition in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language."

TCLP testing. They also show that if the one-step application fails to pass the criteria, then a second-step application may be sufficient.

**B. The '367 Patent**

The '367 patent issued on March 25, 1998 from application serial number 663,692, which was filed on June 14, 1996. The '692 application is a continuation-in-part of the '461 application, which issued as the '982 patent and was filed on March 15, 1993. The '367 patent contains 16 claims, of which Sevenson is currently asserting 11, 13, 14, and 16 against the Government.

The abstract to the '367 patent provides that "[i]n the preferred embodiment, soils or contaminated materials containing radionuclides and radioactive wastes are contacted with technical grade phosphoric acid (TGPA) which contains sulfates as an impurity." This passage is fully consistent with Sevenson's claim construction and fully supports the ordinary and customary meaning of the words used in the claims to the person of ordinary skill in the art.

Examples 7-15 and Tables XI-XXIII are added for the first time to the '367 patent. These Examples and Tables illustrate the effectiveness of using technical grade phosphoric acid to reduce the concentration of leachable radionuclides and radioactive waste materials.

In the '367 patent, the application of technical grade phosphoric acid is the "preferred embodiment" of the present invention. It supplies the necessary sulphate and phosphate ions to reduce concentrations of leachable radionuclides.

**C. The '123 Patent**

The '123 patent issued on June 29, 1999 from application serial number 08/942,803, which was filed on October 2, 1997. The '803 application is a continuation of the '692 application, which issued as the '367 patent on June 14, 1996. The '123 patent contains 28 claims, of which Sevenson is asserting claims 1-7 and 15-20.

The ‘123 patent claims a mixing process involving a treatment additive supplying sulphates and phosphates to reduce the leachability of lead and other heavy metals. The ‘123 patent does not address radionuclides. Whereas the ‘982 patent involved the treatment of lead in metal-bearing material and metal-bearing soil, the ‘123 patent involves the treatment of metal-bearing material and metal-bearing soil as well as other environmental media including “sludge,” “a waste matrix” and “wire waste.”

Claims 1-7 of the ‘123 patent cover a mixing process involving a “metal-bearing material” with a “treatment additive” comprising a first and second components. Claims 15-20 cover a process involving “a waste matrix” with a treatment additive.

The ‘123 patent specification is largely the same as the ‘982 patent. This demonstrates that both patents embody the same technology using a treatment additive comprising a first component of sulphates and a second component of phosphates to render materials containing leachable lead non-hazardous for purposes of waste disposal.

**D. The ‘608 Patent**

The ‘608 patent issued on November 20, 1999 from application serial number 08/953,5968, which was filed on October 17, 1997. The ‘608 patent is a continuation of the ‘692 application, which was filed on June 14, 1996 and issued as the ‘367 patent. The ‘692 application contains 40 claims, of which Sevenson is asserting claims 1-7, 11-24, and 26-30.

The ‘608 patent claims a one-step and two-step mixing process involving a reagent or treatment additive comprising sulphates (or other listed chemicals) and phosphates to reduce concentrations of leachable radioactive substances contained in solid and liquid waste materials. Claims 1-7, 11-13 and 15-17 of the ‘608 patent cover a two-step process involving a “material” contacting with a “reagent” supplying sulphates (or other listed chemicals) and contacting “said first mixture with a phosphate compound to produce a second mixture.”

The fundamental difference between the two-step process in the ‘608 patent and the two-step process in the ‘982 patent relates to the constituent in the material treated. In the ‘608 patent, the process reduces concentrations of leachable radioactive substances. In the ‘982 patent, the process reduces leachable lead below 5.0 mg/l.

Claims 19-24 and 26-30 of the ‘608 patent cover a one-step process involving contacting a material with a treatment additive comprising a first component supplying sulphates (or other listed chemicals) and a second component supplying phosphates. The fundamental difference between the one-step process in the ‘608 patent and the one-step process in the ‘982 patent is the reduction in concentrations of leachable radioactive substances resulting from the process described in the ‘608 patent.

The specification of the ‘608 patent contains fifteen examples and twenty-three tables illustrating the effectiveness of Sevenson’s treatment technology using sulphates and phosphates to reduce concentrations of leachable radioactive substances in a wide variety of materials.

**E. The ‘485 Patent**

The ‘485 patent issued on October 31, 2000 from application serial number 09/340,903, which was filed on June 18, 1999. The ’903 application is a continuation of the ‘803 application, which was filed on October 2, 1997 and issued as the ‘123 patent. The ‘485 patent contains 36 claims, of which Sevenson is asserting claims 1-6 and 15-36 against the Government.

The ‘485 patent claims a one-step mixing process using a treatment additive comprising a first component and a second component to treat lead-bearing materials. This patent expands the list of chemicals that may be used as a first component to include chlorides, fluorides and halides in addition to sulphates and other chemicals.

Claims 1-6 and 15-21 of the '485 patent cover a one-step mixing process involving a treatment additive contacting "lead-bearing material" (Claims 1-6), or "a waste matrix of lead-bearing material" (Claims 15-21).

The fundamental difference between the claims in the '485 patent and those in the '123 patent are the inclusion of fluorides, chlorides and halides as chemicals that may be included within the first component of the treatment additive in the '485 patent. Claims 1-6 and 15-21 of the '485 patent continued to include sulphates as a possible chemical in the first component. Claims 22-36 simply incorporate a one-step process involving sulphates and phosphates.

## V. PROSECUTION HISTORY OF THE PATENTS-IN-SUIT

All of the asserted patents are related to each other.[7] As will be demonstrated below, the prosecution histories do not provide any rationale for deviating from the skilled artisan's understanding of the ordinary meaning of the claim terms in light of the specifications.

### A. Prosecution History of the Non-Asserted '936 Patent

As set forth above, the '936 patent is a continuation-in-part of the '774 application. During prosecution of the '936 patent, the PTO rejected the pending claims over an alleged prior art reference. The applicants then conducted an examiner interview in which amendments were proposed to claims to overcome the rejections. Thereafter, the applicants filed a response to the PTO's rejections in which they amended some of the claims in a manner not relevant to the claim construction issues addressed herein. In explaining the amendments, the applicants informed the PTO that "the [alleged prior art] patent does not relate to the treatment of solid waste but rather to a liquid treatment. The above changes to the claims of the present invention

[7] The prosecution histories are voluminous. Sevenson will make the histories available to the Court, either in paper format or on a CD-ROM, at the Court's request.

were discussed and it was noted that these claims more particularly recite a treatment of solid waste materials." The claims were then allowed.[8]

### B. Prosecution History of the '982 Patent

The prosecution history of the '982 patent does not justify limiting the asserted claims in any material respect. The '461 application was filed on March 15, 1993 as a continuation-in-part of the application leading to the '936 patent. The PTO initially rejected the claims over alleged prior art (the Stanforth reference), as well as in light of the claims issued in the '936 patent under the "judicially created doctrine of obviousness-type double patenting." The applicants overcame the double patenting rejection by filing a terminal disclaimer, which means that the claims of the '982 patent expire at the time those in the '936 patent expire. To overcome the Stanforth prior art rejection, the applicants amended the claims to remove "hydroxides" as a possible first component – again an issue not relevant to the claim construction disputes in this litigation.

Subsequently, the PTO issued another rejection of the claims over another prior art reference, the O'Hara reference. In response, the applicants amended the specification and some of the dependent claims as well as added new claims. The applicants amended the claims to overcome the O'Hara reference and explained that:

> The present invention discloses a method of treating various metal bearing materials with a first component and a second component to stabilize the leachable metals. The first component supplies a member from a group that includes hydroxides as taught by O'Hara. To avoid the rejection based on O'Hara the claims have been amended to delete references to hydroxides, lime and portland cement. The remaining group that makes up the first component no longer includes a member that is taught by O'Hara. O'Hara does not teach a first component that comprises either sulphates, halites or silicates.

---

[8] The '936 patent was subsequently re-examined by the PTO. Rather than participate in the reexamination proceedings, Sevenson elected to pursue the same claim scope in a subsequent pending application.

Exh. 7, Amdt. of Nov. 7, 1994, at 31. The applicants then stressed their "discovery that calcium sulfate can be used to immobilize metals[, which] is neither taught nor suggested by O'Hara." *Id.* at 33. Again, none of the applicants' statements is particularly relevant to the parties' present claim construction disputes. The claims were then allowed.

**C. Prosecution History of the '367 Patent**

As set forth above, the '367 patent is a continuation-in-part of the '982 patent. From the '982 patent to the '367 patent, the applicants amended the specification and submitted twenty new claims. The applicants added the "specification to add new materials relating to the treatment of radionuclides and radioactive substances." Exh. 8, Preliminary Amdt. at 69. The newly added material is supported by the originally issued patent in the family, the '936 patent, as set forth in the applicants' preliminary amendment.

The PTO rejected seventeen of the original claims of the application leading to the '367 patent in light of the Pal patent. The PTO allowed three claims, but the applicants canceled those claims in response to a restriction requirement.[9] In response to the prior art rejections, the applicants amended the claims and added that the host material or contaminated liquid are contacted "with a single reactant comprising a source of a sulfate ion and a phosphate ion." Exh. 8, Amdt. of Mar. 25, 1997, at 2. The PTO then allowed the amended claims. Thus, the prosecution history does not provide any rationale for deviating from the ordinary meaning of the claim terms read in light of the specification.

---

[9] A restriction requirement is a statutory based rejection of the claims on non-prior art grounds. The PTO issues a restriction requirement when a single application contains more than one independent and distinct invention. *Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1567 (Fed. Cir. 1996). Specifically, 35 U.S.C. § 121 provides the basis for rejection, stating that "[i]f two or more independent and distinct inventions are claimed in one application, the Commissioner may require the application to be restricted to one of the inventions." *Id.* (citing 35 U.S.C. § 121).

**D. Prosecution History of the '123 Patent**

The applicants filed the '803 application, which issued as the '123 patent, on October 2, 1997. The '803 application is a continuation of the '367 patent and was filed to prosecute those claims that were previously allowed during prosecution of the '367 patent but were canceled in response to the restriction requirement along with additional claims. The PTO rejected these claims under the "judicially created doctrine of obviousness-type double patenting," but made no prior art objections. The applicants filed a terminal disclaimer to overcome the double patenting rejection and the claims were allowed. Thus, nothing in the '123 patent prosecution history provides any rationale for deviating from the ordinary meaning of the claim terms read in light of the specification.

**E. Prosecution History of the '608 Patent**

The '608 patent was filed as the '568 application on October 17, 1997 and is a continuation of the '367 patent. The 568 application contained forty claims. The PTO rejected several of the claims for formal reasons, which the applicants later fixed in an amendment. The PTO also rejected the claims under the "judicially created doctrine of obviousness-type double patenting." The applicants filed a terminal disclaimer to overcome the double patenting rejection.

The PTO also rejected two of the claims over the Wagh reference and several other claims over the Gaffney reference. To overcome the Wagh reference, the applicants filed a declaration establishing that they had invented the claimed subject matter prior to the Wagh reference. As for the Gaffney reference, the applicants distinguished their claimed inventions on the grounds that Gaffney required use of a Group IIIB metal source to reduce the leach rate of uranium whereas the claimed inventions did not use a Group IIIB metal. Exh. 10, Amdt. of Feb. 26, 1999, at 4-6. The applicants also argued that the end product of the Gaffney process was a

non-crystalline structure, whereas the claimed inventions result in a crystalline structure. *Id.* at 6-7. The claims were subsequently allowed. The applicants arguments vis-à-vis Gaffney are not germane to the claim construction issues at hand and do not provide any rationale for deviating from the ordinary meaning of the claim terms read in light of the specification.

### F. Prosecution History of The '485 Patent

The '485 patent was filed as the '903 application on June 28, 1999 and is a continuation of the '123 patent. By Preliminary Amendment, the applicants initially sought prosecution on 21 claims. The PTO rejected all of the claims under the "judicially created doctrine of obviousness-type double patenting." The applicants subsequently filed a terminal disclaimer to obviate this rejection.

The PTO also rejected some of the claims over the Stanforth reference. In response, the applicants amended some of the claims, specifically to delete "hydroxides" and "calcium oxide" as a claimed member of the group that potentially could be the first component. The applicants correctly asserted that "Stanforth does not teach the use of a phosphate and a sulfate for the treatment of lead contaminated soils and waste materials." Exh. 11, Amdt. of Mar. 21, 2000, at 6-13. The PTO then allowed the claims. The applicants arguments with respect to the Stanforth reference are not germane to the claim construction issues at hand and do not provide any rationale for deviating from the ordinary meaning of the claim terms read in light of the specification.

## VI. THE GUIDING LEGAL PRINCIPLES

### A. Patent Principles

A U.S. patent provides the owner with the right, for a limited time, to exclude others from making, using, offering for sale, or selling the invention throughout the U.S., or importing into the U.S. the invention, during the term of the patent. 35 U.S.C. § 154(a)(1). Accordingly, a

person may infringe a patent if he or she "without authority makes, uses, offers to sell or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor. . . ." 35 U.S.C. § 271(a).

The "patented invention" referred to in Title 35 of the United States Code is defined by the "claims" that appear at the end of each U.S. patent. The typical U.S. patent contains three main parts: (1) the "written description," which describes the invention in all its detail; (2) the "drawings" or "figures," which provide an illustration of the invention; and (3) the claims. These three components of the patent together make up the patent "specification." *See generally* 35 U.S.C. §§ 112, 113.

The claims of the patent "provide the concise formal definition of the invention. They are the numbered paragraphs 'which particularly [point] out and distinctly claim the subject matter which the applicant regards as his invention.' 35 U.S.C. § 112. It is to these wordings that one must look to determine whether there has been infringement." *Autogiro Co. of Am. v. United States*, 384 F.2d 391, 395-96 (Ct. Cl. 1967). Accordingly, it has often been said that the claims are like the deed to a piece of property in that the claims provide the "metes and bounds" of the invention protected by the patent. *In re Vamco Mach. & Tool, Inc.*, 752 F.2d 1564, 1577 n.5 (Fed. Cir. 1985). Much like a person who invades the property without the owner's permission trespasses on the property owner's rights, a person or entity who uses a claimed invention without the patent owner's permission "infringes" the patent in question. This is discussed next.

**B. Patent Infringement**

The core dispute in a patent infringement case is whether the accused infringer is making, using or selling "the patented invention." Infringement is a question of fact, determined by comparing the claims to the product or method accused of infringement. Typically, the patentee

will identify a product or method that the accused infringer is making/using/selling in the U.S. and will assert that the identified product "infringes" one or more claims of his/her patent. The accused party will aver that the making and selling of the identified product are not acts of infringement because the product does not fall within the scope of the patent claims.

Patent infringement is determined by reference to the "claims" appearing at the end of each patent. This dispute requires a determination of whether the claims of the patent in suit "read on" or "cover" the accused product. The Federal Circuit describes this as a two-step process: "[f]irst, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process." *Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766, 769 (Fed. Cir. 1996).

Claim construction is for the Court alone to determine. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-91 (1996). Claim construction is thus a question of law. *Id.*, at 388-91. The second step, wherein the properly construed claims are compared to the accused device, is a question of fact. *Wang Labs., Inc. v. American Online, Inc.*, 197 F.3d 1377, 1380-81 (Fed. Cir. 1999). The parties' focus at the present stage of the instant dispute is on the first step, claim construction. Accordingly, the Federal Circuit's claim construction principles are addressed below.

**C. Claim Construction**

The Federal Circuit has "frequently stated that the words of a claim are generally given their ordinary and customary meaning," which is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*) (*cert. denied)* 156 S. Ct. 1332 (2006) (citations omitted); *see also Altiris, Inc. v.*

*Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003)(there is a "heavy presumption" that claim terms carry their ordinary and customary meaning).

> The inquiry into the meaning that claim terms would have to a person of skill in the art at the time of the invention is an objective one. [A] court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean. Those sources include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).

No sources are barred from consideration and there is no required sequence to analyzing sources so long as those sources do not contradict claim meaning that is unambiguous in light of the intrinsic evidence. *Phillips*, 415 F.3d at 1324 (citing *Vitronics Corp. v. Conceptronic Inc.*, 90 F.3d 1076, 1583-84 (Fed. Cir. 1996)); *see also Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003).

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words. In such circumstances, general purpose dictionaries may be helpful." *Phillips*, 415 F.3d at 1314. The court is free to consult dictionaries at any time to help determine the meaning of the claim terms "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1332 n.1 (Fed. Cir. 2001) (citation omitted); *see also Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1459 (Fed. Cir. 1998). In those cases where the meaning of a claim term as understood by persons of skill in the art is not readily

apparent, or where patentees have used terms idiosyncratically, the court looks to the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art. *Phillips*, 415 F.3d at 1314.

**1. Intrinsic Evidence**

In interpreting an asserted claim from the perspective of a person of ordinary skill in the art at the time of invention, a court should look to the intrinsic evidence of record – specifically, the patent itself – which includes the claims, the specification and the prosecution history. *Vitronics*, 90 F.3d at 1582; *see also Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1309 (Fed. Cir. 1999); *Markman*, 52 F.3d at 979.

**a. Claims**

To begin with, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Moreover, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Id.*; *see also Vitronics*, 90 F.3d at 1582. "Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Phillips*, 415 F.3d at 1314. A term used in multiple claims must be interpreted consistently in all of those claims. *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995); *see also CVI/Beta Ventures, Inc. v. Tura L.P.*, 112 F.3d 1146, 1159 (Fed. Cir. 1997) ("the meaning of a term in a claim must be defined in a manner that is consistent with its appearance in other claims in the same patent") (citing *Fonar Corp. v. Johnson & Johnson*, 821 F.2d 627, 632 (Fed. Cir. 1987)). Moreover, "[b]ecause [the] patents[in-suit] all derive from the same parent application and share many common terms, [the court should] interpret the claims consistently across all asserted patents."

*NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005). "Differences among claims can also be a useful guide in understanding the meaning of particular claim terms." For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips,* 415 F.3d at 1314-15.

**b. Specification**

Next, the "[c]laims must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979. The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. This does not mean, however, that limitations from the specification should be added to the claims. *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985). The specification may be consulted in order to determine the scope and meaning of the language employed in the claims, *see Markman*, 52 F.3d at 982, ***without reading extraneous material from the specification into the claims***. *E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988). The Federal Circuit has "repeatedly warned against confining the claims to those embodiments" described in the specification. *Phillips*, 415 F.3d at 1323. In particular, it has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Id.*

**c. Prosecution History**

In addition, the court should also consider the patent's prosecution history. *Id.* at 1317. The prosecution file history "contains the complete record of all the proceedings before the [PTO], including any express representations made by the applicant regarding the scope of the claims." *Vitronics*, 90 F.3d at 1582. Statements made by the applicant during a patent's

prosecution history, including those made in its parent applications, are relevant to proper claim interpretation from the perspective of a person of ordinary skill in the relevant art. *Jonsson v. Stanley Works*, 903 F.2d 812, 818 (Fed. Cir. 1990). "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317.

### 2. Permissible Deviation from the Ordinary Meaning of Claim Terms

There are only three very limited circumstances in which claims may be given a special definition that differs from the ordinary meaning of the claim language as understood by one of ordinary skill in the art in view of the intrinsic evidence:

#### a. Explicit Definition for the Claim Term

"[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). However, there is a "heavy presumption in favor of the ordinary meaning of claim language as understood by one of ordinary skill in the art" which can only be overcome "where the patentee has chosen to be his or her own lexicographer by ***clearly setting forth an explicit definition for a claim term***." *Prima Tek II, LLC v. Polypap*, 318 F.3d 1143, 1148 (Fed. Cir. 2003)(emphasis added); *see also Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1370 (Fed. Cir. 2002) ("This strong presumption in favor of the ordinary meaning of claim language as understood by one of ordinary skill in the art may be overcome where . . . the patentee has chosen to become his or her own lexicographer by ***clearly and explicitly defining the claim term.***"); *LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364, 1374 (Fed. Cir. 2006)("[I]n determining whether a statement by a patentee was intended to

be lexicographic, it is important to determine whether the statement was designed to define the claim term or to describe a preferred embodiment.”).

**b. Expressions of Manifest Exclusion in the Specification Representing a Clear Disavowal of Claim Scope**

“[T]he specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor.” *Phillips*, 415 F.3d at 1316 (citing *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001)). “However, this intention must be ***clear*** . . . . and cannot draw limitations from a preferred embodiment.” *Conoco, Inc. v. Energy & Envtl. Int’l, L.C.*, 460 F.3d 1349 (Fed. Cir. 2006)(emphasis added), *citing Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (“The patentee may demonstrate an intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of ***manifest exclusion or restriction***, representing a ***clear disavowal*** of claim scope.”) (emphasis added), and citing *Phillips*, 415 F.3d at 1323 (“[W]e have expressly ***rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.***”) (emphasis added).

**c. Clear and Unmistakable Disavowal in the Prosecution History**

“Under the doctrine of prosecution disclaimer, a patentee may limit the meaning of a claim term by making a ***clear and unmistakable*** disavowal of scope during prosecution.” *Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006). “Furthermore, ‘where the patentee has ***unequivocally*** disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender.’” *Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1368 (Fed. Cir. 2004) (*quoting Omega Eng’g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003)) (emphasis added).

### 3. Extrinsic Evidence

If the intrinsic evidence does not clarify the meaning of a disputed claim term, extrinsic evidence may be consulted to ensure that the claim construction being considered by the Court "is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Pitney Bowes*, 182 F.3d at 1309. While extrinsic evidence can shed useful light on the relevant art, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (internal quotations omitted).

Where intrinsic evidence resolves an ambiguity in a disputed claim term, it is improper to rely on extrinsic evidence. *Vitronics*, 90 F.3d at 1583. The Federal Circuit has recognized, however, that there will be instances in which intrinsic evidence is insufficient to enable the court to determine the meaning of the asserted claims. In those instances extrinsic evidence may also properly be relied on to understand the underlying technology and to construe the claims from the perspective of a person of ordinary skill in the relevant art. *Id.* at 1584; *Markman*, 52 F.3d at 980. "[E]xtrinsic evidence may be used only to assist in the proper understanding of the disputed limitation; it may not be used to vary, contradict, expand or limit the claim language from how it is defined, even implicitly, in the specification or file history." *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1373 (Fed. Cir. 2001) (citing *Vitronics*, 90 F.3d at 1584-85).

Extrinsic evidence is that evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles. *Vitronics*, 90 F.3d at 1584 (citing *Markman*, 52 F.3d at 980). The Federal Circuit has a hierarchy in considering extrinsic evidence. Objective evidence, such as dictionaries, other patents and treatises, are preferred. *Vitronics*, 90 F.3d at 1585 ("prior art documents and dictionaries . . . are

more objective and reliable guides. Unlike expert testimony, these sources are accessible to the public in advance of litigation. They are to be preferred over opinion testimony, whether by an attorney or artisan in the field of technology to which the patent is directed"). "Because dictionaries, and especially technical dictionaries, endeavor to collect the accepted meanings of terms used in various fields of science and technology, those resources [are] properly recognized as [useful in assisting the court to determine] the meaning of [a claim according] to those of skill in the art of the invention." *Phillips*, 415 F.3d at 1318. Expert testimony, therefore, may be used to explain the background of the invention, but may never be used to vary or contradict the claim language. *Vitronics*, 90 F.3d at 1584-85.

## VII. ANALYSIS OF THE DISPUTED TERMS

At this point, there appear to be multiple categories of disputes regarding the meaning of the claim terms. The first category relates to a number of disputed claim terms[10] in which the Government is essentially attempting to redraft the claim language to require certain components and the like to be in the form of "*two separate and distinct compounds*." The claim language itself, however, does not contain any such restrictions and the specification does not require any such restriction. Also, as demonstrated above, the prosecution history does not justify limiting the claims to require "two separate and distinct compounds" to supply a phosphate and a sulphate. Thus, Sevenson's constructions should be adopted.[11]

---

[10] Specifically, the Government proposes to interject an extraneous "separate and distinct compound" limitation into the following disputed elements of the asserted claims: "*first component*"; "*phosphate compound*"; "*phosphate supplying reagent*"; "*reagent*"; "*second component*"; and "*sulfate reagent.*"

[11] Sevenson's proposed constructions for each disputed term are set forth in the parties' "Modified Joint Claim Construction Statement," filed October 18, 2006.

The second category relates to a number of disputed claim terms in which the Government injects an extraneous "*compound*" limitation into certain elements of the asserted claims. The term "*compound*," has specific scientific meaning to one ordinary skill in the art. The Government's use of the term "*compound*" unduly varies the ordinary meaning of certain acids,[12] ions,[13] and the like contrary to the intrinsic evidence and the ordinary meaning to those skilled in the art of the invention. Thus, Sevenson's constructions should be adopted.

The third category relates to a number of claim terms[14] in which the Government is essentially attempting to redraft the claim language to require certain terms to incorporate limitations from a preferred embodiment into the claim language, in violation of long-standing Federal Circuit precedent as confirmed by the Federal Circuit in *Phillips*, 415 F.3d 1303. Because of that, Sevenson's proposed constructions should be adopted.

The fourth category relates to a number of claim terms[15] in which the ordinary meaning is readily apparent, but which the Government has unduly limited by construing them in the

---

[12] Specifically, the Government proposed to interject an extraneous "compound" limitation into the following disputed elements of the asserted claims: "*phosphoric acid*" and "*sulfuric acid*."

[13] Specifically, the Government proposes to inject an extraneous "compound" limitation into the following disputed elements of the asserted claims: "*at least one phosphate anion*"; "*one or more reactive sulfate ion(s)*"; "*one or more reactive phosphate ions*"; "*source of a phosphate ion*"; and "*source of a sulfate ion*".

[14] Specifically, the Government proposes to incorporate limitations from a preferred embodiment of the specification into the following disputed claim terms: (i) a term in which the Government interposes a weight limitation in "*technical grade phosphoric acid*"; (ii) terms in which the Government interpose a "*TCLP test criteria*" limitation, including: "*concentration of leachable radioactive substances*"; "*concentration of leachable radionuclides and radioactive compounds*"; "*immobilize(ing)*"; "*leachable lead*"; "*leachable lead level*"; "*leachable metal level(s)*"; "*non-leachable solid materials*"; "*stabilize*"; "*supply(ies)*"; and (iii) terms in which the Government interposes a "*containing leachable radionuclides and radioactive compounds*" limitation, including: "*contaminated*"; "*host material*" and "*material*".

[15] Specifically, the Government improperly construes the following claim terms in the manner in which they are specifically used in the claims: "*combination*"; "*contaminated*"; "*contaminated*

(continued…)

specific manner in which they are used in the claims without justification from the intrinsic evidence. Because of that, Sevenson's proposed constructions representing ordinary meaning should be adopted.

The fifth category relates to a number of disputed claim terms in which the parties dispute the ordinary meaning. In one group of claim terms[16] the Government improperly incorporates the term "substance," which has an ordinary meaning understood by those skilled in the chemical arts. In another group of claim terms the Government unduly narrows its constructions to a "compound with the chemical formula" [17] or "compound containing"[18] or "compound having a molecular structure containing"[19] or "compound"[20] without taking into consideration the available variation in purity of chemicals and reagents. In yet another group of

---

*soils or solid waste materials*"; "*first mixture*"; "*lead-bearing material*"; "*material*"; "*metal-bearing material(s)*"; "*mixture*"; "*second mixture*"; "*single reactant*"; "*treatment additive*"; and "*waste matrix*".

[16] The ordinary meaning of the following claim terms are in dispute with respect to the meaning of "substance" used by the Government in its constructions of: "*dispersion agent*"; "*fine-grained solids*"; "halites"; "*leachable metal*"; "sulphate(s)"; "*waste matrix*"; "*waste matrix of lead-bearing material*" and "*waste material of metal-bearing material and soil*."

[17] The ordinary meaning of the following claim terms are in dispute with respect to the "with the chemical formula" limitation used by the Government in its constructions of: "*dibasic calcium phosphate*"; "*monobasic calcium phosphate*"; "*phosphoric acid*"; "*sulfuric acid*" and "*trisodium phosphate*."

[18] The ordinary meaning of the following claim terms are in dispute with respect to the "compound containing" limitation used by the Government in its constructions of: "*ammonium phosphate(s)*"; "*calcium sulfate*"; "*chloride(s)*"; "*fluoride(s)*"; "*halides*"; "*halites*"; "*potassium phosphate(s)*"; "*pyrophosphate(s)*"; "*sulfate of ion(s)*"; "*sulphate(s)*"; "*sulphates of aluminum*"; and "*sulphates of iron.*"

[19] The ordinary meaning of the following claim terms are in dispute with respect to the "having a molecular structure containing" limitation used by the Government in its constructions of "*silicates.*"

[20] The ordinary meaning of the following claim terms are in dispute with respect to the "compound" limitation used by the Government in its constructions of "*water-soluble phosphate*."

claim terms[21] the parties dispute the proper meaning of "aqueous." Lastly, the parties dispute the ordinary meaning of miscellaneous claim "*solution form*."

The sixth category relates to a number of disputed claim terms[22] in which the Government's proposed construction is contingent upon the adoption of one or more other disputed Government constructions incorporated therein. Accordingly, the court should not adopt the proposed construction for these claim terms where it does not adopt the Government's proposed construction for other disputed claim terms incorporated within.

### A. The "Separate and Distinct Compound" Claim Terms

Numerous asserted claims recite an element in which the Government attempts to read in a limitation requiring that there be a "separate and distinct compound." For example, claim 1 of the '982 patent requires that the claimed "first component supplies at least one member selected from the group consisting of sulphates, halites, and silicates, and wherein said second component supplies at least one phosphate anion." '982 Patent at cl. 1. The Government proposes the following representative claim construction for the term "first component" in the '982 patent:

> A ***separate and distinct compound*** capable of supplying a source of sulphates, halites, and/or silicates, wherein sulphates consist of a substance containing the anion $(SO_4)^{2-}$,[23] wherein halites consist of the substance sodium chloride (NaCl)[24],

[21] The ordinary meaning of the following claim terms are in dispute: "*aqueous phosphate compound*" and "*aqueous phosphate reagent*."

[22] Specifically, the Government proposes a construction contingent upon the adoption of other disputed claim constructions contained therein for the following disputed claim terms: "*contaminated*"; "*first component*"; "*mixture*"; "*reagent*"; "*second component*"; "*second mixture*"; "*single reactant*".

[23] The improper inclusion by the Government of the language of this "wherein" clause in disputed claim term "*first component*" is separately addressed in Sections VII.E.1., VII.E.2. and VII.F. below.

[24] The improper inclusion by the Government of the language of this "wherein" clause in disputed claim term "*first component*" is separately addressed in Sections VII.E.1., VII.E.2. and VII.F. below.

> and wherein silicates consist of a substance having a molecular structure containing silicon, oxygen, and one or more metals[25], but not including hydroxides, lime or portland cement.

Modified Joint Claim Construction Statement, U.S. Pat. No. 5,527,982 at 6 (First component). Other claims of the '982 patent, the '123 patent, the '608 patent and the '485 patent contain similar claim elements that the Government proposes each be construed in a similar fashion, namely, "*first component*," "*second component*," "*phosphate compound*," "*phosphate supplying reagent*," "*reagent*" and "*sulfate reagent*."[26]

The plain language of the claims does not require that there be a "separate and distinct compound" for each of these claim elements. For example, claim 20 of the '608 patent recites "…said first component supplies at least one member selected from the group consisting of sulphates, halites, silicates, alum and calcium oxide, and wherein said second component supplies phosphate anion;..." '608 Patent at cl. 20. Nothing in the claim language requires that the first and second components must each be a "separate and distinct compound." There must be a textual reference or 'hook' in the actual language of the claim with which to associate a

---

[25] The improper inclusion by the Government of the language in this "wherein" clause in disputed claim term "*first component*" is separately addressed in Section VII.E.2. and VII.F. below.

[26] Specifically, the Government interjects the extraneous limitation "separate and distinct compound" into the following disputed elements of the following asserted claims: "***first component***" in claims (i) 1 and 4 of the '982 patent, (ii) 1-3, 6, 15-17 and 20 of the '123 patent, (iii) 20, 26, 27 and 30 of the '608 patent, and (iv) 1-3, 6, 15-17, 20-23, 26 and 27 of the '485 patent; "***second component***" in claims (i) 1, 5 and 9 of the '982 patent, (ii) 1, 2, 4-6, 15, 16 and 18-20 of the '123 patent, (iii) 20, 26, 28, 29 and 30 of the '608 patent and (iv) 1, 2, 4-6, 15, 16, 18-23 and 27 of the '485 patent; "***phosphate compound***" in claims 1, 5-7 and 11 of the '608 patent; "***phosphate supplying reagent***" in claims 22, 24, 25, 28-33 and 35 of the '485 patent; "***reagent***" in claims 1 and 4 of the '608 patent; and "***sulfate reagent***" in claims 30, 31 and 34-36 of the '485 patent.

proffered claim construction requiring "separate and distinct compounds."[27] The specification does not impose such a limitation; indeed, the term "distinct" does not appear anywhere in the specifications of the '982, '123, '608 or '485 patents. The term "separate" only appears in the context of "separate beakers" in the asserted '367 and '608 patents. '367 Patent, at Exs. 10, 13 and 14; '608 Patent at Examples 10, 13 and 14. As set forth above, there is nothing in the prosecution history relating to a requirement that the first and/or second components be "separate and distinct" from one another. *NTP*, 418 F.3d at 1297. Thus, there is no basis in the intrinsic evidence for imposing the "separate and distinct compound" limitation as the Government urges.

For the basis of its construction, the government relies on Fig. 1, Fig 2a and Fig. 2b[28] that illustrate single and two step mixing protocols having two groups of treatment chemicals and language in the specification describing a first and second group of treatment chemicals. In opposition to the long-standing rule of claim construction that claims ***are not*** to be confined to embodiments of the specification (*Phillips*, 415 F.3d at 1323), the Government's construction does just that and confines the claim terms to the embodiment disclosed in Figs. 1, 2a and 2b requiring two groups of treatment chemicals. A patent's drawings were "not meant to represent 'the' invention or to limit the scope of coverage defined by the words used in the claims themselves." *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1342 (Fed. Cir. 2001). Indeed, the specification also describes, contrary to the Government's narrow construction, phosphoric acid

---

[27] In *NTP*, the court found that the accused infringer's claim construction requiring "separate and distinct" components for a "RF receiver" and a "destination processor" lacked merit because there was no textual "hook" in the claim language for a limitation of the like to be imposed. *NTP*, 418 F.3d at 1309-10.

[28] For its construction of the claim term "*first component*," the Government also relies on the prosecution history which clearly disavowals hydroxides, lime or Portland cement. However, because the infringing acts of the Government do not include the use of hydroxides, lime or Portland cement, these allegedly disclaimed elements are not considered relevant to this suit.

used as the sole treatment chemical and sole source of the first and second components, thereby capable of supplying both a source of sulphates, halites, and/or silicates and a source of at least one phosphate anion. ‘608 Patent at Col. 16, lines 54-56, Table V and Table VI. Accordingly, the limitation of "separate and distinct compounds" is not supported by the specification as the Government urges.

Moreover, Sevenson's construction of these disputed claim terms[29] are supported by the plain language of the claims and the ordinary meaning to one skilled in the technical art. For example, in the ‘982 patent Sevenson proposes the following constructions for the terms "*first component*" [30] and "*second component*": [31]

---

[29] These claim terms refer to "*first component*"; "*second component*"; "*phosphate compound*"; "*phosphate supplying reagent*"; "*reagent*" and "*sulfate reagent*."

[30] Altogether, Sevenson proposes five different definitions for the disputed claim term "*first component*," consistent in each case with the plain language of the asserted claims. In claims 1-3, 6, 15-17 and 20 of the ‘123 patent, Sevenson's proposed construction is the same as that proposed for claim 1 of the ‘982 patent, except that calcium oxide has been added to the group of other chemicals that the first component supplies as recited in claim 1 of the ‘123 patent. ‘123 Patent at cl. 1 and Modified Joint Claim Construction Statement U.S. Pat. No. 5,916,123 at 6. In claims 20, 26, 27 and 30 of the ‘608 patent, Sevenson's proposed construction for the disputed claim term "*first component*" is the same as that proposed for claim 1 of the ‘123 patent, except that alum has been added to the group of other chemicals that the "*first component*" supplies as recited in claim 20 of the ‘608 patent. ‘608 Patent at cl. 20 and Modified Joint Claim Construction Statement U.S. Pat. No. 5, 994,608 at 16. In the ‘485 patent, Sevenson's two proposed definitions follow the plain language of asserted claims 1 and 23 respectively. For claims 1-3, 6, 15-17 and 20-22 of the ‘485 patent, Sevenson's proposed construction is the same as that proposed for claim 1 of the ‘982 patent, except that chlorides, fluorides and halides have been added to the group of other chemicals that the "*first component*" supplies as recited in claim 1 of the ‘485 patent. ‘485 Patent at cl. 1; and Modified Joint Claim Construction Statement U.S. Pat. No. 6,139,485 at 6. For claims 23, 26 and 27, although Sevenson's proposed definition is a more general, it is consistent with the collective plain language of the more specific constructions proposed in the ‘982 patent, the ‘123 patent, the ‘608 patent and claims 1-3, 6, 15-17 and 20-22 of the ‘485 patent.

[31] Sevenson proposes one definition for the disputed claim term "*second component*" in the following asserted claims containing this term: (i) 1, 5 and 9 of the ‘982 patent; (ii) 1, 2, 4-6, 15-16 and 18-20 of the ‘123 patent; (iii) 20, 26 and 28-30 of the ‘608 patent; and (iv) 1, 2, 4-6, 15-16, 18-23 and 27 of the ‘485 patent.

***First component*:** **A material capable of supplying a source of sulphates, halites, and/or silicates**

***Second component*:** **A material capable of supplying at least one phosphate anion**

Modified Joint Claim Construction Statement, U.S. Pat. No. 5,527,982 at 6 (First component) and 9 (Second component). Sevenson bases its construction on the language of claim 1 of the '982 patent which recites in relevant part, "wherein said first component supplies at least one member selected from the group consisting of sulphates, halites, and silicates, and wherein said second component supplies at least one phosphate anion." '982 Patent at cl. 1. Therefore, Sevenson's constructions follow the plain language of the claims are supported by the specification (*see* e.g., '982 patent at 3:16-25) and do not interject extraneous limitations. Accordingly, they should be adopted.

In the case of the claim terms "*phosphate compound*," "*phosphate supplying reagent*," "*reagent*" and "*sulfate reagent*," Sevenson's constructions are nothing more than the ordinary meaning understood by those skilled in the art of the invention. For example, Sevenson proposes that the term "*phosphate compound*" is "***a material comprising two or more elements or parts*** capable of supplying a source of phosphate anion $(PO_4)^{3-}$." This construction based on the ordinary meaning of the term "compound" as defined in chemical dictionaries. Technical dictionaries, like a chemical dictionary, are preferred objective evidence (*Vitronics*, 90 F.3d at 1585) because they endeavor to collect the accepted meanings of terms used in the various fields of science and technology and are properly recognized as useful in assisting the court to determine the meaning of a claim language. *Phillips*, 415 F.3d at 1318. Hawley's Condensed

Chemical Dictionary defines "compound" to mean, "***a substance***[32] ***composed of atoms or ions of two or more elements*** in chemical combination." Hawley's Condensed Chemical Dictionary, 11th Ed. (Van Nostrand Reinhold Co., Inc. 1987) at 302 (compound) attached as Exhibit 6. There is no dispute as to the remaining portion of the definition.[33]

Similarly, Sevenson proposes ordinary meanings for the terms "*phosphate supplying reagent*," "*reagent*" and "*sulfate reagent*." Sevenson construes these terms as "[a] material" in place of the Government's proposed phrase "[a] separate and distinct compound". For the reasons discussed above, the Government's insertion of an extraneous "separate and distinct compound" limitation in these definitions for "*phosphate supplying reagent*,"[34] "*reagent*"[35] and "*sulfate reagent*," is improper. Sevenson's proposed constructions do not read any extraneous limitations into the meaning of the claim terms. Rather, Sevenson's use of the term "material" in its definitions supports the ordinary meaning of the disputed claim terms. The term "material" is used to denote that something is composed of or pertaining to physical substances and relating to matter. American Heritage Dictionary, 2d Coll.Ed. (Houghton Mifflin Co. 1982) at 806 (material –*adj*. 1.) attached as Exhibit 7. These disputed claim terms, all reagents in this case, are clearly composed of or pertain to substances and relate to matter. Therefore, Sevenson's

---

[32] The term "substance" means a material of which every part is like every other part. Hawley's at 1102 (substance) attached as Exhibit 18.

[33] Both Sevenson's and the Government's proposed construction for disputed claim term "*phosphate compound*" contain the following clause, "capable of supplying a source of phosphate anion, $(PO_4)^{3-}$".

[34] Sevenson and the Government do not dispute the remaining clause "capable of supplying a source of phosphate anion $(PO_4)^{3-}$" which appears in both parties' constructions for the disputed claim term "*phosphate supplying reagent*".

[35] Sevenson also disputes the Government's improper inclusion of the language in this "wherein" clause in the Government's construction of the term "*reagent*" in Sections VII.E.1., VII.E.2. and VII.F. below.

constructions, which follow the ordinary meaning of one skilled in the art and do not interject extraneous limitations, should be adopted.

**B. The "Compound" Limitation Claim Terms**

**1. The "Compound" Limitation is not Supported By Intrinsic Evidence**

Numerous asserted claims recite an element in which the Government attempts to read in a limitation requiring certain ion elements to be a "compound". For example, claim 1 of the '982 requires that the claimed "second component supplies at least one phosphate anion." '982 Patent at cl. 1. The Government proposes the following representative claim construction for "*at least one phosphate anion*" and "*one or more reactive phosphate ions*" in the '982 patent: "A ***compound capable of supplying a source*** of one or more phosphate anions, $(PO_4)^{3-}$, per molecule of said compound; for example, triple super phosphate contains up to three time the amount of available phosphate per molecule." Such an extraneous limitation without support in the claims, specification or prosecution file history is improper. Other claims of the '982 patent, the '367 patent, the '123 patent, the '608 patent and the '485 patent contain similar claim elements that the Government proposes each be construed in a similar fashion, namely, "*at least one phosphate anion*,"[36] "*one or more reactive phosphate ions*,"[37] "*one or more reactive sulfate ion(s)*,"[38] "*source of a phosphate ion*"[39] and "*source of a sulfate ion*."[40]

---

[36] Specifically, the Government interjects the extraneous limitation "*compound capable of supplying a source of*" into the disputed element "***at least on phosphate anion***" of the following asserted claims: (i) 1 of the '982 patent and (ii) 1 and 15 of the '123 patent.

[37] Specifically, the Government interjects the extraneous limitation "*compound capable of supplying a source of*" into the disputed element "***one or more reactive phosphate ions***" of asserted claims 24 and 32 of the '485 patent.

[38] Specifically, the Government interjects the extraneous limitation "*compound containing*" into the disputed element "***one or more reactive sulfate ion(s)***" of asserted claims 22 and 30 of the '485 patent.

Sevenson proposes that these claim terms be given their ordinary meaning particularly in light of the fact that there is nothing in the specification or prior art that would justify deviating from this meaning. There is no support in the plain language of the claims to require that the "*at least one phosphate anion*" be a "compound" supplying a source of, or containing, one or more phosphate anions . For example, claims 1 and 15 of the '123 patent recite, "wherein said second component supplies at least one phosphate anion; …" '123 Patent at cl.1 and cl. 5. Indeed, the plain language of these claims requires another component, i.e., the ***second component***, to supply the "*at least one phosphate anion*,"[41] The plain language of the claims does not distinguish the meaning of "*at least one phosphate anion*" from its presumed ordinary meaning. The specification does not impose a "compound" limitation either. As set forth above, there is nothing in the prosecution history relating to a requirement that the term "at least one phosphate anion" is anything but one or more phosphate anions.

---

[39] Specifically, the Government interjects the extraneous limitation "*one or more compounds which supplies*" into the disputed element "***source of a phosphate ion***" of asserted claim 11 of the '367 patent.

[40] Specifically, the Government interjects the extraneous limitation "*one or more compounds which supplies*" into the disputed element "***source of a sulfate ion***" of asserted claim 11 of the '367 patent.

[41] For the disputed claim term "***one or more reactive sulfate ion(s)***" the plain language of asserted claim 22 of the '485 patent requires that "the first component includes one or more reactive sulfate ions." '485 Patent at cl. 22. Likewise, the plain language of asserted claim 30 of the '485 patent requires that a different component the "sulfate reagent" include one or more reactive sulfate ions. '485 Patent at cl. 30. For the disputed claim term "***one or more reactive phosphate ions***" the plain language of asserted claims 24 and 32 of the '485 patent require that the "phosphate supplying reagent supplies one or more reactive phosphate ions." '485 Patent at cl. 24 and cl. 30. For the disputed claim terms "***source of a phosphate anion***" and "***source of a sulfate ion***," the plain language of asserted claim 11 of the '367 patent requires that a "single reactant" comprises a source of a phosphate ion and a sulfate ion. '367 Patent at cl. 11. For the disputed term "sulfate ion(s)," the plain language of the asserted claim 17 of the '485 patent requires that the "first component supplies sulfate ions." '485 Patent at cl. 17.

For the basis of its construction of the disputed claim terms "*at least one phosphate anion*" and "*one or more reactive phosphate ions*," the Government improperly relies on the specifications of the '982, '123, and '485 patents which merely describe (i) "[a] second group consisting of treatment chemicals which can supply phosphate ions"; (ii) a "second group, 'group 2', comprising a source of phosphate anion"; and (iii) "[t]he phosphate supplying reagent includes phosphate ion sources having one or more reactive phosphate ions, …". Modified Joint Claim Construction Statement, U.S. Pat. No. 5,527,982 at 10 (At least one phosphate anion); Modified Joint Claim Construction Statement, U.S. Pat. No. 5,916,123 at 10 (At least one phosphate anion); Modified Joint Claim Construction Statement, U.S. Pat. No. 6,139,485 at 35 (One or more reactive phosphate ions). These phrases in the specifications cited by the Government are not a definition of the disputed terms "*at least one phosphate anion*" or "*one or more reactive phosphate ions*". Rather, the cited language describes two embodiments of the term "second group", and an embodiment of the disputed claim term "phosphate supplying reagent". The Government's asserted support is misplaced. The specification does not support insertion of the "compound" limitation as the Government urges.

The Government proposes that the terms "*source of a phosphate ion*" and "*source of a phosphate ion*" be construed as "[o]ne or more compounds which supplies a reactive" phosphate ion or sulfate ion, respectively. For the basis of its constructions, the Government improperly relies on language in the specification that merely describes several embodiments of a source of sulfate ions and one embodiment of a source of phosphate ions. Modified Joint Claim Construction Statement, U.S. Pat. No. 5,732,367 at 5 (Source of a sulfate ion) and 6 (Source of a phosphate ion). The phrases in the specifications cited by the Government neither define the disputed terms "*source of a phosphate ion*" or "*source of a sulfate ion*," not do they require that

these disputed terms consist of a "compound" per se. Sevenson's proposed constructions, "[t]he point of origin for a reactive" phosphate ion or sulfate ion, respectively, represent ordinary meaning as supported by the ordinary meaning of the term "source". *Id.*; American Heritage at 1235 (source 1.) ("point of origin") attached as Exhibit 8. Thus, Sevenson's constructions should be adopted.

### 2. The Extraneous "Compound" Limitation is Contrary to the Ordinary Meaning

The Government's attempt to read in a limitation requiring certain acid and ion elements and the like to be a "compound" is also contrary to their ordinary meaning. Sevenson proposes that these claim elements be given their ordinary meaning particularly in light of the fact that there is nothing in the specification or prior art that would justify deviating from this meaning. For an example of an acid element, claim 5 of the '982 patent requires that the claimed "second component is at least one member selected from the group consisting of phosphoric acid, ..." '982 Patent at cl. 5. The Government proposes the following representative claim construction for "*phosphoric acid*" in the '982 patent: "A ***compound*** with the chemical formula[42] $H_3PO_4$". Modified Joint Claim Construction Statement, U.S. Pat. No. 5,527,982 at 14 (Phosphoric acid). For example of an ion element, claim 22 of the '485 patent requires that the claimed "first component includes one or more reactive sulfate ions, …" '485 Patent at cl. 22. The Government proposes the following representative claim construction for "*one or more reactive sulfate ions*" in the '485 patent: "A ***compound*** containing a reactive sulphate ion, $(SO_4)^{2-}$." Other claims of the '982 patent, the '123 patent, the '608 patent and the '485 patent contain

---

[42] Sevenson also disputes the Government's limitation "*with the chemical formula*" in Section VII.E.2. below.

similar disputed claim elements that the Government proposes each be construed in a similar fashion.[43]

The term "compound" has specific scientific meaning to one of ordinary skill in the art. A compound is a substance composed of atoms or ions of two or more elements in a chemical reaction. Hawley's at 302 (compound) attached as Exhibit 6. The Government's injection of the term "*compound*" contravenes the ordinary meaning of "acid" or "ion" which implies particular chemical properties that not all compounds possess.

An acid is one of a large class of chemical substances whose water solutions have one or more of the following properties: sour taste, ability to make litmus dye turn red and to cause other indicator dyes to change to characteristic colors, ability to react with and dissolve certain metals to form salts and ability to react with bases or alkalies to form salts. Hawley's at 15 (acid) attached as Exhibit 9. While in some cases an acid may be a compound, not all compounds are acids. Accordingly, the Government is unduly varying the ordinary meaning of "acid" by incorporating the term "compound" in its proposed definitions of "*phosphoric acid*" and "*sulfuric acid*." Thus, Sevenson's constructions should be adopted.

Likewise, an ion is an atom or radical that has lost or gained one or more electrons and has thus acquired an electric charge. Positively charged ions are cations and those having a negative charge are anions. Hawley's at 643-644 (ion) attached as Exhibit 10. While a

---

[43] Specifically, the Government interjects the extraneous limitation "compound" into the following disputed elements of the following asserted claims: "***phosphoric acid***" in claims: (i) 5 and 9 of the '982 patent, (ii) 5, 6, 19 and 20 of the '123 patent, (iii) 29 and 30 of the '608 patent, and (iv) 5, 6, 19-21, 25, 27, 29, 33 and 35 of the '485 patent; "***sulfuric acid***" in claims: (i) 3, 21, 26-28 and 34-36 of the '485 patent; "***at least on phosphate anion***" in claims: (i) 1 of the '982 patent, and (ii) 1 and 15 of the '123 patent; ***"one or more reactive sulfate ion(s)"*** in claims 22 and 30 of the '485 patent; "***one or more reactive phosphate ions***" in claims 24 and 32 of the '485 patent; "***source of a phosphate ion***" in claim 11 of the '367 patent; and "***source of a sulfate ion***" in claim 11 of the '367 patent.

compound may contain an ion, an ion is not necessarily a compound. Use of the term "compound" also does not account for the acquired negative charge that is characteristic of an ion. Accordingly, the Government is unduly varying the ordinary meaning of certain ion elements and the like by incorporating the term "compound" in its proposed definitions of the disputed claim terms: "*at least one phosphate anion*," "*one or more reactive sulfate ion(s)*," "*one or more reactive phosphate ions,*" "*source of a phosphate ion*," and "*source of a sulfate ion*."

Moreover, Sevenson's construction of these claim terms[44] are supported by ordinary meaning. For example, Sevenson proposes the following construction for "*phosphoric acid*" in the relevant asserted claims: "An ***acid*** comprising $H_3PO_4$". Modified Joint Claim Construction Statement, U.S. Pat. No. 5,527,982 at 14 (Phosphoric acid). Similarly, Sevenson defines the disputed claim term "*one or more reactive sulfate ion(s)*" as: "At least one sulfate ***ion*** $(SO_4)^{2-}$ available for use in a reaction". Sevenson more particularly defines the acid and ion elements by what the are, i.e., an acid or an ion, respectively, and not as a compound which does not have the same import. Thus, Sevenson's proposed constructions should be adopted.

**C. The Government Attempts to Read in Limitations from the Specification**

Numerous asserted claims recite an element which the Government attempts to read in limitations from the specification in violation of the long-standing Federal Circuit precedent which proscribes reading extraneous material from the specification into the claims. *E.I. Du Pont de Nemours & Co.*, 849 F.2d at 1433. Accordingly, Sevenson's constructions which represent ordinary meaning should be adopted.

[44] *Id.*

### 1. The "technical grade phosphoric acid (TGPA)" claim term

The parties dispute the meaning of "technical grade phosphoric acid (TGPA)." Sevenson proposes that TGPA be given its ordinary meaning particularly in light of the fact that there is nothing in the specification or prior art that would justify deviating from this meaning. TGPA is an element in dependent claim 13 of the '367 patent and claim 11 of the '608 patent. The Government proposes that TGPA be construed as "a phosphoric acid that contains up to 70% (by weight) phosphate (as $P_2O_5$) and sulfate $(SO_4)^{2-}$, typically as sulfuric acid in the range of 2.5% – 7% (by weight) as an impurity." Modified Joint Claim Construction Statement, U.S. Pat. No. 5,732,367 at 8 (Technical grade phosphoric acid) and Modified Joint Claim Construction Statement, U.S. Pat. No. 5,994,608 at 11 (Technical grade phosphoric acid). The abstract of the '367 patent states:

> A process for chemical fixation of radionuclides and radioactive compounds present in soils and solid materials. Radionuclides and other radioactive compounds are converted to low-temperature Apatite-Group structural isomorphs (general composition: $(AB)_5\ (XO_4)_3\ Z$), usually phosphatic, that are insoluble, non-leachable, non-zeolitic, and pH stable by contacting with a sulfate, hydroxide, chloride, fluoride and/or silicate source and with a phosphate anion in either a one or two step process. In the preferred embodiment, soils or contaminated materials containing radionuclides and radioactive wastes are contacted with ***technical grade phosphoric acid (TGPA) which contains sulfates as an impurity***.

'367 Patent at Abstract (emphasis added). The abstract, while describing TGPA as containing sulfates, does not contain any weight percentage. The specification of the '367 patent and the '608 patent describes that "[i]n the preferred embodiment, technical grade phosphoric acid (TGPA) is used in a one step process. TGPA contains sulfate as an impurity in addition to a phosphate anion source." '367 Patent at 5:15-18; '608 Patent at 4:44-47. Again, the '367 and '608 patents merely describe the use of TGPA without setting forth a limitation on the weight percentages of sulfate impurities.

The Government improperly relies on a description of TGPA in the '367 patent, which merely describes the weight percentage as "typical," to inject weight percentage limitations into the claims. Specifically, the '367 and '608 patents describe that "[t]echnical grade phosphoric acid ("TGPA") that contains up to 70% (by weight) phosphate (as $P_2O_5$) and sulfate ($SO_4^{-2}$), ***typically as sulfuric acid in the range of 2.5% to 7% (by weight) as an impurity***, is a source of both a sulfate ion and a phosphate ion and can, therefore, be used as a single reactant." '367 Patent at 6:52-57; '608 Patent at 6:6-11 (emphasis added). The '367 and '608 patents clearly describe the weight percentage as "typical" – nothing more. This is not a clear disclaimer of subject matter requiring reading into the claims a limitation from the specification. *See, e.g.*, *SciMed Life Sys.*, 242 F.3d at 1343-44. Moreover, the '367 and '608 patents describe the typical weight percentage of sulfuric acid – not "sulfate impurities" as the Government urges. Thus, it is improper to interpose the weight percentage limitations into the disputed claim term. *See Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1365-66 (Fed. Cir. 2001).

### 2. The "TCLP Test Criteria" Limitation

Numerous asserted claims recite an element[45] in which the Government attempts to read in a limitation related to TCLP test criteria from the specification despite the Federal Circuit's rejection of construing a claim's scope to one embodiment. *Phillips*, 415 F.3d at 1323

---

[45] Specifically, the Government interposes "the TCLP test criteria" limitation into the following elements of the following asserted claims: "***concentration of leachable radioactive substances***" in claims 1, 15-17 and 20 of the '608 patent; "***concentration of leachable radionuclides and radioactive compounds***" in claim 11 of the '367 patent; "***immobilize(ing)***" in claims 22-36 of the '485 patent; "***leachable lead***" in claims 1, 15 and 22-36 of the '485 patent; "***leachable lead level***" in claims 1, 15, 22, 28 and 30 of the '485 patent; "***leachable metal level(s)*** in claims 1 and 15 of the '123 patent; "***non-leachable solid materials***" in claims 1 and 20 of the '608 patent; "***stabilize***" in claims (i) 1 of the '982 patent, (ii) 1 and 15 of the '123 patent, and (iii) 1 and 15 of the '485 patent; "***supply(ies)***" in claims (i) 1 of the '982 patent, (ii) 1, 3, 15 and 17 of the '123 patent, and (iii) 1, 15, 17 and 24 of the '485 patent.

("expressly rejected the contention that if a patent describes only a single embodiment, the clams of the patent must be construed as being limited to that embodiment). Sevenson proposes that these claim terms be given their ordinary meaning in light of the fact that nothing in the specification warrants deviation from the ordinary meaning.

For example, the Government proposes that "*leachable lead*," "*leachable lead level*" and "*leachable metal level(s)*" be construed as "… present in the TCLP extract from a representative sample of waste after performing the TCLP test method". Modified Joint Claim Construction Statement, U.S. Pat. No. 6,139,485 at 4 (Leachable lead) and 5 (Leachable lead level); Modified Joint Claim Construction Statement, U.S. Pat. No. 5,916,123 at 5 (Leachable metal level(s)). For the basis of this construction, the Government cites to the specifications of the asserted patents that merely provide that it is an object of the invention to provide a method which decreases the leaching of lead to levels below the regulatory limit of 5mg/l by the toxicity characteristic leaching procedure (TCLP) test criteria. '485 Patent at 3:20-24, 5:8-11 and 6:3-8.[46]

[46] Similarly, the Government proposes that the claim terms "***immobilize(ing)***," "***non-leachable solid materials***," "***stabilize***," and "***supplies***" be construed as "… the TCLP metal level [is] below the regulatory threshold limit under the TCLP test criteria of the EPA. See e.g., Modified Joint Claim Construction Statement, U.S. Pat. No. 6,139,485 at 28 (Immobilize(ing)); Modified Joint Claim Construction Statement, U.S. Pat. No. 5,994,608 at 7 (Non-leachable solid materials); Modified Joint Claim Construction Statement, U.S. Pat. No. 6,139,485 at 5 (Stabilize); and Modified Joint Claim Construction Statement, U.S. Pat. No. 6,139,485 at 8 (Supplies). Here, the Government cites to specifications of the asserted patents which state, "… so as to render the metal substantially non-leachable, that is, to levels below the regulatory threshold limit under the TCLP test criteria of the USEPA." '485 Patent at 4:64-67. Also, the Government proposes that the claim terms "***concentration of leachable radioactive substances***" and "***concentration of leachable radionucides and radioactive compounds***" be construed as "[t]he amount of picocuries per liter (pCi/l) in the TCLP extract of a sample". Modified Joint Claim Construction Statement, U.S. Pat. No. 5,994,608 at 6 (Concentration of leachable radioactive substances); Modified Joint Claim Construction Statement, U.S. Pat. No. 5,732,367 at 6 (Concentration of leachable radionuclides and radioactive compounds). The Government's cite to Hawley's at 303 for the basis that radioactivity is usually expressed in millicuries per milliliter (mCi/mL) or millicuries per millimol (mCi/mM) is erroneous as to the Government's proposed constructions (continued…)

During the prosecution of the asserted patents, the USEPA regulatory testing criteria for treated waste material changed from the EP Toxicity (EPTOX) to the TCLP test criteria, thereby making the TCLP test the preferred test for identifying the tendency of waste to leach. Regardless, the Federal Circuit has rejected limiting the claims to one embodiment and the specifications of the asserted patents disclose other tests used to determine if waste material has been rendered non-hazardous. Each of the asserted patents state:

> Another object of the present invention is to provide a method of treating a wide variety of lead bearing process materials, wire fluff and chips, cracked battery plastics, carbon with lead dross, foundry sand, lead base paint, leaded gasoline contaminated soils, peat and muck, sludges and slurries, lagoon sediment, and bird and buck shots, ***in order to render the material non-hazardous by RCRA definition, and pass the EPTOX, MEP, ANS Calvet and DI Water Extract tests***.

'982 Patent at 3:61 through 4:2; '123 Patent at 4:4-12; '608 Patent at 4:8-16; '485 Patent at 5:23-31. Further, the specification discloses data in Table VIII using the EPTOX test criteria which, importantly, has the same non-hazardous threshold level as the TCLP test criteria, i.e., below 5.0 mg/l in the extract. '485 Patent at 6:18-19. The asserted patents state:

> In order to illustrate the relative proportions of two chemicals, e.g., gypsum and phosphoric acid, needed for treatment of lead-toxic wastes, three soil samples from a lead contaminated test site were processed using the present invention, in which gypsum powder was used in the first step, and phosphoric acid solution in water at concentrations of about 7, 15 and 22 percent by weight in the second step. ***The soil was measured for lead content in accordance with the EP Toxicity Test before and after treatment. A level of leachable lead below 5 mg/l was considered non-hazardous according to this procedure. During these test runs, the EP Toxicity Test criteria were in force for treated waste material.*** The results of these tests are set forth in Table VIII:

'982 Patent at 17:7-19; '123 Patent at 17:33-45 '608 Patent at 21:3-15; and '485 Patent at 19:58 through 20:3.

---

specific to picocuries per liter (pCi/l). Indeed, the Government's cite substantiates Sevenson's construction of "… picocuries ***in a mass or volume*** of material."

The Government improperly relies on the citations to TCLP testing criteria, exclusive of the EPTOX testing criteria, *inter alia*, to interpose TCLP limitations into the asserted claims. No where in the specifications of the asserted patents are these claim elements[47] expressly defined and there has been no clear disavowal of subject matter of the EPTOX test criteria in the specification or prosecution history. Moreover, the asserted patents also describe using the EPTOX test to identify the tendency of wastes to generate a leachate. *See, e.g.*, '485 Patent at 1:46-58, 12:9-11; 11:45-48, Table II., 17:54-56 and 19:65-66. Thus, it is improper to interpose the TCLP limitation into these claim terms, and Sevenson's constructions which represent the ordinary meaning should be adopted.

**3. The Containing Leachable Radionuclides and Radioactive Compounds" Limitation**

A few claim terms, "*contaminated*," "*host material*" and "*material*" are disputed for the Government's attempt to read in a limitation requiring that the elements be confined to "containing leachable radionuclides and radioactive compounds" or "containing leachable radioactive substances". For example, for the element "*contaminated*" the Government provides a lengthy and narrow definition: "[c]ontaining leachable radionuclides and radioactive compounds…" with three "wherein" clauses further limiting the "radionuclides and radioactive compounds". See Table 1. For support, the Government cites to certain passages in the specification to material being treated contaminated with radionuclides and radioactive compounds, but ignores other passages which disclose other embodiments. Modified Joint Claim Construction Statement, U.S. Pat. No. 5,732,367 at 9 (Contaminated).

[47] These claim elements are: "*leachable lead*"; "*leachable lead level*"; "*leachable metal level(s)*"; "*immobilize(ing)*"; "*non-leachable solid materials*"; "*stabilize*" and "*supplies*".

The use of the word "*contaminated*" and "*material*" in the specification of the '367 patent is more broad than the Government portrays. For example, the '367 specification describes solid and liquid waste materials contaminated with lead and other metals *See e.g.*, '367 Patent at 3:9-10 and 3:45-65. While in the '367 patent the claims of this patent are directed to immobilizing radionuclides and radioactive compounds, there is no indication in the specification or prosecution history that practicing the claimed treatment methods of the '367 patent will not also immobilize other contaminates such as lead and other metals contained within the same material being treated for radionuclides and radioactive compounds. In fact, the same method (i.e., contacting contaminated materials with one or more sulfate ion and one or more phosphate ion) is employed for treating radionuclide-contaminated as well as lead- or other metal-contaminated materials. *See, e.g.*, '982 Patent at cl. 1 and '485 Patent at cl. 22. Thus, there is no basis in the intrinsic evidence for imposing this limitation as the Government urges.

In the specification of the '608 patent, the term "*material*" is used in a general sense and comprises more than the Government submits. For Example, asserted claim 22 of the '608 patent is directed to material "selected from the group consisting of soils, debris, sludges, slag, sand, silts, sediments, industrial waste and solid waste materials". Likewise, the Field of the Invention of the '608 patent states:

> The present invention pertains to the field of chemical fixation of ***hazardous waste materials, including metal-bearing materials and radionuclides and radioactive substances, in debris, soils, solid materials, sludges and materials precipitated or filtered from liquids***, rendering such hazardous waste materials within a stabilized, insoluble, non-leachable, non-zeolitic and pH stable form suitable for safe and ecologically-acceptable disposal; typically regulated by the U.S. Department of Energy, the U.S. Environmental Protection Agency ("USEPA"), and others. The ecologically safe state of the treated materials is not altered by exposure of the treated materials to acidic leachate, acid rain, or radioactive groundwater. In addition, the safe state of the treated materials is not altered by exposure to changing weather conditions; including rain, heat, freeze and thaw.

'608 Patent at 1:20-36. Thus, there is no basis in the intrinsic evidence for imposing this "containing leachable radioactive substances" limitation as the Government urges.

Sevenson proposes the ordinary meaning for "*contaminated*" and "*material*" in light of the fact that nothing in the specification warrants deviation from the ordinary meaning, except for the element "*host material*". The element "*host material*" is expressly defined in the '367 patent as "debris, soil, sludges and solid materials." '367 Patent at 5:7-8. Sevenson hereby proposes this definition for "*host material*, "thereby amending herein its Modified Joint Claim Construction Statement, U.S. Pat. No. 5,732,367 at 4 (Host material). Accordingly, Sevenson's constructions should be adopted.

**D. Ordinary Meaning is Apparent in Certain Claim Terms**

Numerous asserted claims recite an element[48] in which the ordinary meaning of the claim language as understood by a person of skill in the art is readily apparent. In such case, claim construction involves little more than the application of the widely accepted meaning of the commonly understood term. *Phillips*, 415 F.3d at 1314. In such circumstances, general purpose and technical dictionaries are useful. *Id*. Sevenson proposes that these terms, set forth in Table 1 below, be given their ordinary meaning particularly in light of the fact their meaning is

[48] Specifically, the ordinary meaning of the following disputed claim terms are apparent in the following asserted claims: "***combination***" in claims 28 and 30 of the '485 patent; "***contaminated***" in claim 16 of the '367 patent; "***contaminated soils or solid waste materials***" in claims 22-36 of the '485 patent; "***first mixture***" in claims: (i) 1 of the '982 patent and (ii) 1 of the '608 patent; "***lead-bearing material***" in claims 1-6 of the '485 patent; "***material***" in claims 1, 2, 12-18, 20-22 and 24 of the '608 patent; "***metal-bearing material(s)***" in claims: (i) 1, 3, 7 and 12 of the '982 patent and (ii) 1-7 of the '123 patent ; "***mixture***" in claims: (i) 11 of the '367 patent, (ii) 1 and 15 of the '123 patent, (iii) 20 of the '608 patent and (iv) 1, 15, 22, 28 and 30 of the '485 patent; "***second mixture***" in claims: (i) 1 of the '982 patent and (ii) 1 of the '608 patent; "***single reactant***" in claims 11 and 13 of the '367 patent; "***treatment additive***" in claims: (i) 1 and 15 of the '123 patent, (ii) 20 of the '608 patent, and (iii) 1, 15 and 22 of the '485 patent; and "waste matrix" in claims 16-21 of the '485 patent.

commonly understood and there is nothing in the intrinsic evidence that would justify deviating from the ordinary meaning.

**TABLE 1**

| TERM | SEVENSON'S POSITION |
|---|---|
| **Combination** | A result or product of bringing two or more entities into close relationship[49]<br><br>American Heritage at 265 (combination; combine) attached as Exhibit 11. |
| **Contaminated** | To contain an undesirable or unwanted material[50]<br><br>McGraw-Hill Dictionary of Scientific and Technical Terms, 3d Ed. (McGraw-Hill Inc. 1984) at 356 (contaminate) attached as Exhibit 12. |
| **Contaminated soils or solid waste materials** | Soil or solid waste materials containing an undesirable or unwanted material[51] |

[49] The Government ignores the common meaning and construes "***combination***" in two different ways, each in the specific manner in which it is respectively used in claims 28 and 30 of the '485 patent. Modified Joint Claim Construction Statement, U.S. Pat. No. 6,139,485 at 41 and 44.

[50] The Government ignores the common meaning and construes "***contaminated***" in the specific manner in which it is used in claim 16 of the '367 patent, i.e., "… containing leachable radionuclides and radioactive compounds" and excluding other contaminates, like lead and other metals, described in the specification. Modified Joint Claim Construction Statement, U.S. Pat. No. 5,732,367 at 9 (Contaminated). The Government has further construed "***contaminated***" contrary to its ordinary meaning by reading in extraneous limitations of a preferred embodiment. *See* Section VII.C.3. above.

[51] The Government ignores the common meaning and construes "***contaminated soils or solid waste materials***" in the specific manner in which it is used in claim 22 of the '485 patent, i.e., "… containing leachable lead" and excluding other contaminates like other metals described in the specification. Modified Joint Claim Construction Statement, U.S. Pat. No. 6,139,485 at 28 (Contaminated). The Government ignores the language of claim 28 which recites in relevant part, "A method of immobilizing *leachable lead in contaminated soils and solid waste materials* comprising: contacting contaminated soils and solid waste materials with…" "485 Patent at cl. 28. The language of claim 28 of the '485 patent does not limit the meaning of "*contaminated soils and solid waste materials*" to mean contaminated ***only*** with leachable lead; indeed, the

(continued…)

| TERM | SEVENSON'S POSITION |
|---|---|
| | McGraw-Hill at 356 (contaminate) attached as Exhibit 12. |
| **First mixture** | A first homogeneous or heterogeneous material in any physical state that consists of two or more chemical components that have no firm chemical bonding between them and that are physically separable[52]<br><br>Hawley's at 790 (mixture); American Heritage at 842 (mixture); Bennett, Concise Chemical and Technical Dictionary, 11th Ed. (Van Nostrand Reinhold Co., Inc. 1987) at 704 (mixture), each attached as Exhibit 13. |
| **Lead-bearing material** | Materials that have the capacity to yield, produce or release lead[53]<br><br>American Heritage at 115 (bear –*intr*. 1.) attached as Exhibit 14. |
| **Material** | Composed of or pertaining to physical substances; related to matter[54]<br><br>American Heritage at 806 (material –*adj*. 1.) attached as Exhibit 7. |
| **Metal-bearing** | Materials that have the capacity to yield, produce or release metals[55] |

---

language of claim 28 is non-specific in regard to contaminates and only specific to the particular contaminate it is immobilizing.

[52] The Government ignores the common meaning and construes "***first mixture***" in two different ways, each in the specific manner in which it is respectively used in claim 1 of the '982 patent (Modified Joint Claim Construction Statement, U.S. Pat. No. 5,527,982 at 5 (First mixture), i.e., "… first component and a second component…" and in claim 1 of the '608 patent (Modified Joint Claim Construction Statement, U.S. Pat. No. 5,994,608 at 5) (First mixture), i.e., "… contacting said material with a reagent…".

[53] The Government ignores the common meaning and construes "***lead-bearing material***" in the specific manner in which it is used in claim 1 of the '485 patent, i.e., "… a lead-bearing material containing leachable lead…". Modified Joint Claim Construction Statement, U.S. Pat. No. 6,139,485 at 3 (Lead-bearing material).

[54] The Government ignores the common meaning and construes "***material***" in the specific manner in which it is used in claim 1 of the '608 patent, i.e., "… contains leachable radioactive substances…". Modified Joint Claim Construction Statement, U.S. Pat. No. 5,994,608 at 3.

[55] The Government ignores the common meaning and construes "***metal-bearing material(s)***" in the specific manner in which it is used in claim 1 of the '982 patent (Modified Joint Claim Construction Statement, U.S. Pat. No. 5,527,982 at 3 (Metal-bearing materials(s)) and claim 1 of

(continued…)

| TERM | SEVENSON'S POSITION |
|---|---|
| **material(s)** | American Heritage at 115 (bear –*intr*. 1.) attached as Exhibit 14. |
| **Mixture** | A homogeneous or heterogeneous material in any physical state that consists of two or more chemical components that have no firm chemical bonding between them and that are physically separable[56]<br><br>Hawley's at 790 (mixture); American Heritage at 842 (mixture); Bennett, at 704 (mixture) attached as Exhibit 13. |
| **Second mixture** | A second homogeneous or heterogeneous material in any physical state that consists of two or more chemical components that have no firm chemical bonding between them and that are physically separable[57]<br><br>Hawley's at 790 (mixture); American Heritage at 842 (mixture); Bennett, at 704 (mixture) attached as Exhibit 13. |
| **Single reactant** | One entity in a chemical reaction[58] |

---

the '123 patent (Modified Joint Claim Construction Statement, U.S. Pat. No. 5,916,123 at 3 (Metal-bearing materials(s)), i.e., "… contains at least one leachable metal…".

[56] Taking its position to the extreme, the Government ignores the common meaning and construes "***mixture***" in nine different ways, each in the specific manner in which it is used in the following asserted claims: (i) claim 11 of the '367 patent (Modified Joint Claim Construction Statement, U.S. Pat. No. 5,732,367 at 7 (Mixture)), (ii) claims 1and 15 of the '123 patent (Modified Joint Claim Construction Statement, U.S. Pat. No. 5,916,123 at 11 and 20 (Mixture)), (iii) claim 20 of the '608 patent (Modified Joint Claim Construction Statement, U.S. Pat. No. 5,994,608 at 17 (Mixture)) and (iv) claims 1, 15, 22, 28 and 30 of the '485 patent (Modified Joint Claim Construction Statement, U.S. Pat. No. 6,139,485 at 11, 21, 32, 42 and 46 (Mixture)).

[57] The Government again ignores the common meaning and construes "***second mixture***" in two different ways, each in the specific manner in which it is respectively used in claim 1 of the '982 patent, i.e., "… mixing a metal-bearing material with a first mixture comprising a first component and a second component to form a second mixture…" (Modified Joint Claim Construction Statement, U.S. Pat. No. 5,527,982 at 11 (Second mixture)) and in claim 1 of the '608 patent, i.e., "…contacting said material with a reagent …***… to produce a first mixture; contacting said first mixture with a phosphate compound…" (Modified Joint Claim Construction Statement, U.S. Pat. No. 5,994,608 at 6 (Second mixture)).

[58] The Government ignores the common meaning and construes "***single reactant***" in the specific manner in which it is used in claim 11 of the '367 patent, i.e., "… sulfate ion and a phosphate ion that acts with the host material to form a new set of molecules,…". Modified Joint Claim Construction Statement, U.S. Pat. No. 5,732,367 at 4 (Single reactant).

| TERM | SEVENSON'S POSITION |
|---|---|
| | McGraw-Hill at 1336 (reactants); American Heritage at 1085 (reactant); Bennett, at 888 (reactant) attached as Exhibit 15. |
| **Treatment additive** | A reactant[59]<br><br>McGraw-Hill at 27 (additive 1.) attached as Exhibit 16. |
| **Waste matrix** | A matter within which material bearing leachable substances is contained[60]<br><br>American Heritage at 806 (matrix –*n*. 1.) (matrix) attached as Exhibit 17. |

The Government's improper construction based on the manner in which the term is specifically used in a claim is no more evident than for those terms in which the Government proposes multiple definitions.[61] A term used in multiple claims must be interpreted consistently in all of those claims. *Southwall*, 54 F.3d at 1579. Moreover, the multiple uses of a term require a meaning broad enough to apply to all uses of that term. *Digital Biometrics, Inc. v. Identix, Inc.*,

---

[59] The Government ignores the common meaning and construes "***treatment additive***" in the specific manner in which it is used in claims 1 and 15 of the '982 patent, claim 20 of the '608 patent (Modified Joint Claim Construction Statement, U.S. Pat. No. 5,994,608 at 15 (Treatment additive), and claims 1, 15 and 22 of the '485 patent (Modified Joint Claim Construction Statement, U.S. Pat. No. 6,139,485 at 5, 18 and 29 (Treatment additive)), i.e., "first component plus second component mixed together."

[60] The Government ignores the common meaning and construes "***waste matrix***" in the specific manner in which it is used in claim 16 of the '485 patent, i.e., "…waste matrix…***…containing leachable lead and soil…". Modified Joint Claim Construction Statement, U.S. Pat. No. 6,139,485 at 17 and 21 (Waste matrix). The Government improperly relies on the specification of '485 patent 3:40-46 which describes types of waste materials including other metal-bearing materials other than lead.

[61] The Government proposes multiple definitions for the following claim terms: "*combination*"; "*first mixture*"; "*mixture*"; "*second mixture*".

149 F.3d 1335, 1345 (Fed. Cir. 1998); *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001); *NTP*, 418 F.3d at 1293 ("Because [the] patents[-in-suit] all derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents"). In claim 30 of the '485 patent, the Government construes the term "*combination*" differently from how it is construed in claim 28 (*see* above) as, "*sulfate reagent* plus phosphate supplying reagent mixed together". Modified Joint Claim Construction Statement, U.S. Pat. No. 6,139,485 at 52 (Sulfate reagent). The Government proposes to construe this and other disputed elements on a case-by-case basis, inconsistently within the same patent and/or the asserted patents.

As stated above, deviation from ordinary meaning is only permissible if the specification reveals a special definition (*LG Electronics*, 453 F.3d at 1374) or manifest exclusion of claim scope (*Phillips*, 415 F.3d at 1323), or if the prosecution history reveals an unmistakable disavowal of scope during prosecution (*Purdue Pharma L.P.*, 438 F.3d at 1136). The terms of Table 1 have neither been expressly defined in the specification nor has subject matter been clearly surrendered in the specification or during prosecution history. Thus, the Government's constructions that deviate from ordinary meaning are improper and Sevenson's constructions representing the ordinary meaning should be adopted.

### E. Disputed Ordinary Meaning

Sevenson and the Government dispute the ordinary meaning of the following miscellaneous claim elements set forth below.

#### 1. The Term "Substance" Has a Distinct Meaning

The Government improperly uses the term "substance" within several of its proposed constructions for disputed claim elements.[62] For example, the Government construes "*waste matrix of lead-bearing material*" as "[a] *substance* within which material containing leachable lead and soil is contained." Modified Joint Claim Construction Statement, U.S. Pat. No. 6,139,485 at 17. The term "substance" has specific scientific meaning to one of ordinary skill in the art. A substance is characterized by a unique and identical constitution and is thus homogenous. In other words, it is a material of which every part is like every other part. Hawley's at 1102 (substance) attached as Exhibit 18. As the Government proposes, waste matrices, the material actually being treated, must be a homogenous material. There is no limitation in the specification or prior art requiring that the asserted claims be construed in such a manner. In place of "substance," Sevenson uses the term "matter"[63] which does not impart a specific characteristic onto the material being treated. As such, Sevenson's constructions should be adopted.

---

[62] Specifically, the Government proposes to interject a "*substance*" limitation into the following disputed elements of the following asserted claims: "***dispersion agent***" in claims 13 and 24 of the '608 patent; "***fine-grained solids***" in claim 16 of the '367 patent; "***leachable metal***" in claims: (i) 1 and 2 of the '982 patent and (ii) 1 and 15 of the '123 patent; "***waste matrix***" in claims 16-21 of the '485 patent; "***waste matrix of lead-bearing materia***l" in claim 15 of the '485 patent; and "***waste matrix of metal-bearing material and soil***" in claims 15-20 of the '123 patent.

[63] The term "matter" means anything that has mass or occupies space. Hawley's at 735. (Exhibit 29).

### 2. Other "Compound" Limitations

Numerous asserted claims recite an element in which the Government unduly limits the ordinary meaning by imposing the clause "compound with the chemical formula"[64] or "compound containing"[65] or "compound having a molecular structure containing"[66] or "compound."[67] For example, the Government construes "*dibasic calcium phosphate*" as "[a] compound with the chemical formula $CaHPO_4{\sim}2H_2O$." Modified Joint Claim Construction Statement, U.S. Pat. No. 6,139,485 at 37. Similarly, the Government construes "*ammonium phosphate*" as "[c]ompounds containing ammonium and a phosphate anion, $(PO_4)^{3-}$". Modified

---

[64] Specifically, the Government unduly narrows the meaning of the following disputed elements by interposing the limitation "with the chemical formula" in the following asserted claims: "***dibasic calcium phosphate***" in claims 25, 29 and 33 of the '982 patent; "***monobasic calcium phosphate***" in claims 25, 29 and 33 of the '982 patent; "***phosphoric acid***" in claims (i) 5 and 9 of the '982 patent, (ii) 5, 6, 19 and 20 of the '123 patent, (iii) 29 and 30 of the '608 patent, and (iv) 5, 6, 19-21, 25, 27, 29, 33 and 35 of the '485 patent; "***sulfuric acid***" in claims (i) 3 of the '608 patent and (ii) 3, 21, 26-28 and 34-36 of the '485 patent; and "***trisodium phosphate***" in claims (i) 5 of the '982 patent and (ii) 25, 29 and 33 of the '485 patent.

[65] Specifically, the Government unduly narrows the meaning of the following disputed elements by interposing the limitation "compounds containing" in the following asserted claims: "***ammonium phosphate(s)***" in claim 5 of the '982 patent; "***calcium sulfate***" in claim 3 of the '608 patent; "***chloride(s)***" in claims 1, 8 and 15 of the '485 patent; "***fluoride(s)***" in claims 1 and 15 of the '485 patent: "***halides***" in claims 1 and 15 of the '485 patent; "***halites***" in claims: (i) 1 and 4 of the '982 patent, (ii) 1 and 15 of the '123 patent, (iii) 1 and 20 of the '608 patent, and (iv) 1 and 15 of the '485 patent; "***potassium phosphate(s)***" in claims (i) 5 of the '982 patent and (ii) 25, 29 and 33 of the '485 patent; "***pyrophosphate(s)***" in claim 5 of the '982 patent; "***sulfate ion(s)***" in claim 17 of the '485 patent; "***sulphate(s)***" in claims: (i) 1 of the '982 patent, (ii) 1, 3, 6, 15, 17, and 20 of the '123 patent, (iii) 1,3, 4, 20, 27 and 30 of the '608 patent, and (iv) 1, 6, 15 and 20 of the '485 patent; "***sulphates of aluminum***" in claim 4 of the '982 patent; and "***sulphates of iron***" in claim 4 of the '982 patent.

[66] Specifically, the Government unduly narrows the meaning of the disputed element "***silicates***" by interposing the limitation "having a molecular structure containing" in the following asserted claims: (i) 1 of the '982 patent, (ii) 1 and 15 of the '123 patent, (iii) 1 and 20 of the '608 patent, and (iv) 1 and 15 of the '485 patent.

[67] Specifically, the Government unduly narrows the meaning of the disputed element "***water-soluble phosphate***" by interposing a "compound" limitation in the asserted claim 7 of the '608 patent.

Joint Claim Construction Statement, U.S. Pat. No. 5,527,982 at 13. These definitions do not account for the fact that many compounds do not occur in nature in their pure form and that often different grades exist with varying amounts of impurities. *See* e.g., '367 Patent at 6:52-55 ("technical grade phosphoric acid contains 70% (by weight) phosphate…***… and sulfate…***…, typically as sulfuric acid in the range of 2.5% to 7% by weight as an impurity,…"). *See also*, Exhibits 19-25, Sigma-Aldrich's online catalog that sets forth for example available grades of chemicals and reagents, including, for example, phosphoric acid, sulfuric acid, ammonium phosphate, calcium sulfate, calcium phosphate dibasic, calcium phosphate monobasic and trisodium phosphate. Accordingly, Sevenson's proposed constructions should be adopted.

### 3. The "Aqueous Phosphate" Claim Terms

The parties dispute the ordinary meaning of "*aqueous phosphate compound*"[68] and "*aqueous phosphate reagent*"[69]. Sevenson proposes the following constructions, "[a] ***liquid material containing water*** [comprising two or more elements or parts][70] capable of supplying a source of phosphate anion, $(PO_4)^{3-}$,[71] wherein water is a compound with the formula $H_2O$[72]".

---

[68] The disputed element "***aqueous phosphate compound***" is in asserted claim 28 of the '608 patent.

[69] The disputed element "***aqueous phosphate reagent***" is in the following asserted claims: (i) 4 and 18 of the '123 patent, and (ii) 4 and 18 of the '485 patent.

[70] Sevenson construes "***aqueous phosphate compound***" and "***aqueous phosphate reagent***" the same, except for the clause "comprising two or more elements or parts" which only appears in Sevenson's definition for the element "*aqueous phosphate compound*" to define the "compound" portion of this element.

[71] The parties do not dispute the following clause contained within both party's construction for "*aqueous phosphate reagent*," "…capable of supplying a source of phosphate anion, $(PO_4)^{3-}$, wherein water is a compound with the chemical formula $H_20$".

The Government proposes in relevant part, "[a] phosphate ***compound made with water***".

General purpose and technical dictionaries and the non-asserted claims of the '608 patent support Sevenson's construction which is based on the understood meaning of "aqueous". The term "aqueous" means "pertaining to, similar to, ***containing, or dissolved in water***." American Heritage at 66 (aqueous) attached as part of Exhibit 26. It has also been defined to mean "***water solution***." Bennett, at 85 (aqueous) attached as part of Exhibit 26. Likewise, the non-asserted claim 5 of the '608 patent is a source of enlightenment as to the ordinary meaning of the disputed elements (*Phillips*, 415 F.3d at 1314; *Vitronics*, 90 F.3d at 1582) and recites, "[t]he process of claim 1, wherein said ***phosphate compound is an aqueous solution***." Nowhere in the specifications of the asserted patents is there support for "compounds made with water" as the Government urges. Thus, Sevenson's constructions should be adopted.

**4. The "Solution Form" Claim Term**

Sevenson and the Government dispute the ordinary meaning of "*solution form*." This disputed element is found in claim 1 and 15 of the asserted '485 patent. The meaning of "*solution form*" is a well understood term to one of ordinary skill in the art of the invention. "[C]laim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words. . . . In such circumstances, general purpose dictionaries may be helpful." *Phillips*, 415 F.3d at 1314. Sevenson construes "*solution form*" to mean "[a] ***liquid containing dissolved material(s)***." Joint Modified Claim Construction Statement, U.S. Pat. No. 6,139,485 at11 (Solution form); American Heritage at 1230 (solution –

[72] The parties do not dispute the following clause contained within both party's construction for "*aqueous phosphate compound*," "…wherein water is a compound with the chemical formula $H_20$".

*n*. 3.)(the state of being dissolved) attached as Exhibit 27. Additionally, at the time of invention, other soil remediation patents use the term "solution" as Sevenson proposes. *See* e.g., U.S. Pat. No. 5,785,935 at 11:21-26 attached as Exhibit 28 ("The leachant solution is comprised of an ***aqueous solution*** of an acid and a salt. The anion of the acid forms a ***water-soluble*** salt with all of the heavy metals which contaminate the soil.") Thus, Sevenson's construction representing the commonly understood meaning of "*solution*" should be adopted.

### F. Government's Construction is Contingent Upon Adoption of Other Disputed Claim Term Definitions

Numerous asserted claims[73] recite a disputed element construed by the Government to incorporate the Government's proposed definitions for other disputed claim terms therein. For example, the Government proposes the following representative claim construction for the term "*reagent*" in the '608 patent:

> A separate and distinct compound capable of supplying ***sulfates***, ***halites***, ***silicates***, alum, and/or calcium oxide, that participates in a chemical reaction, wherein ***sulphates consist of a substance containing the anion*** $(SO_4)^{2-}$, wherein ***halites consist of the substance sodium chloride (NaCl)***, wherein ***silicates consist of a substance having a molecular structure containing silicon, oxygen, and one or more metals***, wherein alum consists of any of a group double sulfates of metals, for example $M_2(SO_4)_2$~$12H_2O$, and wherein calcium oxide consists of a compound with the chemical formula CaO, also known as lime

[73] Specifically, the Government incorporates its proposed definitions for other disputed claim terms in its proposed definition for the following disputed elements of the following asserted claims: "***first component***" in claims: (i) 1 and 4 of the '982 patent, (ii) 1-3, 6, 15-17 and 20 of the '123 patent, (iii) 20, 26, 27 and 30 of the '608 patent, and (iv) 1-3, 6, 15-17, 20-23, 26 and 27 of the '485 patent; "***mixture***" in claims: (i) 11 of the '367 patent, (ii) 1 and 15 of the '123 patent, (iii) 20 of the '608 patent and (iv) 1, 15, 22, 28 and 30 of the '485 patent; "***reagent***" in claims 1 and 4 of the '608 patent;; "mixture"; "reagent"; "***second component***" in claims (i) 1, 5 and 9 of the '982 patent, (ii) 1, 2, 4-6, 15, 16 and 18-20 of the '123 patent, (iii) 20, 26, 28, 29 and 30 of the '608 patent and (iv) 1, 2, 4-6, 15, 16, 18-23 and 27 of the '485 patent; "***second mixture***" in claims: (i) 1 of the '982 patent and (ii) 1 of the '608 patent; and "***single reactant***" in claims 11 and 13 of the '367 patent.

Modified Joint Claim Construction Statement, U.S. Pat. No. 5,994,608 at 4. Contained within the Government's construction of disputed claim term "*reagent*" are the disputed constructions for "*sulphate(s)*," "*halites*" and "*silicates*." Other claims of each of the asserted patents contain elements that the Government proposes be construed to incorporate the Government's definitions of other disputed claim terms.[74] Accordingly, the court should not adopt the proposed construction for these claim terms where it does not adopt the Government's construction for other disputed claims terms incorporated therein.

## VIII. CONCLUSION

For the foregoing reasons, Sevenson respectfully requests that the Court adopt Sevenson's proposed constructions for the claim terms discussed herein. Sevenson expressly

[74] *Id.*

reserves the right to respond to any of the Government's proposed constructions, particularly, as to those terms for which the Government disputes, but has provided no prior indication of a dispute.

Dated: November 8, 2006

Respectfully submitted,

By: s/Brian E. Ferguson

**MCDERMOTT, WILL & EMERY, LLP**
Brian E. Ferguson
600 13th Street, N.W.
Washington, D.C. 20005
(202) 756-8000
bferguson@mwe.com

**WEBSTER SZANYI LLP**
Kevin A. Szanyi
Nelson Perel
1400 Liberty Building
Buffalo, New York 14202
(716) 842-2800
nperel@websterszanyi.com

**ATTORNEYS FOR PLAINTIFF SEVENSON ENVIRONMENTAL SERVICES, INC.**

WDC99 1292206-3.057200.0012