IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-1075C

Judge Thomas C. Wheeler

SEVENSON ENVIRONMENTAL SERVICES, INC.,
Plaintiff,

v.

THE UNITED STATES,
Defendant

and

SHAW ENVIRONMENTAL, INC.,
Defendant-Intervenor.

**DEFENDANT'S OPENING CLAIM CONSTRUCTION BRIEF**

PETER D. KEISLER
Assistant Attorney General

JOHN J. FARGO
Director

MARCY E. COOK
Attorney
Civil Division
U.S. Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0459
Facsimile: (202) 307-0345

Attorneys for the United States

RUSSEL O. PRIMEAUX
Kean Miller Hawthorne
D'Armond McCowan & Jarman LLP
One American Place, 22nd Floor
Post Office Box 3513
Baton Rouge, LA 70821-3513
Phone: 225.387.0999
Facsimile: 225.388.9133

Counsel for Shaw Environmental, Inc.

November 8, 2006

# Table of Contents

Table of Authorities . . . iii

Index of Exhibits . . . v

Introduction . . . 1

Statement of the Issue . . . 2

Statement of the Case . . . 2

Summary of Argument . . . 4

Argument . . . 4
- I. Applicable Claim Construction Law . . . 4
- II. Analysis of Key Terms Appearing in More than One of the Patents-in-Suit . . . 7
  - A. First Component . . . 8
  - B. Second Component . . . 13
  - C. At Least One Phosphate Anion . . . 18
  - D. Technical Grade Phosphoric Acid (TGPA) . . . 22
  - E. Leachable Metal . . . 24
  - F. Leachable [Metal or Lead] Level(s) . . . 25
  - G. To Stabilize or To Immobilize . . . 26
  - H. Supply(ies)(ing) . . . 28
- III. Analysis of the Markush Group and its Members . . . 29
- IV. Analysis of Remaining Terms in the '982 Patent . . . 35
  - A. Metal-Bearing Materials . . . 35
  - B. First Mixture . . . 35
  - C. Second Mixture . . . 36
- V. Analysis of Remaining Terms in the '367 Patent . . . 37
  - A. Host Material . . . 37
  - B. Single Reactant . . . 37
  - C. Source of a Phosphate Ion . . . 38
  - D. Source of a Sulfate Ion . . . 40
  - E. Mixture . . . 42
  - F. Concentration of Leachable Radionuclides and Radioactive Compounds . . . 42
  - G. Contaminated . . . 43
  - H. Fine-Grained Solids . . . 44
- VI. Analysis of Remaining Terms in the '123 Patent . . . 44
  - A. Metal-Bearing Materials . . . 44
  - B. Treatment Additive . . . 45
  - C. Mixture . . . 46
  - D. Aqueous Phosphate Reagent . . . 47

VII. Analysis of the Remaining Terms in the '608 Patent . . . . . . . 47
A. Material . . . . . . . 47
B. First Mixture . . . . . . . 48
C. Second Mixture . . . . . . . 48
D. Concentration of Leachable Radioactive Substances . . . . . . . 49
E. Non-Leachable Solid Materials . . . . . . . 50
F. Treatment Additive . . . . . . . 50
G. Mixture . . . . . . . 51
H. Water-Soluble Phosphate . . . . . . . 51
I. Dispersion Agent . . . . . . . 52
J. Aqueous Phosphate Compound . . . . . . . 52
VIII. Analysis of Remaining Terms in the '485 Patent . . . . . . . 53
A. Lead-Bearing Material . . . . . . . 53
B. Leachable Lead . . . . . . . 54
C. Treatment Additive . . . . . . . 55
D. Solution Form . . . . . . . 55
E. Mixture . . . . . . . 56
F. Aqueous Phosphate Reagent . . . . . . . 58
G. One or More Reactive Sulfate Ion(s) . . . . . . . 58
H. Second Component . . . . . . . 60
I. Monobasic Calcium Phosphate . . . . . . . 61
J. Dibasic Calcium Phosphate . . . . . . . 62
K. Combination . . . . . . . 63
L. Sulfate Reagent . . . . . . . 63

Conclusion . . . . . . . 66

## TABLE OF AUTHORITIES

### CASES


Abbott Labs. v. Baxter Pharm. Prods., Inc.,
334 F.3d 1274 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Autogiro Co. of Am. v. United States,
384 F.2d 391 (Ct. Cl. 1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6, 12, 65

CCS Fitness, Inc. v. Brunswick Corp.,
288 F.3d 1359 (Fed. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

C.R. Bard, Inc. v. United States Surgical Corp.,
388 F.3d 858 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16, 23, 65

CVI/Beta Ventures, Inc. v. Tura LP,
112 F.3d 1146 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 43

Conoco, Inc. v. Energy & Envtl. Intern., L.C.,
460 F.3d 1349 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 61, 63

Genentech, Inc. v. Chiron Corp.,
112 F.3d 495 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 33

Gillette Co. v. Energizer Holdings, Inc.,
405 F.3d 1367 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Innova/Pure Water, Inc. v. Safari Water Filtration,
381 F.3d 1111 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Jansen v. Rexall Sundown, Inc.,
342 F.3d 1329 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Manning v. Paradis,
296 F.3d 1098 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 39, 41, 60

Moleculon Research Corp. v. CBS, Inc.,
793 F.2d 1261 (Fed. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Phillips v. AWH Corp.,
415 F.3d 1303 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Process Control Corp. v. HydReclaim Corp.,
190 F.3d 1350 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Renishaw PLC v. Marposs Societa' per Azioni,
158 F.3d 1243 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Rhine v. Casio, Inc.,
183 F.3d 1342 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Scripps Clinic & Research Found. v. Genentech, Inc.,
927 F.2d 1565 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Vitrionics Corp. v. Conceptronic, Inc.,
90 F.3d 1576 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

**STATUTES**

28 U.S.C. § 1498(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

40 C.F.R. 261.24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**MISCELLANEOUS**

Hackh's Chemical Dictionary (4th ed. 1969)........................................................................38

Hawley's Condensed Chemical Dictionary (11th ed. 1987)............................................33, 43, 49

McGraw-Hill Dictionary of Scientific and Technical Terms (4th ed. 1989)....................38, 52, 56

The American Heritage Dictionary (2d College ed. 1982)..........................................................44

**Index of Exhibits**

A. U.S. Patent No. 5,527,982

B. U.S. Patent No. 5,732,367

C. U.S. Patent No. 5,916,123

D. U.S. Patent No. 5,994,608

E. U.S. Patent No. 6,139,485

F. Toxicity Characteristic, 40 C.F.R. § 261.24

G. Hawley's Condensed Chemical Dictionary (11th ed. 1987) excerpt of "compound"

H. Hawley's Condensed Chemical Dictionary (11th ed. 1987) excerpt of "material"

I. McGraw-Hill Dictionary of Scientific and Technical Terms (4th ed. 1989) excerpt of "reactant" and Hackh's Chemical Dictionary (4th ed. 1969) excerpt of "reactant"

J. Hawley's Condensed Chemical Dictionary (11th ed. 1987) excerpt of "concentration"

K. The American Heritage Dictionary (2d College ed. 1982) excerpts of "fine-grained," "grain," and "solid"

L. McGraw-Hill Dictionary of Scientific and Technical Terms (4th ed. 1989) excerpt of "disperser"

M. McGraw-Hill Dictionary of Scientific and Technical Terms (4th ed. 1989) excerpt of "solution"

**IN THE UNITED STATES COURT**
**OF FEDERAL CLAIMS**

| | |
|---|---|
| SEVENSON ENVIRONMENTAL SERVICES, INC., Plaintiff, | |
| v. | |
| THE UNITED STATES, Defendant, | No. 05-1075C |
| and | Judge Thomas C. Wheeler |
| SHAW ENVIRONMENTAL, INC., Defendant-Intervenor. | Electronically Filed on November 8, 2006 |

**DEFENDANT'S OPENING CLAIM CONSTRUCTION BRIEF**

**Introduction**

At issue in this case is the proper interpretation of claims 1-5 and 9 of U.S. Patent No. 5,527,982 ("the '982 patent"); claims 11, 13, 14, and 16 of U.S. Patent No. 5,732,367 ("the '367 patent"); claims 1-7 and 15-20 of U.S. Patent No. 5,916,123 ("the '123 patent"); claims 1-7, 11-24, and 26-30 of U.S. Patent No. 5,994,608 ("the '608 patent"); and claims 1-6 and 15-36 of U.S. Patent No. 6,139,485 ("the '485 patent").[1] As set forth in the Modified Joint Claim Construction Statement ("MJCCS"), filed by the parties October 18, 2006, the parties have proposed different interpretations of several of the claim terms found in the asserted claims. This brief represents the Government's claim construction position. The Government has been joined by Shaw Environmental Services, Inc., ("Shaw"), on this brief.

[1] The five patents-in-suit are attached as Exhibits A-E. The '982 patent is Exhibit A; the '367 patent is Exhibit B; the '123 patent is Exhibit C; the '608 patent is Exhibit D; and the '485 patent is Exhibit E.

## Statement of the Issue

Whether the disputed claim terms of the '982, '367, '123, '608, and '485 patents should be given the Government's proposed constructions, as set forth in the MJCCS and, if applicable, as modified in this brief.

## Statement of the Case

Sevenson brought this action pursuant to 28 U.S.C. § 1498(a) seeking reasonable and entire compensation for the alleged use by the Government of a hazardous and radioactive waste remediation process as claimed in the five patents-in-suit. These patents relate to a method for treating waste material, such as soil that is contaminated with lead, so that it is no longer hazardous as defined by the United States Environmental Protection Agency (EPA). Around 1990, the EPA developed a test to determine whether waste is "toxic." The test, which applies to lead and other potentially hazardous elements, is called the Toxicity Characteristic Leaching Procedure (TCLP). The TCLP test measures the amount of lead (or other element) that will be removed from the waste in conditions such as acid rain, or long exposure to the elements. The TCLP test is based upon the solubility of the contaminants in the material being tested; using the procedure, one attempts to attempts to dissolve the potentially hazardous element present from the waste sample. In other words, the TCLP test attempts to measure whether the lead or other element will in some way "leach" out of the waste and become an environmental or health concern. If the waste "fails" the TCLP test (i.e., too much of the potentially hazardous element leaches out), it must either be treated until it "passes" (as defined by regulation), or disposed of in a special landfill.

The patents-in-suit relate to a method for treating waste so that it "passes" the EPA's TCLP test. See, e.g., '982 patent, col. 2, lines 35-47. The method as defined by the patents-in-

suit involves mixing waste materials with a combination of sulfate and phosphate, which results in the formation of lead-phosphate minerals. See, e.g., '982 patent, equations 3(a) and 3(b). These lead phosphate minerals have very low solubilities, and therefore the treated waste material will "pass" the TCLP test. The first of the patents-in-suit was filed on March 15, 1993, however, all five of the patents are continuations or continuations in part of U.S. Patent No. 5,193,936, which is itself a continuation in part of an abandoned application. The abandoned application was filed on March 16, 1990. Using phosphoric acid as the treatment chemical, the Government began treating lead-contaminated soil at the Colonie, NY site beginning in the fall of 1999.

Prior to filing this lawsuit against the Government, Sevenson pursued an action against the Government's contractor, Shaw Environmental Services, Inc., ("Shaw") in the Western District of New York ("the NY litigation"). Both Shaw and Sevenson filed claim construction briefs in the NY litigation; however, no claim construction was completed by the Court in that case. Shaw is now a third party defendant before this Court.

In the instant case, Sevenson initially asserted 115 claims from the five patents-in-suit. On October 13, 2006, Sevenson indicated that it was reducing the number of claims it was asserting to 77. However, even with this reduction in the number of claims it is asserting, the number of actual claim terms at issue did not decrease substantially. This is because the claims that Sevenson eliminated were predominantly dependent claims, while most of the disputed claim terms appear in the independent claims, which remain at issue. The independent claims which Sevenson did eliminate are largely duplicative of other claims. As a result, the Government must thoroughly analyze each claim term from each of those 77 claims as chosen by

Sevenson. This brief provides the Government's positions with respect to the construction of the claim terms found in each of the 77 claims asserted by Sevenson.

## Summary of Argument

The Government has based its proposed constructions of the claim terms at issue on the ordinary and customary meaning of the terms, or, where appropriate, on special meanings assigned by the patentee in the patent. In both cases, the Government's constructions are supported by the language of the claims and/or the specification of the patent. As the Federal Circuit re-affirmed in Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005), "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." Id. at 1316 (citing Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). Therefore, the Court should adopt the Government's proposed constructions.

## Argument

### I. Applicable Claim Construction Law

The claims of the patent define the invention to which the patentee is entitled the right to exclude. Innova/Pure Water, Inc. v. Safari Water Filtration, 381 F.3d 1111, 1115 (Fed. Cir. 2004). "[T]he construction of claims is simply a way of elaborating the normally terse claim language: in order to understand and explain, but not to change, the scope of the claims." Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565, 1580 (Fed. Cir. 1991). "The words of a claim are generally given their ordinary and customary meaning" which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Phillips, 415 F.3d at 1312-13 (internal quotations omitted).

In order to determine what the person of ordinary skill in the art would have understood the disputed claim language to mean at the time of the invention, the court can look to the following sources: "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." Id. at 1314 (quoting Innova, 381 F.3d at 1116). "It is well settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification, and, if in evidence, the prosecution history." Vitrionics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

First, "a claim construction analysis must begin and remain centered in the claim language itself, for that is the language the patentee has chosen to particularly point out and distinctly claim the subject matter which the patentee regards as his invention." Innova, 381 F.3d at 1116 (internal quotations omitted). In addition to the words of the claims themselves, "the context in which a term is used in the asserted claim can be highly instructive." Phillips, 415 F.3d at 1314. Moreover, "other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." Id. "The claims, of course, do not stand alone. Rather, they are part of a fully integrated written instrument." Id. at 1315.

Second, the "claims must be read in view of the specification, of which they are a part." Id. The Federal Circuit has affirmed that the "specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." Id. (quoting Vitrionics, 90 F.3d at 1582). "The construction that stays true to the claim language and *most naturally aligns with the patent's description of the invention* will be, in

the end, the correct construction." Renishaw, 158 F.3d at 1250 (emphasis added). The drawings and the abstract also form part of the specification. "In those instances where a visual representation can flesh out words, drawings may be used in the same manner and with the same limitations as the specification." Autogiro Co. of Am. v. United States, 384 F.2d 391, 398 (Ct. Cl. 1967). Notably, there are two primary methods by which the specification can provide a special definition given to a claim term by a patentee. First, "the claim term will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history." CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002). Second, "the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." Phillips, 415 F.3d at 1316.

In addition to the language of the claims themselves and the specification, the court should also consider the patent's prosecution history. Id. at 1317. While the prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes," it "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id. The Federal Circuit has noted that, in most cases, the intrinsic evidence by itself will resolve any ambiguities in patent claims. Vitrionics, 90 F.3d at 1583.

Nevertheless, where the intrinsic evidence is insufficient, it is permissible for the court to consider extrinsic evidence, such as dictionaries, treatises, prior art, and expert testimony in performing its claim construction analysis. See Phillips, 415 F.3d at 1318-19. Dictionaries,

treatises, and prior art are preferred over expert testimony. Vitrionics, 90 F.3d at 1584-85. In Phillips, the Federal Circuit affirmed that dictionaries and treatises may be consulted "at any time … when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." Phillips, 415 F.3d at 1322-23 (quoting Vitrionics, 90 F.3d at 1584 n.6). Finally, claims should be construed to preserve their validity. Rhine v. Casio, Inc., 183 F.3d 1342, 1345 (Fed. Cir. 1999). However, if the only construction that is consistent with the claim's language and the specification would render the claim invalid, then the claim is simply invalid. Process Control Corp. v. HydReclaim Corp., 190 F.3d 1350, 1357 (Fed. Cir. 1999).

In sum, in order to determine the meaning that a claim term would have to a person of ordinary skill in the art in question, the court looks first to the intrinsic evidence, including the patent claims, specification, and prosecution history, and when necessary, to the extrinsic evidence, with more weight given to dictionaries and treatises than expert testimony. See, e.g., Phillips, 415 F.3d at 1312-23.

## II. Analysis of Key Terms Appearing in More than One of the Patents-in-Suit

Because of the numerous patents and claims asserted by Sevenson, the resulting claim construction analysis is very complex. As set forth in the MJCCS, the parties have different interpretations of several terms that appear in more than one of the patents-in-suit. These terms not only appear in multiple patents, but they are also central to the interpretation of each of the patents and the understanding of the patents as a whole, therefore the Government is treating these terms first in its briefing. The following terms are grouped by the Government's proposed definition for them, which is the same throughout the patents-in-suit.

**A.** **First Component** means a separate and distinct compound capable of supplying a source of [a Markush group] [2]

The term "first component" appears in the '982 patent, claims 1, 4, and 9; the '123 patent, claims 1-3, 6, 15-17, and 20; the '485 patent, claims 1-3, 6, 15-17, 20-23, 26, and 27; and the '608 patent, claims 1, 4, 20, 26, 27, and 30.[3] For example, claim 1 of the '982 patent provides that "wherein said *first component* supplies at least one member selected from the group consisting of sulphates, halites, and silicates." (emphasis added). The language "at least one member selected from the group consisting of … " signals that the listed elements are members of a "Markush" group. See Abbott Labs. v. Baxter Pharm. Prods., Inc., 334 F.3d 1274, 1280 (Fed. Cir. 2003) ("A Markush group is a listing of specified alternatives of a group in a patent claim, typically expressed in the form: a member selected from the group consisting of A, B, and C."). Each occurrence of the term "first component" is associated with a Markush group – the specific members of the Markush group vary in each patent. Table 1 summarizes the claim term,

[2] The definition of this term is consistent throughout the patents-in-suit, with the exception that the members of the Markush group in brackets are different in each patent. The definitions proposed by each party for each patent are consistent with the Markush group present in that corresponding patent. For example, in the '982 patent, the Markush group is defined as "sulphates, halites, and silicates." Therefore, in the proposed definitions by each party for the '982 patent, the portion in brackets is "sulphates, halites, and silicates." In contrast, in the '123 patent, the Markush group is defined as "sulphates, halites, silicates, and calcium oxide." Therefore, in the proposed definitions for the '123 patent, the portion in brackets is "sulphates, halites, silicates, and calcium oxide."

[3] In claims 1 and 4 of the '608 patent, the claim term at issue is "reagent" (as opposed to "first component"). However, this claim term has the same definition as "first component" as it is used in each of the patents.

corresponding patent and claims, the relevant claim language that corresponds to that claim term, and the Government's proposed construction for that claim term.[4]

**Table 1**

| CLAIM TERM AND CORRESPONDING PATENT | CLAIM LANGUAGE |
|---|---|
| **First Component**<br><br>'982 Patent<br><br>Claims 1 and 4 | "[W]herein said first component supplies at least one member selected from the group consisting of sulphates, halites, and silicates … " |
| **First Component**<br><br>'123 Patent<br><br>Claims 1, 2, 3, 6, 15, 16, 17, and 20 | "[W]herein said first component supplies at least one member from the group consisting of sulphates, halites, silicates and calcium oxide … " |
| **First Component**<br><br>'485 Patent<br><br>Claims 1, 2, 3, 6, 15, 16, 17, 20, 21, 22, 23, 26, and 27 | "[W]herein said first component supplies at least one member from the group consisting of sulphates, chlorides, fluorides, halites, halides, and silicates … " |

[4] In the MJCCS, the Government's proposed definition for "first component" in the '123 patent, claims 1-3, 6, 15-17, and 20 was "a separate and distinct compound capable of supplying a source of sulphates, halites, silicates, and calcium oxide." The proposed definition should read: "a separate and distinct compound capable of supplying a source of sulphates, halites, silicates, *and/or* calcium oxide." Similarly, in the MJCCS, the Government's proposed definition for "reagent" in the '608 Patent, Claim 1 was "a separate and distinct compound capable of supplying sulfates, halites, silicates, alum, and/or calcium oxide." The proposed definition should read: "a separate and distinct compound capable of supplying *a source of* sulfates, halites, silicates, alum, *or* calcium oxide." Finally, in the MJCCS, the Government's proposed definition for "first component" in the '608 patent, Claim 20 was "a separate and distinct compound capable of supplying sulfates, halites, silicates, alum, and/or calcium oxide." The proposed definition should read: "a separate and distinct compound capable of supplying *a source of* sulfates, halites, silicates, alum, and/or calcium oxide." These changes are reflected in Table 1 and are consistent with the proposed definitions of the Markush groups present in each of the other patents and with the relevant law on Markush groups. See, e.g., Abbott, 334 F.3d at 1280-81 (noting that Markush groups introduced by the singular "a" are closed unless they include qualifying language).

| CLAIM TERM AND CORRESPONDING PATENT | CLAIM LANGUAGE |
|---|---|
| **Reagent** (see *supra*, n. 4)<br><br>'608 Patent<br><br>Claims 1 and 4 | "[A] reagent selected from the group consisting of sulfates, halites, silicates, alum and calcium oxide … " |
| **First Component**<br><br>'608 Patent<br><br>Claims 20, 26, 27, and 30 | "[W]herein said first component supplies at least one member selected from the group consisting of sulphates, halites, silicates, alum and calcium oxide … " |

When viewed in the context of the intrinsic evidence, one of ordinary skill in the art would conclude that the term "first component" means "a separate and distinct compound capable of supplying a source of [a Markush Group]."[5] The parties disagree on whether the first component is "a separate and distinct compound" as the Government contends, or "a material," as Sevenson contends. Beyond stating that the first component supplies the Markush group members, the claim language itself does not expressly state whether the first component is "a separate and distinct compound" or "a material." However, the specification, including the drawings, from each of the patents supports the conclusion that the patentee intended "first component" to mean "a separate and distinct compound."

For example, the "Summary of the Invention" section of the specifications of the '982, '123, and '485 patents explicitly states that "[a] *first group of treatment chemicals* for use in the processes of the present invention includes lime, gypsum, alum, halites, portland cement, and

[5] The Government's proposed definitions for "first component" as set forth in the MJCCS incorporate the proposed definitions for each of the members of the Markush groups. For simplicity, this section of this brief will address only the "first component" element of the claim term. For analysis of the definitions of the Markush group members, see *infra*, Part III (Analysis of the Markush Group and its Members).

other similar products that can supply sulfates, halites, hydroxides, and/or silicates." '982 patent, col. 3, lines 16-19; '123 patent, col. 3, lines 26-30; '485 patent, col. 4, lines 46-49 (emphasis added). In addition, the same section describes "mixing the solid waste with a *sulfate compound*, such as calcium sulfate dihydrate (gypsum powder) or sulfuric acid." '982 patent, col. 2, lines 26-28; '123 patent, col. 2, lines 38-40; '608 patent, col. 2, lines 41-43; '485 patent, col. 3, lines 4-6 (emphasis added). Similarly, the "Description of the Preferred Embodiment" section of the specifications of all four patents states that "*[a] first group, 'group one'*, comprises a source of sulfate, hydroxide, chloride, fluoride, and/or silicates." '982 patent, col. 5, lines 1-2; '123 patent, col. 5, lines 6-7; '485 patent, col. 6, lines 24-25; '608 patent, col. 8, lines 11-12 (emphasis added); see also '982 patent, col. 19, lines 54-56 (Example 6); '123 patent, col. 20, lines 3-5 (Example 6); '608 patent, col. 23, lines 53-55 (Example 6); '485 patent, col. 22, lines 40-42 (Example 6) ("The treatability studies are designed to optimize the amount and grade of gypsum powder (*or other sulfate compound*) needed during step I.") (emphasis added). The references in the specifications to "a first group" and "group one" treatment chemicals are juxtaposed with and contrasted to the repeated references throughout the specifications to "a second group" and "group two" treatment chemicals. See, e.g., '982 patent, col. 3, lines 20-26, col. 5, lines 5-10; see also *infra*, Part II.B. (Second Component). This highlights the separate and distinct nature of the first component. Also, the specification of each patent clearly indicates that to one of skill in the art, each of the Markush group members is a "compound"; therefore, the Government's construction should be adopted.

The patentee's use of this deliberate language in the specification to indicate separate and distinct groups of treatment chemicals supports the Government's proposed definition for "first component." The patentee has indicated the importance of this language by including it not only

in the "Description of the Preferred Embodiment," but also in the "Summary of the Invention" of each of the patents. See, e.g., C.R. Bard, Inc. v. United States Surgical Corp., 388 F.3d 858, 864 (Fed. Cir. 2004) (noting that "[s]tatements that describe the invention as a whole are more likely to be found in certain sections of the specification, such as the Summary of the Invention.").

Moreover, the drawings accompanying each of the patents distinctly show separate and distinct groups of treatment chemicals. Where, as here, a visual representation is used to "flesh out words," the drawings are an important part of the specification to consider when performing claim construction analysis. See Autogiro, 384 F.3d at 391. Figure 1 from the '982 patent is reproduced below:

**Figure 1**




FIG. I

Consistent with the language in the specification, Figure 1 depicts the "group one" and "group two" treatment chemicals as separate and distinct compounds that participate in the patented method. See '982 patent, Figs. 1, 2a, 2b; '123 patent, Figs. 1, 2a, 2b; '485 patent, Figs. 1, 2a, 2b; '608 patent, Figs. 1, 2a, 2b.

Finally, Sevenson's proposed definition for "first component" should be rejected because it incorporates the word "material," which is used in each of the five patents-in-suit to refer to the material that is being treated by the patented method, i.e., the metal-bearing material. Therefore, Sevenson's proposed definition introduces another level of confusion and uncertainty into the claim construction analysis of these patents. Thus, based on a totality of the intrinsic evidence, it is clear that the construction of "first component" that stays true to the claim language and most naturally aligns with the patent's description of the invention is the Government's proposed definition: "a separate and distinct compound capable of supplying a source of [a Markush] group." See Renishaw, 158 F.3d at 1250.

**B.** **Second Component** means a separate and distinct compound capable of supplying a source of phosphate anion, $(PO_4)^{3-}$

The term "second component" appears in the '982 patent, claims 1, 5, and 9; the '123 patent, claims 1, 2, 4-6, 15, 16, and 18-20; the '485 patent, claims 1, 2, 4-6, 15, 16, 18-22, 24, 25, 28-33, and 35; and the '608 patent, claims 1, 5, 6, 7, 11, 20, 26, and 28-30.[6] For example, Claim 1 of the '982 patent provides that "wherein said *second component* supplies at least one

[6] In claims 22, 24, 25, 28, 29, 30, 31, 32, 33, and 35 of the '485 patent, the claim term at issue is "phosphate supplying reagent" (as opposed to "second component"). However, this claim term has the same definition as "second component" as it is used in each of the patents. In claims 1, 5, 6, 7, and 11 of the '608 patent, the claim term at issue is "phosphate compound" (as opposed to "second component"). However, this claim term has the same definition as "second component" as it is used in each of the patents.

phosphate anion." (emphasis added). Table 2 summarizes the claim term, corresponding patent and claims, the relevant claim language that corresponds to that claim term, and the Government's proposed construction for that claim term.

**Table 2**

| CLAIM TERM AND CORRESPONDING PATENT | CLAIM LANGUAGE |
|---|---|
| **Second Component**<br><br>'982 Patent<br><br>Claims 1, 5, and 9 | "[W]herein said second component supplies at least one phosphate anion … " |
| **Second Component**<br><br>'123 Patent<br><br>Claims 1, 2, 4, 5, 6, 15, 16, 18, 19, and 20 | "[W]herein said second component supplies at least one phosphate anion … " |
| **Second Component**<br><br>'485 Patent<br><br>Claims 1, 2, 4, 5, 6, 15, 16, 18, 19, 20, 21 | "[W]herein said second component supplies at least one phosphate anion in solution form … " |
| **Phosphate Supplying Reagent**<br><br>'485 Patent<br><br>Claims 22, 24, 25, 28, 29, 30, 31, 32, 33, and 35 | "[W]herein said second component is a phosphate supplying reagent … " |
| **Phosphate Compound** (see *supra*, n. 7)<br><br>'608 Patent<br><br>Claims, 1, 5, 6, 7, and 11 | "[W]ith a phosphate compound … " |
| **Second Component**<br><br>'608 Patent<br><br>Claims, 20, 26, 28, 29, and 30 | "[W]herein said second component supplies phosphate anion … " |

When viewed in the context of the intrinsic evidence, one of ordinary skill in the art would conclude that the term "second component" means "a separate and distinct compound capable of supplying a source of phosphate anion, $(PO_4)^{3-}$." The parties disagree about two aspects of the construction of this claim term. First, as with the term "first component," the parties disagree on whether the first component is "a separate and distinct compound" as the Government contends, or "a material," as Sevenson contends. The claim language itself does not expressly state whether the "second component" is "a separate and distinct compound" or "a material." However, the specification, including the drawings, from each of the patents indicates that the patentee intended "second component" to mean "a separate and distinct compound."

For example, the "Summary of the Invention" section of the specifications of the '982, '123, and '485 patents explicitly states that "[a] *second group consists of treatment chemicals* which can supply phosphate ions." '982 patent, col. 3, lines 20-21; '123 patent, col. 3, lines 31-32; '485 patent, col. 4, lines 50-51 (emphasis added). Similarly, the "Description of the Preferred Embodiment" section of the specifications of all four patents states that "*[t]he second group, 'group two'*, comprises a source of phosphate anion." '982 patent, col. 5, lines 5-6; '123 patent, col. 5, lines 10-11; '485 patent, col. 6, lines 28-29; '608 patent, col. 8, lines 16-17 (emphasis added). Moreover, the specifications of each patent describe "products like phosphoric acid (phosphoric), pyrophosphates, triple super phosphate, trisodium phosphates, potassium phosphates, ammonium phosphates and/or *similar compounds*." '982 patent, col. 5, lines 6-10; '123 patent, col. 5, lines 11-14; '608 patent, col. 8, lines 16-20; '485 patent, col. 6, lines 29-33 (emphasis added); see also '982 patent, col. 19, lines 54-58 (Example 6); '123 patent, col. 20, lines 3-8 (Example 6); '608 patent, col. 23, lines 53-57 (Example 6); '485 patent, col. 22,

lines 40-44 (Example 6) ("The treatability studies are designed to optimize … the amount and concentration of phosphoric acid (*or other phosphate compound*) needed in step II .") (emphasis added)). As with the claim term "first component," the references in the specifications to "a second group" and "group two" treatment chemicals are juxtaposed with and contrasted to the repeated references throughout the specifications to "a first group" and "group one" treatment chemicals, which highlights the separate and distinct nature of both the first and second components. See *supra*, Part II.A. (First Component). In addition, the specification of each patent clearly indicates that to one of skill in the art, each of the Markush group members is a "compound"; the Government's construction should be adopted.

The patentee's use of this deliberate language in the specification to indicate separate and distinct groups of treatment chemicals supports the Government's proposed definition for "second component" as being a separate and distinct compound. The patentee has indicated the importance of this language by including it not only in the "Description of the Preferred Embodiment," but also in the "Summary of the Invention" of each of the patents. See, e.g., C.R. Bard, 388 F.3d at 864. Moreover, the drawings accompanying each of the patents clearly show separate and distinct groups of treatment chemicals. Figure 1 from the '982 Patent (reproduced *supra* as Figure 1), clearly indicates that the patentee intended the first and second components to be separate and distinct compounds. See '982 patent, Figs. 1, 2a, 2b; '123 patent, Figs. 1, 2a, 2b; '485 patent, Figs. 1, 2a, 2b; '608 patent, Figs. 1, 2a, 2b. Finally, as with "first component," Sevenson's proposed definition incorporates the word "material," which is used in each of the five patents-in-suit to refer to the material that is treated by the patented method. Therefore, Sevenson's proposed definition introduces another level of confusion and uncertainty into the claim construction analysis of these patents and should not be adopted.

The second disagreement between the parties with respect to the construction of the term "second component" is whether the "second component" is capable of supplying "a source of phosphate anion" as the Government contends, or whether the "second component" is capable of supplying "at least one phosphate anion." While the claim language of several of the claims which employ the term "second component" use the phrase "at least one phosphate anion," the specification makes it clear that one of skill in the art would conclude that the claim term "second component" as used by the patentees in the patent means "a separated and distinct compound capable of supplying a source of phosphate anion, $(PO_4)^{3-}$." For example, the specifications of each patent state that "[t]he phosphate-supplying reagent includes phosphate ion sources having one or more reactive phosphate ions, such as phosphoric acid, trisodium phosphate, a potassium phosphate and monobasic or dibasic calcium phosphates." '982 patent, col. 6, lines 23-27; '123 patent, col. 6, lines 25-29; '485 patent, col. 7, lines 41-45. Similarly, the specification of each patent refers to the second group of treatment chemicals as "treatment chemicals which can supply phosphate ions," and further states that "[t]his group includes products such as phosphoric acid, pyrophosphates, triple super phosphate (TSP), trisodium phosphate, potassium phosphates, ammonium phosphates and/or others capable of supplying phosphate anion when mixed with a metal-bearing process material or with a metal-toxic hazardous waste." '982 patent, col. 3, lines 20-26; '123 patent, col. 3, lines 32-37; '485 patent, col. 4, lines 51-56. From these examples in the specification, it is evident that the patentee intended the term "second component" to refer to those compounds which are capable of supplying a source of phosphate anion. Thus, based on a totality of the intrinsic evidence, it is clear that the construction of "second component" that stays true to the claim language and most naturally aligns with the patent's description of the invention

is the Government's proposed definition: "a separate and distinct compound capable of supplying source of phosphate anion, $(PO_4)^{3-}$." See Renishaw, 158 F.3d at 1250.

**C. At Least One Phosphate Anion** means a compound capable of supplying a source of one or more phosphate anions, $(PO_4)^{3-}$, per molecule of said compound; for example, triple super phosphate contains up to three times the amount of available phosphate per molecule

The term "at least one phosphate anion" appears in the '982 patent, claim 1; the '123 patent, claims 1 and 15; and the '485 patent, claims 1, 15, 24, and 32.[7] For example, Claim 1 of the '982 patent provides that "wherein said second component supplies *at least one phosphate anion*." (emphasis added). The following table summarizes the claim term, corresponding patent and claims, the relevant claim language that corresponds to that claim term, and the Government's proposed construction for that claim term.

**Table 3**

| CLAIM TERM AND CORRESPONDING PATENT | CLAIM LANGUAGE |
|---|---|
| **At Least One Phosphate Anion**<br><br>'982 Patent<br><br>Claim 1 | "[W]herein said second component supplies at least one phosphate anion … " |
| **At Least One Phosphate Anion**<br><br>'123 Patent<br><br>Claims 1 and 15 | "[W]herein said second component supplies at least one phosphate anion … " |

[7] In claims 24 and 32 of the '485 patent, the claim term at issue is "one or more reactive phosphate ions" (as opposed to "at least one phosphate anion"). However, this claim term has the same definition as "at least one phosphate anion" as it is used in each of the patents.

| CLAIM TERM AND CORRESPONDING PATENT | CLAIM LANGUAGE |
|---|---|
| **At Least One Phosphate Anion**<br><br>'485 Patent<br><br>Claims 1 and 15 | "[W]herein said second component supplies at least one phosphate anion in solution form … " |
| **One or More Reactive Phosphate Anions**<br><br>'485 Patent<br><br>Claims 24 and 32 | "[W]herein said phosphate supplying reagent supplies one or more reactive phosphate ions … " |

When viewed in the context of the intrinsic evidence, one of ordinary skill in the art would conclude that the term "at least one phosphate anion" means "a compound capable of supplying a source of one or more phosphate anions, $(PO_4)^{3-}$, per molecule of said compound; for example, triple super phosphate contains up to three times the amount of available phosphate per molecule."

First, several examples in the specifications of the '982, '123, and '485 patents confirm the Government's proposed definition for "at least one phosphate anion." The "Summary of the Invention" section of the specifications of the '982, '123, and '485 patents explicitly states that "[a] second group consists of treatment chemicals which can supply phosphate ions. *This group includes products such as* phosphoric acid, pyrophosphates, triple super phosphate (TSP), trisodium phosphate, potassium phosphates, ammonium phosphates and/or others capable of supplying phosphate anion." '982 patent, col. 3, lines 20-26; '123 patent, col. 3, lines 31-35; '485 patent, col. 4, lines 50-56 (emphasis added). Similarly, the "Description of the Preferred Embodiment" section of the specifications of all three patents state that "[t]he second group, 'group two', comprises a source of phosphate anion. *This group consists of products like* phosphoric acid (phosphoric), pyrophosphates, triple super phosphate, trisodium phosphates,

potassium phosphates, ammonium phosphates *and/or similar compounds capable of supplying a phosphate anion*." '982 patent, col. 5, lines 5-10; '123 patent, col. 5, lines 10-15; '485 patent, col. 6, lines 28-33; '608 patent, col. 8, lines 16-17 (emphasis added). The specifications of each patent also state that "[t]he phosphate-supplying reagent includes phosphate ion sources having one or more reactive phosphate ions, such as phosphoric acid, trisodium phosphate, a potassium phosphate and monobasic or dibasic calcium phosphates." '982 patent, col. 6, lines 23-27; '123 patent, col. 6, lines 25-39; '485 patent, col. 7, lines 41-45. These repeated references in the specification to various compounds that are capable of supplying phosphate anions clearly indicate that to one skilled in the art, the term "at least one phosphate anion" must mean "a compound capable of supplying a source of one or more phosphate anions, $(PO_4)^{3-}$, per molecule of said compound; for example, triple super phosphate contains up to three times the amount of available phosphate per molecule."

Second, Sevenson's proposed definition for "at least one phosphate anion" is "at least one molecule of $(PO_4)^{3-}$." This definition does not make practical sense in the context of the claim language itself or the specification, especially when viewed in light of the purpose of the patent. In other words, "at least one molecule of $(PO_4)^{3-}$" could not chemically achieve the invention's stated purpose of "fixation and stabilization of metals in contaminated materials." See, e.g., '982 patent, Title. This would be clear to one of ordinary skill in the art reading the patents. "In construing claims, the problem the inventor was attempting to solve, as discerned from the specification and the prosecution history, is a relevant consideration." CVI/Beta Ventures, Inc. v. Tura LP, 112 F.3d 1146, 1160 (Fed. Cir. 1997). The specifications from the '982, '123, and '485 patents each clearly indicate that the "problem the inventor was attempting to solve" was to provide a "chemical treatment technology for immobilizing leachable lead in contaminated soils

and solid waste materials." '982 patent, col. 2, lines 21-23; '123 patent, col. 2, lines 32-34; '485 patent, col. 2 lines 66-67 to col. 3, line 1. See also '982 patent, col. 4, lines 7-11; '123 patent, col. 4, lines 17-21; '485 patent, col. 5, lines 37-40 ("The present invention provides a method which converts metal-toxic process materials and hazardous wastes into a material which has a lower leachability of metal as determined by EPA's TCLP test.").

Similarly, the preamble for each independent claim reveals the intended purpose of the invention. The preamble of claim 1 of the '982 patent is representative: "A method of treating metal-bearing materials to stabilize leachable metal contained therein … ." From this, it is evident that the method of the patents-in-suit must be performed to effect the stabilization of the leachable metals contained therein. See Jansen v. Rexall Sundown, Inc., 342 F.3d 1329, 1333 (Fed. Cir. 2003) (holding that the preamble was a "statement of the intentional purpose for which the method must be performed"). In Manning v. Paradis, 296 F.3d 1098 (Fed. Cir. 2002), the Federal Circuit held that where the preamble defined the purpose of the invention as "treating a subject in cardiac arrest," the claim required not just any amount of oxygen to be delivered to the heart, but rather a "therapeutic amount" of oxygen. Id. at 1102.[8] Likewise, the purpose of the patents-in-suit is to treat metal-bearing materials to stabilize leachable metal contained therein– this requires a stoichiometric amount of phosphate, which a person skilled in the art knows is more than a single molecule.

[8] While Manning arose in the context of an appeal from a patent interference proceeding, a claim in interference proceedings is to be given its *broadest* possible construction. Genentech, Inc. v. Chiron Corp., 112 F.3d 495, 500 (Fed. Cir. 1997). In Manning, the broadest possible construction still required a "therapeutic amount" of oxygen to satisfy the claim language. Manning, 296 F.3d at 1102.

In sum, the repeated references in the specifications of the '982, '123, and '485 patents to the compounds that supply phosphate anions make it evident that to a person of ordinary skill in the art, "at least one phosphate anion" means "a compound capable of supplying a source of one or more phosphate anions, $(PO_4)^{3-}$, per molecule of said compound." Also, the specifications of each patent, as well as the preambles to each of the independent claims, clearly show that the purpose of the invention is to treat metal-bearing materials to stabilize leachable metal. This purpose cannot be accomplished with a single molecule of $(PO_4)^{3-}$. However, Sevenson's proposed construction would allow in a single molecule of $(PO_4)^{3-}$ to satisfy the claim. Therefore, Sevenson's proposed construction of the term "at least one phosphate anion" eviscerates the language and purpose of its own patents and should not be adopted. In contrast, the Government's proposed construction should be adopted because it is consistent with the language of the specification, the purpose of the invention, and "defines [the term] in the context of the whole patent." Renishaw, 158 F.3d at 1250.

**D. Technical Grade Phosphoric Acid (TGPA)** means phosphoric acid that contains up to 70% (by weight) phosphate (as $P_2O_5$) and sulfate ($SO_4^{-2}$), typically as sulfuric acid in the range of 2.5% to 7% (by weight) as an impurity

The term "technical grade phosphoric acid" ("TGPA") appears in the '367 patent, claim 13 and the '608 patent, claim 11. For example, claim 13 of the '367 patent provides that "wherein said single reactant is technical grade phosphoric acid." Each of these two claims uses, but does not explicitly define, the term TGPA. When viewed in context of the intrinsic evidence, however, one of ordinary skill in the art would conclude that the Court should adopt the Government's proposed construction. While a "court may not read a limitation into the a claim from the specification," Innova, 381 F.3d at 1117, an equally important canon of claim construction recognizes that "the specification may reveal a special definition given to a claim

term by the patentee that differs from the meaning it would otherwise possess. *In such cases, the inventor's lexicography governs*." Phillips, 415 F.3d at 1316 (emphasis added). The Court in Phillips provided guidelines to assist in the determination of whether language from the specification was limiting:

> One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case. Much of the time, upon reading the specification in that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive.

Id. at 1323. Along these lines, the Federal Circuit has also noted that "[s]tatements that describe the invention as a whole are more likely to be found in certain sections of the specification, such as the Summary of the Invention." C.R. Bard, 388 F.3d at 864.

In the "Summary of the Invention" section of both the '367 and the '608 patents, the specification states that "[t]echnical grade phosphoric acid ('TGPA') … contains up to 70% (by weight) phosphate (as $P_2O_5$) and sulfate ($SO_4^{-2}$), typically as sulfuric acid in the range of 2.5% to 7% (by weight) as an impurity." '367 patent, col. 6, lines 52-55; '608 patent, col. 6, lines 6-9. Notably, this definition of TGPA appears in the "Summary of the Invention" section of each patent, making it "more likely" to describe the invention as a whole. See C.R.Bard, 388 F.3d at 864. Moreover, the only other references to TGPA in the patents refer to "TGPA which contains sulfates as an impurity." See, e.g., '367 patent, abstract. This broader language is not inconsistent with the actual definition provided by the patentee in the "Summary of the Invention" section of both patents. Utilizing the logic set forth by the Court in Phillips, it is evident that the patentee was not merely providing examples of the invention, but rather that the patentee intended for the claims containing the term TGPA and the single embodiment of that

term, as found in each of the patents, to be strictly coextensive. See Phillips, 415 F.3d at 1323. In this situation, the patentee has provided a special definition for the term, and the patentee's lexicography governs.

Sevenson's proposed definition is "commercially available phosphoric acid having sulphates as an impurity." As is evident from the discussion above, the definition proposed by Sevenson does not have any support in the claim language, the specifications of either patent, or extrinsic evidence. Sevenson's proposed definition is not employed in any part of either patent and should not be adopted by this Court. Where, as here, the specification clearly reveals a special definition given to the term TGPA by the patentee, the inventor's lexicography governs. Therefore, this Court should adopt the Government's proposed construction.

**E.** **Leachable Metal** means one or more of the following substances: lead, aluminum, arsenic (III), barium, bismuth, cadmium, chromium (III), copper, iron, nickel, selenium, silver, and zinc [9]

The term "leachable metal" appears in the '982 patent, claims 1 and 2 and the '123 patent, claims 1 and 15. For example, claim 1 of the '982 patent provides that "wherein said metal-bearing material contains at least one leachable metal selected from the group consisting of lead, aluminum, arsenic (III), barium, bismuth, cadmium, chromium (III), copper, iron, nickel, selenium, silver, and zinc." The plain language of the claim itself provides a clear understanding of the ordinary meaning of the term "leachable metal." With respect to the term "leachable metal," the claims are written in the Markush group format. The Markush group format lists

---

[9] The Government has changed its proposed definition for "leachable metal" from "one of the following substances: … " to "one *or more* of the following substances: … ." This change is consistent with the proposed definitions of the Markush groups present in each of the other patents and with the relevant law on Markush groups. See, e.g., Abbott, 334 F.3d at 1280-81 (noting that Markush groups introduced by the singular "a" are closed unless they include qualifying language).

specified alternatives of a group. See Abbott Labs., 334 F.3d at 1280. The specified alternatives for the term "leachable metal" are "lead, aluminum, arsenic (III), barium, bismuth, cadmium, chromium (III), copper, iron, nickel, selenium, silver, and zinc." See '982 patent, col. 20, lines 7-11; '123 patent, col. 20, lines 24-27, col. 21, lines 29-34. Therefore, because "claim construction analysis must begin and remain centered on the claim language itself," Innova, 381 F.3d at 1116, this Court should adopt the Government's proposed construction.

F. **Leachable [Metal or Lead] Level(s)** means the concentration (measured in mg/L) of [metal or lead] present in the TCLP extract from a representative sample of waste after performing the TCLP test method

The term "leachable metal level(s)" appears in the '123 patent, claims 1 and 15. The term "leachable lead level(s)" appears in the '485 patent, claims 1, 15, 22, 28, and 30.[10] For example, claim 1 of the '123 patent provides that "the leachable metal level in said cured material is below 5.0 mg/l." The claims do not explicitly define the term "leachable metal level." However, when viewed in context of the specification, one of ordinary skill in the art would conclude that the term "leachable [metal or lead] level" means the "concentration (measured in mg/L) of [metal or lead] present in the TCLP extract from a representative sample of waste after performing the TCLP test method."

The specification of each patent states, in the "Summary of the Invention" section, that an object of the invention is "to provide a method which decreases the leaching of lead in lead-bearing materials to levels below the regulatory limit of 5 mg/l by TCLP test criteria." '123 patent, col. 3, lines 56-59; '485 patent, col. 5, lines 8-11. In addition, in the "Background of the

[10] The Government's proposed definitions for "leachable metal level(s)" and "leachable lead level(s)" are identical with the exception that the word "lead" is substituted for "metal" in the latter definition. Therefore, for simplicity, the Government is treating both terms in this section of its brief.

Invention" section of the specification, each patent specifically identifies the TCLP test method: "The regulatory threshold limit under Resource Cons. and Recovery Act is 5 mg/l of leachable lead as measured by TCLP (toxicity characteristic leaching procedure) test criteria, United States Environmental Protection Agency (USEPA) method 1311 (SW-846)." '123 patent, col. 2, lines 11-16; '485 patent, col. 2, lines 44-49. Section 261.24 of the United States Code specifies that a waste is toxic, if, after performing the TCLP test method (EPA test method 1311), "the extract from a representative sample of the waste contains any of the contaminants listed in table 1 at the concentration [measured in mg/l] equal to or greater than the respective value given in that table." 40 C.F.R. § 261.24 (Exhibit F). Therefore, to a person of ordinary skill in the art, the term "leachable [metal or lead] level" means the "concentration (measured in mg/L) of [metal or lead] present in the TCLP extract from a representative sample of waste after performing the TCLP test method."

**G. To Stabilize or To Immobilize** means to convert into non-leachable form, i.e., the TCLP metal level is below the regulatory threshold limit under the TCLP test criteria of the EPA

The term "stabilize" appears in the '982 patent, claim 1; the '123 patent, claims 1 and 15; and the '485 patent, claims 1 and 15. For example, claim 1 of the '982 patent provides that "[w]hat is claimed is: A method of treating metal-bearing materials to stabilize leachable metal contained therein." The term "immobilize(ing)" appears in the '485 patent, claims 22 through 36. For example, claim 22 of the '485 provides for "[a] method of immobilizing leachable lead in contaminated soils or solid waste materials." The Government's proposed definitions for "stabilize" and "immobilize" are identical. Both terms are found in the preamble to claims. Therefore, for simplicity, the Government is treating both terms in this section of its brief. Sevenson has proposed different definitions for each of these terms.

When viewed in context of the intrinsic evidence, one of ordinary skill in the art would conclude that the term "stabilize" means: "Convert into non-leachable form, i.e., the TCLP metal level is below the regulatory threshold limit under the TCLP test criteria of the EPA." First, the context in which the term is used in the claims supports this definition. For example, claim 1 of the '982 patent recites "[a] method of treating metal bearing materials to stabilize leachable metal contained therein … such that the TCLP metal level for said leachable metal in the cured material is below 5.0 mg/l." In this context, it is clear that the term "stabilize" is utilized to indicate a conversion from leachable into non-leachable form. Second, support for this definition can be found throughout the specifications of the '982, '123, and '485 patents. For example, the specification of each of the patents states that "[t]he processes of the present inventions provide reactions that *convert leachable metals, especially lead, into a non-leachable form which is geochemically stable* for indefinite periods … " '982 patent, col. 3, lines 10-14; '123 patent, col. 3, lines 21-25; '485 patent, col. 3, lines 56-59 (emphasis added). In addition, all three specifications describe the purpose of the treatment technology as "to render the metal substantially *non-leachable, that is, to levels below the regulatory threshold limit under the TCLP test criteria of the USEPA*." '982 patent, col. 3, lines 34-36; '123 patent, col. 3, lines 45-47; '485 patent, col. 4, lines 64-67 (emphasis added). See also '982 patent, col. 2, lines 57-59; '123 patent, col. 3, lines 1-3; '485 patent, col. 3, lines 35-37 ("The invention relates to treatment methods employed to chemically convert leachable metal in metal-bearing solid and liquid waste materials to a non-leachable form."). Similarly, each of the patents states that: "It is another object of the present invention to provide a method to immobilize lead to leachable levels below 5 mg/l by TCLP test criteria." '982 patent, col. 3, lines 49-50; '123 patent, col. 3, lines 60-61; '485 patent, col. 5, lines 12-14. Thus, the Government's proposed construction "stays true to the

claim language and most naturally aligns with the patent's description of the invention." See Renishaw, 158 F.3d at 1250.

**H. Supply(ies)(ing)** means to make available for the stabilization process

The term "supply(ies)(ing)" appears in the '982 patent, claim 1; the '123 patent, claims 1, 3, 15, and 17; and the '485 patent, claims 1, 15, 17, and 24. For example, claim 1 of the '982 patent uses the term "supplies" twice: "wherein said first component *supplies* at least one member selected from the group consisting of sulphates, halites, and silicates, and wherein said second component *supplies* at least one phosphate anion." The parties agree that the term "supply(ies)(ing)" means, in part, "to make available." However, the Government contends that the term "supplies" should be construed to mean "to make available for the stabilization process," while Sevenson contends that it should be construed to mean simply to "provide or make available one or more reactant(s)." "When viewed in context of the intrinsic evidence, one of ordinary skill in the art would conclude that the term "supply(ies)(ing)" means: "To make available for the stabilization process, wherein the stabilization process is converting the leachable metal into non-leachable form, i.e., the TCLP metal level is below the regulatory threshold limit under the TCLP test criteria of the EPA." Support for this definition can be found throughout the specifications of all three patents.[11] For example, the specifications of each of the patents states that the material "treated with a phosphate-supplying reagent reacts chemically to immobilize the remaining leachable lead." '982 patent, col. 6, lines 19-26; '123 patent, col. 6,

[11] The part of this definition which reads "wherein the stabilization process is converting the leachable metal into non-leachable form, i.e., the TCLP metal level is below the regulatory threshold limit under the TCLP test criteria of the EPA" is taken from the Government's proposed definition for "stabilize." Support for the Government's proposed definition of "stabilize" can be found *supra*, Part II.G.

lines 20-29; '485 patent, col. 7, lines 36-45. See also '982 patent, col. 9, lines 26-29; '123 patent, col. 9, lines 55-59; '485 patent, col. 11, lines 37-40 ("In addition, the amount of phosphate-supplying reagent is prescribed in an amount sufficient to produce mineral species such as hydroxy-lead apatite in contaminated soil or solid waste material."). The specifications, which are "usually dispositive" in determining the meaning of a claim term, clearly indicate that to one of ordinary skill in the art, the meaning of "supply(ies)(ing)" in the patents-in-suit is "to make available for the stabilization process."

## III. Analysis of the Markush Group and its Members

Within the77 asserted claims, as set forth in the MJCCS, the parties have different interpretations of 15 terms that define members of the Markush groups. Several of these terms appear in more than one of the patents-in-suit. In each case, the Markush group member is a chemical that participates in the treatment method. For example, claim 5 of the '982 patent provides that "wherein said second component is at least one member selected from the group consisting of phosphoric acid, trisodium phosphate, triple super phosphate, pyrophosphates, potassium phosphates and ammonium phosphates." Because the only dispute between the the parties is the same for each of these terms, the Government has grouped these terms together. Table 4 summarizes the claim term, the asserted claims where the term is found, and the respective positions of the parties.

**Table 4**

| TERM AND CORRESPONDING PATENT CLAIMS | SEVENSON'S PROPOSED DEFINITION | THE GOVERNMENT'S PROPOSED DEFINITION |
|---|---|---|
| **Ammonium phosphate(s)**<br><br>'982 patent, Claim 5 | A material comprising ammonium and a phosphate anion $(PO_4)^{3-}$ | Compounds containing ammonium and a phosphate anion, $(PO_4)^{3-}$ |

| Term and Corresponding Patent Claims | Sevenson's Proposed Definition | The Government's Proposed Definition |
|---|---|---|
| **Calcium sulfate**<br><br>'608 patent, Claim 3 | A material comprising $CaSO_4$ | A compound containing calcium and a sulfate group, $(SO_4)^{2-}$ |
| **Chloride(s)**<br><br>'485 patent, Claims 1 and 15 | A material comprising a chlorine ion, $Cl^-$ | A compound containing a chlorine ion, $Cl^-$ |
| **Fluoride(s)**<br><br>'485 patent, Claims 1 and 15 | A material comprising a fluorine ion, $F^-$ | A compound containing a fluorine ion, $F^-$ |
| **Halide(s)**<br><br>'485 patent, Claims 1 and 15 | A material comprising a halogen ion (fluorine, chlorine, bromine, iodine, astatine) | A compound containing a halogen element (fluorine, chlorine, bromine, iodine, astatine) |
| **Halite(s)**<br><br>'982 patent, Claims 1 and 4;<br>'123 patent, Claims 1 and 15;<br>'485 patent, Claims 1 and 15;<br>'608 patent, Claims 1 and 20 | A material comprising sodium chloride (NaCl) | The compound sodium chloride (NaCl) |
| **Phosphoric acid**<br><br>'982 patent, Claims 5 and 9;<br>'123 patent, Claims 5, 6, 19, and 20;<br>'485 patent, Claims 5, 6, 19, 20, 21, 25, 27, 29, 33, and 35;<br>'608 patent, Claims 29 and 30 | An acid comprising $H_3PO_4$ | A compound with the chemical formula $H_3PO_4$ |
| **Potassium phosphate(s)**<br><br>'982 patent, Claim 5;<br>'485 patent, Claims 25, 29, and 33 | A material comprising potassium and a phosphate anion $(PO_4)^{3-}$ | Compounds containing potassium and a phosphate anion, $(PO_4)^{3-}$ |
| **Pyrophosphate(s)**<br><br>'982 patent, Claim 5 | A material comprising a pyrophosphate $(P_2O_7)^{4-}$ | Compounds containing a pyrophosphate group, $(P_2O_7)^{4-}$ |

| TERM AND CORRESPONDING PATENT CLAIMS | SEVENSON'S PROPOSED DEFINITION | THE GOVERNMENT'S PROPOSED DEFINITION |
|---|---|---|
| **Silicate(s)**<br><br>'982 patent, Claim 1;<br>'123 patent, Claims 1 and 15;<br>'485 patent, Claims 1 and 15;<br>'608 patent, Claims 1 and 20 | A material comprising silicon, oxygen, and one or more metals with or without hydrogen | A compound having a molecular structure containing silicon, oxygen, and one or more metals |
| **Sulfuric acid**<br><br>'485 patent, Claims 3, 21, 26, 27, 28, 34, 35, and 36;<br>'608 patent, Claim 3 | An acid comprising $H_2SO_4$ | A compound with the chemical formula $H_2SO_4$ |
| **Sulphate(s)**<br><br>'982 patent, Claim 1;<br>'123 patent, Claims 1, 3, 6, 15, 17, and 20;<br>'485 patent, Claims 1, 6, 15, and 20;<br>'608 patent, Claims 1, 3, 4, 20, 27, and 30 | A material comprising the anion $(SO_4)^{2-}$ | A compound containing a sulphate group, $(SO_4)^{2-}$ |
| **Sulphates of aluminum**<br><br>'982 patent, Claim 4 | A material comprising aluminum and a sulphate $(SO_4)^{2-}$ | Compounds containing aluminum and a sulphate group, $(SO_4)^{2-}$ |
| **Sulphates of iron**<br><br>'982 patent, Claim 4 | A material comprising iron and a sulphate $(SO_4)^{2-}$ | Compounds containing iron and a sulphate group, $(SO_4)^{2-}$ |
| **Trisodium phosphate**<br><br>'982 patent, Claim 5;<br>'485 patent, Claims 25, 29, and 33 | A material comprising $Na_3PO_4$ | A compound with the chemical formula $Na_3PO_4$ |

The parties agree as to the chemical composition of each of these terms.[12] The disagreement between the parties is a highly technical, but significant, dispute as to whether each of these 15 Markush group members is a "compound," as the Government contends, or a "material" as Sevenson contends. The specifications support the conclusion that to one of ordinary skill in the art, each of these Markush group members is a "compound," and not a "material." The "Summary of the Invention" section of each patent describes "mixing the solid waste with a *sulfate compound*, such as calcium sulfate dihydrate (gypsum powder) or sulfuric acid." '982 patent, col. 2, lines 26-28; '123 patent, col. 2, lines 38-40; '608 patent, col. 2, lines 41-43; '485 patent, col. 3, lines 4-6 (emphasis added). Similarly, the specifications of each patent describe "products like phosphoric acid (phosphoric), pyrophosphates, triple super phosphate, trisodium phosphates, potassium phosphates, ammonium phosphates and/or *similar compounds*." '982 patent, col. 5, lines 6-10; '123 patent, col. 5, lines 11-14; '608 patent, col. 8, lines 16-20; '485 patent, col. 6, lines 29-33 (emphasis added). See also '982 patent, col. 19, lines 54-58 (Example 6); '123 patent, col. 20, lines 3-8 (Example 6); '608 patent, col. 23, lines 53-57 (Example 6); '485 patent, col. 22, lines 40-44 (Example 6) ("The treatability studies are designed to optimize the amount and grade of gypsum powder (*or other sulfate compound*) needed during step I, and the amount and concentration of phosphoric acid (*or other phosphate compound*) needed in step II .") (emphasis added). The specification of each patent clearly indicates that to one of skill in the art, each of the Markush group members is a "compound."

[12] Because none of the 15 terms in Table 3 are defined in the patents or the prosecution histories, the Government relied extensively on chemical and technical dictionaries in forming its definitions of these terms. Phillips, 415 F.3d at 1322. However, since the parties agree as to the chemical compositions of these terms, the Government is not addressing that aspect of these terms in its briefing.

The ordinary and customary meanings of the words "compound" and "material" as evidenced by Hawley's Condensed Chemical Dictionary supports the conclusion that each of the Markush group members is a "compound." Hawley's Condensed Chemical Dictionary defines "compound" as "[a] substance composed of atoms or ions of two or more elements in chemical combination." Hawley's Condensed Chemical Dictionary 302 (11th ed. 1987) (hereinafter Hawley's) (Exhibit G). This definition is consistent with the chemical compositions of the Markush group members to which the parties have agreed. For example, the parties have agreed that "halite" is sodium chloride (NaCl). In contrast, Hawley's defines the term "material" as "[a] nonspecific term used with various shades of meaning in the technical literature." Id. at 734 (Exhibit H). This court should not adopt a construction that incorporates such a "nonspecific" term, the meaning of which is indefinite.

In addition, Sevenson's proposed definitions should not be adopted because they incorporate the word "comprising." "Transitional phrases, such as 'comprising,' 'consisting of,' and 'consisting essentially of,' are terms of art in patent law that define the scope of the claim with respect to what unrecited additional components or steps, if any, are excluded from the scope of the claim." Conoco, Inc. v. Energy & Envtl. Intern., L.C., 460 F.3d 1349, 1360 (Fed. Cir. 2006) (internal quotations omitted). Specifically, "comprising" is a "term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim." Genentech, 112 F.3d at 501. As such, it signifies an "open" claim. Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1271 (Fed. Cir. 1986).

Each of the 15 terms in Table 4 is a member of a Markush group. See Abbott Labs., 334 F.3d at 1280 ("A Markush group is a listing of specified alternatives of a group in a patent claim,

typically expressed in the form: a member selected from the group consisting of A, B, and C."). Markush groups are limited to the specified alternatives listed: that is, without providing explicit qualifying language, the members of a Markush group can only be used singly, and only those members listed can be employed. Id; see also Gillette Co. v. Energizer Holdings, Inc., 405 F.3d 1367, 1372 (Fed. Cir. 2005). By incorporating the term of art "comprising" into its proposed definitions for each of these 15 terms, Sevenson attempts to impermissibly broaden the scope of each Markush group. For example, if the Court were to adopt Sevenson's proposed construction, while the Markush group must be limited to the members of the group, see, e.g., Abbott Labs., 334 F.3d at 1280, by defining each Markush group member using the "open" term "comprising," the Markush group would nevertheless be "open" to additional compounds in addition to those named. This Court should not adopt a proposed construction that incorporates language which is a term of art utilized in claim language itself. This is especially true when such a construction would contradict the established law relating to Markush groups. Notably, none of the Government's proposed definitions employ a word which is also a term of art in patent law, nor do the Government's proposed definitions conflict with the established law on Markush groups.

In sum, to one of skill in the art, each member of a Markush group is clearly a "compound" and the Court should not adopt any proposed construction that incorporates the term of art "comprising." Therefore, the Court should adopt the Government's proposed definitions for each of the 15 terms in Table 4.

## IV. Analysis of Remaining Terms in the '982 Patent

### A. **Metal-Bearing Materials** means material(s) containing at least one leachable metal

The term "metal-bearing materials" appears in claims 1 and 3. For example, claim 1 provides that "[w]hat is claimed is: A method of treating metal-bearing materials." The plain language of the claim itself provides a clear understanding of the ordinary meaning of the term "metal-bearing materials." Claim 1 states that "wherein said metal-bearing material contains at least one leachable metal." '982 patent, col. 20, line 7. Therefore, "metal-bearing materials" includes any "material(s) containing at least one leachable metal," as defined in the patent. This definition is supported by the specification of the patent. In the "Summary of the Invention" section, the specification states that "[t]he metal-bearing materials referred to herein which the present invention treats include those materials having leachable lead, aluminum, arsenic (III), barium, bismuth, cadmium, chromium (III), copper, iron, nickel, selenium, silver and zinc." '982 patent, col. 2, line 65 to col. 3 lines 1-3. This is consistent with the Government's proposed definition for "metal-bearing materials" and for "leachable metal." See *supra*, Part II.E. Therefore, this Court should adopt the Government's proposed definition because it "stays true to the claim language and most naturally aligns with the patent's description of the invention." Renishaw, 158 F.3d at 1250.

### B. **First Mixture** means first component plus second component mixed together

The term "first mixture" appears in claim 1. For example, claim 1 provides for mixing "a first mixture comprising a first component and a second component to form a second mixture." Sevenson's proposed definition for the term "first mixture" is "a first homogeneous or heterogeneous material in any physical state that consists of two or more chemical components

that have no firm chemical bonding between them and that are physically separable." Sevenson's proposed definition does not consider the plain language of the claims, and "a claim construction analysis must begin and remain centered on the claim language itself." Innova, 381 F.3d at 1116. Here, the claim language itself clearly defines the term "first mixture" as the "first component plus second component mixed together." The parties have proposed definitions for the terms "first component" and "second component," ensuring that the Government's proposed definition is complete and reflects the "ordinary and customary" meaning of the words of the claim.

**C.** **Second Mixture** means metal-bearing material plus first mixture mixed together, wherein the first mixture is the first component plus the second component mixed together

The term "second mixture" appears in claim 1. Claim 1 provides for "mixing a metal-bearing material with a first mixture comprising a first component and a second component to form a second mixture." As with "first mixture," Sevenson's proposed definition ignores the specific language present in the claim. A claim construction analysis must begin and remain centered on the claim language itself." Innova, 381 F.3d at 1116. Here, the claim language itself clearly defines the term "second mixture" as the "metal-bearing material plus first mixture mixed together, wherein the first mixture is the first component plus the second component mixed together." The parties have proposed definitions for the terms "metal-bearing material" and "first mixture," ensuring that the Government's proposed definition is complete and reflects the "ordinary and customary" meaning of the words of the claim.

## V. Analysis of Remaining Terms in the '367 Patent

### A. **Host Material** means debris, soil, sludges, and solid materials containing leachable radionuclides and radioactive compounds

The term "host material" appears in claims 11 and 14. For example, claim 11 provides for "a process for treating a host material comprising solid waste materials containing leachable radionuclides and radioactive compounds." First, the plain language of the claim itself supports the Government's proposed definition. Moreover, "the specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." Vitronics, 90 F.3d at 1582. With respect to the term "host material," the patentees clearly defined the term in the specification. The specification provides: "the present invention relates to a chemical treatment process that reduces the leachability and solubility of radionuclides and other radioactive substances contained in debris, soils, sludges and solid materials ('the host material' or 'the host matrix')." '367 patent, col. 5, lines 5-8. In addition, the specification describes the material as "consisting of, or containing, radionuclides and other radioactive substances." '367 patent, col. 6, lines 50-52.

### B. **Single Reactant** means a source of a sulfate ion and a phosphate ion that acts with the host material to form a new set of molecules, wherein a sulfate ion is the negative ion $(SO_4)^{2-}$, and wherein a phosphate anion is the negative ion $(PO_4)^{3-}$

The term "single reactant" appears in claims 11 and 13. For example, claim 11 provides for "a single reactant comprising a source of a sulfate ion and a phosphate ion." "A claim construction analysis must begin and remain centered on the claim language itself." Innova, 381 F.3d at 1116. Here, the claim language itself clearly defines the term "single reactant" as the "a source of a sulfate ion and a phosphate ion." The term reactant is not defined in the patents or the prosecution histories, therefore it is appropriate and necessary for this court to resort to

extrinsic evidence, such as dictionaries. The McGraw-Hill Dictionary of Scientific and Technical Terms defines "reactant" as "the molecules that act upon one another to make a new set of molecules." McGraw-Hill Dictionary of Scientific and Technical Terms 1570 (4th ed. 1989) (hereinafter McGraw-Hill); see also Hackh's Chemical Dictionary 573 (4th ed. 1969) (hereinafter Hackh's).[13] The Government's proposed definition is consistent with the use of the term "single reactant" in the context of the patent as a whole. See Renishaw, 158 F.3d at 1250. Therefore, this Court should adopt the Government's construction.

C. **Source of a Phosphate Ion** means one or more compounds which supplies a reactive phosphate ion, wherein a phosphate anion is the negative ion $(PO_4)^{3-}$

The term "source of a phosphate ion" appears in claim 11. For example, claim 11 provides for "a single reactant comprising a source of a … phosphate ion." The claims do not explicitly define the term "source of a phosphate ion." However, when viewed in the context of the intrinsic evidence, one of ordinary skill in the art would conclude that the term "source of a phosphate ion" means "one or more compounds which supplies a reactive phosphate ion, wherein a phosphate anion is the negative ion $(PO_4)^{3-}$."

The specification states that "[a] second group consists of treatment chemicals which can *supply phosphate ions*," and further elaborates that "[t]his group includes products such as phosphoric acid, pyrophosphates, triple super phosphate (TSP), trisodium phosphate, potassium phosphates, ammonium phosphates and/or others capable of *supplying phosphate anion*." '367 patent, col. 4, lines 8-13 (emphasis added). In addition, the specification states that "[t]he second group, 'group two', comprises a *source of phosphate anion*. This group consists of products like phosphoric acid (phosphoric), pyrophosphates, triple super phosphate, trisodium phosphates,

[13] The excerpts of McGraw-Hill and Hackh's defining "reactant" are attached as Exhibit I.

potassium phosphates, ammonium phosphates and/or similar compounds capable of *supplying a phosphate anion*." '367 patent, col. 8, lines 55-60. From this, it would be clear to one of skill in the art that the term "source of a phosphate ion" is referring to a compound, such as phosphoric acid, triple super phosphate, or potassium phosphate, which is capable of supplying a phosphate ion.

Moreover, the specification makes it evident that the phosphate ion must be reactive, which, when viewed in context of the patents as whole, means that it must convert leachable metals into non-leachable form. The specification states that "[t]he phosphate-supplying reagent includes *phosphate ion sources having one or more reactive phosphate ions*, such as phosphoric acid, trisodium phosphate, a potassium phosphate and monobasic or dibasic calcium phosphates." '367 patent, col. 9, lines 66-67 to col. 10, lines 1-3. More generally, the specification states that "[t]he processes of the present invention provide reactions that convert leachable metals, especially lead, into a non-leachable form." '367 patent, col. 4 lines 66-67 to col. 5, line 1. In order to convert leachable metals into non-leachable form, more than a single molecule of phosphate is required. See, e.g., Manning, 296 F.3d at 1102. When viewed in the context of the patent as a whole, one of skill in the art would conclude that the term "source of a phosphate ion" means "one or more compounds which supplies a reactive phosphate ion, wherein a phosphate anion is the negative ion $(PO_4)^{3-}$."

In sum, the Government's proposed definition for "source of a phosphate ion" is consistent with the intrinsic evidence and with the other claims of the patent.

**D.** **Source of a Sulfate Ion** means one or more compounds which supplies a reactive sulfate ion, wherein a sulfate ion is the negative ion $(SO_4)^{2-}$

The term "source of a sulfate ion" appears in claim 11. For example, claim 11 provides for "a single reactant comprising a source of a sulfate ion." The claims do not explicitly define the term "source of a sulfate ion." However, when viewed in the context of the intrinsic evidence, one of ordinary skill in the art would conclude that the term "source of a sulfate ion" means "one or more compounds which supplies a reactive sulfate ion, wherein a sulfate ion is the negative ion $(SO_4)^{2-}$"

For example, the specification states that "sulfuric acid, or alum in liquid or powder form can also be used as *sources of sulfate ion* in certain solid wastes that contain sufficient calcium prior to treatment." '367 patent, col. 9, lines 13-14 (emphasis added). In addition, the specification states that "[a] first group of treatment chemicals for use in the processes of the present invention includes lime, gypsum, alum, halites, portland cement, and other similar products that can *supply sulfates*, halites, hydroxides, and/or silicates." '367 patent, col. 4, lines 4-8 (emphasis added); see also '367 patent, col. 8, lines 51-54 ("[a] first group, 'group one', comprises a source of sulfate, hydroxide, chloride, fluoride, and/or silicates."). From this, it would be clear that to one of skill in the art, the term "source of a sulfate ion" is referring to a compound, such as gypsum, alum, or portland cement, which is capable of supplying a sulfate ion.

Moreover, the specification establishes that the sulfate ion must be reactive in order to convert leachable metals into a non-leachable form. For example, in the "Summary of the Invention" section of the specification, the specification states that in the first step of the invention, the waste is mixed with a sulfate compound "having at least one sulfate ion for

contacting waste particles and reacting with said leachable lead to produce a substantially insoluble lead composition." '367 patent, col. 3, lines 16-18. Likewise, the specification states that "[t]he processes of the present invention provide reactions that convert leachable metals, especially lead, into a non-leachable form." '367 patent, col. 4 lines 66-67 to col. 5, line 1. In order to convert leachable metals into non-leachable form, more than a single molecule of sulfate is required. See, e.g., Manning, 296 F.3d at 1102. In addition, the Government's proposed definition for "source of a phosphate ion" is consistent with "source of a phosphate ion." See, e.g., Phillips, 415 F.3d at 1102.

Finally, the Government's proposed definition for the term "source of a sulfate ion" is consistent with the patentee's use of TGPA in the patent. In the specification, the patentee states that:

> Technical grade phosphoric acid ('TGPA') that contains up to 70% (by weight) phosphate (as $P_2O_5$) and sulfate ($SO_4^{-2}$), typically as sulfuric acid in the range of 2.5% to 7% (by weight) as an impurity, is a source of both a sulfate ion and a phosphate ion and can, therefore, be used a single reactant.

'367 patent, col. 6, lines 52-57. First, the Government's proposed definition allows for "one or more" compounds, therefore, a single compound – such as TGPA – can satisfy the Government's proposed definition. Second, the Government's proposed definition for "source of a sulfate ion" requires that the compound (or compounds) supply a reactive sulfate ion. Therefore, the reactive sulfate ion must be present in large enough quantities to participate measurably in the chemical reactions defined in the patents. In the range of sulfate impurities defined by the patentees (2.5% to 7%), the Government believes that TGPA, properly construed, satisfies this standard.[14]

---

[14] Notably, the Government's proposed definition for TGPA was formulated based upon the inventor's definition. Should this court adopt Sevenson's proposed definition for TGPA, the Government's position with respect to "source of a sulfate ion" may change.

In sum, the Government's proposed definition for "source of a sulfate ion" is consistent with the intrinsic evidence and with the other claims of the patent. Therefore, this Court should adopt the Government's construction.

**E.** **Mixture** means host material plus single reactant mixed together, containing substantially insoluble Apatitic-structure mineral species

The term "mixture" appears in claim 11. For example, claim 11 provides for mixing a "single reactant comprising a source of a sulfate ion and a phosphate ion to form a mixture; said mixture containing substantially insoluble Apatitic-structure mineral species." Sevenson's proposed definition for the term "mixture " is "a homogeneous or heterogeneous material in any physical state that consists of two or more chemical components that have no firm chemical bonding between them and that are physically separable." Sevenson's proposed definition does not consider the plain language of the claims, and "a claim construction analysis must begin and remain centered on the claim language itself." Innova, 381 F.3d at 1116. Here, the claim language itself clearly defines the term "mixture" as the "host material plus single reactant mixed together, containing substantially insoluble Apatitic-structure mineral species."[15] The parties have proposed definitions for the terms "host material" and "single reactant."

**F.** **Concentration of Leachable Radionuclides and Radioactive Compounds** means the amount of picocuries per liter (pCi/l) in the TCLP extract of a sample

The term "concentration of leachable radionuclides and radioactive compounds" appears in claim 11. For example, claim 11 provides that "the concentration of leachable radionuclides and radioactive materials is decreased." The claims of the patent do not suggest a definition for this term. However, the examples present in the specification would make it clear to one of skill

[15] The parties have agreed on the definition of "Apatitic-structure mineral species": "A class of minerals comprising the general structure $(AB)_5(XO_4)_3Z$."

in the art that the term "concentration of leachable radionuclides and radioactive compounds means the amount of picocuries per liter (pCi/l) in the TCLP extract of a sample." For instance, in Example 7, treated and control samples were extracted using the TCLP test method, and then tested for radioactivity. "All results presented below are in the units of picocuries per liter (pCi/l)." '367 patent, col. 24, lines 41-42 (Example 7). See also, e.g., '367 patent, col. 25, lines 15-16 (Example 7), col. 28, line 26 (Table XV, Example 9), col. 29, line 15 (Table XVI, Example 10). In addition, Hawley's specifically notes under the definition for "concentration" that "[f]or radioactivity, the concentration is usually expressed as millicuries per milliliter (mCi/mL) or millicuries per millimol mCi/mM." Hawley's at 303 (Exhibit J).

G. **Contaminated** means containing leachable radionuclides and radioactive compounds [16]

The term contaminated appears in claim 16. Claim 16 provides that "said solid waste materials are contaminated fine-grained solids." The abstract of the patent states that the invention treats "soils or contaminated materials containing radionuclides and radioactive wastes." Moreover, the specification notes that the same equipment "is used for treating soils and solid waste materials contaminated with radionuclides and other radioactive substances." The title of the patent – "Reduction of leachability and solubility of radionuclides and radioactive substances in contaminated soils and materials" – also makes it clear that the purpose of the patent is to treat materials contaminated with radioactive compounds. See CVI/Beta Ventures, 112 F.3d at 1160 ("In construing claims, the problem the inventor was attempting to solve, as discerned from the specification and the prosecution history, is a relevant consideration."). When

[16] The parties have proposed definitions for "leachable radionuclides and radioactive compounds." The parties have agreed on the definition of "radioactivity."

viewed in context of the intrinsic evidence, one of ordinary skill in the art would conclude that the term contaminated means "containing leachable radionuclides and radioactive compounds."

**H.** **Fine-Grained Solids** means substance(s) of a definite shape and volume, not liquid or gaseous, having a smooth, even grain, wherein grain is the relative size of the particles composing the substance

The term "fine-grained solids" appears in claim 16. For example, claim 16 provides that "said solid waste materials are contaminated fine-grained solids." Neither the patents themselves nor the prosecution histories suggest a definition for the term "fine-grained solids." Therefore, it is appropriate for this court to look to extrinsic evidence, such as dictionaries, to define this term. See Vitronics, 90 F.3d at 1583. The American Heritage Dictionary 505 (2d College ed. 1982) (hereinafter American Heritage), defines "fine-grained" as "having a fine, smooth, even grain." The same dictionary defines "grain" as "the relative size of the particles composing a substance," American Heritage at 570, and "solid" as "of definite shape and volume." American Heritage at 1163.[17] Therefore, the Government's definition is consistent with the ordinary and customary meaning of "fine-grained solids."

## VI. Analysis of Remaining Terms in the '123 Patent

**A.** **Metal-Bearing Materials** means material(s) containing at least one leachable metal

The term "metal-bearing materials" appears in claims 1 through 7. The term "waste-matrix of metal-bearing material and soil" appears in claims 15 through 20. As there is no dispute as to the meaning of "waste matrix" or "soil," the construction of the term "metal-bearing material" resolves all issues as to this claim as well.

---

[17] The excerpts of American Heritage defining "fine-grained," "grain," and "solid" are attached as Exhibit K.

For example, the preamble to claim 1 provides that "[w]e claim: A method of treating metal-bearing material." The plain language of the claim itself provides a clear definition of "metal-bearing materials" when it states: "wherein said metal-bearing material contains at least one leachable metal." '123 patent, col. 20, lines 23-24. As used in the claims, "metal-bearing materials" means "material(s) containing at least one leachable metal." This definition is supported by the specification of the patent.

Further, in the "Summary of the Invention" section, the specification states that "[t]he metal-bearing materials referred to herein which the present invention treats include those materials having leachable lead, aluminum, arsenic (III), barium, bismuth, cadmium, chromium (III), copper, iron, nickel, selenium, silver and zinc." '123 patent, col. 3, lines 10-13. The Government's proposed definition for "metal-bearing materials" and for "leachable metal" is consistent with the "Summary of the Invention." See *supra*, Part II.E. Therefore, the Court should adopt the Government's proposed definition because it "stays true to the claim language and most naturally aligns with the patent's description of the invention." Renishaw, 158 F.3d at 1250.

B. **Treatment Additive** means first component plus second component mixed together

The term "treatment additive" appears in claims 1 and 15. For example, claim 1 provides for preparing a "treatment additive comprising a first component and a second component to form a mixture." Sevenson's proposed definition for the term "treatment additive" is "a reactant." Sevenson's proposed definition does not consider the plain language of the claims, and "a claim construction analysis must begin and remain centered on the claim language itself." Innova, 381 F.3d at 1116. Here, the claim language itself clearly defines the term "treatment additive" as the

"first component plus second component mixed together." The parties have proposed definitions for the terms "first component" and "second component," ensuring that the Government's proposed definition is complete and reflects the "ordinary and customary" meaning of the words of the claim. Therefore, this Court should adopt the Government's proposed definition for "treatment additive."

**C.** **Mixture** means metal-bearing material plus treatment additive mixed together, wherein the treatment additive is the first component plus the second component mixed together

The term "mixture" appears in claims 1 and 15.[18] Claim 1 provides for "mixing a metal-bearing material with a treatment additive comprising a first component and a second component to form a mixture;" claim 15 requires "mixing said waste matrix with a treatment additive comprising a first component and a second component to form a mixture." Sevenson's proposed definition for the term "mixture " is "a homogeneous or heterogeneous material in any physical state that consists of two or more chemical components that have no firm chemical bonding between them and that are physically separable." Sevenson's proposed definition does not consider the plain language of the claims, and "a claim construction analysis must begin and remain centered on the claim language itself." Innova, 381 F.3d at 1116. Here, the claim language itself clearly defines the term "mixture" as the "metal-bearing material plus treatment additive mixed together, wherein the treatment additive is the first component plus the second component mixed together." The Government's proposed definition for "mixture" in claim 15

---

[18] Defendant's proposed definition for the term "mixture" in claim 15 is identical to it proposed definition for "mixture" in claim 1, with the exception that instead of "metal-bearing material," claim 15 references a "waste matrix of metal-bearing material and soil."

mirrors the claim language from claim 15. The Government's proposed definition is complete and reflects the "ordinary and customary" meaning of the words of the claim.

**D.** **Aqueous Phosphate Reagent** means a compound made with water capable of supplying a source of phosphate anion, $(PO_4)^{3-}$, wherein water is a compound with the chemical formula $H_2O$

The term "aqueous phosphate reagent" appears in claims 4 and 18. For example, claim 4 provides that "wherein said second component is an aqueous phosphate reagent." As with the Markush group members discussed *supra*, Part III, the parties only disagree as to whether the "aqueous phosphate reagent" is a "compound," as the Government contends, or a "material" as Sevenson contends. The specifications support the conclusion that to one of ordinary skill in the art the "aqueous phosphate reagent" is a "compound," and not a "material." For example, the specification of the patent describes "products like phosphoric acid (phosphoric), pyrophosphates, triple super phosphate, trisodium phosphates, potassium phosphates, ammonium phosphates and/or *similar compounds*." '123 patent, col. 5, lines 11-14 (emphasis added). See also '123 patent, col. 20, lines 3-8 (Example 6) ("The treatability studies are designed to optimize … the amount and concentration of phosphoric acid (*or other phosphate compound*) needed in step II .") (emphasis added). The specification of each patent clearly indicates that to one of skill in the art the "aqueous phosphate reagent" is a "compound"; the Government's construction should be adopted.

## VII. Analysis of the Remaining Terms in the '608 Patent

**A.** **Material** means debris, soil, sludges, and solid materials containing leachable radioactive substances

The term "material" appears in claims 1, 2, 12-18, 20-22, and 24. For example, claim 1 provides for "[a] process for treating a material that contains leachable radioactive substances."

With respect to the term "host material," the patentees clearly defined the term in the specification. The specification provides: "the present invention relates to a chemical treatment process that reduces the leachability and solubility of radionuclides and other radioactive substances contained in debris, soils, sludges and solid materials ('the host material' or 'the host matrix')." '608 patent, col. 4, lines 31-34. "[T]he specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." Vitronics, 90 F.3d at 1582. In addition, the specification describes the material as "consisting of, or containing, radionuclides and other radioactive substances." '608 patent, col. 6, lines 4-6. Thus, the Government's construction is consistent with the use of the term in the specification.

**B.** **First Mixture** means material plus reagent mixed together

The term "first mixture" appears in claim 1. Claim 1 provides for "contacting said material with a reagent … to produce a first mixture. Sevenson's proposed definition for the term "first mixture" is "a first homogeneous or heterogeneous material in any physical state that consists of two or more chemical components that have no firm chemical bonding between them and that are physically separable." Sevenson's proposed definition does not consider the plain language of the claims. Here, the claim language itself clearly defines the term "first mixture" as the "material plus reagent mixed together." Accordingly, no further inquiry is necessary or appropriate. See Innova, 381 F.3d at 1116 ("A claim construction analysis must begin and remain centered on the claim language itself..").

**C.** **Second Mixture** means first mixture plus phosphate compound mixed together, wherein the first mixture is the material plus reagent mixed together

The term "second mixture" appears in claim 1. Claim 1 provides for "contacting said first mixture with a phosphate compound to produce a second mixture." As with "first mixture,"

Sevenson's proposed definition does not consider the plain language of the claim. Here, the claim language itself clearly defines the term "second mixture" as the "first mixture plus phosphate compound mixed together, wherein the first mixture is the material plus reagent mixed together." Accordingly, no further inquiry is necessary or appropriate. See Innova, 381 F.3d at 1116.

**D. Concentration of Leachable Radioactive Substances** means the amount of picocuries per liter (pCi/l) in the TCLP extract of a sample

The term "concentration of leachable radioactive substances" appears in claims 1, 15-17, and 20. For example, claim 1 provides that "the concentration of leachable radioactive substances in said material so treated is decreased." The claims of the patent do not suggest any definition for this term.

The examples present in the specification make it clear that to one of skill in the art, the term "concentration of leachable radioactive substances means the amount of picocuries per liter (pCi/l) in the TCLP extract of a sample." For instance, in Example 7, treated and control samples were extracted using the TCLP test method, and then tested for radioactivity. "All results presented below are in the units of picocuries per liter (pCi/l)." '608 patent, col. 24, lines 33-34 (Example 7). See also, e.g., '608 patent, col. 25, lines 7-8 (Example 7), col. 28, line 18 (Table XV, Example 9), col. 29, line 15 (Table XVI, Example 10). In addition, Hawley's specifically notes under the definition for "concentration" that "[f]or radioactivity, the concentration is usually expressed as millicuries per milliliter (mCi/mL) or millicuries per millimol mCi/mM." Hawley's at 303 (Exhibit J). Thus, the Government's is consistent with the intrinsic and extrinsic evidence.

E. **Non-Leachable Solid Materials** means materials of a definite volume and shape with a TCLP metal level below the regulatory threshold limit under the TCLP test criteria of the EPA

The term "non-leachable solid materials" appears in claims 1 and 20. For example, claim 1 provides that "non-leachable solid materials are formed." The parties agree that "solid" means "having a definite volume and shape." However, the parties disagree as to the meaning of the term "non-leachable." The claim language itself suggests no definition for the term. "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." Phillips, 415 F.3d at 1316.

In the "Summary of the Invention" section of the specification, the patentee stated that the purpose of the invention was "to render the metal substantially non-leachable, that is, to levels below the regulatory threshold limit under the TCLP test criteria of the USEPA." The Government's construction adopts this definition as provided by the patentees.

F. **Treatment Additive** means first component plus second component mixed together

The term "treatment additive" appears in claim 20. Claim 20 provides for "contacting said material with a treatment additive comprising a first component and a second component to form a mixture." Sevenson's proposed definition for the term "treatment additive" is "a reactant." Sevenson's proposed definition does not consider the plain language of the claims. Here, the claim language itself clearly defines the term "treatment additive" as the "first component plus second component mixed together." Accordingly, no further inquiry is necessary or appropriate. See Innova, 381 F.3d at 1116 ("A claim construction analysis must begin and remain centered on the claim language itself..").

**G. Mixture** means material plus treatment additive mixed together, wherein the treatment additive is the first component plus the second component mixed together

The term "mixture" appears in claim 20. For example, Claim 20 provides for "contacting said material with a treatment additive comprising a first component and a second component to form a mixture." As with the terms “first mixture” and “second mixture,” Sevenson’s proposed definition does not consider the plain language of the claims. Here, again the claim language itself clearly defines the term "mixture" as the "material plus treatment additive mixed together, wherein the treatment additive is the first component plus the second component mixed together." See Innova, 381 F.3d at 1116.

**H. Water-Soluble Phosphate** means a phosphate compound capable of dissolving in water, wherein water is a compound with the chemical formula $H_2O$

The term "water-soluble phosphate" appears in claim 7, which provides: "wherein said phosphate compound is a water-soluble phosphate." As with the Markush group members discussed *supra*, Part III, the parties only disagree as to whether the "water-soluble phosphate" is a "compound," as the Government contends, or simply "a phosphate" as Sevenson contends. The specifications support the conclusion that to one of ordinary skill in the art the "water-soluble phosphate" is a "compound," and not simply "a phosphate." For example, the specification of the patent describes "products like phosphoric acid (phosphoric), pyrophosphates, triple super phosphate, trisodium phosphates, potassium phosphates, ammonium phosphates and/or *similar compounds*." '608 patent, col. 8, lines 17-20 (emphasis added). See also '608 patent, col. 23, lines 53-57 (Example 6) ("The treatability studies are designed to optimize … the amount and concentration of phosphoric acid (*or other phosphate compound*) needed in step II .") (emphasis

added). The specification of each patent clearly indicates that to one of skill in the art the "water-soluble phosphate" is a "compound"; the Government's construction should be adopted.

**I. Dispersion Agent** means a substance added to suspensions to separate the particles

The term "dispersion agent" appears in claims 13 and 24. For example, claim 13 provides that "wherein said process comprises an additional step of contacting said material with a dispersion agent." The term "dispersion" and "dispersion agent" appear in the patent to provide the example that water can serve as a dispersion agent. See, e.g., '608 patent, col. 31, lines 31-32 (Example 13), col. 6, lines 11-13, and col. 7, lines 63-65. However, the term "dispersion agent" is never defined in the patents or the prosecution histories. Therefore it is appropriate and necessary for this court to look to extrinsic evidence, such as dictionaries, to define this term. See Vitronics, 90 F.3d at 1583. McGraw-Hill defines "disperser" as "material added to solid-in-liquid or liquid-in-liquid suspensions to separate the individual suspended particles." McGraw-Hill at 558 (Exhibit L). This definition is consistent with the Government's proposed definition. Thus, the Court should adopt the Government's proposed definition.

**J. Aqueous Phosphate Compound** means a phosphate compound made with water, wherein water is a compound with the chemical formula $H_2O$

The term "aqueous phosphate compound" appears in claim 28. For example, claim 28 provides that "wherein said second component is an aqueous phosphate compound." As with the Markush group members discussed *supra*, Part III, the parties only disagree as to whether the "aqueous phosphate compound" is a "compound," as the Government contends, or a "material" as Sevenson contends. First, the claim term itself is defined as a "compound." Second, the specifications support the conclusion that to one of ordinary skill in the art the "aqueous phosphate compound" is a "compound," and not a "material." For example, the specification of

the patent describes "products like phosphoric acid (phosphoric), pyrophosphates, triple super phosphate, trisodium phosphates, potassium phosphates, ammonium phosphates and/or *similar compounds*." '608 patent, col. 8, lines 17-20 (emphasis added). See also '608 patent, col. 23, lines 53-57 (Example 6) ("The treatability studies are designed to optimize … the amount and concentration of phosphoric acid (*or other phosphate compound*) needed in step II .") (emphasis added). Moreover, "claim terms are normally used consistently throughout the patent." Phillips, 415 F.3d at 1314. The Government's proposed definitions for "water-soluble phosphate" and "aqueous phosphate compound" are consistent. The specification of each patent clearly indicates that to one of skill in the art the "aqueous phosphate compound" is a "compound"; the Government's construction should be adopted.

## VIII. Analysis of Remaining Terms in the '485 Patent

### A. Lead-Bearing Material means material(s) containing leachable lead

The term "lead-bearing materials" appears in claims 1 through 6. The term "waste matrix of lead-bearing material and soil" appears in claim 15. The term "waste matrix" appears in claims 16 through 21. The term "contaminated soils or solid waste materials" appears in claims 22 through 36. The Government's proposed definition for "waste matrix of lead-bearing material and soil" is "a substance within which material containing leachable lead and soil is contained." The Government's proposed definition for "waste matrix" is "a substance within which material containing leachable lead and soil is contained." The Government's proposed definition for "contaminated soils or solid waste materials" is "soils or solid waste materials containing leachable lead." These definitions are nearly identical to the Government's proposed definition for "metal bearing materials"; therefore the Government is treating all of these terms

together in its briefing. For example, the preamble of claim 1 provides for "[a] method of treating lead-bearing material."

The plain language of the claim itself provides a clear understanding of the ordinary meaning of the term "metal-bearing materials." Claim 1 states provides for "a lead-bearing material containing leachable lead." '485 patent, col. 22, line 58. See also '485 patent, claim 15 ("a waste matrix of lead-bearing material containing leachable lead"); claim 22 ("contaminated soils or solid waste materials containing leachable lead "). Therefore, "lead-bearing material" means "material(s) containing leachable lead." This definition is supported by the specification of the patent. In the "Summary of the Invention" section, the specification states that "[t]he metal-bearing materials referred to herein which the present invention treats include those materials having leachable lead" '485 patent, col. 3, lines 44-45. Therefore, the Government's proposed definition "stays true to the claim language and most naturally aligns with the patent's description of the invention." Renishaw, 158 F.3d at 1250.

**B.** **Leachable Lead** means lead present in the TCLP extract from a representative sample of waste after performing the TCLP test method

The term "leachable lead" appears in the '485 patent, claims 1, 15, and 22 through 36. For example, claim 1 provides for "[a] method of treating lead-bearing material to stabilize leachable lead." The claim construction analysis for "leachable metal [lead] levels" demonstrated that the term "leachable lead levels" should be construed as "the concentration (measured in mg/L) of metal [lead] present in the TCLP extract from a representative sample of waste after performing the TCLP test method." See *supra*, Part II.F. The term "leachable lead" is simply a subpart of the term "leachable lead level." Therefore, the proper construction of the term

"leachable lead" is "lead present in the TCLP extract from a representative sample of waste after performing the TCLP test method."

**C.** **Treatment Additive** means first component plus second component mixed together

The term "treatment additive" appears in claims 1, 15, and 22. For example, claim 1 provides for mixing "a treatment additive comprising a first component and a second component to form a mixture." Sevenson's proposed definition for the term "treatment additive" is "a reactant." Sevenson's proposed definition does not consider the plain language of the claims. Here, the claim language itself clearly defines the term "treatment additive" as the "first component plus second component mixed together." Accordingly, no further inquiry is necessary or appropriate. See Innova, 381 F.3d at 1116 ("A claim construction analysis must begin and remain centered on the claim language itself..").

**D.** **Solution Form** means a homogeneous liquid mixture in which the components are uniformly distributed throughout the mixture

The term "solution form" appears in claims 1 and 15. For example, claim 1 provides that "wherein said second component supplies at least one phosphate anion in solution form." The parties agree that the term "solution form" refers to a liquid. But while the term "solution form" appears in the patent and the patent provides several examples of different phosphoric acid solutions, see, e.g., '485 patent, col. 7, lines 52-65, col. 8, lines 27-30, col. 8, lines 46-48, and col. 11, lines 16-17, that term is never actually defined in the patent or the prosecution histories. Therefore it is appropriate and necessary for this court to look to extrinsic evidence, such as dictionaries, to define this term. See Vitronics, 90 F.3d at 1583. McGraw-Hill defines "solution" as "[a] single, homogenous liquid … phase that is a mixture in which the components … are

uniformly distributed throughout the mixture." McGraw-Hill at 1771.[19] Thus, a substance in "solution form" must be one which is in the form of a homogeneous liquid mixture in which the components are uniformly distributed throughout the mixture.

**E.** **Mixture** means lead-bearing material plus treatment additive mixed together, wherein the treatment additive is the first component plus the second component mixed together

The term "mixture" appears in claims 1, 15, 22, 28, and 30. The term "mixture" appears in multiple claim throughout the patent, but has slightly different definitions as defined by the claims. The Government's definitions simply follow the claim language, and therefore are all treated in this section of its briefing. Table 5 summarizes the claim term, the asserted claims where the term is found, the relevant claim language that corresponds to that claim term, and the Government's proposes construction for that claim term.

**Table 5**

| CLAIM TERM AND CLAIM NUMBER | CLAIM LANGUAGE | GOVERNMENT'S PROPOSED CONSTRUCTION |
|---|---|---|
| Mixture<br><br>Claim 1 | "[M]ixing a lead-bearing material containing leachable lead with a treatment additive comprising a first component and a second component to form a mixture." | Lead-bearing material plus treatment additive mixed together, wherein the treatment additive is the first component plus the second component mixed together |
| Mixture<br><br>Claim 15 | "[M]ixing mixing said waste matrix with a treatment additive comprising a first component and a second component to form a mixture" | Waste matrix of lead-bearing material plus treatment additive mixed together, wherein the treatment additive is the first component plus the second component mixed together |

[19] The excerpt of McGraw-Hill defining "solution" is attached as Exhibit M.

| CLAIM TERM AND CLAIM NUMBER | CLAIM LANGUAGE | GOVERNMENT'S PROPOSED CONSTRUCTION |
|---|---|---|
| Mixture<br><br>Claim 22 | "[C]ontacting contaminated soils or solid waste materials containing leachable lead with a treatment additive comprising a first component and a second component to form a mixture" | Contaminated soils or solid waste materials plus treatment additive mixed together, wherein the treatment additive is the first component plus the second component mixed together |
| Mixture<br><br>Claim 28 | "[C]ontacting contaminated soils and solid waste materials with a combination of sulfuric acid and a phosphate supplying reagent; and curing said mixture" | Sulfuric acid plus phosphate supplying reagent, mixed together |
| Mixture<br><br>Claim 30 | "[C]ontacting contaminated soils or solid waste materials with a combination of a sulfate reagent which includes one or more reactive sulfate ions and a phosphate supplying reagent; and curing said mixture" | Sulfate reagent plus phosphate supplying reagent mixed together.\ |

Sevenson's proposed definition for the term "mixture " is "a homogeneous or heterogeneous material in any physical state that consists of two or more chemical components that have no firm chemical bonding between them and that are physically separable." Sevenson's proposed definition does not consider the plain language of the claims, and "a claim construction analysis must begin and remain centered on the claim language itself." Innova, 381 F.3d at 1116. Here, the claim language itself clearly defines the term "mixture" as the "lead-bearing material plus treatment additive mixed together, wherein the treatment additive is the first component plus the second component mixed together."

**F. Aqueous Phosphate Reagent** means a compound made with water capable of supplying a source of phosphate anion, $(PO_4)^{3-}$, wherein water is a compound with the chemical formula $H_2O$

The term "aqueous phosphate reagent" appears in claims 4 and 18. For example, claim 4 provides that "wherein said second component is an aqueous phosphate reagent." As with the Markush group members discussed *supra*, Part III, the parties only disagree as to whether the "aqueous phosphate reagent" is a "compound," as the Government contends, or a "material" as Sevenson contends. The specifications support the conclusion that, to one of ordinary skill in the art, the "aqueous phosphate reagent" is a "compound," and not a "material." The specification of the patent describes "products like phosphoric acid (phosphoric), pyrophosphates, triple super phosphate, trisodium phosphates, potassium phosphates, ammonium phosphates and/or *similar compounds*." '485 patent, col. 6, lines 28-33 (emphasis added). See also '485 patent, col. 22, lines 40-44 (Example 6) ("The treatability studies are designed to optimize … the amount and concentration of phosphoric acid (*or other phosphate compound*) needed in step II .") (emphasis added). The specification of each patent clearly indicates that to one of skill in the art the "aqueous phosphate reagent" is a "compound."

**G. One or More Reactive Sulfate Ion(s)** means a compound containing a reactive sulphate ion, $(SO_4)^{2-}$

The term "one or more reactive sulfate ions" appears in claims 22 and 30 and the term "sulfate ion" appears in claim 17. The Government's proposed definition for "sulfate ion" is "a compound containing a sulphate ion, $(SO_4)^{2-}$." This definition is nearly identical to the Government's proposed definition for "one or more reactive sulfate ions"; therefore the Government is treating them in the same section in its briefing. For example, claim 22 provides that "wherein said first component includes one or more reactive sulfate ions." When viewed in

the context of the intrinsic evidence, one of ordinary skill in the art would conclude that the term "one or more reactive sulfate ion(s)" means "a compound containing a reactive sulphate ion, $(SO_4)^{2-}$."

For example, the specification states that "sulfuric acid, or alum in liquid or powder form can also be used as *sources of sulfate ion* in certain solid wastes that contain sufficient calcium prior to treatment." '485 patent, col. 6, lines 54-57 (emphasis added). In addition, the specification states that "[a] first group of treatment chemicals for use in the processes of the present invention includes lime, gypsum, alum, halites, portland cement, and other similar products that can *supply sulfates*, halites, hydroxides, and/or silicates." '485 patent, col. 4, lines 46-49 (emphasis added); see also '485 patent, col. 6, lines 24-27 ("[a] first group, 'group one', comprises a source of sulfate, hydroxide, chloride, fluoride, and/or silicates."). From this, it is clear that to one of skill in the art, the term "one or more reactive sulfate ions" is referring to a compound, such as gypsum, alum, or portland cement, which is capable of supplying a sulfate ion. In addition, the "Summary of the Invention" section of each patent describes "mixing the solid waste with a *sulfate compound*, such as calcium sulfate dihydrate (gypsum powder) or sulfuric acid." '485 patent, col. 3, lines 4-6 (emphasis added). See also '485 patent, col. 22, lines 40-42 (Example 6) ("The treatability studies are designed to optimize the amount and grade of gypsum powder (*or other sulfate compound*) needed during step I.") (emphasis added). The specification of each patent clearly indicates that to one of skill in the art, each of the Markush group members is a "compound" – the Government's construction should be adopted.

Moreover, the plain language of the claim states that the sulfate ion must be reactive, which, when viewed in context of the patents as whole, means that it must convert leachable metals into non-leachable form. The specification supports this conclusion. For example, in the

"Summary of the Invention" section of the specification, the specification states that in the first step of the invention, the waste is mixed with a sulfate compound "having at least one sulfate ion for contacting waste particles and reacting with said leachable lead to produce a substantially insoluble lead composition." '485 patent, col. 3, lines 6-8. Likewise, the specification states that "[t]he processes of the present invention provide reactions that convert leachable metals, especially lead, into a non-leachable form." '485 patent, col. 3, lines 56-58. In order to convert leachable metals into non-leachable form, more than a single molecule of sulfate is required. See, e.g., Manning, 296 F.3d at 1102. When viewed in the context of the patent as a whole, one of skill in the art would conclude that the term "one or more reactive sulfate ion(s)" means "a compound containing a reactive sulphate ion, $(SO_4)^{2-}$." Therefore, this Court should adopt the Government's construction.

**H.** **Second Component** means a phosphate supplying reagent, wherein a phosphate supplying reagent is a separate and distinct compound capable of supplying a source of phosphate anion, $(PO_4)^{3-}$

The term "second component" appears in claims 22, 23, and 27.[20] For example, claim 22 provides that "wherein said second component is a phosphate supplying reagent." "A claim construction analysis must begin and remain centered on the claim language itself." Innova, 381 F.3d at 1116. Here, the claim language itself clearly defines the term "second component" as "a phosphate supplying reagent." Therefore, this Court should adopt the Government's proposed definition for "second component."

---

[20] In the context of these claims, the term "phosphate supplying reagent" means a separate and distinct compound capable of supplying source of phosphate anion, $(PO_4)^{3-}$." See *supra*, Part II.B.

**I. Monobasic Calcium Phosphate** means a compound with the chemical formula $CaH_4(PO_4) \cdot H_2O$

The term "monobasic calcium phosphate" appears in claims 25, 29, and 33. For example, claim 25 provides that "wherein said phosphate supplying reagent is phosphoric acid, trisodium phosphate, potassium phosphate, mono basic calcium phosphate, or dibasic calcium phosphate." As with the Markush group members discussed *supra*, Part III, the parties do not disagree with respect to the chemical composition of the claim terms, they only disagree as to whether "monobasic calcium phosphate" is a "compound," as the Government contends, or a "material" as Sevenson contends. The specifications support the conclusion that to one of ordinary skill in the art the "monobasic calcium phosphate" is a "compound," and not a "material." For example, the specification of the patent describes "products like phosphoric acid (phosphoric), pyrophosphates, triple super phosphate, trisodium phosphates, potassium phosphates, ammonium phosphates and/or *similar compounds*." '485 patent, col. 6, lines 29-33 (emphasis added). See also '485 patent, col. 22, lines 40-44 (Example 6) ("The treatability studies are designed to optimize … the amount and concentration of phosphoric acid (*or other phosphate compound*) needed in step II .") (emphasis added). The specification of each patent clearly indicates that to one of skill in the art the "monobasic calcium" is a "compound."

In addition, Sevenson's proposed definition should not be adopted because it incorporates the word "comprising." "Transitional phrases, such as 'comprising,' 'consisting of,' and 'consisting essentially of,' are terms of art in patent law that define the scope of the claim with respect to what unrecited additional components or steps, if any, are excluded from the scope of the claim." Conoco, 460 F.3d at 1360 (internal quotations omitted). Use of a patent law term of

art is inappropriate in this instance because such a term does not help inform the Court as to how a person skilled in the art of hazardous waste remediation would understand the claim language.

J. **Dibasic Calcium Phosphate** means a compound with the chemical formula $CaHPO_4 \cdot 2H_2O$

The term "dibasic calcium phosphate" appears in claims 25, 29, and 33. For example, claim 25 provides that "wherein said phosphate supplying reagent is phosphoric acid, trisodium phosphate, potassium phosphate, mono basic calcium phosphate, or dibasic calcium phosphate." As with the Markush group members discussed *supra*, Part III, the parties do not disagree about the chemical aspects of the claim construction, they only disagree as to whether "dibasic calcium phosphate" is a "compound," as the Government contends, or a "material" as Sevenson contends. The specifications support the conclusion that to one of ordinary skill in the art the "dibasic calcium phosphate" is a "compound," and not a "material." For example, the specification of the patent describes "products like phosphoric acid (phosphoric), pyrophosphates, triple super phosphate, trisodium phosphates, potassium phosphates, ammonium phosphates and/or *similar compounds*." '485 patent, col. 6, lines 29-33 (emphasis added). See also '485 patent, col. 22, lines 40-44 (Example 6) ("The treatability studies are designed to optimize … the amount and concentration of phosphoric acid (*or other phosphate compound*) needed in step II .") (emphasis added). The specification of each patent clearly indicates that to one of skill in the art the "aqueous phosphate reagent" is a "compound."

In addition, Sevenson's proposed definition should not be adopted because it incorporates the word "comprising." "Transitional phrases, such as 'comprising,' 'consisting of,' and 'consisting essentially of,' are terms of art in patent law that define the scope of the claim with respect to what unrecited additional components or steps, if any, are excluded from the scope of

the claim." Conoco, 460 F.3d at 1360 (internal quotations omitted). Use of a patent law term of art is inappropriate in this instance because such a term does not help inform the Court as to how a person skilled in the art of hazardous waste remediation would understand the claim language.

K. **Combination** means sulfuric acid plus phosphate supplying reagent, mixed together

The term "combination" appears in claims 28 and 30.[21] For example, claim 28 provides for "a combination of sulfuric acid and a phosphate supplying reagent." Here, the claim language itself clearly defines the term "combination" as "sulfuric acid and a phosphate supplying reagent." "A claim construction analysis must begin and remain centered on the claim language itself." Innova, 381 F.3d at 1116. Therefore, this Court's inquiry ends with the definition in the claim.

L. **Sulfate Reagent** means a separate and distinct compound capable of supplying a sulfate ion, $(SO_4)^{2-}$, that participates in a chemical reaction

The term "sulfate reagent" appears in claims 30, 31, and 34-36. For example, claim 30 provides for contacting soils or solid waste materials with "a sulfate reagent which includes one or more reactive sulfate ions." When viewed in the context of the intrinsic evidence, one of ordinary skill in the art would conclude that the term "sulfate reagent" means "a separate and distinct compound capable of supplying a sulfate ion, $(SO_4)^{2-}$, that participates in a chemical reaction." The parties disagree on whether the first component is "a separate and distinct compound" as the Government contends, or "a material," as Sevenson contends. The claim

[21] The Government's proposed definition for "combination" is "sulfuric acid plus phosphate supplying reagent, mixed together." The term "combination" appears in two claims throughout the patent, but has slightly different definitions as defined by the claims. The Government's definitions simply follow the claim language, and therefore are both treated in this section of its briefing. In claim 30, "combination" means "sulfate reagent plus phosphate supplying reagent mixed together."

language itself does not expressly state whether the sulfate reagent is "a separate and distinct compound" or "a material." However, the specification, including the drawings, support the conclusion that the patentee intended "sulfate reagent" to mean "a separate and distinct compound."

The "Summary of the Invention" section of the specification explicitly states that "[a] *first group of treatment chemicals* for use in the processes of the present invention includes lime, gypsum, alum, halites, portland cement, and other similar products that can supply sulfates, halites, hydroxides, and/or silicates." '485 patent, col. 4, lines 46-49 (emphasis added). In addition, the same section describes "mixing the solid waste with a *sulfate compound*, such as calcium sulfate dihydrate (gypsum powder) or sulfuric acid." '485 patent, col. 3, lines 4-6 (emphasis added). Similarly, the "Description of the Preferred Embodiment" section of the specification states that "*[a] first group, 'group one'*, comprises a source of sulfate, hydroxide, chloride, fluoride, and/or silicates." '485 patent, col. 6, lines 24-25; <u>see also</u> '485 patent, col. 22, lines 40-44 (Example 6) ("The treatability studies are designed to optimize the amount and grade of gypsum powder (*or other sulfate compound*) needed during step I.") (emphasis added). The references in the specification to "a first group" and "group one" treatment chemicals are juxtaposed with and contrasted to the repeated references throughout the specification to "a second group" and "group two" treatment chemicals. <u>See, e.g.</u>, '485 patent, col. 4, lines 50-55, col. 6, lines 28-34; <u>see also</u> *supra*, Part II.B. (Second Component). This highlights the separate and distinct nature of the sulfate reagent. Also, the specification of each patent clearly indicates that to one of skill in the art, each of the Markush group members is a "compound"; therefore, the Government's construction should be adopted.

The patentee's use of this deliberate language in the specification to indicate separate and distinct groups of treatment chemicals supports the Government's proposed definition for "sulfate reagent." The patentee has indicated the importance of this language by including it not only in the "Description of the Preferred Embodiment," but also in the "Summary of the Invention" of each of the patents. See, e.g., C.R. Bard, 388 F.3d at 864 (noting that "[s]tatements that describe the invention as a whole are more likely to be found in certain sections of the specification, such as the Summary of the Invention").

Moreover, the drawings accompanying the patent distinctly show separate and distinct groups of treatment chemicals. See, e.g., Figure 1 (reproduced *supra*, Part II.A). Where, as here, a visual representation is used to "flesh out words," the drawings are an important part of the specification to consider when performing claim construction analysis. See Autogiro, 384 F.3d at 391. Consistent with the language in the specification, Figure 1 depicts the "group one" and "group two" treatment chemicals as separate and distinct compounds that participate in the patented method. See '485 patent, Fig. 1.

Finally, Sevenson's proposed definition should be rejected because it incorporates the word "material," which is used in each of the five patents-in-suit to refer to the material that is treated by the patented method. Therefore, Sevenson's proposed definition introduces another level of confusion and uncertainty into the claim construction analysis of these patents. Thus, based on a totality of the intrinsic evidence, it is clear that the construction of "sulfate reagent" that stays true to the claim language and most naturally aligns with the patent's description of the invention is the Government's proposed definition: "a separate and distinct compound capable of supplying a sulfate ion, $(SO_4)^{2-}$, that participates in a chemical reaction." See Renishaw, 158 F.3d at 1250.

**Conclusion**

For the reasons stated above, the Government requests that the Court construe the claim terms in accordance with the foregoing definitions.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JOHN J. FARGO
Director

Dated: 11/8/06

MARCY E. COOK
Attorney
Civil Division
U.S. Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0459
Facsimile: (202) 307-0345

Attorneys for the United States

Dated: Nov. 8, 2006

RUSSEL O. PRIMEAUX
Kean Miller Hawthorne
D'Armond McCowan & Jarman LLP
One American Place, 22nd Floor
Post Office Box 3513
Baton Rouge, LA 70821-3513
Phone: 225.387.0999
Facsimile: 225.388.9133

Counsel for Shaw Environmental, Inc.