**IN THE UNITED STATES COURT**
**OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **SEVENSON ENVIRONMENTAL SERVICES, INC.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**THE UNITED STATES,**<br><br>**Defendant.** | ) | **Case No.: 05-1075C**<br>**Judge Thomas C. Wheeler** |

**Electronically Filed November 29, 2006**

**PLAINTIFF SEVENSON ENVIRONMENTAL SERVICES, INC.'S**
**REPLY BRIEF IN SUPPORT OF CLAIM CONSTRUCTION**

**McDERMOTT WILL & EMERY LLP**
Brian E. Ferguson
600 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 756-8000

**WEBSTER SZANYI LLP**
Kevin A. Szanyi
Nelson Perel
1400 Liberty Building
Buffalo, New York 14202
(716) 842-2800

*Attorneys for Plaintiff*
*Sevenson Environmental Services, Inc.*

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. ANALYSIS OF THE DISPUTED TERMS ..... 3

A. The Government Improperly Interjects as an Extraneous Limitation Two "Separate and Distinct Compounds" ..... 3

B. The Government Improperly Interjects an Extraneous Numerical Amount Limitation ..... 7

C. The Government Improperly Interjects Extraneous "Compound" Limitations ..... 11

1. The Government Improperly Interjects a Preferred "Compound" Embodiment from the Specifications ..... 11

2. The Government Improperly Interjects an Extraneous "Compound" Limitation Contrary to Common and Ordinary Meaning ..... 12

3. The Government Improperly Interjects Closed Language Limitations which do not Account for Impurities ..... 12

D. The Government Improperly Ignores the Common and Ordinary Meaning of Claim Terms, Thereby Rendering Other Claim Language Superfluous and Redundant ..... 14

E. The Government Improperly Interjects a Weight Limitation from the Specifications into Disputed Term "Technical Grade Phosphoric Acid" ..... 20

F. The Government Improperly Interjects a TCLP Test Criteria Limitation from the Specifications into the Claims ..... 22

G. Miscellaneous Disputed Claim Terms ..... 26

III. CONCLUSION ..... 29

# TABLE OF AUTHORITIES

**Page**

## Cases

*Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14 (Fed. Cir. 2000)................................ 5

*Astrazeneca AB v. Mut. Pharm. Co.,* 384 F.3d 1333 (Fed. Cir. 2004)....................................... 21

*CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359 (Fed. Cir. 2002) .................................... 16

*Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998) .............................................. 1

*E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430 (Fed. Cir. 1988)...... 12

*Gart v. Logitech, Inc.*, 254 F.3d 1334 (Fed. Cir. 2001)................................................................ 5

*Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575 (Fed. Cir. 1996)................................ 6

*Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323 (Fed. Cir. 2001)...................... 1

*Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361 (Fed. Cir. 2004).................................. 3

*Manning v. Paradis*, 296 F.3d 1098 (Fed. Cir. 2002) .................................................................. 7

*Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005)................................. 2

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*).................................... *passim*

*Power Mosfet Techs., LLC v. Siemens AG*, 378 F.3d 1396 (Fed.Cir. 2004) .......................... 2, 14

*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243 (Fed. Cir. 1998) ....................... 21

*Rhine v. Casio, Inc.*, 183 F.3d 1342 (Fed. Cir. 1999) ................................................................... 7

*Teleflex, Inc. v. Fricosa N. Am. Corp.*, 299 F.3d 1313 (Fed. Cir. 2002)...................................... 3

## Miscellaneous

American Heritage Dictionary, 2d Coll.Ed (Houghton Mifflin Co. 1982) .................................. 7

Hawley's Condensed Chemical Dictionary 11th Ed. (Van Nostrand Reinhold Co., Inc. 1987 ........................................................................................... 23

McGraw-Hill Dictionary of Scientific and Technical Terms, 3d Ed. (McGraw-Hill Inc. 1984) ................................................................................................ 27

Plaintiff Sevenson Environmental Services, Inc. ("Sevenson") submits this Reply in further support of its claim construction positions advanced in the Modified Joint Claim Construction Statement filed on October 18, 2006 (the "MJCCS") and in its Memorandum on Claim Construction filed on November 8, 2006 (hereafter referred to as "Sevenson's Brief"), and responds to the arguments set forth in the Government's Opening Claim Construction Brief (hereafter referred to as "the Government's Brief").

## I. INTRODUCTION

The tortured arguments proffered by the Government serve only to confirm the correctness of Sevenson's claim construction positions. Sevenson's constructions are plainly grounded in the ordinary and customary meanings to a person of ordinary skill in the art as supported by technical and general dictionaries, and are consistent with the context of the patents as a whole.[1] In contrast, The Government proposes constructions of the claim terms contrary to the common and ordinary meaning.

The Government repeatedly seeks to add unclaimed and unnecessary limitations to the claims via its proposed constructions. There a number of disputed claim terms in which the Government is attempting to redraft the claim language to include certain extraneous limitations with no support in the intrinsic evidence. Part A below addresses the Government's improper insertion of the extraneous "separate and distinct compound" limitation into numerous claims, even though there is nothing in the claim language that requires such limitations, and further the specification expressly contradicts the Government's position. Part B addresses its

---

[1] To aid in determining the meaning of the asserted claims, at any time general purpose and technical dictionaries may be consulted "so long as the dictionary definitions do not contradict any definition found in or ascertained by a reading of the patent documents." *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1332 n.1 (Fed. Cir. 2001) (citation omitted); *see also Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1459 (Fed. Cir. 1998).

impermissible numerical amount limitation whereby the Government incorrectly contends that "at least one" and "one or more" really mean "more than one." Part C addresses the Government's improper insertion of several "compound" limitations which alters the meaning of the certain claim terms.

The Government also improperly proffers definitions that would render wholly redundant and meaningless other terms present in the claims, thereby resulting in unnecessary limitations and redundancy in the asserted claims.[2] Similarly, Part D illustrates how for a number of disputed claim terms the Government has ignored the common and ordinary meaning and has instead limited the claim terms on a claim-by-claim basis to the specific manner in which that term is used so to render other claim limitations wholly superfluous and redundant.

The Government also repeatedly seeks to add limitations from the specifications to the claims via its proposed constructions. Part E addresses the Government's improper insertion of an unclaimed weight percentage limitation into the term "technical grade phosphoric acid." Finally, Part F addresses the Government's improper insertion of a TCLP test criteria into certain disputed claims.

There is a heavy presumption that claim terms are to be given their "ordinary and customary meaning" as understood by one of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1312-13. There are three limited circumstances in which claims may be given a special definition that differs from the common and ordinary meaning: (i) an explicit

---

[2] Every word in a claim is presumed to have meaning, and it is a basic rule that claim terms are interpreted so that no term in the claim is rendered superfluous. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("a claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so"); *Power Mosfet Techs., LLC v. Siemens AG*, 378 F.3d 1396, 1410 (Fed .Cir. 2004) (interpretations of claims rendering claim terms superfluous is disfavored).

definition for a claim term in which the patentee is his own lexicographer (*Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (*en banc*) (*cert. denied*) 156 S. Ct. 1332 (2006) (citations omitted)), (ii) expressions of manifest exclusion or restriction in the specification representing a clear disavowal of claim scope (*Teleflex, Inc. v. Fricosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002)), and (iii) a clear and unmistakable disavowal of claim scope in the prosecution history (*Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1368 (Fed. Cir. 2004)).

Among the disputed claim terms here, the Sevenson inventors acted as their own lexicographer with respect to only a single term, "host material," which is explicitly defined in the '367 patent. '367 patent at 5:7-8. For all other disputed claim terms, nothing in the intrinsic evidence, including the specifications and prosecution histories of the asserted patents, warrants deviation from the common and ordinary meaning. The Government's proposed constructions should be rejected because they are contrary to the common and ordinary meaning and violate basic tenets of claim construction law by interjecting extraneous limitations and limitations from the specifications into the claims, and offers constructions that add redundant and superfluous language in the claims. Accordingly, Sevenson's constructions should be adopted.

## II. ANALYSIS OF THE DISPUTED TERMS

### A. The Government Improperly Interjects as an Extraneous Limitation Two "Separate and Distinct Compounds"

The Government's claim that there must be "separate and distinct compounds" separately supplying sulfates and phosphates represents the most fundamental disagreement between the parties on claim construction. Technically, the issue is not one of claim construction because the term the Government seeks to add is **not** a term contained in any of the asserted claims in this case. For example, substituting the government's proposed construction for the terms "first

component" and "second component" into claim 1 of the '982 patent in place of the terms themselves yields the following claim language:

> 1. A method of treating metal-bearing materials to stabilize leachable metal contained therein, said method comprising the steps of:
> Mixing a metal-bearing material with a first mixture comprising a [***A separate and distinct compound*** *capable of supplying a source of sulphates, halites, and/or silicates, wherein sulphates consist of a substance containing the anion* $(SO_4)^{2-}$*, wherein halites consist of the substance sodium chloride (NaCl), and wherein silicates consist of a substance having a molecular structure containing silicon, oxygen, and one or more metals, but not including hydroxides, lime, or portland cement*] and a [***A separate and distinct compound*** *capable of supplying a source of phosphate anion,* $(PO_4)^{3-}$] to form a second mixture, wherein… .

Nothing in the intrinsic evidence justifies limiting the scope of the asserted claims to two "separate and distinct compound[s]."[3] To the contrary, the asserted claims specifically recite that a single treatment additive, mixture or reagent may be used to supply the sulfates and phosphates necessary to practice the invention. For this reason, the Government's attempt to add the term "separate and distinct compounds" separately supplying sulfates and phosphates should be rejected out of hand.

No permissible circumstance exists to warrant deviating from the common and ordinary meaning as the Government contends. For support, the Government merely references disclosure in the specifications to a "first group" and/or "group one" treatment chemicals,

---

[3] Specifically, the Government interjects the extraneous limitation "separate and distinct compound" into the following disputed elements of the following asserted claims: "***first component***" in claims (i) 1 and 4 of the '982 patent, (ii) 1-3, 6, 15-17 and 20 of the '123 patent, (iii) 20, 26, 27 and 30 of the '608 patent, and (iv) 1-3, 6, 15-17, 20-23, 26 and 27 of the '485 patent; "***phosphate compound***" in claims 1, 5-7 and 11 of the '608 patent; "***phosphate supplying reagent***" in claims 22, 24, 25, 28-33 and 35 of the '485 patent; "***reagent***" in claims 1 and 4 of the '608 patent; "***second component***" in claims (i) 1, 5 and 9 of the '982 patent, (ii) 1, 2, 4-6, 15, 16 and 18-20 of the '123 patent, (iii) 20, 26, 28, 29 and 30 of the '608 patent and (iv) 1, 2, 4-6, 15, 16, 18-23 and 27 of the '485 patent; and "***sulfate reagent***" in claims 30, 31 and 34-36 of the '485 patent.

juxtaposed with references to a "second group" and/or "group two" treatment chemicals.[4] But neither this cited language, nor any other language of the specifications amounts to an *explicit* definition or *deliberate*[5] language limiting the meaning of "*first component*," "*phosphate compound*," "*phosphate supplying reagent*," "*reagent*," "*second component*," or "*sulfate reagent*" to two "separate and distinct compounds." Also, there is no clear and unmistakable disavowal in the specifications or prosecution histories of the asserted patents that restrict the claim scope from comprising one treatment chemical as a source of both sulfate and phosphate ions.

Moreover, the Government fails to consider the whole patent and ignores language in the specifications of the asserted patents that describes a ***single*** treatment additive, mixture or reagent, e.g., phosphoric acid, capable of providing sulfate and phosphate ions. *See* e.g., '608 patent at 16:54-56 ("The example also illustrates that ***one*** or more compounds of the same group can be used together meet the regulatory threshold limit"); Table III in Example 1 (Shows that a single-step application of phosphoric acid reduced leachable lead content to 3.6 mg/l under TCLP testing); Table V in Example 3 (Shows certain treated material that did not pass the TCLP regulatory criteria of 5.0 mg/l "was retreated …***… using sufficient amounts of phosphoric acid …***… to lower the TCLP lead to 2.4 mg/l and 2.5mg/l, respectively."); and Table VI in

[4] The Government also erroneously relies on certain figures in the patents showing one embodiment of the invention, while ignoring the long-standing rule of claim construction that claims are not to be confined to one embodiment of the specification, even if there is only a single embodiment. *Phillips*, 415 F.3d at 1323. In addition, the Government's argument contravenes Federal Circuit precedent that a patent's drawings are "not meant to represent 'the' invention or to limit the scope of coverage defined by the words used in the claims themselves." *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1342 (Fed. Cir. 2001).

[5] "The specification cannot support a definition that is contrary to the common and ordinary meaning of a claim term unless it communicates a deliberate and clear preference for [an] alternative definition." *Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 21 n. 5 (Fed. Cir. 2000).

Example 4 (shows a number of single step applications of phosphoric acid to a variety of lead-bearing materials reducing the amount of leachable lead in those materials to below 5.0 mg/l under TCLP testing). The Government's claim interpretation would thus exclude a preferred embodiment of the specifications of the asserted patents directed to phosphoric acid as the sole treatment additive, mixture or reagent. *See Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1581 (Fed. Cir. 1996), *cert denied*, 519 U.S. 911 (1996) ("[I]t is unlikely that an inventor would define the invention in a way that excluded the preferred embodiment, or that persons of skill in [the art] would read the specification in such a way.").

The Government's proffered construction of "separate and distinct compounds" improperly converts the claims directed to a "one-step" treatment application into "two-step" treatment application. The error of this construction is most clearly shown by the fact that in addition to "one-step" claims, the asserted patents specifically cover "two-step" claims whereby a separate and distinct source of sulfates is supplied followed by a second step application of a separate source of phosphates. These "two-step" claims would have been completely unnecessary if, as the Government contends, the "one-step" claims required a separate and distinct compound supplying sulfates and a separate and distinct compound supplying phosphates. Accordingly, Sevenson's constructions, which are consistent with the common and ordinary meaning and do not exclude embodiments described in the intrinsic evidence, should be adopted.[6]

---

[6] The Government's contention that use by Sevenson of the term "material" within its constructions causes confusion because the term "material" is itself disputed and because it also appears as part of other disputed elements, like "metal-bearing material(s)" is without merit. Sevenson uses the term according to its common and ordinary meaning consistently among the disputed claim elements (i.e., "material" means "composed of or pertaining to physical

(continued…)

### B. The Government Improperly Interjects an Extraneous Numerical Amount Limitation

In the following disputed elements: "*at least one phosphate anion*,"[7] "*one or more reactive phosphate anions*,"[8] "*source of a phosphate ion*,"[9] "*one or more reactive sulfate ion(s)*,"[10] "*source of a sulfate ion*,"[11] and "*sulfate ion(s)*,"[12] the Government attempts to impose extraneous amount limitations into the asserted claims, with respect to either (i) the amount of phosphate or sulfate ions necessary to treat the metal-bearing material, and/or (ii) the amount of metal-bearing material being treated. First, the Government incorrectly argues that in order to practice the claimed inventions, "at least one" phosphate or "one or more" sulfate ion must be construed to actually mean "more than a single molecule" of phosphate or sulfate. *See* e.g., Government's Brief, Part II. C. at 20- 21; Part VII. G. at 59-60. This argument is contrary to Federal Circuit precedent which has consistently construed "at least one" and "one or more" to mean "one or more than one." *See*, e.g., *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999) ("use of the phrase 'at least one' means that there could be only one or more than one"). For support, the Government cites to *Manning v. Paradis*, 296 F.3d 1098 (Fed. Cir. 2002) as authority permitting inference in order for the invention to work that there must be more than one

---

substances; related to matter." American Heritage Dictionary, 2d Coll.Ed (Houghton Mifflin Co. 1982) at 806 (material –*adj*. 1.) attached as Exhibit 7 to Sevenson's Brief.

[7] Disputed claim term "***at least one phosphate anion***" is in asserted claims: (i) 1 of the '982 patent, and (ii) 1 and 15 of the '123 patent.

[8] Disputed claim term "***one or more reactive phosphate ions***" is in asserted claims 24 and 32 of the '485 patent.

[9] Disputed claim term "***source of a phosphate ion***" is in asserted claim 11 of the '367 patent.

[10] Disputed claim term "***one or more reactive sulfate ion(s)***" is in asserted claims 22 and 30 of the '485 patent.

[11] Disputed claim term "***source of a sulfate ion***" is in asserted claim 11 of the '367 patent.

[12] Disputed claim term "***sulfate ion(s)***" is in asserted claim 17 of the '485 patent.

phosphate and sulfate ion to react with metal-bearing waste material. The Government's authority is misplaced because here, the intended purpose of the claimed inventions as set forth in the preamble of the asserted claims is realized without reading in the "more than one limitation" as the Government urges. Indeed, one ion of phosphate and one ion of sulfate would treat or react with one molecule of waste to immobilize or stabilize the leachable materials contained therein. Nothing in the specifications or prosecution history indicates anything contrary to one phosphate and one sulfate ion being capable of reacting with waste to achieve the purpose of the claimed inventions. Likewise, there is no limitation in the intrinsic evidence to the amount of soil or other waste material being treated with at least one phosphate and one or more sulfate ion(s).

The Government's contention that more than a single molecule of phosphate ion and sulfate ion is required to practice the invention is contrary to the intrinsic evidence. The plain language of the claims do not require such a limitation. For example, asserted claim 1 of the '982 patent states, "… said second component supplies at least one phosphate anion;… ." Formerly asserted claim 12 of the '982 patent similarly states, "… a phosphate reagent having ***at least one phosphate anion for reacting*** with leachable metal… ." Asserted claim 22 of the '485 patent recites, "… said first component includes one or more reactive sulfate ions,… ." Likewise, these terms have neither been expressly defined in the specifications of the asserted patents as the Government contends, nor has subject matter been clearly surrendered in the specifications or during prosecution. Accordingly, the Government's constructions for disputed claim terms: "*at least one phosphate anion*," "*one or more reactive phosphate anions*," "*source of a phosphate ion*," "*source of a sulfate ion*," "*sulfate ion(s)*," and "*one or more reactive sulfate ion(s)*" should be rejected.

On the other hand, Sevenson's constructions set forth below in Table 1 represent the common and ordinary meaning, consistent with the plain language of the claims and the patent as a whole, and therefore should be adopted.

**TABLE 1**

| Term | Sevenson's Proposed Construction | Plain Language or the Claims |
|---|---|---|
| **At least one phosphate anion** | At least one phosphate anion of $(PO_4)^{3-}$<br>MJCCS, U.S. Pat. No. 5,916,123 at 10. | "A method of treating metal-bearing material with a treatment additive comprising a first component and a second component …***…wherein said second component supplies ***at least one phosphate anion***, … ."<br>'123 patent at cl. 1. |
| **One or more reactive sulfate ion(s)** | At least one sulfate ion $(SO_4)^{2-}$ available for use in a reaction<br>MJCCS, U.S. Pat. No. 6,139,485 at 30.<br>American Heritage at 1085 (reactive 3.) ("Tending to participate in reactions") attached hereto as Exhibit 39. | "A method of immobilizing leachable lead in contaminated soils or solid waste materials comprising:<br>contacting contaminated soils or solid waste materials containing leachable lead with a treatment additive comprising a first component and a second component to form a mixture, wherein said first component includes ***one or more reactive sulphate ions***, and wherein said second component is a phosphate supplying reagent; and … ."<br>'485 patent at cl. 22. |
| **One or more reactive phosphate ions** | At least one phosphate ion available for use in a reaction<br>MJCCS, U.S. Pat. No. 6,139,485 at 35.<br>American Heritage at 1085 (reactive 3.) ("Tending to participate in reactions") attached hereto as Exhibit 39. | "The method of immobilizing leachable lead in contaminated soils or solid waste materials of claim 22, wherein said phosphate supplying reagent supplies ***one or more reactive phosphate ions***."<br>'485 patent at cl. 24. |

| Term | Sevenson's Proposed Construction | Plain Language or the Claims |
|---|---|---|
| **Source of a phosphate ion** | The point of origin for a reactive phosphate ion, wherein a phosphate ion is the negative ion $(PO_4)^{3-}$<br><br>MJCCS, U.S. Pat. No. 5,732,367 at 6.<br><br>American Heritage at 1235 (source 1.) ("Point of origin") attached as Exhibit 8 to Sevenson's Brief. | "A process for treating a host material comprising solid waste materials containing leachable radionuclides and radioactive compounds, said process comprising the steps of:<br><br>contacting said host material with a single reactant comprising a ***source of a sulfate ion and a phosphate ion*** to form a mixture, said mixture containing substantially insoluble Apatitic-structure mineral species; and … ."<br><br>'367 patent at cl. 11. |
| **Source of a sulfate ion** | The point of origin for a reactive sulfate ion, wherein a sulfate ion is the negative ion $(SO_4)^{2-}$<br><br>MJCCS, U.S. Pat. No. 5,732,367 at 5.<br><br>American Heritage at 1235 (source 1.) ("Point of origin") attached as Exhibit 8 to Sevenson's Brief | "A process for treating a host material comprising solid waste materials containing leachable radionuclides and radioactive compounds, said process comprising the steps of:<br><br>contacting said host material with a single reactant comprising a ***source of a sulfate ion*** and a phosphate ion to form a mixture, said mixture containing substantially insoluble Apatitic-structure mineral species; and … ."<br><br>'367 patent at cl. 11. |
| **Sulfate ion(s)** | A material comprising sulfate ion $(SO_4)^{2-}$<br><br>American Heritage at 806 (material –*adj*. 1.) ("Composed of or pertaining to physical substances; related to matter") attached as Exhibit 7 to Sevenson's Brief.<br><br>MJCCS, U.S. Pat. No. 6,139,485 at 23. | "The method of treating said waste matrix of claim 15, wherein said first component supplies ***sulfate ions***."<br><br>'485 patent at cl. 17. |

### C. The Government Improperly Interjects Extraneous "Compound" Limitations

There are three instances where the Government improperly inserts a "compound" limitation into disputed claim terms. First, the Government restricts the meaning of certain ion components and the like to a compound based on an embodiment described in the specifications of the asserted patents. Second, the Government restricts the meaning of certain ions, acids and the like to a compound contrary to the common and ordinary meaning of the disputed claim terms. Last, the Government unduly restricts the common and ordinary meaning of certain chemical members of the claimed Markush groups by imposing closed language phrases that do not account for impurities and variability in grades of chemicals available.

#### 1. The Government Improperly Interjects a Preferred "Compound" Embodiment from the Specifications

For disputed claim elements "*at least one phosphate anion*," "*one or more reactive phosphate ions*," "*one or more reactive sulfate ion(s)*," "*source of a phosphate anion*," "*source of a sulfate ion*" and "*sulfate ion*," the Government unduly restricts the claim scope by imposing a compound limitation in its proposed constructions. For example, the Government construes "*one or more reactive sulfate ion(s)*" to mean "[a] compound containing a reactive sul[f]ate ion, $(SO_4)^{2-}$." MJCCS, U.S. Pat. No. 6,139,485 at 30 (One or more reactive sulfate ion(s)). For support, the Government cites to passages in the specification that disclose certain chemicals and compounds useful in providing sulfate ions. *Id*. Nothing in the specification of the '608 patent or any other of the asserted patents by explicit definition or by manifest exclusion, and nothing in the prosecution history by clear and unmistakable disavowal, require "one or more reactive sulfate ion(s)" to be limited to a compound. The Government is attempting to read in a preferred embodiment from the specifications of the asserted patents in defiance of the long-standing rule that limitations from the specifications are not to limit claim scope. *E.I. Du Pont de Nemours &*

*Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988); *Phillips*, 415 F.3d at 1323. Thus, Sevenson's constructions represent the common and ordinary meaning consistent with the context of the patent as a whole and should be adopted. *See* Table 1 above.

**2. The Government Improperly Interjects an Extraneous "Compound" Limitation Contrary to Common and Ordinary Meaning**

The Government's attempt to read into some asserted claims a "compound" limitation requiring certain acids and ion elements and the like to be a "compound" is contrary to the common and ordinary meaning.[13] As more fully set forth in Part VII.B.2. of Sevenson's Brief, the common and ordinary meaning of the terms "ion" and "acid" to one of ordinary skill in the art implies particular chemical properties or characteristics that not all compounds possess. Therefore, to define these claim terms as "compounds" unduly alters their common and ordinary meaning without any support in the intrinsic evidence to do so. Sevenson's constructions, set forth in Table 1 above, do not alter the common and ordinary meaning of the acid and ion elements and follow the plain language of the claims. Accordingly, Sevenson's constructions should be adopted.

**3. The Government Improperly Interjects Closed Language Limitations which do not Account for Impurities**

The Government attempts to unduly restrict the common and ordinary meaning of numerous disputed claim terms that define the members of the Markush groups of the asserted

[13] Specifically, the Government interjects the extraneous "compound" limitation into the following disputed elements of the following asserted claims: "***phosphoric acid***" in claims: (i) 5 and 9 of the '982 patent, (ii) 5, 6, 19 and 20 of the '123 patent, (iii) 29 and 30 of the '608 patent, and (iv) 5, 6, 19-21, 25, 27, 29, 33 and 35 of the '485 patent; "***sulfuric acid***" in claims: (i) 3, 21, 26-28 and 34-36 of the '485 patent; "***at least on phosphate anion***" in claims: (i) 1 of the '982 patent, and (ii) 1 and 15 of the '123 patent; "***one or more reactive sulfate ion(s)***" in claims 22 and 30 of the '485 patent; "***one or more reactive phosphate ions***" in claims 24 and 32 of the '485 patent; "***source of a phosphate ion***" in claim 11 of the '367 patent; and "***source of a sulfate ion***" in claim 11 of the '367 patent.

claims. Specifically, the Government imposes one of the following restrictive clauses in its proposed definitions: (i) "compound containing,[14]" (ii) compound with the chemical formula,[15]" and (iii) "compound having a molecular structure containing.[16]" The Government's proposed language is an improper effort to exclude any additional ingredients, ***like impurities***, that are present, but not specified. Whereas, Sevenson's proposed constructions, which employ the term "comprising," include unrecited but present impurities in the chemical members of the Markush groups of the claimed inventions. It is apparent to one of ordinary skill in the art that there are varying grades of chemicals available. Indeed, the specifications of the asserted patents acknowledge this by describing ***Technical Grade*** Phosphoric Acid as "70% (by weight) phosphate …***… and sulfate …***…, typically as sulfuric acid in the range of 2.5% to 7% by

[14] Specifically, the Government unduly narrows the scope of the following asserted claims by imposing the limitation "compounds containing" in the following dispute claim terms: "***ammonium phosphate(s)***" in claim 5 of the '982 patent; "***calcium sulfate***" in claim 3 of the '608 patent; "***chloride(s)***" in claims 1, 8 and 15 of the '485 patent; "***fluoride(s)***" in claims 1 and 15 of the '485 patent: "***halides***" in claims 1 and 15 of the '485 patent; "***halites***" in claims: (i) 1 and 4 of the '982 patent, (ii) 1 and 15 of the '123 patent, (iii) 1 and 20 of the '608 patent, and (iv) 1 and 15 of the '485 patent; "***potassium phosphate(s)***" in claims: (i) 5 of the '982 patent and (ii) 25, 29 and 33 of the '485 patent; "***pyrophosphate(s)***" in claim 5 of the '982 patent; "***sulfate ion(s)***" in claim 17 of the '485 patent; "***sulphate(s)***" in claims: (i) 1 of the '982 patent, (ii) 1, 3, 6, 15, 17, and 20 of the '123 patent, (iii) 1,3, 4, 20, 27 and 30 of the '608 patent, and (iv) 1, 6, 15 and 20 of the '485 patent; "***sulphates of aluminum***" in claim 4 of the '982 patent; and "***sulphates of iron***" in claim 4 of the '982 patent.

[15] Specifically, the Government unduly narrows the meaning of the following asserted claims by imposing the limitation "with the chemical formula" in the following dispute claim terms: "***dibasic calcium phosphate***" in claims 25, 29 and 33 of the '982 patent; "***monobasic calcium phosphate***" in claims 25, 29 and 33 of the '982 patent; "***phosphoric acid***" in claims: (i) 5 and 9 of the '982 patent, (ii) 5, 6, 19 and 20 of the '123 patent, (iii) 29 and 30 of the '608 patent, and (iv) 5, 6, 19-21, 25, 27, 29, 33 and 35 of the '485 patent; "***sulfuric acid***" in claims: (i) 3 of the '608 patent, and (ii) 3, 21, 26-28 and 34-36 of the '485 patent; and "***trisodium phosphate***" in claims: (i) 5 of the '982 patent, and (ii) 25, 29 and 33 of the '485 patent.

[16] Specifically, the Government unduly narrows the meaning of the disputed element "***silicates***" by interposing the limitation "having a molecular structure containing" in the following asserted claims: (i) 1 of the '982 patent, (ii) 1 and 15 of the '123 patent, (iii) 1 and 20 of the '608 patent, and (iv) 1 and 15 of the '485 patent.

weight as an impurity,… .” *See also* Exhibits 19-25 to Sevenson’s Brief that illustrate varying grades of other disputed chemical claim terms. Accordingly, Sevenson’s constructions should be adopted.

### D. The Government Improperly Ignores the Common and Ordinary Meaning of Claim Terms, Thereby Rendering Other Claim Language Superfluous and Redundant

Numerous asserted claims recite a disputed element in which the Government wrongly attempts to read in extraneous information into the claims, thereby causing remaining claim language to be redundant and superfluous. *Power Mosfet*, 378 F.3d at 1410 (interpretations of claims rendering claim terms superfluous is disfavored). For example, claim 1 of the ‘982 patent states, “… wherein said ***metal-bearing material*** contains at least one leachable metal selected from the group consisting of … .” ‘982 patent at cl. 1. The Government proposes to construe “*metal-bearing material*” as “[m]aterial(s) containing at least one leachable metal.” *See* MJCCS, U.S. Pat. No. 5,527,982 at 3 (Metal-bearing material). For support, the Government claims to rely on the plain language of the claims. While the Government’s proposed construction does follow the language of claim 1, the fatal flaw is that it ignores the common and ordinary meaning of the term in question, limiting the term to the specific manner in which it is used in the claim.

This is best demonstrated by an example. Substituting the Government’s proposed construction for “*metal bearing material*” into claim 1 of the ‘982 patent in place of the term itself yields the following claim language: “… wherein said [***material(s) containing at least one leachable metal***] contains at least one leachable metal selected from the group consisting … .” The result is an obvious redundancy that renders the term “at least one leachable metal” *already present in the claim* completely superfluous.

Other claims of the asserted patents contain similar disputed claim elements set forth in Table 2 below that the Government proposes be construed in a similar, illogical fashion.

**TABLE 2**

| Disputed Term | The Government's Proposed Construction | Effective Claim Construction |
|---|---|---|
| **Combination**[17] | [1]Sulfuric acid plus phosphate supplying reagent, mixed together<br><br>[2]Sulfate reagent plus phosphate supplying reagent mixed together | [1]"A method of immobilizing leachable lead …***… comprising: contacting contaminated soils and solid waste material with a [***sulfuric acid plus phosphate supplying reagent, mixed together***] of sulfuric acid and a phosphate supplying reagent; and … ."<br><br>'485 patent at cl. 28<br><br>[2]"A method of immobilizing leachable lead …***… comprising: contacting contaminated soils or solid waste materials with a [***sulfate reagent plus phosphate supplying reagent mixed together***] of a sulfate reagent which includes one or more reactive sulfate ions and a phosphate supplying reagent; and … ."<br><br>'485 patent at cl. 30 |
| **Contaminated soils or solid waste materials**[18] | Soils or solid waste materials containing leachable lead<br><br>MJCCS, U.S. Pat. No. 6,139,485 at 28 | "A method of immobilizing leachable lead …***… comprising: contacting [***soils or solid waste materials containing leachable lead***] containing leachable lead… ."<br><br>'485 patent at cl. 22 |

[17] Disputed claim term "***combination***" is in asserted claims 28 and 30 of the '485 patent.

[18] Disputed claim term "***contaminated soils or solid waste material***" is in asserted claims 22-36 of the '485 patent.

| Disputed Term | The Government's Proposed Construction | Effective Claim Construction |
|---|---|---|
| **First mixture**[19] | [1]First component plus second component mixed together<br><br>MJCCS, U.S. Pat. No. 5,527,982 at 5.<br><br>[2]Material plus reagent mixed together<br><br>MJCCS, U.S. Pat. No. 5,994,608 at 5. | [1]"A method of treating metal-bearing materials …***… mixing a metal-bearing material with a [***first component plus a second component mixed together***] comprising a first component and a second component to form a second mixture … ."<br><br>'982 patent at cl. 1.<br><br>[2]"A process for treating a material …***… contacting said material with a reagent selected from the group consisting of sulfates, halites, silicates, alum and calcium oxide to produce a [***material plus reagent mixed together***]; … ."<br><br>'608 patent at cl. 1. |
| **Host Material**[20,21] | Debris, soil, sludges, and solid materials containing leachable radionuclides and radioactive compounds<br><br>MJCCS, U.S. Pat. No. 5,732,367 at 4. | "A process for treating a [***debris, soil, sludges, and solid material containing leachable radionuclides and radioactive compounds***] comprising solid waste materials containing leachable radionuclides and radioactive compounds, … ."<br><br>'367 patent at cl. 11. |

[19] Disputed claim term "***first mixture***" is in asserted claims: (i) 1 of the '982 patent, and (ii) 1 of the '608 patent.

[20] Disputed claim term "***host material***" is in asserted claims 11 and 14 of the '367 patent.

[21] The patentee in the '367 patent has chosen to be his own lexicographer and has explicitly defined "***host material***" to mean "debris, soil, sludges and solid materials." '367 patent at 5:7-8. The Government attempts to read in a further limitation, "containing leachable radionuclides and radioactive compounds" in direct contravention to the express written definition. The patentee's lexicography governs (*Phillips*, 415 F.3d at 1316 (*citing CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)) and thus, Sevenson's proposed construction which reiterates verbatim this lexicography should be adopted.

| Disputed Term | The Government's Proposed Construction | Effective Claim Construction |
|---|---|---|
| **Lead-bearing material(s)**[22] | Material(s) containing leachable lead<br>MJCCS, U.S. Pat. No. 6,139,485 at 3. | "A method of treating lead-bearing material …***… mixing a [***material(s) containing leachable lead***] containing leachable lead with a … ."<br>'485 patent at cl. 1. |
| **Material**[23] | Debris, soil, sludges, and solid materials containing leachable radioactive substances<br>MJCCS, U.S. Pat. No. 5,994,608 at 3. | "A process for treating a [***debris, soil, sludges, and solid materials containing leachable radioactive substances***] that contains leachable radioactive substances, … ."<br>'608 patent at cl. 1. |
| **Metal-bearing material(s)**[24] | Material(s) containing at least one leachable metal<br>MJCCS, U.S. Pat. No. 5,527,982 at 3. | "A method of treating metal-bearing materials …***… mixing a [***material(s) containing at least one leachable metal***] with a first mixture …***… wherein said [***material(s) containing at least one leachable metal***] contains at least one leachable metal … ."<br>'982 patent at cl. 1. |

[22] Disputed claim term "***lead-bearing material***" is in asserted claims 1-6 of the '485 patent.

[23] Disputed claim term "***material***" is in asserted claims 1, 2, 12-18, 20-22 and 24 of the '608 patent.

[24] Disputed claim term "***metal-bearing material(s)***" is in asserted claims: (i) 1, 3, 7 and 12 of the '982 patent, and (ii) 1-7 of the '123 patent.

| Disputed Term | The Government's Proposed Construction | Effective Claim Construction |
|---|---|---|
| **Mixture**[25] | [1]Metal-bearing material plus treatment additive mixed together, wherein the treatment additive is the first component plus the second component mixed together<br><br>MJCCS, U.S. Pat. No. 5,916,123 at 11.<br><br>[2]Waste matrix of metal-bearing material and soil plus treatment additive mixed together, wherein the treatment additive is the first component plus the second component mixed together<br><br>MJCCS, U.S. Pat. No. 5,916,123 at 20. | [1]"A method of treating metal-bearing material …***… mixing a metal-bearing material with a treatment additive comprising a first component and a second component to form a [***metal-bearing material plus treatment additive mixed together, wherein the treatment additive is the first component plus the second component mixed together***], … ."<br><br>'123 patent at cl. 1.<br><br>[2]"A method of treating a waste matrix of metal-bearing material and soil …***… mixing said waste matrix with a treatment additive comprising a first component and a second component to form a [***waste matrix of metal-bearing material and soil plus treatment additive mixed together, wherein the treatment additive is the first component plus the second component mixed together***], … ."<br><br>'123 patent at cl. 15. |
| **Second mixture**[26] | [1]Metal-bearing material plus first mixture mixed together, wherein the first mixture is the first component plus the second component mixed together<br><br>MJCCS, U.S. Pat. No. 5,527,982 at 11.<br><br>[2]First mixture plus phosphate compound mixed together, | [1]"A method of treating metal-bearing materials …***… mixing a metal-bearing material with a first mixture comprising a first component and a second component to form a [***metal-bearing material plus first mixture mixed together, wherein the first mixture is the first component plus the second component mixed together***], ... ." |

[25] Disputed claim term "***mixture***" is in asserted claims: (i) 11 of the '367 patent, (ii) 1 and 15 of the '123 patent, (iii) 20 of the '608 patent, and (iv) 1, 15, 22, 28 and 30 of the '485 patent.

[26] Disputed claim term "***second mixture***" is in asserted claims: (i) 1 of the '982 patent, and (ii) 1 of the '608 patent.

| Disputed Term | The Government's Proposed Construction | Effective Claim Construction |
|---|---|---|
| | wherein the first mixture is the material plus reagent mixed together<br><br>MJCCS, U.S. Pat. No. 5,994,608 at 6. | '982 patent at cl. 1.<br><br>[2]"A process for treating material …***… contacting said first mixture with a phosphate compound to produce a [***first mixture plus phosphate compound mixed together, wherein the first mixture is the material plus reagent mixed together***]; … ."<br><br>'608 patent at cl. 1. |
| **Single reactant**[27] | A source of a sulfate ion and a phosphate ion that acts with the host material to form a new set of molecules, wherein a sulfate ion is the negative ion $(SO_4)^{2-}$, and wherein a phosphate anion is the negative ion $(PO_4)^{3-}$<br><br>MJCCS, U.S. Pat. No. 5,732,367 at 4. | "A process for treating a host material comprising …***… contacting said host material with a [***a source of a sulfate ion and a phosphate ion that acts with the host material to form a new set of molecules, wherein a sulfate ion is the negative ion*** $(SO_4)^{2-}$***, and wherein a phosphate anion is the negative ion*** $(PO_4)^{3-}$] comprising a source of a sulfate ion and phosphate ion to form a mixture … ."<br><br>'367 patent at cl. 11. |
| **Treatment additive**[28] | First component plus second component mixed together<br><br>MJCCS, U.S. Pat. No. 5,916,123 at 5. | "A method of treating metal-bearing material with a [***first component plus a second component mixed together***] comprising a first component and a second component to form … ."<br><br>'123 patent at cl. 1. |

[27] Disputed claim term "***single reactant***" is in asserted claims 11 and 12 of the '367 patent.

[28] Disputed claim term "***treatment additive***" is in asserted claims: (i) 1 and 15 of the '123 patent, (ii) 20 of the '608 patent and (iii) 1, 15 and 22 of the '485 patent.

| Disputed Term | The Government's Proposed Construction | Effective Claim Construction |
|---|---|---|
| **Waste matrix**[29] | A substance within which material containing leachable lead and soil is contained<br>MJCCS, U.S. Pat. No. 6,139,485 at 21. | "A method of treating [***a substance within which material containing leachable lead and soil is contained***] containing leachable lead and soil to . . . ."<br>'485 patent at cl. 15. |

It is readily apparent that the Government's proposed constructions violate basic claim construction rules. In contrast, Sevenson's constructions represent the common and ordinary meaning of the terms and do not render other language in the claims superfluous and redundant. As such, Sevenson's proposed constructions should be adopted

### E. The Government Improperly Interjects a Weight Limitation from the Specifications into Disputed Term "Technical Grade Phosphoric Acid"

The Government incorrectly contends that its proposed definition of "Technical Grade Phosphoric Acid (TGPA)[30]" is supported by the patentee's lexicography. There are varying descriptions[31] of TGPA in the '367 patent and the '608 patent with no explicit or clear and deliberate intention from the patentee to limit the claims to the one embodiment as the Government urges. In order to act as one's own lexicographer in the specification, "a patentee

[29] Disputed claim term "***waste matrix***" is in asserted claims 16-21 of the '485 patent.

[30] Disputed claim term "***TGPA***" is in asserted claim: (i) 13 of the '367 patent, and (ii) 11 of the '608 patent.

[31] The Abstract of the '367 patent describes TGPA as containing "sulfates as an impurity," without any weight percentage limitations. '367 patent at Abstract (emphasis added). The specification of the '367 patent and the '608 patent describes that "[i]n the preferred embodiment, technical grade phosphoric acid (TGPA) is used in a one step process. TGPA contains sulfate as an impurity in addition to a phosphate anion source." '367 Patent at 5:15-18; '608 Patent at 4:44-47. Again, the '367 and '608 patents merely describe the use of TGPA without setting forth a limitation on the weight percentages of sulfate impurities.

must ***deliberately and clearly*** point out[32] how these terms differ from the conventional understanding." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998) (emphasis added). The Government improperly relies, to the exclusion of broader descriptions, on a description of TGPA in the '367 patent which describes the weight percentage as "**typical**," to inject weight percentage limitations into the claims. Specifically, the '367 and '608 patents describe that "[t]echnical grade phosphoric acid ("TGPA") that contains up to 70% (by weight) phosphate (as $P_2O_5$) and sulfate ($SO_4^{-2}$), ***typically as sulfuric acid in the range of 2.5% to 7% (by weight) as an impurity***, is a source of both a sulfate ion and a phosphate ion and can, therefore, be used as a single reactant." '367 Patent at 6:52-57; '608 Patent at 6:6-11 (emphasis added). The '367 and '608 patents clearly describe the weight percentage as "typical" – nothing more. Moreover, the '367 and '608 patents describe the typical weight percentage of sulfuric acid – not "sulfate impurities" as the Government urges.

Nothing in the claims themselves remotely suggests that the TGPA used to practice the invention is limited to any specific weight limitations. Quite simply, the Government's proposed construction improperly imposes a weight percentage limitation from the specifications in defiance of the long-standing prohibition against limiting claim scope to a preferred embodiment. Accordingly, Sevenson's construction should be adopted.

---

[32] An exemplary strong signal that one is acting as his own lexicographer is a statement in the specification that "[t]he solubilizers suitable according to the invention ***are defined below***." *Astrazeneca AB v. Mut. Pharm. Co.,* 384 F.3d 1333, 1338 (Fed. Cir. 2004) (emphasis added).

### F. The Government Improperly Interjects a TCLP Test Criteria Limitation from the Specifications into the Claims

For a number of disputed claim terms,[33] the Government improperly imposes a limitation from the specifications of the asserted patents related to the TCLP test and related criteria. The TCLP test and related criteria is a preferred embodiment to ascertain whether waste materials have been sufficiently treated to reduce the level of leachable materials according to current regulatory standards. For the disputed claim terms "*immobilize(ing)*," "*non-leachable solid materials*," "*stabilize*," and "*supplies*" the Government imposes the limitation:

> **… the TCLP metal level is below the regulatory threshold limit under the TCLP test criteria of the EPA**

*See* e.g., MJCCS, U.S. Pat. No. 6,139,485 at 28 (Immobilize(ing)); MJCCS, U.S. Pat. No. 5,994,608 at 7 (Non-leachable solid materials); MJCCS, U.S. Pat. No. 6,139,485 at 5 (Stabilize); and MJCCS, U.S. Pat. No. 6,139,485 at 8 (Supplies). The Government also imposes into the disputed claim terms "*leachable lead*," "*leachable lead level*" and "*leachable metal level(s)*" the limitation:

> **… [(measured in mg/L)][34] …***… present in the TCLP extract from a representative sample of waste after performing the TCLP test method**

---

[33] Specifically, the Government interjects the extraneous "TCLP" limitation into the following disputed elements of the following asserted claims: "***concentration of leachable radioactive substances***" in claims 1, 15-17 and 20 of the '608 patent; "***concentration of leachable radionuclides and radioactive compounds***" in claim 11 of the '367 patent; "***immobilize(ing)***" in claims 22-36 of the '485 patent; "***leachable lead***" in claims 1, 15 and 22-36 of the '485 patent; "***leachable lead level***" in claims 1, 15, 22, 28 and 30 of the '485 patent; "***leachable metal level(s)***" in claims 1 and 15 of the '123 patent; "***non-leachable solid materials***" in claims 1 and 20 of the '608 patent; "***stabilize***" in claims: (i) 1 of the '982 patent, (ii) 1 and 15 of the '123 patent and (iii) 1 and 15 of the '485 patent; and "***supply(ies)***" in claims: (i) 1 of the '982 patent, (ii) 1, 3, 15 and 17 of the '123 patent, and (iii) 1, 15, 17 and 24of the '485 patent.

[34] The Government's argument that that the scope of the claims must be limited to measuring "leachable metal level(s)" and "leachable lead level" in mg/L because these are the units of measurement the patentee used is erroneous because well known mathematical equations exist to (continued…)

*See* e.g., MJCCS, U.S. Pat. No. 6,139,485 at 4 (Leachable lead); MJCCS, U.S. Pat. No. 6,139,485 at 5 (Leachable lead level); MJCCS, U.S. Pat. No. 5,916,123 at 5 and 18 (Leachable metal level(s)). For disputed claim terms "*concentration of leachable radioactive substances*," "*concentration of leachable radionucides and radioactive compounds*" and "*contaminated*" the Government imposes the following limitation:

> **… [t]he amount of picocuries per liter (pCi/l)[35] in the TCLP extract of a sample**

*See* e.g., MJCCS, U.S. Pat. No. 5,994,608 at 6 (Concentration of leachable radioactive substances); MJCCS, U.S. Pat. No. 5,732,367 at 6 (Concentration of leachable radionuclides and radioactive compounds).

The Government's proposed constructions ignore descriptions in the specifications of the asserted patents to other test methods and criteria by which treated waste materials may be measured. Each of the asserted patents states in the Summary of Invention:

> ***Another object of the present invention*** is to provide a method of treating a wide variety of lead bearing process materials …***… in order ***to render the material non-hazardous by RCRA definition, and pass EPTOX, MEP, ANS Calvet and DI Water Extract tests***.

---

convert units of measure from one to another. Accordingly, Sevenson's constructions which do not unnecessarily limit the claim scope to units of measurement should be adopted.

[35] The Government's argument for limiting the concentration of leachable radioactivity to picocuries per liter (pCi/l) is erroneous because Hawley's Condensed Chemical Dictionary, cited by the Government, states that the concentration of radioactivity "is usually expressed as millicuries per milliliter (mCi/mL) [i.e., curies per volume] ***or*** millicuries per millimol (mCi/mM) [i.e., curies to mass]." Hawley's Condensed Chemical Dictionary 11th Ed. (Van Nostrand Reinhold Co., Inc. 1987at 303 (*see* the Government's Exhibit J to the Government's Brief). Sevenson's constructions which recite "picocuries in a mass or volume of material" are more consistent with the common and ordinary meaning, are of substantial breadth to account for varying units of measurement, and should therefore be adopted.

'982 Patent at 3:61 through 4:2; '123 Patent at 4:4-12; '608 Patent at 4:8-16; '485 Patent at 5:23-31. Additionally, the Government ignores specific examples set forth in the Description of the Preferred Embodiment section of the asserted patents employing the EPTOX test and related criteria. '982 Patent at 17:7-19; '123 Patent at 17:33-45 '608 Patent at 21:3-15; and '485 Patent at 19:58 through 20:3. The Government has not considered the context of the whole patent by limiting the disputed claim terms to the TCLP test and related criteria to the exclusion of other disclosed tests and related criteria. Indeed, the Government here again imposes a preferred embodiment from the specifications of the asserted patents into the claims in violation of fundamental patent law. *Phillips*, 415 F.3d at 1323. Thus, Sevenson's constructions set forth in Table 3 below represent the common and ordinary meaning and should therefore be adopted.

**TABLE 3**

| Term | Sevenson's Proposed Construction |
|---|---|
| **Concentration of leachable radioactive substances** | The amount of leachable picocuries in a mass or volume of material<br>American Heritage at 275 (concentration 4.) ("The amount of a specified substance in a unit amount of another substance") attached hereto as Exhibit 30. |
| **Concentration of leachable radionuclides and radioactive compounds** | The amount of leachable picocuries in a mass or volume of material<br>American Heritage at 275 (concentration 4.) ("The amount of a specified substance in a unit amount of another substance") attached hereto as Exhibit 30. |
| **Immobilize(ing)** | To prevent freedom of movement or effective use<br>American Heritage at 658 (immobilize 2.) ("To impede movement or use of") attached hereto as Exhibit 31. |
| **Leachable lead** | Lead that has been or has the capacity to be dissolved out of something by a carrier fluid<br>American Heritage at 743 (leach –*intr*. 1.) ("To be dissolved and washed out by a percolating liquid") |

| | |
|---|---|
| | attached hereto as Exhibit 32. |
| **Leachable lead level** | The amount of lead that can be removed from a material by extraction<br><br>American Heritage at 743 (leach –*intr*. 1.) ("To be dissolved and washed out by a percolating liquid") attached hereto as Exhibit 32. |
| **Leachable metal level(s)** | The amount of metal that can be removed from a material by extraction<br><br>American Heritage at 743 (leach –*intr*. 1.) ("To be dissolved and washed out by a percolating liquid") attached hereto as Exhibit 32. |
| **Non-leachable solid materials** | Materials having a definite volume and shape containing entities not removable by extraction fluids<br><br>American Heritage at 743 (leach –*intr*. 1.) ("To be dissolved and washed out by a percolating liquid") attached hereto as Exhibit 32.<br><br>American Heritage at 1229 (solid 1.) ("Of definite shape and volume; not liquid or gaseous") attached hereto as Exhibit 33. |
| **Stabilize** | To put within a state of defined limit(s); not easily decomposed or otherwise modified chemically<br><br>American Heritage at 1254 (stable 4.) ("Not easily decomposed or otherwise modified chemically") attached hereto as Exhibit 34. |
| **Supply(ies)** | Provide or make available one or more reactant(s)<br><br>American Heritage at 1293 (supply –*tr*. 1.) ("To make (something needed, desired or lacking) available for use; provide") attached hereto as Exhibit 35. |

## G. Miscellaneous Disputed Claim Terms

For the following remaining terms, the common and ordinary meanings are readily apparent and in such a case, claim construction involves little more than the application of the widely accepted meaning of the commonly understood term. *Phillips*, 415 F.3d at 1314. Sevenson's proffered definitions are consistent within the context of the asserted patents and should therefore be adopted.

**TABLE 4**

| Term | Sevenson's Construction | Reiterated Argument of Sevenson's Brief |
|---|---|---|
| **Aqueous phosphate compound** | A liquid material containing water comprising two or more elements or parts capable of supplying a source of phosphate anion, $(PO_4)^{3-}$, wherein water is a compound with the formula $H_2O$<br><br>American Heritage at 66 (aqueous) ("Pertaining to, similar to, containing, or dissolved in water") attached as part of Exhibit 26 to Sevenson's Brief.<br><br>Bennett, at 85 (aqueous) ("Water solution") attached as part of Exhibit 26 to Sevenson's Brief.<br><br>Hawley's at 302 (compound) ("A substance composed of atoms or ions of two or more elements in chemical combination.") attached as Exhibit 6 to Sevenson's Brief. | Part VII.E.3. |
| **Aqueous phosphate reagent** | A liquid material containing water capable of supplying a source of phosphate anion, $(PO_4)^{3-}$, wherein water is a compound with the formula $H_2O$<br><br>American Heritage at 66 (aqueous) ("Pertaining to, similar to, containing, or dissolved in water") attached as part of Exhibit 26 to Sevenson's Brief.<br><br>Bennett, at 85 (aqueous) ("Water solution") | Part VII.E.3. |

| Term | Sevenson's Construction | Reiterated Argument of Sevenson's Brief |
|---|---|---|
| | attached as part of Exhibit 26 to Sevenson's Brief. | |
| **Combination** | A result or product of bringing two or more entities into close relationship<br><br>American Heritage at 265 (combination; combine) (The act of forming a chemical compound) attached as Exhibit 11 to Sevenson's Brief. | Part VII.D. |
| **Contaminated** | To contain an undesirable or unwanted material<br><br>McGraw-Hill Dictionary of Scientific and Technical Terms, 3d Ed. (McGraw-Hill Inc. 1984) at 356 (contaminate) ("To render unfit or to soil by the introduction of foreign or unwanted material") attached as Exhibit 12 to Sevenson's Brief. | Part VII.D. |
| **Dispersion agent** | A material which facilitates the movement of one item within another.<br><br>American Heritage at 380 (disperse 1.) ("To scatter in different directions") attached hereto as Exhibit 36. | Part VII.E.1 |
| **Fine-grained solids** | Material having no free liquids comprising solid small particles.<br><br>American Heritage at 492 (fine 8.) ("Consisting of extremely small particles") attached hereto as Exhibit 37.<br><br>American Heritage at 1229 (solid 1.) ("Of definite shape and volume; not liquid or gaseous") attached hereto as Exhibit 33. | Part VII.E.1 |
| **Lead-bearing material** | Materials that have the capacity to yield, produce or release lead<br><br>American Heritage at 115 (bear –*intr.* 1.) ("Having the capacity to yield, produce or release") attached as Exhibit 14 to Sevenson's | Part VII.D. |

| Term | Sevenson's Construction | Reiterated Argument of Sevenson's Brief |
|---|---|---|
| | Brief. | |
| **Leachable metal** | Lead, aluminum, arsenic (III), barium, bismuth, cadmium, chromium (III), copper, ion, nickel, selenium, silver, and/or zinc that have been or have the capacity to be dissolved out of something by a carrier fluid.<br><br>American Heritage at 743 (leach –*intr*. 1.) ("To be dissolved and washed out by a percolating liquid") attached hereto as Exhibit 32. | Part VII.E.1 |
| **Metal-bearing material(s)** | Materials that have the capacity to yield, produce or release metals<br><br>American Heritage at 115 (bear –*intr*. 1.) ("Having the capacity to yield, produce or release") attached as Exhibit 14 to Sevenson's Brief. | Part VII.D. |
| **Solution Form** | A liquid containing dissolved material(s)<br><br>American Heritage at 1230 (solution 3.) ("The state of being dissolved") attached hereto as Exhibit 38. | Part VII.E.4. |
| **Treatment additive** | A reactant<br><br>McGraw-Hill at 27 (additive 1.) ("A substance added to another to improve, strengthen or otherwise alter it") attached as Exhibit 16 to Sevenson's Brief. | Part VII.D. |
| **Waste matrix** | A matter within which material bearing leachable substances is contained<br><br>American Heritage at 806 (matrix –*n*. 1.) ("A situation or surrounding substance within which something originates, develops, or is contained") attached as Exhibit 17 to Sevenson's Brief. | Part VII.D. |

| Term | Sevenson's Construction | Reiterated Argument of Sevenson's Brief |
|---|---|---|
| **Water-soluble phosphate** | A phosphate capable of dissolving in water, wherein water is a compound with the chemical formula $H_2O$<br><br>American Heritage at 1230 (soluble 1.) ("Capable of being dissolved") attached hereto as Exhibit 38. | Part VII.E.2. |

## III. CONCLUSION

For the foregoing reasons, Sevenson respectfully requests that the Court adopt Sevenson's proposed constructions for the claim terms discussed herein.

Dated: November 29, 2006

Respectfully submitted,

By: s/Brian E. Ferguson
**MCDERMOTT, WILL & EMERY, LLP**
Brian E. Ferguson
600 13th Street, N.W.
Washington, D.C. 20005
(202) 756-8000
bferguson@mwe.com

**WEBSTER SZANYI LLP**
Kevin A. Szanyi
Nelson Perel
1400 Liberty Building
Buffalo, New York 14202
(716) 842-2800
nperel@websterszanyi.com

**ATTORNEYS FOR PLAINTIFF SEVENSON ENVIRONMENTAL SERVICES, INC.**