IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-1075C

Judge Thomas C. Wheeler

SEVENSON ENVIRONMENTAL SERVICES, INC.,
Plaintiff,

v.

THE UNITED STATES,
Defendant

and

SHAW ENVIRONMENTAL, INC.,
Defendant-Intervenor.

**DEFENDANT'S REPLY TO PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

PETER D. KEISLER
Assistant Attorney General

JOHN J. FARGO
Director

MARCY E. COOK
Attorney
Civil Division
U.S. Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0459
Facsimile: (202) 307-0345

Attorneys for the United States

November 29, 2006

RUSSEL O. PRIMEAUX
Kean Miller Hawthorne
D'Armond McCowan & Jarman LLP
One American Place, 22nd Floor
Post Office Box 3513
Baton Rouge, LA 70821-3513
Phone: 225.387.0999
Facsimile: 225.388.9133

Counsel for Shaw Environmental, Inc.

## Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Index of Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Sevenson Has Not Provided Adequate Support for its Proposed Definitions of the "Separate and Distinct Compound" Claim Terms . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. Sevenson Has Not Provided Adequate Support for its Proposed Definitions of the "Compound" Limitation Claim Terms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III. The Government's Constructions Most Naturally Align with the Description of the Invention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

A. Technical Grade Phosphoric Acid (TGPA) . . . . . . . . . . . . . . . . . . . . . . . . 12

B. TCLP Test Criteria and Leachable Radionuclides . . . . . . . . . . . . . . . . . . 14

IV. Sevenson's Reliance on Dictionaries Ignores the Language of the Claims and the Specification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

V. Sevenson Has Not Provided Support for its Proposed Definitions For Those Terms In Which It Contends the "Ordinary Meaning" Is Disputed . . . . . . . . . . 16

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# Table of Authorities

## CASES


Autogiro Co. of Am. v. United States,
384 F.2d 391 (Ct. Cl. 1967) . . . . . . . . . . 6

Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.,
334 F.3d 1294 (Fed. Cir. 2003) . . . . . . . . . . 4

C.R. Bard, Inc. v. United States Surgical Corp.,
388 F.3d 858 (Fed. Cir. 2004) . . . . . . . . . . 9

Conoco, Inc. v. Energy & Envtl. Intern., L.C.,
460 F.3d 1349 (Fed. Cir. 2006) . . . . . . . . . . 19

Ecolab, Inc. v. Envirochem, Inc.,
264 F.3d 1358 (Fed. Cir. 2001) . . . . . . . . . . 13

Fin Control Sys. Pty, Ltd. v. OAM, Inc.,
265 F.3d 1311 (Fed. Cir. 2001) . . . . . . . . . . 15

Gart v. Logitech, Inc.,
254 F.3d 1334 (Fed. Cir. 2001) . . . . . . . . . . 6

Genentech, Inc. v. Chiron Corp.,
112 F.3d 495 (Fed. Cir. 1997) . . . . . . . . . . 19

Hockerson-Halberstadt, Inc. v. Converse Inc.,
183 F.3d 1369 (Fed. Cir. 1999) . . . . . . . . . . 14

Innova/Pure Water, Inc. v. Safari Water Filtration,
381 F.3d 1111 (Fed. Cir. 2004) . . . . . . . . . . 13, 15

Liebscher v. Boothroyd,
258 F.2d 948 (C.C.P.A. 1958). . . . . . . . . . .16

Moleculon Research Corp. v. CBS, Inc.,
793 F.2d 1261 (Fed. Cir. 1986) . . . . . . . . . . 19

NTP, Inc. v. Research in Motion, Ltd.,
418 F.3d 1282 (Fed. Cir. 2005) . . . . . . . . . . 3, 4

Phillips v. AWH Corp.,
415 F.3d at 1303 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 8, 10, 13

Phonometrics, Inc. v. Northern Telecom Inc.,
133 F.3d 1459 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Renishaw PLC v. Marposs Societa' per Azioni,
158 F.3d 1243 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Scripps Clinic & Research Found. v. Genentech, Inc.,
927 F.2d 1565 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Vitronics Corp. v. Conceptronic, Inc.,
90 F.3d 1576 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15

**MISCELLANEOUS**

Hawley's Condensed Chemical Dictionary (11th ed. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 18

## Index of Exhibits

A. Hawley's Condensed Chemical Dictionary (11th ed. 1987) excerpt of "material"

B. Hawley's Condensed Chemical Dictionary (11th ed. 1987) excerpt of "compound"

**IN THE UNITED STATES COURT**
**OF FEDERAL CLAIMS**

| | |
|---|---|
| SEVENSON ENVIRONMENTAL SERVICES, INC., Plaintiff, ) | |
| v. ) | |
| THE UNITED STATES, Defendant, ) | |
| and ) | No. 05-1075C<br>Judge Thomas C. Wheeler |
| SHAW ENVIRONMENTAL, INC., Defendant-Intervenor.) | Electronically Filed on November 29, 2006 |

**DEFENDANT'S REPLY TO PLAINTIFF'S**
**<u>OPENING CLAIM CONSTRUCTION BRIEF</u>**

Defendant, the United States ("the Government") respectfully submits this Reply to Sevenson Environmental Services, Inc.'s ("Sevenson") Opening Claim Construction Brief [hereinafter Plaintiff's Opening Brief]. The Government has been joined by Shaw Environmental, Inc. on this brief.

## <u>Introduction</u>

Sevenson's opening brief completely lacks support for its proposed claim term definitions. For every claim term at issue, Sevenson asserts that its proposed definition is the "ordinary meaning," yet Sevenson ignores the intrinsic evidence. Sevenson merely attempts to discredit the Government's proposed definitions by dismissing the role of the specification in claim construction and citing inapposite case law. A proper claim construction is necessary to understand and explain the claim language so that the Court and the parties can proceed to determine infringement, invalidity, and damages, if necessary. By not providing support for its

proposed definitions, Sevenson has not articulated any reason for the Court to adopt its definitions. In contrast, the Government's proposed definitions are supported by the intrinsic evidence or represent the ordinary and customary meaning of the claim terms to one of skill in the art, as demonstrated by dictionaries and treatises.

## Argument

This reply brief is structured to mirror the order of Sevenson's opening claim construction brief. However, in its reply, the Government will focus on only the most significant claim terms and on illustrative examples from individual patents.[1]

### I. Sevenson Has Not Provided Adequate Support for its Proposed Definitions of the "Separate and Distinct Compound" Claim Terms

Sevenson groups the terms "first component," "second component," "phosphate compound," "phosphate supplying reagent," and "sulfate reagent" together in its opening brief under the category of "separate and distinct compound" claim terms. Pl.'s Opening Br. at 31. These terms are primarily found in the Government's opening brief under its "first component" and "second component" sections. Defendant's Opening Claim Construction Brief at 8, 13 [hereinafter Defendant's Opening Brief].

While Sevenson asserts that its proposed meanings for these terms are "nothing more than the ordinary meaning understood by those skilled in the invention," Pl.'s Opening Br. at 35, Sevenson provides no support in either its brief or its appendix for this blanket assertion. In contrast, the Government has shown through numerous examples from the claims and the

---

[1] The specifications of each of the patents-in-suit are nearly identical. The Government's opening brief, as well as the Modified Joint Claim Construction Statement ("MJCCS"), provide the evidence supporting the Government's proposed claim construction for every term.

specifications of the patents that one of ordinary skill in the art would conclude that each of these terms means "a separate and distinct compound."

First, Sevenson provides no basis for the Court to adopt its proposed definitions or reject the Government's proposed definitions for these terms. Importantly, as set forth in the Government's opening brief, the parties agree with respect to the part of the proposed definitions that deal with the chemical, or group of chemicals, that the component supplies. See, e.g., Def.'s Opening Br. at. 8, n.2.[2] Despite this agreement, as support for its proposed definitions, Sevenson devotes this section of its brief to demonstrating that the agreed-upon portions of the proposed definitions are proper. Pl.'s Opening Br. at. 35-36. After demonstrating that the agreed-upon portions of the terms are properly defined, Sevenson then draws the illogical conclusion that the Government's proposed definitions are improper.

Second, Sevenson improperly dismisses the role of the specification in interpreting the claim terms at issue. The Federal Circuit has affirmed that "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." Phillips v. AWH Corp., 415 F.3d at 1303, 1315 (Fed. Cir. 2005) (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Sevenson cites NTP, Inc. v. Research in Motion, Ltd., 418 F.3d 1282, 1309-10 (Fed. Cir. 2005), for the proposition that "[t]here must be a textual reference or 'hook' in the actual language of the claim with which to associate a proffered claim construction requiring 'separate and distinct compounds.'" Pl.'s Opening Br. at 33-34 and n. 27. Sevenson's reliance on NTP for the proposition that there is no basis to define these terms as "separate and distinct" is inappropriate

[2] For example, with respect to the term "first component" in claim 1 of the '982 patent, the parties agree that the "first component" supplies a source of sulphates, halites, and silicates.

– Sevenson merely seizes on the words "separate and distinct" without analyzing the context of the court's construction. In NTP, the parties disputed whether a receiver and processor employed by the invention were "separate and distinct." The court first noted that "[w]ithout any claim term that is susceptible of clarification by the written description, there is no legitimate way to narrow the property right." NTP, 418 F.3d at 1310. The court was unable to find a term in the claims that required construction, and therefore the claim language did not support imposing an additional limitation on the claims. Id. at 1309-11. However, in this instant case, both parties agree that these terms require construction by the court, and, contrary to Sevenson's assertions, in the instant case there is a "textual reference in the actual language of the claim with which to associate a proffered claim construction." Id. at 1310. For example, the term "first component" provides the textual hook. Claim 1 of the '982 patent provides that "wherein said first component supplies at least one member selected from the group consisting of sulphates, halites, and silicates." From this, it is clear – as the parties agree – that the"first component" supplies sulphates, halites, and silicates. "While certain terms may be at the center of the claim construction debate, the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms." Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc., 334 F.3d 1294, 1299 (Fed. Cir. 2003). Therefore, the words "sulphates," "halites," and "silicates" are central to understanding and determining the ordinary and customary meaning of the term "first component" in claim 1 of the '982 patent, and provide an obvious textual reference in the actual language of the claim with which to associate a claim construction.

The patents use the words "sulphates," "halites," and "silicates" repeatedly in the specification, both in the "Summary of the Invention" and the "Description of the Preferred Embodiment Section" to refer to a "first group" of treatment chemicals. See, e.g., '982 patent,

col. 3, lines 16-19 ("A *first group of treatment chemicals* for use in the processes of the present invention includes lime, gypsum, alum, halites, portland cement, and other similar products that can supply *sulfates, halites, hydroxides, and/or silicates*."); '982 patent, col. 4, lines 65-67 to col. 5, lines 1-2 ("The treatment chemicals useful in the present invention may be divided into two groups. … A *first group, 'group one'*, comprises a source of *sulfate, hydroxide, chloride, fluoride, and/or silicates*."). From these examples, it is clear that to one of skill in the art, the words "sulphates," "halites," and "silicates" refer to a "first group" of treatment chemicals. The references in the specifications to "a first group" and "group one" treatment chemicals are juxtaposed with and contrasted to the repeated references throughout the specification to "a second group" and "group two" treatment chemicals. See, e.g., '982 patent, col. 3, lines 20-26, col. 5, lines 5-10. Sevenson also argues that the Government's proposed constructions cannot be adopted because in two examples in the specification, phosphoric acid was the sole treatment chemical. First, the examples cited by Sevenson never describe the phosphoric acid being a source of the first and second components. Second, the specifications of each of the patents-in-suit also contain the following language:

> Evaluation of a single treatment chemical in one step reveals that phosphoric acid was most effective in fixation of leachable lead, followed by granular super-phosphate, a fertilizer grade product available in nurseries and farm supply houses. However, *neither treatment effectively treated leachable lead to the USEPA treatment standard of 5.0 mg/l by TCLP methodology*.

See, e.g., '982 patent, col. 16, lines 44-50 (emphasis added). Here, the patentee explicitly states that phosphoric acid alone does not meet the treatment standard of the invention. The patentee's own language describing the claim term at issue highlights the separate and distinct nature of the claim terms at issue.

Moreover, the drawings accompanying each of the patents clearly show separate and distinct groups of treatment chemicals. Sevenson, citing Gart v. Logitech, Inc., 254 F.3d 1334, 1342 (Fed. Cir. 2001), again relies on inapposite case law to suggest that the drawings in the patents-in-suit should not be considered during the claim construction process. Pl.'s Opening Br. at 33. Gart actually supports the Government's position. In Gart, the court was considering whether the drawings in the patent should limit the scope of the claims. In determining that the drawings of the patent at issue in that case would not limit the scope of the claims, the court stated that "[t]he '165 patent presents these drawings only to depict the preferred embodiment. These drawings are not meant to represent 'the' invention or to limit the scope of coverage defined by the words used in the claims themselves." Gart, 254 F.3d at 1342. In contrast, the drawings referenced by the Government, Figures 1, 2a, and 2b, are described in the patents as exhibiting "the single step mixing method," and "the two step mixing method." See, e.g., '982 patent, col. 4, lines 25-33. On the other hand, the patentee describes Figure 3 as "a block diagram of *one embodiment* of the treatment technology of the present invention." See, e.g., '982 patent, col. 4, lines 39-40 (emphasis added). The contrast between the descriptions of each drawing makes it evident that the patentee intended for Figures 1, 2a, and 2b to depict the invention as a whole, and not merely a single embodiment, as in Figure 3. In situations like this, where a visual representation is used to "flesh out words," the drawings are an important part of the specification to consider when performing a claim construction analysis. See Autogiro Co. of Am. v. United States, 384 F.2d 391, 398 (Ct. Cl. 1967). As fully articulated by the Government in its opening brief, Figures 1, 2a, and 2b of each of the patents-in-suit depict "separate and distinct" "group one" and "group two" treatment chemicals, consistent with the specification and the claim language.

Finally, Sevenson also maintains that the Government's use of the word "compound" to define these claimed compositions is improper. Sevenson, on the other hand, suggests use of the word "material" to define these claim terms.[3] First, the term "material" is used in each of the five patents-in-suit to refer to the object or workpiece upon which the patented method is performed. Defining additional claim terms relating to the treatment technology as "materials" would only serve to introduce another level of confusion and uncertainty into the analysis of these patents and would be at odds with the Court's purpose in construing these claims. See Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565, 1580 (Fed. Cir. 1991) ("the construction of claims is simply a way of elaborating the normally terse claim language: in order to understand and explain"). Sevenson provides a definition for "material" from the American Heritage Dictionary as "something [that] is composed of or pertaining to physical substances and relating to matter." Pl.'s Opening Br. at 36. However, Sevenson earlier stated that "[t]echnical dictionaries, like a chemical dictionary, are preferred objective evidence." Pl.'s Opening Br. at 35. Hawley's Condensed Chemical Dictionary defines "material" as "[a] nonspecific term used with various shades of meaning in the technical literature." Hawley's Condensed Chemical Dictionary 374 (11th ed. 1987) (hereinafter Hawley's) (Exhibit A). With respect to the term "material," whether the Court looks to a technical dictionary or a general dictionary, the term "material" carries an ambiguous meaning and therefore does not and cannot help the court or the parties to understand and explain the claim language. However, the term "compound" is

[3] The "material vs. compound" issue recurs throughout the claim construction. Part V of this brief also deals with this issue. Sevenson addressed the definition of "material" only in conjunction with this group of claim terms, and, accordingly, the Government will respond to Sevenson's argument here.

consistent with the ordinary and customary meaning of the terms at issue as they are used in the claims and in the specifications. Therefore, the Government's definitions should be adopted.

## II. Sevenson Has Not Provided Adequate Support for its Proposed Definitions of the "Compound" Limitation Claim Terms

Sevenson groups the terms "at least one phosphate anion," "one or more reactive phosphate ions," "one or more reactive sulfate ions," "source of a phosphate ion," "source of a sulfate ion," "phosphoric acid," and "sulfuric acid" together in its opening brief under the category of "compound" limitation claim terms. Pl.'s Opening Br. at 37. These terms are fully discussed in the Government's opening brief in the sections "at least one phosphate anion," "Analysis of the Markush Group and its Members," and in the remaining sections of the brief. Def.'s Opening Br. at 18, 29.

Here, again, Sevenson provides no support in either its brief or its appendix for what it describes as the "compound" limitation claim terms. In contrast, the Government has shown through numerous examples from the claims themselves and the specifications of the patents that one of ordinary skill in the art would conclude that each of these terms refers to "a compound." Rather than providing support for its own proposed definitions in its opening brief, Sevenson merely attempts to discredit the Government's proposed definitions by improperly dismissing the specifications of the patents and making unsupported and incorrect assertions regarding the meaning of the terms to one of skill in the art.

First, Sevenson wrongly asserts that the Government's proposed definitions which incorporate the term "a compound" are not supported by the intrinsic evidence. Pl.'s Opening Br. at 37. "Claims must be read in view of the specification, of which they are a part." Phillips, 415

F.3d at 1315 (internal quotations omitted). In its opening brief, Sevenson attempts to dismiss all of the language in the specifications of the patents-in-suit that refers to each of these claim terms as "compounds" by arguing that such language merely depicts potential embodiments of the invention. However, this argument is misleading. For example, with respect to the claim term "at least one phosphate anion," both the "Summary of the Invention" section and the "Description of the Preferred Embodiment" section contain descriptions of compounds which supply phosphate anions. See, e.g., '982 patent, col. 3, lines 20-26 ("A second group consists of treatment chemicals which can supply phosphate ions. *This group includes products such as* phosphoric acid, pyrophosphates, triple super phosphate (TSP), trisodium phosphate, potassium phosphates, ammonium phosphates and/or others capable of supplying phosphate anion."(emphasis added)); '982 patent, col. 5, lines 5-10 ("The second group, 'group two', comprises a source of phosphate anion. *This group consists of products like* phosphoric acid (phosphoric), pyrophosphates, triple super phosphate, trisodium phosphates, potassium phosphates, ammonium phosphates *and/or similar compounds capable of supplying a phosphate anion*." (emphasis added)); '982 patent, col. 19, lines 54-58 (Example 6) ("The treatability studies are designed to optimize … the amount and concentration of phosphoric acid (*or other phosphate compound*) needed in step II ." (emphasis added)). "Statements that describe the invention as a whole are more likely to be found in certain sections of the specification, such as the Summary of the Invention." C.R. Bard, Inc. v. United States Surgical Corp., 388 F.3d 858, 864 (Fed. Cir. 2004). The patents-in-suit refer to both the phosphate anion and sulfate anion supplying sources as "compounds" repeatedly, both in the Summary of the Invention section, as well as throughout the remainder of the specifications, as was fully described in Defendant's Opening Brief.

Importantly, the sources for the phosphate anion and sulfate anion are never referred to anywhere in the specification as anything other than chemical compounds. Nevertheless, Sevenson incorrectly argues that the Government's use of the term "compound" in defining these terms is contrary to the ordinary meaning of these terms. Pl.'s Opening Br. at 40. Sevenson further argues that its own proposed definitions should be adopted, as they represent the ordinary meaning of these terms, yet Sevenson provides no support for this assertion. Sevenson's argument is based solely on three dictionary definitions; one of "compound," one of "acid," and one of "ion."[4] With respect to the terms that include the word "ion," the intrinsic evidence makes it clear that to one of skill in the art, each of these terms refers to "a compound." "[A] common meaning, such as one expressed in a relevant dictionary, that flies in the face of the patent disclosure is undeserving of fealty." Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998). The Federal Circuit in Phillips reaffirmed that:

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

Phillips, 415 F.3d at 1316 (citing Renishaw, 158 F.3d at 1250). A full understanding of what the inventors claimed clarifies that each of the claimed compositions is a "compound," and consistent with the specifications of each of the patents-in-suit. The invention's purpose is the "fixation and stabilization of metals in contaminated materials." See, e.g., '982 patent, Title. Sevenson's proposed definition for "at least one phosphate anion" is "at least one molecule of

---

[4] The Government agrees that "phosphoric acid" and "sulfuric acid,"can be construed to read "an acid with the chemical formula X," where X defines an acid as described by the parties in the MJCCS. See also Def.'s Opening Br. at 29-34.

$(PO_4)^{3-}$." This definition does not make practical sense in the context of the claim language or the specification, especially when viewed in light of the purpose of the patent. In other words, "at least one molecule of $(PO_4)^{3-}$" could not chemically achieve the invention's stated purpose. This would be clear to one of ordinary skill in the art reading the patents. Likewise, the purpose of the patents-in-suit is to treat metal-bearing materials to stabilize leachable metal contained therein – this requires an amount of phosphate that is proportional to the amount of leachable metal content of the material to be treated. See, e.g., '982 patent, col. 6, line 27 - col. 8, line 27. A person skilled in the art knows that the amount of phosphate necessary to stabilize leachable metal would be more than a single molecule. However, Sevenson's proposed construction would allow even a single ion to satisfy the claim. For example, if one could prepare a solution that contains a single ion of phosphate and a single ion of sulfate, then under Sevenson's proposed claim construction for these terms, pouring the solution onto metal-bearing soil would infringe their patents, although the solution could, at most react with only two metal bearing molecules, an infinitesimal amount that could not possibly achieve the purpose of the claimed invention. This activity is not "what the inventors actually invented and intended to envelop with the claim." Renishaw, 158 F.3d at 1250. In contrast, the Government's proposed construction should be adopted because it is consistent with the language of the specification, the purpose of the invention, and "defines [the term] in the context of the whole patent." Id.

## III. The Government's Constructions Most Naturally Align with the Description of the Invention

Sevenson also groups the terms "technical grade phosphoric acid," "concentration of leachable radioactive substances," concentration of leachable radionuclides and radioactive compounds," "immobilize," "leachable lead," "leachable lead level," "leachable metal level," non-leachable solid materials," "stabilize," "supplies," "contaminated," "host material," and "material" together in its opening brief under the category of terms in which "the Government attempts to read in limits from the specification." Pl.'s Opening Br. at 42. These terms are addressed at numerous places in the Defendant's Opening Brief.

### A. Technical Grade Phosphoric Acid (TGPA)

Sevenson asserts, without support, that the term "technical grade phosphoric acid" should be given its ordinary meaning. Pl.'s Opening Br. at 43. Tellingly, nowhere in its opening brief does Sevenson define what that ordinary meaning is, let alone provide support for the proposed definition. According to the MJCCS, Sevenson's proposed definition for TGPA is "commercially available phosphoric acid having sulphates as an impurity." This definition has no support in Sevenson's briefs, the claims, the specifications, or the prosecution histories of any of the patents-in-suit. Moreover, Sevenson has not provided any extrinsic support for its proposed definition for the term TGPA. Finally, Sevenson's proposed definition contains broad language such as "commercially available" and "impurity" that are not otherwise defined and therefore would not serve to help the Court or the parties understand and explain the claim language. See Scripps, 927 F.2d at 1580. Sevenson provides no basis on which the Court could adopt Sevenson's proposed definition.

In contrast to Sevenson's construction, the Government has provided, in its opening brief, extensive support from the intrinsic record to support its proposed definition for TGPA: "phosphoric acid that contains up to 70% (by weight) phosphate (as $P_2O_5$) and sulfate ($SO_4^{-2}$), typically as sulfuric acid in the range of 2.5% to 7% (by weight) as an impurity." The source of the Government's definition is simple: it comes from the patent specification. While a "court may not read a limitation into a claim from the specification," Innova/Pure Water, Inc. v. Safari Water Filtration, 381 F.3d 1111, 1117 (Fed. Cir. 2004), an equally important canon of claim construction recognizes that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. *In such cases, the inventor's lexicography governs*." Phillips, 415 F.3d at 1316 (emphasis added). Sevenson's reliance on Ecolab, Inc. v. Envirochem, Inc., 264 F.3d 1358, 1365-66 (Fed. Cir. 2001), to support their argument that the Government is improperly reading a limitation from the specification into the claim is misplaced. In Ecolab, the court affirmed the district court's refusal to add a numerical limit to a claim based on affidavit testimony from the prosecution history. Id. at 1363, 1366. In the instant case, the definition utilized by the Government is a statement directly from the "Summary of the Invention" section of the specification of each patent. That statement is used in a manner that indicates that the patentee intended for the claims containing the term TGPA and the single embodiment of that term, as found in each of the patents, to be strictly coextensive. See Phillips, 415 F3d at 1323; see also Def.'s Opening Br. at 22-24. In this situation, the patentee has provided a special definition for the term TGPA, and the patentee's lexicography governs.

### B. TCLP Test Criteria and Leachable Radionuclides

As with TGPA, Sevenson provides no support for the claim terms discussed in its opening brief from pages 44-49. As set forth in great detail in its opening brief, the Government has defined these terms consistent with the intrinsic evidence and as one of ordinary skill in the art would understand them. For example, with respect to the terms the Government has defined using the TCLP test limits, the patents-in suit clearly define the term "non-leachable" to mean "levels below the regulatory threshold limit under the TCLP test criteria of the USEPA." See, e.g., '982 patent, col. 3, lines 34-36. While Sevenson repeatedly attempts to read each claim term in isolation, "proper claim construction … demands interpretation of the entire claim in context, not [as] a single element in isolation." Hockerson-Halberstadt, Inc. v. Converse Inc., 183 F.3d 1369, 1374 (Fed. Cir. 1999). The Government's proposed construction for each of these terms "stays true to the claim language and most naturally aligns with the patent's description of the invention." Renishaw, 158 F.3d at 1250.

## IV. Sevenson's Reliance on Dictionaries Ignores the Language of the Claims and the Specification

Sevenson groups the terms "combination," "contaminated," "contaminated soils and solid waste materials," "first mixture," "lead-bearing material," "material," metal-bearing," "material," "mixture," "second mixture," "single reactant," treatment additive," and "waste matrix," together in its opening brief under the category of terms in which the "ordinary meaning is apparent." Pl.'s Opening Br. at 49. These terms are primarily discussed in Parts IV-VIII of the Government's opening brief.

It is a settled principle of claim construction that "a claim construction analysis must begin and remain centered on the claim language itself." Innova, 381 F.3d at 1116. The Government's proposed definitions for these terms simply mirror the definition provided directly in the claim terms. For example, claim 1 of the '982 patent provides for mixing "a first mixture comprising a first component and a second component to form a second mixture." Therefore, based on the plain language of the claim itself, the Government's proposed definition for "first mixture" in the '982 patent is "first component plus second component mixed together." Due to the variations in the claim language across the five patents-in-suit, the Government's proposed definitions for these terms vary according the claim language employed by the patentee. Sevenson argues that this variation proves that the Government's constructions are improper. Pl.'s Opening Br. at 53. Sevenson is wrong. While "[a] word or phrase used consistently throughout a claim should be interpreted consistently," Phonometrics, Inc. v. Northern Telecom Inc., 133 F.3d 1459, 1465 (Fed. Cir. 1998), the important distinction in the instant case is that these terms are not used consistently throughout the claims in each of the patents. See also Fin Control Sys. Pty, Ltd. v. OAM, Inc., 265 F.3d 1311, 1318 (Fed. Cir. 2001) ("[T]erms appearing in different portions should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims.")

Sevenson completely ignores the fact that these terms vary from claim to claim, and that the patentee provided clear definitions for each term in each claim. Where the intrinsic evidence resolves any ambiguities in a disputed claim term, it is improper to rely on extrinsic evidence, such as dictionaries. Vitronics, 90 F.3d at 1583. "[A] common meaning, such as one expressed in a relevant dictionary, that flies in the face of the patent disclosure is undeserving of fealty."

Renishaw, 158 F.3d at 1250. Nevertheless, without even considering the plain language of the claims, Sevenson relies exclusively on dictionaries for its proposed definitions . The definitions proposed by Sevenson also do not promote the purpose of claim construction: to understand and explain the claim language. See Scripps, 927 F.2d at 1580. For example, Sevenson's proposed definition for "first mixture" is "a first homogenous or heterogenous material in any physical state that consists of two or more chemical components that have no firm chemical bonding between them and that are physically separable." Almost every word in Sevenson's proposed definition for "first mixture" is ambiguous; proceeding in the instant case with such a definition would be difficult for both the Court and the parties. Of greater import, few of Sevenson's terms find any support in the Specification. The same is true of many of Sevenson's other proposed definitions. "Indiscriminate reliance on dictionaries can often produce absurd results." Renishaw, 158 F.3d at 1250 (quoting Liebscher v. Boothroyd, 258 F.2d 948, 951 (C.C.P.A. 1958)). Sevenson's definitions find little support in the patent in suit and could produce absurd results.

## V. Sevenson Has Not Provided Support for its Proposed Definitions For Those Terms In Which It Contends the "Ordinary Meaning" Is Disputed

Sevenson groups the terms "waste matrix of lead bearing material," "fine-grained solids," "leachable metal," "waste matrix," "waste matrix of lead-bearing material," "waste matrix of lead-bearing material and soil," "dibasic calcium phosphate," "monobasic calcium phosphate," "phosphoric acid," "sulfuric acid," "trisodium phosphate," "ammonium phosphate," "calcium sulfate," "chloride," "fluoride," "halide," "halite," "potassium phosphate," "pyrophosphate," "sulfate ions," "sulphate," "sulphates of aluminum," "sulphates of iron," "silicates," "water-

soluble phosphate," "aqueous phosphate compound," "aqueous phosphate reagent," and "solution form," together under the category of terms it defines as having a "disputed ordinary meaning."[5] Pl.'s Opening Br. at 55-58. Each of these terms is addressed individually in the Government's brief.

Of these claim terms, the majority center around the "compound vs. material" dispute. The Government proposes that these claim terms are defined as "compounds" while Sevenson proposes that these claim terms are largely defined as "materials comprising." In its opening brief, Sevenson provides no support for its proposed construction . In contrast, the Government's brief fully sets forth the proposed construction of each term, followed by citations to authorities supporting why each of these terms should be defined as a "compound," as opposed to a "material comprising." Def.'s Opening Br. at 29-35.

First, repeated references in the specifications of each patent make it clear that "what the inventors actually invented and intended to envelop with the claim," Renishaw, 158 F.3d at 1250, were chemical compounds. See, e.g., '982 patent, col. 2, lines 26-28; '123 patent, col. 2, lines 38-40; '608 patent, col. 2, lines 41-43; '485 patent, col. 3, lines 4-6 ("mixing the solid waste with a *sulfate compound*, such as calcium sulfate dihydrate (gypsum powder) or sulfuric acid" (emphasis added)); '982 patent, col. 5, lines 6-10; '123 patent, col. 5, lines 11-14; '608 patent, col. 8, lines 16-20; '485 patent, col. 6, lines 29-33 ("products like phosphoric acid (phosphoric), pyrophosphates, triple super phosphate, trisodium phosphates, potassium phosphates, ammonium phosphates and/or *similar compounds*" (emphasis added)); '982 patent, col. 19, lines 54-58

---

[5] Of these terms, the term "waste matrix" also appears in Part IV of Sevenson's opening brief under the heading of terms that have an apparent ordinary meaning. In addition, the terms "phosphoric acid" and "sulfuric acid" also appear in Part II of Sevenson's opening brief.

(Example 6); '123 patent, col. 20, lines 3-8 (Example 6); '608 patent, col. 23, lines 53-57 (Example 6); '485 patent, col. 22, lines 40-44 (Example 6) ("The treatability studies are designed to optimize the amount and grade of gypsum powder (*or other sulfate compound*) needed during step I, and the amount and concentration of phosphoric acid (*or other phosphate compound*) needed in step II ." (emphasis added)). The specification of each patent clearly indicates that to one of skill in the art, each of these claim terms is a "compound."

Second, the ordinary and customary meanings of the words "compound" and "material" as evidenced by Hawley's supports the conclusion that each of these claim terms is a "compound." Hawley's defines "compound" as "[a] substance composed of atoms or ions of two or more elements in chemical combination." Hawley's at 302 (Exhibit B). This definition is consistent with the chemical compositions of these compounds to which the parties have agreed. For example, the parties have agreed that "halite" is sodium chloride (NaCl). In contrast, Hawley's defines the term "material" as "[a] nonspecific term used with various shades of meaning in the technical literature." Id. at 734 (Exhibit A). The definition proposed by Sevenson does not promote the purpose of claim construction: to understand and explain the claim language. See Scripps, 927 F.2d at 1580; see also, *supra*, Part I. In addition, Sevenson attempts to discredit the Government's proposed definitions by asserting that they do not account for the natural occurrences of impurities that are found in chemical compounds. However, one of skill in the art would know that impurities are naturally found in all chemicals. Sevenson's Exhibits 19-25 simply confirm this fact.

Third, the term "material" is used in each of the five patents-in-suit to refer to the object or workpiece upon which thepatented method is performed. Defining additional claim terms relating to the treatment technology as "materials" would only serve to introduce another level of

confusion and uncertainty into the analysis of these patents and would be at odds with the Court's purpose in construing these claims. See Scripps, 927 F.2d at 1580 ("the construction of claims is simply a way of elaborating the normally terse claim language: in order to understand and explain").

In addition, Sevenson's proposed definitions should not be adopted because they incorporate the word "comprising." "Transitional phrases, such as 'comprising,' 'consisting of,' and 'consisting essentially of,' are terms of art in patent law that define the scope of the claim with respect to what unrecited additional components or steps, if any, are excluded from the scope of the claim." Conoco, Inc. v. Energy & Envtl. Intern., L.C., 460 F.3d 1349, 1360 (Fed. Cir. 2006) (internal quotations omitted). Specifically, "comprising" is a "term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim." Genentech, Inc. v. Chiron Corp., 112 F.3d 495, 501 (Fed. Cir. 1997). As such, it signifies an "open" claim. Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1271 (Fed. Cir. 1986). By incorporating the term of art "comprising" into its proposed definitions for these claim terms, Sevenson attempts to impermissibly broaden the scope of those terms. This Court should not adopt a proposed construction that incorporates language which is a term of art utilized in claim language itself. Sevenson has provided no support for its own proposed definitions and has not countered the Government's proposed definitions; therefore, the Government's proposed definitions should be adopted.

**Conclusion**

For the reasons stated above and for those in the Government's opening brief, the Government requests that the Court construe the claim terms in accordance with the Government's proposed definitions.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JOHN J. FARGO
Director

Dated: 11/29/06

MARCY E. COOK
Attorney
Civil Division
U.S. Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0459
Facsimile: (202) 307-0345

Attorneys for the United States

Dated: Nov. 29, 2006

RUSSEL O. PRIMEAUX
Kean Miller Hawthorne
D'Armond McCowan & Jarman LLP
One American Place, 22nd Floor
Post Office Box 3513
Baton Rouge, LA 70821-3513
Phone: 225.387.0999
Facsimile: 225.388.9133

Counsel for Shaw Environmental, Inc.