# Cleaning Up the Nation's Waste Sites: Markets and Technology Trends




2004 Edition

This page intentionally left blank

Office of Solid Waste
And Emergency Response
(5102G)

EPA 542-R-04-015
September 2004
www.epa.gov/tio
clu-in.org/marketstudy

# Cleaning Up the Nation's Waste Sites: Markets and Technology Trends

## *2004 Edition*

This page intentionally left blank

# Notice

Preparation of this report has been funded wholly or in part by the United States Environmental Protection Agency (EPA) under contract number 68-W-03-038. Mention of trade names or commercial products does not constitute endorsement or recommendations for use. This document is intended for information purposes and does not create new nor alter existing Agency policy or guidance. The document does not impose any requirements or obligations on EPA, states, other federal agencies, or the regulated community.

A limited number of printed copies of *Cleaning Up the Nation's Waste Sites: Markets and Technology Trends, 2004 Edition* is available free of charge by mail or by facsimile from:

U.S. EPA/National Service Center for Environmental Publications (NSCEP)
P.O. Box 42419
Cincinnati, OH 45242-2419
*Telephone:* 513-489-8190 or 800-490-9198
*Fax:* 513-489-8695

A portable document format (PDF) version of this report is available for viewing or downloading from the Hazardous Waste Cleanup Information (CLU-IN) web site at http://clu-in.org/marketstudy. Printed copies can also be ordered through that web address, subject to availability.

### For More Information

For more information about remediation markets, including tools to help advance technologies through all stages of product development from bench scale to full commercialization, visit the EPA web site http://www.epa.gov/tio/vendor.

# Acknowledgments

This document was prepared for the U.S. Environmental Protection Agency's Technology Innovation and Field Services Division (TIFSD). The report would not have been possible without the assistance of staff throughout EPA, the Department of Defense (DOD), and the Department of Energy (DOE). Special thanks go to staff in EPA's Office of Superfund Remediation and Technology Innovation; Office of Solid Waste; Office of Underground Storage Tanks; Federal Facilities Restoration and Reuse Office; and Office of Federal Facilities Enforcement; and Office of Brownfields Cleanup and Redevelopment. DOD's Office of the Assistant Under Secretary of Defense for Environmental Security, and DOE's Office of Environmental Restoration were exceptionally generous with their time and expertise. Important contributions were also received from a number of other parties identified in various sections of the report.

# Executive Summary

Over the next several decades, federal, state, and local governments and private industry will commit billions of dollars annually to clean up sites contaminated with hazardous waste and petroleum products from a variety of industrial sources. This commitment will result in a continuing demand for hazardous waste site remediation services and technologies.

Hundreds of small, medium, and large companies across the nation will respond to this demand, supplying skilled professionals and advanced technologies to address contaminated sites. Researchers and technology developers will continue working to provide smarter and cheaper solutions to the complex environmental contamination problems still to be addressed. Investors will seek to identify technologies that provide the most promising technical and financial future. Universities continually seek to adjust their environmental sciences and engineering curricula to ensure that their future graduates are prepared for the challenges they will face in this field.

To make cost-effective and sound investment decisions, all these groups will need information on the nature and extent of the future cleanup market. With this need in mind, EPA has produced this overview of the site characterization and remediation market. EPA believes that information on the Nation's cleanup needs will help industry and government officials develop better and more targeted research, development, and business strategies.

## Background

EPA's mission includes the important goal of restoring contaminated land to productive use, and the Agency has established ambitious targets.[1] The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA, or Superfund) and the Resource Conservation and Recovery Act (RCRA) provide the legal authority for most of EPA's work toward this goal. Cleanups are also generally required to comply with a number of other state and federal statutes. To achieve this goal, EPA works with many partners at all levels of government to ensure that appropriate cleanup tools are used; that resources, activities, and outcomes are coordinated with partners and stakeholders and effectively communicated to the public; and that cleanups are protective and contribute to community revitalization.

EPA is a leader in influencing how hazardous waste site cleanups are conducted in all cleanup programs. The agency directly conducts many cleanups and removals under the Superfund program. In addition, it conducts oversight of state, tribal, and federal facility cleanup programs; develops regulations, policies, guidances, and technical publications; and promotes technology innovation. In its efforts to coordinate across the various programs, EPA seeks to recognize the need for cleanup tools that will have wide applicability.

In developing this report, EPA has identified seven major cleanup programs or market segments that make up the national cleanup market:

- National Priorities List (NPL, or Superfund)
- Resource Conservation and Recovery Act (RCRA) Corrective Action
- Underground Storage Tanks (UST)
- Department of Defense (DOD)
- Department of Energy (DOE)
- Other (Civilian) Federal Agencies
- States and Private Parties (including brownfields)

While segmentation is necessary to better understand each market, the parties involved in site characterization and remediation require a unified picture of the market in order to make better informed investment, marketing, and other strategic decisions. This study provides both perspectives—it sums up the entire market based on a thorough analysis of each segment. Smarter investments by all involved parties will result in more cost-

[1] 2003-2008 EPA Strategic Plan, Objective 3, Land Preservation and Restoration. http://www.epa.gov/ocfo/plan/2003sp.pdf

effective remediation technologies, thereby reducing the cost burden for the nation as a whole as it works to recover contaminated land and groundwater and protect the public's health.

## Study Approach

This report updates and expands a 1996 analysis that brought together valuable information on site characteristics, market size, and other factors that affect the demand for remediation services.[2] As with the previous report, the focus of this study is on the potential future applications of remediation technologies.

To provide a useful estimate of future needs, the demand estimates focus on remaining cleanup work at sites where the remedies have not yet been chosen, and do not include projects that are underway or completed. While the report considers a broad range of remediation services required in the future, its purpose is to provide insight into the potential for the application of new treatment and site characterization technologies.

This report is not a budgeting analysis. Most of the cleanups are typically funded by the public and private owners of the properties and those who are potentially responsible for the contamination. A small percentage of cleanups are likely to be conducted by EPA. The report's time horizon, approximately 30 years, is beyond the budgeting period of most private and public institutions. Moreover, the uncertainties in many of the market estimates, including who will conduct, oversee, and pay for the needed cleanups, make it impossible to convert these estimates to resource needs for specific government or private organizations.

In addition to providing a unified perspective of the nature and scope of the Nation's contaminated property cleanup needs, this report includes a more in-depth analysis of the seven major programs or market segments identified earlier, covering areas such as their structure, operation, and regulatory requirements. Information and analyses of the following are provided for each segment:

- Factors Affecting Demand—the economic, political, and technical factors and trends that may influence the size, timing, or characteristics of the market segment (market drivers);
- Numbers and Characteristics of Sites—measures of the market in terms of the number of sites to be remediated, occurrence of contaminants, and extent of remediation work needed;
- Estimated Cleanup Costs—remediation cost estimates, or the value of the market;
- Market Entry Conditions—considerations that may benefit vendors and researchers, such as contracting practices, competition, and information sources;
- Technology Issues and R&D—technologies used in a specific market segment and relevant research and development.

The study also includes analyses of remediation needs in three market "niches," each of which presents a specific set of remediation challenges—the cleanup of former manufactured gas plant (MGP) and other coal tar sites, mining sites, and drycleaner sites. It also addresses two specific issues that affect hazardous waste sites in most remediation programs—site characterization technology, and the remediation of dense non-aqueous phase liquids (DNAPLs). These niches cut across all seven market segments.

The data used for this report are from federal databases, such as the Comprehensive Environmental Response, Compensation, and Liability Information System (CERCLIS), RCRA Info, and DOD's Restoration Management Information System (RMIS), published studies, guidance documents, and web sites; commercial information; and other sources. Some are current through fiscal years (FY) 2001 and 2002, while others are current through 2003 and the first part of 2004. Because many hazardous waste sites are still undergoing evaluation, data availability differs from one market segment to another. Each chapter of the

[2] U.S. Environmental Protection Agency, Office of Solid Waste and Emergency Response, Technology Innovation Office, *Cleaning Up the Nation's Waste Sites: Markets and Technology Trends*, EPA 542-R-96-005, April 1997.

report includes an explanation of the analytical methodology, information sources, and assumptions, and a detailed list of references. Supporting information is included in the appendices, as well as in explanations in the narrative, footnotes, and figures.

## Study Limitations

The reliability and detail of the estimates in this report are a function of the availability and quality of data, and, obviously, the innate uncertainties in forecasting future events. In addition, each of the seven programs have somewhat different operational practices and use varying definitions of terms such as "sites," "facilities," "installations," and "operable units." Although most of the activities underlying this cost estimate are for remedial action and site evaluation, they also include some administrative work where costs are not reported separately.

It cannot be overemphasized that the estimates in this report are just estimates. It is likely that assumptions about the future, which are based on historical experience, will be more reliable for the earlier years than the later years. Likewise, estimates for sites already in a state or federal cleanup program would be more reliable than those for sites that have yet to be discovered. Nevertheless, the resulting estimates provide a plausible range of the likely extent of the nation's site cleanup needs.

The estimate of the total cost of each cleanup market segment is based on estimates of historical averages for each market segment and these may change in the future. Future cleanups may turn out to be more or less complex, or applications of advanced site characterization and cleanup technologies may improve the cleanup cost-effectiveness.

Predictions of potential future site discoveries and additions to the NPL are also based on recent history. The cleanup market includes sites that are not yet enrolled in a cleanup program, or have not yet been discovered. The ultimate number of additions to the NPL or discoveries of non-NPL sites depend upon several factors which are difficult to predict. Nevertheless, these sites are expected to be an important component of the market.

The limitations and uncertainties of the market estimates vary from one market segment to another. For example, the forecast of future releases from USTs is hampered by a paucity of data with which to estimate leakage rates; the estimate of the number and potential cost of mining site cleanups is presented as a wide range of values and reflects an attempt to develop a consensus of a number of industry and government sources; and the estimate of the number of potential manufactured gas plant sites needing cleanup is based on studies that have estimated the number of original facilities that cause the contamination and assumptions regarding their disposition since their operations ceased many years ago. Although DOD and DOE have clearly identified most of the contamination problems at their installations and facilities, there are technological uncertainties at some DOE sites which may cause the estimates to be overstated or understated.

Although this report estimates the potential scope of the market, it does not explicitly estimate the timing of the cleanup work. As in most economic activities, one cannot simply assume that the cleanup work will be conducted at a constant pace from year to year. The schedule of any project can be expedited or retarded by the availability of funds in any given year; technical uncertainties; difficulties in achieving agreements among stakeholders on a number of issues, such as cleanup approach and target end states, who will pay, who is responsible for damages, and how the site will be reused. In addition, long-term stewardship will be needed at many sites.

## Major Findings

Although substantial progress has been made over the past quarter century, a considerable amount of cleanup work remains. At current levels of site cleanup activity in the U.S. (About $6-8 billion annually), it would take 30 to 35 years to complete most of the work needed.

Quantifying the amount and nature of future work is subject to the limitations and uncertainties described above and requires making a number of assumptions. Users of the report will reap the greatest benefit if they carefully review the discussions of how the estimates were developed, which are included throughout the report. Given these limitations, the following are some of the major findings:

- Under current regulations and practices a total of 235,000-355,000 sites (average 294,000) will need to be cleaned up in all seven programs (Exhibit). More than 90 percent of these sites are in programs that tend to have smaller, less-complex cleanup projects, such as UST sites and sites managed under state cleanup programs. The sites in the remaining programs, such as Superfund, DOD, and DOE, tend to be larger and more complex, on average.
- These cleanups are estimated to cost $170-250 billion (average $209 billion). Most of this cost will be borne by the owners of the properties (private and public entities) and those potentially responsible for the contamination.

**Estimated Number of Hazardous Waste Sites and Cleanup Costs: 2004-2033**




These estimates are derived from judgements regarding the most likely scenarios within a range of estimates. The estimates described in the report, include a number of assumptions such as the average cleanup cost per site, number of new site discoveries, and future additons to the NPL.

NPL: National Priorities List, or Superfund; RCRA-CA: Resource Conservation and Recovery Act Corrective Action program; UST: Underground Storage Tanks; DOD: Department of Defense; DOE: Department of Energy; Civilian Agencies: non-DOD and non-DOE federal agencies; and State & Private: state mandatory, voluntary, and brownfields sites, and private sites.

Totals may not add due to rounding.

- The estimated number of sites (294,000) includes sites that have already been discovered (77,000) plus an estimate of the number of sites to be discovered in the future (217,000). The estimated number of future sites (mostly NPL, UST and sites managed under state programs) is based on the rate of new sites discovered in the late 1990s and early 2000s:

   - Between 1993 and 2003 an average of 28 sites per year were listed on the NPL. This report assumes that this rate will continue for 10 years. Although listings may continue beyond 10 years, they are not included because of uncertainties in predicting NPL listings.
   - The estimated number of future UST site discoveries is based on the annual rate of new releases in recent years (6,000-12,000) and the assumption that this rate will continue for 10 years. Although tank releases may continue beyond 10 years and leakage rates may decline, these scenarios are not included because of uncertainties in predicting these trends.
   - The estimated number of sites to be discovered under state mandatory and voluntary cleanup programs is based on an average of 5,000 cleanups completed annually in recent years. Because studies indicate that there are many sites yet to be discovered, it is assumed that this activity level will continue for at least 30 years.
- Most cleanup programs have similar contaminants: solvents and other organics, metals, and petroleum products.
- Over the next 30 years, there will be a need to address many smaller sites, primarily 125,000 UST and 150,000 state and private party sites (including brownfields). There is also a need to screen many more sites to determine whether or not they have contamination problems.
- The demand for cleanup of many sites will be influenced by real estate development activity as well as regulatory requirements. Some sites do not come to the attention of state or federal cleanup programs until they are investigated in the course of development activity or real estate transactions. For some properties, developers or prospective site users may assume all or part of the cleanup costs.
- Non-DOD and non-DOE federal agencies that have contaminated sites, including the Departments of Interior, Agriculture, and Transportation, combined, have been spending less than $200 million annually for site cleanups. They have an estimated $15-21 billion of cleanup work yet to be completed.
- Improved approaches to site characterization have been demonstrated to lead to faster, cheaper, and better cleanups. For example, newer site characterization approaches have made the removal and treatment of DNAPLs at some sites more cost effective than containing the material in the subsurface.
- The trend toward risk-based cleanups, which is found throughout the remediation market, may influence the remedy selection process, foster more flexibility in site reuse, and provide incentives for property owners to bring more sites into remediation programs. It is difficult to predict the impact of these developments on the use of specific remedy types.
- The need for monitoring and long-term operation and maintenance of remedy components is expected to increase in most market segments.

At current public and private spending levels for site cleanups, it will take several decades to complete all the cleanup work estimated in this report. As with most cleanups requiring technically complex solutions and coordination of multiple stakeholders, the work load will probably fluctuate from year to year. Most of these costs will be borne by private companies, and owners of state and federal facilities, such as DOD and DOE. This market represents a significant opportunity for continued development and implementation of cleanup approaches and technologies that will result in better, cheaper, and faster site cleanups, as well as technologies that enable us to better address challenging contamination problems such characterizing NAPLs in the subsurface.

Technical solutions to a particular contaminated site problem are generally similar, regardless of the regulatory program under which they are implemented. While individual markets may not support certain investment decisions, the aggregate demand across all markets might justify the up-front investment in a technology that ultimately drives down the cost of moving contaminated sites into productive use. By recognizing this potential for economies of scale in cleanup technology markets, the information in this report contributes to better investment decisions across all markets.

This page intentionally left blank

# Table of Contents

Page

**Notice . . . . . . . . . . iii**

**Acknowledgments . . . . . . . . . . iv**

**Executive Summary . . . . . . . . . . v**

**Chapter 1. Introduction and Summary . . . . . . . . . . 1-1**

1.1 Introduction . . . . . . . . . . 1-1
1.2 Using This Document . . . . . . . . . . 1-2
1.3 Study Approach and Limitations . . . . . . . . . . 1-2
1.4 Market Size . . . . . . . . . . 1-4
1.5 Hazardous Waste Site Characteristics . . . . . . . . . . 1-13
1.5.1 Contaminated Media . . . . . . . . . . 1-14
1.5.2 Contaminants of Concern . . . . . . . . . . 1-14
1.6 Cleanup Program Status and Factors Affecting Demand . . . . . . . . . . 1-16
1.6.1 Superfund Sites . . . . . . . . . . 1-17
1.6.2 RCRA Corrective Action Sites . . . . . . . . . . 1-18
1.6.3 Underground Storage Tank Sites . . . . . . . . . . 1-19
1.6.4 Department of Defense Sites . . . . . . . . . . 1-20
1.6.5 Department of Energy Sites . . . . . . . . . . 1-20
1.6.6 Civilian Federal Agency Sites . . . . . . . . . . 1-21
1.6.7 State and Private Party Sites . . . . . . . . . . 1-22
1.6.8 Manufactured Gas Plant Sites . . . . . . . . . . 1-23
1.6.9 Mining Sites . . . . . . . . . . 1-24
1.6.10 Drycleaner Sites . . . . . . . . . . 1-24
1.6.11 Site Characterization . . . . . . . . . . 1-25
1.6.12 DNAPLs . . . . . . . . . . 1-25
1.7 Implications for Site Characterization and Cleanup . . . . . . . . . . 1-26

**Chapter 2. Remediation Technologies Used At National Priorities List Sites . . . . . . . . . . 2-1**

2.1 Definitions of Remediation Technologies . . . . . . . . . . 2-1
2.2 Historical Use of Remediation Technologies at Superfund Sites . . . . . . . . . . 2-2
2.2.1 Containment and Disposal Technologies for Source Control . . . . . . . . . . 2-4
2.2.2 Treatment Technologies for Source Control . . . . . . . . . . 2-5
2.2.3 Groundwater Remedies . . . . . . . . . . 2-6
2.3 Advancing Remediation and Characterization Technologies . . . . . . . . . . 2-7
2.4 References . . . . . . . . . . 2-10

Page

**Chapter 3. Demand For Remediation of National Priorities List Sites . . . . . . . . . . 3-1**

3.1 The Superfund Program . . . . . . . . 3-1
3.1.1 The National Contingency Plan . . . . . . . . 3-1
3.1.2 The Superfund Process . . . . . . . . 3-2
3.1.3 Program Status . . . . . . . . 3-3
3.2 Factors Affecting Demand for Cleanup . . . . . . . . 3-3
3.3 Number of Sites . . . . . . . . 3-5
3.4 Site Characteristics . . . . . . . . 3-7
3.4.1 Types of Contaminated Matrices . . . . . . . . 3-8
3.4.2 Types of Contaminants . . . . . . . . 3-8
3.4.3 Estimated Quantities of Contaminated Material . . . . . . . . 3-11
3.5 Estimated Cleanup Costs . . . . . . . . 3-13
3.6 Market Entry Considerations . . . . . . . . 3-15
3.6.1 Market Considerations During Remedy Selection . . . . . . . . 3-16
3.6.2 Market Considerations During Design and Procurement . . . . . . . . 3-17
3.6.3 Research, Development, and Demonstration . . . . . . . . 3-18
3.7 References . . . . . . . . 3-19

**Chapter 4. Demand for Remediation of RCRA Corrective Action Sites . . . . . . . . . . 4-1**

4.1 Program Description . . . . . . . . 4-2
4.1.1 Regulatory History . . . . . . . . 4-2
4.1.2 Corrective Action Process . . . . . . . . 4-7
4.1.3 Corrective Action Implementation . . . . . . . . 4-8
4.2 Factors Affecting Demand for Cleanup . . . . . . . . 4-10
4.3 Number and Characteristics of RCRA Sites . . . . . . . . 4-11
4.3.1 Number of RCRA Sites . . . . . . . . 4-11
4.3.2 Types of RCRA Sites . . . . . . . . 4-13
4.4 Estimated Cleanup Costs . . . . . . . . 4-16
4.5 Market Entry Considerations . . . . . . . . 4-17
4.6 Remediation Technologies . . . . . . . . 4-17
4.7 References . . . . . . . . 4-19

**Chapter 5. Demand for Remediation of Underground Storage Tank Sites . . . . . . . . . . 5-1**

5.1 Federal Program Description . . . . . . . . 5-2
5.2 Factors Affecting Demand for Cleanup . . . . . . . . 5-4
5.2.1 General Trends . . . . . . . . 5-4
5.2.2 State Regulations and Funding Sources . . . . . . . . 5-6
5.2.3 2002 Brownfields Legislation and EPA's USTfields Initiative . . . . . . . . 5-7
5.2.4 MTBE Contamination and the Remediation Market . . . . . . . . 5-7
5.2.5 State Performance-Based Environmental Cleanup Programs . . . . . . . . 5-8

Page

5.3 Number and Location of USTs . . . . 5-9
5.3.1 Population of UST Sites in the U.S. . . . . 5-9
5.3.2 Location of Regulated Tanks . . . . 5-10
5.3.3 Potential Number of Sites to be Cleaned Up . . . . 5-10
5.4 Estimated Cleanup Costs . . . . 5-12
5.5 Market Entry Considerations . . . . 5-12
5.6 Remediation Technologies . . . . 5-13
5.7 References . . . . 5-15

**Chapter 6. Demand For Remediation of Department of Defense Sites . . . . 6-1**

6.1 Program Description . . . . 6-2
6.1.1 Installation Restoration Program . . . . 6-2
6.1.2 Base Realignment and Closure (BRAC) . . . . 6-4
6.1.3 The Military Munitions Response Program . . . . 6-5
6.2 Factors Affecting the Demand for Cleanup . . . . 6-5
6.3 Number and Characteristics of Sites . . . . 6-6
6.3.1 Number and Types of Sites . . . . 6-6
6.3.2 Contaminated Matrices . . . . 6-9
6.3.3 Types of Contaminants . . . . 6-11
6.4 Estimated Cleanup Costs . . . . 6-13
6.5 Market Entry Considerations . . . . 6-14
6.6 Remediation Technologies . . . . 6-16
6.6.1 Technologies Used at DOD Sites . . . . 6-16
6.6.2 Research, Development, and Demonstration . . . . 6-16
6.7 References . . . . 6-18

**Chapter 7. Demand For Remediation of Department of Energy Sites . . . . 7-1**

7.1 Program Description . . . . 7-2
7.1.1 Deactivation and Decommissioning of Surplus Facilities . . . . 7-3
7.1.2 Remedial Actions . . . . 7-4
7.1.3 Long-Term Surveillance and Maintenance . . . . 7-5
7.1.4 Stabilization of High-Risk Materials . . . . 7-6
7.1.5 Regulatory Requirements and Other Program Drivers . . . . 7-6
7.1.6 Policy Initiatives: The Top-to-Bottom Review . . . . 7-7
7.2 Factors Affecting Demand for Cleanup . . . . 7-7
7.3 Number and Characteristics of Sites . . . . 7-9
7.4 Estimated Cleanup Costs . . . . 7-12
7.4.1 Life Cycle Costs . . . . 7-12
7.4.2 Timing of Expenditures . . . . 7-14
7.5 Market Entry Considerations . . . . 7-14
7.6 Remediation Technologies . . . . 7-17
7.6.1 Private Sector Involvement: Mechanisms . . . . 7-20
7.6.2 Private Sector Involvement: Programs . . . . 7-21
7.7 References . . . . 7-24

Page

**Chapter 8. Demand for Remediation of Sites Managed By Civilian Federal Agencies ......... 8-1**

8.1 Civilian Federal Agency Cleanup Programs ........ 8-2
8.2 Factors Affecting Demand for Cleanup ........ 8-3
8.3 Number of Facilities and Sites ........ 8-4
8.4 Site Characteristics ........ 8-7
8.5 Estimated Cleanup Costs ........ 8-8
8.6 Remediation Technologies ........ 8-11
8.7 References ........ 8-11

**Chapter 9. Demand for Remediation of States and Private Party Sites ........ 9-1**

9.1 Programs Addressing State Sites ........ 9-2
9.1.1 State Hazardous Waste Cleanup Programs ........ 9-2
9.1.2 Voluntary Cleanup and Brownfield Programs ........ 9-4
9.1.3 Federal Initiatives Affecting State Cleanups ........ 9-6
9.2 Factors Affecting Demand for Cleanups ........ 9-7
9.3 Number and Characteristics of Sites ........ 9-9
9.3.1 State Mandatory Hazardous Waste Programs ........ 9-9
9.3.2 Voluntary Cleanup and Brownfield Programs ........ 9-12
9.3.3 Contaminants and Media ........ 9-13
9.4 Estimated Cleanup Costs ........ 9-15
9.4.1 Status and Capacity of State Cleanup Funds ........ 9-15
9.4.2 Annual and Projected Cleanup Costs ........ 9-18
9.5 Market Entry Conditions ........ 9-19
9.6 Remediation Technologies ........ 9-21
9.7 References ........ 9-22

**Chapter 10. Demand for Remediation of Manufactured Gas Plants and Related Coal Tar Sites ........ 10-1**

10.1 History ........ 10-1
10.2 Gas Manufacturing Processes ........ 10-2
10.3 Number and Characteristics of Sites ........ 10-2
10.4 Waste Types and Quantities ........ 10-7
10.5 Remediation Technologies ........ 10-9
10.6 Estimated Cleanup Costs ........ 10-13
10.7 References ........ 10-15

Page

**Chapter 11. Demand for Remediation of Mining Sites . . . 11-1**

11.1 Industry Description . . . 11-1
11.1.1 Types of Mining . . . 11-2
11.1.2 Mining Processes . . . 11-2
11.1.3 Types of Wastes . . . 11-4
11.1.4 Regulatory Programs . . . 11-5
11.1.5 Mines on Federal Lands . . . 11-7
11.2 Factors Affecting Demand . . . 11-8
11.3 Number of Sites . . . 11-9
11.4 Market Entry Conditions . . . 11-12
11.5 Estimated Cleanup Costs . . . 11-12
11.6 Remediation Technologies . . . 11-13
11.7 Research and Development . . . 11-14
11.8 References . . . 11-15

**Chapter 12. Demand for Remediation of Drycleaner Sites . . . 12-1**

12.1 Industry Description . . . 12-1
12.1.1 Drycleaning Processes . . . 12-2
12.1.2 Types of Wastes and Waste Management Practices . . . 12-5
12.1.3 State and Industry Drycleaner Site Cleanup Programs . . . 12-6
12.2 Factors Affecting Demand for Remediation . . . 12-7
12.3 Number and Characteristics of Sites . . . 12-8
12.3.1 Active Drycleaning Facilities . . . 12-8
12.3.2 Inactive Drycleaning Facilities . . . 12-10
12.4 Market Entry Considerations . . . 12-11
12.5 Estimated Cleanup Costs . . . 12-11
12.6 Remediation Technologies . . . 12-11
12.6.1 Site Assessment Technologies . . . 12-13
12.6.2 Remediation Technologies . . . 12-14
12.7 References . . . 12-15

**Chapter 13. Demand for Site Characterization Services . . . 13-1**

13.1 Market Description . . . 13-1
13.2 Site Characterization Tools . . . 13-5
13.2.1 Sample Access and Collection Technologies . . . 13-6
13.2.2 Sample Analysis Technologies . . . 13-6
13.2.3 Field Technologies . . . 13-7
13.2.4 Adaptive Site Management Approaches . . . 13-7
13.3 Factors Affecting Demand . . . 13-11
13.4 Number of Sites That Will Need Characterization . . . 13-13
13.5 Estimated Value of Site Characterization Market . . . 13-16
13.6 Market Entry Conditions . . . 13-18
13.7 References . . . 13-19

Page

**Chapter 14. DNAPLs at Hazardous Waste Sites . . . . . . . . . . 14-1**

14.1 Market Description . . . . . . . . . . 14-1
14.1.1 DNAPLs in the Environment . . . . . . . . . . 14-2
14.1.2 Chemical Compounds that are DNAPLs . . . . . . . . . . 14-2
14.1.3 Industrial Activities . . . . . . . . . . 14-3
14.1.4 Hydrogeological Characteristics . . . . . . . . . . 14-4
14.2 Factors Affecting Demand for Remediation Services . . . . . . . . . . 14-4
14.3 Number and Types of Sites . . . . . . . . . . 14-6
14.4 Estimated Cleanup Costs . . . . . . . . . . 14-9
14.4.1 Pump-and-Treat System Costs . . . . . . . . . . 14-9
14.5 Remediation Technologies . . . . . . . . . . 14-13
14.5.1 Site Characterization . . . . . . . . . . 14-13
14.5.2 Treatment Technologies . . . . . . . . . . 14-14
14.5.3 Balancing Source Removal/Treatment vs. Containment . . . . . . . . . . 14-15
14.6 References . . . . . . . . . . 14-16

**Appendix A. Supporting Data for Analysis of National Priorities List Sites . . . . . . . . . . A-1**

**Appendix B. Supporting Data for Analysis of Underground Storage Tank Sites . . . . . . . . . . B-1**

**Appendix C. Supporting Data for Analysis of Department of Defense Sites . . . . . . . . . . C-1**

**Appendix D. Supporting Data for Analysis of Manufactured Gas Plant Sites . . . . . . . . . . D-1**

**Appendix E. Federal and State Programs . . . . . . . . . . E-1**

**Appendix F. Acronyms . . . . . . . . . . F-1**

# List of Exhibits


| Exhibit | | Page |
|---|---|---|
| 1-1 | Estimated Number of Sites to be Remediated | 1-5 |
| 1-2 | Estimated Remaining Remediation Cost ($Billions) | 1-6 |
| 1-3 | Media to be Remediated | 1-14 |
| 1-4 | Contaminant Groups to be Remediated | 1-15 |
| 2-1 | Treatment Technologies | 2-3 |
| 2-2 | Remedy Types Selected or Used for Source Control at NPL Sites, FY 1982-2002 | 2-4 |
| 2-3 | Superfund Remedial Actions at Source Control Treatment Projects FY 1982-2002 | 2-6 |
| 2-4 | Groundwater and Other Remedy Types Selected or Used at NPL Sites, FY 1982-2002 | 2-7 |
| 2-5 | Superfund Sites With P&T, In-situ Treatment, or MNA as Part of a Groundwater Remedy FY 1982-2002 | 2-8 |
| 3-1 | Location of NPL Sites With Planned Remedial Actions by State and EPA Region | 3-5 |
| 3-2 | Phase of Remediation of Operable Units at Non-Federal NPL Sites with Planned Remedial Actions | 3-6 |
| 3-3 | Frequencies of Contaminated Matrices at NPL Sites With RODs | 3-8 |
| 3-4 | Frequencies of Major Contaminant Groups at NPL Sites With RODs | 3-9 |
| 3-5 | Frequencies of Major Contaminant Subgroups at NPL Sites With RODs | 3-10 |
| 3-6 | Frequencies of the Most Common Contaminants at NPL Sites With RODs | 3-11 |
| 3-7 | Distribution of Quantities of Contaminated Soil, Sediment, and Sludge at NPL Sites With RODs | 3-12 |
| 3-8 | Estimated Quantity of Contaminated Soil, Sediment, and Sludge for Major Contaminant Groups at NPL Sites With Planned Remedial Actions | 3-13 |
| 3-9 | Estimated Cleanup Costs for NPL Sites | 3-14 |
| 4-1 | Location of RCRA Sites Subject to Corrective Action by State and EPA Region | 4-12 |
| 4-2 | Priority Ranking of RCRA Sites Subject to Corrective Action | 4-13 |
| 4-3 | Location of RCRA Sites Likely to Require Corrective Action by State and EPA Region | 4-14 |
| 4-4 | Major Waste Management Processes at RCRA Facilities | 4-14 |
| 4-5 | Estimated RCRA Corrective Action Costs ($Millions) | 4-17 |
| 4-6 | Remedies Selected for Soil at 86 RCRA Corrective Action Facilities | 4-18 |
| 5-1 | Backlog of UST Site Cleanups to be Completed | 5-4 |
| 5-2 | Confirmed Releases at UST Sites | 5-4 |
| 5-3 | Compliance Status of USTs by Region | 5-5 |
| 5-4 | UST Site Cleanup Progress 1991-2002 | 5-10 |
| 5-5 | Estimated Number of UST Sites Needing Remediation | 5-11 |
| 5-6 | Types and Frequencies of Soil Remediation Technologies at LUST Sites | 5-13 |
| 5-7 | Type and Frequency of Groundwater Remediation Technologies at LUST Sites | 5-14 |

| Exhibit | | Page |
|---|---|---|
| 6-1 | Number of DOD Sites by Status | 6-7 |
| 6-2 | Number of DOD Sites and Installations Needing Cleanup | 6-8 |
| 6-3 | Location of DOD Sites Needing Cleanup | 6-8 |
| 6-4 | Most Common Types of DOD Sites Needing Cleanup | 6-9 |
| 6-5 | Frequency of Contaminated Matrices at DOD Sites Needing Cleanup | 6-10 |
| 6-6 | Frequency of Contaminated Matrices by Site Type at DOD Sites Needing Cleanup | 6-10 |
| 6-7 | Major Contaminant Groups by Matrix at DOD Sites Needing Cleanup | 6-11 |
| 6-8 | Major Contaminant Groups by DOD Component at Sites Needing Cleanup | 6-12 |
| 6-9 | Frequency of Major Contaminant Groups for the Most Common DOD Site Types Needing Cleanup | 6-13 |
| 6-10 | DOD Cleanup Expenditures: FY 2001-2005 | 6-13 |
| 6-11 | Treatment Technologies Used at DOD Sites | 6-17 |
| 7-1 | Remaining Release Sites and D&D Facilities by Location | 7-11 |
| 7-2 | Estimated Remaining Life Cycle Cost for DOE Site Restoration by Installation | 7-13 |
| 7-3 | Actual and Planned EM and Site Restoration Budget: FY 2000-2004 | 7-14 |
| 7-4 | DOE Environmental Management Expenditures 2002-2004 ($000) | 7-15 |
| 7-5 | Examples of Innovative Technologies Useful to DOE | 7-18 |
| 8-1 | Number of Civilian Federal Facilities Potentially Requiring Cleanup | 8-5 |
| 8-2 | DOI Allocation of the Central Hazardous Materials Fund | 8-6 |
| 8-3 | Examples of Types of Contaminated Facilities at Civilian Federal Agencies | 8-8 |
| 8-4 | Estimate Cleanup Cost for Civilian Federal Agencies | 8-9 |
| 9-1 | State Cleanup Program Summary | 9-3 |
| 9-2 | Sites in State Hazardous Waste Programs | 9-10 |
| 9-3 | Number of Non-NPL State Hazardous Waste Sites | 9-11 |
| 9-4 | Voluntary and Mandatory Cleanup Program Status | 9-13 |
| 9-5 | Contaminants Found at a Sample of Brownfield Sites | 9-14 |
| 9-6 | State Fund Activity 1995, 1997, and 2000 ($ millions) | 9-16 |
| 9-7 | State Hazardous Waste Funds Expenditures and Balances 2000 and 1997 | 9-17 |
| 9-8 | Estimated Total Cost of State Site Cleanups ($Millions) | 9-19 |
| 9-9 | Remediation Techniques Used at a Sample of Brownfield Sites | 9-22 |
| 10-1 | Types and Numbers of Former Manufactured Gas Plants & Related Coal Tar Facilities in the U.S. | 10-4 |
| 10-2 | Estimated Magnitude & Disposition of Former Manufactured Gas Plants & Other Coal Tar Sites in the U.S | 10-6 |
| 10-3 | Estimated Quantities of Residuals and Wastes Released at Former MGP & Other Coal Tar Sites in the U.S. | 10-8 |
| 10-4 | Remediation Alternatives by Category of Waste at Former Manufactured Gas Plants | 10-11 |
| 10-5 | Estimated Average Remediation Cost by Site Type | 10-14 |
| 11-1 | Number of Active Mining Sites - 2001 | 11-10 |
| 11-2 | Comparison of Estimates of Number of Abandoned Hard Rock Mining Sites | 11-11 |
| 11-3 | Estimated Remediation Costs for U.S. Hardrock Mines | 11-13 |

Page

12-1 Number and Types of Active Drycleaners in the United States . . . . . . . . . . . . . . . . . . . . . . 12-9
12-2 Estimated Drycleaner Site Remediation Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-12
12-3 Site Assessment Technologies Used at Drycleaner Sites . . . . . . . . . . . . . . . . . . . . . . . . . 12-13
12-4 Site Remediation Technologies Used at Drycleaner Sites . . . . . . . . . . . . . . . . . . . . . . . . 12-14

13-1 Major Characterization Technology Subcategories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-6
13-2 Examples of Common Field Analytical Technologies . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-8
13-3 Examples of Projects with Savings and Efficiency Improvements Associated With Advanced Site Characterization Technologies . . . . . . . . . . . . . . . . . . . . 13-12
13-4 Estimated Number of Sites to Require Sampling and Analysis . . . . . . . . . . . . . . . . . . . . . 13-15
13-5 Estimated Major Components of Superfund Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-16
13-6 Remediation Cost and Site Size ($millions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-17
13-7 Estimated Site Characterization Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-17

14-1 Common DNAPL-Related Chemicals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-3
14-2 Occurrence of VOCs and SVOCs at Contaminated Sites . . . . . . . . . . . . . . . . . . . . . . . . . 14-6
14-3 Estimated Number of Sites With DNAPLs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-8
14-4 Cleanup Costs for Selected Pump-and-Treat Projects . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-10
14-5 Comparison of Pump-and-Treat Costs for Selected Projects . . . . . . . . . . . . . . . . . . . . . . 14-11

A-2 Contaminant Groups and Subgroups for the Analysis of Contaminants at NPL and DOD Sites . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-3
A-2 Superfund Remedial Action Contractors (RACs) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-13

B-1 UST Corrective Action Measures Mid-Year FY 2004 (As of March 31, 2004) . . . . . . . . . . . B-2

C-1 Location of DOD Sites Needing Cleanup . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-2
C-2 Definitions of DOD Site Types . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-4
C-3 DOD Site Types Needing Cleanup . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-10
C-4 Frequency of Matrices by DOD Site Type . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-12
C-5 Frequency of Major Contaminant Groups by Matrix and DOD Component . . . . . . . . . . . . . C-14
C-6 Frequency of Major Contaminant Groups by DOD Site Type . . . . . . . . . . . . . . . . . . . . . . . C-16
C-7 Frequency of Contaminant Subgroup by Matrix . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C-18

D-1 Estimated Disposition of Former Manufactured Gas Plants & Other Coal Tar Sites in the U.S. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-2
D-2 Estimated Typical Remediation Cost by Site Type . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-4

This page intentionally left blank

# Chapter 1
# Introduction and Summary

## 1.1 Introduction

Over the next several decades, federal, state, and local governments and private industry will commit billions of dollars annually to clean up sites contaminated with hazardous waste and petroleum products. This commitment will result in a continuing demand for site remediation services and technologies. This report provides an overview of the site characterization and remediation market to help industry and government officials develop research, development, and business strategies. It was prepared to aid those who are developing, commercializing, and marketing new technologies to meet the future cleanup demand.

This report updates and expands a 1996 analysis that brought together valuable information on site characteristics, market size, and other factors that affect the demand for remediation services.[1] As with the previous report, the focus of this study is on the potential future applications of remediation technologies. To provide a realistic estimate of future needs, the estimates of demand focus on remaining cleanup work at sites where cleanup technologies have not yet been chosen, and exclude projects that are underway or completed. While the report considers a broad range of remediation services required in the future, its purpose is to provide insight into the potential application of new treatment and site characterization technologies.

In addition to providing a unified perspective of the characteristics and scope of the nation's contaminated property cleanup needs, this report provides a more in-depth analysis of the seven major cleanup programs or market segments:

- National Priorities List (NPL, or Superfund)
- Resource Conservation and Recovery Act (RCRA) Corrective Action
- Underground Storage Tanks (UST)
- Department of Defense (DOD)
- Department of Energy (DOE)
- Other (Civilian) Federal Agencies
- States and Private Parties (including brownfields)

In addition to providing updates and new information relating to these seven market segments, this report also includes analyses of remediation needs in three market "niches," each of which presents a specific set of remediation challenges—the cleanup of former manufactured gas plant (MGP) and other coal tar sites, mining sites, and drycleaner sites; and two specific issues that affect hazardous waste sites in most remediation programs—site characterization technology and the remediation of dense non-aqueous phase liquids (DNAPLs).

---

[1] U.S. Environmental Protection Agency, Office of Solid Waste and Emergency Response, Technology Innovation Office, *Cleaning Up the Nation's Waste Sites: Markets and Technology Trends*, EPA 542-R-96-005, April 1997

## 1.2 Using This Document

This chapter contains a summary of the findings of this report. Chapter 2 describes the recent trends in the use of remedial technologies at Superfund sites. Because many contamination problems are similar across the seven market segments, the Superfund technology information is useful to help understand potential technology trends in the other markets. Chapters 3 through 9 address each of the seven market segments listed above. These seven segments can be added to arrive at the total remediation market.

Chapters 10 through 14 address five specialized portions of the remediation market. The analyses in these chapters are from a different perspective than the first seven market segments, and the estimates of market size and value are not additive to those in chapters 3 through 9. The five topics include manufactured gas plant sites (MGPs), mining sites, drycleaner sites, site characterization, and dense non-aqueous phase liquids (DNAPLs).

For most market segments, seven areas are addressed within each chapter:

- Program or Market Segment Description—the structure, operation, and regulatory requirements of the program;
- Factors Affecting Demand—the economic, political, and technical factors and trends that influence the size, timing, or characteristics of the market segment (market drivers);
- Numbers and Characteristics of Sites—measures of the market in terms of the number of sites to be remediated, occurrence of contaminants, and extent of remediation work needed;
- Estimated Cleanup Costs—remediation cost estimates, or the value of the market;
- Market Entry Conditions—considerations that may benefit vendors and researchers, such as contracting practices, competition, and information sources;
- Technology Issues and Research and Development (R&D)—technologies used in a specific market segment and relevant research and development; and
- References—citations are referenced at the end of each chapter.

Appendices A through F contain supporting data, sources for additional information on the remediation market and technologies, and definitions of terms used in this report. The acronyms are on the last four pages of the document (Appendix F).

## 1.3 Study Approach and Limitations

The data used for this report are from federal databases, such as the Comprehensive Environmental Response, Compensation, and Liability Information System (CERCLIS), RCRA Info, and DOD's Restoration Management Information System (RMIS), published studies, guidance documents, and web sites; commercial information; and other sources. Some are

current through fiscal years (FY) 2001 and 2002, while others are current through 2003 and the first part of 2004. Because many sites are still undergoing evaluation, data availability differs from one market segment to another. Each chapter includes an explanation of the analytical methodology, information sources, and assumptions, and a list of references. Supporting information is included in the appendices.

This report is not a budgeting analysis. Most of the cleanups are typically funded by the public and private owners of the properties and those who are potentially responsible for the contamination. A small percentage of cleanups are likely to be conducted by EPA. The report's time horizon, approximately 30 years, is beyond the budgeting period of most private and public institutions. Moreover, the uncertainties in many of the market estimates, including who will conduct, oversee, and pay for the needed cleanups, make it impossible to convert these estimates to resource needs for specific government or private organizations.

It cannot be overemphasized that the estimates in this report are just estimates. It is likely that assumptions about the future, which are influenced by historical experience, will be more reliable for the earlier years than the later years. Likewise, estimates for sites already in a state or federal cleanup program would be more reliable than those for sites that have yet to be discovered. Nevertheless, the resulting estimates provide a plausible picture of the likely extent of the nation's hazardous waste site cleanup needs.

The limitations and uncertainties of the market estimates vary from one market segment to another. For example, the forecast of future releases from USTs is hampered by a paucity of data with which to estimate leakage rates; the estimate of the number and potential cost of mining site cleanups is presented as a wide range of values and reflects an attempt to develop a consensus of a number of industry sources; and the estimate of the number of potential manufactured gas plant sites needing cleanup is based on studies that have estimated the number of original facilities that caused the contamination and assumptions regarding their disposition since their operations ceased many years ago. Although DOD and DOE have clearly identified much of the contamination problems at their installations and facilities, there are a significant number of DOE sites that have not yet been fully characterized. The analysis is further complicated by the fact that the definitions of sites and facilities differ somewhat from one market segment to another. In this report, the term "site" is used to indicate an individual area of contamination, which can be small or large. The terms "facility" and "installation" identify an entire tract, including contiguous land within the borders of a property, and may contain more than one site.

Although this report estimates the potential scope of the market, it does not explicitly estimate the timing of the cleanup work. As in most economic activities, one cannot simply assume that the cleanup work will be conducted at a constant pace from year to year. The schedule of any project can be expedited or retarded by the availability of funds in any given year; technical uncertainties; difficulties in achieving agreements among stakeholders on a number of issues, such as cleanup approach and target end states, who will pay, who is responsible for damages, and how the site will be reused. In addition, long-term stewardship will be needed at many sites.

## 1.4 Market Size

Under current regulatory requirements and practices, an estimated 294,000 sites (range 235,000 - 355,000) in the seven market segments will need to be cleaned up (Exhibit 1-1). This estimate does not include sites where cleanup is completed or ongoing.

More than 90 percent of these sites are in programs that tend to have relatively smaller, less-complex cleanup projects, such as the UST program (125,000 sites) and state voluntary and mandatory cleanup programs (150,000). The sites in the remaining programs, such as Superfund, DOD, and DOE, tend to be larger and more complex, on average.

The 294,000 sites estimate includes 77,000 sites that have already been discovered plus an estimated 217,000 sites estimated to be discovered in the future. The estimate of the number of future sites is based on the rate of new site discoveries in recent years and is expected to be highly variable from year to year. Future discoveries could very well turn out to be higher or lower than in the past. Most of these "future" sites would be managed under the UST and state mandatory and voluntary cleanup programs, including brownfields.

This analysis assumes that EPA will add new sites to the NPL for another 10 years, UST site discoveries will continue for 10 years, and new state and private party site discoveries will continue for 30 years. Although new site discoveries may very well continue much longer, these longer-term scenarios are not included in the above estimates because of uncertainties regarding such long-term predictions. In addition to the initial site cleanup work, many sites will require long-term stewardship and groundwater treatment or monitoring for many years.

DOD and DOE, have identified most of the contaminated sites on their properties. Nevertheless, new ones continue to be reported each year, but at a declining rate. In addition, there is evidence that there may be thousands of sites from previous industrial activities, such as mining, gas manufacturing, and drycleaning, that may need to be cleaned up. Estimates for these sectors are not included in the above figures.

*For four of the seven cleanup programs, regulatory authorities have identified most hazardous waste sites. There may be several hundred thousand contaminated state, private party, and UST sites yet to be identified, and additions to the NPL are continuing.*

The estimated cost to clean up the 294,000 sites is about $209 billion (Exhibit 1-2). Most of this cost will be borne by the owners of the properties (private and public entities) and those potentially responsible for the contamination. This estimate represents the midpoint of a range that results from uncertainty regarding the extent and type of contamination at many sites, the number of sites that will be identified in the future, and the average per-site cost of remediation in some markets.

Although most of the activities underlying this cost estimate are for remedial action and site evaluation, they also include some administrative work where costs are not reported separately. Because this estimate does not include inflation for future years, the amounts actually to be expended probably will be higher in future-year dollars.

**Exhibit 1-1. Estimated Number of Sites to be Remediated**

| Market Segment | Sites Remaining to be Remediated | Explanation |
|---|---|---|
| Superfund<br>• Current Sites<br>• Projected Sites<br>• Subtotal, NPL | <br>456<br>280<br>736 | The number of sites includes non-federal proposed and final National Priorities List (NPL) sites that still require at least one further remedial action (RA). The NPL also includes 177 federally-owned sites, which are addressed in the DOD, DOE, and civilian federal agencies market segments below. In addition to currently listed sites, it is assumed that EPA will add an average of 23-49 sites to the NPL each year for the next 10 years (Expected value 28). |
| RCRA Corrective Action | 3,800 | Although it is likely that construction of remedies at most of these cleanups can be completed in 30 years, many more decades may be needed for monitoring and groundwater treatment. RCRA Corrective Action sites related to large federal facilities are included in the DOD, DOE, and civilian federal agencies market segments below. |
| Underground Storage Tanks (USTs) | 125,000 | Includes 35,000 sites already identified as of March 2004, and 60,000-120,000 sites (average 90,000) that are projected to leak over the next 10 years The already identified sites may be underestimated because sites where "cleanups are initiated" are not included, even though some of these site do not yet have designated cleanup contractors. Although UST cleanups are expected to continue beyond 10 years as new leaks occur, and leakage rates may decrease in the future, these scenarios are not included in the estimate. |
| DOD | 6,400 | DOD originally identified over 30,000 sites on over 1,700 installations. Of these, responses have been completed or cleanups are planned or underway at about 24,000 sites. |
| DOE | 5,000 | DOE has completed active cleanup of contaminated soil, debris, and structures at half of its approximately 10,000 release sites. Groundwater remediation is expected to continue at many sites, and long-term stewardship will be needed at 129 DOE installations. The estimates also are based on the assumption that there will be a greater emphasis on containment than on treatment and other remediation strategies. |
| Civilian Federal Agencies | > 3,000 | This figure does not include an estimated 8,000-31,000 abandoned mine sites. |
| States | 150,000 | Represents 23,000 sites already identified and 127,000 new sites projected to be identified over the next 30 years in state mandated programs, voluntary cleanup programs, and brownfield programs. Additional sites may be discovered beyond the 30 years. |
| Total | 294,000 | The total is the most likely value within a range of 235,000 to 355,000 sites. It represents sites requiring cleanup, and excludes sites where cleanup work is ongoing or complete. |

**Exhibit 1-2. Estimated Remaining Remediation Cost ($Billions)**

| Market Segment | Cost to Clean Up Remaining Sites: Middle Value | Cost to Clean Up Remaining Sites: Range | Comments |
|---|---|---|---|
| Superfund<br>• Current Sites<br>• Projected Sites<br>• Subtotal, NPL | <br>19.4<br>12.7<br>32.1 | <br>16 - 23<br>8 - 27<br>24 - 50 | The current sites estimate is for currently listed sites not owned by the federal government that still need remedial action. The projected sites figure is based on an assumed 28 new additions to the NPL annually (range 23-49) over the next 10 years. |
| RCRA, Corrective Action | 44.5 | 31 - 58 | Does not include long-term monitoring and groundwater treatment. RCRA Corrective Action costs related to large federal facilities are included in the DOD, DOE, and civilian federal agencies market segments. |
| RCRA, UST | 15.6 | 12 - 19 | Includes 35,000 sites already identified as of March 2004, and 60,000-120,000 sites (average 90,000) that are projected to leak over the next 10 years. Additional tank leaks will probably continue beyond 10 years. |
| DOD | 33.2 | NA | This figure includes some costs for sites where cleanup work has begun. |
| DOE | 35.0 | NA | Does not include the cost long-term stewardship, which is needed at 129 DOE installations; and the cost of cleaning up wastes for which no proven practical cleanup approach is currently available, such as contamination at nuclear test sites and certain groundwater and surface water. |
| Civilian Federal Agencies | 18.5 | 15 - 22 | Does not include the potential $18-51 billion cost for cleaning up 8,000-31,000 abandoned mine sites, most of which are on lands for which a federal agency is responsible for cleanup. |
| States | 30.0 | 24 - 36 | There is a potential of several hundred thousand additional sites beyond the 30 years. |
| Total | 208.9 | 174 - 253 | The total represents estimated cost for the cleanup of sites required under current regulations and practices, and excludes sites where cleanup work has begun or is complete. |

Although this study estimates the long-term need for site cleanups, it does not estimate the pace of cleanup, which is likely to fluctuate from year to year, depending on private and public funding, who is paying for the cleanups, and other factors. However, Chapters 3 through 14 include discussions of the factors that affect the extent and timing of the cleanup work. Most of the cleanup program work considered in the above estimates will take 30-35 years to complete.

The estimates for each market segment are described below.

## Superfund Sites

The 456 NPL sites not owned by the federal government (non-federal) that require one or more future remedial actions (RAs) make up a relatively well-defined market for remediation technologies. The NPL also includes 177 federally-owned sites with future RAs planned. These sites are included in the market estimates for federal agencies. The number of future listings, which are expected to be primarily non-federal sites, was assumed to average 28 sites annually,

which is the average for 1993-2003. This average listing rate is within a range estimated in a 2001 study by Resources for the Future (RFF), a non-profit environmental research group. The RFF study predicted that listings would average between 23 and 49 sites per year over a 10-year period, with a most likely value of 35. In the three years since that study, the listing rate has averaged 23. Most new listings are not federal sites. Although listings may continue beyond 10 years, they are not included in this analysis because of uncertainties in predicting them.

The estimated cost for the 456 non-federal already listed Superfund sites that have not begun RA is $16-23 billion, with a middle value of $19 billion (2003 dollars). This estimate is based on an average cost per operable unit (OU) of $1.4 million for remedial investigations/feasibility studies (RI/FS), $1.4 million for remedial design (RD), $11.9 million for remedial action (RA), and $10.3 million for long-term remedial action (LTRA) for sites that require long-term treatment to restore groundwater or surface water. The range in values result from varying the RA costs by plus and minus 20 percent. The details of these calculations and data sources are provided in Section 3.5.

This estimate is more than twice that of a similar estimate in the 1997 edition of this report. The difference is explained by an 18 percent increase in the general price level, the fact that the remaining sites on the NPL that have not begun RA are expected to be more complex and have more OUs than the average for previous NPL sites, and the fact that LTRA costs were not included in the previous report. Although construction has been completed at many sites since the 1996 edition, about 200 sites have since been added to the NPL.

Using the same unit cost estimates per OU, and assuming 23-49 sites will be listed annually, the 230-490 sites assumed to be listed over the next 10 years will cost $8-27 billion. At the most likely listing rate of 28 sites annually, the cleanups would cost $13 billion. If more or fewer sites are listed, this total would be adjusted accordingly. This estimate is based upon the above assumptions plus the expectation that future sites will be more complex, larger, and have more OUs per site than the average NPL site in the past.

## RCRA Corrective Action Sites

EPA estimates that 3,800 regulated hazardous waste treatment, storage, and disposal facilities (TSDFs) eventually will require remediation under the RCRA Corrective Action program. This number is more than half of the approximately 6,670 TSDFs that currently operate or have operated and are subject to the corrective action regulations. The emphasis in the short term is on stabilization remedies for risk reduction at about 1,700 of the 3,800 sites. Over the longer term, additional remedies may be required at most of the 3,800 RCRA Corrective Action sites.

Under current regulations, cleanup of the 3,800 sites that are likely to require corrective action will cost between $31 billion and $58 billion, with a middle value of $44.5 billion, or $11.4 million per facility. Approximately 41 percent of the total cost will be incurred by nine percent of the facilities with cleanup costs of greater than $50 million. The average cost-per-site estimate is based on cost data in an economic analysis in support of the development of the Corrective Action Management Unit (CAMU) Rule in 2000. Approximately 80-90 percent of this amount will be incurred by privately-owned facilities and the remainder by federal facilities. This

estimate does not include costs for the large DOD and DOE facilities. However, since it includes costs for some smaller ones, there is some overlap with the estimates for DOD and DOE below.

This estimated average cost per site is about 20 percent lower than that estimated in the 1993 Regulatory Impact Analysis (RIA) for Subpart S. This difference reflects a variety of changes since that RIA, including more efficient site characterization and cleanup approaches, the use of risk-based cleanup approaches, and savings due to the CAMU policies described in Section 4.1. Over the past few years, implementation of the Corrective Action program has shifted toward more flexible, risk-based cleanups and away from the regulatory approach modeled in the 1993 RIA. In addition, the near-term costs of the program are likely to reflect the program's emphasis in the short term on stabilization remedies rather than permanent remedies.

## Underground Storage Tank Sites

EPA estimates that 95,000 to 155,000 UST sites (middle value, 125,000) will require cleanup under the RCRA underground storage tank regulations over the next 30 years. This estimate includes 35,000 already identified sites that have not yet been cleaned up plus 60,000-120,000 projected releases over a 10-year period (6,000-12,000 per year). The 35,000-site figure may understate the actual market because it does not include all sites without designated cleanup contractors. Some sites reported as "cleanups initiated" actually have not yet selected remediation technologies or contractors. UST sites average an estimated 2.7 tanks per site, although the number varies widely from one site to another. Although USTs account for 43 percent of sites to be cleaned up, they account for only 7 percent of the above-estimated national cleanup costs. Tank sites are typically the smallest and least costly to remediate,  There may be some overlap with the estimated number of state and private sites, which includes brownfield sites and UST sites.

> *Although USTs account for 43% of all cleanup sites, they account for only 7% of estimated national cleanup costs. These sites are typically among the smallest and least costly to remediate.*

The UST cleanup market could reach $12-19 billion, with a middle-value of $16 billion, or an average of $125,000 per UST site. This estimate does not include costs related to replacing, testing, or upgrading tanks, pipes, and related equipment. The availability of funds for UST cleanups is somewhat less dependent on public appropriations. Most of the UST costs are paid by property owners, state and local governments, and special trust funds, often based on dedicated taxes, such as fuel taxes.

## Department of Defense Sites

The DOD estimated that, as of September 2003, remedies had not been selected for 6,400 sites on hundreds of installations and other locations that require remediation of contaminated materials. Cleanups are being planned or are underway at another almost 2,700 sites, bringing the total number of active DOD sites to about 9,000. These sites are distributed almost evenly among the Air Force, Army, Navy, and formerly used defense sites (FUDS). DOD estimates that all of these sites will be cleaned up by 2015. Of all DOD installations, including those where remedial action has begun, 146 are on the NPL.

*Federal and state agencies have increased their emphasis on cleaning up sites needed for the closure or reassignment of government facilities or economic development.*

DOD estimates that the cost of completing all the remaining remediation work at all DOD sites from FY 2003 onward will be about $33 billion. Although most of these funds will go to sites that have not yet selected remedies, they also include some expenditures at sites already in remedial design or remedial action. About $16.4 billion of these funds are for cleanups at sites being realigned or closed (BRAC) as well as non-BRAC installations. The remaining $16.8 billion is for the cost to complete over 1,700 sites that may contain unexploded ordnance or waste military munitions. About 20 percent of DOD's FY 2004 planned cleanup expenditures of about $1.7 billion is for evaluating and cleaning up properties that are to be transferred to other federal, state, or local government agencies or private parties (BRAC) sites. This percentage has ranged from 20 to 37 percent between 2000 and 2004 and averaged almost 30 percent.

## Department of Energy Sites

The DOE has identified about 5,000 contaminated sites on 39 installations and other locations that require remediation. DOE is responsible for 19 currently listed NPL sites in 13 states. The Department expects to have almost all its sites cleaned up by 2035, although monitoring and groundwater treatment may continue beyond that period. In addition, no remedy is yet available for some of DOE's wastes. DOE estimates that long-term stewardship will be needed at up to 129 installations and has established the Office of Legacy Management to address this need.

*The DOE market estimates utilize several critical assumptions, which make them sensitive to budget fluctuations, cleanup standards, and further site investigations.*

The DOE estimates that environmental restoration of its properties will cost $35 billion and take until 2035 to complete active remediation at most of its sites.[2] The estimates do not include the cost of cleaning up wastes for which no proven cleanup technology currently exists, such as wastes at nuclear test sites and much of the groundwater contamination the agency is responsible for addressing. The estimates also are based on the assumption that there will be greater emphasis on containment than on treatment and other remediation strategies. Five installations account for 71 percent of the value of the remediation work: Rocky Flats Environmental Technology Site, Colorado; Idaho National Engineering Laboratory, Idaho; Savannah River Site, South Carolina; Oak Ridge Reservation, Tennessee; and Hanford Reservation, Washington. These costs include those for all environmental restoration required under the CERCLA, RCRA, other federal statutes, and state laws. About $2.2 billion of DOE's FY 2004 requested budget of $7.8 billion is likely to go for site cleanup.

[2] Environmental restoration accounts for about one-third of DOE's estimated environmental program. DOE anticipates spending $111 billion on environmental management by 2035. The other two-thirds of DOE's environmental management costs are for the following types of activities: waste management, nuclear material and facility stabilization, national program planning and management, landlord activities, and technology development. DOE's FY 2004 budget for environmental management is $7.2 billion, of which $2.4 billion is for restoration.

## Civilian Federal Agency Sites

As of April 1995, over 3,000 contaminated sites on 700 facilities, distributed among 17 non-DOD and non-DOE federal agencies, were potentially in need of remediation. A facility may contain one or more contaminated areas or "sites." Because investigations of many of these facilities are not complete, the exact number of facilities and sites to be remediated has yet to be determined. The Department of Interior (DOI), Department of Agriculture (USDA), and National Aeronautics and Space Administration (NASA) together account for about 70 percent of the civilian federal facilities reported to EPA as potentially needing remediation. Although 3,000 sites have been identified by these agencies, there are probably more that have not yet been reported, including an estimated 8,000-31,000 abandoned mine sites, most of which are on federal lands.

The $15-22 billion estimated cost for the cleanup of at least 3,000 civilian federal sites is based on estimates from various officials and reports from DOI, USDA, and NASA, which combined account for most civilian federal contaminated sites, and extrapolated to all federal agencies. The level and timing of these expenditures will depend upon the availability of resources and technologies. At current funding levels, about $100-200 million annually, it could take 100-200 years to clean up all these sites. The transfer of public properties to private use may require agencies to reallocate resources to clean up properties designated for transfer.

## State, Private Party, and Brownfield Sites

It is estimated that total annual expenditures for state and private cleanups has averaged about $1 billion and that about 5,000 cleanups are typically completed annually under all mandatory and voluntary state programs. At this rate, 150,000 sites can be completed in 30 years, at a cost of $30 billion. Estimates beyond 30 years are not provided in this report, although there are probably several hundred thousand additional potentially contaminated sites that have not been identified. Sites tend to become identified and studied when a health or safety hazard becomes known, when a real estate transaction occurs, or when development proposals are being evaluated. These activities trigger development studies and due diligence investigations. Thus, increases in economic activity and redevelopment projects could lead to an increase in the number of cleanups needed at any given time.

About half of state site cleanups in recent years have been under mandated state programs and half have been under voluntary cleanup and brownfields programs. In addition, there may be several hundred thousand additional brownfield sites yet to be identified. EPA defines Brownfields as "real property, the expansion, redevelopment, or reuse of which may be complicated by the presence or potential presence of a hazardous substance, pollutant or contaminant." Although the definition can vary from state to state, they are usually abandoned, idled, or under-used industrial and commercial facilities. EPA's investment in brownfields, more than $700 million since 1995, has leveraged more than $5.1 billion in cleanup and redevelopment funding and financed the assessment of more than 4,300 properties. The cleanup of most of these sites will be the responsibility of the property owners and will probably be conducted in conjunction with state voluntary cleanup programs. Over the past decade, interest in the redevelopment of potentially contaminated sites has grown. In this situation, the availability of funds will be on a site-specific basis. If states want to accelerate the pace of work,

they will have to rely on non-budget sources of funds, such as private party actions, voluntary cleanups, and cost recovery/cost sharing.

## Manufactured Gas Plant (MGP) Sites

There is no separate remediation program for the characterization and remediation of MGP and other coal tar sites, and no line item for this category of sites in the above exhibits. MGP sites may be addressed under any of the remediation programs, such as Superfund, RCRA, or a state environmental program, depending on the nature and extent of the contamination and other site-specific factors. Because these sites may be managed under different remediation programs, the estimates of the MGP market should not be added to those in the seven major market segments above. Adding these estimates would be double-counting sites and costs, thereby overestimating the scope of the market.

Before the United States had a network of natural gas pipelines and electricity, fuel for lighting, heating, and cooking was manufactured from coal and petroleum at thousands of manufacturing facilities across the country. As a result of these activities, hazardous materials are likely to be present in the subsurface and groundwater at thousands of locations. While some of these sites, especially those currently owned and operated by large gas and electric utility companies, are being addressed, most of the former manufactured gas sites have not been identified.

It is estimated that from 1800 to the mid-1900s between 36,000 and 55,000 manufactured gas plants and related coal tar sites were built in the United States. These sites varied in size from less than one acre to approximately 200 acres. Because of the nature of the gas manufacturing process and the practices at the time, almost all these plants released contaminated materials to the environment. It is estimated that 30,000-45,000 of these sites that probably had releases of hazardous substances have not been investigated and many may need to be cleaned up.

MGP cleanup costs have been documented to range from a few hundred thousand dollars to $86 million for a single site. Most tend to be in the $3-10 million dollar range. Should all 30,000-45,000 sites be need cleanup, the estimated cost would be $26-128 billion.

## Mining Sites

There are about 14,500 active coal, metal, and nonmetal mineral mines in the United States, between 100,000 and 500,000 abandoned hard rock (metals and nonmetal minerals) mines on private, state, and federal lands in the west, and approximately 13,000 abandoned coal mines, mostly small and mid-sized, in the east. Many of these properties continue to threaten human health and the environment because of the materials left behind and because mined-out areas are exposed to the elements. Most of the mine sites are on land for which the federal government is responsible, primarily DOI and USDA. Most of the mining budgets of these agencies are directed to safety and water quality issues, and a smaller portion is available for site remediation.

Mining sites may be addressed under any of the remediation programs, such as Superfund, RCRA, or a state environmental program, depending on the nature and extent of the contamination and other site-specific factors. Therefore, the estimates of the mining-site market should not be added to those of the seven major market segments. Adding these estimates would be double-counting sites and, therefore, overestimating the scope of the market.

There is a wide range of estimates and opinions on how many mining properties pose a serious risk to the environment and are likely candidates for remediation. The most promising estimates indicate that about 8,000-31,000 abandoned mine sites pose a significant risk to the environment and human health. The estimated cost for hardrock mining sites alone is $20-54 billion.

## Drycleaner Sites

Almost 16,000 active drycleaner sites will probably need site investigation and remediation at an estimated cost of $6 billion. Cleanup costs are estimated to average $403,000 per site and range from $19,000 to over $3 million. About 28 percent of the costs are for site characterization.

> *There may be 9,000 to 90,000 sites that were formerly occupied by drycleaners and that are likely to have released drycleaning chemicals to the environment.*

These estimates do not include cleanup work that may be needed at a potential 9,000-90,000 "inactive" sites. Inactive sites are properties that do not currently have a drycleaning operation, but did have one in the past. Older drycleaners used more cleaning compounds per garment and tended to have more releases of chemicals to the environment than newer ones. Over the past several decades, the amount of perchloroethylene used by the industry has decreased more than 80 percent. Less than 10 percent of drycleaners still use petroleum solvents.

## Site Characterization

Although the type and amount of site characterization work needed varies widely from site to site, all potential hazardous waste sites require some sort of site investigation. Despite the variability, it is useful to estimate an approximation of the number of sites that will need sampling and analysis work (see box). The phases of site assessment shown in the box are similar to, but not precisely those, used in American Society for Testing Materials (ASTM) standards. Approximations were made to align phases of RCRA, Superfund and other programs.

**_Estimated Sampling and Analysis Needs Over 30 Years (Number of Sites_)**

| | |
|---|---|
| Phase I | 0 |
| Phase II | 1.2 million |
| Phase III | 285,000 |
| Remedial Action | 392,000 |
| O&M and Long-Term Remedial Action | 508,000 |

The cost of this work is estimated based on the ratio of RI/FS cost in the Superfund program to total cleanup cost. Remedial Investigation/ Feasibility Studies (RI/FS) have accounted for about 10 percent of total Superfund site expenditures and 16 percent for smaller sites. Applying these averages to the total site remediation market, and assuming historical site characterization practices continue, about $21 billion will be needed for site characterization work over the next 30 years. However, given the growing use of advanced site characterization approaches–including field analytical technologies, systematic planning, and dynamic work plans–site managers may allocate greater proportions of their budgets for site characterization in the future. Better site characterization can reduce the overall cost and improve the effectiveness of cleanups.

Sampling and analysis technologies are used during all phases of site work, except Phase I site assessments (estimated market of almost 12 million assessments over the next 30 years). The sampling and analysis required during remedial actions varies widely from one site to another. Remedial actions often require confirmation sampling and sometimes major additional site characterization. A significant amount of sampling and analysis is also needed during O&M and long-term remediation of groundwater and surface water. Thus the 508,000 site estimate is an upper-bound estimate for sites that will need continued sampling and analysis during O&M and, at a number of sites, long-term remediation.

### DNAPLs

This report provides a general indication of the number of sites likely to have a DNAPL problem. It is estimated that 29-44 percent of NPL sites are likely to have free-phase liquid or residual DNAPLs present in the subsurface, or an average of 37 percent. The estimates are 28 percent for RCRA Corrective Action and state sites, and 30 percent for DOD and DOE sites. Applying these percentages, it is estimated that these four program areas have a combined 48,000 sites with a medium to high potential to have a DNAPL problem. For the other market segments, the data on the types of compounds used or constituents of releases were too sparse to develop an estimate.

Any estimate of the value of the DNAPL cleanup work needed is hampered by the extremely wide range of potential site conditions and the paucity of program-wide data on costs that pertain to specific DNAPL remediations. However, an indication of the level of costs is provided by studies of pump-and-treat (P&T) costs, a major expense in DNAPL cleanups. A 2001 EPA study found that the average annual O&M costs of pump-and-treat systems at 79 fund-financed sites is approximately $570,000, and the median is $350,000. This difference is due to a small number of systems with relatively high costs that raise the average. The periods of operation of these systems as well as the costs vary widely from site to site. The average pump-and-treat system in the EPA study operated for 18 years, for an average cost of $10 million. Pump-and-treat systems at some sites with DNAPLs may need to operate for considerably longer periods.

## 1.5 Hazardous Waste Site Characteristics

The selection of remedies at contaminated sites depends largely on the types of media and contaminants present. This section describes the types of contaminants and media that are to be remediated in the various market segments.

The data used to develop these estimates vary widely among the market segments. The Superfund (NPL) data are available from the Records of Decision (RODs) for over 1,100 sites. The characteristics of these sites are assumed to be representative of all NPL sites, including those needing further remediation. The DOD media and contaminant data are based on information from over 6,000 sites to be remediated as of September 2001. The RCRA estimates are based on data from fewer than 300 of the estimated 3,800 sites to be remediated. Although the DOE estimates are based on data from over 100 installations, the data do not include information from all 10,500 sites at these installations and other properties. The DOE and RCRA data are from data collected in the early and mid-1990s.

### 1.5.1 Contaminated Media

*More than three-fourths of sites have contaminated soil or groundwater, or both. Contaminated sediment, sludge, and surface water also are present, but at fewer sites.*

Groundwater and soil are the most prevalent contaminated media. In addition, large quantities of other contaminated material, such as sediments, landfill waste, and sludge, are present at many sites. Exhibit 1-3 shows the most common contaminated media for each of four market segments. More than three-quarters of NPL, RCRA, DOD, and DOE sites have contaminated soil or groundwater, or both. Contaminated sediment, sludge, and surface water also are present, but at fewer sites. Soil and groundwater also are a primary concern for UST sites, although comprehensive program-wide data are not available.

**Exhibit 1-3. Media to be Remediated**

| | Percent of Sites | | |
|---|---|---|---|
| **Remediation Program** | **Groundwater** | **Soil** | **Sediment** |
| NPL Sites | 83% | 78% | 32% |
| RCRA Corrective Action Sites | 82% | 61% | 6% |
| DOD Sites | 63% | 77% | 18% |
| DOE Sites | 72% | 72% | 72% |

Notes:
- 11% of NPL sites contain contaminated sludge; 11% of the surveyed RCRA sites contain contaminated sludge and 10% contain contaminated surface water; 9% of DOE sites contain contaminated surface water, and about half of the DOE installations contain contaminated rubble and debris.
- The DOE soil percentages also contain sediment and sludge.

### 1.5.2 Contaminants of Concern

Many contamination problems and technology needs are similar across the major remediation programs. For example, solvents, petroleum products, and metals are common to most programs. Some markets also have more specialized needs arising from wastes that are unique to a particular industrial practice. For example, DOE has a need for technologies to characterize, treat, and dispose of mixed waste; remediate radioactive tank waste; stabilize landfills; and deactivate facilities. DOD is concerned with remediating soil contaminated with explosives, unexploded ordnance, and perchlorate.

*VOCs, the most frequently occurring contaminant type, are present at more than two-thirds of Superfund, RCRA, and DOD sites, and almost half of the DOE installations. VOCs (BTEX) also are the primary contaminants at UST sites.*

Exhibit 1-4 shows the frequency of occurrence of the most prevalent contaminant groups. VOCs, the most frequently occurring contaminant type, are present at more than two-thirds of Superfund, RCRA, and DOD sites, and almost half of the DOE sites.

*Almost all of the market sectors have substantial numbers of sites with metals and VOCs.*

VOCs, primarily in the form of BTEX (benzene, toluene, ethylbenzene, and xylenes) also are primary contaminants at UST sites. Many sites to be remediated by civilian federal agencies and states also are believed to contain VOCs, but only sparse data for these programs are available.

Metals are prevalent in almost all of the major market sectors. Metals, not including radioactive metals, are present at about three-quarters of the Superfund and DOD sites, and about half of the RCRA and DOE sites. They also are likely to be found in the other market segments. Of the 12 contaminants most frequently found at Superfund and DOD sites, more than half are metals, primarily arsenic, chromium, lead, zinc, nickel, and cadmium.

**Exhibit 1-4. Contaminant Groups to be Remediated**

| Remediation Program | Percent of Sites | | |
|---|---|---|---|
| | VOCs | Metals | SVOCs |
| NPL Sites | 78% | 77% | 71% |
| RCRA Corrective Action Sites | 67% | 46% | 32% |
| DOD Sites | 64% | 72% | 57% |
| DOE Sites | 38% | 55% | 38% |

Notes:
- DOE figures for VOCs and SVOCs are combined. 90% of DOE sites contain radioactive elements.
- About 19% of DOD sites yet to be investigated and/or cleaned up may contain unexploded ordnance or waste military munitions.

The contamination characteristics of each market segment are discussed below.

For **NPL** sites, VOCs is the most common contaminant group remediated, followed by metals, and SVOCs. Most sites are complex, requiring remediation for more than one of these contaminant groups: 24 percent of the sites contain two contaminant groups and 52 percent contain all three. These contaminants are not necessarily in the same contaminated medium. Halogenated VOCs are by far the most common subgroup of organic contaminants, followed by BTEX, non-halogenated VOCs, polynuclear aromatic hydrocarbons (PAHs), non-halogenated SVOCs, phenols, pesticides, and polychlorinated biphenyls (PCBs). The most common metal cleaned up at NPL sites is arsenic, followed by chromium and lead. NPL data are based on contaminants for which remedies have been selected in the past.

The most common contaminant groups at **RCRA** sites are halogenated VOCs, found at 60 percent of sites; metals, found at 46 percent of sites; and non-halogenated VOCs, found at 32 percent of sites. These estimates are based on two studies in the early 1990s that used data from fewer than nine percent of all the likely corrective action projects.

Approximately 96 percent of **USTs** contain petroleum products including used oil and less than four percent contain hazardous substances. For USTs containing petroleum products, gasoline accounts for 66 percent and diesel fuel for 21 percent. The most likely constituents of concern in these products are BTEX and SVOCs, such as PAHs, creosols, and phenols.

*Hundreds of DOD sites contain explosives and one percent contain radioactive contaminants. In addition, information from some installations indicates that the presence of unexploded ordnance may be significantly greater than these percentages indicate.*

Based on information on over 6,000 **DOD** sites that needed remediation as of September 2001, metals are found at 72 percent of the sites, followed by VOCs at 64 percent, and SVOCs at 57 percent. Although many similar contaminants also are frequently found at non-defense related sites, some DOD sites contain contaminants that present unique problems for selecting remediation approaches. For example, hundreds of DOD sites with available data contain explosives, and about one percent contain radioactive contaminants.

Radioactive contaminants are found at 90 percent of **DOE** installations and include uranium, tritium, thorium, and plutonium. The most frequently present non-radioactive metals, which are found at 55 percent of the installations, include lead, beryllium, mercury, arsenic, and chromium. Organic chemicals are found at 38 percent of DOE installations and include PCBs, hydrocarbons from fuel and other petroleum products, and TCE. Mixed waste, containing radioactive and hazardous contaminants, also is a problem at many installations. The available data do not indicate if a specific contaminant has been identified at only one site or at more than one site on an installation.

*Radioactive contaminants are found at 90 percent of the DOE installations and non-radioactive metals are found at 55 percent.*

Waste at **civilian federal agency** and **state** sites is typical of industrial facilities and include organic chemicals, metals, and solvents. However, no national compilation of the specific contaminants at these sites is available.

Based on a limited data from samples of **state** sites, the most prevalent pollutant categories are organic chemicals, especially VOCs, SVOCs (PAHs and PCBs), solvents, and petroleum products.

## 1.6 Cleanup Program Status and Factors Affecting Demand

The demand for remediation services is driven largely by federal and state requirements, public and private expenditures, and activity in the real estate and property development industries.

Changes in these factors will affect each of the market segments in a different way, since each market has its own priorities and operating procedures. Thus, successful planning for technology development and marketing of remediation services should include consideration of the program structure, requirements, and site characteristics of the specific market sectors as well as the shifting requirements and budgets. The most prevalent factors that could alter the scope of the cleanup effort, as well as the technologies to be used in each market, are described below.

### 1.6.1 Superfund Sites

The Superfund program is the federal program to clean up releases of hazardous substances at abandoned or uncontrolled hazardous waste sites. As of September 30, 2003, EPA had listed 1,518 sites on the NPL, and proposed another 54. Of these, 274 sites were deleted from the list or referred for response to another authority, leaving a total of 1,244 final NPL sites. As additional sites are studied and ranked, they may be added to the NPL. The scope of the cleanup effort, as well as the technologies to be used in the future, will be influenced by the following factors:

- Between 1993 and 2003, EPA listed 305 sites, or an average of 28 sites per year. This report assumes that future listings will average 28 sites per year from 2004 to 2013. At this rate, 280 additional sites would be listed by 2013. If more "NPL-eligible" sites are found and evaluated, they may be addressed by other programs, such as RCRA Corrective Action or a state program, or may continue to await evaluation and/or cleanup. Because the decision on whether to list a site is complex, depending on many variables and input from many stakeholders, there is some uncertainty inherent in any such prediction.

- Based on information from two GAO reports (1998 and 1999) there appears to be a sufficient supply of Superfund-eligible sites and potentially-eligible sites in EPA's CERCLIS database to supply the aforementioned 280 sites. GAO identified 1,800 sites that have a Hazardous Ranking System (HRS) score of at least 28.5, which make them eligible for consideration for listing on the NPL and estimated that another 3,800 sites in CERCLIS are in earlier stages of the Superfund pipeline. Evaluations of the later sites have not progressed to the point where their NPL eligibility could be determined. Estimates of state and federal program managers have varied widely regarding the percentage of these sites that will ultimately be listed. Thus, we can only conclude that some portion of the 5,600 (1,800 + 3,800) sites awaiting a listing decision will eventually be listed on the NPL. In addition, from time to time, new site discoveries lead to new proposed listings. Thus the potential supply is not inconsistent with the 280-site assumption.

- Current resources appropriated to the program may be insufficient to fully implement the program, as defined above—to continue work on currently listed sites, address other CERCLA programs, such as removals, and begin the process of listing, evaluating, and cleaning up additional sites. The FY 2004 budget request to manage the Superfund program is about $1.4 billion. According to the 2001 RFF study, Superfund faces an average annual budget shortfall of approximately $100-200 million over a 10-year period. Depending on how the budget is allocated, this shortfall may or may not affect the sites where remedies have not yet been selected (the focus of this report). To address a number of long-term Superfund issues, EPA is working with the National Advisory Council for Environmental

Policy and Technology (NACEPT) to develop consensus on the issues and identify the future direction of the Superfund Program. In April 2004, The Superfund Subcommittee submitted its final report to the full NACEPT committee.

- State and PRP funding for Superfund site cleanups may fluctuate in the future. Many states are facing serious budget shortfalls in 2003 and 2004 and many PRPs face difficult business conditions. The PRPs have historically paid for 70 percent of Superfund site remediations. For Superfund remedial actions, the states contribute 50 percent of the construction and operation costs where they own the site and significant amounts of operation and maintenance (O&M) costs for certain Superfund actions in their state. In addition, as more Fund-lead NPL sites complete 10 years of long-term remedial actions, states will become responsible for continuing the LTRA work.

- In planning and implementing cleanups, EPA coordinates extensively with various EPA offices, PRPs, state and local governments, planning authorities, and local communities and developers. These requirements may influence the sequence of work, types of cleanup technologies selected for a site, and the number of sites to be listed on the NPL in the future.

### 1.6.2 RCRA Corrective Action Sites

The cleanup of RCRA Corrective Action sites is influenced by the regulatory and site-management refinements that EPA and the states have been building into the cleanup process, federal funding of state oversight, and improved field technologies which can lead to better site characterization, improved remedy design, lower cleanup costs, and better and faster cleanups.

- The RCRA Cleanup Baseline sites that are striving to meet 2005 interim Government Performance and Results Act (GPRA) goals represent the most immediate actions to be taken at RCRA sites. While these sites represent the readily identified, near-term cleanup market, many other RCRA sites with less immediate human health concerns will also need cleanup.

- Revisions to the Subtitle C requirement for cleaning up some hazardous waste implemented over the past decade are likely to encourage treatment and removal as compared to leaving waste in place.

- Refinements in site characterization technologies during the last decade have begun to decrease site-assessment costs, improve data quality and remedy design, and expand the applicability of less traditional remedies.

- The pace of the cleanups is affected by the availability of funds to pay for state and federal oversight. Many states are facing budget deficits in FY 2003 and 2004, and staffing levels and budgets for hazardous waste remediation in most states have not increased in about a decade.

- Land development trends are also likely to affect the pace and nature of RCRA cleanups. Redevelopment or transfer of commercial and industrial properties usually require site assessments and, if necessary, remediation. The 2002 brownfields law, (The Small Business Liability Relief and Brownfields Revitalization Act—P.L. 107-118), the Superfund Redevelopment Program, and the RCRA Brownfields Initiative are encouraging the reuse of former industrial and other properties. These programs have implemented policy changes and demonstrated many approaches that foster the cleanup and redevelopment of contaminated properties, including a number where waste has been left on site.

### 1.6.3 Underground Storage Tank Sites

The demand for remediation services at contaminated UST sites primarily will be influenced by federal and state requirements, and the number of releases occurring at old and new tanks. The timing of these cleanups will be influenced by the availability of state and federal funds for site assessment and cleanup and the pace of economic development.

- Since 1998, there has been a more than 50 percent drop in the number of new releases reported. As more tanks come into compliance with the new requirements, the number of new releases is expected to continue to drop.

- Even if the current backlog of all known sites is eliminated, there will always be additional releases at some sites in the future. Many older tanks still exist, many tanks are not in full compliance, some new or upgraded tanks leak due to failure of components or spills, many tanks are not operated and maintained properly, and over half of the states are not inspecting all of their tanks at the minimum recommended rate. The GAO has estimated that 76,000 active regulated tanks may not be upgraded, which implies that there is a backlog of potentially contaminated sites that may be discovered over a period of time as they are replaced or removed.

- The pace of the cleanups is affected by the availability of funds. Appropriations from one source of funds, the federal Leaking Underground Storage Tank Fund (LUST Trust Fund) have been about $70-80 million annually. At the end of 2003, the fund had a balance of $2.1 billion. The gasoline tax that supports the fund is scheduled to expire in 2005. The other two major funding sources–state tank trust funds and direct appropriations, and property owners or responsible parties–are stable.

*Although the number of releases has declined significantly, tanks continue to leak, because older tanks still exist, many tanks are not in full compliance with upgrade requirements, and many are not operated properly.*

- The 2002 brownfields law and EPA's USTfields initiative may lead to an increase in the number of UST sites identified as needing cleanup as well as the pace of cleanups.

- Concerns about methyl tertiary-butyl ether (MTBE) contamination may influence the amount and timing of UST cleanups in some states. Some states have passed legislation addressing MTBE. These activities will lead to more site evaluations and/or cleanups.

### 1.6.4 Department of Defense Sites

DOD installations typically have multiple contaminated sites regulated by either CERCLA, RCRA, state laws, federal statutes that mandate base realignments and closings, or a combination of these. The following factors strongly influence the nature of the cleanup needed.

- The pace of remediation is subject to change in response to budgetary and political developments. The FY 2004 planned DOD budget for restoration is almost $1.7 billion. Of these funds, approximately $328 million, or 20 percent, is allocated to closing (BRAC) sites. An additional BRAC round is scheduled for 2005.

*The DOD cleanup budget has remained steady, and is expected to continue at its current level. The proportion of the cleanup budget going to the cleanup of facilities scheduled to close has fluctuated from 20 to 37% between 2000 and 2005.*

- The proportion of the environmental restoration budget allocated to cleanup at active installations and FUDS continues to increase (69% in FY 2003) relative to study and investigation funding.

- Although DOD believes that most sites have been located, new sites continue to be identified. The recently established munitions program has led to an increased the number of new sites. Between FY 2001 and FY 2003, DOD identified approximately 1,700 additional sites. Of these, about 1,000 are munitions program sites.

- In determining the priorities for funding at all sites, DOD generally addresses the worst sites first. As of the end of FY 2002, DOD has reduced the number of high relative risk sites at active installations and FUDS properties by 58 percent. DOD anticipates achieving remedy in place or remedy completes at all high relative-risk sites by 2007. In implementing its priorities, DOD may assign varying levels of priority to different sites on a given installation. This policy may lead to acceleration of some projects at a given installation while other projects at the same installation are postponed.

- The rate of base closures and realignments will affect the sequencing of cleanup for all sites. New schedules will need to be generated for the FY 2005 round of closures.

### 1.6.5 Department of Energy Sites

DOE is responsible for cleaning up installations and other locations that have been used for nuclear weapons research, development, and production for over five decades. The following policy, regulatory, economic, and technical factors will significantly affect the scope, schedule, and cost of DOE's remediation effort.

- Based upon a 2002 critical assessment of its program—the Top-to-Bottom Review–DOE began a major initiative to accelerate cleanup of its installations and other locations by at least 30 years, prioritize risks, improve its contracting practices, and reduce program costs. DOE expects this initiative to profoundly affect the scope and scheduling of its cleanups.

- Under the initiative, DOE is promoting a new "risk-based" cleanup strategy that would assist in prioritizing risk—and thereby prioritize cleanups—among the various sites on a DOE-wide basis. The initiative also has the potential to increase the use of remediation approaches that leave more waste on site, compared to treatment and other active remediation approaches than previously planned, thereby reducing remediation costs for some projects.

*In 2002, DOE began a major initiative to accelerate cleanup of its sites by at least 30 years, prioritize risks, improve contracting practices, and reduce program costs.*

- Cleanup schedules are heavily dependent upon the availability of funds. DOE's estimate that it can complete legacy waste cleanup at all DOE properties by 2035 could be lengthened or shortened, depending on the funds appropriated by Congress.

- At many sites it is difficult to forecast the extent of cleanup work needed, because remedy decisions usually require balancing potential land uses with the alternative cleanup options and long-term stewardship approaches, and collaboration with many stakeholders.

- Groundwater remediation is expected to continue at many sites, and long-term stewardship will be needed at 129 DOE installations. The Department has established the Office of Legacy Management to address this need.

*DOE estimates that long-term stewardship will be needed at up to 129 installations and has established the Office of Legacy Management to address this need.*

- There is a potential market for cleanup at sites for which there is no current feasible remediation approach. The costs for these activities are excluded from the above cost estimates, though applicable stewardship and monitoring costs for these sites are included. For example, costs are excluded for the nuclear explosion test grounds at the Nevada Test Site; large surface water bodies, including the Clinch and Columbia rivers; and most contaminated groundwater for which, even with treatment, future use will remain restricted.

These factors indicate that, despite significant progress in establishing the scope of work for DOE's cleanup program, there are uncertainties inherent in the remediation of DOE properties. The DOE cleanup market estimates rely on several critical assumptions, which makes them particularly sensitive to budget fluctuations, cleanup standards, and further site investigations

### 1.6.6 Civilian Federal Agency Sites

The responsibility to clean up non-DOD and non-DOE contaminated sites falls to 17 federal agencies. Because these programs are more fragmented throughout the government, detailed site characteristics data are limited and more site investigation is needed to fully identify cleanup needs. Three primary factors influence the market for remediation of civilian federal agency sites.

- Lack of funds constrains federal agency site remediation programs. Based on current and recent budgets, it would take 100 to 200 years to clean up all of the identified sites, under current environmental regulations. The limited resources available for site cleanups provide these agencies with incentives to prioritize efforts; encourage and eliminate barriers to the use of less costly innovative technologies; use more cost-effective contracting procedures; streamline management structures and processes; and seek cost recovery from other parties.

- Changes in federal and state environmental regulations and standards often impact the scope and pace of cleanup required at civilian federal facilities.

- The transfer of public properties to private use may require agencies to reallocate resources for cleaning up properties designated for transfer.

- Civilian federal agencies may be responsible for cleaning up between 8,000 and 31,000 abandoned mine sites, most of which have not been evaluated. The potential cost for this effort is not included in the discussion of the civilian agency budgets above.

### 1.6.7 State and Private Party Sites

Sites not owned by federal agencies that require cleanup, but cannot be addressed under the federal cleanup programs, are addressed by state cleanup programs. The cleanup of these sites are generally financed by the states or private parties. To manage the cleanup of contaminated sites, most states have created two types of programs—mandated cleanup programs and voluntary cleanup and brownfield programs. The mandated programs, which are roughly patterned after the federal Superfund program, generally include enforcement authority and state funds to finance the remediation of abandoned waste sites. The extent and pace of these programs are determined by states' financial and legal commitment to environmental restoration.

> *The financial and legal commitments to site restoration vary from state to state. Almost all states have programs to encourage voluntary cleanups and develop brownfield properties.*

Voluntary cleanup programs (VCPs) and brownfield programs encourage private parties to voluntarily clean up sites rather than expend state resources on enforcement actions or remediations. Fifty states and territories have VCPs and 31 have established brownfield programs that are separate from their VCPs. It is often difficult to distinguish between a brownfield program and a VCP. Many brownfield sites are addressed by volunteers.

- The state market for remediation services is largely dependent upon the commitment and ability of states and private companies to establish and manage hazardous waste programs, to finance cleanups, and to encourage or compel responsible parties to clean up sites. Funding and staff levels of state cleanup programs have remained steady for about a decade.

- The Brownfields Revitalization Act is expected to expand the number of sites to be assessed and/or cleaned up. The law greatly mitigates the potential liability of innocent (not responsible for pollution) property owners, reduces financial uncertainties for investors and property owners, and directly funds various projects and programs, which serve as examples, case histories, and lessons learned for other sites.

- Over approximately the past decade, the U.S. capacity to address brownfields has grown enormously. Today, there is a growing cadre of developers, planners, consultants, engineering and construction firms, attorneys, and public officials with the expertise to evaluate, clean up, and revitalize brownfield properties. The growing acceptance of the practicability of cleaning up and revitalizing brownfield sites has the potential for enlarging the market for site characterization and cleanup services.

- The pace of development in a region will influence the number of brownfield and voluntary sites that need to be evaluated. It is estimated that only 10-15 percent, of the estimated one-half to one million brownfield sites, have been identified. Most of the remaining sites have not been identified, primarily because they are vacant or underused and the owners do not wish to become involved in the complicated and costly world of remediation.

- The growing popularity of smart growth policies are likely to advance the demand for the state and brownfield cleanups, since infill development and the preservation of greenfields are primary components of smart growth programs.

- Forty-one states have long-term stewardship programs for one or more of their cleanup programs. These programs are important because of the widespread use of remedies that allow hazardous substances to remain on site.

### 1.6.8 Manufactured Gas Plant Sites

Most of the cleanups at MGP sites have involved those owned or operated by utilities. Because the original commercial MGPs were in good locations, close to population or commercial centers, the utilities that owned them simply reused the property for modern facilities, such as natural gas or electricity distribution. Thus, there is a known history and chain of ownership. Many utilities are aware of the potential environmental problems associated with their properties and are conducting monitoring or cleanups under RCRA or a state program. However, the location and disposition of many of the other types of MGP sites is less defined.

Former manufactured gas plants, or their waste products, may be discovered over many years, in conjunction with other cleanup programs, such as RCRA, Superfund, or Brownfields. There is no dedicated effort to search for them.

Site investigators and remediation planners could benefit from knowledge of the history and operations of this defunct industry. When combined with the growing body of literature on site characterization and remediation techniques, they would be able to develop the most effective and practicable cleanups.

### 1.6.9 Mining Sites

The following primary factors influence the market for remediation of mine lands.

- The reclamation budgets of the federal and state agencies that manage mine lands are small in comparison to the magnitude of the abandoned mine waste problem.

- Growing markets for first or second homes and recreational activities in previously sparsely-populated mining areas may foster increased demand for cleanup of some sites or restrictions on park use.

- The transfer of properties in mining areas where complete control of the source of the pollution has not been achieved may require institutional controls. Thus, there is a growing need for methods to ensure compliance with institutional controls.

- A number of the over 14,000 active and inactive mine sites that are not abandoned also may require remediation. Releases of contaminants into the environment can result from inadequately designed facilities such as tailings dams, accidents, leaks and spills, or failure to properly operate a facility. Thus some portion of these sites are likely to require remediation of soil, groundwater, and/or surface water, among other things.

- The passage of Good Samaritan legislation would probably encourage more state and local governments to undertake some remediation.

### 1.6.10 Drycleaner Sites

The use of drycleaning solvents has been decreasing, primarily because the industry has been switching to new more efficient machines and, to a lesser extent, the use of alternative solvents. Nevertheless, there remain thousands of sites from previous operations.

- The declining use of perchloroethylene by drycleaners will mean fewer discharges to the environment in the future.

- For the 12 states with dedicated drycleaner remediation funds, the money available to the funds appears to be stable.

- For other states, general availability of state cleanup funds, will be a critical factor for many cleanups. Drycleaners have average revenues of about $250,000; remediation costs can run hundreds of thousands of dollars, and several have cost over a million. Even a moderate-cost cleanup can amount to several years of profit for the average drycleaner.

- In addition to active drycleaner facilities, many inactive facilities (properties that currently do not have a drycleaner, but did in the past) have not yet been discovered. Many of these facilities may have released hazardous substances to the environment that resulted in contaminated soil and groundwater. Although data on these facilities are sparse, it is estimated that there are between 9,000 and 90,000 sites.

- The level of assessment and cleanup is directly related to the cleanup standards adopted by the states. Many states have adopted risk-based cleanup standards for soil and groundwater.

### 1.6.11 Site Characterization

Although it averages only about 10 percent of cleanup costs, site characterization is a major determinant of the ultimate effectiveness, schedule, and cost of remedial actions. The following factors are driving the demand for sampling and analysis technologies:

- The use of field analytical technologies is expected to increase relative to traditional approaches. There is a growing body of evidence that indicates that substantial cost and time savings and better site characterizations are usually achieved with the use of field technologies, especially when combined with dynamic work plans and systematic planning. Field technologies can also foster significant savings in dollars and time during remedial action, because they provide accurate site characterization data and allow site crews to adapt to new information on a daily basis.

- The demand for revitalization of brownfields and UST sites implies a requirement to conduct many Phase I and Phase II type site assessments. A smaller percentage will require further site investigation and cleanup.

- The demand for due diligence by property purchasers, developers, and lenders also implies a significant demand for Phase I and, possibly, Phase II assessments.

- The demand to redevelop sites provides a powerful economic incentive for faster site assessments and cleanups. Developers and investors usually operate under serious time constraints to implement projects. The combination of field analytics, dynamic work plans, and systematic planning may allow development to proceed more expeditiously.

Based on these factors, it is expected that the use of newer characterization approaches will grow relative to older ones. To the extent that improved site characterizations reduce overall remediation costs, they would allow more sites to be cleaned up. Improved cost-effectiveness of cleanups is especially important, given the finite resources available for most cleanup programs.

### 1.6.12 DNAPLs

The CERCLA remedy selection process and NCP include a preference for remedies that provide "permanence and treatment." to the extent practicable. However, the ability to economically delineate the DNAPL source zones varies from site to site. Similarly, the ability to show that source reduction will dramatically reduce long-term costs of containment also varies from one site to another. Thus, the proportion of DNAPL sites that will be subject to containment and the number that will undergo source zone treatment is uncertain. A number of factors may affect decisions that attempt to strike a balance between remediating a source zone and long-term pump and treat at DNAPL sites, and hence the potential demand for remediation services. These factors, which are not mutually exclusive, include:

- Potential contamination at uncharacterized or undiscovered sites, such as MGP sites, former drycleaners sites, or other types of sites, may lead to continued additions to the number of sites that need to be assessed and/or cleaned up.

- A number of states have recognized the need to consider newer site characterization and remediation technologies prior to granting ARAR waivers for technical impracticability.

- Reuse considerations at a site may drive the need for faster cleanups. Developers may need the properties that might otherwise be encumbered by pump-and-treat equipment or institutional controls related to the contamination and remedy..

- Continued advances in site characterization techniques that allow a better definition of the source zone, which is especially needed for deep sources, offer the potential to reduce remediation costs. Such advances may be enhanced when coupled with more effective use of innovative in-situ technologies for the removal or destruction of DNAPL sources, and may contribute to increased use of treatment versus long-term containment remedies.

## 1.7 Implications for Site Characterization and Cleanup

Although substantial progress has been made over the past quarter century, a considerable amount of cleanup work, which will take 30 to 35 years to complete, remains. As with most cleanups requiring technically complex solutions and coordination of multiple stakeholders, the work load will fluctuate from year to year. Most of the costs will be borne by private and public owners of contaminated properties and responsible parties. This work includes the cleanup of a number of very large, complex sites as well as the assessment and, when necessary, cleanup of many small sites. The needed work represents a significant opportunity for the continued development and implementation of site characterization and cleanup approaches and technologies that can result in better, cheaper, and faster cleanups, as well as technologies that enable us to better address challenging contamination problems such characterizing NAPLs in the subsurface.

Technical solutions to a particular contaminated site problem are generally similar, regardless of the regulatory program under which they are implemented. While individual markets may not support certain important investment decisions, the aggregate demand across all markets might justify the up-front investment in a technology that ultimately drives down the cost of moving contaminated sites into productive use. By recognizing this potential for economies of scale in cleanup technology markets, the information in this report contributes to better investment decisions across all market segments.

# Chapter 2 Remediation Technologies Used At National Priorities List Sites

The U.S. faces significant technological challenges as it seeks the most efficient and effective approaches to clean up its contaminated waste sites. This chapter examines trends in the use of remediation technologies at hazardous waste cleanup sites covered under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), commonly known as Superfund.

Although Superfund sites are a small percentage of all contaminated sites, the program has been in the forefront in selecting and applying new site characterization and remediation technologies that are less costly and more effective. Developments in the Superfund sector tend to influence technology selection in other market segments. Many of the remediation projects in recent years involve technologies that were not even available when the law was reauthorized. The development of new technologies has been driven, in part, by a preference for "permanence and treatment" in the 1986 reauthorized law and the resulting quest for more cost-effective processes.

## 2.1 Definitions of Remediation Technologies

The text box summarizes the major types of remedies used at hazardous waste sites. Most Superfund records of decision (RODs) for remedial action address the source of contamination, such a soil, sediment, sludge, and solid-matrix wastes. Such "source control" RODs select "source control technologies." Groundwater remedial actions, also known as "non-source control actions," may be a component of a "source control" ROD and the treatment technologies chosen for groundwater remediation are referred to as "groundwater technologies."

***Superfund Remedy Types***

***Source Control Remedy Types***

- **Source Control Treatment:** Treatment of any source in situ or ex situ, including technologies such as chemical treatment and thermal desorption.
- **Source Control Containment:** Containment of a contaminant source using caps, liners, covers, on-site and off-site landfilling, or other means.
- **Other Source Control:** Other forms of remediation of a contaminant source, such as institutional controls, monitoring, and population relocation.

***Groundwater Remedy Types***

- **Pump and treat:** Extraction of groundwater from an aquifer and treatment above ground. Treatment can include technologies such as air stripping and ion exchange.
- **In-Situ Treatment:** Treatment of groundwater in place without extracting it from an aquifer, using technologies such as air sparging and permeable reactive barriers.
- **Monitored Natural Attenuation:** The reliance on natural attenuation processes, within the context of a carefully controlled and monitored approach to site cleanup to achieve site-specific remediation objectives within a time frame that is reasonable compared to other alternatives.
- **Groundwater Containment:** Containment of groundwater through the use of a vertical engineered impermeable subsurface barrier, or a hydraulic barrier created by pumping.
- **Other Groundwater Remedies:** Groundwater remedies that do not fall into the above categories, such as water-use restrictions and the provision of alternative water supplies.

The term "treatment technology" means any unit operation or series of unit operations that alters the composition of a hazardous substance, pollutant or contaminant through chemical, biological, or physical means to reduce the toxicity, mobility, or volume of the contaminated materials being treated. Treatment technologies are an alternative to land disposal of hazardous wastes without treatment (see "definitions" at 40 CFR 300.5, 55 Federal Register 8819, March 8, 1990).

Established technologies are those for which cost and performance information is readily available. The most frequently used established technologies are on- and off-site incineration, solidification/stabilization (S/S), soil vapor extraction (SVE), thermal desorption, and pump-and-treat (P&T) technologies for groundwater. Technologies used to treat groundwater after it has been pumped to the surface usually involve traditional water treatment approaches, which are considered established technologies.

Innovative treatment technologies are alternative treatment technologies with a limited number of field applications and limited data on cost and performance. Often, these technologies are established in other fields, such as chemical manufacturing or hazardous waste treatment. In such cases, it is the application of a technology or process at a waste site (to soil, sediments, sludge, and solid-matrix waste, or groundwater) that is innovative, not the technology itself.

Both innovative and established technologies are grouped as source control treatment or in-situ groundwater treatment technologies on the basis of the type of application most commonly associated with the technology. Some technologies can be used for both source control and in-situ groundwater treatment.

Exhibit 2-1 lists 17 types of source control (primarily soil) technologies, 10 types of in-situ groundwater treatment technologies, eight types of groundwater P&T technologies, as well as other approaches, such as monitored natural attenuation (MNA) for groundwater, and groundwater containment. The definitions of these technologies may be found in the EPA report *Treatment Technologies For Site Cleanup: Annual Status Report (Eleventh Edition)* (EPA, 2004a). They are based on the *Remediation Technologies Screening Matrix Reference Guide, Version 3* (FRTR 2003a). Technologies that are applicable to both source control and groundwater treatment are also indicated. For P&T technologies, this report focuses on the treatment portion of the technology.

## 2.2 Historical Use of Remediation Technologies at Superfund Sites

This section reviews the types of hazardous waste remediation technologies that tend to be used at NPL sites. Most of the discussion on the selection and use of innovative and established technologies is derived from a more detailed analysis in the *Annual Status Report* which contains information on each planned, ongoing, and completed treatment technology project selected for use in the Superfund program through fiscal year (FY) 2002 (U.S. EPA 2004a). The analysis is based on data from RODs signed between FYs 1982 and 2002, which ended on September 30, 2002. During this period, EPA made cleanup decisions in 2,610 RODs for over 1,200 NPL sites. It also contains data on a limited number of non-Superfund federal facility sites.

## Exhibit 2-1. Treatment Technologies

### *Source Control Treatment Technologies*

- Bioremediation
- Chemical Treatment
- Electrokinetics
- Flushing
- Incineration (on-site and off-site)

- Mechanical Soil Aeration
- Multi-Phase Extraction
- Neutralization
- Open Burn (OB) and Open Detonation (OD)
- Physical Separation

- Phytoremediation
- Soil Vapor Extraction
- Soil Washing
- Solidification/Stabilization
- Solvent Extraction

- Thermal Desorption
- Thermally Enhanced Recovery
- Vitrification

### *In-situ Groundwater Treatment Technologies*

- Air Sparging
- Bioremediation (also a source control technology)
- Chemical Treatment (also a source control Technology)
- Electrokinetics (also a source control technology)
- Flushing (also a source control Technology)

- In-well Air Stripping
- Multi-phase Extraction
- Permeable Reactive Barriers
- Phytoremediation (also a source control technology)
- Thermally Enhanced Recovery (also a source control technology)

### *Pump-and-treat Technologies (Ex-Situ Treatment)*

- Adsorption
- Air Stripping (also a source control technology)
- Bioremediation
- Chemical Treatment (also a source control technology)
- Filtration

- Ion Exchange
- Metals Precipitation
- Membrane Filtration

### *Monitored Natural Attenuation for Groundwater*

- Includes a variety of physical, chemical, or biological processes, such as biodegradation; dispersion; dilution; sorption; volatilization; radioactive decay; and chemical or biological stabilization, transformation, or destruction of contaminants.

### *In-situ Groundwater Containment*

- Vertical engineered subsurface impermeable barrier
- Hydraulic Barrier created by pumping

### *Other Groundwater*

- Groundwater Use Restrictions
- Alternative Water Supply
- Groundwater remedies that do not fall into above categories

Source: U.S. EPA, Office of Solid Waste and Emergency Response, *Treatment Technologies For Site Cleanup: Annual Status Report (Eleventh Edition),* EPA-542-R-03-009, February 2004. http://www.clu-in.org/asr; and *The Remedial Technologies Development Matrix and Reference Guide* web site maintained by the Federal Remediation Technology Roundtable. http://clu-in.org/remed1.cfm#tech_sele

### 2.2.1 Containment and Disposal Technologies for Source Control

Exhibit 2-2 shows the remedy types for source control implemented or planned over the life of the Superfund program. These data are based on an analysis of the RODs signed between 1982 and 2002. A source control remedy has been implemented or planned at 70 percent of NPL sites. Fifty-two percent of all source control sites have selected treatment of a source, such as contaminated soil or sediment. Fifty-five percent of sites have implemented or plan to implement containment or off-site disposal of a source.

**Exhibit 2-2. Source Control Remedy Types Selected or Used for at NPL Sites, FY 1982-2002**

| Remedy Type | Number of Sites | Percent of Sites with Source Control |
|---|---|---|
| Treatment of a Source | 541 | 52% |
| Containment or Off-site Disposal of a Source | 576 | 55% |
| Institutional Controls of a Source | 525 | 49% |
| Other Source Control | 457 | 44% |
| Total Source Control Sites | 1,046 | 100% |

Notes:
- ROD = Record of Decision.
- Data for FY 2002 includes an estimated 70 percent of FY 2002 RODs.
- 1,046 sites with source control. More than one remediation application may be used at a site.

Source: U.S. EPA, Office of Solid Waste and Emergency Response, *Treatment Technologies For Site Cleanup: Annual Status Report (Eleventh Edition),* EPA-542-R-03-009, February 2004. http://www.clu-in.org/asr.

Prior to 1987, the most common methods for remediating hazardous waste were to excavate the contaminated material and dispose of it in an off-site landfill, or to contain the waste on site by means of containment systems (*e.g.*, caps or slurry walls). In the late 1980s and early 1990s, the number of remedies that included treatment began to increase. Later, in the second half of the 1990s, the percentage decreased. According to the *Annual Status Report*, the percentage of source control treatment RODs was generally higher from FY 1988 through FY 1996 (59 to 75 percent of the RODs) than for the period FY 1997 through FY 2002 (39 to 51 percent of the RODs) (U.S. EPA 2004a).

Many factors contribute to the selection of remedies at hazardous waste sites. Although the Superfund Amendments and Reauthorization Act of 1986 (SARA) requires a preference for the use of permanent remedies, existing regulations provide site managers with flexibility in remedy selection, so long as they meet the principle requirements for the selection of remedies. Remedy decisions may also be influenced by EPA's policies for considering cost (U.S. EPA 1996b) and land use (U.S. EPA 1995, 2001c) in remedy selection, new developments in remediation technologies, and changing knowledge and experience with technologies used for site

characterization, containment, and treatment. By considering land use and cost-effectiveness, decision-makers may have the flexibility to base remedy selection on restricted, rather than unrestricted land uses. Thus, nontreatment remedies, such as containment and institutional controls, may be protective of human health and the environment at some sites, while other sites will require other remedies.

### 2.2.2 Treatment Technologies for Source Control

Between 1982 and 2002, 863 applications of treatment technologies were implemented or planned for source control at 638 Superfund sites. More than one type of technology may have been selected at a site. Exhibit 2-3 provides an overview of the in-situ and ex-situ technologies selected for source control. As the figure shows, 42 percent of all treatments selected for source control at Superfund remedial action sites were in-situ technologies. Soil vapor extraction (SVE) (213 projects, 25 percent), bioremediation (48 projects, 6 percent), and solidification/stabilization (48 projects, 6 percent) are the most common in-situ technologies, together accounting for 85 percent of all in-situ source control treatment projects.

The most common ex-situ technologies are solidification/stabilization (157 projects, 18 percent); incineration (147 projects, 17 percent); thermal desorption (69 projects, 8 percent); and bioremediation (54 projects, 6 percent). These technologies together account for 86 percent of ex-situ source control treatment projects.

The *Annual Status Report*, which is available on line, provides a detailed description of the trends in the use of these technologies from 1982 through 2002 (U.S. EPA 2004a). An appendix to the report lists treatment technology projects for source control at remedial sites by EPA region. While in-situ technologies as a percent of all treatment technologies tend to fluctuate from year-to-year, the general trend since 1985 has been an increase in their use. In-situ treatments as a percent of source control treatments increased from 31percent for the FY 1985 to FY 1989 period to 49 percent for the FY 1998 to FY 2002 period. Some of the key factors that have influenced this upward trend include:

- In-situ technologies are often more cost-effective than ex-situ approaches which require excavation and materials handling, especially for large sites.

- Because in-situ technologies require no excavation, the levels of exposure to contaminated substances is reduced, compared to that associated with ex-situ methods.

- As in-situ treatment technologies are used more frequently, site managers and other remediation professionals are more willing to accept them as a viable and reliable approach.

**Exhibit 2-3. Superfund Remedial Actions at Source Control Treatment Projects FY 1982-2002 (Total Projects = 863)**




Notes: Data for 2002 include an estimated 70% of FY 2002 RODs. More than one remediation application may be used at a site.

Source: U.S. EPA, Office of Solid Waste and Emergency Response, *Treatment Technologies for Site Cleanup (Eleventh Edition)*, EPA-542-R-03-009, February, 2004.

### 2.2.3 Groundwater Remedies

Groundwater treatment technologies are designed to remove or immobilize contamination in an aquifer. Groundwater remedies can be grouped into five general types: remedies specifying extraction of groundwater, usually by pumping, followed by aboveground treatment (pump and treat); remedies specifying in-situ treatment; remedies specifying MNA; remedies specifying containment using subsurface vertical engineered impermeable barriers or hydraulic barriers created by pumping; and other actions, such as groundwater use restrictions, drilling prohibitions, and other land use (institutional) controls (Exhibit 2-1).

Exhibits 2-4 and 2-5 display the application of groundwater remedies on a site basis. These data are based on an analysis of the 2,610 RODs and supplementary documents signed between 1982 and 2002. More than one type of remedy may have been selected at a site or in a specific ROD. At some sites, several applications of the same type of groundwater remedy may have been specified. At sites for which several types of groundwater remedies were selected, the remediation may not have occurred in the same aquifer or groundwater plume.

A groundwater remedy has been implemented or is planned at 71 percent of the NPL sites. Pump and treat has been implemented or planned at 67 percent, in-situ treatment at 13 percent, and

MNA at 19 percent of NPL groundwater sites. At many sites, more than one type of groundwater remedy is planned or implemented.

**Exhibit 2-4. Groundwater Remedy Types Selected or Used at NPL Sites, FY 1982-2002**

| Remedy Type | Number of Sites | Percent of Sites |
|---|---|---|
| Groundwater Pump and treat | 713 | 67% |
| In-situ Treatment of Groundwater | 135 | 13% |
| MNA of Groundwater | 201 | 19% |
| Institutional Controls for Groundwater | 515 | 48% |
| Other Groundwater (includes other and VEB) | 735 | 69% |
| Total Groundwater Sites | 1,062 | 100% |

Notes:
- ROD = Record of Decision; VEB = vertical engineered barrier
- Data for FY 2002 includes an estimated 70 percent of FY 2002 RODs.
- 1,062 groundwater sites. Pump and treat, in-situ treatment, or MNA has been used or selected as part of the remedy for 851 sites. More than one remediation application may be used at a site.

Source: U.S. EPA, Office of Solid Waste and Emergency Response, *Treatment Technologies For Site Cleanup: Annual Status Report (Eleventh Edition),* EPA-542-R-03-009, February 2004. http://www.clu-in.org/asr

Exhibit 2-5 shows the results of an analysis of the use of pump and treat, in-situ treatment, and MNA for groundwater, both alone and in combination with other remedies. This analysis focuses on these three remedies because they are intended to result in the reduction or immobilization of contaminants. Of the 851 sites, pump and treat alone was used in 556 (65 percent) of the sites, and in combination with other technologies at 713 (84 percent) sites; MNA alone at 96 sites (11 percent); and in-situ groundwater treatment alone at 31 sites (4 percent). In-situ treatment alone, or in combination with other technologies, was selected at 135 sites (16 percent) and MNA alone, or in combination with other technologies, was selected at 201 (24 percent) of the sites.

## 2.3 Advancing Remediation and Characterization Technologies

Opportunities exist for technology vendors who want to work cooperatively with EPA, and other federal agencies, such as the Departments of Defense (DOD) and Energy (DOE). In many cases the programs involve other industry partners as well. A number of programs are available to support the development and use of advanced technologies through research, development, testing, and evaluation, and through information sharing and networking about experiences with remediation technologies. Many of these programs also include resources to help vendors publicize the capabilities of their technologies to all interested parties. Some of the more important efforts are listed below:

**Exhibit 2-5. Superfund Sites With P&T, In-situ Treatment, or MNA as Part of a Groundwater Remedy FY 1982-2002**




Notes: Data for 2002 include an estimated 70% of FY 2002 RODs. More than one remediation application may be used at a site.

Source: U.S. EPA, Office of Solid Waste and Emergency Response, *Treatment Technologies for Site Cleanup (Eleventh Edition)*, EPA-542-R-03-009, February, 2004.

- **Clean-Up Information System (CLU-IN).** This web site, maintained by EPA's Technology Innovation and Field Services Division (TIFSD), provides information about innovative treatment and site characterization technologies and acts as a forum for all waste remediation stakeholders. It also provides tools to assist technology developers and vendors demonstrate and bring their technologies to market. Most of the resources referred to in this report and cited below are available for downloading from this web site. http://www.clu-in.org

- **Superfund Innovative Technology Evaluation (SITE) Program**. The EPA established the SITE Program to help promote the use of innovative remediation and monitoring and measurement technologies at hazardous waste sites. The program, which is administered by ORD's National Risk Management Research Laboratory, headquartered in Cincinnati, Ohio, offers a mechanism where the performance and costs of innovative technologies can be demonstrated and evaluated by an independent third party at a particular hazardous waste site. The demonstration projects allow participation by private entities, state environmental agencies and federal agencies. Under this program, EPA enables the field testing of technologies and provides reports on completed technology evaluations. The web site describes the current technologies of interest, how to participate in the program, and provides the publication *SITE Technology Profiles* for downloading. This publication describes each project and lists available reports. http://www.epa.gov/ORD/SITE

- **EPA REACH IT**. This EPA web site allows vendors to search, view, download and print information about innovative remediation and characterization technologies. It provides users access to comprehensive information about treatment and characterization technologies and their applications. It combines information submitted by technology service providers about remediation and characterization technologies with information from EPA, the U.S. Department of Defense (DOD), the U.S. Department of Energy (DOE), and state project managers about sites at which innovative technologies are being deployed. Those sources together provide up-to-date information, not only about technologies one can use to characterize or remediate a site, but also about sites at which those technologies are being used and the service providers that offer them. As of October 2002, REACH IT contained information on 607 remediation technology vendors; 1,380 technologies; and 1,564 sites at which remediation technologies have been applied. It also contained information on 128 characterization technology vendors; 209 technologies; and 232 sites at which characterization technologies have been applied. http://www.epareachit.org.

- **Groundwater Remediation Technologies Analysis Center (GWRTAC).** In 1995, EPA established GWRTAC at the National Environmental Technologies Applications Center (NETAC) in association with the University of Pittsburgh. This center develops and disseminates information on current research, development, and demonstration efforts related to in-situ groundwater technologies. The Center also analyzes trends in technology development. http://www.gwrtac.org.

- **Remediation Technologies Development Forum (RTDF).** The RTDF was established in 1992 after industry approached the EPA to identify what they could do together to develop and improve the environmental technologies needed to address their mutual cleanup problems in the safest, most cost-effective manner. The RTDF is a public-private partnership created to undertake research, development, demonstration, and evaluation efforts focused on finding innovative solutions to high priority problems. The RTDF includes partners from industry, several federal and state government agencies, and academia who voluntarily share knowledge, experience, equipment, facilities, and even proprietary technology to achieve common cleanup goals. http://www.rtdf.org.

- **Federal Remediation Technologies Roundtable (FRTR).** The FRTR works to build a collaborative atmosphere among federal agencies involved in hazardous waste site cleanup. FRTR was established in 1990 to bring together top federal cleanup program managers and other remediation community representatives to share information and learn about technology-related efforts of mutual interest; discuss future directions of the national site remediation programs and their impact on the technology market; interact with similar state and private industry technology development programs; and form partnerships to pursue subjects of mutual interest. http://www.frtr.gov.

Since these sources are often used in the preparation of lists of cleanup alternatives or bid documents, it is important that technology vendors and developers ensure that information on their products and services are represented. In addition, joining and participating in activities of various professional societies and trade groups may help a vendor promote specific capabilities.

## 2.4 References

FRTR, 2003a. *Remedial Technologies Development Matrix and Reference Guide* web site including a user-friendly tool to screen for technologies for a remediation project. Federal Remediation Technology Roundtable. http://clu-in.org/remed1.cfm#tech_sele

FRTR, 2003b. *Technology Cost and Performance,* web site covering case studies and cost and performance information on site characterization, remediation, and monitoring technologies, Federal Remediation Technology Roundtable. http://www.frtr.gov/

U.S. EPA (Environmental Protection Agency), 1995. *Land Use in the CERCLA Remedy Selection Process,* OSWER Directive 9355.7-04, Office of Solid Waste and Emergency Response, May 1995.

U.S. EPA, 1996a. *Initiatives to Promote Innovative Technology in Waste Management,* OSWER Directive 9380.0-25, Office of Solid Waste and Emergency Response, April 29, 1996.

U.S. EPA, 1996b. *The Role of Cost in the Superfund Remedy Selection Process,* EPA 540-F-96-018, Solid Waste and Emergency Response, September 1996. http://www.epa.gov/superfund/resources/cost_dir

U.S. EPA, 1999. *Use of Monitored Natural Attenuation at Superfund, RCRA Corrective Action, and Underground Storage Tank Sites,* OSWER Directive 9200.4-17P, Office of Solid Waste and Emergency Response, April 21, 1999.

U.S. EPA, 2001a. *Abstracts of Remediation Case Studies Volume 5*, EPA-542-R-01-008, Federal Remediation Technologies Roundtable, May 2001.

U.S. EPA, 2001b. *Groundwater Pump-and-Treat Systems: Summary of Selected Cost and Performance Information*, EPA 542-R-01-0219, Office of Solid Waste and Emergency Response, Technology Innovation Office, December 2001.

U.S. EPA. 2001c. *Reuse Assessments: A Tool to Implement the Superfund Land Use Directive*, (OSWER Directive No. 9355.7-06P), June 2001. http://www.epa.gov/superfund/resources/reusefinal.pdf

U.S. EPA, 2002a. *Groundwater Remedies Selected at Superfund Sites*, EPA 542-R-01-022, Office of Solid Waste and Emergency Response, Technology Innovation Office, January 2002.

U.S. EPA, 2002b. *Abstracts of Remediation Case Studies Volume 6,* EPA-542-R-02-006, Federal Remediation Technologies Roundtable, June 2002.

U.S. EPA, 2003a. Publications on Remediation., web site managed by EPA's Office of Solid Waste and Emergency Response, Technology Innovation Office. http://www.epa.gov/swertio1/pubitech.htm

U.S. EPA, 2003b. Vendor Support, web site maintained by Office of Superfund Remediation and Technology Innovation to provide tools to help remediation technology vendors and developers advance and implement their technologies. http://clu-in.org/vendor.

U.S. EPA, 2004a. *Treatment Technologies For Site Cleanup: Annual Status Report (Eleventh Edition),* EPA-542-R-03-009, Office of Solid Waste and Emergency Response, February 2004. http://www.clu-in.org/asr

U.S. EPA, 2004b. *Annual Status Report Remediation Database,* Office of Solid Waste and Emergency Response, Technology Innovation Office, http://epa.gov/tio/technologies

This page intentionally left blank

# Chapter 3
# Demand for Remediation of National Priorities List Sites

This chapter presents estimates of the number, location, size, characteristics, and cleanup costs of hazardous waste sites that have been or will be placed on the Superfund National Priorities List (NPL), but for which a remedy has yet to be selected. It also describes the implications of a number of technical, regulatory, and economic factors for the demand for cleanup technologies. Because many Superfund sites have undergone detailed site assessments, much information is available on their characteristics. In addition, the remediation technologies used for the Superfund program are likely to reflect needs in other programs with similar cleanup challenges.

## 3.1 The Superfund Program

Superfund is the federal program, administered by EPA, to clean up releases of hazardous substances at abandoned or uncontrolled hazardous waste sites. In addition to establishing enforcement authorities, the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) created a trust fund to be used for site identification and cleanup. CERCLA was substantially altered by the Superfund Amendments and Reauthorization Act of 1986 (SARA), which made three changes to the Superfund program that are of particular significance to technology vendors: (1) it stressed the importance of permanent remedies; (2) it supported the use of new treatment technologies to achieve permanent remedies; and (3) it expanded research and demonstrations to promote the development of innovative treatment technologies.

***Highlights***
- As of September 2003, remedial construction was complete at 886 of the 1,518 NPL sites. EPA had conducted more than 7,000 removal actions at over 5,000 sites.
- As of May 2003, 456 proposed and final NPL sites not owned by the federal government still require remedial action. Estimated cleanup cost for these sites are \$16–23 billion (most likely \$19 billion).
- Between 1993 and 2003, EPA added an average of 28 sites annually to the NPL.
- If 28 sites per year are added to the NPL for the next 10 years, the additional cost would be \$13 billion. (The range of estimates is 23-49 sites annually for 10 years at an estimated cost of \$8–27 billion).
- EPA is working with an advisory council to address the future direction of the program. These deliberations may impact how Superfund's budget is allocated among the various projects.
- The need to balance the interests of diverse stakeholders and consider redevelopment issues may influence the sequence of work, technologies selected, and NPL listings.
- About 83% percent of NPL sites require remediation of groundwater, 78% of soil, 32% of sediments, and 11% of sludge.
- VOCs are to be remediated at 78% of NPL sites, followed by metals (77%) and SVOCs (71%). More than half the sites have all three.

### 3.1.1 The National Contingency Plan

The procedures for implementing CERCLA are spelled out in the National Oil and Hazardous Substances Pollution Contingency Plan, commonly referred to as the National Contingency Plan (NCP). The NCP outlines the steps that EPA and other federal agencies must follow in responding to releases of hazardous substances or oil into the environment. Among other things,

the NCP addresses selecting remedies that protect human health and the environment, maintaining protection over time, and minimizing untreated waste. With regard to treatment technologies, the NCP specifies several treatment expectations, including the following:

- Principal threats are to be treated wherever practical;
- Combination of treatment with containment, as necessary; and
- Consideration of innovative treatment technologies to the maximum extent practicable.

### 3.1.2 The Superfund Process

The site characterization and cleanup process established by the NCP begins with the discovery of a potential hazardous waste site, and includes the following general steps:

1) A "preliminary assessment" (PA) is conducted to determine the existence of potential threats to human health or the environment that require a "removal action" or further study. If the PA indicates an emergency requiring immediate or short-term action to reduce the risk to the public, a removal action is conducted to stabilize or clean up the site.

2) If a hazard is identified or remains after a removal action is performed, a "site inspection" (SI) is conducted to determine whether a site warrants scoring under the Hazard Ranking System (HRS). EPA uses the HRS to score sites on the basis of their potential effects on human health and the environment and to determine a site's eligibility for the National Priorities List (NPL), EPA's list of sites with the worst contamination problems. Sites that score above a threshold may be considered for proposal for the NPL. Inclusion on the NPL authorizes EPA to respond to the site by either pursuing enforcement against responsible parties or paying for a response using the Superfund funds.

3) When a site is added to the NPL, an in-depth planning and investigation phase begins, during which the nature and extent of contamination and site risks are determined, and treatment alternatives are evaluated. This phase is known as the "remedial investigation/feasibility study" (RI/FS). EPA requires the results of the RI/FS, including the rationale for selecting a remedy, to be presented to the public, and documented in a "Record of Decision" (ROD). Some sites require a series of RI/FSs and RODs to address different "operable units (OUs)," which are portions of a site reflecting pathways of exposure (*e.g.*, soil, water) that require separate cleanup actions.

   RODs provide useful information for technology vendors interested in gaining access to the hazardous waste cleanup market. First, RODs specify the technology type determined to be the appropriate remedy for a site. Second, technology vendors can use RODs to determine why EPA selected or rejected a specific remedy. EPA must consider nine criteria for remedy selection: overall protectiveness; compliance with other environmental laws and regulations; long-term effectiveness and permanence; short-term effectiveness; implementability; cost; reduction of toxicity, mobility, or volume of wastes; state acceptance; and community acceptance.

4) Following the ROD, detailed engineering specifications for the selected cleanup approach are developed. This phase is called "remedial design" (RD). The designs are used to solicit competitive bids to perform the "remedial action" (RA). In the RA phase, waste is actually treated, disposed, or contained. If necessary, "operation and maintenance" (O&M) begins at the conclusion of the RA. This phase can include such actions as groundwater monitoring and periodic site inspections to ensure continued effectiveness of remedies. The final step in the process is to delete the site from the NPL. This step is initiated when all necessary cleanup responses under CERCLA are completed.

At any point in this process, an emergency requiring a removal action can occur at a site. In addition, community involvement activities take place throughout the process to ensure that all interested parties participate in the decision-making process. Enforcement actions that compel those responsible for the contamination to clean up the site also occur throughout the cleanup process to ensure optimal use of Superfund resources.

As part of its responsibility for implementing the Superfund program, EPA is responsible for determining the best way to clean up each site. Other federal agencies such as the Department of Defense (DOD) and Department of Energy (DOE) are responsible for cleaning up NPL sites at their facilities in accordance with the requirements of the NCP and with EPA concurrence. Under the Superfund program, states also may take the lead to determine remedial alternatives and contract for the design and remediation of a site.

### 3.1.3 Program Status

Since its beginning in 1980, efforts under Superfund have included the identification and ranking of sites, detailed site investigation, mitigation of immediate threats, and selection and implementation of remedies to clean up the worst sites (those listed on the NPL). Over the life of the program, the number of sites that have progressed from study and evaluation to actual cleanup has grown. As of September 2003, EPA had listed 1,518 sites on the NPL and proposed another 54. Of these, 274 sites were deleted from the NPL, or referred for response to another authority, leaving a total of 1,244 final NPL sites. In addition, EPA had conducted over 7,000 removal actions at over 5,000 sites, over 80 percent of which are not NPL sites.

By September 30, 2003, remedial construction activity was complete at 886 sites and 375 remedial construction projects were underway at NPL sites (U.S. EPA 2004c). Another 230 sites were in the RD phase and the remainder were in various stages of site investigation or remedy selection. As additional sites are studied and ranked, they may be added to the NPL.

## 3.2 Factors Affecting Demand for Cleanup

Many technical, economic, public policy, and legal factors have combined to determine the number of sites currently included in the Superfund program, the cleanup standards and technologies to be used, and cleanup work schedule. Some factors that could influence the scope of the cleanup effort, as well as the technologies to be used in the future, are described below.

- The number of sites added to the NPL, which is difficult to forecast. Listing a site is ultimately a decision made by the Assistant Administrator of OSWER, typically, after consulting with state and EPA regional officials, potentially responsible parties (PRPs), local government, and the governor. Earlier in the program, new additions to the NPL fluctuated substantially from zero to over 400 in a single year. However between 1993 and 2003, the range has been much narrower (13 to 43) and averaged 28 per year. A 2001 study by an environmental research group predicted that it would range between 23 and 49 per year over the next decade, with a middle value of 35 (Probst & Konisky 2001). The average for the three years since that study has been 23. Listing rates of this magnitude are not inconsistent with the potential supply of "NPL-caliber" sites. Section 3.3 (Number of Sites) describes listing rate scenarios. If more "NPL-eligible" sites are found, they may be addressed through other programs, such as RCRA Corrective Action or a state program, or may continue to await evaluation and/or cleanup. Because the decision on whether to list a site is complex, depending on many variables and input from many stakeholders, there is some uncertainty inherent in any such prediction.

- Although the Superfund Trust Fund now accounts for a small portion of revenues, the Superfund operating budget has been relatively stable. Budget authority is $1.31 billion, $1.27 billion, and $1.39 billion (requested) for FY 2002, 2003, and 2004 (requested), respectively.

- State and PRP funding for Superfund site cleanups may fluctuate in the future. Many states are facing serious budget shortfalls in 2003 and 2004. For Superfund remedial actions, the states contribute 50 percent of the construction costs where they own the site and all operations and maintenance (O&M) costs for fund-financed sites in their state. For fund-financed remedies that involve long-term treatment or other measures to restore groundwater or surface water quality, CERCLA requires that states assume the costs after 10-years. The management of many of these sites are now being transferred to states. To improve O&M performance and ease the potential cost burden of these projects, EPA has been conducting studies on pump-and-treat systems to develop recommended optimization practices prior to takeover (U.S. EPA 2001).

  PRP contributions to site remediation may be affected by business conditions and EPA's enforcement program activities. State staffing and budgets for both Superfund and non-Superfund hazardous waste sites programs have been at about the same level in nominal dollars for at least seven years (See Chapter 9, State and Private Party Sites).

- Current resources appropriated to the program may be insufficient to fully implement the program. According to a 2001 Resources for the Future study, Superfund faces an average annual budget shortfall of approximately $100-200 million over a 10-year period (Probst & Konisky 2001). To address this and other long-term Superfund issues, EPA is working with the National Advisory Council for Environmental Policy and Technology (NACEPT) to help guide the future direction of the Superfund Program. While the work of this group cannot yet be quantified in terms of a market projection, it would be helpful for remediation service providers to keep abreast of developments in this area (U.S. EPA 2004c).

- In planning and implementing its cleanups, EPA coordinates extensively with its regions, potentially responsible parties (PRPs), state and local governments, planning authorities, local communities, and developers to ensure that the remedies protect public health and the environment and are consistent with the anticipated future use of the site. Balancing the considerations of these stakeholders may influence the sequence of work, types of technologies selected for a site, and the number of sites to be listed on the NPL in the future.

## 3.3 Number of Sites

The market for cleanup at NPL sites includes sites where remedial action (RA) is planned but has not yet begun. Remedial action is the phase of cleanup that typically involves construction, and in some cases operation, of the remediation technology. As of May 30, 2003, 456 proposed and final NPL sites not owned by the federal government and 177 NPL sites located at federal facilities still required at least one further remedial action (U.S. EPA 2003a). Federal facilities on the NPL are addressed in Chapters 6, 7, and 8. Exhibit 3-1 presents the geographical distribution of the 456 NPL sites for which future RAs are planned among states and EPA regions. The data reflect the industrialized nature of these regions which have many abandoned industrial facilities. New Jersey, Pennsylvania, New York, California, Texas and Florida alone account for approximately 45 percent of these NPL sites.

For some of the 456 sites EPA has identified more than one operable unit (OU) or part of the site for which an RA is planned. The total number of OUs with planned RAs is 1,073. There may be more than one remediation or site investigation technology employed at a given OU. Forty-eight percent of these OUs are undergoing remedial investigations and feasibility studies (RI/FSs), and

**Exhibit 3-1. Location of NPL Sites With Planned Remedial Actions by State and EPA Region**




Notes: Includes 456 proposed and final National Priority List (NPL) sites not owned by the federal government.
Source: U.S. EPA, Office of Emergency and Remedial Response, CERCLIS, June 2003

still awaiting the selection of remedial technologies (Exhibit 3-2). For 52 percent, remedies have been selected, but not implemented (*i.e.,* RA has not begun). Although the specific technologies selected are not included in this report, Chapter 2 enumerates the treatment technologies previously selected at NPL sites and provides references for additional site-specific information.

**Exhibit 3-2. Phase of Remediation of Operable Units at Non-Federal NPL Sites with Planned Remedial Actions**

| Remedial Assessment Not Begun | Study Under Way | Remedy Selected | Design Under Way | Total Operable Units |
|---|---|---|---|---|
| 174 (16%) | 346 (32%) | 70 (7%) | 483 (45%) | 1,073 (100%) |

Note: Total sites equals 456; each site may contain more than one operable unit. There may be more than one remediation or site investigation technology employed at a given OU.

Source: Office of Emergency and Remedial Response, CERCLA Information System, June 2003.

Cleanup contractors for EPA-lead sites typically are selected after the remedial design (RD) has been completed. For PRP-lead sites, some PRPs may select a vendor to conduct both the RD and RA. Historically, PRPs have conducted RDs and RAs at about 70 percent of Superfund sites.

This report does not estimate the smaller market for remediation technologies in the Superfund removal program. As of the end of FY 2003, EPA had conducted over 7,000 removal actions at over 5,000 sites, over 80 percent of which are not currently NPL sites. It is difficult, to predict the number, type, and timing of the cleanup of these sites. Removals are usually limited to one year and $2 million, and historically have relied little on innovative technologies.

### *Future NPL Sites*

The above estimate of the number of NPL sites to be remediated does not include future listings on the NPL, which also represents a market for remediation technologies. The number of sites that eventually will be listed is uncertain and may depend upon several factors which are difficult to predict. Most regions and states do not have a proactive site discovery process aimed at developing a complete inventory, which would provide information for such predictions. From time to time, there are "pop-up" sites that are a surprise. The estimate of future listings is based on recent listing trends. In addition, an examination of the potential supply of hazardous waste sites was conducted to ensure that the projected listing rate is feasible.

Between 1993 and 2003, EPA listed 305 sites, or an average of 28 per year. This report assumes that listings will average 28 sites per year from 2004 to 2013, totaling 280 additional sites by 2013. If more "NPL-eligible" sites are found and evaluated, they may be addressed by other programs, such as RCRA Corrective Action or a state program, or may continue to await evaluation and/or cleanup. Because the decision on whether to list a site is complex, depending on many variables and input from many stakeholders, there is some uncertainty inherent in any

such prediction. Although EPA may continue to add sites to the NPL beyond 2013, longer-term scenarios are not included in this analysis because of uncertainties in making these predictions.

The 28-site per year estimate is within a range of estimates developed by a private environmental research group in 2001 (Probst & Konisky 2001). Based on interviews with EPA regions and nine states and an analysis of listing trends, this study predicted that new listings would range from 23 to 49 annually over a decade, with a most probable value of 35. In the three years since that study listings have averaged 23.

Based on information from two GAO reports (U.S. GAO 1998 and 1999) there appears to be a sufficient supply of Superfund-eligible and potentially-eligible sites in EPA's CERCLIS database to supply the assumed number of sites for listing. GAO identified 1,800 sites that have a Hazardous Ranking System (HRS) score of at least 28.5, which makes them eligible for consideration for listing. GAO also estimated that another 3,800 sites in CERCLIS are in earlier stages of the Superfund pipeline. Evaluations of the later sites have not progressed to the point where their NPL eligibility could be determined. Estimates of state and federal program managers have varied widely regarding the percentage of these sites that will ultimately be listed. Thus, we can only conclude that some portion of the 5,600 (1,800 + 3,800) sites awaiting a listing decision will eventually be listed on the NPL. In addition, from time to time, new site discoveries lead to new proposed listings. Thus the potential supply is not inconsistent with the 280-site assumption.

The characteristics of NPL sites vary with the basis for listing and when the listing occurs. The three basic mechanisms for adding sites to the NPL are the following:

- Each state may nominate a total of one site without regard to its Hazard Ranking System (HRS) score;
- The Agency may propose listing sites recommended by the Agency for Toxic Substances and Disease Registry; and
- A site may be evaluated with the HRS, and if the score is above 28.5, that score could be used to support adding that site to the NPL.

This third mechanism is the primary one used to add sites. In the earlier years of the program, sites listed on the NPL were ranked under the original HRS, which emphasized exposure to contaminated groundwater. The revised HRS also considers soil and sediment exposure and additional pathways (U.S. EPA 1990).

## 3.4 Site Characteristics

This section describes how frequently certain waste matrices and contaminants are being remediated at NPL sites. This information can be used to provide insight on the potential for the applications of certain remedial technologies at NPL sites where RAs are planned. Technologies that tend to be used at NPL sites are discussed in Chapter 2.

The analysis is based on a study of sites with signed RODs. As of May 2003, data on contaminants and contaminated matrices were available for 1,105 sites (U.S. EPA 2003a). Data

are not available for another approximately 50 sites with RODs, many of which had "No Action" RODs which do not call for remediation. Because these 1,105 sites represent 79 percent of the 1,395 non-federally owned sites ever listed or proposed for listing on the NPL as of May 2003, EPA believes that their characteristics are likely to be representative of those of other NPL sites.

### 3.4.1 Types of Contaminated Matrices

Exhibit 3-3 shows the percentage of NPL sites remediated for various contaminated matrices: 83 percent of sites require remediation of groundwater, 78 percent of soil, 32 percent of sediments, and 11 percent of sludge. Because too few RODs contain data on other types of wastes, such as waste piles and mine tailings, a meaningful analysis for those types of wastes could not be done.

**Exhibit 3-3. Frequencies of Contaminated Matrices at NPL Sites With RODs**




Notes: Based on data available for 1,105 National Priorities List sites with fiscal year 1982-2003 Records of Decision (RODs). A site may contain more than one contaminated matrix.

Source: U.S. EPA, Office of Emergency and Remedial Response, CERCLIS, June 2003.

### 3.4.2 Types of Contaminants

Sites with RODs were analyzed for the presence of three major contaminant groups: volatile organic compounds (VOCs), semivolatile organic compounds (SVOCs), and metals. These broad groups of contaminants were further divided into more specific treatability subgroups that better coincide with the application of certain technologies, such as bioremediation. The 12 most frequently occurring contaminants also are identified. Appendix A, Exhibit A-1 lists common chemicals in each group. Chemicals and elements are grouped in accordance with EPA test methods for evaluating solid waste and standard chemical references, which are also identified in the exhibit.

### *Major Contaminant Groups*

Exhibit 3-4 presents the frequency of cleanup of the major contaminant groups. VOCs, alone or in combination with other contaminant groups, are to be remediated at 78 percent of sites, followed by metals (77 percent) and SVOCs (71 percent). For this analysis the occurrence of a contaminant group at a site is counted only once, whether or not it was found in more than one matrix. These data also indicate that the NPL sites tend to be complex: all three groups (VOCs, SVOCs, and metals) are to be remediated at 52 percent of the sites and two groups are to be remediated at 24 percent of the sites, but not necessarily in the same matrix. The sites listed as "others" only contain contaminants described as radioactive elements, non-metallic inorganics such as nitric oxides, explosives and asbestos, or unspecified organics or inorganics.

**Exhibit 3-4. Frequencies of Major Contaminant Groups at NPL Sites With RODs**




Notes: Based on data available for 976 National Priorities List sites with fiscal year 1982-2003 Records of Decision (RODs). Percentages do not total to 100 due to rounding

The 24 sites listed as "others" contain only radioactive elements, non-metallic inorganics, or unspecified organics or inorganics.

Source: U.S. EPA, Office of Emergency and Remadial Response, CERCLIS, June 2003.

### *Subgroups of Volatile and Semivolatile Organics*

Two of the major contaminant groups, VOCs and SVOCs, were subdivided into more specific treatability subgroups that better coincide with the application of certain technologies, such as bioremediation. Exhibit 3-5 shows the frequency of cleanup of these subgroups as well as the metals group. The subgroups are described below, grouped according to the three major contaminant groups:

**Exhibit 3-5. Frequencies of Major Contaminant Subgroups at NPL Sites With RODs**




Notes: Based on data available for 976 National Priorities List Sites with fiscal year 1982-2003 Records of Decision (RODs). Contaminant information for 24 of the sites with data does not fall into these subgroups. A site may contain one or more of the 10 contaminant groups.

Source: U.S. EPA, Office of Emergency and Remedial Response, CERCLIS, June 2003.

- VOCs include: halogenated, BTEX (benzene, toluene, ethylbenzene, xylene), and other non-halogenated VOCs (ketones and alcohols). The most prevalent class of organics, halogenated VOCs, which are widely used as solvents, are being remediated at 675 (69 percent) of the sites. With regard to BTEX, although many of these compounds result from petroleum products, CERCLA prohibits listing sites on the NPL that are contaminated with petroleum products alone.

- SVOCs include: polychlorinated biphenyls (PCBs), polynuclear aromatic hydrocarbons (PAHs), pesticides, phenols (including pentachlorophenol), and other SVOCs, which include chlorobenzene and phthalates. The most common SVOCs are PAHs and phenols, to be addressed at 49 percent and 32 percent of sites, respectively.

- Metals include: lead, arsenic, chromium, cadmium, zinc, nickel, and other less frequently found metals.

For this analysis, each subgroup was counted only once per site, regardless of whether it occurred alone, with other types of contaminants, or in more than one matrix. Because more than one contaminant subgroup can be present at a site, the total number of occurrences is greater than the total number of sites.

### *Most Common Individual Contaminants*

Exhibit 3-6 shows the 12 contaminants most commonly found to need remediation at NPL sites. The list contains six VOCs and six metals. Again, a contaminant is only counted once for each site, even if it occurs in more than one matrix; and more than one contaminant can occur per site.

**Exhibit 3-6. Frequencies of the Most Common Contaminants at NPL Sites With RODs**




Notes: Based on data available for 976 National Priorities List Sites with fiscal year 1982-2003 Records of Decision (RODs). A site may contain one or more of these contaminants.

Source: U.S. EPA, Office of Emergency and Remedial Response, CERCLIS, June 2003.

## 3.4.3 Estimated Quantities of Contaminated Material

The market also can be described in terms of the quantity of contaminated material to be remediated. Fewer RODs contain quantity data than the number that contain contaminant and matrix information. The RODs for 42 percent of the 1,105 sites with RODs contain information on the quantities of soil, sludge, or sediment to be remediated using any method (*i.e.*, treatment, containment, or off-site disposal). The data from these sites are used to characterize the quantities of material requiring some type of remediation.

### *Distribution of Quantities*

Exhibit 3-7 presents the distribution of the total quantities per site of contaminated soil, sediment, and sludge requiring remediation. Based on these estimates, almost 44 percent of the sites are expected to contain 10,000 or fewer cubic yards, and less than 17 percent of the sites are expected to contain 100,000 or more cubic yards of contaminated material. These data indicate an appreciable market for technologies that can effectively treat small quantities of contaminated media, as well as a number of sites with larger quantities. These data include all available data on material to be treated, contained, or disposed. However, because reviews of

RODs indicate that quantities of waste to be capped often are not documented in the ROD, the proportion of sites that contain large quantities of wastes may be greater than the data indicate. The quantity distributions for soil, sediment, and sludge shown in Exhibit 3-7 involve primarily contaminated soil to be remediated.

**Exhibit 3-7. Distribution of Quantities of Contaminated Soil, Sediment, and Sludge at NPL Sites With RODs**

| Estimated Quantities (Cubic Yards) | Number of NPL Sites With Data By Matrix | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Soil | | Sediment | | Sludge | | Total | |
| | Federal Facilities | Non-fed. Facilities | Federal Facilities | Non-fed. Facilities | Federal Facilities | Non-fed. Facilities | Federal Fac. | Non-fed. Fac. |
| < 1,000 | 10 | 44 | 2 | 29 | 1 | 9 | 13 | 82 |
| 1,000 - 5,000 | 10 | 82 | 2 | 28 | 0 | 11 | 12 | 121 |
| 5,001 - 10,000 | 7 | 57 | 0 | 16 | 0 | 5 | 7 | 78 |
| 10,001 - 30, 000 | 9 | 95 | 3 | 14 | 1 | 14 | 13 | 123 |
| 30,001 - 50,000 | 10 | 52 | 2 | 10 | 1 | 11 | 13 | 73 |
| 50,001 - 100,000 | 6 | 39 | 2 | 9 | 0 | 12 | 8 | 60 |
| > 100,000 | 14 | 75 | 2 | 16 | 2 | 10 | 18 | 101 |
| Total | 66 | 444 | 13 | 122 | 5 | 72 | 84 | 638 |

Note: Data are from 714 NPL sites.

Source: U.S. EPA, Office of Emergency and Remedial Response, CERCLA Information System, June, 2003.

### *Quantities by Major Contaminant Group*

The quantities of contaminated material (soil, sediment, and sludge) at the 456 non-federal NPL sites with planned RAs were estimated for the three major contaminant groups (*i.e.*, VOCs, SVOCs, and metals) from estimates contained in the RODs for sites with similar contaminants. The average quantity for each contaminant group at the sites with ROD data was multiplied by the estimated number of sites that contain the same contaminant groups based on the percentages in Exhibit 3-4.

Exhibit 3-8 indicates the estimated quantities of contaminated materials at NPL sites by contaminant group. An estimated 74 million cubic yards of soil, sludge, and sediment are to be remediated at the sites. Much of this material, 66 million cubic yards, is accounted for by materials contaminated by metals alone, and in combination with other contaminants. VOCs, alone and combined with other contaminants, total 38 million cubic yards; and SVOCs total 60 million cubic yards.

In developing these estimates, it was assumed that all of the contaminated material at a site contained the contaminant groups present. The average site quantities by contaminant group

varied from a low of 45,000 cubic yards for a single group (other) to a high of 682,000 cubic yards for SVOCs and metals.

**Exhibit 3-8. Estimated Quantity of Contaminated Soil, Sediment, and Sludge for Major Contaminant Groups at NPL Sites With Planned Remedial Actions**

| Contaminant Group | No. of Sites With Data | Average Based on Available Data (Cu. Yds.) | Number of Sites With Planned Remedial Action [a] | Projected Total Quantity (Cu. Yds.) [b] |
|---|---|---|---|---|
| **Single Contaminant Group** | | | | |
| Metals | 46 | 230,920 | 46 | 10,622,320 |
| VOCs | 9 | 53,267 | 36 | 1,917,612 |
| SVOCs | 24 | 247,116 | 14 | 3,459,624 |
| Others | 5 | 45,556 | 9 | 410,004 |
| **Multiple Contaminant Groups** | | | | |
| VOCs & Metals | 27 | 46,450 | 41 | 1,904,450 |
| SVOCs & Metals | 40 | 681,618 | 32 | 21,811,776 |
| VOCs & SVOCs | 46 | 53,527 | 41 | 2,194,607 |
| VOCs, SVOCs & Metals | 255 | 135,683 | 237 | 32,156,871 |
| Totals | 452 | 1,494,137 | 456 | 74,477,264 |

Notes:
a Based on the distribution of contaminant groups among the 976 sites with contaminant data shown in Exhibit 3-4. Each site is placed in one subgroup only.
b The total for each subgroup is calculated by multiplying columns (3) and (4).

Source: U.S. RODs, fiscal years 1982-2003. Site-specific data are not available for all quantities of material to be remediated at all sites with planned remedial actions.

## 3.5 Estimated Cleanup Costs

EPA has estimated the value of the market for the 456 non-federal facility NPL sites with planned RAs. The estimated cost for non-federal already listed Superfund sites that have not begun RA is $15.5-23.3 billion in 2003 dollars. This estimate is based on an average cost per OU of $14.7 million ($1.4 million for RI/FS + $1.4 million for RD + $11.9 million for RA), and $10.3 million for long-term remedial action (LTRA) for sites that require long-term treatment to

restore groundwater and surface water (2003 dollars).[1] The range in values result from varying the RA costs by plus and minus 20 percent. The calculations are shown in Exhibit 3-9.

The unit cost estimates are applied to the 1,073 OUs that have not yet begun RA, as well as to the assumed 230-490 future NPL sites. It was assumed that 50 percent of sites with RD underway have already incurred the RD costs, 50 percent of sites with study underway already have incurred RI/FS costs, and 45 percent of all sites will require LTRA.

### Exhibit 3-9. Estimated Cleanup Costs for NPL Sites [a]

| | Low | Medium | High |
|---|---|---|---|
| **Existing Pre-RA Sites (In the Relevant Market) [b]** | | | |
| No. of Sites | 456 | 456 | 456 |
| No. of OUs | 1,073 | 1,073 | 1,073 |
| Total Cost | $15,516 mil | $19,395 mil | $23,274 mil |
| **Assumed New NPL Listings 2004 - 2013 [a]** | | | |
| No. of Sites Per Year | 23 [c] | 28 [d] | 49 [e] |
| Total over 10 years | 230 | 280 | 490 |
| Number of OUs | 541 | 658 | 1,152 |
| Total Cost | $8,363 mil | $12,726 mil | $26,725 mil |
| **Total NPL [a, b]** | | | |
| Current & Future NPL Sites | $23,879 mil | $32,121 mil | $50,000 mil |

Notes:
Low Cost of RI/FS+RD+RA = $11.6 million per OU (from text above) and 230 additional sites to the NPL.
Medium Cost of RI/FS+RD+RA= $14.7 million per OU (from text above) and 280 additional sites to the NPL.
High Cost of RI/FS+RD+RA= $17.6 million per OU (from text above) and 490 additional sites to the NPL.
NA Not applicable
LCC Life Cycle Cost, or cost to complete

a For purposes of this analysis, it is assumed that listings cease after 10 years, although cleanup work is likely to continue many years beyond. Although new sites may be added to the NPL beyond 10 years, they are not included because of uncertainties in predicting NPL listings.
b Does not include costs for sites that have begun RA.
c Low case in the Resources for the Future study, derived from the average for 1996-1999 (Probst & Konisky, 2001)
d Average of 1993-2003 actual additions to the NPL
e High case in the Resources for the Future study (Probst & Konisky 2001)

[1] These 2003 figures are adjusted from 1999 dollars reported in the 2001 Resources for the Future study ($1.3 million each for RI/FS and RD, 11.0 million for RD) ± 20% (Probst & Konisky, 2001). The average LTRA cost per OU was reported in a 2001 EPA study using data from 79 LTRA projects as $10.0 million and adjusted to 2003 dollars (U.S. EPA 2001). Price adjustments are based on the gross domestic product (GDP) price deflator.

This estimate does not include (a) costs for federal facility NPL sites, which are described in Chapters 6 through 8, (b) the cost of continuing work at NPL sites that have already begun remedial action, and (c) costs for site assessments, removals, administrative costs such as payrolls, other federal agency support, oversight of potentially responsible party (PRP)-lead cleanups, and enforcement activities. This estimate is more than twice that of a similar estimate in the 1997 edition of this report. The difference is explained by an 18 percent increase in the general price level, the fact that the remaining sites on the NPL that have not begun RA are expected to be more complex and have more OUs than the average for previous NPL sites, and the fact that LTRA costs were not included in the previous report.

Using the same unit cost estimates per OU, and assuming 23-49 sites will be listed annually, the 230-490 sites assumed to be listed over the next 10 years will cost $8.7-26.7 billion (at the assumed most-likely value of 28 sites annually for 10 years, the cost would be $12.7 billion). If more or fewer sites are listed, this total would be adjusted accordingly. This estimate is based upon the above assumptions plus the expectation that future sites will be more complex, larger, and have more OUs per site than the average NPL site in the past.

Another indication of the amount of cleanup effort likely to be undertaken is the size of the EPA Superfund budget. During the mid-1990s, Congress allocated $1.4 billion annually. By 2002, budget authority had dropped to $1.27 billion (excluding a post-911 appropriation), and by 2003, it was $1.24 billion. For 2004, EPA has requested $1.39 billion. The EPA budget does not include costs incurred by PRPs, states, or other federal agencies. Although the Superfund budget has been relatively stable in nominal dollars, it has declined about 15 percent between 2000 and 2003 in real (adjusted for inflation) dollars.

Although it is useful to examine the trends in the Superfund budget, these figures do not coincide with total national expenditures for site work. Since the EPA budget does not include costs incurred by PRPs, states, or other parties, the budget data do not compare with the above market value estimates. The market estimates include both cleanup costs incurred by PRPs and other parties and direct costs paid by EPA for sites for which there is no available responsible party. The amount paid by responsible parties compared to EPA varies from project to project and is difficult to forecast.

In addition to site work at Fund-paid sites, EPA's Superfund budget also pays for activities that are not for direct site work, such as administration and management, cost recoveries, enforcement, removals and other short-term actions, oversight of PRP activities, and research and development. About 25-35 percent of the EPA Superfund budget typically goes to long-term site remediation activities. Thus, the above market value estimates were not developed to be used for budget analysis or planning.

## 3.6 Market Entry Considerations

Technology decisions for Superfund sites are based on the specific information available for each site and the state-of-the-art of the available technologies. Information on new technologies is particularly critical at two points in the decision-making process: during remedy selection, and during remedy design and procurement. This section describes how technology vendors can

benefit from understanding how site managers consider their options during these two cleanup phases.[2]

### 3.6.1 Market Considerations During Remedy Selection

The Superfund RI/FS process is an integrated, phased approach to characterizing the site risks and evaluating remedial alternatives. Early in the RI/FS stage, technologies are identified and screened with respect to technical implementability, effectiveness, and relative cost. To ensure that Superfund site managers and consulting engineers consider a given technology, it is important to make them aware of the technology at this early stage. During the final technology evaluation, later in the RI/FS, technologies are compared and evaluated using the nine evaluation criteria specified in the National Contingency Plan (NCP). Information on technology performance and cost is particularly important during this final evaluation. EPA and engineering consulting firms (who usually conduct the RI/FSs for EPA, states, and PRPs) use a variety of information sources, many of which are described in Section 2.3, to identify potential technologies and to make their capabilities more widely known. Since information for innovative technologies may be limited, treatability studies or on-site demonstrations may be used to assess cost and performance.

While Superfund policies encourage the selection and implementation of new technologies, the Superfund remedy selection process can present some hurdles for innovative technology vendors because:

- Information on innovative technologies is often limited. Superfund site managers and consulting engineers may not have as much information on the performance and cost of an innovative technology as for an established technology. Reports and databases about established remedial technologies have already been developed. Superfund site managers may have difficulty comparing the merits of an innovative to a conventional technology if they do not have information on a technology's cost, implementability, short- and long-term effectiveness, and ability to reduce the toxicity, volume, or mobility of the contaminants.

- Treatability studies and on-site demonstrations may be impractical. The NCP and EPA policy encourage the use of bench- or pilot-scale treatability studies, when appropriate and practical (EPA, 1990). EPA policy stipulates that: *promising new technologies should not be eliminated from consideration solely because of uncertainties in their performance and cost, particularly when timely treatability study could resolve those uncertainties* (U.S. EPA 1996a). In reality, the funding and schedule for site cleanup, as well as contracting and regulatory impediments, may preclude the use of studies and demonstrations.

- The RI/FS contractor may be prohibited from bidding on the RA. For example, at EPA-lead and state-lead sites, the remedial design contractor at a site usually does not conduct the remedial action. A technology vendor that has the capability to provide both RI/FS and

[2] A useful source for tools to help technology vendors advance and implement their technologies is the Vendor Support web site maintained by OSRTI, http://clu-in.org/vendor/.

RD/RA services should determine the relative value of the two opportunities before deciding which service to provide.

To make their capabilities more widely known, technology vendors may consider participating in the programs cited in Section 2.3, and contacting remedial project managers (RPMs) and consulting engineers. A vendor who is interested in a particular NPL site, may contact the assigned EPA RPM for more information. The appropriate EPA regional office or web site, listed in Appendix A, can provide the identity of the RPM for a specific site. Also, information on specific technologies may be provided to consulting engineers for their consideration in the analysis of cleanup options. Appendix A also includes a list of current regional service contracts (RACs).

### 3.6.2 Market Considerations During Design and Procurement

Once a remedy has been selected and documented in a ROD, the project enters the design process, where the details of the cleanup, such as waste quantities and performance standards, are more clearly defined. At this stage, federal and state agencies can make use of technology information for preparing requests for proposals and evaluating bids.

All Superfund sites requiring cleanup for which EPA has the lead currently are funded by one of the following mechanisms:

- Remedial Action Contracts (RACs): The RACs provide professional architect/engineering services to EPA to support response planning and oversight of CERCLA. These services include: program support (management); remedial investigation and feasibility studies; engineering services to design remedial actions; engineering evaluations and cost analyses for non-time-critical removal actions, including issuing and managing subcontracts for construction of the selected remedy, and engineering services for construction oversight. RAC services also include enforcement support, such as negotiation support, and oversight of RI/FS studies, remedial designs, and remedial actions; and other technical assistance, including community relations, sampling and analysis, and pre-design investigations. Services may also include technical and management services supporting EPA's coordination and/or oversight of remedial activities performed by a State, the U.S. Army Corps of Engineers, or responsible parties.

- Emergency and Rapid Response Services (ERRS) Contracts: The ERRS contracts provide emergency, time-critical removal, and quick remedial response cleanup services for the CERCLA, Oil Pollution Act (OPA), and Underground Storage Tank (UST) programs. They provide cleanup personnel, equipment, and materials to contain, recover, or dispose of hazardous substances, analyze samples, and restore sites. Because of the broad range of cleanup services needed and the rapid time frame within which the contractors must respond, it is likely that the contractors will do substantial subcontracting.

- Interagency Agreements (IAGs): EPA enters into agreements with the U.S. Army Corps of Engineers, Bureau of Reclamation, or other federal agencies.

- Cooperative Agreements (CAs): EPA enters into agreements with states, political subdivisions, or Native American Tribes. The state performs work with its own resources, or by contracting for needed goods and services with private firms.

As previously stated, a list of regional service contracts is included in Appendix A, Exhibit A-2.

The most definitive sources of information on selected remedies for sites entering RD and RA are the RODs, *Treatment Technologies For Site Cleanup: Annual Status Report (Eleventh Edition)* (U.S. EPA 2004a), and the *Annual Status Report Remediation Database* (U.S. EPA 2004b). The RODs provide detailed information on the site contaminants and risks posed, the selected remedy, estimated costs, and associated cleanup levels. ROD information is also available on the EPA web site (http://www.epa.gov/superfund/sites/rods/index.htm). A copy of the ROD and other site background documents can also be obtained by contacting the Regional Community Involvement Coordinator (CIC) for the site and by visiting the site information repository. The location of the site information repository may be obtained from the EPA web site or the CIC. The Superfund Public Information System (SPIS), available on CD ROM, also contains ROD documents and abstracts as well as CERCLIS and Archive data. The SPIS is available on CD-ROM from the National Technical Information Services (NTIS), (telephone 1-800-553-6847) or from their web site at order@NTIS.gov. Their product number is SUB-5462.

For information on innovative treatment and selected established technologies, the *Annual Status Report Remediation Database* (U.S. EPA 2004b) provides the most current summary information on the contaminants and media to be remediated, anticipated or actual cleanup schedules, and expected site lead (EPA, state, PRP).

A vendor may use these publications to identify opportunities or assess remediation service or technology needs. Vendors also may provide cost, performance, and availability information to the EPA RPM or state site manager and the site remedial design firm or agency. Vendors can enhance their responsiveness to requests for proposals (RFPs) for site remedial actions by keeping abreast of site activities. Once an RFP has been issued, the award of a contract may take weeks or months.

### 3.6.3 Research, Development, and Demonstration

Technology vendors, property owners, A/E firms, site managers, and other stakeholders may benefit from new applications that are currently in various stages of research, development, testing an evaluation. Likewise, some vendors or technology developers may need help to disseminate information about their technologies and services. Section 2.3 describes the major programs that conduct or support RD&D, as well as sources to help vendors publicize to all stakeholders the capabilities of their technologies.

## 3.7 References

Probst, Katherine N. & David M. Konisky, et. al., 2001. *Superfund's Future, What Will It Cost*, Resources For the Future, Washington, D.C. 2001.

Russell, Milton, et. al., 2001. *Superfund Remediation Decisions: Quantitative Analysis of Experience*, 1987-2000 and *Policy Implications- Phase I Report*, Joint Institute for Energy and Environment, Knoxville, TN, October 2001.

U.S. EPA (Environmental Protection Agency), 1990. "Hazard Ranking System; Final Rule," 55 *Federal Register* 51532, Vol. 55, No. 241, Part II, December 14, 1990.

U.S. EPA, 1992. *Test Methods for Evaluating Solid Waste, Physical/Chemical Methods, Third Edition, Proposal Update II*, PB94-170321, Office of Solid Waste and Emergency Response, November 1992.

U.S. EPA, 1996a. *Initiatives to Promote Innovative Technology in Waste Management,* OSWER Directive 9380.0-25, Office of Solid Waste and Emergency Response, April 29, 1996.

U. S. EPA, 1996b. *The Facts Speak For Themselves: A Fundamentally Different Superfund Program*, Office of Emergency and Remedial Response, November 1996.

U.S. EPA, 2001. *Groundwater Pump and Treat Systems: Summary of Selected Cost and Performance Information at Superfund-financed Sites,* EPA-542-R-01-021b, Office of Solid Waste and Emergency Response, December 2001. http://www.clu-in.org

U. S. EPA, 2002. *Records of Decision (RODs), 1982-2002,* on CD-ROM, PB96-593551, Office of Emergency and Remedial Response, 2002.

U.S. EPA, 2003a. CERCLA Information System (CERCLIS), Office of Emergency and Remedial Response, June 2003.

U.S. EPA, 2004a. *Treatment Technologies For Site Cleanup: Annual Status Report (Eleventh Edition),* EPA-542-R-03-009, Office of Solid Waste and Emergency Response, February 2004. http://www.clu-in.org/asr

U.S. EPA, 2004b. *Annual Status Report Remediation Database,* Office of Solid Waste and Emergency Response. http://epa.gov/tio/technologies

U.S. EPA, 2004c. National Advisory Council for Environmental Policy and Technology (NACEPT), web site. http://www.epa.gov/oswer/SFsub.htm

U.S. EPA, 2004d. *Superfund: Building on the Past, Looking to the Future*, ("120-day study"), April 22, 2004.

U.S. EPA, 2004e. Vendor Support, web site maintained by Office of Superfund Remediation and Technology Innovation to provide tools to help remediation technology vendors advance and implements their technologies. http://cluin.org/vendor

U.S. GAO, 1998. *Hazardous Waste, Information on Potential Superfund Sites,* GAO/RECD-99-22, U.S. General Accounting Office, November 1998.

U.S. GAO, 1999a. *Superfund: Progress Problems, and Future Outlook,* GAO/T-RCED-99-128, U.S. General Accounting Office, March 23, 1999.

U.S. GAO, 1999b. *Superfund Progress and Challenges*, Statement for the Record by David G. Wood, Associate Director, Environmental Protection Issues, Resources, Community, and Economic Development Division, GAO/RCED-99-202, U.S. General Accounting Office, May 25, 1999.

U.S. GAO, 1999c. *Hazardous Waste, Observations on EPA's Cleanup Program and Budget Management Practices,* GAO/T-RCED-99-168, U.S. General Accounting Office, April 29, 1999.

U.S. GAO, 1999d. *Superfund: Half the Sites Have All Cleanup Remedies in Place or Completed,* GAO/T-RCED-99-245, U.S. General Accounting Office, July 1999.

U.S. GAO, 2001. *EPA's Expenditures to Clean Up the Bunker Hill Superfund Site*, GAO-01-431R, U.S. General Accounting Office, March 28, 2001.

# Chapter 4
# Demand for Remediation of RCRA Corrective Action Sites

Prior to the passage of the Resource Conservation and Recovery Act (RCRA) (42 U.S.C. §§6901-6922k), facilities that treated, stored, or disposed of hazardous waste, and occasionally waste generators and transporters (collectively known as waste handlers) often experienced releases of waste into the environment. Much of that waste, which is similar to the hazardous waste found at Superfund sites, was disposed of intentionally or unintentionally on the land. A number of RCRA sites have remediation needs that equal or exceed those of many Superfund sites. Although not all RCRA sites will require cleanup, this program represents a substantial market for environmental site characterization and cleanup services.

RCRA assigns the responsibility of corrective action to facility owners and operators and authorizes EPA to oversee corrective action. Unlike Superfund, oversight responsibility is delegated to authorized states. EPA estimates that the universe of RCRA hazardous waste handlers subject to corrective action exceeds 6,600 sites. EPA has discretionary or statutory authority to impose corrective action on these sites, when necessary. Of the 6,600 sites, about 3,800 are likely to require corrective action. These sites have had a preliminary evaluation by a regulatory authority and, based on these evaluations, are required to undergo further investigation and/or cleanup. EPA and the states are examining the extent of that contamination and the scope of corrective action needed at these sites.

Although RCRA requires that all sites in need of corrective action be cleaned up, EPA has set ambitious interim cleanup targets for 1,714 sites identified by EPA and the states as warranting early action. EPA and the authorized states selected these sites, known collectively as the RCRA Cleanup Baseline, because they pose potential unacceptable exposures of contaminants to humans and/or are likely to spread groundwater contamination. By 2005, 95 percent of these baseline sites will have controlled the potential for human exposure, and 70

***Highlights***
- EPA and the states have identified 3,829 sites that are likely to require corrective action.
- EPA and the states have identified 1,714 sites, known collectively as the RCRA Cleanup Baseline, that warrant early action to control current human exposures and migration of contaminated groundwater.
- During the past five to ten years, refinements in site characterization methods have been resulting in reduced site-assessment costs, improved data quality, expanded applicability of less traditional remedies, and improved remedy design.
- The pace of the cleanups is likely to be affected by fluctuations in state budgets. State staffing levels and budgets (in nominal dollars) for hazardous waste remediation and oversight has not increased in about a decade.
- Land development trends are also likely to affect the pace and nature of RCRA cleanups, since property transfers or redevelopment generally require site assessments and, if necessary, remediation.
- Based on limited samples of sites, over 80% of RCRA sites require remediation of groundwater, 60% of soil, 10% each of sludge and surface water, and 6% of sediments.
- Based on limited samples of sites, VOCs are to be remediated at 60% of sites, followed by

percent of them will have controlled the migration of contaminated groundwater thereby decreasing the immediate health risks from these sites. Achieving these goals will enable the Agency to meet its interim goals for corrective action set under the Government Performance and Results Act (GPRA) of 1993. Nevertheless, in most cases, the interim goals are not the final remedy. While achieving final cleanups is not likely to occur as quickly as meeting the interim goals, the steps taken to attain interim goals are directing attention to cleanup at most baseline sites.

## 4.1 Program Description

RCRA has a long and complex regulatory history that has led to a performance-based approach to evaluating and cleaning up contaminated sites. To develop a practical understanding of this market, it is useful to understand this history, the general process that has evolved for managing RCRA sites, and how these steps are implemented by EPA and authorized states.

### 4.1.1 Regulatory History

RCRA mandates several regulatory programs, but the largest is the waste management program, known as Subtitle C. Subtitle C sets forth comprehensive national requirements for managing the treatment, storage, disposal, and recycling of solid and hazardous waste. Among other provisions, Subtitle C establishes a management system to control new hazardous waste from the time it is generated to its ultimate disposal ("cradle-to-grave"). In addition to its primary purpose of preventing releases of process waste into the environment by minimizing waste generation and by creating reuse and recycling incentives, Subtitle C contains important requirements that address releases of contaminants into the environment from RCRA sites. It is these requirements that influence the nature and amount of nationwide cleanup activities.

Releases of contamination at RCRA sites are addressed under the RCRA Corrective Action program, which is administered by EPA's Office of Solid Waste (OSW), EPA regional offices, and states that EPA has authorized to implement the program. Congress initially authorized EPA to promulgate requirements for monitoring and remediating only on-site releases to groundwater from hazardous waste management units, such as landfills. Later, with enactment of the 1984 Hazardous and Solid Waste Amendments (HSWA) of RCRA, Congress greatly expanded EPA's corrective action authority to include releases to all environmental media from regulated solid waste management units (SWMUs) at treatment, storage, and disposal facilities (TSDFs) seeking permits under Subtitle C. A solid waste management unit is a discernible unit in which solid waste has been placed at any time, irrespective of whether the unit was intended for the management of solid or hazardous waste. This definition includes any area of a facility at which solid waste has been routinely and systematically released. A release may include intentional or accidental spillage, leakage, pumping, pouring, emitting, emptying, discarding, injecting, escaping, leaching, dumping, or disposal of hazardous waste into the environment. It also may include the abandonment or discarding of barrels, containers, and other closed receptacles containing hazardous waste or hazardous constituents. RCRA Corrective Action can be conducted at any RCRA facility that handles hazardous waste.

In 1990, EPA proposed detailed regulations intended to govern the technical and procedural aspects of corrective action (40 CFR Part 264 Subpart S) (EPA 1990a) and in 1996, published an Advance Notice of Proposed Rulemaking (ANPR) that established guidance on areas of the program not addressed by the 1990 proposed regulations (U.S. EPA 1996a). Many provisions in these proposed rules were withdrawn, and only the ANPR continues to serve as EPA's primary corrective action implementation guidance.

In implementing the program, EPA and the authorized states have revised the basic approach to corrective action by (a) establishing interim goals that rely on near-term actions to reduce imminent threats and prevent further spread of contamination that had been released into the environment; (b) establishing long-term remediation goals; (c) streamlining the procedures for addressing newly generated waste that previously posed unintended barriers to cleaning up RCRA sites (remediation waste); (d) increasing emphasis on using risk-based approaches and parity with Superfund program requirements in determining appropriate cleanup levels; and (e) implementing a number of reforms to streamline program administration. EPA's intent has been to limit the regulatory barriers impeding timely and cost-effective cleanups, control present risks posed by RCRA sites, and allow EPA and authorized states to exercise considerable flexibility throughout the site management process.

### *Interim Goals*

In conjunction with the proposed Subpart S regulations of 1990, EPA issued the *RCRA Implementation Study*. This report addressed the long-term goal of cleaning up RCRA sites but emphasized the importance of interim environmental actions to reduce imminent threats and prevent further spread of contamination that had been released into the environment (U.S. EPA 1990b). Soon after, EPA established procedures in the 1992 *RCRA Stabilization Strategy* for implementing near-term actions to prevent the migration of contamination within and outside facility boundaries (U.S. EPA 1991).

In 1993, EPA merged the Agency's near-term strategic interests in preventing human exposures and the spread of contamination with the GPRA goals. EPA also considered stakeholder concerns that the Corrective Action program was focused more on the process of cleanup than on outcomes. Therefore, in 1994, EPA established environmental indicators to measure near-term results at RCRA sites, effectively moving the focus of the Corrective Action program from process to outcomes. The two environmental indicators against which progress towards the 2005 GPRA goals are being measured are (1) the control of current human exposures, and (2) the control of migration of contaminated groundwater. These indicators provide a means of evaluating and reporting on current site conditions rather than on the conditions of sites following final cleanup. Considerable progress has been made toward this end. EPA and the states have identified 1,714 sites that warrant early action. See EPA's Corrective Action web site for the latest information on specific sites and progress at http://www.epa.gov/epaoswer/hazwaste/ca/facility.htm.

### Long-Term Goals

Meeting the interim environmental indicator goals generally represents only a small component of a typical site's final corrective action. The ultimate goal of RCRA Corrective Action is to achieve final remedies that are appropriate for reasonably anticipated future land uses. EPA, the states, and other stakeholders are developing specific long-term goals for corrective action and are continuing to streamline the administrative process in anticipation of cleaning up all high, medium, and low-priority RCRA sites in the decade ahead. EPA and the states have identified 3,829 sites that are likely to require corrective action.

### Remediation Waste

Early in the 1990s, EPA recognized that several Subtitle C regulations, which control newly generated waste, also pose unintended barriers to managing "remediation waste," which is waste generated during RCRA Corrective Action. To minimize or eliminate these and other barriers, the Agency and authorized states, with advice from stakeholders, took several actions.

In 1993, EPA proposed the Corrective Action Management Unit (CAMU) rule allowing sites to place waste generated during a cleanup into a CAMU or a temporary unit without first having to treat it. CAMUs are physical, geographic areas within a facility designated during cleanups for the treatment, storage, or disposal of remediation waste. Temporary units are tanks or container storage areas designated during cleanups for use solely to treat or store remediation waste. The CAMU rule eased the land disposal restrictions for remediation waste generated during a cleanup, thus exempting these units from the Subtitle C land disposal unit minimum technology requirements (§264.552 (a)(2)) (U.S. EPA 1993a). The CAMU rule established general performance-based standards to accommodate the variety of site situations that exist in the RCRA program and granted EPA and authorized states considerable regulatory relief and flexibility in the use of CAMUs and temporary units.

The rule was intended to result in more expeditious on-site treatment of greater volumes of remediation waste at less cost. However, in spite of broad support, the rule was challenged in court due in large part to concern that it lacked explicit waste treatment and unit design requirements for CAMUs. Following this challenge, EPA agreed to re-examine the CAMU rule in the context of developing the 1996 proposed Hazardous Remediation Waste Management Requirements (HWIR-Media) rule, and the litigation was stayed pending the outcome of this rulemaking process.

When EPA published the final HWIR-Media rule (63 FR 65874) in 1998, the specific provisions of the rule did not address the basic concerns of the litigants (U.S. EPA 1998a). To remove the litigation cloud that had been deterring the use of CAMUs in the field since 1993, EPA agreed in 2000 to amend the 1993 rule by imposing several minimal waste treatment and design standards and limits on the types of waste that may be managed in a CAMU. The CAMU definition was also modified to specify that CAMUs be located within contiguous property under the control of the owner/operator where the waste originated. The final amendments to the CAMU Rule became effective in January 2002 (U.S. EPA 2002a).

In 1998, EPA finalized selected portions of the 1996 proposed Hazardous Remediation Waste Management Requirements (HWIR-Media) rule (U.S. EPA 1998a). Although the final rule does

not provide the broad reforms proposed in the 1996 HWIR-media rule (U.S. EPA 1996b), it does offer relief from some of the Subtitle C requirements on TSDFs during cleanup operations. It also makes available a special form of RCRA permit, called a remedial action plan (RAP), for the treatment, storage, or disposal of waste generated during cleanup activities. RAPs provide an alternative to traditional permits and help expedite cleanup.

Until that time, the treatment, storage, or re-disposal of hazardous remediation waste required the same type of traditional, facility-wide RCRA permit (Part B permit) as a TSDF engaged in managing process waste. Obtaining such a permit can take several years. The final HWIR-Media rule removed the facility-wide corrective action requirements and made available flexible performance-based standards that may be imposed via a traditional Part B permit or a RAP for remediation waste management sites. The new performance-based standards may be applied in lieu of 40 CFR 264 Subparts B, C, D, and 264.101.

The final HWIR-Media rule also contained a number of important provisions, including the creation of a new kind of waste management unit called a staging pile for storing (not treating) waste, which then is not subject to land disposal restrictions (LDRs) or minimum technology requirements (MTRs). The rule excludes dredged materials from RCRA Subtitle C regulations if the materials are managed by an appropriate permit under the Clean Water Act or the Marine Protection Research and Protection Act. The rule also simplifies the procedures states must follow when seeking authorization to manage their RCRA programs.

In 1998, EPA established alternative treatment standards under Phase IV of the LDR for contaminated soil produced during cleanup operations. If remediation waste is not amenable to waste-specific standards specified in the LDR (§268.40), a facility may apply the alternative treatment standards (§268.49; 63 FR 28556; May 26, 1998) promulgated pursuant to the 1984 HSWA (U.S. EPA 1998b). These standards are less stringent than those in §268.40.

Also in 1998, EPA amended the rule that specified the requirements for closing land disposal units containing hazardous waste. The amendment allowed EPA and authorized states to use a variety of authorities to impose requirements on non-permitted land disposal units requiring post-closure care and allowed for the closure of certain land-based units with released hazardous constituents to be addressed through the Corrective Action program (U.S. EPA 1998c). These changes give regulators increased flexibility to use alternate mechanisms under a variety of authorities to address closure requirements based on the particular needs of the facility.

As part of ongoing efforts to improve program coordination, the Agency issued a final memorandum entitled Risk-Based Clean Closure in 1998. The Risk-Based Clean Closure memorandum provides additional guidance on EPA's interpretation of clean closure, specifically with respect to the amount of residual contamination that may remain in an environmental medium while still meeting the clean closure standards (U.S. EPA 1998d). Further guidance on "restricted-use clean closure" is available in Final Guidance on *Completion of Corrective Action Activities at RCRA Facilities*, which guides EPA and authorized states through the process of determining when a cleanup is complete (U.S. EPA 2003a).