### *Risk-Based Corrective Action*

EPA issued a parity policy in 1996 between the CERCLA (Superfund) and RCRA Corrective Action programs, entitled *Coordination Between RCRA Corrective Action and Closure and CERCLA Site Activities* (U.S. EPA 1996c). This guidance describes the conditions under which acceptance of decisions made by other remedial programs may be used. It recommends risk-based approaches when developing cleanup levels for RCRA regulated units and establishes the general principle that RCRA and CERCLA cleanups will achieve similar environmental results, thereby establishing a policy that cleanups under one program will be acceptable to the other program. It also identifies situations when deferral of activities to other programs is appropriate, and encourages coordination among the various cleanup programs at the federal and state levels. Risk-based corrective action provides an alternative to the use of strict numeric standards for specific contaminants as endpoints for cleanup activity, which is generally less cost effective.

### *RCRA Cleanup Reforms*

Through a series of administrative reforms, known as the RCRA Cleanup Reforms, EPA continues to work with the states and stakeholders to develop new results-oriented cleanup guidelines, foster outreach and training to encourage flexible approaches to corrective action, and enhance community involvement. The RCRA Cleanup Reforms are expected to nurture creative, practical approaches which, in the field, means eliminating unnecessary administrative or technical steps, evaluating sites for overall risk, and applying appropriate risk-based facility-wide corrective action measures.

Several guidance documents have been issued since 1999 to promote effective cleanup results and enhance public involvement. For instance, EPA's final *Handbook of Groundwater Protection and Cleanup Policies for RCRA Corrective Action*, issued in 2002, is intended to help regulators, owners and operators of RCRA sites, and the public locate and understand EPA policies on groundwater use, protection, and cleanup within the framework of applicable state requirements (U.S. EPA 2002b). The *Results-Based Approaches and Tailored Oversight Guidance for Facilities Subject to Corrective Action Under Subtitile C of the Resources Conservation and Recovery Act* encourages technical and administrative innovation to achieve environmentally protective cleanups on a facility-specific basis (U.S. EPA 2003c). The approaches discussed in the document offer regulators flexibility in setting cleanup goals, planning data collection efforts, and letting owners/operators undertake cleanup actions with reduced Agency oversight when appropriate. A January 2001 memorandum discusses a variety of new enforcement approaches, such as reduced agency oversight and flexible compliance schedules, that are available to EPA and authorized states to help accomplish timely, protective, and efficient corrective action (U.S. EPA 2001).

EPA has also expanded outreach and developed comprehensive training as part of the 1999 reforms. Some of the training gives EPA and state regulators the opportunity to learn from their peers about successful cleanup approaches. EPA has also begun piloting the most innovative of these approaches at the site level. Twenty-five pilots were launched in the first year. Creating partnerships, training, connecting communities with cleanups, and capitalizing on the redevelopment potential of RCRA sites are likely to increase the number of cleanups started during this decade.

### 4.1.2 Corrective Action Process

A rigid process-oriented framework, such as that proposed in Subpart S (U.S. EPA 1990a) and the 1994 Corrective Action Plan (U.S. EPA 1994a), is not always applicable to the wide range of contamination problems at the diverse types of RCRA sites. The 1996 Advanced Notice of Proposed Rulemaking (ANPR), EPA's primary corrective action implementation guidance, emphasizes a performance-based approach and asserts that the elements of the process should not become ends in themselves (U.S. EPA 1996a). EPA recommends that cleanups be guided by several operating principles:

- Corrective action decisions should be based on risk;
- Corrective action should focus on results rather than process;
- Interim actions and stabilization should be used to reduce risks and prevent exposure;
- Corrective action activities should be phased to focus resources on the areas or exposure pathways of highest concern;
- Corrective action requirements should be addressed using the most appropriate authority, including state authorities, for any given facility (In certain cases, the states may rely on non-RCRA state authorities to satisfy correction action requirements); and
- Corrective action implementation should provide for meaningful inclusion of all stakeholders through full, fair, and equitable public participation.

Although the implementation of corrective action varies from site to site, it generally begins with an evaluation of existing site conditions, including information from the initial site assessment, called a RCRA facility assessment (RFA). EPA or an authorized state conducts the RFA, which involves examining a facility's SWMUs to determine if a release has occurred or if the potential for a release exists.

While site characterization is underway for the final cleanup, the owner or operator of a facility may be required to conduct an interim action, such as stabilizing contaminated waste to prevent the spread of contamination or providing an alternative source of drinking water if actual or potential contamination of drinking water supplies exists. Although an interim action typically occurs early during the investigation of the site, it may take place at any time prior to completion of the final remedy.

When additional site information is necessary to support an interim action, cleanup decision, or achievement of environmental indicators, the facility owner or operator may conduct a RCRA facility investigation (RFI). The RFI involves sampling, modeling, and other testing to determine the nature and extent of contamination and to characterize the site's geological and hydrological conditions.

If a corrective action is needed, a site owner will conduct a corrective measures study (CMS) to evaluate alternative remediation approaches and select a preferred alternative as the remedy. Sometimes, the CMS, which is the responsibility of the facility owner or operator with oversight from EPA or the state, can be conducted concurrently with the RFI. In cases where EPA or a state is using performance standards or a similar approach, or where the preferred remedy is apparent early in the process, the CMS may be highly focused. Upon approval of a remedy by

the regulatory agency, the owner or operator may begin corrective measures implementation (CMI), which involves designing, constructing, maintaining, and monitoring the remedial measure. EPA recommends that current and reasonably expected future land uses be considered when selecting corrective action remedies.

### 4.1.3 Corrective Action Implementation

#### *State Authorization*

States are the primary implementors of the RCRA program, including RCRA Corrective Action. EPA provides several million dollars annually in grants to states for state oversight of cleanup at RCRA sites. As of April 17, 2003, EPA has authorized 48 states, some territories, and the District of Columbia to manage their own base programs for waste management and prevention. Thirty-nine states and one territory are authorized to oversee RCRA Corrective Action. EPA regional offices have the lead responsibility for implementing the program in Indian Territories and in states that have yet to be authorized for corrective action. Many other states have for some time been operating similar corrective action programs under their own authorities. The states have no RCRA universe of their own that is not reported to EPA. EPA's State Authorization Tracking System (StATS) tracks the status of each state and territory in establishing and maintaining RCRA authorized hazardous waste programs, including corrective action (see http://www.epa.gov/epaoswer/hazwaste/state/stats/stats.htm).

Prior to granting a state or territory full authorization for corrective action, EPA regional offices may develop grants and cooperative agreements under RCRA §3011 giving the state the lead for corrective action oversight at specific sites. Although authorized state programs must meet the minimum federal requirements, a state may adopt regulations that are more stringent than the federal requirement.

#### *Permitting and Enforcement*

Corrective action may be implemented through the RCRA permit process, state or federal enforcement orders, or voluntarily. All sites that are required to have RCRA permits, such as TSDFs, and those sites where EPA or a state has discretionary authority under RCRA to impose corrective action, are subject to corrective action requirements. About 86 percent of RCRA sites subject to corrective action are TSDFs. Corrective action may be imposed to clean up on-site contamination, offsite contamination, and one-time spills.

EPA or an authorized state permits all TSDFs to treat, store, or dispose of hazardous waste. Section 3004(u) of HSWA, which is directed specifically toward controlling releases from SWMUs, is the primary authority requiring corrective action at permitted TSDFs. It compels a facility owner or operator to address SWMU releases due to past disposal or recent contamination whenever seeking a RCRA permit. Additional authority is available under §3004(v) of HSWA to require a permitted TSDF to clean up contamination beyond the facility boundary. Thus, HSWA requires all hazardous waste facilities that obtain a RCRA permit after November 8, 1984, to take corrective action for any releases from past disposal or recent contamination from the facility, including all SWMU and off-site releases. For a TSDF operating under interim status rather than a RCRA permit, EPA can invoke HSWA §3008(h), which provides for

enforcement orders, or state orders in an authorized state, to address any release of hazardous waste. The corrective action process for both permitting and enforcement orders is similar.

For actual or potential releases not originating from a SWMU, such as a one-time spill from a vehicle traveling across a facility, or for releases at RCRA sites with permits that pre-date HSWA, EPA may impose its omnibus permitting authority pursuant to HSWA §3005(c)(3). This provision allows EPA to modify the facility's permit as necessary, requiring corrective action for any potential threat to human health or the environment. Also, HSWA §7003 gives EPA broad authority to seek injunctive relief in the appropriate U.S. District Court or to issue administrative corrective action orders for any waste from any source, including SWMUs, where the handling, storage, treatment, transportation, or disposal of solid or hazardous waste may pose an imminent and substantial danger to public health or the environment.

To minimize the regulatory burden of RCRA Corrective Action without endangering public health or the environment, EPA created exemptions and special permits. For example, EPA conditionally exempts from the Subtitle C hazardous waste regulations any waste samples collected solely for the purpose of monitoring or testing the characteristics or composition of RCRA facility contamination. Referred to as the Treatability Studies Sample Exemption Rule (CFR 261.4(e) and (f)), the exemption places limits on the quantity of contaminated media than can be shipped, stored at a laboratory or testing facility, and treated there (U.S. EPA 1994b). The exemption rule also limits the amount of time the contaminated media may be retained for analysis or treatment. Although EPA encourages authorized states to adopt exemptions and special permits, the states are not required to adopt them because they are less stringent than existing federal requirements.

Special permits and modifications are available to facilitate the development and application of innovative technologies. For example, facility owners or operators may obtain RCRA research, development, and demonstration (RD&D) permits for pilot-scale evaluations of treatment technologies. EPA, in collaboration with the state, has the authority to modify a permit or enforcement order to allow on-site technology demonstrations at corrective action sites. In this case, EPA may grant a site-specific treatability variance for contaminated soils and debris when the facility cannot achieve the stringent technology-based treatment standards in the land disposal restrictions. Other permitting options are available through the Subpart X rule of RCRA, titled "Miscellaneous Units," which addresses hazardous waste management units that do not fit the current RCRA definition of container, tank, surface impoundment, pile, land treatment unit, landfill, incinerator, boiler, industrial furnace, or underground injection well (U.S. EPA 1987). For instance, EPA and the Department of Defense have worked together to dispose of munitions using the permitting options available for pilot-scale RD&D and the Subpart X rule.

The remedial action plan (RAP), a special type of RCRA permit, made available in the final HWIR-media rule (1998) as an alternative to traditional permits, can be used for the treatment, storage, or disposal of waste generated during remediation activities. RAPs can be used for cleaning up contaminated areas or areas in close proximity to the contamination, and they may be used for cleaning up offsite locations when treating, storing, or disposing of the waste off site is more protective than on site.

## 4.2 Factors Affecting Demand for Cleanup

The extent and timing of the cleanup of RCRA Corrective Action sites is significantly influenced by the regulatory and site-management refinements that EPA and the states have been building into the cleanup process; federal funding of state oversight; and improvements in field technologies that better characterize contamination, improve remedy design, lower overall cleanup costs, and improve the quality and pace of site cleanups. These factors create incentives for owners and operators in the broader market to consider actual cleanup over containment.

- The RCRA Cleanup Baseline sites that are striving to meet their 2005 interim GPRA goals represent the most immediate actions to be taken at RCRA sites. While these sites represent the readily identified, near-term market for cleanup, many other RCRA sites with less immediate human health concerns will also need to be cleaned up.

- Revisions to the Subtitle C requirement for cleaning up some hazardous waste implemented over the past decade are likely to encourage treatment and removal as compared to leaving waste in place. As described in section 4.1.1, the revisions most likely to impact the market include introducing alternative standards for CAMUs, temporary units, and staging piles specifically to handle remediation waste that is no longer considered newly-generated hazardous waste; defining LDR alternative treatment standards for cleanups; harmonizing the sometimes duplicative closure and corrective action requirements; streamlining permit requirements for cleanup activities; and removing the obligation for facility-wide corrective action.

  Before these changes occurred, the stringent Subtitle C requirement was frequently counterproductive when applied to the cleanup of individual sites because it imposed unnecessary costs and delays and limited cleanup options. Even if treating or permanently removing the waste was the preferred option, parties sometimes decided not to clean up certain sites or sought to leave the waste in place at others. Such actions may lead to increased long-term risk of human exposure to contamination and the potential that the contamination will spread offsite or to groundwater.

- The 1999 and 2001 cleanup reforms are intended to increase the number and efficiency of cleanups and establish aggressive national cleanup goals. The reforms established more flexible, facility-specific approaches to account for the variety of conditions at RCRA sites.

- Refinements in field technologies and methods used to characterize site contamination and its likely movement in the environment and to improve remedy design are changing the cleanup market. Refinements in these technologies during the last five to ten years have begun to decrease site-assessment costs, improve data quality, and expand the applicability of less traditional remedies. For instance, in the past, a semi-permanent well had to be installed to sample groundwater quality and a drill rig was needed to obtain soil borings at depth. While these technologies still have their place, newer technologies, such as the hydropunch and cone penetrometer, are available at a dramatically lower cost. Also available are geophysical technologies, such as remote sensing, to determine subsurface conditions. Almost 30 percent of all sites EPA sampled in a study of RCRA Corrective Action implementation

used some type of innovative characterization approach (U.S. EPA 2002c). Low-priority sites were more likely than medium and high priority sites to employ these approaches. Site characterization, conducted at less cost, often results in better designed remedies for particular site conditions, rather than in over-designed remedies intended to account for the many unknowns associated with a site.

- The pace of the cleanups is affected by the availability of funds to pay for state and federal oversight. Many states have been facing budget deficits in 2003 and 2004 and, on average, state staffing levels and budgets for hazardous waste remediation has not increased in about a decade. Section 9.4 (State and Private Party Sites) includes a description of trends in state capabilities.

- Land development trends are also likely to affect the pace and nature of RCRA cleanups. If there is demand for the redevelopment or transfer of commercial and industrial properties, they will require site assessments and, if necessary, remediation. The 2002 brownfields law, titled "The Small Business Liability Relief and Brownfields Revitalization Act (P.L. 107-118)," the Superfund Redevelopment Program, and the RCRA Brownfields Initiative are encouraging the reuse of former industrial and other properties. These programs have implemented policy changes and demonstrated many approaches and ideas that foster the cleanup and redevelopment of contaminated properties, including a number where waste has been left on site. By publicizing the potential for reusing tainted properties, these activities may have the impact of increasing the pace of cleanup of corrective action sites. (See Section 9.1.2, Voluntary Cleanup and Brownfield Programs).

## 4.3 Number and Characteristics of RCRA Sites

All RCRA sites requiring permits and those where EPA or a state has discretionary authority to impose corrective action are subject to corrective action requirements. However, not all of these sites will actually require corrective action, and until further study is conducted, the number of RCRA sites that will require cleanup can only be estimated. Nevertheless, EPA's RCRAInfo electronic database and two previous EPA studies, can be used to estimate the potential extent of future cleanups.

### 4.3.1 Number of RCRA Sites

As of March 31, 2003, EPA's RCRAInfo database, a national program management and inventory system on hazardous waste handlers, contained information on 6,677 RCRA sites where EPA has discretionary or statutory authority to impose corrective action when necessary (U.S. EPA 2003b). Exhibit 4-1 shows the distribution among the states of the RCRA sites subject to corrective action. Exhibit 4-2 contains the current numbers of sites in this universe in EPA's ten regions. EPA and the states have identified approximately 29 percent high-priority sites, 24 percent medium-ranked sites, 29 percent low-ranked sites, and have not ranked 19 percent of the sites. A RCRA facility investigation (RFI) has been imposed at 38 percent of the sites subject to

corrective action. The RFI involves sampling, modeling, and other testing to determine the nature and extent of environmental contamination and to characterize the site's geological and hydrological conditions. A RFI has been imposed at 79 percent of the high-priority sites, 38 percent of the medium-priority sites, and 20 percent of the low-priority sites. While about 20 percent of the sites in this universe are implementing stabilization measures, only 10 percent of them have selected a remedy.

**Exhibit 4-1. Location of RCRA Sites Subject to Corrective Action by State and EPA Region**




Notes: Includes 6,674 sites inthe Subject to Corrective Action Universe (sites reported to EPA or authorized states as having a release of a hazardous substance)

Source: U.S. EPA, Office of Solid Waste, RCRA Info database, March 31, 2003.

**Exhibit 4-2. Priority Ranking of RCRA Sites Subject to Corrective Action**

| EPA Region | Ranking | | | | Total Facilities |
|---|---|---|---|---|---|
| | High | Medium | Low | Unranked | |
| 1 | 176 | 85 | 43 | 83 | 387 |
| 2 | 188 | 208 | 267 | 23 | 686 |
| 3 | 308 | 46 | 62 | 87 | 503 |
| 4 | 272 | 196 | 151 | 268 | 887 |
| 5 | 355 | 445 | 691 | 486 | 1,977 |
| 6 | 236 | 204 | 228 | 114 | 782 |
| 7 | 99 | 146 | 126 | 19 | 390 |
| 8 | 58 | 68 | 126 | 108 | 360 |
| 9 | 140 | 123 | 236 | 45 | 544 |
| 10 | 78 | 46 | 29 | 8 | 161 |
| Total | 1,910 | 1,567 | 1,959 | 1,241 | 6,677 |

Source: U.S. EPA, Office of Solid Waste, RCRAInfo database, March 28, 2003

A subset of this universe represents 3,829 sites that are required to undergo further site investigation and or cleanup. These sites are most likely to require some sort of remedial action in the near term and already may be involved in some phase of corrective action. Approximately eight percent of these sites are federal facilities. Exhibit 4-3 shows the distribution among the states of the RCRA sites in this universe, which is called the "corrective action workload universe." Most states have fewer than 100 of these sites.

### 4.3.2 Types of RCRA Sites

The type of activities that have occurred at a site may lend insight into the nature of the cleanup needed. A TSDF may operate one or more types of hazardous waste management processes. Typical management processes include land disposal, such as landfills, land treatment units, surface impoundments, waste piles, and underground injection wells; incineration; treatment, storage in tanks; and boilers and industrial furnaces. A waste pile is any non-containerized accumulation of solid, nonflowing hazardous waste that is used for treatment or storage. The definitions of the other processes may be found in 40 CFR §260.10 (U.S. EPA 1980).

**Exhibit 4-3. Location of RCRA Sites Likely to Require Corrective Action by State and EPA Region**




Notes: Includes 3,829 facilities in the Corrective Action Workload Universe (facilities with statutory requirements for corrective action due to permitting requirements and facilities where corrective action has been imposed).

Source: U.S. EPA, Office of Solid Waste, RCRA Info database, March 31, 2003.

Exhibit 4-4 presents the major processes operated now or in the past by RCRA facilities in EPA's RCRAInfo database. Because each facility may be performing more than one process, the total number of processes exceeds the number of facilities. Storage and treatment account for 72 percent of the processes reported, followed by land disposal at 23 percent, and incineration at four percent.

**Exhibit 4-4. Major Waste Management Processes at RCRA Facilities**




Source: U.S. EPA, Office of Solid Waste, RCRA Info database, March 31, 2003.

In one study, EPA's Technology Innovation Office obtained information on a total of 275 TSDFs in 1992 and 1993 for the purpose of identifying relationships between site characteristics and the use of innovative technologies at RCRA Corrective Action sites (U.S. EPA 1994c). At the 214 TSDFs where contamination data were available, halogenated volatile organic compounds (VOCs), the most prevalent of all contaminant groups reported, were present at a majority of the TSDFs, followed by heavy metals, and nonhalogenated VOCs. Groundwater contamination was reported at 82 percent and soil contamination at 61 percent of the 256 TSDFs for which media data were available.

A second study is EPA's 1993 regulatory impact analysis (RIA), developed to support the corrective action rule, Subpart S (U.S. EPA 1993b). EPA analyzed information on a sample of 79 TSDFs to estimate contamination likely to be present in soil or groundwater at concentration levels that would require action. Of the 2,600 facilities, estimated at the time of the 1993 RIA to require corrective action, about 80 percent appeared to have significant releases to on-site groundwater and 30 percent were likely to have significant off-site groundwater contamination. This estimate is close to the 82 percent observed in EPA's study of 275 TSDFs (U.S. EPA 1994c).

Contaminants in groundwater and soil at RCRA facilities were estimated in the RIA. The top ten contaminants expected in groundwater at concentrations that were high enough in 1990 to trigger concern are, in order of frequency, chromium, benzene, methylene chloride, arsenic, lead, tetrachloroethylene, trichloroethylene, naphthalene, 1,1,2-trichloroethane, 1,1-dichloroethylene. Based on this data on-site soil contaminant concentrations above EPA action levels are expected to occur at about 68 percent of the 2,600 facilities estimated at the time of the study to require corrective action. In soil, tetrachloroethylene, trichloroethylene, chromium, and arsenic were expected to be at concentration levels above EPA's 1990 action levels.

In 1997, EPA developed a snapshot on corrective action implementation nationwide based on a statistically representative sample of 84 facilities among 889 corrective action sites that had final remedies selected or stabilization measures in place. The site data reflected the universe of RCRA facilities subject to corrective action in 1990. EPA surveyed Agency regional and state regulators responsible for the selected facilities and received 62 responses. The survey results were compiled into the RCRA Corrective Action Implementation Database (RCAID) (U.S. EPA 2002c).

The majority of facilities in the extrapolated RCAID universe were manufacturing industries. Although spills were estimated to be a major concern at over half of the facilities, landfills, surface impoundments, and underground storage tanks also contributed significantly to facility contamination. Nearly all of the facilities had both soil and groundwater contamination, and the contamination had migrated beyond the facility boundary at about half of the sites. Using the extrapolated data, OSW estimated that 84 percent of the facilities with a final remedy and/or stabilization measure in place had VOCs, 41 percent had SVOCs, 23 percent had metals, 10 percent had polychlorinated biphenyls, 5 percent had pesticides, and 20 percent had other types of contaminants, such as radionuclides and phenol.

Another study of treatment experiences at RCRA corrective actions involved 30 sites identified from readily available information sources in 2000 (U.S. EPA 2000a). EPA's Technology Innovation Office, which conducted the study, selected sites that were illustrative of the types of cleanups conducted at RCRA corrective actions. They were not necessarily representative of the entire universe of RCRA cleanups. The sites, which varied in size and complexity, had chlorinated solvents, polycyclic aromatic hydrocarbons (PAHs), benzene, toluene, ethylbenzene, and xylenes (BTEX), other VOCs and SVOCs, and petroleum hydrocarbons.

Information on contaminants and contaminated media at 99 RCRA sites was found in the statements of basis completed before 2000 (most were signed before 1995). A statement of basis is similar to a Superfund ROD. The number of sites reporting groundwater contamination exceeded 70 percent and was similar to the number reporting soil contamination. Nearly 70 percent of the sites in the database reported VOCs, about 40 percent reported SVOCs (including halogenated, nonhalogenated, PAHs, PCBs, phenols, and pesticides), and nearly 50 percent reported metals. Dense non-aqueous phase liquids (DNAPLs) were found at 53 sites; the most common were 1,1,1-trichloroethane (1,1,1-TCA), 1,1-dichloroethene, tetrachloroethylene and (PCE), and 1,1-dichloroethane.

## 4.4 Estimated Cleanup Costs

All known estimates of the ultimate cost of the RCRA Corrective Action program are subject to uncertainties inherent in predicting the course of a large multi-year program. The types and sizes of sites are quite diverse, and detailed data are available on only a sample of sites. The most appropriate estimate was prepared in the background work for the proposed amendments to the CAMU Rule in 2000 (U.S. EPA 2000b). This estimate is based on the RCAID survey data described in Section 4.3.3. EPA surveyed EPA regional and state regulators responsible for the selected facilities and received 62 responses. The cleanup cost varied widely from site to site, from under $1 million to over $50 million. Over half the facilities had cleanup costs under $5 million, and 9 percent had costs over $50 million. The data were reported in terms of ranges and precise average cost per site was not provided. However, by taking the upper and lower cost value of each range, a reasonable approximation of an upper and lower limit of the estimated costs were developed. These calculations appear in Exhibit 4-5.

Based on these estimates, cleanup of the 3,829 sites that are likely to require corrective action will cost between $31 billion and $58 billion, with a middle-value of $44 billion, or $11.4 million per facility. Approximately 41 percent of the total cost will be incurred by nine percent of the facilities. These estimated corrective action costs do not include those of the very large DOD and DOE facilities, although it may include some smaller ones.

This estimated average cost per site is about 20 percent lower (in 2003 dollars) than that estimated in the 1993 Regulatory Impact Analysis for Subpart S. This difference reflects a variety of changes since that RIA, including more efficient site characterization and cleanup approaches, the use of risk-based cleanup approaches, and savings due to the CAMU policies described in Section 4.1. Over the past few years, implementation of the Corrective Action program has shifted toward more flexible, risk-based cleanups and away from the regulatory approach modeled

in the 1993 RIA. In addition, the near-term costs of the program are likely to be reduced due to the program's emphasis in the short-term on stabilization remedies rather than permanent remedies.

**Exhibit 4-5. Estimated RCRA Corrective Action Costs ($Millions)**

| | | Cost Per Site [a] | | | Total Cost [c] | | |
|---|---|---|---|---|---|---|---|
| **Cost** | **% of Sites** | **Low** | **High** | **No. of Sites [b]** | **Low** | **High** | **Average** |
| < 1.0 | 32 | 0 | 1.0 | 1,225 | 245 | 1,225 | 735 |
| 1 - 5 | 24 | 1 | 5.0 | 919 | 919 | 4,595 | 2,757 |
| 5 - 10 | 13 | 5 | 10.0 | 498 | 2,489 | 4,978 | 3,734 |
| 10 - 25 | 20 | 10 | 25.0 | 766 | 7,658 | 19,145 | 13,402 |
| 25- 50 | 2 | 25 | 50 .0 | 77 | 1,915 | 3,829 | 2,872 |
| > 50 | 9 | 51 | 70 .0 | 345 | 17,575 | 24,123 | 20,849 |
| Total | 100 | | | 3,829 | 30,800 | 57,895 | 44,347 |

a The lowest ($200,000) and highest ($70 million) values are conservative assumptions
b Sites likely to require corrective action, from Section 3.4.3.
c Number of sites multiplied by cost per site

Source: U.S. EPA, 2000c, *Economic Analysis of the Proposed Amendments to the Corrective Action Management Unit Rule (Background Document)*, Office of Solid Waste, August 7, 2000.

## 4.5 Market Entry Considerations

The responsibility for RCRA corrective action at individual sites lies with the owners and operators who contract directly with commercial vendors for services. RCRA requires that owners and operators be aware of technologies that may be used and those that are subject to restrictions or are banned. Although vendors interested in the corrective action market can obtain some information about specific sites by querying RCRAInfo on line, they will have to contact specific owners or operators to obtain information on an individual facility's corrective action requirements, waste characteristics, and cleanup needs. The RCRAInfo query form is at http://www.epa.gov/enviro/html/rcris/rcris_query_java.html. Many state hazardous waste agencies, and to a lesser degree EPA regional offices, have additional information about the corrective action needs of sites in their areas.

## 4.6 Remediation Technologies

Remedies selected for a given site may attain media cleanup standards through various combinations of removal, treatment, engineering, and institutional controls. While EPA maintains current information on the general characteristics of RCRA sites in the RCRAInfo database, it has not compiled information on remedial action decisions at sites undergoing cleanup.

Case 1:05-cv-01075-TCW Document 47-3 Filed 01/03/2007 Page 13 of 85



Data on technology applications for 186 RCRA facilities are available from an EPA study completed in 1994 (U.S. EPA 1994c). Of 133 facilities treating groundwater, pump and treat was selected for 116 sites (87 percent) and innovative technologies were selected for nine sites (seven percent). The innovative technologies were in-situ bioremediation at four sites, ex-situ bioremediation for two sites, and unspecified bioremediation, thermal desorption, and chemical treatment for one site each. Of 86 sites requiring soil treatment, established technologies were selected for 55 sites (64 percent), including capping and off-site disposal at 51 sites, incineration for one site, and other technologies for three sites. Innovative technologies, such as soil vapor extraction (SVE), bioremediation, and chemical treatment, were selected for 31 (39 percent) of the sites requiring soil treatment. Of the innovative technologies selected for contaminated soil, most were likely to be used to remediate halogenated and non-halogenated VOCs. Exhibit 4-6 summarizes specific innovative and established technologies applied or likely to be applied to soil contamination at the 86 sites requiring soil treatment.

**Exhibit 4-6. Remedies Selected for Soil at 86 RCRA Corrective Action Facilities**




* More than one technology may be used at a single site.

Source: *Analysis of Facility Corrective Action Data*, January 1994

Another EPA study is available on remedies selected for 30 RCRA Corrective Action sites, 18 of which had ongoing cleanups while 12 had completed cleanups (U.S. EPA 2000c). EPA selected these sites from information readily available in 2000 on cleanups that had occurred or were underway between 1986 and 2000. The selected sites include a wide range of industries, such as wood treaters, chemical plants, refineries, paper mills, manufacturing facilities, and waste treatment plants, that vary in size, complexity, and contaminants. Seven of these sites selected soil vapor extraction—the most frequently used soil cleanup technology. Far less frequently selected in-situ technologies were bioremediation of soil and groundwater, bioventing, chemical oxidation, permeable reactive barriers, and air sparging. The ex-situ technologies selected included pump and treat, bioremediation, and thermal desorption.

Projected remedies selected for facilities in the RCAID database were based on site characterization data collected in 1992 and 1993 (U.S. EPA 2002c). The final remedy information on 78 solid waste management units in RCAID showed that pump and treat (15 percent) and cap/cover (31 percent) were selected most often. Barrier walls were selected for 13 percent of the units, and

soil vapor extraction was selected for nine percent. Pump and treat and cap/cover were also the most common stabilization measures taken at many facilities prior to selecting the final remedy.

Information on final remedies selected for RCRA sites was found in 99 statements of basis. Most of the remedy or stabilization decisions reported in these documents were made in the mid-1990s. The most frequently selected remedies or stabilization measures for soil were excavation with off-site disposal, capping or cover, and in-situ soil vapor extraction. The remedies selected most frequently for groundwater were pump and treat and containment wall.

## 4.7 References

U.S. EPA (Environmental Protection Agency), 1980. 40 CFR Part 260.10, U.S. Environmental Protection Agency, 45 *Federal Register*, p. 33066, May 19.

U.S. EPA, 1987. *Hazardous Waste Miscellaneous Units, Applicable to Owners and Operators; Final Rule*, U.S. Environmental Protection Agency, Office of Solid Waste, 52 *Federal Register*, p. 46946, December 10, 1987.

U.S. EPA, 1990a. *Corrective Action for Solid Waste Management Units (SWMUs) at Hazardous Waste Management Facilities; Proposed Rule* (40 CFR Parts 265, 265, 270, and 217), U.S. Environmental Protection Agency, Office of Solid Waste, 55 *Federal Register* 145, pp. 30798-30884, July 27, 1990.

U.S. EPA, 1990b. *The Nation's Hazardous Waste Management Program at a Crossroads: The RCRA Implementation Study*, U.S. Environmental Protection Agency, Office of Solid Waste and Emergency Response, EPA/530-SW-90-069.

U.S. EPA, 1991. *RCRA Stabilization Strategy*, U.S. Environmental Protection Agency, Office of Solid Waste, October 25, 1991.

U.S. EPA, 1993a. *Corrective Action Management Units and Temporary Units; Corrective Action Provisions Under Subtitle C; Final Rule*, U.S. Environmental Protection Agency, Office of Solid Waste, 58 *Federal Register*, p. 8658, February 16, 1993.

U.S. EPA, 1993b. *Draft Regulatory Impact Analysis for the Final Rulemaking on Corrective Action for Solid Waste Management Units Proposed Methodology for Analysis*, U.S. Environmental Protection Agency, Office of Solid Waste, March 1993.

U.S. EPA, 1994a. *RCRA Corrective Action Plan (Final)*, U.S. Environmental Protection Agency, Office of Solid Waste, Directive 9902.3-2A, May, 1994.

U.S. EPA, 1994b. *Hazardous Waste Management System: Identification and Listing of Hazardous Waste; Treatability Studies Sample Exclusion*, Final Rule (40 CFR Part 261), U.S. Environmental Protection Agency, Office of Solid Waste, 59 *Federal Register* 34, p. 8362, February 18, 1994.

U.S. EPA, 1994c. *Draft Analysis of Facility Corrective Action Data*, U.S. Environmental Protection Agency, Office of Solid Waste and Emergency Response, Technology Innovation Office, January 1994.

U.S. EPA, 1996a. *Corrective Action for Releases from Solid Waste Management Units at Hazardous Waste Management Facilities; Advanced Notice of Proposed Rulemaking*, ANPR, 40 CFR, U.S. Environmental Protection Agency, Office of Solid Waste, 61 *Federal Register* 85, pp. 19431-19464, May 1, 1996.

U.S. EPA, 1996b. *Hazardous Waste Identification Rule; Proposed Rule*, U.S. Environmental Protection Agency, 61 *Federal Register*, p. 18780, April 29, 1996.

U.S. EPA, 1996c. *Coordination Between RCRA Corrective Action and Closure and CERCLA Site Activities*, U.S. Environmental Protection Agency, Office of Solid Waste and Emergency Response, September 24, 1996. http://ww.epa.gov/swerffrr/doc/924memo.htm

U.S. EPA, 1998a. *Hazardous Remediation Waste Identification Rule (HWIR-Media) Final Rule*, 40 CFR Parts 260, 261, 264, 265, 268, 270 and 271, U.S. Environmental Protection Agency, Office of Solid Waste and Emergency Response, 63 *Federal Register* 229, p. 65874, November 30, 1998.

U.S. EPA, 1998b. *Land Disposal Restrictions Phase IV: Final Rule Promulgating Treatment Standards for Metal Wastes and Mineral Processing Wastes; Mineral Processing Secondary Materials and Bevill Exclusion Issues; Treatment Standards for Hazardous Soils, and Exclusion of Recycled Wood Preserving Wastewaters*, U.S. Environmental Protection Agency, 63 *Federal Register* 100, p.28555-28604, May 26, 1998.

U.S. EPA, 1998c. *Standards Applicable to Owners and Operators of Closed and Closing Hazardous Waste Management Facilities: Post-Closure Permit Requirement and Closure Process; Final Rule* (40 CFR Parts 264, 265, 270, and 271), U.S. Environmental Protection Agency, Office of Solid Waste, 63 *Federal Register* 204, pp. 56710-56714, October 22, 1998.

U.S. EPA, 1998d. *Risk-Based Clean Closure,* memorandum, U.S. Environmental Protection Agency, Office of Solid Waste, March 16, 1998.

U.S. EPA, 2000a. *Treatment Experiences at RCRA Corrective Actions*, U.S. Environmental Protection Agency, EPA 542-F-00-020, Office of Solid Waste and Emergency Response, December 2000.

U.S. EPA, 2000b. *Economic Analysis of the Proposed Amendments to the Corrective Action Management Unit Rule (Background document)*, Office of Solid Waste, August 7, 2000.

U.S. EPA, 2001. *Transmittal of Guidance on Enforcement Approaches for Expediting RCRA Corrective Action*, U.S. Environmental Protection Agency, Office of Enforcement and Compliance Assurance, January 2, 2001.

U.S. EPA, 2002a. *Amendments to the Corrective Action Management Unit Rule*, U.S. Environmental Protection Agency, Office of Solid Waste, 67 *Federal Register* 14, p. 2961-3029, January 22, 2002.

U.S. EPA, 2002b. *Handbook of Groundwater Protection and Cleanup Policies for RCRA Corrective Action for Facilities Subject to Corrective Action Under Subtitle C of the Resource Conservation and Recovery Act*, U.S. Environmental Protection Agency, Office of Solid Waste and Emergency Response, EPA/530/R-01/015, October 17, 2001, 66 *Federal Register*, pp. 52762-52763, September 2002.

U.S. EPA, 2002c. *A Study of the Implementation of the RCRA Corrective Action Program*, and *Highlights from A Study of the Implementation of the RCRA Corrective Action Program*, Environmental Protection Agency, Office of Solid Waste, April 9, 2002.

U.S. EPA, 2003a. Final *Completion of Corrective Action Activities at RCRA Facilities*, U.S. Environmental Protection Agency, Office of Solid Waste, 68 *Federal Register* 37, p. 8757, February 25, 2003.

U.S. EPA, 2003b. RCRAInfo electronic database, U.S. Environmental Protection Agency, Office of Solid Waste, March 2003.

U.S. EPA, 2003c. *Results-Based Approaches and Tailored Oversight Guidance for Facilities Subject to Corrective Action Under Subtitle C of the Resource Conservation and Recovery Act,* U.S. Environmental Protection Agency, Office of Solid Waste, September 2003.

This page intentionally left blank

# Chapter 5
# Underground Storage Tank Sites

Underground storage tanks (USTs) are used by a wide variety of industries, such as petroleum and chemical manufacturing and distribution, transportation, agriculture, and government. About 680,000 active tanks are currently subject to federal regulations. Ninety-six percent of these contain petroleum products, including used oil. Less than four percent contain hazardous substances. In addition, more than 1.5 million federally regulated USTs have been closed.

Subtitle I of the Hazardous and Solid Waste Amendments to the Resource Conservation and Recovery Act (RCRA) was enacted in 1984 to control and prevent leaks and spills from USTs. Subtitle I governs USTs storing regulated substances, including gasoline, aviation fuel, diesel fuel, other petroleum products, and hazardous substances defined under the Superfund program. Pursuant to Subtitle I, EPA has promulgated regulations requiring, among other things, that leaks and spills be remediated and future releases be prevented. These regulations have compelled cleanup activities at many UST sites, providing opportunities for the application of a variety of remediation technologies.

Releases of petroleum or hazardous substances can result from a spill during tank filling operations, leaks in the tank or pipes attached to the tank due to corrosion, structural failure, or faulty installation. As of March 31, 2004, more than 443,000 releases from federally regulated USTs had been confirmed (U.S. EPA 2004). These releases can contaminate soil and groundwater and cause fire or explosions. While considerable progress has been made in cleaning up contamination from underground storage tanks during the last decade—more than 311,000 contaminated sites have been cleaned up—many more remain to be remediated.

***Highlights***

- Although considerable progress has been made in cleaning up UST sites over the past decade, it is estimated that 95,000 to 155,000 UST sites will require cleanup under the RCRA underground storage tank regulations.
- This estimate includes 35,000 already identified sites that have not yet been cleaned up plus an estimated 60,000-120,000 sites that may have future releases over a 10-year period.
- Although new reported releases of contaminants from tanks may continue beyond 10 years and tank leakage rates may decline, these scenarios are not included in this report because of uncertainties in predicting these trends.
- The cost of these cleanups could reach $12-19 billion. This estimate does not include costs related to replacing, testing, or upgrading tanks, pipes, and related equipment.
- The year-to-year fluctuations in the number of cleanups will depend on the availability of funds from public and private sources; the failure rate of tank systems; cleanup cost savings through the growing use of newer site management approaches; and additional site characterization and remediation costs that may result from sites that are difficult to remediate (e.g., MTBE).
- Since 1998, the number of confirmed releases reported to EPA has been declining. Nevertheless, it is expected that there will always be some additional releases in the future.
- UST tank sites account for over 43% of all waste sites estimated in this report to be cleaned up.
- The average UST site is typically smaller and less costly to remediate than those of most

## 5.1 Federal Program Description

The federal regulatory program is implemented by EPA's Office of Underground Storage Tanks (OUST). The federal UST technical requirements and state program approval regulations were promulgated in September 1988 and became effective on December 22, 1988 (U. S. EPA 1988). These regulations, to a large extent, determine the size of the market for cleanup services.

The regulations apply to any UST, except those specifically exempted, excluded, or deferred, used to store petroleum products or substances defined as hazardous under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). The regulations do not apply to tanks storing hazardous wastes regulated under Subtitle C of RCRA. An UST is defined as any tank that has at least 10 percent of its volume buried below ground, including piping connected to the tank. Generally, the requirements for tanks containing chemicals are somewhat more stringent than those containing petroleum products.

The basic federal requirements include:

- A tank owner must register his or her tank(s) with the state authority by completing a notification form about the characteristics and contents of the UST.

- A tank owner must institute a periodic leak detection program to actively seek out releases. For tanks installed after December 1988, leak detection requirements become effective at the time of installation. For older tanks, the requirements were phased in over time with a final completion date of December 1993.

- A tank owner must maintain records of leak detection activities, corrosion protection system inspections, repair and maintenance activities, and closure site assessments.

- A tank owner must notify the appropriate regulatory authority of all suspected or confirmed releases as well as follow-up actions taken or planned. Suspected leaks must be investigated immediately to determine if they are real. If evidence of environmental damage is the cause for suspicion, it must be reported immediately to the regulatory authority.

- If a leak or spill is confirmed, tank owners must: (a) take immediate action to stop and contain the leak or spill; (b) notify the regulatory authority within 24 hours or other reasonable time period specified by the implementing agency; and (c) take action to mitigate further damage to people and the environment.

- All USTs must be protected from corrosion and have devices that prevent spills and overfills, in accordance with EPA's upgrade and new tank standards.

- A tank owner closing an UST must notify the regulatory authority 30 days before permanent closure.

The following kinds of tanks are currently *exempt* or *excluded* from the regulations:

- Farm and residential tanks holding 1,100 gallons or less of motor fuel used for non-commercial purposes.
- Tanks storing heating oil for use on the premises.
- Storage tanks on or above the floor of areas such as basements or tunnels.
- Septic tanks.
- Storm-water and waste-water collection systems.
- Flow-through process tanks.
- Tanks holding 110 gallons or less.
- Emergency spill and overflow containment UST system.
- Certain pipeline facilities, including gathering lines regulated under other federal or state statutes.
- Surface impoundments, pits, ponds, or lagoons.
- Liquid traps or associated gathering lines directly related to oil or gas production and gathering operations.
- UST systems holding hazardous substances listed or identified under Subtitle C of RCRA.
- Any wastewater treatment tank system that is part of a wastewater treatment facility regulated under Section 401 or 307(b) of the Clean Water Act (CWA).
- Equipment or machinery that contains regulated substances for operational purposes, such as hydraulic lift tanks and electrical equipment tanks.
- Any UST system that contains a *de minimis* concentration of regulated substances.

In addition, certain categories of tanks, known as deferred USTs, are not yet subject to the full federal UST regulations. Until EPA decides how to regulate these USTs fully, the only regulations that apply are Subpart A (Interim Prohibition) and Subpart F (release, response, and corrective action). Examples of deferred tanks include underground, field-constructed, bulk storage tanks, and UST systems that contain radioactive wastes.

Changes in the types of tanks covered by the regulations could significantly impact the potential size of the market. However, EPA is not contemplating any such changes at this time. Although these categories of tanks are currently excluded from federal regulations, some of them may be subject to state regulations.

EPA designed the UST program to be implemented by the states. Authority to implement the program is delegated to states through either the formal process of obtaining state program approval (SPA) or a cooperative agreement. Thirty-three states, the District of Columbia, and Puerto Rico have all been approved to act in lieu of the federal program. Most of the other states operate their own program under their own laws with limited federal oversight. The Act also allows for states to have more stringent requirements than that of the federal regulations. For example, some states may include home heating oil tanks in their program. EPA supports state programs by providing resources from the federal Leaking Underground Storage Tank Fund (LUST Trust Fund), grants to states and tribal programs, technical assistance, training, and information exchange.

## 5.2 Factors Affecting Demand for Cleanup

The demand for remediation services at contaminated UST sites primarily will be influenced by federal regulations, state requirements, and the number of releases occurring at old and new tanks. The timing of these cleanups will be influenced by the availability of state and federal funds for site assessment and cleanup of UST sites and the pace of economic development.

### 5.2.1 General Trends

In October 2002, EPA established a national goal of completing between 18,000 and 23,000 cleanups each year for the fiscal years 2003-2007. If EPA is able to meet this goal, the backlog of sites needing remediation, which has remained steady over the past decade, will be halved by 2007. Exhibit 5-1 shows the number of sites in the backlog since 1991 (U.S. EPA 2003c).

**Exhibit 5-1. Backlog of UST Site Cleanups to be Completed**




Source: U.S. EPA, Office of Solid Waste and Emergency Response, FY 2003 Semi-Annual End-of-Year Activity Report, November 25, 2003.

A number of factors led to an increase in the number of confirmed releases in 1997 and 1998, including the implementation of leak detection requirements (which became effective in 1993); tank upgrading requirements to prevent spills, overfills, and corrosion (which became effective in 1998); and reporting requirements. Since 1998, the number of confirmed releases has almost steadily declined from 29,600 to 12,000 (Exhibit 5-2). During the last three years, they have ranged from 6,000 to 12,000 and averaged 9,000. As more tanks come into compliance, the number of new releases is expected to continue to drop. However, it is expected that there will always be releases in the future. Many older tanks still exist and many older, as well as upgraded tanks, are not in full compliance.

**Exhibit 5-2. Confirmed Releases at UST Sites**




Source: U.S. EPA, Office of Solid Waste and Emergency Response, FY 2003 Semi-Annual End-of-Year Activity Report, November 25, 2003.

The failure rate of tank systems is determined by such factors as tank age, material of construction, corrosion protection systems in place, and other design and site-specific factors such as soil type, weather, and operations and maintenance practices. Because information on these factors is limited, estimates of market size are subject to some uncertainty. The following observations have been made about some of the factors that influence tank failure rates.

**Exhibit 5-3. Compliance Status of USTs by Region**




- While none of the states are in full compliance with EPA's leak detection and upgrading requirements, most of the tanks that states monitor had the required leak prevention and detection equipment installed as of September 2003. The compliance rates were 79 percent for release prevention and 72 percent for leak detection. Region 9 had the highest percentage of operational compliance with release prevention requirements (93%), while Region 3 had the lowest (69%). For leak detection requirements, the range was from 89 percent (Region 9) to 55 percent (Regions 1 and 10). However, there is variation in the reporting by the states, since some states' reports are based on more stringent requirements. (Exhibit 5-3)

- According to a 2003 GAO report (based on data collected in 2001 and 2002), 29 percent of tanks are not operated and maintained properly, thus increasing the chance of leaks and posing health risks. In addition, over half of the states are not inspecting all of their tanks at the minimum rate of at least once every three years recommended by EPA (U.S. GAO 2001, and 2003). This implies that even if the backlog of all known sites is eliminated, there are likely to be additional releases at some sites in the future.

- GAO also estimates that 11 percent (76,000) of the active regulated tanks that states monitor and 30 percent of tanks on tribal lands, may not be upgraded (U.S. GAO 2003). Most of these tanks are believed to be empty or inactive. States reported to GAO that they generally do not discover tank leaks or contamination around tanks until the empty tanks are removed from the ground during replacement or closure. Thus, there is a backlog of potentially contaminated sites that may be discovered over a period of time as they are replaced or removed.

- Despite the upgraded equipment, a number of states reported to GAO that upgraded tanks leaked. GAO cites that researchers have concluded that tanks with upgraded equipment and monitoring systems do not provide complete protection against leaks. However, the extent of this problem is unknown.

### 5.2.2 State Regulations and Funding Sources

Some states have promulgated requirements that are more stringent than the federal standards, such as a requirement for double-lined tanks, more stringent monitoring procedures, or earlier upgrading compliance dates.

The pace of the cleanups is affected by the availability of funds to pay for cleanups and oversight. UST cleanups are primarily financed from three sources:

- The federal Leaking Underground Storage Tank Fund (LUST Trust Fund). Revenues from the fund are derived from a gasoline tax of 0.1 cent per gallon. Appropriations from the fund have been about $70-80 million annually.[1]

- State tank trust funds or direct appropriations are generally used to assist owners and PRPs in paying for cleanups. A number of these are also financed by gasoline taxes. Between 1999 and 2003, the annual revenues of these funds averaged $1.3 billion and they paid out an average of about $1.1 billion annually.

- PRPs and site owners.

**State Tank Funds 1999-2003 (Billions of Dollars)**

| | 1999 | 2000 | 2001 | 2002 | 2003 | Average |
|---|---|---|---|---|---|---|
| Revenues | 1.38 | 1.19 | 1.21 | 1.34 | 1.37 | 1.30 |
| Approximate amount paid | 0.70 | 1.49 | 0.68 | 1.49 | 1.16 | 1.10 |

Source: Association of State and Territorial Solid and Hazardous Waste Management Officials, *State Fund Survey Results 2003.*

EPA regulations that limit the liability of lenders for corrective action in many situations help to encourage the extension of credit to credit-worthy UST owners. The availability of credit to UST owners, especially the many small businesses that operate USTs, is necessary to assist them in meeting their obligations to upgrade, maintain, and otherwise comply with RCRA Subtitle I and

1 The gasoline tax is scheduled to expire in 2005. The federal LUST Trust Fund helps states oversee corrective action and pay for cleanups at UST sites where the owner or operator is unknown, unwilling, or unable to respond, or which require emergency action. Most of the money appropriated from the fund goes to states, which use the funds to oversee corrective action by responsible parties, to clean up sites where no responsible party can be found, and for enforcement and administration. As of the end of 2003, the balance was $2.1 billion.

related environmental requirements. Under these regulations, which were promulgated in 1995, any person or lending institution that guarantees loans secured by real estate containing an UST or UST system may not be liable for the required corrective action, so long as the lender is not otherwise engaged in petroleum production, refining, or marketing (U.S. EPA 1995b).

### 5.2.3 2002 Brownfields Legislation and EPA's USTfields Initiative

The 2002 brownfields law, titled "The Small Business Liability Relief and Brownfields Revitalization Act (P.L. 107-118)," and EPA's USTfields initiative may lead to an increase in the total number of UST sites identified as needing cleanup as well as the pace of cleanups. This potential increase would result from the increased number of site assessments completed. The increased pace of cleanups could result from additional funds made available under the new law.

As many as 200,000 of the estimated 500,000 brownfield sites across the country are impacted by petroleum leaking from USTs, and many of these sites are gas stations that have shut down because they could not comply with the 1998 federal UST upgrade requirements (NEMW 2001). These properties pose threats to public health and the environment, and pose challenges for the redevelopment plans of the communities in which they are located.

Many UST cleanups are funded using state assurance funds, which usually do not have sufficient money to clean up all of the eligible sites in a given year. This scarcity of money has contributed to the backlog of over 136,000 sites nationwide that have not completed cleanup. The new brownfields law may help address this backlog. This law expands the current EPA Brownfields program and for the first time, allows "low-risk" petroleum sites to be eligible for assessment and cleanup grant funding under the Brownfields program. Prior to the new law, petroleum contamination was not eligible for Brownfields funding. The law authorizes up to 25 percent in grant awards annually through 2006 for the assessment and cleanup of brownfields contaminated with petroleum. In FY 2003, EPA awarded 103 new Brownfield Petroleum grants totaling $22.3 million. This new authority builds upon and complements EPA's USTfields Initiative, which addressed "high-priority" petroleum-contaminated properties and awards funds to states, tribes, and intertribal consortia. Under the USTfields Initiative, $4.8 million in grants were awarded to 36 states and three tribes to cleanup properties contaminated from leaking USTs. Although no further USTfields grants are planned, the petroleum grants under the Brownfields program continues to encourage further site assessments, cleanup, and redevelopment.

### 5.2.4 MTBE Contamination and the Remediation Market

Concerns about methyl tertiary-butyl ether (MTBE) contamination may influence the amount and timing of UST cleanups in some states. According to a 2003 survey of 50 states conducted by The New England Interstate Water Pollution Control Commission (NEIWPCC 2003), MTBE is detected in gasoline releases to groundwater 60 percent of the time, averaged among the states. Most states do not intend to open closed sites to look for MTBE or tertiary-butyl alcohol (TBA), unless they have reason to suspect a problem. Most states say there are very few cases where MTBE is the only concern. Thirty-three states say that MTBE drives cleanup and investigative efforts less than 20 percent of the time, or never. BTEX and free-product is the primary

remediation driver in these states. In most states, less than 10 percent of the sites have situations where BTEX has been successfully remediated but MTBE remains.

Nevertheless, some states, such as California and New York, indicated that MTBE contamination drives remediation at LUST sites more than 80 percent of the time. Connecticut, Maryland, Nevada, and New Jersey indicated that MTBE drives remediation more than 60 percent of the time; Maine and New Hampshire indicated that MTBE drives remediation more than 40 percent of the time; and Delaware and Vermont indicated that MTBE drives remediation more than 20 percent of the time.

In this survey, Delaware indicated that the threat of lawsuits is a potential driver for remediation at sites where MTBE contamination is present. Illinois indicated that once it adopts new legislation to address MTBE contamination, it expects to see an increase in the number of LUST remediation cases at sites where MTBE is the only concern. New York indicated that its high percentage of sites where MTBE is the only concern is a reflection of the fact that more than 193 spills have impacted more than 860 private water supply wells, requiring alternate water supplies.

### 5.2.5 State Performance-Based Environmental Cleanup Programs

Traditionally, environmental cleanups have been completed using time and materials (T&M) reimbursable contracts. Under these T&M cleanups, contractors bill their clients for hours worked and the cost of materials. Historically, these types of contracts provide very few incentives for contractors to meet any performance standards and conduct the cleanup in a timely and cost effective manner. In addition, there is little incentive for contractors to use the best technologies or to develop innovative practices.

Many states are moving toward performance-based cleanup programs to reduce cleanup costs and improve accountability for cleanup performance at UST sites. These "Pay For Performance" (PFP) contracts include the following basic elements: 1) a firm fixed price; 2) a fixed time limit for achieving the environmental goals of the cleanup; 3) cleanup goals specified in terms of specific contamination levels detected at specific locations; 4) criteria for system start-up and contamination reduction milestone payments, including closure; 5) provisions for the state to take additional contamination measurements at its own expense and discretion; and, 6) escape clauses specifying conditions under which the contractor can be released from the contract. Useful information on the background of pay-for-performance and implementation tools are available on the U.S. EPA web site. http://www.epa.gov/swerust1/pfp/

States with experience using both T&M and PFP contracting report that LUST site cleanups are being done faster and cheaper at PFP sites. In addition, state officials report a greater use of innovative cleanup technologies and more aggressive approaches to cleaning up "hot spots" at PFP sites. States also have reported that their paperwork burden is reduced substantially under PFP because they no longer monitor the details of a contractor's expenditures. Oklahoma estimates that $6,629,000 of unnecessary expenses were incurred prior to obtaining cleanup guarantees using its Pay-For-Performance program (Oklahoma, 2001).

Contractors who conduct PFP cleanups have the opportunity to realize greater profit under a PFP contract than under a T&M contract because the contractor assumes some of the risk of the cleanup. PFP frees them to manage their sites more efficiently, lowers paperwork costs, allows the contractor to purchase equipment that can be reused on other jobs, and allows the government to pay the contractor in a more timely manner. In fact, PFP contractors in pioneering states, such as California, Florida, South Carolina, and Oklahoma, are generally doing quite well and most are looking for more PFP business.

The cost savings associated with PFP programs can be leveraged to conduct more cleanups in states with PFP programs. In addition, PFP programs encourage the use of innovative technologies, which may help drive the market for some newer remediation technologies applicable to LUST sites.

## 5.3 Number and Location of USTs

The data on the number and status of currently registered USTs are derived from data that EPA compiles semi-annually from reports it receives from 56 states and territories. The states compile their data from information received from tank owners. Reporting quality varies from state-to-state and has resulted in some under-reporting of the number of tanks subject to the regulations. EPA estimates that there is an average of 2.65 tanks per UST site, although this number actually varies widely from one site to another.

### 5.3.1 Population of UST Sites in the U.S.

The number of potential corrective actions are related to the population of active and closed tanks subject to the federal regulations. EPA reports that as of March 31, 2004, 679,249 active tanks and 1,582,638 closed tanks have been registered in the U.S. (U.S. EPA 2003d). Nearly all contain petroleum. These sites include marketers who sell gasoline to the public (such as service stations and convenience stores) and non-marketers who use tanks solely for their own needs (such as fleet service operators and local governments). EPA estimates about 25,000 tanks hold hazardous substances covered by the UST regulations. Using EPA's estimated average of the 2.65 tanks per site, over 256,000 active sites with USTs are subject to the UST corrective action regulations.

In 1988, EPA estimated that there were between 5 and 7 million USTs (U.S. EPA 1988). Taking the midpoint of this range implies a total UST population of 6 million, of which 2.2 million active and closed USTs are currently subject to the regulations. The remaining 3.8 million tanks are exempt from the federal regulations and are not included as part of the market for remediation services in this report. Section 5.1 identifies the seven exempt categories of tanks. Although the exempt tanks are not quantified in this report, they nevertheless represent a potential for cleanup work in selected states where state regulations include some federally exempt tanks.

### 5.3.2 Location of Regulated Tanks

Appendix B lists the number of regulated tank sites by state, as reported to EPA in September 2003. Texas, California, Florida, New York, North Carolina, Michigan, Illinois, and Pennsylvania contain almost 40 percent of all active and closed tanks. The location data should be used with caution because a state's tank population may not be correlated with the number of releases, and cleanup program requirements, reporting practices, and data quality vary by state.

### 5.3.3 Potential Number of Sites to be Cleaned Up

**Exhibit 5-4. UST Site Cleanup Progress 1991-2002**




Source: U.S. EPA, Office of Solid Waste and Emergency Response, FY 2003 Semi-Annual End-of-Year Activity Report, November 25, 2003.

By September 2003, 439,385 confirmed releases were reported to EPA. Remedial design or remedial action had been initiated at 403,558 sites and completed at 303,120 (Exhibit 5-4). Thus, cleanup has not been completed at 136,265 sites. Of these, cleanup has been initiated at 100,438 sites and no cleanup action has been taken at the remaining 35,827 sites. A cleanup is considered "initiated" if a state or responsible party has evaluated the site and initiated one or more of the following five types of activities: management of contaminated soil, removal of free-product, management or treatment of dissolved petroleum contamination, monitoring of the groundwater or soil being remediated by natural attenuation, or the state has determined that no further actions are necessary to protect human health or the environment. At this stage, some physical activity (such as pumping, soil removal, recovery well installation) has usually begun at a site. Thus, the term "cleanup initiated" covers a range of situations. EPA's data does not indicate the extent of work done. Although many of these sites have substantial amounts of work yet to be done, including these sites in the market for future cleanup work may overstate somewhat the true market potential. Remediation contractors for some of these sites may already have been selected.

The total number of UST sites to be cleaned up in the future includes the already identified sites plus sites that will be reported in the future due to new releases or existing releases that have not yet been reported. Exhibit 5-5 displays the estimate of the number of UST sites likely to be cleaned up in the future. This exhibit, which uses data as of March 31, 2004, shows that there are 34,734 already confirmed releases for which cleanup has not begun (EPA 2004). In addition, as stated previously, there are likely to be new releases reported due to leaks in the future. The number of projected future releases can come from the active tank universe, the inactive universe, and unregulated tanks. There are numerous abandoned and empty tanks, many of

which are not identified, that may need to be cleaned up. The estimated number of future UST site discoveries is based on the annual rate of new releases in recent years and the assumption that this rate will continue for 10 years. Although tank releases may continue beyond 10 years, and leakage rates may decline, these scenarios are not included because of uncertainties in predicting these trends.

**Exhibit 5-5. Estimated Number of UST Sites Needing Remediation**

| | Reported to EPA Through 3/31/04 | Estimated Future Releases (2004-2033) [a] | Total [b] (2004-2013) |
|---|---|---|---|
| Confirmed Releases | 443,568 | 60,000 - 120,000 | 503,568-563,568 |
| Cleanups Completed Through March 31, 2004 | 311,125 | NA | 311,125 |
| Cleanups Initiated but Not Completed as of 3/31/04 [c] | 97,709 | NA | 97,709 |
| Releases Reported as of 3/31/04, but cleanups not initiated | 34,734 [d] | NA | 34,734 |
| Future Cleanups Required, but not initiated (2004 -2033) | 34,734 [d] | 60,000 - 120,000 | 94,734-154,734 [c] (Average 124,734) |

Notes:
NA Not applicable
[a] Assumes 6,000-12,000 confirmed releases annually for 10 years, which is the range for 2001, 2002, and 2003.
[b] Although tank releases may continue beyond 10 years, and leakage rates may decline, these scenarios are not included because of uncertainties in predicting these trends.
c Some of these sites may have designated cleanup contractors and some do not, but the number that already have contractors is unknown. To allow for a conservative market estimate, it is assumed that they all have selected contractors.
[d] This figure is derived by subtracting "cleanups initiated" and "cleanups completed" from "confirmed releases."

Between 2001 and 2003, the number of confirmed releases ranged from over 6,000 to over 12,000, with no specific increasing or decreasing trend (although these figures are about half what they were in 1998). Based on these figures, it is estimated that an average of 6,000-12,000 new releases will be reported per year over the next 10 years. Thus, an estimated 94,734-154,734 sites will need to be remediated over at least 10 years, with a middle value of 124,734.[2]

Although the size of the entire market has been estimated, the year-to-year fluctuations in cleanup efforts are difficult to predict. The difference between confirmed releases and cleanups initiated has averaged over 47,000 for the past four years. Exhibit 5-4 shows the comparison between the number of confirmed releases and cleanups initiated each year. During the first half of FY 2004, about 8,000 cleanups were completed. However, the year-to-year fluctuations in activity would depend upon the factors discussed in Section 5.2, such as the availability of private and public funds and real estate development activity.

[2] 6,000-12,000 X 10 years + 34,734 backlog as of March 31, 2004.

## 5.4 Estimated Cleanup Costs

Site characterization and cleanup costs vary widely from one site to another and EPA does not have a precise average cost per site.[3] Nevertheless, EPA estimates that the average remediation cost per site is $125,000. This cost estimate typically includes activities such as site investigations, feasibility studies, and treatment or disposal of soil and groundwater. Multiplying this average by the number of sites that will need remediation (94,734–154,734), the projected total remediation cost is $11.8–19.2 billion (average $15.6 billion). The presence of MTBE or other factors that may make remediation more difficult at these sites can boost the remediation cost (See section 5.2.3).

## 5.5 Market Entry Considerations

The following factors will be important to the success of vendors operating in the UST remediation market.

- Site work is primarily the responsibility of owners and operators of establishments such as retail gasoline stations, petroleum and chemical marketing operations, fleet maintenance and auto repair shops, and manufacturing or transportation facilities.

- Most work is contracted locally. However, some large firms and government agencies will use national contractors. Many of the national contractors tend to subcontract to local firms.

- States also issue contracts to cover large areas over a period of time for work done directly by the states.

- EPA is responsible for administering the program on tribal lands.

- The level of enforcement activity varies from one state to another. In addition, some states regulate tanks that are not regulated under RCRA. Information on these activities generally are available through state authorities. An indication of a state's commitment to its tank program can be obtained from its compliance rate with federal tank standards. EPA publishes a semi-annual report on its web site which provides the percent of tanks in each state that are in significant operational compliance with federal release prevention requirements and with leak detection requirements (U.S. EPA 2003c, 2004b).

- As tank testing and other requirements are implemented, the extent of cleanup activities and costs per site probably will decrease. Thus, economical ways to remediate smaller releases may be needed.

---

3 Based on a review of literature and data, the University of Tennessee reported that the cost of remediating UST sites had varied widely, generally between $2,000 to over $400,000. Costs at individual sites can exceed a million dollars (Bueckman & Russell, 1991). If only a small amount of soil needs to be removed or treated, cleanup costs can run as low as $10,000. Corrective action for leaks that affect groundwater can cost from $100,000 to over $1 million, depending on the extent of contamination.

## 5.6 Remediation Technologies

Data on the kinds of innovative technologies used to remediate contaminated UST sites have not been centralized. However, a survey conducted in 2001 by the University of Massachusetts provided information on the use of remediation technologies for contaminated groundwater and soils at LUST sites (Kostecki and Nascarella 2001). Thirty five states responded to this 12-question survey. The questions dealt with the types of technologies used, use of technologies by site, changes in technology use over time, barriers to implementation, and the impact of monitored natural attenuation. The survey results were compared with similar data collected from 45 states in a 1995 University of Massachusetts survey. Comparisons were made based on a percentage of total sites for each survey (Exhibit 5-6).

As the exhibit shows, landfilling continued to be the most frequently selected option for soil remediation at LUST sites (about one-third of the sites), although most environmentalists agree that it is not an ideal option because it transfers waste from one site to another. The percentage of UST sites using landfilling is considerably higher than occurs at NPL sites. Over the 2000 through 2002 period, only 23 percent of NPL sites used containment or off-site disposal (the data do not provide a separate figure for landfilling).

**Exhibit 5-6. Types and Frequencies of Soil Remediation Technologies at LUST Sites**




Source: Kostecki, Paul and Marc Nascarella, "Lust Cleanup Landscape Changing: Landfilling Still In, Pump and Treat on the Way Out," *Contaminated Soil Sediment and Water*, January/February 2003.

The next two most commonly used treatment technologies, soil vapor extraction (SVE) and low-temperature thermal desorption (LTTD), have grown in popularity between the 1995 and 2001 surveys. SVE use grew from 9 percent of LUST sites in 1995 to 18 percent in 2001. This is considerably greater than the SVE usage at NPL sites, where SVE was selected for only 8 percent of the sites between 2000 and 2002 (U.S. EPA 2004a).

The use of low-temperature thermal desorption (LTTD) at LUST sites has been growing steadily since the early 1990s. In a 1995 study, industry representatives reported that thermal desorption was only used on a limited basis in the early 1990s. By 1995 it was used at numerous sites in almost every state (Tremblay 1995). The 2001 data indicate that use of LTTD at LUST sites has continued to grow from 3 percent of sites in 1995 to 16 percent in 2001. This is considerably higher than the usage rates at NPL sites (11 percent of NPL sites between 2000 and 2002 used either low- or high-temperature thermal desorption).

Although monitored natural attenuation (MNA) and biopiles showed great promise for remediating soil at LUST sites in the early 1990s, their use declined from 28 to 19 percent and from 16 to 3 percent, respectively between 1995 and 2001. The decline in biopile use could be attributed to a lack of confidence in the technology while the decline in MNA is attributed to the fact that this method of cleanup takes too long and partly to an EPA Office of Solid Waste and Emergency Response (OSWER) directive, *The Use of Monitored Natural Attenuation at Superfund, RCRA Corrective Action, and Underground Storage Tanks Sites*. During the same period, the use of landfarming increased by 2 percent. It remains as popular in 2001 as it was in 1985 (Kostecki & Nascarella 2003).

The 2001 survey results indicate that MNA continues to be the most common option for remediating groundwater at LUST sites (Exhibit 5-7). Between 1995 and 2001, MNA use grew from 49 to 67 percent of sites while the use of pump and treat declined from 30 to 12 percent. The MNA usage rate is substantially higher than that of NPL sites. MNA-only RODs have hovered around 20 percent of groundwater RODs between 1999 and 2001, and dropped to only 7 percent in 2002. Pump and treat, which has been selected at 67 percent of NPL sites between 1982 and 2002 (U.S. EPA 2004a), has been declining at LUST sites (from 30 percent in 1995 to 12 percent in 2001). The decline of pump and treat may be attributed to the fact that it takes a long time to achieve cleanup goals, it has been demonstrated to spread contamination in some cases, and it is expensive to operate and maintain.

**Exhibit 5-7. Type and Frequency of Groundwater Remediation Technologies at LUST Sites**




Source: Kostecki, Paul and Marc Nascarella, "Lust Cleanup Landscape Changing: Landfilling Still In, Pump and Treat on the Way Out," *Contaminated Soil Sediment and Water*, January/February 2003.

In-situ bioremediation and air sparging are the other two most common technologies used at LUST sites (Kostecki & Nascarella 2003). Bioremediation use at LUST sites is significantly lower than at NPL sites (9 percent in 2001 compared to a range of 8 to 36 percent of NPL sites between 1997 and 2002).

The results of the 2001 survey indicate that, except for low-temperature thermal desorption, the older soil remediation technologies such as SVE and landfarming, are growing in popularity for soil remediation, while MNA continues to grow as the technology of choice for groundwater remediation. An interesting result of this study is that no new soil- or groundwater-remediation technologies has been developed in the past decade, according to respondents in 35 states.

## 5.7 References

Bueckman & Russell, 1991. *Underground Storage Tanks: Resource Requirements for Corrective Action*, Bueckman, D. S., S. Kumar, and M. Russell, University of Tennessee, Waste Management Research and Education Institute, Knoxville, TN, December 1991.

Kostecki & Nascarella, 2003. "Lust Cleanup Landscape Changing: Landfilling Still In, Pump and Treat on the Way Out," Kostecki, Paul, and Marc Nascarella, *Contaminated Soil Sediment and Water,* January/February 2003.

NEMW, 2002. *Recycling America's Gas Stations: The Value and Promise of Revitalizing Petroleum Contaminated Properties* Northeast-Midwest Institute and National Association of Local Government Environment Professionals, 2002.

NEIWPCC, 2003. *A Survey of State Experiences With MTBE and Other Oxygenate Contamination at LUST Sites,* New England Interstate Water Pollution Control Commission, August 2003.

Oklahoma, 2001. *Oklahoma's Pay-For-Performance Program*, Petroleum Storage Tank Division, Oklahoma Corporation Commission, April 2001. http://www.nga.org/cda/files/OKPAYFORPERF.pdf

Tremblay et al, 1995. "Innovation Skyrockets at 50,000 LUST Sites," Deborah, L., D. S. Tulis, P. Kostecki, and K. Ewald, *Soil and Groundwater Cleanup*, December 1995.

U. S. EPA (Environmental Protection Agency), 1988. *Technical Requirements and State Program Approval; Final Rule*, 53 FR No. 185, Office of Underground Storage Tanks, September 23, 1988.

U. S. EPA, 1991. *Survey of Underground Storage Tanks,* Office of Underground Storage Tanks, Spring 1991.

U. S. EPA. 1992a. *TC [Toxicity Characteristic] Study of Contaminated Media and Debris*, Draft, Office of Underground Storage Tanks, July 1992.

U.S. EPA, 1992b. *Technologies and Options for UST Corrective Actions: Overview and Current Practice,* EPA/ 542/ R-92/010, Office of Underground Storage Tanks and Technology Innovation Office, August 1992.

U. S. EPA, 1993. *An Overview of Underground Storage Tank Remediation Options,* EPA 510-F-93-029, Office of Underground Storage Tanks, October 1993.

U. S. EPA, 1995a. *How to Evaluate Alternative Cleanup Technologies for UST Sites: A Guide for Corrective Action Plan Reviewers*, EPA-510-B-95-007, Office of Underground Storage Tanks, May 1995.

U. S. EPA, 1995b. *Underground Storage Tanks: Lender Liability; Final Rule*, 40 CFR Parts 280 and 281, *Federal Register*, Vol. 60, p. 46692, September 7, 1995.

U.S. EPA, 1996. *Pay for Performance Cleanups, Effectively Managing Underground Storage Tank Cleanups,* EPA 510-B-96-002, Office of Solid Waste and Emergency Response, June 1996.

U. S. EPA, 1997. *Expedited Site Assessment Tools for USTs: A Guide for Regulators*, EPA-510-B97-001, Office of Underground Storage Tanks, March 1997.

U. S. EPA, 1999. *The Use of Monitored Natural Attenuation at Superfund, RCRA Corrective Action, and Underground Storage Tanks Sites*, OSWER Directive 9200.4-17P, Office of Solid Waste and Emergency Response, April 21, 1999.

U.S. EPA, 2000. *Underground Storage Tank Program: Regional and State Contacts*, EPA 510-F-00-00, Office of Solid Waste and Emergency Response, January 2000.

U. S. EPA, 2003a. Cleanup Information Web site (CLU-IN), Office of Solid Waste and Emergency Response, (http:// www.cluin.org).

U. S. EPA, 2003b. Office of Underground Storage Tanks web site, Office of Solid Waste and Emergency Response. http://www.epa.gov/swerust1

U.S. EPA, 2003c. *Semi-Annual Activity Report, Second Half (September 30 2003)*, Office of Underground Storage Tanks. http://www.epa.gov/swerust1/cat/camarchv.htm

U.S. EPA, 2004a. *Treatment Technologies For Site Cleanup: Annual Status Report (Eleventh Edition),* Office of Solid Waste and Emergency Response, Technology Innovation Office, EPA-542-R-03-009, February 2004. http://www.clu-in.org/asr

U.S. EPA, 2004b. *Semi-Annual Activity Report, First Half ( March 31, 2004)*, Office of Underground Storage Tanks. http://www.epa.gov/swerust1/cat/camarchv.htm

U.S. GAO, 2001. *Environmental Protection: Improved Inspections in Enforcement Would Better Ensure the Safety of Underground Storage Tanks,* GAO-01-464, U.S. General Accounting Office, Report to Congress, May 2001.

U.S. GAO, 2002. *Environmental Protection: Improved Inspections and Enforcement Would Ensure Safer Underground Storage Tanks,* GAO-02-712T, U.S. General Accounting Office, May 8, 2002.

U.S. GAO, 2003. *Environmental Protection: Recommendations for Improving the Underground Storage Tank Program,* GAO-03-529T, U.S. General Accounting Office, March 5, 2003.

# Chapter 6
# Demand for Remediation of Department of Defense Sites

The Department of Defense (DOD) has undertaken the task of cleaning up wastes that have resulted from numerous industrial, commercial, training, and weapons activities, as well as cleaning up closing military bases so that the properties can be transferred to local communities for economic revitalization. DOD has estimated that of the approximately 9,000 sites it has remaining in the cleanup process or with future preliminary assessment starts planned, almost 6,400 of these sites have yet to start and/or complete evaluation and more than 2,600 sites have remedial design or other remedial action underway or planned for future completion. These sites contain hazardous waste contamination involving soil, groundwater, and other media. Typical contaminants include petroleum products, solvents, heavy metals, explosives and munitions residue, polychlorinated biphenyls (PCBs), and pesticides.

***Highlights***
- Approximately 9,000 DOD sites remain in the remediation process.
- DOD estimates that it will cost $16.4 billion to complete cleanup of its active installations, BRAC and FUDS sites.
- An additional $16.8 billion is projected for Military Munitions Response sites. The full scope of MMRP cleanup is still uncertain.
- DOD estimates that it will complete remediation of all of its sites up by 2015.
- Achieving the above goals is contingent upon receiving adequate funding.
- An additional round of base closures and realignments scheduled to begin in FY 2005 could alter the sequence of the cleanup effort.
- The nature and magnitude of contamination at some sites have yet to be determined.

Over more than two decades, DOD has made considerable progress in locating, investigating, and cleaning up thousands of contaminated sites. DOD has identified more than 30,000 sites on over 1,700 installations. Of these, over 21,000 sites were cleaned up or found to require no further remedial action. To address sites in its cleanup program, DOD uses a prioritization scheme for sequencing work based on the relative risk of individual sites. Under this management approach, decisions regarding such issues as cleanup standards, remedy selection, and no further action determinations are made site-by-site rather than for an entire installation. Decisions on these issues are made on a risk management approach that considers the relative threat to human health and the environment, reasonable anticipated land use, cost-effectiveness, and speed of cleanup, and depend on early and meaningful public participation. DOD works with the regulatory agencies and other interested parties to streamline and find economies in the environmental restoration process.

To accomplish site characterization and cleanups, DOD needs the services of firms that can clean up wastes similar to those found at private sector industrial facilities as well as firms that can remediate wastes that are unique to DOD, such as unexploded ordnance (UXO). These environmental service firms will have to understand DOD operating procedures and keep abreast of the overall direction of its environmental programs.

## 6.1 Program Description

The DOD created the Installation Restoration program (IRP) in 1975 to investigate and remediate contaminated sites resulting from past DOD activities. The Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), and the Resources Conservation and Recovery Act (RCRA) are the primary federal laws that govern the identification, investigation, and cleanup of DOD contaminated sites. Congress formally established the Defense Environmental Restoration Program (DERP) and its funding mechanism, the Defense Environmental Restoration Account (DERA) in 1986. DERP uses the CERCLA framework for DOD cleanup. Also during the 1980s, Congress recognized the need to close or reduce the size of many installations, and authorized four rounds of base realignment and closures (BRAC) in 1988, 1991, 1993, and 1995 (U.S. Congress, 1998). The FY 2002 Defense Authorization Act authorized another round of closures for FY 2005.

DOD installations typically have multiple contaminated sites regulated by CERCLA, RCRA corrective action provisions, RCRA underground storage tank (UST) provisions, or all three. Through Executive Order 12580, signed in January 1987, the President delegated to the Secretary of Defense Presidential CERCLA authorities for investigation and cleanup measures for releases of hazardous substances from facilities under the jurisdiction of the Secretary. The interface between CERCLA and RCRA authorities is determined by the circumstances at specific sites, including factors such as the source and cause of the contamination, the status of the installation as either a National Priorities List (NPL) or non-NPL site, and whether the installation has or is seeking a RCRA permit to manage hazardous wastes. DOD cleanups must also consider the requirements of state laws and the BRAC acts. Partnering efforts allow DOD, EPA, and the states to reconcile overlaps and inconsistencies in regulatory requirements to ensure the most effective and timely cleanups. A detailed description of their remediation programs is included in the *Defense Environmental Restoration Program Annual Report to Congress* (U.S. DOD, 2002a).

The implementation process for the DOD cleanup program generally follows those of the environmental statutes. Although the regulatory framework of CERCLA and RCRA differ in many ways, their implementation processes generally parallel one another. Each requires assessments and investigations to determine the need for cleanup, and the selection and design of appropriate remedies to ensure protection of human health and the environment. However, each program has its own nomenclature for the various phases of study, design, and cleanup.

### 6.1.1 Installation Restoration Program

DERP is the DOD program for the evaluation and cleanup of past contamination at DOD sites. The Deputy Undersecretary of Defense for Installations and Environment or ODUSD (I&E) oversees environmental restoration activities, including work conducted at BRAC installations.

DOD refers to the program for meeting its responsibilities under CERCLA as the IRP. Under IRP, DOD cleans up all contaminated sites for which cleanup is required by environmental statutes, whether or not the sites are on the NPL. Although policy direction and oversight of IRP are the responsibility of the ODUSD (I&E), each individual DOD Component (Army, Navy, Air

Force, and Defense Logistics Agency) is responsible for program implementation. The Army Corps of Engineers (Corps) is the execution agent for all Formerly Used Defense Sites (FUDS) as well as for the Defense and State Memorandum of Agreement (DSMOA) program which funds states and territories for technical services they provide to support the cleanup of DOD facilities. In 2001 DOD established the Military Munitions Response Program (MMRP) to manage cleanup of unexploded ordnance (UXO) and waste military munitions (WMM) at areas other than operational ranges. The DERP Management Guidance (U.S. DOD, 2001a) defined and established the MMRP, laying out specific requirements for the DOD components.

Each installation works toward completing its environmental restoration requirements by developing and maintaining a management action plan (MAP) or a base realignment and closure (BRAC) cleanup plan (BCP). A MAP contains information about an active installation's past activities and current status, presents a vision for future site-level requirements, establishes schedules, and identifies future funding requirements through completion. A BCP is the equivalent document for an installation undergoing base closure and transfer of property to the community. Each installation updates its MAP or BCP at least once a year.

DERP has specified procedures for evaluating sites and procuring cleanup services under the IRP that conform to the regulatory requirements of the National Oil and Hazardous Substances Contingency Plan (NCP). These procedures cover all the phases of site operations, including preliminary assessment (PA), site inspection (SI), remedial investigation/feasibility study (RI/FS), remedial design (RD), and remedial action (RA). In most cases, activities related to preliminary assessment through remedial design are conducted by different contractors than are those related to remedial action. Activities conducted under IRP are classified as follows:

- Investigation: Analysis to characterize the nature, extent, and risk of releases of hazardous substances to the environment and to develop and select cleanup remedy.

- Interim Action: Early measure to reduce the risk of releases of hazardous substances before the initiation of more complicated, comprehensive, and long-term cleanup remedies. For example, placing fences around contaminated areas or removing and treating or disposing of contaminated soil.

- Design: Performance specifications or detailed engineering plans and specifications to construct and implement a final cleanup remedy.

- Cleanup: Action to construct and implement a final cleanup remedy.

In selecting and designing remedies at NPL sites, DOD officials coordinate with EPA regional officials to ensure that cleanup goals meet regulatory requirements. Most contracting is done by installations, either through centralized contracting service centers or directly with the installation. Although the DOD Components follow the general procedures specified by DERP, each DOD Component procures its own cleanup services. Section 6.5 describes typical procurement practices.

### 6.1.2 Base Realignment and Closure (BRAC)

Additional procedures and expedited timetables have been established for the cleanup of bases being closed or realigned. These procedures, known as DOD's Fast Track Cleanup Program, have influenced the sequence of work to be conducted. This BRAC cleanup approach balances reuse needs and priorities with environmental requirements in prioritizing and sequencing cleanup of sites. In the past, most restoration projects included the same overall cleanup time line for an entire installation, regardless of the relative threat to human health and the environment that individual sites caused. In implementing the relative risk approach, DOD is working with EPA, the states, and the public to review the prioritization process.

A major influence on the selection of projects for remediation is DOD's effort to speed the economic recovery of communities with closed installations. In prioritizing sites and developing cleanup plans DOD considers the potential for local job creation and economic development, and the accelerated pace of site investigation, evaluation, and cleanup efforts. The key features of the program are:

- A BRAC Cleanup Team (BCT) is established at each installation slated for closure, to enhance environmental decision-making at the installation. Each BCT includes representatives from the installation, state environmental regulatory agency, and EPA Regional Office. These teams have the authority, responsibility, and accountability for environmental restoration programs at those installations.

- A BRAC Cleanup Plan (BCP) is prepared for each installation slated for closure and updated annually to reflect new information and changing conditions. The BCP serves as a comprehensive and consolidated statement of the status of the installation and strategy to expedite its cleanup. The BCT is responsible for the preparation of this plan.

- A Restoration Advisory Board (RAB) is established in communities where interest is sufficient to warrant it. RABs are intended to bring together people who reflect diverse interests within the community, in order to foster the early and continual flow of information between the affected community, the installation, and the state and federal regulatory agencies (U.S. DOD, 1994).

- An Environmental Baseline Survey (EBS) is conducted for each closing installation, as mandated the Community Environmental Response Facilitation Act (CERFA), which is an amendment to CERCLA. The CERFA requires DOD to identify and document all uncontaminated parcels of land and installations undergoing closure. These properties quickly can be turned over to communities for economic reuse.

The BRAC environmental program encompasses more than environmental restoration efforts. BRAC environmental funding also addresses closure-related environmental compliance, which includes such actions as the removal of USTs, closure of hazardous waste treatment, storage, and disposal facilities (TSDFs), radon surveys, and asbestos abatement.

### 6.1.3 The Military Munitions Response Program

Decades of military training, weapons system testing, and munitions production has resulted in the presence of UXO, discarded munitions, and munitions residue on ranges where training and testing occurred. In addition, excess, obsolete, and damaged munitions have been disposed of at numerous military installations. In 2001 DOD established the Military Munitions Response program (MMRP) to manage the cleanup of UXO, waste military munitions (WMM), and chemical residues of munitions at areas other than operational ranges. DOD has been addressing these issues since the inception of the IRP and will continue to conduct some incidental munitions response activities under the IRP. Sites within the MMRP are those where the firing or disposal of munitions has occurred during training exercises and were not addressed under the IRP. The 2001 Management Guidance for the Defense Environmental Restoration Program defines the requirements for the MMRP. The guidance specifies the eligibility, identification, characterization, tracking and reporting on munitions response sites that is similar to the IRP, including adding the MMRP data in the Restoration Management Information System (RMIS) database.

## 6.2 Factors Affecting the Demand for Cleanup

The following factors could alter the scope of the cleanup as well as the technologies used:

- The pace of remediation is subject to change in response to budgetary and political developments. The entire FY 2003 DOD budget for environmental restoration is approximately $2.07 billion. Of these funds, $760.6 million, or approximately 37 percent, represent BRAC funds (U.S. DOD, 2004).

- The proportion of the environmental restoration budget allocated for cleanup at active installations and FUDS continues to increase while study and investigation funding decreases. The FY 2003 budget obligated approximately 59 percent of the funds to cleanup and 26 percent to studies and investigations. The FY 2005 planned budget estimates that approximately 70 percent of the funds will go toward cleanup.

- Although DOD believes that most sites have been located, new sites continue to be identified. The recently established MMRP may impact on the number of new sites.

- DOD classifies all IRP sites in terms of a relative-risk framework, evaluating each site based on three factors: the nature and extent of the contaminant, the potential for it to migrate, and receptors that could be impacted by the contamination. The resulting evaluation is not an estimate of absolute risk or a substitute for a baseline risk or health assessment. It serves as a basis for discussing the relative risk of sites with involved stakeholders.

- In determining the priorities for funding at all sites, DOD generally addresses the worst sites first. The projected time line for the remediation of high relative-risk sites is significantly shorter than the time lines for medium or low risk sites. As of the end of FY 2002, DOD has achieved its goal of reaching remedy in place (RIP) or response complete (RC) status at 50 percent of its high-relative risk sites. In implementing its priorities, DOD may assign

varying levels of priority to different sites on a given installation. This policy may lead to acceleration of some projects at a given installation while other projects at the same installation are postponed.

- At closing installations, DOD has been working to complete remediation at all of the current BRAC sites by the end of FY 2005. However, the department does not anticipate reaching this goal. It does expect to achieve RIP or RC at 83 percent of BRAC IRP sites. In addition, for the FY 2005 round of closures the schedule and sequencing of sites may change at the affected installations.

- DOD policy calls for extensive consultation with EPA, state environmental authorities, local communities, local planning authorities, and other interested parties in planning and implementing its cleanup programs. These requirements may influence the sequence of work and types of technologies selected for a site.

- Changes in regulatory requirements also may affect cleanup goals, technologies used, and cost.

- Cleanup requirements at many identified sites are uncertain because the nature and magnitude of contamination is only partially known. As DOD continues to characterize the contamination problem and accumulate data from site investigations, cleanup needs will become more clearly defined.

## 6.3 Number and Characteristics of Sites

Site characteristics data presented in this chapter are based on information in the *Defense Environmental Restoration Program: Annual Report to Congress for Fiscal Year 2003* (U.S. DOD, 2004) and an analysis of DOD's Restoration Management Information System (RMIS), which is an important tool DOD uses for program management and oversight. RMIS contains data provided by the Components on the status of DOD sites for which they are responsible (U.S. DOD, 2001b). This report uses data from two separate tabulations of RMIS data – one based on the program status as of September 30, 2003 and one based on the program status as of September 30, 2001 (U.S. DOD 2004 and 2002a). The 2003 data are presented only at the total program and component levels. The 2001 data provide more detail regarding the types of sites, media, and contaminants being addressed by DOD.

### 6.3.1 Number and Types of Sites

As of September 30, 2003, DOD has identified 30,273 sites (including 3,091 sites on FUDS properties) located on over 1,700 installations and facilities, that have or had potential hazardous waste contamination involving soil, groundwater or other media. This total includes 2,817 MMRP sites, mostly on FUDS properties (U.S. DOD, 2004). Response actions were completed at 21,213 sites (18,584 sites on DOD installations and facilities and 2,629 FUDS). Of the remaining 9,060 sites (6,827 DOD sites and 2,233 FUDS sites, including MMRP) 6,396 were planning for or in various phases of investigation, and 2,664 are planning for or are in various stages of cleanup. The remaining sites also include 1,729 MMRP sites. Exhibit 6-1 shows the

status of these sites by component. Exhibit 6-2 shows the breakdown of the 9,060 sites needing cleanup by component. The most significant change in number of sites between 2001 and 2003 is an almost 85 percent increase in the number of identified MMRP sites.

**Exhibit 6-1. Number of DOD Sites by Status**

| | Sites Identified | | | | Sites Needing Cleanup [a] | | |
|---|---|---|---|---|---|---|---|
| DOD Component | IRP Sites | MMRP Sites | Total Sites | Responses Completed [a] | Cleanup Planned or Under way | Investi-gation Planned or Under way | Total |
| Army | 12,266 | 560 | 12,826 | 10,927 | 398 | 1,501 | 1,899 |
| Navy | 4,715 | 225 | 4,940 | 3,220 | 536 | 1,184 | 1,720 |
| Air Force | 6,830 | 261 | 7,091 | 3,984 | 1,089 | 2,018 | 3,107 |
| DLA | 553 | 0 | 553 | 453 | 64 | 36 | 100 |
| DTRA | 1 | 0 | 1 | 0 | 1 | 0 | 1 |
| FUDS | 3,091 | 1,771 | 4,862 | 2,629 | 576 | 1,657 | 2,233 |
| **TOTAL** | 27,456 | 2,817 | 30,273 | 21,213 | 2,664 | 6,396 | 9,060 |

Notes:
[a] Includes MMRP sites
IRP = Installation Restoration Program; MMRP = Military Munitions Response Program
DTRA = Defense Threat Reduction Agency
Source: U.S. DOD, 2004, Defense Environmental Restoration Program, Annual Report to Congress, Fiscal Year 2003, Spring 2004

DOD derived the estimates on the types and characteristics of sites in the remainder of this chapter from a combination of data in RMIS, and information provided by the DOD Components as of September 30, 2001. Although the total number of sites in these tabulations is slightly lower than the FY 2003 sites indicated above, they depict typical DOD site characteristics. However, because SIs and RI/FSs have not been completed at a number of these sites, these estimates, as well as program cost estimates, may be revised either up or down over the next several years as more information becomes available. Exhibit 6-3 shows the geographic distribution of these sites, and Appendix Exhibit C-1 shows the breakdown by DOD component and state. California, with 2,011 sites has the most DOD sites needing cleanup.

## Exhibit 6-2. Number of DOD Sites and Installations Needing Cleanup




Note: Totals equal 8,974 sites and 2,218 installations to be remediated as of September 30, 2001. The number of installations is less than those appearing in Exhibit C-1 because some installations were included by more than one component.

Source: DOD, Office of the Deputy Under Secretary of Defense (Installations and Environment), Restoration Management Information System, November 2001.

## Exhibit 6-3. Location of DOD Sites Needing Cleanup




Notes: Total equals 8,974 sites to be remediated as of September 30, 2001. Appendix Exhibit C-1 provides the data by state and DOD component.

Source: DOD, Office of the Deputy Under Secretary of Defense (Installations and Environment), Restoration Management Information System, November 2001.

DOD categorizes its sites into 44 types, which are different than the site types used to categorize the NPL sites in Chapter 3 of this report. The DOD system of site nomenclature uses categories that include both activities and physical descriptions. Exhibit 6-4 shows the number of sites for each of the 10 most common site types that need cleanup. These sites account for 71 percent of all DOD sites needing remediation. Although some sites may have resulted from more than one type of activity, each site is counted in only one category. The definitions of all the site types are provided in Appendix Exhibit C-2. Appendix Exhibit C-3 details, by DOD Component, the number of each site type requiring remediation.

**Exhibit 6-4. Most Common Types of DOD Sites Needing Cleanup**




Notes: These 10 site types account for 6,364 (71%) of the 8,974 DOD sites to be remediated as of September 30, 2001. Appendix Exhibit C-2 gives definitions of the 44 site types. Appendix Exhibit C-3 lists the frequencies of all 44 site types.

Source: DOD, Office of the Deputy Under Secretary of Defence (Installations and Environment), Restoration Management Information System, 2001.

### 6.3.2 Contaminated Matrices

Of the 8,974 sites estimated to need cleanup in FY 2001, data that identified the type of matrix (contaminated soil, groundwater, surface water, and sediment) were available for 6,119 sites, or 77 percent. Exhibit 6-5 shows, by DOD Component, the number of sites that contain each type of matrix. Sixty three percent of the sites have contaminated groundwater and 77 percent have contaminated soil. Contaminated surface water and sediment are associated with only 15 percent and 18 percent of the sites, respectively. The totals add to up to more than the number of sites, since a site may contain more than one type of contaminated media.

The relevant media vary from one site type to another (Exhibit 6-6). For example, contaminated groundwater was found at 85 percent of fire/crash area sites, but only 42 percent of the storage area sites. Likewise, 61 percent of underground storage tank sites had soil contamination, compared to 100 percent of pesticide shop sites and 91 percent of storage area sites. However, the amount of available data varies from one site type to another. Of the top 10 site types, data were available for a low of 9 percent of unexploded ordnance sites to a high of 91 percent of surface disposal areas. Appendix Exhibit C-4 provides the matrices associated with all 44 site types.

**Exhibit 6-5. Frequency of Contaminated Matrices at DOD Sites Needing Cleanup**




Notes: Based on 6,118 sites for which data were available as of September 30, 2001. Appendix Exhibit C-4 shows the breakdown of these data by site type. Appendix Exhibit C-5 shows the breakdown by DOD component.

Source: DOD, Office of the Deputy Under Secretary of Defense (Installations and Environment), Restoration Management Information System, November 2001.

**Exhibit 6-6. Frequency of Contaminated Matrices by Site Type at DOD Sites Needing Cleanup**

| Site Type | No. of Sites | No. of Sites w/Data | Ground-water | Soil | Surface Water | Sediment |
|---|---|---|---|---|---|---|
| Spill Area | 1,107 | 874 (79%) | 58% | 78% | 12% | 13% |
| Landfill | 974 | 850 (87%) | 74% | 74% | 27% | 26% |
| Und. Storage Tanks | 840 | 459 (55%) | 80% | 61% | 5% | 7% |
| Other | 734 | 121 (16%) | 8% | 14% | 2% | 3% |
| Unexploded Munitions/Ord. | 588 | 54 (9%) | 5% | 7% | 2% | 2% |
| Surface Disposal Area | 563 | 512 (91%) | 53% | 82% | 16% | 22% |
| Storage Area | 477 | 417 (87%) | 42% | 91% | 10% | 14% |
| Contaminated Groundwater | 418 | 321 (77%) | 90% | 54% | 17% | 14% |
| Disposal Pit/ Dry Well | 414 | 352 (85%) | 54% | 64% | 13% | 18% |
| Fire/Crash Training Area | 249 | 208 (84%) | 85% | 85% | 19% | 19% |

Notes: The 10 most common site types account for 6,364 or 71% of the 8,974 DOD sites to be remediated as of September 30, 2001. Appendix Exhibit C-4 lists the frequency of contaminated matrices for all 44 site types to be remediated.

Source: DOD Office of the Deputy Under Secretary of Defense (Installations & Environment), Restoration Management Information System (RMIS), data as of September 2001.

### 6.3.3 Types of Contaminants

For this study, using available data, the contaminants were grouped into five categories: volatile organic compounds (VOCs), semivolatile organic compounds (SVOCs), metals, explosives and propellants, and "other." "Other" primarily includes inorganic elements and compounds such as asbestos, arsenic, inorganic cyanides, corrosives, pesticides, and herbicides. Exhibits 6-7 and 6-8 show the major contaminant groups by matrix and DOD Component. The data used to create these exhibits are in Appendix Exhibit C-5.

The most prevalent contaminant groups in groundwater are VOCs and metals, which appear in 74 percent and 63 percent of DOD groundwater sites, respectively (Appendix Exhibit C-5). However, while metals appear in the majority of sites in all matrices, VOCs are present in only 45 percent and 49 percent of the soil and surface water sites, respectively. SVOCs and metals were more consistent across different media than VOCs. SVOCs were found at between 49 and 64 percent of the sites, and metals were found at between 63 and 79 percent of the sites.

**Exhibit 6-7. Major Contaminant Groups by Matrix at DOD Sites Needing Cleanup**




Notes: Based on 6,118 sites needing cleanup for which data were available as of September 30, 2001. A contaminant group may appear in more than one matrix at a site. Appendix Exhibit C-5 provides the supporting data.

Source: DOD, Office of the Deputy Under Secretary of Defense (Installations and Environment), Restoration Management Information System, November 2001.

The most frequently occurring group–metals– is found at 72 percent of all sites with available contaminant data, followed by VOCs at 64 percent, and SVOCs at 57 percent. VOCs are found at most sites in all the components, except at DLA sites, where VOCs account for only 41 percent of the sites. These waste groups also are frequently found at sites related to non-defense

industrial facilities. In addition, some sites contain contaminants that are found less frequently in industry and that present unique problems for selecting remediation approaches. For example, over 6 percent of DOD sites contain explosives and some contain low-level radiation. Explosives are found at 13 percent of Army sites, but at 1 percent of Navy and Air Force sites. Appendix Exhibit C-5 shows a breakdown of these data into the frequencies of the most common contaminant groups for each medium and DOD Component.

**Exhibit 6-8. Major Contaminant Groups By DOD Component at Sites Needing Cleanup**




Notes: Based on 6,118 sites needing cleanup for which data were available as of September 30, 2001. More than one contaminant group can appear at a site. Appendix Exhibit C-5 provides the supporting data.

Source: DOD, Office of the Deputy Under Secretary of Defense (Installations and Environment), Restoration Management Information System, November 2001.

The frequency of occurrence of contaminants also varies by site type. Exhibit 6-9 shows the relative frequency of occurrence of the major contaminant groups for five of the seven most common site types. The "other" site type is not shown nor is the fifth most common site type unexploded munitions/ordnance since data for this site type is sparse. Metals and VOCs are common to all five site types, although the frequencies vary. For example the occurrence of metals ranges from 48 percent of underground storage tanks to 88 percent of landfills. Appendix Exhibit C-6 shows contaminant group occurrences for all 44 site types.

**Exhibit 6-9. Frequency of Major Contaminant Groups for the Most Common DOD Site Types Needing Cleanup**




Notes: Based on 6,118 sites needing cleanup for which data were available as of September 30, 2001. More than one contaminant group can appear at a site. Appendix Exhibit C-6 shows the breakdown of the data for all site types.

Source: DOD, Office of the Deputy Under Secretary of Defense (Installations and Environment), Restoration Management Information System, November 2001.

## 6.4 Estimated Cleanup Costs

DOD annual funding for DERP and BRAC combined peaked at $2.5 billion in FY 1994. The FY 2003 funding was $2.1 billion and planned expenditures for FY 2004 are $1.7 billion. BRAC accounts for $344 million, or 20 percent of the planned budget (Exhibit 6-10). Between 2000 and 2005 (estimated), the BRAC percentage has ranged from 20 to 37 percent. However, BRAC expenditures may need to increase again with the addition of installations from the next round of BRAC scheduled for FY 2005. Also, because the environmental issues at a BRAC installation require more

**Exhibit 6-10. DOD Cleanup Expenditures: FY 2001-2005**




[a] includes DLA prior year unobligated balance available for execution FY 05.

Source: U.S. Department of Defense, Environmental Restoration Program, Annual Report to Congress, Fiscal Year 2003, 2004.

extensive consideration than active installations, BRAC cost-to-complete estimates are not declining at the same rate as the estimates for active installations.

It should be noted that not all BRAC environmental funds are used for site investigation and remediation. They may also be used for other closure-related environmental expenses such as environmental compliance and planning. Compliance efforts may include actions such as the removal of underground storage tanks, closure of hazardous waste TSDFs, and radon surveys. Planning may involve environmental analyses required under NEPA, or decision-making with regard to property reuse and redevelopment. On the other hand, BRAC funding is not limited to the designated amounts.

In the past 19 years, DOD has spent approximately $25 billion on environmental restoration (U.S. DOD 2004). DOD estimates that, as of September 2003, cost to complete of the 9,060 active installation, FUDS, and BRAC IRP sites still in progress or with anticipated future assessments planned will be approximately $16.4 billion. The cost to complete for the 987 MMRP sites with investigation or cleanup in progress or where future activity is anticipated is estimated to be approximately $16.8 billion. Most of these funds are for sites that have not yet begun remedial action, although some are for sites that have already selected remedies. These cost-to-completion estimates do not include program management, DTRA, or other miscellaneous overhead and support costs. Approximately $1.26 billion of the $16.4 billion IRP estimate is designated for investigation and approximately $2.55 billion of the $16.8 billion MMRP estimate is designated for investigation. As the MMRP develops, DOD's MMRP cost-to-complete estimates may change.

DOD's goal is to have remedial action complete at active installations by the end of FY 2014 and at the end of FY 2005 for most of the BRAC sites from pre-2005 BRAC rounds. Because completion dates have not been determined for some FUDS properties, it is more difficult to approximate a final cleanup date. With the MMRP still in development, it would be premature to deal with cleanup time tables.

## 6.5 Market Entry Considerations

Although policy is determined centrally by the Deputy Under Secretary of Defense (Installations and Environment), each service is responsible for investigating and restoring its own sites and manages its own efforts to perform this work. Almost all DOD site assessments and remedial actions are done by contractors. Generally, there are two groups of contractors: those that work on site investigations and assessments and those that do remedial actions. Contractors in the first group seldom do the construction work. Vendors seeking markets for innovative technologies should take action to ensure that their technologies are considered at the earlier stages of site investigation and assessment. For example, even if a vendor is precluded from working on the RI/FS of a particular site, he or she may provide information on their technology to the DOD officials and contractors working on the RI/FS. References and links to the various DOD offices involved in technology development and contracting appear at the end of this report. The following is a summary of the practices of each DOD Component.

### *Army*

The Army's environmental restoration program is managed under the Assistant Secretary of the Army (Installations and Environment) (ASA(I&E)) and the Assistant Chief of Staff for Installation Management (ACSIM). In addition to managing active installations and BRAC environmental restoration programs, the ASA(I&E) and ACSIM oversee the management of the FUDS program. Execution of the cleanup is decentralized, with centralized oversight. In both the active installations and the BRAC programs, the Army installations are the focal point for restoration activity. The installation environmental coordinator manages the day-to-day activities, which are executed primarily through the U.S. Army Corps of Engineers (USACE). The Corps also implements remediation programs for DLA and the Air Force, and supports EPA, other federal agencies, and states in environmental restoration activities. The Army Environmental Center (USAEC), a field-operating agency under ACSIM, provides program management support and oversight for ACSIM, while the Center for Health Promotion and Preventive Medicine plays a key role in providing risk assessment expertise and review of decision documents. For additional information on these Army programs as well as details on the contracting process, opportunities, and contacts see the links in section 6.7.

### *Navy*

The Navy's environmental restoration program, begins with the Assistant Secretary of the Navy (Installations and Environment). Under the Assistant Secretary, the Chief of Naval Operations and the Commandant of the Marine Corps rely on a host of internal and external organizations to accomplish their DERP goals. The Naval Facilities Engineering Command (NAVFAC) and its eight Engineering Field Divisions and Activities (EFD/As) nationwide execute the Navy's restoration program. Remedial project managers (RPMs) are assigned for each installation in each of the geographic regions. The RPMs reside at the EFD/As but work closely with the installations and the regulators in planning, setting priorities, establishing budgets, and coordinating project execution. RPMs and the support staff at the EFD/As manage contracting, technical coordination, direction, and execution of the work on a regional basis. Installations maintain ultimate responsibility for their respective restoration programs. Detailed information and opportunities are available on the NAVFAC web site by command (link in section 6.7).

The Naval Facilities Engineering Service Center (NFESC) provides the Navy with specialized engineering, scientific, and technical products and services. It is the hub for the Navy's innovative environmental remedial technology demonstrations, evaluations, and technology information transfer efforts. NFESC encourages vendors and innovators to submit abstracts on their environmental technologies for potential application throughout the Navy and DOD. FY 2001 awards for field application projects totaled approximately $3.7 million. The Navy disseminates this information through regular technical seminars and collaborative efforts with other agencies and organizations involved in remediation technologies. For additional information on NFESC, see the link in section 6.7.

### *Air Force*

The Air Force's environmental restoration program begins with the Assistant Secretary for Installations, Environment and Logistics, with a Deputy Assistant for Installations and another Deputy Assistant for Environment, Safety, and Occupational Health. The IRP is decentralized and executed by the nine Force Major Commands. The Air Force Center for Environmental

Excellence (AFCEE), headquartered at Brooks Air Force Base, Texas, is a field operating agency of the Civil Engineers of the Air Force. It has seven business lines, each with its own technical and support staff. AFCEE provides environmental, planning and construction management services and products. Small businesses can list themselves with the Air Force Small Business Environmental Database (AFSBED) managed by AFCEE. Information from AFSBED is available to small and minority businesses, government buyers, and large prime contractors who use the database regularly. The AFCEE also lists requests for proposal (RFPs) on its web site as well as on the federal government's general business opportunities site. Air Force HQ also has a web site dedicated to contracting procedures and opportunities. For more detailed information, see the links in section 6.7.

## 6.6 Remediation Technologies

DOD uses a variety of remediation technologies at its hazardous waste sites and actively conducts and supports research and demonstrations to meet its environmental restoration needs more efficiently and effectively.

### 6.6.1 Technologies Used at DOD Sites

EPA's treatment technologies database details the types of treatment technologies used at DOD NPL sites (EPA 2004). Comprehensive data on technology use at other DOD sites are not available. The available data from NPL sites may also be indicative of the types of approaches that might be needed for non-NPL DOD sites. Exhibit 6-11 lists the types of treatment technologies used in 153 source control applications at DOD sites and 164 groundwater projects. The most prevalent source control treatment technologies are SVE (31% of applications), in-situ bioremediation (15%), ex-situ bioremediation (10%), and ex-situ solidification/stabilization (10%).

DOD groundwater applications fall into three general approaches: monitored natural attenuation (40% of applications), pump and treat (33%), and in-situ treatment technologies (27%). The most frequently used groundwater treatments were air sparging (44% of in-situ treatment applications), in-situ bioremediation (20%), dual-phase extraction (13%), and chemical treatment (7%).

### 6.6.2 Research, Development and Demonstration

The Department's efforts predominantly focus on three major areas:

- Technology transfer,
- Demonstration and certification of emerging technologies, and
- Development of new technologies.

***Technology Transfer***

DOD uses the latest communications technologies to disseminate information, including the World Wide Web. In addition to DOD's own web sites, each of the services has at least one site dedicated to providing information on cleanup programs and technologies. The Army sites

include the U.S. Army Corps of Engineers (USACE) and the U.S. Army Environmental Center (USAEC). The Navy sites include the Navy Environmental Leadership Program (NELP) and the Naval Facilities Engineering Service Center (NFESC). The Air Force Center for Environmental Excellence (AFCEE) is the key site for information on Air Force programs and technologies. These sites also provide information and links for innovators and vendors to contact the services and potentially become part of the military's cleanup process.

### Exhibit 6-11. Treatment Technologies Used at DOD Sites

| Remediation Approach | Type | Number of Projects | Remediation Approach | Type | Number of Projects |
|---|---|---|---|---|---|
| **Source Control Treatment Technologies** | | | **In-Situ Groundwater Treatment Technologies** | | |
| Bioremediation | Ex Situ | 16 | Air Sparging | In Situ | 20 |
| Bioremediation | In Situ | 23 | Bioremediation | In Situ | 9 |
| Chemical Treatment | Ex Situ | 1 | Chemical Treatment | In Situ | 3 |
| Chemical Treatment | In Situ | 1 | Dual-Phase Extraction | In Situ | 6 |
| Dual-Phase Extraction | In Situ | 1 | In-Well Air Stripping | In Situ | 1 |
| Flushing | In Situ | 1 | Permeable Reactive Barrier | In Situ | 3 |
| Incineration | Ex Situ | 19 | Phytoremediation | In Situ | 2 |
| Open Burn/Open Detonation | Ex Situ | 2 | Thermally Enhanced Recovery | In Situ | 1 |
| Physical Separation | Ex Situ | 5 | **Total In-Situ Treatment Groundwater Technologies** | | **45** |
| Phytoremediation | Ex Situ | 1 | | | |
| Phytoremediation | In Situ | 1 | | | |
| Soil Vapor Extraction | In Situ | 48 | **Groundwater Approaches Summary** | | |
| Soil Washing | Ex Situ | 2 | Pump and Treat | | 54 |
| Solidification/Stabilization | Ex Situ | 15 | In-Situ Groundwater | | 45 |
| Solidification/Stabilization | In Situ | 3 | Monitored Natural Attenuation | | 65 |
| Thermal Desorption | Ex Situ | 11 | **Total Groundwater** | | **164** |
| Thermally Enhanced Recovery | In Situ | 3 | | | |
| **Total Source Control Treatment Technologies** | | **153** | | | |

Source: U.S. EPA, 2003. *Annual Status Report Remediation Database,* Office of Solid Waste and Emergency Response, Technology Innovation Office, http://epa.gov/tio/technologies

DOD has been active in facilitating technology transfer among development and demonstration programs and technology users. For example, DOD is working with the Federal Remediation Technologies Roundtable (FRTR), an interagency organization created to facilitate collaboration among federal agencies, such as the Department of Energy (DOE) and EPA, which also have a stake in technology development. The FRTR publishes a variety of documents on remediation technologies, including tool guides, case studies, and reports which are available on their web site.

#### *Demonstrations and Certification of Emerging Technologies*

The Department has two programs that research and assess technologies, the Strategic Environmental Research and Development Program (SERDP) and the Environmental Security Technology Certification Program (ESTCP). SERDP is a program in partnership with EPA and DOE which focuses on identifying, developing, and implementing environmental restoration technologies that minimize or eliminate the environmental impacts of DOD's activities. ESTCP is a program that demonstrates, tests, and validates new technologies. Each program introduces several cutting-edge restoration technologies. For example, in FY 2001 DOD supported a system that combines soil washing with phytoremediation to clean lead-contaminated soil from small arms ranges, and extended a successful pilot biowall treatment trench to clean up trichloroethene-contaminated hot spots.

With the increased attention to munitions cleanup, the Department plans to continue its significant investment in advancing the state of munitions response technology. To date, the focus has been on technologies related to site characterization. The Department is now planning to expand its technology development to address the hardware, methods, and scientific understanding to address other aspects of munitions response. In addition to the OSD programs, SERDP and ESTCP, that determine areas for technology investment, the Army, as the lead service for UXO technology development, is investing in research on improvements to detection hardware systems.

Each of the services also maintains technology development and demonstration programs. The Army Environmental Center, the Naval Facilities Engineering Service Center, and the Air Force Center for Environmental Excellence are leaders in cleanup technology demonstrations.

## 6.7 References

U.S. Congress, 1988, 1990. *Base Realignment and Closure Acts* of 1988, P.L. 100-526 (BRAC 88) and 1990, P.L. 101-510 (BRAC 91, 93, and 95). http://www.dtic.mil/envirodod/brac/index.html

U.S. DOD, 1994. *Restoration Advisory Board (RAB) Implementation Guidelines*, Memorandum Deputy Under Secretary of Defense (Environmental Security), U.S. Department of Defense, October 13, 1994.

U.S. DOD, 1999. *Relative Risk Site Evaluation*, U.S. Department of Defense, Deputy Under Secretary of Defense (Installations and Environment), July 1999.

U.S. DOD, 2001a. *Management Guidance for the Defense Environmental Restoration Program*, U.S. Department of Defense, Deputy Under Secretary of Defense (Installations and Environment), September 2001. http://www.dtic.mil/envirodod/

U.S. DOD, 2001b. *Restoration Management Information System* (RMIS), U.S. Department of Defense, Deputy Under Secretary of Defense (Installations and Environment).

U.S. DOD, 2002a. *Defense Environmental Restoration Program: Annual Report to Congress for Fiscal Year 2001*, U.S. Department of Defense, Deputy Under Secretary of Defense (Installations and Environment), Spring 2002. http://www.dtic.mil/envirodod

U.S. DOD, 2002b. *DOD Environmental Technology Program: A Report to Congress for Fiscal Year 2001,* U.S. Department of Defense, Deputy Under Secretary of Defense (Installations and Environment), March 2002. http://63.88.245.60/Derparc_FY01/DERP/indexEight.htm

U.S. DOD, 2002c. *Restoration Management Information System (RMIS) Data Dictionary*, U.S. Department of Defense, Deputy Under Secretary of Defense (Installations and Environment), April 2002. http://www.dtic.mil/envirodod

U.S. DOD, 2004. *Defense Environmental Restoration Program: Annual Report to Congress for Fiscal Year 2003*, U.S. Department of Defense, Deputy Under Secretary of Defense (Installations and Environment), Spring 2004. http://www.dtic.mil/envirodod/

U.S. EPA (Environmental Protection Agency), et al, June 2000. *Site Remediation Technology InfoBase: A Guide to Federal Programs, Information Resources, and Publication on Contaminated Site Technologies, 2nd Edition*, prepared by the member agencies of the Federal Remediation Technologies Roundtable. http://www.frtr.gov

U.S. EPA, et al, December 2001. *Federal Remediation Technologies Roundtable: Creating Tools for the Hazardous Waste Cleanup Community*, prepared by the member agencies of the Federal Remediation Technologies Roundtable, December 2001. http://www.frtr.gov

U.S. EPA, et al, April 2002. *Remediation Technologies Screening Matrix*, 4th Edition, prepared by the member agencies of the Federal Remediation Technologies Roundtable. http://www.frtr.gov

U.S. EPA, et al, 2002. *Abstracts of Remediation Case Studies, 1995-2002,* Volumes 1 - 6, prepared by the member agencies of the Federal Remediation Technologies Roundtable. http://www.frtr.gov

U.S. EPA, 2003. *Annual Status Report Remediation Database,* tabulation done in June 2003, Office of Solid Waste and Emergency Response. http://epa.gov/tio/technologies

**Related Links:**

*DOD documents on environmental cleanup:*
Office of the Secretary of Defense - Cleanup: http://www.dtic.mil/envirodod/
Defense Environmental Network & Information System: http://www.denix.osd.mil

*DOD business opportunities:*
Federal registry of business opportunities: http://www.fedbizopps.gov
DOD central contractor registration: http://www.dodbusopps.com/egov/dod.ccr.html
National Environmental Technology Test Sites (NETTS) Program: http://www.serdp.org/NETTS/
Environmental Security Technology Certification Program: http://www.estcp.org

*Army*
US Army Environmental Center: http://www.aec.army.mil
US Army Corps of Engineers: - http://www.usa00.army.mil
USACE Environmental Programs Contracting Opportunities: http://www.hq.environmental.usace.army.mil/tools

*Navy*
Naval Facilities Engineering Service Center: http://www.nfesc.navy.mil
Naval Facilities Engineering Command: http://www.navfac.navy.mil
Naval Environmental Leadership Program (NELP): http://nelp.navy.mil/

*Air Force*
Air Force Center for Environmental Excellence: http://www.afcee.brooks.af.mil/
Air Force Small Business Environmental Database: http://www.brooks-smallbusiness.com/afsbed.htm
Air Force HQ Contracting: http://www.safaq.hq.af.mil/contracting
Air Force HQ Environmental Restoration Branch: http://www.il.hq.af.mil/ilevr.html

# Chapter 7
# Demand for Remediation of Department of Energy Sites

One of the most serious and costly environmental remediation tasks facing the federal government is the cleanup and restoration of more than 100 installations and other locations that are the responsibility of the U.S. Department of Energy (DOE). DOE's "legacy" of environmental contamination at these sites has resulted from activities related to the development and production of nuclear weapons and other technologies that began in the 1940s with the Manhattan Project and continued through the Cold War. Nuclear weapons production halted in the United States in 1989, initially to correct widespread environmental and safety problems; later it was stopped indefinitely because of the end of the Cold War (U.S. DOE 1996a).

DOE properties contain unique radiation hazards, huge volumes of contaminated soil and water, and a large number of contaminated structures ranging from evaporation ponds to nuclear reactors to chemical plants used for the extraction of nuclear materials (U.S. DOE 1996b). DOE estimates that as of the end of fiscal year (FY) 2004, the remaining cost for restoration of its legacy sites would be $111 billion (U.S. DOE 2004). Hazardous waste remediation, including the cleanup of buried waste, soil, groundwater, surface water, and facility decontamination and decommissioning (D&D) account for about one-third of the total, or about $35 billion. DOE's most recent estimate for cleaning up its contaminated sites, under its accelerated cleanup initiative, aims for the completion of cleanup at all release sites by 2035. These costs are significantly lower than estimates in the FY 2002 and 2003 budgets because of a cost reduction made possible by management and organizational reforms within DOE. The remainder of DOE's environmental management costs are for activities such as waste management; facility stabilization; nuclear material stabilization, packaging, and transportation; program planning and management; landlord activities; and technology development.

***Highlights***

- DOE has estimated that the cost to complete active remediation of wastes at most of its legacy sites will be $35 billion, although this figure is probably an underestimate because it does not include the cost of addressing contamination problems that currently lack viable cleanup technologies.
- DOE aims to complete active cleanup at most of its sites by 2035.
- Five installations account for 73% of expected costs.
- An estimated 40 million cubic meters of soil and 1.7 trillion gallons of groundwater will require remediation.
- Approximately 3,000 surplus DOE facilities await D&D.
- Long-term stewardship will be needed at up to 129 installations and DOE has established the Office of Legacy Management to address this need.
- In 2002, DOE began a major initiative to accelerate cleanup of its sites, prioritize risks, improve contracting practices, and reduce program costs. This initiative will profoundly affect the scope and scheduling of cleanup work, and the types of remediation technologies used.
- Achievement of DOE's cleanup goals is largely contingent upon receipt of additional funding yet to be approved by Congress in future years.
- The full extent of the cleanup needed is still uncertain because the nature and extent of contamination at some sites have not been characterized and final remedial action or regulatory decisions have not been made for many sites still awaiting cleanup.

These figures are likely an underestimate of the total DOE cleanup cost because they do not include all cleanup activities needed, such as the cost of cleaning up new releases of contaminants, remediating facilities that are still in operation, or contamination problems that currently lack viable cleanup technologies, such as certain groundwater contamination and nuclear test sites. Nor does the current estimate include the costs of monitoring and maintaining site remedies over the thousands of years that radioactive hazards will remain. DOE's environmental cleanup program offers an enormous opportunity for firms that provide remediation services.

## 7.1 Program Description

Between the inception of its environmental management program in 1989 and FY 2003, DOE has spent over $70 billion on establishing the cleanup program, developing the management and remediation approaches to be employed, and cleaning up the less complex sites (U.S. DOE 2002d, 2003a, and 2004). The program constitutes nearly a third of the Department's budget, and remediation and restoration account for about a third of the cleanup program budget.

Programs to clean up environmental damage resulting from Cold War nuclear weapons development are managed by DOE's Office of Environmental Management (EM), established in 1989. In 2003, DOE established an Office of Legacy Management to focus on the long-term care of legacy liabilities of former nuclear weapons production areas following cleanup completion of the surface areas at each site. In the 2005 Budget Request to Congress, the Department proposes to create the Office of Future Liabilities, which will focus on the cleanup of facilities and contaminated media at active sites that fall outside the EM scope.

Information on the program's activities are available in the justifications in DOE's budget requests to Congress for the fiscal years from 2000 to 2005. Additional background is available from DOE's *Baseline Environmental Management Report* (BEMR), a multi-volume study published in 1995 and 1996.[1]

EM must ensure that environmental legacies of the Cold War are addressed and resolved in a manner that does not impede future national security missions, and that the nation's radioactive wastes are disposed of permanently and safely (U.S. DOE Web 2003b). The EM program historically has been managed as a loose association of individual field sites (U.S. DOE 2002d). EM provides budget and program support to nine Operations/Field Offices, each of which has the responsibility for directing cleanup work at one or more sites (U.S. DOE 1998). The offices are located in Albuquerque (NM), Chicago (IL), Idaho Falls (ID), Las Vegas (NV), Oakland (CA), Oak Ridge (TN), Miamisburg (OH), Rocky Flats (CO), Richland (WA), and Aiken (SC). The Field and Operations Offices oversee all activities to assess and clean up inactive hazardous and radioactive facilities—such as reactors, laboratories, equipment, buildings, pipelines, waste

1 The BEMR report was a key source of information for the 1996 edition of this study. The BEMR combined an analysis of current environmental management data with estimates of the future costs of the EM program. This analysis was replaced by the *Accelerating Cleanup: Paths to Closure* report, which established a baseline schedule and cost for each project. The information in *Paths to Closure* was updated in 1999 and 2000, but no comparably detailed information has been published since the introduction of DOE's Central Internet Database in 2000.

treatment systems, and storage tanks—and sites at all DOE installations, as well as at some non-DOE locations that have been specified by Congress.
The Albuquerque, Chicago, Nevada, Oakland, Ohio, Oak Ridge, Rocky Flats, and Small Sites Closure Offices are responsible for cleanup, facility decommissioning, and/or waste packaging at 110 (Fiori & Jones 2000) of DOE's 114 geographic sites. Many of these sites will have no continuing DOE presence after closure, except for stewardship activities. DOE presence will continue long term at the Idaho and Savannah River Sites and Hanford's Office of River Protection and Richland Operations Office, where the mission encompasses remediation of contaminated land, disposition of facilities for alternate uses, final decontamination and decommissioning, and operational oversight (as landlord) for the facilities and programs.

Environmental restoration of the DOE complex involves the following activities:

- Deactivation and decommissioning—decontamination and safe disposition of deactivated and surplus equipment, buildings, and other facilities;
- Remedial actions—site characterization to identify the contaminants and physical properties at a site, and remediation activities to stabilize, reduce, or remove site contaminants;
- Long-term surveillance and maintenance (S&M)—monitoring the site to ensure that contamination has been successfully addressed and providing maintenance services to ensure the long-term integrity of containment remedies or continued effective operation of pump-and-treat remedies; and
- Stabilization of high-risk materials—treatment and/or packaging of highly radioactive materials.

These restoration activities are described in greater detail in the following subsections.

### 7.1.1 Deactivation and Decommissioning of Surplus Facilities

DOE constructed over 20,000 facilities to support nuclear weapons production and other activities. More than 3,800 of them have been declared surplus to date, and approximately 3,000 await D&D. These facilities have exceeded their design life and no longer serve a mission for DOE. Many of them are contaminated with radioactive materials, hazardous chemicals, asbestos, and lead, including lead-based paint. Because of the potential for release of radioactive and hazardous materials to the environment, these surplus facilities must be monitored, maintained, and guarded. Four major types of structures require deactivation and decommissioning–reactor facilities, radionuclide separation facilities, fuel and weapons component fabrication facilities, and laboratories.

Deactivation involves actions that render a facility safe and stable until it can be decommissioned. It includes processes used to place nuclear materials and chemicals, equipment, and operating systems into a low-risk, low-cost and mostly passive condition. Decommissioning, which takes place after deactivation, includes surveillance and maintenance, decontamination, and/or dismantlement. It involves stabilizing, reducing, or removing radioactive and/or other types of contamination, and can consist of dismantling a facility, entombing or covering part or all of the facility, or converting a facility for other uses.

Based on the FY 2005 DOE Congressional Budget Request (U.S. DOE 2004) the remaining cost (remaining life cycle cost) for decontamination and decommissioning at legacy waste sites is about $20 billion, as of the end of FY 2004.

EM typically performs decommissioning under CERCLA as a "non-time-critical removal action." In fact, there are few regulatory compliance agreements for D&D at DOE sites. Most sites' Federal Facility Agreements deal with waste from weapons production, such as high-level waste, transuranics, mixed low-level waste, and contaminated soil and groundwater problems, not with contaminated buildings or other structures (U.S. DOE Web 2002).

### 7.1.2 Remedial Actions

Remedial actions involve the containment, treatment, or removal of radioactive and/or hazardous materials and pollutants in free product form or in soil, sediment, fractured bedrock, and groundwater. An estimated 3 million cubic meters of solid radioactive and hazardous wastes have been buried or otherwise released to the subsurface throughout the DOE complex. As a result of the release of these materials, an estimated 40 million cubic meters of soil and 1.7 trillion gallons of groundwater contain contaminants above an action level and will require remediation (U.S. DOE 2000). The largest contamination challenges are found at the Idaho, Oak Ridge, Hanford, Rocky Flats, and Savannah River sites (U.S. DOE 2002e).

The typical wastes found at DOE sites are shown in the text box. Contaminants include hazardous metals such as chromium, mercury, and lead; radioactive laboratory and processing waste; explosive and pyrophoric materials; solvents; and numerous radionuclides.

Sources of contaminants include plumes emanating from seepage basins, cribs, leaking tanks, and landfills; airborne releases deposited on the soil surface by wind or precipitation; wells used for underground injection of wastes; and waste-disposal areas with contaminants mobilized by precipitation, groundwater, or surface water flowing through the site. Burial of low-level radioactive waste, mercury, lead, spent solvents, explosives, and contaminated equipment has resulted in large inventories of poorly characterized land-stored waste.

***DOE Waste Types:***

**hazardous**—containing hazardous constituents but no radionuclides;

**mixed**—containing both hazardous and radioactive materials

**low-level**—radioactive waste not classified as high-level waste, TRU, or spent nuclear fuel. "Low" does not refer to its level of radioactivity

**11e(2) byproducts**—mill tailings containing very low concentrations of naturally occurring alpha-emitting radionuclides in large volumes of generally soil-like materials

**"orphan waste"**—those waste streams for which disposal pathways have not been identified;

**transuranic (TRU)**—containing plutonium, americium, and other elements with atomic numbers higher than uranium; and

**high-level**—defined based on its source rather than its constituents and their concentrations. Includes fission products, traces of uranium and

DOE considers cleanup at a site "complete" when it meets the following conditions:

- Deactivation or decommissioning of all facilities listed in the EM program has been completed, excluding any long-term surveillance and monitoring;
- All releases to the environment have been cleaned up in accordance with agreed-upon cleanup standards;
- Groundwater contamination has been contained, and long-term treatment or monitoring is in place;
- Nuclear material and spent fuel have been stabilized and/or placed in safe long-term storage; and
- Legacy waste (i.e., waste produced by past nuclear weapons production activities, with the exception of high-level waste) has been disposed of in an approved manner.

After closure, many DOE sites will require long-term surveillance and maintenance.

### 7.1.3 Long-Term Surveillance and Maintenance

Even after site closure, DOE will maintain a presence at most sites to ensure that the remedy remains effective, an important responsibility at sites where contaminants have been reduced or contained, but not eliminated. DOE has estimated that up to 129 geographic locations (e.g., installations) will require long-term stewardship (U.S. DOE 2001c). Such long-term stewardship will be active at the majority of sites with groundwater monitoring and/or treatment, containment systems such as covers and subsurface barriers, and passive or active institutional controls. At sites released for unrestricted use, stewardship will be passive, involving only maintenance of records. The extent of long-term stewardship to be conducted is determined by DOE and other stakeholders based on the end state reached at each site. In some cases, the cleanup plan addresses an entire geographic site; in other cases, long-term stewardship may occur at a portion of a large site long before cleanup of the entire area is completed.[2]

The Office of Legacy Management (LM) has responsibility for sites that have been closed and no longer support DOE's ongoing national security, energy, and science missions, such as the EM closure sites (Pinellas Plant, Weldon Spring), Uranium Mill Tailings Remedial Action (UMTRA) sites, and Formerly Utilized Sites Remedial Action Program (FUSRAP) locations where remediation is complete. As more sites are successfully remediated and closed, LM will manage the land and associated resources as a federal trustee, preserve records and information, perform surveillance and maintenance associated with environmental remedies, such as long-term pump and treat, and manage post-closure liabilities.

[2] DOE also conducts surveillance and maintenance activities during the environmental restoration process. For example, S&M activities may be conducted to prevent worker, public, and environmental exposure to potential hazards at a site awaiting D&D. For some facilities – particularly reactors and large processing canyons – an initial "interim" phase of long-term stewardship is needed after a facility has been stabilized, but where further remedial action or D&D is not expected to occur for a significant period of time (U.S. DOE 2001b).

### 7.1.4 Stabilization of High-Risk Materials

One of the most costly and dangerous components of DOE's cleanup effort—the stabilization of high-risk materials—presents a challenge unique in environmental restoration. High-risk materials include all highly radioactive wastes stored in tanks, spent nuclear fuel, all special nuclear materials, and some transuranic waste. A major cost driver in the EM complex is the plan to retrieve, treat, and vitrify waste in the tank farms, which alone is projected to cost $20 billion (U.S. DOE 2004). Special nuclear materials, primarily plutonium metals and oxides and highly enriched uranium, must be stabilized and then packaged for long-term storage. All spent nuclear fuel must be treated and/or packaged and placed in dry storage. Some transuranic waste must be treated to remove organics before it is packaged for shipment and stored in the Waste Isolation Pilot Plant. Additionally, all the structures from which high-risk materials have been removed must undergo decontamination and decommissioning (U.S. DOE 2002d).

### 7.1.5 Regulatory Requirements and Compliance Agreements

DOE installations typically have multiple areas of contamination regulated by either CERCLA, RCRA Corrective Action provisions, RCRA underground storage tank provisions, or all three. DOE also is required to consult with EPA and consider state environmental requirements and the needs of all stakeholders in designing and conducting remediations at facilities for which it is responsible. The interface between the regulatory authorities is determined by circumstances at specific sites, such as the sources and causes of the contamination, whether the installation is an NPL site (DOE has 19 currently on the NPL and 2 deleted), whether it is operating under a RCRA permit to manage hazardous waste, the anticipated future land use, the interest of nearby communities, and state actions and laws. DOE works with all stakeholders at its facilities to integrate and reconcile all the requirements and agree on an approach to address the environmental problems. The agreements are typically summarized in a compliance agreement, which is used for the majority of DOE cleanup work.

Compliance agreements provide for establishing legally enforceable schedule milestones that govern the work to be done and include, but are not limited to, Federal Facility Agreements, Interagency Agreements, settlement agreements, consent orders, and compliance orders. The 70 compliance agreements at DOE sites vary greatly but can be divided into three main types: (1) agreements specifically required by CERCLA to address cleanup of federal NPL sites or by RCRA to address the management of mixed radioactive and hazardous waste at DOE facilities, (2) court-ordered agreements resulting from lawsuits initiated primarily by states, and (3) other agreements, including state administrative orders enforcing state hazardous waste management laws (U.S. GAO 2002a).

Compliance agreements are site-specific and are not intended to provide a mechanism for DOE to use in prioritizing risks among the various sites. The agreements reflect local DOE and community priorities for addressing environmental contamination at individual sites and are not designed or developed to consider environmental risk from a DOE-wide perspective.

The first class of compliance agreements, those specifically required by CERCLA or by RCRA, are in effect at all of DOE's major sites. They tend to cover a relatively large number of cleanup

activities and include most of the schedule milestones that DOE must meet. By contrast, agreements that implement court-ordered settlements exist at only a few DOE sites, tend to focus on a specific issue or concern, and have fewer schedule milestones. These agreements are typically between DOE and one or more states. The remaining agreements are based on state or federal environmental laws and address a variety of needs, such as cleaning up hazardous materials spills or remediating groundwater contamination. Some of these agreements may specify only a few milestones, while others incorporate detailed schedules and approaches.

### 7.1.6 Policy Initiatives: The Top-to-Bottom Review

Early in 2002, EM completed a critical assessment of its program—the "Top-to-Bottom Review." The Review's major observation was that EM had been oriented toward managing risks rather than actually reducing them. Based upon the Review's recommendations, DOE began a major initiative to accelerate cleanup of its legacy wastes by at least 30 years, prioritize risks, improve its contracting practices, and reduce program costs. Under this initiative, DOE would complete cleanup projects at some sites more quickly; revise other cleanup plans, such as reclassifying certain wastes to different risk categories to speed cleanup and reduce cost; and concentrate funding more on cleanup and less on maintenance and non-cleanup activities (U.S. GAO 2002b).

DOE expects this initiative to profoundly affect the scope and scheduling of its cleanups. As of mid-2004, DOE has signed letters of intent with state and federal regulators that outline an agreement in principle to accelerate cleanup at Amchitka Island (AK), Hanford (WA), Idaho National Engineering Laboratories (ID), Oak Ridge Reservation (TN), Nevada Test Site (NV), Paducah (KY), Pantex (TX), Pinellas (FL), and Savannah River (SC). Increased funding has been approved for this purpose. Of the remaining sites, some will not be able to accelerate the cleanup schedule, either for technical reasons or because closure is already near term.

Under the initiative, DOE is promoting a new "risk-based" cleanup strategy that would assist in prioritizing risk—and thereby prioritize cleanups—among the various sites on a DOE-wide basis. If implemented, this approach could alter the funding balance among DOE sites.

The initiative also has the potential to increase the use of remediation approaches that leave more wastes on site than previously planned, thereby reducing remediation costs at some projects. For example, one proposal is to change the current practice of classifying waste as high level, based on the treatment process that created it, to classifying the waste based on its actual composition. This change would result in the reclassification of much of DOE's high-level waste into low-level mixed or transuranic waste, which would significantly affect the cost of treatment and packaging and disposition.

## 7.2 Factors Affecting Demand for Cleanup

The nature, extent, and timing of the DOE cleanups is determined by the annual budget provided by Congress, DOE policy and resource allocation, the types of waste and contaminated media at DOE properties, compliance agreements with states and other stakeholders, and the provisions of CERCLA, RCRA, and other federal and state environmental statutes.

- DOE expects its accelerated site cleanup initiative (Section 7.1.6) to profoundly affect the scope and scheduling of its cleanups. DOE has signed letters of intent with a number of state and federal regulators, and is prioritizing risks, improving its contracting practices, and implementing other measures to reduce program costs and accelerate cleanups. These measures may lead to the reclassification of some waste to a different risk category and concentrate funding more on cleanup and less on maintenance and non-cleanup activities.

- Under the initiative, DOE is promoting a "risk-based" cleanup strategy that would assist in prioritizing risk among the various sites on a DOE-wide basis. In addition, it is likely to affect the types of remedies selected, such as increasing the use of remediation approaches that leave more wastes on site than previously planned.

- DOE may need to renegotiate and modify compliance agreements to implement many aspects of the new initiatives. Federal facility compliance agreements as well as environmental laws and regulations drive DOE's cleanup decisions. The effect of compliance agreements on certain aspects of DOE's initiative, especially its proposal to reclassify waste into different risk categories to increase disposal options, is unclear. Reclassifying the waste may involve the concurrence of the Nuclear Regulatory Commission, EPA, and other regulatory agencies. Securing the concurrence of all parties, plus potential legal challenges by stakeholders, can delay or alter cleanup decisions.

- Cleanup schedules are heavily dependent upon the availability of funds. DOE's estimate that it can complete remediation of legacy wastes at all DOE properties by 2035 could be lengthened or shortened, depending on the funds appropriated by Congress. A lack of funds could limit DOE's ability to meet milestones of some existing compliance agreements between DOE and other stakeholders, as well as limit DOE's ability to commit to new agreements. In 2002, Congress increased the EM appropriation by $800 million (in a special Cleanup Reform Account) to help DOE meet its 2035 cleanup completion goal. Achievement of the accelerated cleanup goals is largely contingent upon receipt of additional funding, yet to be approved by Congress, in future years (U.S. DOE 2003b). If milestones cannot be achieved because of budget shortfalls, stakeholders may renegotiate compliance plans.

- The type and extent of remediation to be undertaken will be affected by the cleanup standards/end states that are to be applied. At many sites, it is difficult to define the extent of cleanup work needed. The decision usually requires balancing potential land uses with the feasibility of alternative cleanup and long-term stewardship approaches. DOE determines end-state goals for a site only after consulting with the regulatory agencies, state and local authorities, and other affected parties. Communities must address how the land is to be used, and regulators must determine an acceptable level of residual contamination.

- Current site assumptions about planned end states do not rule out future decisions to change the target end state from that envisioned under those assumptions. The ultimate end state of a site may be revised due to the development of new technologies, more economical cleanup approaches, the availability of additional resources, and changes in the cleanup agreements.

- Uncertainty about the nature and extent of contamination at some sites contributes to the difficulty in defining the extent of cleanup work needed. Though nearly all of the release sites have been at least partially characterized, final remedial action and/or regulatory decisions have not been made for most sites still awaiting cleanup. In estimating the environmental liability related to each site, DOE used site-specific assumptions regarding the amount and type of contamination and remediation technologies that will be employed (U.S. DOE 2003b).

- DOE assumes only existing (baseline) technologies, such as groundwater pump and treat, to be available for estimating cleanup costs *where they are applicable*. Estimates are based on remedies considered technically and environmentally reasonable and achievable. Estimated cleanup costs at sites for which there is no current feasible remediation approach are excluded from the baseline estimates, though applicable stewardship and monitoring costs for these sites are included. The cost estimate would be higher if some remediation were assumed for these areas; however, absent effective remedial technologies for the sites, no basis for estimating costs is available. Significant areas for which cleanup costs are excluded include the nuclear explosion test grounds at the Nevada Test Site; large surface water bodies, including the Clinch and Columbia rivers; and contaminated groundwater for which, even with treatment, future use will remain restricted (U.S. DOE 2003b).

- The program scope may increase in the future due to the transfer of additional facilities and/or sites, further affecting the uncertainty of out-year work scope and schedules. For example, DOE sought and received funding and authority from Congress in 2001 to remediate a uranium mill tailings site at the former Atlas mill near Moab, Utah. The cleanup will be conducted under the Uranium Mill Tailings Radiation Control Act of 1978, which is the same authority used for the 22 sites that were remediated in the DOE UMTRA Project.

These factors indicate that there are many uncertainties inherent in the remediation of the facilities for which DOE is responsible, despite significant efforts in recent years to establish the scope of work for DOE's environmental management program. The work scope projections address long periods of time, which compounds the uncertainty.

## 7.3 Number and Characteristics of Sites

EM historically has been responsible for environmental restoration at 134 "geographic sites," which are distinct locations that generated waste or were contaminated by DOE or predecessor agency activities. Geographic sites range in size from as small as a football field to larger than the state of Rhode Island, and usually correspond to a DOE installation or campus, such as the Hanford Reservation in Washington or Oak Ridge Reservation in Tennessee. Altogether, they encompass an area of over two million acres—equal to the size of Rhode Island and Delaware combined. At the beginning of 1998, cleanup responsibility for 21 sites managed by EM under FUSRAP was transferred to the U.S. Army Corps of Engineers, leaving 113 geographic sites in the EM program (Applegate & Dycus 1998). The addition in 2001 of the former Atlas uranium mill site brought the number to 114 geographic sites located in 31 states and one territory (U.S. DOE 2000).

DOE uses the term "release site" to mean a specific area where contaminants may have been spilled, disposed of, or abandoned at an installation. A geographic site can contain many release sites, or it may contain none at all; for example, the contaminated areas at the General Electric site (CA) consist of a hot cell and a glove box enclosure. According to DOE's 2003 budget request to Congress, of the 10,527[3] release sites identified so far, 5,227 of them were cleaned up by the end of 2002. Completion of active cleanup signifies that mobilization to remove or treat contaminated soil, debris, and structures has ended. It does not necessarily signify that the site has been completely cleaned up. Groundwater cleanup, which could take decades, might yet remain to be accomplished.

Despite the complexity and size of the challenge, substantial progress has been made in cleaning up many sites over the past decade. For example, DOE's UMTRA project successfully concluded surface cleanup with the remediation of the 22nd and final uranium mill tailings site at Maybell, Colorado, in 1998; a second phase of the project aims to achieve groundwater compliance at the sites. At the beginning of FY 2003, DOE had completed active cleanup at 76 of the 114 geographic sites. Extensive work remains to be completed at some of the 38 remaining locations, particularly at the Hanford facility and the Savannah River Site.

DOE plans to complete cleanup at an additional 13 geographic sites by the end of FY 2006. At the sites remaining after 2006, which includes the largest ones, DOE will continue treatment of the remaining legacy waste streams and management of legacy nuclear materials, including nuclear material stabilization and disposition. To protect human health and the environment, the Department will implement long-term stewardship activities after active cleanup is completed at the sites. DOE expects to complete most high-risk work by 2012 and all currently defined work by 2035 (U.S. DOE 2003b).

Exhibit 7-1 shows the major DOE installations where cleanup of release sites and/or facilities has not been completed.[4] The locations that have only wastes to package, with no release sites or facilities to remediate, do not appear in the exhibit. About half of the release sites have been cleaned up, and roughly 905 of the remaining sites are expected to have cleanup completed by 2015, 250 more by 2025, and the remaining 3,135 by 2035. Estimates for several hundred release sites are not available. The Nevada Test Sites and the Hanford facility (including the Office of River Protection) account for 59 percent of the release sites remaining to be remediated. Other installations with large numbers of release sites include Los Alamos National Laboratory (795 sites), the Oak Ridge Reservation (374 sites), and the Savannah River Site (198 sites).

---

[3] DOE estimates of the number of release sites discovered to date vary: the number is reported as 9,995, 10,527, 10,082, and 10,374 in the 2002, 2003, 2004, and 2005 budget requests, respectively.

[4] The numbers of release sites shown in Exhibit 7-1 are slightly lower than reported above because specific data for the "Other" category were not available.

**Exhibit 7-1. Remaining Release Sites and D&D Facilities by Location**

| Installation | No. of Re-lease Sites | No. of Facilities | Sites Comple-ted by 2004 | Facilities Completed by 2004 | Release Sites Remain-ing | Facili-ties Remain-ing | Estimated Comple-tion Date |
|---|---|---|---|---|---|---|---|
| Lab for Energy-Rel. Health Res. | 17 | 1 | 17 | 1 | 0 | 0 | 2005 |
| Ashtabula Env. Mgmt. Proj., OH | 3 | 32 | 0 | 21 | 3 | 11 | 2006 |
| Columbus Env. Mgmt. Proj., OH | 2 | 15 | 1 | 14 | 1 | 1 | 2006 |
| Fernald Env. Mgmt. Proj., OH | 6 | 30 | 2 | 24 | 4 | 6 | 2006 |
| Kansas City Plant | 43 | 0 | 42 | 0 | 1 | 0 | 2006 |
| Lawrence Berkeley Natl. Lab | 181 | 0 | 166 | 0 | 15 | 0 | 2006 |
| Lawrence Livermore Natl. Lab | 120 | 0 | 112 | 0 | 8 | 0 | 2006 |
| Mound/Miamisburg Mgmt. Proj., OH | 178 | 135 | 121 | 96 | 57 | 39 | 2006 |
| Rocky Flats Env. Tech. Center, CO | 240 | 377 | 205 | 269 | 35 | 108 | 2006 |
| Sandia National Labs | 263 | 1 | 192 | 1 | 71 | 0 | 2006 |
| Stanford Linear Accelerator Ctr. | 20 | 0 | 19 | 0 | 1 | 0 | 2006 |
| Energy Technology Eng. Center | 10 | 26 | 7 | 23 | 3 | 3 | 2007 |
| Brookhaven National Lab, NY | 76 | 10 | 68 | 4 | 8 | 6 | 2008 |
| Lawrence Livermore Site 300 | 73 | 0 | 65 | 0 | 8 | 0 | 2008 |
| Pantex Plant | 237 | 5 | 76 | 1 | 161 | 4 | 2008 |
| Argonne National Lab, East | 443 | 78 | 443 | 63 | 0 | 15 | 2009 |
| Atlas Site (Moab) | 1 | 0 | 0 | 0 | 1 | 0 | 2011 |
| West Valley Demo. Proj., OH | 1 | 0 | 0 | 0 | 1 | 0 | 2012 |
| General Electric Vallecitos | 0 | 1 | 0 | 0 | 0 | 1 | 2014 |
| Separations Process Research Unit | 6 | 4 | 0 | 0 | 6 | 4 | 2014 |
| Los Alamos National Lab | 2,124 | 1 | 1,329 | 0 | 795 | 1 | 2015 |
| Oak Ridge Reservation, TN | 654 | 248 | 280 | 114 | 374 | 134 | 2015 |
| Portsmouth GDP, OH | 163 | 0 | 149 | 0 | 14 | 0 | 2025 |
| Savannah River Site | 515 | 837 | 317 | 56 | 198 | 781 | 2025 |
| Nevada Test Site & Off-Sites | 2,082 | 0 | 762 | 0 | 1,320 | 0 | 2027 |
| Paducah GDP, KY | 237 | 2 | 87 | 0 | 150 | 2 | 2030 |
| Hanford Site | 1,618 | 1,382 | 302 | 173 | 1,316 | 1,209 | 2035 |
| Idaho Nat. Eng. & Env. Lab | 270 | 365 | 145 | 77 | 125 | 288 | 2035 |
| Office of River Protection (Hanford) | 322 | 148 | 5 | 0 | 317 | 148 | 2035 |
| **Total** | **9,905** | **3,698** | **4,912** | **937** | **4,993** | **2,761** | |

Notes:
- Completed sites are not listed, nor sites where closure is near term or the work involves only waste packaging and/or disposal: e.g., Argonne National Lab - West; General Atomics, CA; Salmon Site, MS; South Valley Superfund Site, NM; Princeton Plasma Physics Lab, NJ; Amchitka Island, AK; and the Inhalation Toxicology Lab, NM.
- The number of release sites in this table will be slightly different from that reported in other sources because specific data for the "Other" category were not available, and because of rounding.

Source: Department of Energy, *FY 2005 Budget Request to Congress*, Environmental Management.

Despite the size of the DOE complex, most of this land is uncontaminated. Less than 15 percent of the land at the five major sites (Hanford, Savannah River, the Idaho National Engineering and Environmental Laboratory, Rocky Flats, and the Oak Ridge Reservation) is contaminated. However, the contamination that does exist presents extraordinary technical challenges because of the presence of radionuclides (Probst 2000).

Contaminants of concern across the complex generally include radionuclides, metals, and dense non-aqueous phase liquids (DNAPLs). More specifically, key contaminants fall into the following groupings (U.S. DOE 2002c).

- **Radionuclides:** plutonium, strontium-90, cesium-137, isotopes of uranium, tritium, thorium, technetium-99, radium, and iodine-129.
- **Metals:** lead, chromium VI, mercury, zinc, beryllium, arsenic, cadmium, and copper.
- **DNAPLs:** carbon tetrachloride, trichloroethene, dichloroethene, tetrachloroethene, chloroform, dichloromethane, and polychlorinated biphenyls.

## 7.4 Estimated Cleanup Costs

DOE has estimated the cost to complete cleanup at all sites that are currently in its program. However, because of uncertainties that DOE has recognized, these estimates are based on a number of critical assumptions, and revisions to these assumptions could raise or lower the probable cost. This section presents the cost estimate and describes the critical assumptions.

### 7.4.1 Life Cycle Costs

DOE estimates that, as of the end of FY 2004, it will cost about $111 billion to complete the cleanup of the remaining legacy release sites currently in EM's program, and that it will complete active cleanup at most of its release sites by 2035 (U.S. DOE 2004).[5] About $35 billion of this total is anticipated to be for remediation. Environmental management funds not spent for site remediation are used for national program planning and management, landlord activities, waste management, facility stabilization, technology development, and nuclear material stabilization, packaging, and transportation.

The estimate relies on several critical assumptions. It does not include all cleanup activities needed, and hence is likely to underestimate the ultimate total cost of cleanup. DOE has yet to determine the cost of remediating facilities that are still in operation (for which cleanup and closure could become the responsibility of either the Office of Future Liabilities or the office operating the facility), or the cost of addressing one-of-a-kind or first-of-a-kind contamination problems that currently lack viable cleanup technologies, such as groundwater contaminated with metals, chlorinated organics, and/or radioactive isotopes. Nor does the current estimate include the costs of monitoring and maintaining site remedies over the thousands of years that radioactive hazards will remain. Thus the ultimate cost of cleaning up properties for which DOE is responsible may be greater than the estimates indicate.

The estimated life-cycle costs and remaining costs as of the end of FY 2004 for each of the major installations are shown in Exhibit 7-2. Two sites account for 55 percent of the program's life-cycle cost, and five sites account for 73 percent. DOE anticipates that by completing site cleanup more quickly, it will reduce the length of time it must bear the fixed costs associated

---

5 This estimate is considerably lower than the $220 billion estimate in the 2002 top-to-bottom review because DOE has undertaken a major effort to accelerate cleanup, improve business practices, and reduce restoration costs (U.S. DOE 2003a and 2004).

with maintaining the infrastructure of a site (a major component of DOE's overall costs). Hence, the Department intends to complete as much cleanup as possible in the near term.

**Exhibit 7-2. Estimated Remaining Life Cycle Cost for DOE Site Restoration by Installation**

| Installation | Release Sites Remaining | Facilities Remaining | Est. Completion Date | Est. Total Life-Cycle Cost ($000) | Est. Remaining Life-Cycle Cost ($000) |
|---|---|---|---|---|---|
| Lab. for Energy-Related Health Res. | 0 | 0 | 2005 | 40,577 | 967 |
| Ashtabula Env. Mgmt. Project, OH | 3 | 11 | 2006 | 156,923 | 33,605 |
| Columbus Env. Mgmt. Proj., OH | 1 | 1 | 2006 | 163,259 | 33,851 |
| Fernald Env. Mgmt. Proj., OH | 4 | 6 | 2006 | 3,553,013 | 1,324,958 |
| Kansas City Plant | 1 | 0 | 2006 | 28,660 | 7,373 |
| Lawrence Berkeley Nat. Lab. | 15 | 0 | 2006 | 33,758 | 7,028 |
| Lawrence Livermore Nat. Lab/ | 8 | 0 | 2006 | 514,673 | 44,530 |
| LLNL Site 300 | 8 | 0 | 2008 | 0 | |
| Mound/Miamisburg Proj., OH | 57 | 39 | 2006 | 1,503,413 | 771,800 |
| Rocky Flats Env. Tech. Center | 35 | 108 | 2006 | 9,297,868 | 4,555,884 |
| Sandia National Laboratories | 71 | 0 | 2006 | 230,721 | 30,018 |
| Stanford Linear Accelerator Center | 1 | 0 | 2006 | 20,599 | 3,316 |
| Energy Technology Eng. Center | 3 | 3 | 2007 | 204,976 | 67,746 |
| Brookhaven National Lab | 8 | 6 | 2008 | 373,359 | 154,055 |
| Pantex Plant | 161 | 4 | 2008 | 192,291 | 81,559 |
| Argonne National Lab, East | 0 | 15 | 2009 | 63,221 | 8,233 |
| Atlas Site (Moab) | 1 | 0 | 2011 | 186,034 | 172,388 |
| West Valley Demo. Proj, OH | 1 | 0 | 2012 | 1,366,841 | 933,942 |
| General Electric Vallecitos b | 0 | 1 | 2014 | 0 | 0 |
| Separations Process Unit | 6 | 4 | 2014 | 245,815 | 234,439 |
| Los Alamos National Laboratory | 795 | 1 | 2015 | 1,529,522 | 858,700 |
| Oak Ridge Reservation | 374 | 134 | 2015 | 7,351,982 | 3,290,155 |
| Portsmouth GDP | 14 | 0 | 2025 | 6,258,959 | 5,306,287 |
| Savannah River Site | 198 | 781 | 2025 | 28,643,636 | 17,859,407 |
| Nevada Test Site & Off-Sites | 1,320 | 0 | 2010-2027 | 2,317,170 | 1,655,160 |
| Paducah GDP | 150 | 2 | 2030 | 4,694,101 | 3,996,310 |
| Hanford / River Protection | 1,633 | 1,357 | 2035 | 56,184,732 | 43,765,834 |
| Idaho Nat. Eng. & Env. Lab | 125 | 288 | 2035 | 14,415,224 | 9,907,649 |
| Waste Isolation Plant | NA | NA | NA | 6,278,763 | 4,486,913 |
| Completed | | | | 1,077,277 | 0 |
| Subtotal, installations | 4,993 | 2,761 | NA | 146,927,367 | 99,592,107 |
| Other (unspecified) | | | | 11,520,380 | 11,520,380 |
| **Total** | **4,993** | **2,761** | | **158,447,747** | **111,112,487** |

Notes:

- "Completed" includes life-cycle costs for sites completed prior to FY 2005, as well as life-cycle costs for various field activities that cannot be credibly allocated to their respective sites.
- "Other" includes life-cycle costs for technology development and deployment, decontamination and decommissioning contributions & offsets, program direction, and headquarters activities.
- This table includes non-remediation work, such as waste packaging and waste management. Remediation is about one-third of this figure.

Source: DOE FY 2005 Budget Request

### 7.4.2 Timing of Expenditures

The ultimate cost of DOE's cleanup will depend on annual funding levels and achievement of the work as scheduled. Higher annual funding tends to accelerate cleanup work and reduce total life-cycle costs in the long run; lower annual funding tends to delay work and increase total costs. Actual or anticipated EM expenditures for FY 2001 through FY 2005 are shown in Exhibit 7-3. Expenditures are expected to increase about 14 percent between FY 2001 and FY 2005. DOE anticipates that these current increases ultimately will lead to earlier completion of many sites and lower life-cycle costs. After 2005, EM's annual site restoration expenditures are expected to decline (U.S. DOE 2004).

**Exhibit 7-3. Actual and Planned EM and Site Restoration Budget: FY 2000-2004**




Source: U.S. DOE, Congressional Budget Requests for Environmental Management, FY 2003 and 2005 (DOE 2003a and DOE 2004)

Exhibit 7-4 shows actual or anticipated EM expenditures for FY 2002 through FY 2005 by major DOE activity type. Stabilization of high-risk materials alone consumed almost half of the EM budget in recent years. Remediation of soil and water took about one-tenth, and D&D of contaminated facilities took a little over one-sixth. The estimates do not include estimates of cleanup costs for facilities currently in use, since they are not part of the EM program.

The completion of cleanup work at release sites is the key measure of success for environmental management, but site cleanup is a very complex task, generally involving numerous activities over many years. The annual budget request, usually available on the DOE web site, contains information on EM program performance, such as the volume of waste treated and disposed of, number of release site cleanups completed and facilities decommissioned, quantity of nuclear material stabilized, quantity of spent nuclear fuel moved to dry storage and prepared and shipped for consolidation, and number and type of innovative technologies deployed.

## 7.5 Market Entry Considerations

DOE is the largest single U.S. purchaser of remediation services (over $2 billion annually), accounting for over one-third of the U.S. remediation market in recent years. DOE also is the largest civilian contracting agency in the federal government; about 90 percent of its annual

## Exhibit 7-4. DOE Environmental Management Expenditures 2002-2004 ($000)

| Activity | FY 2002 Comparable Appropriation | FY 2003 Comparable Appropriation | FY 2004 Comparable Appropriation | FY 2005 Budget Request |
|---|---|---|---|---|
| Nuclear Material Stabilization and Disposition | 592,338 | 579,663 | 713,337 | 725,004 |
| Spent Nuclear Fuel Stabilization and Disposition | 403,617 | 402,307 | 358,176 | 244,681 |
| Solid Waste Stabilization and Disposition | 949,848 | 968,350 | 1,078,195 | 1,065,887 |
| Radioactive Liquid Waste Stabilization and Disposition | 863,087 | 1,002,371 | 1,049,629 | 1,261,084 |
| Radioactive Liquid Waste Stabilization and Disposition: Major Construction | 665,000 | 690,000 | 686,036 | 690,000 |
| Safeguards and Security | 244,361 | 254,747 | 291,124 | 265,059 |
| Soil and Water Remediation | 680,542 | 782,475 | 807,501 | 987,154 |
| Nuclear Facility Decontamination & Decommissioning | 1,095,039 | 1,167,695 | 1,257,843 | 1,206,800 |
| Non-Nuclear Facility Decontamination & Decommissioning | 31,264 | 21,085 | 55,025 | 47,183 |
| Operate Waste Disposal Facility | 154,916 | 176,663 | 153,577 | 174,637 |
| Waste and Material Transportation | 43,522 | 13,631 | 43,994 | 40,751 |
| Technology Development | 200,189 | 113,679 | 66,116 | 60,142 |
| Community and Regulatory Support | 43,763 | 38,589 | 41,217 | 39,854 |
| Program Direction | 301,422 | 279,723 | 276,510 | 271,059 |
| Federal Contribution to the Uranium Enrichment D&D Fund | 420,000 | 432,731 | 449,333 | 463,000 |
| Pre-2004 Completions | 105,392 | 11,786 | 0 | 0 |
| Other | 236,977 | 338,741 | 322,856 | 354,501 |
| Total, EM | 7,031,277 | 7,274,236 | 7,650,469 | 7,896,796 |

Note: The EM budget request also includes offsets, such as the Uranium Enrichment D&D fund, which are not shown above.

Source: DOE FY 2004 and 2005 Congressional Budget Requests (U.S. DOE 2003b and 2004).

budget is spent on contracts. DOE relies primarily on contractors (100,940 in 2002, according to the 2002 performance report) to operate its facilities and carry out its diverse missions (U.S. GAO 2003), including a small army of nearly 36,000 contractors to rectify the environmental hazards resulting from five decades of nuclear weapons production (Probst 2000).

### Characteristics of DOE Contractors

Most of EM's work is accomplished through large prime contractor companies. In 2002, more than 60 percent of over $5 billion in EM contracting was managed by just three firms: Bechtel Group International, Washington Group International/Westinghouse, and Fluor Corporation. Of course, some of that money went to subcontractors. Another 30 percent of the total EM contract revenues flowed through four prime contractors: CH2M Hill, British Nuclear Fuel (BNFL), BWX Technologies, and Jacobs Engineering (Paterson 2002). Few new entrants have found a way to be competitive. A DOE study (*Analysis of the DOE Contractor Base*, 2001) reported that the number of potential bidders for major DOE contracts diminished from 20 to 30 companies a decade ago to about 10 companies in 2001. Recent procurements for multi-billion dollar site management contracts have received only one or two proposals (e.g., the Office of River Protection Tank Waste Remediation System, Fernald Environmental Management Project, and Savannah River Site)(YAHSGS 2002).

The consolidation of DOE remediation contractors reflects a general market trend in the remediation services industry, as noted by Farkas Berkowitz in a 2000 comparison of market shares. In 1994 the top ten companies claimed 38 percent of the remediation market; by 2000 the top five companies claimed 50 percent of the market (YAHSGS 2002). The reluctance of contractors to bid on major DOE procurements is based upon a combination of low profit margins and the difficulty of competing with incumbent contractors. The consolidation of firms and a diversification of firms into other, more profitable commercial markets means that EM now faces a smaller contractor base with less "risk-bearing capacity" as it seeks to accelerate cleanup (Tomlinson & Paterson 2002).

### Increasing Emphasis on Performance-Based Contracting

DOE has committed to increasing its use of performance-based contracting as a means of achieving risk mitigation and to strengthen its business practices. In 1994, two-thirds of remediation contracts were based on time and materials (YAHSGS 2002). If DOE is successful in its effort to integrate performance-based approaches into all levels of its contracting system, companies providing risk-related services such as risk-based corrective action (RBCA) will continue to be a major factor in determining remediation technology applications as well as market share over the coming decade (U.S. DOE 2003a & 2002d).

EM's push to increase the use of pay-for-performance contracting is an important element in advancing its environmental restoration program. To implement this initiative, DOE must compete with commercial markets for the best contractors and contractor personnel. The Department also must alter internal business practices that are not yet consistent with a comprehensive pay-for-performance approach (YAHSGS 2002).

### *DOE's Accelerated Cleanup Schedules*

In response to the top-to-bottom review, DOE EM has opted to move forward more rapidly with its cleanup activities. EM is reviewing remediation plans at many installations and negotiating with regulators and other parties. It is expected that end state goals, remediation approaches, and schedules will be revised, perhaps more than once, at many sites. This expected change in the business approach may offer opportunities to a cleanup contractor who is flexible, resourceful, and efficient in meeting these challenges.

### *Growing Need for Long-Term Stewardship*

In the long run, DOE's program strategy anticipates that activities will shift from cleanup to long-term stewardship, including monitoring, maintenance, and repair of properties where waste has been left on site. For example, many nuclear sites (e.g., FUSRAP sites, low-level waste and mixed-waste burial grounds, closed mine and mine tailings sites) may require long-term attention. The required monitoring and maintenance work may be more suitable to smaller contractors than to those involved in the management and cleanup of DOE's large installations. Monitoring and stewardship programs also should open the door to new instruments and measurement technologies coupled with remote information management systems to maintain perpetual vigilance over past cleanups (YAHSGS 2002).

### *Encouraging the Use of Advanced Technologies*

The contract reform mechanisms sought within EM may affect contractor incentives to use advanced remediation techniques. A cleanup contractor's willingness to deploy an innovative or emerging cleanup technology requires that the benefits achieved through deployment (e.g., reduced cost and schedule) substantially outweigh the down-side risk of failure and recovery due to the greater uncertainties associated with new technologies. In the interest of finding better cleanup approaches, demonstration projects can be structured so that the prime contractor's fees are not affected by success or failure of the demonstrations (YAHSGS 2002). DOE has shown its interest in emerging technologies by funding their development and deploying remedies such as phytoremediation and permeable reactive barriers at its sites, as has been documented in EPA's *Treatment Technologies for Site Cleanup, Annual Status Report, 11th Edition*.

## 7.6 Remediation Technologies and Research, Development, and Demonstration

Even for many experts in the environmental field, the terms and issues at DOE sites can differ significantly from what most environmental engineers encounter at privately owned sites that are subject to CERCLA or RCRA requirements. The presence of radioactive products resulting from nuclear fuel cycles and nuclear weapons production complicates the cleanup of the more familiar contaminants and hazardous wastes (Probst 2000) and present special hazards with regard to worker health and safety. Exhibit 7-5 describes technologies DOE has found useful to the cleanup effort.

## Exhibit 7-5. Examples of Innovative Technologies Useful to DOE

| Technology | Analysis |
|---|---|
| Soil Remediation | **Barometrically Enhanced Remediation Technology (BERT™)** — Passively capitalizes on wind effects and the vertical soil-gas movement resulting from natural barometric pressure oscillations and harnesses this mechanism to ensure a net-upward, vertical soil-gas flux in contaminated soil. Applicable to sites where contaminants are volatile under standard conditions, close to the soil surface, and at concentrations low enough to eliminate the need for off-gas treatment. BERT™ has been deployed at DOE's Idaho Engineering and Environmental National Laboratory. (DOE/EM-0516)<br>**Well Injection Depth Extraction (WIDE)** — A hybrid soil flushing/soil gas extraction system developed by researchers from North Carolina State University. WIDE uses prefabricated vertical wells for the in-situ remediation of contaminated fine-grained soils. A WIDE demonstration of trichloroethene removal took place in Ohio at DOE's Ashtabula Environmental Management Project in 1999. (DOE/EM-0577)<br>**in-situ Gaseous Reduction (ISGR)** — Reduction and immobilization of hexavalent chromium or other redox-sensitive metals in soils by injection of a low-concentration hydrogen sulfide gas mixture. The oxidized metals are reduced and immobilized as either an insoluble oxyhydroxide or sulfide. ISGR was demonstrated in1998 at White Sands Missile Range, New Mexico, in a cooperative DOE/DoD effort. (DOE/EM-0521) |
| Groundwater Remediation | **Hydrous Pyrolysis Oxidation/Dynamic Underground Stripping (HPO/DUS)** — A combination of steam and oxygen injection, electrical heating (if required), soil vapor extraction, in-situ bioremediation, electrical resistance tomography, and conventional pump-and-treat technologies that removes organics (e.g., DNAPLS) from soil and groundwater. DUS volatilizes contaminants, which are carried by the steam to a central extraction well. HPO is a chemical process for destroying contaminants in place in the subsurface. HPO/DUS was applied to full-scale cleanup at the Visalia Superfund Site in Visalia, CA, from 1997 to 1999. The technology is available for licensing. (DOE/EM-0504)<br>**Enhanced in-situ Bioremediation** — Involves electron-donor injection to stimulate indigenous microbes, groundwater pumping, air stripping, and monitoring. The patented use of sodium lactate (or similar electron donors) at high concentrations to enhance bioavailability is marketed as Bioavailability Enhancement Technology™, or BET™. A 1999-2000 demonstration to treat the source area of a TCE plume in the groundwater at Idaho National Engineering and Environmental Laboratory worked so well that the Record of Decision was amended in 2001 to incorporate the technology. (DOE/EM-624)<br>**In-Well Vapor Stripping Technology** — Represented in the United States by four types of commercial in-well vapor stripping systems: NoVOCs™, Density Driven Convection (DDC), Unterdruck-Verdampfer-Brunnen (UVB) Vacuum Vaporizer Well and Coaxial Groundwater Circulation (KGB), and C-Sparger®. Specially designed wells pump water or vapor through a screened interval and recirculate it back into the aquifer through a separate interval. Treatment occurs below ground within the well casing, which reduces costs. A UVB system successfully removed chlorinated solvents from groundwater at Brookhaven National Laboratory from 1999 through 2001. (DOE/EM-0626)<br>**Permeable Reactive Barrier (PRB)** — A zone of reactive material placed in the path of a groundwater plume to reduce concentrations of dissolved organics or inorganics as the water flows through. The reactive medium selected varies with the contaminant(s) requiring treatment, though elemental iron filings are used most frequently. DOE has installed PRBs at many sites, including the Monticello Mill Tailings Site in Utah, the Kansas City Plant in Missouri, the Rocky Flats Mound Site in Colorado, and the Oak Ridge Reservation Y-12 Site in Tennessee. (DOE/EM-0557, DOE/EM-0623) |

### Exhibit 7-5: Examples of Innovative Technologies Useful to DOE (continued)

| Technology | Analysis |
|---|---|
| Facilities Deactivation | **Modified Brokk Demolition Machine With Remote Operator Console** — A commercially available robotic machine purchased for deactivation and decommissioning (D&D) of nuclear facilities. At Idaho Engineering and Environmental Laboratory (INEEL), a Brokk 250 demolition system was demonstrated in 1999 in various D&D activities and was modified and demonstrated again in 2000. It is now part of the general INEEL D&D equipment pool. (DOE/EM-0597) |
| Tank Waste Stabilization | **Thermal Denitration** — Uses high temperatures and a carbon-based reductant (e.g., sugar) to decompose the nitrate and nitrite salts in aqueous sodium-bearing acidic waste to nitrogen gas and oxides of nitrogen. The three-step process calls for evaporation of the acidic liquid, decomposition of the highly volatile components, and chemical interaction of the waste components and the added mixture to form a solid. DOE has over 1,000,000 gallons of sodium-bearing acidic waste to denitrify, solidify, and dispose of. Demonstrated at Pacific Northwest National Laboratory. (DOE/EM-0616) |
| Mixed Waste Stabilization | **Solidification of Radioactive Waste Oils** — Products for free-liquid control in storage, transport, and disposal of radioactive and RCRA-defined waste oils. A polymer solidifying agent, Nochar Petrobond®, was demonstrated in 1999 at the Mound Large-Scale Demonstration and Deployment Project, in Miamisburg, Ohio, to absorb and solidify high-activity tritium-contaminated vacuum-pump oils. (DOE/EM-0598) |
| Nuclear Materials Processing | **Real-Time Monitor for Transuranics in Glass** — An optical sensor for remotely assaying transuranic elements in molten glass as it flows into containers during the vitrification process. The technology was demonstrated at the Savannah River Site three times between 1997 and 1999. (DOE/EM-0561) |
| Characterization | **Tomographic Site Characterization Using CPT, ERT, and GPR** — A geophysical system delivered via cone penetrometer technology (CPT) that incorporates results from electrical resistivity tomography (ERT) and ground penetrating radar (GPR). ERT can be used to monitor or detect subsurface processes such as water infiltration, underground tank leaks, and steam or electrical heating during soil cleanup operations. Data from GPR are used to produce a cross-sectional profile or record of subsurface features. Demonstrated at a test site in Vermont and at the Savannah River Site. (DOE/EM-0517) |
| Containment | **Alternative Landfill Cover** — A regulatory-acceptable alternative to the prescriptive RCRA Subtitle C and D cover design. To identify covers with cost and performance advantages over the prescriptive baseline covers at an arid or semi-arid site, DOE is monitoring an alternative landfill cover demonstration at Sandia National Laboratories in New Mexico to document the performance of four different alternative landfill covers. (DOE/EM-0558)<br>**SEAtrace™ Monitoring System** — A low-cost, early detection system to verify the initial and long-term integrity of subsurface containment barriers by gaseous tracer injection, automated multipoint sampling, and real-time global optimization modeling. The system characterizes the integrity of impermeable barriers constructed above the water table and determines the size and location of leaks. Demonstrated at Dover Air Force Base, Naval Air Station Brunswick, and Brookhaven National Laboratories. (DOE/EM-0549) |

Source: U.S. Department of Energy, the *Innovative Technology Summary Report* series. Available through DOE's Information Bridge at http://www.osti.gov/bridge/ or at apps.em.doe.gov/OST/itsrall.asp.

### 7.6.1 Private Sector Involvement: Mechanisms

DOE uses different mechanisms to invite the private sector to participate in its technology research and development programs. These include specific request for proposals (RFPs) issued in *Federal Business Opportunities* or the *Federal Register* and broad announcements designed to collect "best-in-class" technology providers (U.S. DOE Web 2003a).

Technology transfer can mean many things: technical assistance to solve a specific problem, use of unique facilities, access to patents and software, exchange of personnel, and cooperative research. The most appropriate mechanism will depend on the objective of each partner. A brief description of several technology transfer mechanisms appears below.

**Cooperative agreements:** instruments entered into by the government with industry, universities, and others to support or stimulate research. Agreements are generally cost-shared with the nonfederal participant.

**Cooperative Research and Development Agreements (CRADAs):** an incentive for collaborative research and development. CRADAs are agreements between a specific DOE laboratory and a non-federal source to conduct mutually beneficial research and development that is consistent with the laboratory's mission. CRADAs can be funded either entirely by the partner or by DOE/partner cost sharing. CRADA partnerships can be developed by identifying the specific area for research and development, the intellectual property owned, and the laboratories/facilities technology areas that best match the needs, and then contacting that laboratory/facility technology transfer office.

**Cost-shared contracts/sub-contracts:** collaboration through a procurement of mutual benefit to industry and to government. Often the government can agree not to disseminate, for a limited period of time, commercially valuable data that are generated under a cost-shared contract.

**Licensing:** the transfer of less than ownership rights in intellectual property, such as a patent or software copyright, to permit its use by the licensee. Licenses can be exclusive or for a specific field of use or for a specific geographical area. The potential licensee must present plans for commercialization. The DOE Invention Licensing Home Page and its associated databases provide information on Department-owned patents available for license for commercial use. (http://www.osti.gov/dublincore/gencncl/)

**Personnel exchange programs:** arrangements allowing government or laboratory staff to work in industry facilities and industry personnel to work in government laboratories and facilities to enhance technical capacities and support research in specific areas. Costs are borne by the organization sending the personnel. Intellectual property arrangements can be addressed in exchange agreements.

**R&D consortia:** arrangements involving multiple federal and non-federal parties working together for a common R&D objective. Funding for R&D consortia can be shared, but usually no funds are exchanged between participants.

**Technical assistance to small business:** undertaken by DOE/laboratory/facility personnel in response to an inquiry from an individual or organization seeking to further knowledge, solve a specific problem, or improve a process or product.

**User facility agreements:** arrangements permitting private parties to conduct research and development at a laboratory. For proprietary R&D, the laboratory is paid for the full cost of the activity. If the work will be published, cost can be adjusted. Intellectual property rights generally belong to the user.

**Work for Others (WFO):** arrangements permitting private parties to conduct research and development at a laboratory for either a federal agency or a non-federal entity. In this arrangement, the private entity pays the laboratory's full costs for performing a research project. A WFO arrangement permits a developer to gain access to highly specialized or unique DOE facilities, services, or technical expertise. A technology developer can acquire a WFO by identifying the unique expertise required, identifying the laboratories/facilities technology areas that best match the technology development need, and contacting the laboratory/facility technology transfer office. For proprietary R&D, the laboratory is paid for the full cost of the activity. If the work will be published, cost can be adjusted. Intellectual property rights generally belong to the user.

### 7.6.2 Private Sector Involvement: Programs

Among DOE's many technology development programs, the following are particularly useful to developers of environmental technologies.

The **Environmental Management Science Program (EMSP)**, sponsored by the Office of Science (SC), is designed to inspire breakthroughs in areas critical to the EM mission through basic research, and to fulfill DOE's continuing commitment to the cleanup of environmental liabilities. The program was initiated in FY 1996 to address long-term technical issues and provide EM with near-term fundamental data critical to the advancement of technologies that are under development, but not yet at full scale nor implemented. Proposed basic research should contribute to environmental management activities that would decrease risk for the public and workers, provide opportunities for major cost reductions, reduce time required to achieve EM's mission goals, and, in general, address problems that are considered intractable without new knowledge (NRC 2000). The EM Science Program's solicitations are published in the *Federal Register*. (http://emsp.em.doe.gov/)

Since 1996, the Program has held six competitions and has awarded over $290 million in funding for 361 research projects. A breakdown of the EMSP awards by year is as follows:

- 1996 and 1997: 202 awards totaling $160 million targeted at a broad spectrum of basic science cleanup and waste management issues.
- 1998: 33 awards totaling $30 million focused on high-level radioactive waste and decontamination and decommissioning issues.
- 1999: 39 awards totaling $30 million fostered basic research in the areas of vadose zone contamination and low dose radiation.

- 2000: 42 awards totaling $30 million in research renewals for 1996 and 1997 funded projects.
- 2001: 45 awards totaling $39 million focused on additional high-level radioactive waste and decontamination and decommissioning issues (DOE 2002c).
- 2002: 38 awards totaling $33 million for research on subsurface contamination in the vadose and saturated zones.

The **Natural and Accelerated Bioremediation Research Program (NABIR)** is sponsored by DOE's Office of Biological & Environmental Research within SC to increase understanding and utilization of contaminant bioremediation processes. (http://www.lbl.gov/NABIR/)

The **Small Business Innovation Research (SBIR)** and **Small Business Technology Transfer (STTR)** programs are designed to stimulate and foster scientific and technological innovation in the private sector, strengthen the role of small businesses in meeting federal research and development needs, and increase the commercial application of innovations derived from federally funded research. SBIR defines a small business as a for-profit enterprise operating in the United States with majority domestic ownership and with no more than 500 employees. Phase I SBIR awards up to $100,000 are awarded to explore the feasibility of innovative concepts for nine months. Phase II is the principal research or R&D effort, with awards up to $750,000 over a two-year period. DOE funds approximately 200 Phase I projects and about 90 Phase II projects per year. In Phase III, non-federal capital should be used by the small business concern to pursue commercial applications of the R&D. To aid awardees seeking follow-on funding for Phase III, DOE sponsors a Commercialization Assistance Project that provides individual assistance in developing business plans and preparing presentations to potential investment sponsors. The STTR pilot program is closely modeled on SBIR, with an additional requirement of co-participation by a research institution such as a university, non-profit institute, or contractor-operated, federally funded research and development center. Not less than 40 percent of the work conducted under an STTR award must be performed by the small business concern, and not less than 30 percent of the work must be performed by the non-profit research institution. The STTR awards are fixed-price grants of approximately $100K under Phase I, rising to about $500K in Phase II, given continued successful program performance. University or other non-profit involvement in a project does not limit the applicant to STTR only; application can be made under SBIR alternatively. (http://sbir.er.doe.gov/sbir/)

Within EM, the **Office of Science and Technology** program provides direct technical solutions to closure sites, which are DOE facilities whose primary mission has been completed or terminated and where current activities are focused solely on site remediation. At the start of each fiscal year, "alternative projects" will be identified that target immediate and specific cleanup needs at the sites. Department-wide competitive grant and contract regulations apply. (http://www.em.doe.gov/ost)

The **National Energy Technologies Laboratory (NETL)** supports cleanup by implementing several extramural technology development and deployment programs, with emphasis on technologies for deactivation and decommissioning, and minimization and/or abatement of environmental problems associated with the development and use of the nation's energy supply

(e.g., fly ash from coal-burning facilities). NETL contracts with private-sector industrial and academic organizations for technology development. (http://www.netl.doe.gov/business/solicit/)

The **Strategic Environmental Research and Development Program (SERDP)** is the Department of Defense's corporate environmental R&D program, planned and executed in full partnership with DOE and EPA, with participation by numerous other federal and non-federal organizations. (http://www.serdp.org)

DOE encourages organizations and individuals to submit proposals that are relevant to the DOE research and development mission either in response to formal DOE solicitations or through self-generated unsolicited proposals. An **Unsolicited Proposal** is an application for support of an idea, method, or approach submitted by individuals, businesses, or organizations solely on the proposer's initiative, rather than in response to a formal government solicitation. Funding of Unsolicited Proposals is considered a noncompetitive action. A 50-page detailed booklet titled *Guide for the Submission of Unsolicited Proposals* outlines the Unsolicited Proposals process and is available at
http://professionals.pr.doe.gov/ma5/MA-5Web.nsf/WebPages/Proposal+System?OpenDocument

In 1994, EM's Office of Science and Technology implemented the **Technology Focus Area** approach as a strategy to leverage resources and facilitate sound technology development decisions in the following technology problem areas: deactivation and decommissioning, subsurface contaminants, transuranic and mixed waste, and tanks. The Focus Area approach sought to optimize resources by streamlining technology management activities into a single focus team for each major problem area. A National Research Council report, *Decision Making in the U.S. Department of Energy's Environmental Management Office of Science and Technology* (NRC 1999), provides an extensive overview of the aims and organization of the Technology Focus and Cross-Cutting Technology Areas. As a result of the reorganization brought about by the 2002 top-to-bottom review, EM is working to accelerate cleanup at specific sites and has refocused the science and technology program to address a limited number of critical site-specific cleanup needs, deliver expert services, and provide potentially high payback solutions. DOE terminated the Focus Area and most of the Cross-Cutting Technology Area programs at the end of FY 2002.

Numerous reports exploring DOE's environmental technology research and development needs have been produced by the National Research Council (see the extended bibliography in the appendix). Also, a collaborative effort to draft DOE's *Long-Term Stewardship Science and Technology Roadmap* will define the strategic path forward for the critical science and technology required to support the long-term stewardship program with regard to near-term (5-10 year), intermediate-term (10-20 year), and long-term (20-50 year) general environmental research and development needs (U.S. DOE 2002b).

## 7.7 References

Applegate, John and Stephen Dycus, 1998. "Institutional Controls or Emperor's Clothes? Long-Term Stewardship of the Nuclear Weapons Complex," *Environmental Law Reporter: News & Analysis*, 28(11):10631-10652.

EBI, 2002. "Industry Overview 2002," *Environmental Business Journal*, 14:7-8, Environmental Business International, Inc.

Fiore, James J. and Marcus E. Jones, 2000. "The New Office of Environmental Management's Site Closure Program," Waste Management 2000 Symposium, February 29, 2000, Tucson, AZ.

HR, 2000. *Incinerating Cash: The Department of Energy's Failure to Develop & Use Innovative Technologies to Clean Up the Nuclear Waste Legacy*, U.S. House of Representatives, a staff report prepared for the use of the Committee on Commerce.

NRC, 1999. *Decision Making in the U.S. Department of Energy's Environmental Management Office of Science and Technology*, National Research Council, National Academy Press, Washington, DC, ISBN: 0309063477.

NRC, 2000. *Research Needs in Subsurface Science: U.S. Department of Energy's Environmental Management Science Program*, National Research Council, National Academy Press, Washington, DC.

Paterson, Andrew, 2002. "New Approach in the Works for DOE," Environmental Business Journal, 14(11-12):18-19.

Probst, Katherine and Adam Lowes, 2000. *Cleaning up the Nuclear Weapons Complex: Does Anybody Care?* Resources for the Future, Washington, DC.

Tomlinson, R. and A. Paterson, 2002. "Overview: Reengineering EM for 2003, What's Going On?" Briefing for ITRC Board of Directors, February 19, 2002.

U.S. DOE, 1996a. *The 1996 Baseline Environmental Management Report*, U.S. Department of Energy, Office of Environmental Management, DOE/EM-0290.

U.S. DOE, 1996b. *Closing the Circle on the Splitting of the Atom*, U.S. Department of Energy, Office of Environmental Management, DOE/EM-0266.

U.S. DOE, 1998. *Accelerating Cleanup: Paths to Closure*, U.S. Department of Energy, Office of Environmental Management, DOE/EM-0362.

U.S. DOE, 2000. *Strategic Plan: Strength through Science—Powering the 21st Century*, U.S. Department of Energy.

U.S. DOE, 2001a. *Analysis of the DOE Contractor Base: Readiness, Willingness, Profitability and Trends*, U.S. Department of Energy, Contract Reform and Privatization Project Office.

U.S. DOE, 2001b. *Long-Term Stewardship Study*, U.S. Department of Energy, Office of Environmental Management.

U.S. DOE, 2001c. *Report to Congress on Long-Term Stewardship. Volume 1: Summary Report; Volume 2: Site Summaries*, U.S. Department of Energy, Office of Long-Term Stewardship, DOE/EM-0563, January 2001.

U.S. DOE, 2002a. "Environmental Management: Executive Summary," *FY 2003 Budget Request to Congress*, U.S. Department of Energy.

U.S. DOE, 2002b. *Long-Term Stewardship Science and Technology Roadmap (Draft)*, U.S. Department of Energy, Long-Term Stewardship Science and Technology Roadmap Executive Committee and Workgroups, Idaho Operations Office, DOE/ID-10926, October 2002.

U.S. DOE, 2002c. "Office of Science Financial Assistance Program Notice 02-03; Environmental Management Science Program (EMSP): Research Related to Subsurface Contamination in the Vadose and Saturated Zones," U.S. Department of Energy, *Federal Register*, 67(4):719-725, January 7, 2002.

U.S. DOE, 2002d. *A Review of the Environmental Management Program, United States Department of Energy, Presented to the Assistant Secretary for Environmental Management by the Top-to-Bottom Review Team*, U.S. Department of Energy, February 4, 2002.

U.S. DOE, 2002e. "About OST," U.S. Department of Energy, Office of Environmental Management, Office of Science and Technology web site, June 11, 2002. http://apps.em.doe.gov/OST/aboutmain.asp

U.S. DOE, 2003a. "Environmental Management: Executive Summary," *FY 2004 Budget Request to Congress*, U.S. Department of Energy.

U.S. DOE, 2003b. *Performance and Accountability Report for FY 2002*, U.S. Department of Energy, DOE/ME-0014.

U.S. DOE, 2004. *Department of Energy FY 2005 Budget Request,* DOE/ME-0036, Vol. 5, U.S. Department of Energy, February, 2004.

U.S. DOE Web, 2003a, "Technology Partnership Gateway," U.S. Department of Energy web site, March 1, 2003. http://www.energy.gov/business/partners/ttwg.mechanisms.html

U.S. DOE Web, 2003b. "Inside the DOE—About Us: Our Mission," U.S. Department of Energy web site, March 1, 2003.

U.S. GAO, 2002a. *Waste Cleanup: Implications of Compliance Agreements on DOE's Cleanup Program*, U.S. General Accounting Office, GAO-02-852T, July 19, 2002.

U.S. GAO, 2002b. *Waste Cleanup: Status and Implications of DOE's Compliance Agreements*, U.S. General Accounting Office, GAO-02-567, May 2002.

U.S. GAO, 2003. *Major Management Challenges and Program Risks: Department of Energy*, U.S. General Accounting Office, GAO-03-100, January 2003.

YAHSGS, 2002. *Assessment of the 2000 and 2001 Environmental Management Industry: The Times They Are A-Changin'*, Prepared by YAHSGS LLC, Richland, WA, for the U.S. Department of Energy, Washington, DC.

# Chapter 8
# Demand for Remediation of Sites Managed By Civilian Federal Agencies

This chapter describes the market for cleanup of sites owned or operated by "civilian" federal agencies, which includes all federal agencies except the Departments of Energy and Defense. Civilian agencies are collectively responsible for the management of millions of acres of land and may ultimately be responsible for site characterization and remedial actions at thousands of sites.[1]

**_Highlights_**

- About 70% of civilian federal agency contaminated sites are on lands managed by the DOI and USDA. These agencies combined manage over 700 million acres of land, about a third of U.S. land.
- DOI and USDA have identified at least 3,000 contaminated sites that will require cleanup. In addition, between 5,000 and 25,000 abandoned mine sites are on lands for which these agencies are responsible.
- The cost to complete cleanup at civilian federal agency sites is estimated to be $15-22 billion. This estimate does not include all of the mining sites. Mining sites are addressed in Chapter 11.
- The 17 federal agencies on EPA's docket typically spend an estimated $100-200 million annually for contaminated site cleanup at their properties. This figure may underestimate the total remediation expenditures, because it includes only some of the potential cost recovery and cost sharing.
- Based on the above annual funding level, it will take between 100 and 200 years to clean up the contaminated sites at civilian federal agencies.
- Given the types of environmental problems present, remediation approaches at civilian federal sites are likely to be similar to those used in other programs, such at RCRA and NPL sites.

The most comprehensive source of information on contaminated facilities for which civilian agencies are responsible is the "Federal Agency Hazardous Waste Compliance Docket" ("the docket") (U.S. EPA 2003a). Section 120(c) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), as amended by the Superfund Amendments and Reauthorization Act (SARA), requires EPA to maintain the docket as a repository for information about federal facilities that manage hazardous waste or from which hazardous substances have been, or may be, released. As of January 2003, 1,099 facilities, distributed among 18 civilian federal agencies, were listed on the docket. It is estimated that approximately 70 percent of these facilities may require environmental cleanup.

Although an overall estimate of the potential cost of cleaning up these facilities is unavailable, estimates are available for agencies managing a significant portion of the facilities listed on the docket and for which selected information is available: the U.S. Department of Interior (DOI), U.S. Department of Agriculture (USDA), U.S. Department of Transportation (DOT), and National Aeronautics and Space Administration (NASA). These

[1] Throughout this chapter, the term "site" is used to indicate an individual area of contamination. The term "facility" identifies an entire tract, including contiguous land, that is the responsibility of the subject agency. A "facility" may contain one or more contaminated areas or "sites."

agencies together account for 75 percent of the civilian federal agency facilities listed on the docket. These agencies are also entrusted with managing vast amounts of public land. The largest federal land holder, DOI, is responsible for 507 million acres of surface land, or about one-fifth of the land in the United States; and the U.S. Forest Service (part of USDA) manages 192 million acres of national forest and grasslands.

## 8.1 Civilian Federal Agency Cleanup Programs

Cleanup at hazardous waste sites is regulated in large part by CERCLA/SARA and the Resource Conservation and Recovery Act (RCRA). Federal agencies must comply with CERCLA and RCRA provisions in the same manner as private parties, and are liable for cleaning up contaminated waste at currently- or formerly-owned facilities. Under SARA, the federal agencies also may be liable for cleaning up contaminated waste at facilities acquired through foreclosure or other means and at facilities purchased with federal loans. To meet these requirements, civilian federal agencies implement various programs for assessing potentially contaminated sites and conducting any needed cleanup actions. Some agencies have established central offices to manage these programs, while others have adopted a decentralized approach involving the organization of programs by function or geographic location.

For example, **DOI's** Office of Environmental Policy and Compliance coordinates and develops the agency's environmental policy and programs through three teams and eight regional offices to address: (1) requirements of the National Environmental Policy Act and Council on Environmental Quality; (2) remedial and corrective actions involving hazardous materials; and (3) requirements of the National Oil and Hazardous Substances Pollution Contingency Plan (NCP). In 1995, DOI established the Central Hazardous Materials Fund (CHF) to fund medium- to long-term CERCLA cleanup actions. Each year, bureaus and offices within DOI nominate projects for funding that impact sites on DOI land or that impact DOI resources. Between 1995 and 2002, the CHF, which is administered by the Bureau of Land Management (BLM), received $87.4 million in appropriated funds. An additional $84 million was added through cost sharing and cost recovery. Appropriations for FY 2003 are expected to be about $10 million. This fund may be used for site investigations, feasibility studies, and cleanups at sites for which DOI is responsible. Additional cleanup activities may be funded through the appropriations of the various DOI offices and bureaus. The major land-management components of DOI are shown in the box.

***DOI Agencies Manage 507 Million Acres, One Fifth of U.S. Land:***

Bureau of Land Management: 262 million acres

Fish and Wildlife Service: 96 million acres

National Park Service: 84 million acres

Bureau of Indian Affairs: 56 million acres

Bureau of Reclamation: 9 million acres

**USDA's** Hazardous Materials Policy Council (HMPC) provides overall departmental leadership, in addressing issues relating to hazardous waste management and site cleanup. The council, which consists of senior policy representatives from the major affected offices and agencies

within USDA, was established in 1999 to improve consistency across USDA service areas, and consists of senior policy representatives from those areas. The implementation of the hazardous waste-related activities is the responsibility of the Department's Hazardous Materials Management Program (HMMP). In addition to direct funding, HMMP receives funds from the Hazardous Materials Management Appropriation, which was established in 1988 to provide targeted funding for priority hazardous material cleanup projects on facilities and lands under USDA's jurisdiction, custody, or control and for USDA's share of the costs for cleanup projects on non-USDA property where USDA activities may have contributed to the pollution. The appropriation has been about $15.7 million over the past two years. An additional $26.7 million annually is available for the department's environmental mission from direct USDA funds.

**NASA's** Environmental Compliance and Restoration Program (ECR) is managed from NASA Headquarters under the Office of Management Systems. ECR serves as a centralized lead for ensuring environmental stewardship and sustainability of the agency's facilities. NASA's environmental cleanup and compliance activities are implemented through 10 research or space flight centers located across the country.

**DOT** consists of 13 operating administrations responsible for different transportation sectors (as of 2002). Each administration holds responsibility for restoration activities at its operational facilities, including identification, investigation, and cleanup. In addition to its national mission to protect the navigable water of the U.S., the U.S. Coast Guard provides DOT's short- and long-term emergency response to hazardous substance or oil spills covered under CERCLA/SARA and the NCP. Coast Guard operations were transferred from DOT to the U.S. Department of Homeland Security in 2002.

## 8.2 Factors Affecting Demand for Cleanup

Four primary factors influence the market for remediation of civilian federal agency contaminated waste sites.

- Budget considerations constrain all federal agencies planning site remediation. Although agencies may request funds for contaminated site management and remediation, Congress may not provide the necessary funding. Agencies have intensified their efforts to prioritize cleanup activities within and across facilities by more effectively evaluating alternative future land uses, estimating and prioritizing risks to human health and the environment, evaluating a broad range of remediation technologies, and analyzing the relative costs and benefits of various approaches to cleanup.

  In addition, the federal budget process has created incentives for agencies to implement management reforms that will reduce the costs of operations. Some of these include encouraging and eliminating barriers to the use of less costly, innovative remediation technologies; using more cost-effective contracting procedures; streamlining management structures and processes; and using the "lessons learned" from other agencies and the private sector (U.S. CEQ 1995).

- Federal agencies are subject to the CERCLA "Lender Liability Rule," which assigns responsibility for cleaning up contamination at acquired properties. Although federal agencies that involuntarily acquire contaminated property (through foreclosure or other mechanisms) generally are exempt from CERCLA liability, an agency may be liable for remediating a hazardous waste site if it loans money to, and actively participates in management of, an organization using or generating the hazardous waste. Federal liability is determined on a case-by-case basis for each site that is acquired involuntarily.

C Changes in federal and state environmental regulations and standards often impact the level and pace of cleanup required at civilian federal facilities. If cleanup standards become more rigorous in the future, the market may require more advanced technologies or longer-term and more intensive use of existing technologies than anticipated currently. Conversely, if standards become less stringent, the market for new remedial technologies could decrease.

  In January 2002, for example, EPA amended regulations covering corrective action management units (CAMUs) created under RCRA to facilitate treatment, storage, and disposal of hazardous wastes managed for implementing cleanup. The revised regulations established more detailed minimum design and operating standards for CAMUs and outlined treatment requirements for wastes that are placed in CAMUs without violation of RCRA land disposal restrictions. In addition, the amendment established specific information requirements for CAMU applications, including opportunity for public comment. The U.S. General Accounting Office reviewed the proposed regulations and determined that the process for requesting and obtaining CAMU approval would increase the time and cost of site cleanups (U.S. GAO 2000).

- The transfer of public properties to private use may require agencies to reallocate resources for cleaning up properties designated for transfer. Recent years have witnessed an increase in public-to-private transfers of large properties, many of which are managed for a period of time by the General Services Administration.

## 8.3 Number of Facilities and Sites

Estimates of the number of civilian federal facilities that will require some type of remedial action can be derived from the docket. CERCLA requires that the docket be updated every six months to reflect newly characterized sites. In January 2003, the docket reflected a total of 1,099 facilities (Exhibit 8-1). The docket contains information submitted by civilian agencies under CERCLA Section 103(a), which requires that the National Response Center be notified of a hazardous substance release or potential release. The docket also contains information submitted to EPA by the agencies under RCRA Sections 3005, 3010, and 3016, which addresses facility permitting, notification of hazardous waste activity, and each agency's biennial inventory of hazardous waste activities.

**Exhibit 8-1. Number of Civilian Federal Facilities Potentially Requiring Cleanup**

| Agency | Facilities Listed on Docket |
|---|---|
| Department of Agriculture | 201 |
| Architect of the Capitol | 1 |
| Central Intelligence Agency | 1 |
| Department of Commerce | 10 |
| Army Corps of Engineers | 50 |
| Environmental Protection Agency | 23 |
| General Services Administration | 38 |
| Department of Health and Human Services | 10 |
| Department of Housing and Urban Development | 3 |
| Department of the Interior | 468 |
| Department of Justice | 27 |
| Department of Labor | 3 |
| National Aeronautics and Space Administration | 17 |
| U.S. Postal Service | 26 |
| Tennessee Valley Authority | 45 |
| Department of Transportation | 134 |
| Department of the Treasury | 9 |
| Veterans Administration | 33 |
| Total | 1099 |

Notes:

[a] The number of "sites" (individual areas of contamination) at each facility is not included in the docket.

[b] The U.S. Army Corps of Engineers manages environmental cleanup projects for a variety of civilian federal agencies as well as the Department of Defense and Department of Energy.

Source:

U.S. Environmental Protection Agency. "Federal Agency Hazardous Waste Compliance Docket," 68 *Federal Register* 107, January 2, 2003.

Although it is the most comprehensive source available, the docket provides only broad indications of the remediation market. Some of the factors that limit its utility for market analysis are: many sites listed on the docket do not require remediation; sites that have undergone remediation are not removed from the docket; the docket does not indicate the number of contaminated sites at each facility (a facility can have one or more sites or areas of contamination); and many sites at federal facilities remain to be inventoried and characterized. In addition, the docket excludes federal facilities that have been sold, private facilities where the

federal government may have contributed to site contamination, and facilities that generate small quantities of hazardous waste. Thus, the docket may not account for all potentially contaminated sites on land for which civilian federal agencies are responsible.

In accordance with CERCLA Section 120(d), a preliminary assessment (PA) is conducted for each facility listed on the docket to evaluate the threat they pose to public health and the environment. If warranted, a site inspection is conducted to determine if CERCLA response actions are necessary. If further actions are warranted, an evaluation is conducted to determine whether the site should be placed on the National Priorities List (NPL) for long-term evaluation and remedial response. As of October 2001, 15 civilian federal agency sites had been added, proposed, or deleted from the NPL (U.S. EPA 2003b).

Approximately 30 percent of the docket facilities listed pursuant to CERCLA Section 103 require no further EPA actions, and accordingly are designated "no further remedial action planned" (NFRAP). Although the NFRAP designation means that the contamination at a site is not severe enough to warrant listing the site on the NPL and remediation under the Superfund program, the site still may require cleanup under other environmental programs, such as a state regulation.

DOI estimates that about 1,000 sites under DOI stewardship require restoration. (U.S .DOI 2003b). By 2005, DOI aims to increase its cumulative number of restoration projects to 135 and the cumulative amount of damage settlement funds within the DOI Restoration Fund to $200

**Exhibit 8-2. DOI Allocation of the Central Hazardous Materials Fund**

