million. For example, DOI allocated approximately $10 million of Central Hazardous Materials Fund (CHF) money during 2001 to 35 projects spread among five bureaus: 14 projects in the Bureau of Land Management (BLM); 13 projects in the National Park Service; 4 projects in the Fish and Wildlife Service; 3 projects in the Bureau of Indian Affairs; and 1 project in the U.S. Geological Survey (U.S. DOI 2003a). The geographic distribution of these projects are shown in Exhibit 8-2. By 2005, DOI also plans to have completed cleanup of its 1,000th BLM hazardous material site (U.S. DOI 2003b).

In addition to hazardous waste sites it has already identified, other sites may be discovered on its properties in the future. An estimated 3.5 million acres under the Department's stewardship are in need of restoration. DOI plans to restore about 1.1 million of these acres by 2005. This land includes mined lands, wildlife refuges, park lands, and forests. In the course of implementing this task, additional remediation needs are likely to arise. For example, BLM estimates that between 5,000 and 25,000 abandoned mines on public lands the Bureau administers have caused or could cause environmental damage, mostly from water pollution. In a typical year, DOI works on between 50 and 150 remediation sites.

In 2001, USDA estimated that over 2,000 sites with releases or threatened releases of hazardous substances remained to be addressed over the next 50 years, at an estimated cost of $4 billion (USDA 2001). From 2003 to the end of 2007, USDA anticipates completing 150 CERCLA cleanups. During 2003 alone, USDA planned to complete 68 CERCLA site assessments, 59 CERCLA cleanup plans, and 6 RCRA cleanups. (In contrast, the agency targeted 17 CERCLA cleanups during fiscal year 2002.) More than half of the agency's CERCLA cleanups planned for 2003 involve mining sites (USDA 2003). USDA recognizes that preparation of cleanup plans is emerging as a potential "bottleneck." While 137 CERCLA cleanups were completed in fiscal years 1998-2001, only 84 cleanup plans were completed during that time.

DOT has made significant progress in remediating its contaminated sites. In fiscal year 2002, DOT reported that 91 of its facilities required no further remedial actions under SARA, and that all SARA cleanup efforts were completed (U.S. DOT 2002). This leaves 43 DOT facilities that require remediation. The Coast Guard received DOT funding to conduct response and cleanup activities required of the DOT under CERCLA/SARA. Continued restoration activity is anticipated at three Coast Guard facilities for several years. In addition, the Federal Aviation Administration plans continued cleanup activities at several facilities, and replacement of outdated underground storage tanks and cleaning or removal of unused tanks at decommissioned facilities. DOT uses a "worst first" prioritization system to address problems posed by DOT facilities where significant pollution problems are identified.

## 8.4 Site Characteristics

The types of contamination problems at civilian federal agency facilities vary from agency to agency. Exhibit 8-3 provides examples of the types of contaminated facilities managed by agencies listed most often on the docket. Contaminated facilities owned or operated by other civilian federal agencies encompass research laboratories, properties acquired through foreclosure, and operational facilities such as the Department of Justice federal penitentiaries,

Tennessee Valley Authority power generating plants, and Department of Veterans Affairs medical centers.

**Exhibit 8-3. Examples of Types of Contaminated Facilities at Civilian Federal Agencies**

| | |
|---|---|
| **Department of Interior** | |
| Bureau of Land Management | Landfills (approximately 3,400 closed sites) |
| | Abandoned mining operations |
| | Unauthorized hazardous waste sites |
| Bureau of Reclamation | Reservoirs and drinking water supplies contaminated with agricultural runoff |
| National Park Service | Landfills and dumps (inherited with acquired land) |
| | Abandoned mining operations |
| Fish and Wildlife Service | Contaminated sites resulting from agricultural runoff or upstream industrial operations |
| | Inherited land previously used for industrial or defense purposes |
| **Department of Agriculture** | |
| Forest Service | Abandoned mining sites |
| | Sanitary landfills and aboveground dumps |
| | Wood preservation sites and laboratories |
| Agricultural Research Service | Research laboratories |
| Commodity Credit Corporation | Grain storage facilities |
| Farmers Home Administration | Farms (acquired through foreclosure) where pesticides and other hazardous materials may have been disposed |
| **Department of Transportation** | |
| Federal Aviation Administration (FAA) | FAA Technical Center, with soil and groundwater contamination of 22 areas |
| | Airfields with hazardous solvent or oil spills |
| U.S. Coast Guard | Fuel storage and operation/maintenance facilities |
| **National Aeronautics and Space Administration** | Research laboratories, industrial plants |

## 8.5 Estimated Cleanup Costs

Detailed site information for developing accurate cleanup cost estimates for civilian federal agency sites is not readily available from the agencies. EPA's FEDPLAN-PC information system has been discontinued and information sources on environmental activities of the agencies are scattered among their bureaus and offices. To provide insight into the probable cost of completing cleanup at federal civilian sites, it is useful to examine (a) the probable cost of all sites that have been or are likely to be discovered, given current regulatory requirements, and (b) the probable funding likely to be committed to remediation.

### *Estimated Cost To Complete Cleanup*

Because information on contaminated sites at most agencies is fragmented, it is difficult to develop a clear picture of the cost to complete cleanups at civilian federal agencies. The U.S. General Accounting Office's (GAO) recent study of the issue of environmental liabilities of federal agencies indicates the nature of this difficulty. In an effort to improve the Congressional budgetary process for federal agencies' environmental liabilities, the GAO recently studied the problems posed by the waste-producing assets of these agencies. GAO recommended that the Office of Management and Budget require federal agencies to include in their budget requests supplemental information on estimated environmental cleanup/disposal costs for new acquisitions (U.S. GAO 2003). This requirement implies that agencies will be required to conduct Phase I and Phase II type site assessments when contemplating real estate transactions. It will also ensure that agencies explicitly recognize the financial cost of their potential environmental liabilities.

GAO also assessed the efforts that federal agencies with major cleanup responsibilities have made in setting priorities for spending limited cleanup funds at the sites posing the highest risks (U.S. GAO 1999). GAO found that EPA and USDA had made progress in setting priorities on the basis of site risks, but that additional efforts were required by DOI to complete a site inventory and establish a risk-based prioritization of its sites.

Despite these difficulties, DOI, USDA, and NASA planning and budgetary information indicate that cleanup of sites covered under CERCLA, RCRA, and other environmental regulations will continue to require extensive resources over many years. The following points summarize an estimate of the cost to complete remediation at contaminated federal civilian agency sites.

**Exhibit 8-4. Estimate Cleanup Cost for Civilian Federal Agencies**

| Agency | Cost to Complete ($ Billions) | Explanation/Limitations |
|---|---|---|
| DOI | $4.7-9.8 | Over 1,000 sites identified on 468 facilities. It could require over 100 years to address these sites. DOI reports it could have as many 25,000 sites. (U.S. DOI 2003a and U.S. CEQ 1995). |
| USDA | $4.2 | Over 2,000 sites with releases or threatened releases of hazardous substances (USDA 2001). USDA expects this work to take about 50 years. |
| NASA | $1.3 | Environmental remediation of NASA's research and space flight centers could require an additional 80 years to complete. |
| Subtotal | $10.2-15.3 | These agencies account for 70% of the facilities on the docket. |
| Total, all agencies | $14.6-21.9 | Divide previous figure by 0.7. |

Sources: See explanation in text and references above .

### *Available Funding*

Given the magnitude of the cost to complete cleanups at civilian federal sites, it is useful to examine the level of recent funding.

- Between 1995 and 2002, DOI received $87.4 million in direct funding and an additional $84 million in cost sharing or cost recovery to address sites with hazardous materials. The direct funding comes from the Central Hazardous Materials Fund described in Section 8.1. In recent years, annual CHF funding has been $10 million. These funds may be supplemented through cost sharing and cost recovery from responsible parties or business operators. Historically, about one dollar of PRP funds becomes available for each dollar of direct appropriations.

  DOI's BLM was appropriated $1 million in FY 1997, $3 million in FY 1998, and $10 million in fiscal years 1999, 2000, and 2001 for water quality-related cleanup actions at abandoned mine land sites. In addition, states obligated $10.2 million and the Office of Surface Mining obligated $5.9 million for emergency reclamation projects at abandoned mine lands during 2001. The Office of Surface Mining also distributed $6.9 million to 12 states for elimination of environmental problems caused by acid mine drainage from abandoned coal mines. Although most of these appropriations, which total $33 million, are for land reclamation, safety hazards and other non-remediation activities, a portion of these funds, perhaps 20 percent ($6 million) is likely to be used for site remediation. Thus, the funds available to DOI for remediation of contaminated sites are likely to amount to $26 million annually ($10 million from CHF + $10 million from cost recovery and cost sharing + $6 million directly funded by bureau programs).

- USDA funding for priority CERCLA and RCRA activities are supplemented by Hazardous Materials Management Appropriations (HMMA). For fiscal year 2003, the department requested $15.7 million in HMMA funding, 47 percent ($7.3 million) of which covered actual cleanup work. This request is about equal to HMMA appropriations for fiscal years 2000 and 2001, each of which totaled $15.7 million. Approximately $5.1 million of the HMMA request targeted cleanup of abandoned and inactive mine sites on national forest lands. Of the total HMMA budget request, approximately 88 percent covered CERCLA activities. The remaining 12 percent was allocated to RCRA regulatory compliance, including the removal of underground storage tanks.

  A total of $26.7 million in USDA funds also were committed to meet the agency's environmental mission. USDA anticipates that, between 2003 to the end of 2007, it will complete 150 CERCLA cleanups. Thus, the upper-bound of funds likely to be available to USDA for remediation of contaminated sites is estimated to be about $34 million annually ($7.3 + $26.7 million).

- NASA anticipates that 80 percent of its $41 million annual environmental restoration budget anticipated for fiscal years 2004-2008, or $32.8 million, will be used for remediation of contaminated sites (NASA 2003).

- The total anticipated annual budget for the three agencies is $92.8 million, and extrapolating this figure to all 17 agencies on the docket results in an estimated annual budget of $133 million for contaminated site remediation at federal agencies. This figure may underestimate the total remediation expenditures, because it includes only some of the potential cost recovery and cost sharing that will be available.

Based on the above analysis, and the assumption that funding remains at $133 million annually, it will take 130 to 160 years to remediate the contaminated sites at civilian federal agencies.

## 8.6 Remediation Technologies

Little information is available on the technologies used to clean up facilities owned or operated by civilian federal agencies. Given the types of environmental problems present, the remediation approaches are likely to be similar to those used in other programs, such at RCRA and NPL sites. A useful EPA publication *Innovative Treatment Technologies: Annual Status Report (Eleventh Edition)* describes trends in technologies used at NPL, Department of Defense, and Department of Energy sites (U.S. EPA 2004). Many of those technologies, in particular those implemented at NPL industrial and mining sites, may be implemented at civilian federal agency sites.

To stimulate the use of innovative technologies at federal, including civilian, contaminated sites, EPA is fostering the use of federal facilities as testing and demonstration centers. For example, several new cleanup technologies are under demonstration at the Kennedy Space Center in Florida as part of EPA's Superfund Innovative Technology Evaluation Program. These demonstrations will help to identify cost-effective and easily-implemented technologies for treating groundwater contaminated with dense non-aqueous phase liquids. Also, in an effort to reduce regulatory and institutional barriers to innovative technology development, EPA is working with DOI and the Western Governor's Association to develop innovative technologies for use at mining sites.

## 8.7 References

NASA, 2003. *Fiscal Year 2004 - Congressional Budget*, U.S. National Aeronautics and Space Administration*, 2004.* http://www.ifmp.nasa.gov/codeb/budget

U.S. CEQ, 1995. *Improving Federal Facilities Cleanup*, Council on Environmental Quality, Office of Management and Budget, October 1995.

USDA, 2001. *USDA Hazardous Materials Management Program: Strategic Plan.* U.S. Department of Agriculture, December 2001. http://www.usda.gov/da/hmmg

USDA, 2003. Hazardous Materials Management: *Annual Performance Plans,* FY 2003, 2001, 2000. U.S. Department of Agriculture. http://www.usda.gov/da/hmmg

U.S. DOI, 2001. U.S. *Strategic Plan: FY 2000-2005*, U.S. Department of the Interior. http://www.doi.gov/gpra/doioverviewstratplanv6

U.S. DOI, 2003a. U.S. Department of Interior, Office of Environmental Policy and Compliance web site. http://www.doi.gov/oepc

U.S. DOI, 2003b. *FY 2003 Annual Performance Plan; FY 2001 Annual Performance Report*, U.S. Department of Interior. http://www.doi.gov/gpra/2003/01apr03app

U.S. DOI, 2003c. U.S. Department of Interior. Office of Surface Mining web site. http://www.blm.gov/aml

U.S. DOT, 2002. *Performance and Accountability Report: Fiscal Year 2002,* U.S. Department of Transportation. http://www.dot.gov/perfacc

U.S. EPA (Environmental Protection Agency), 2003a. "Federal Agency Hazardous Waste Compliance Docket." U.S. Environmental Protection Agency, 68 *Federal Register* 107, January 2, 2003.

U.S. EPA, 2003b. *CERCLA Information System*, U.S. Environmental Protection Agency, Office of Solid Waste and Emergency Response 2003.

U.S. EPA, 2004. *Treatment Technologies For Site Cleanup: Annual Status Report (Eleventh Edition),* Office of Solid Waste and Emergency Response, Technology Innovation Office, EPA-542-R--03-009, February 2004. http://www.clu-in.org/asr

U.S. GAO, 1999. *Progress Made by EPA and Other Federal Agencies to Resolve Program Management Issues*, U.S. General Accounting Office, GAO/RCED-99-111, April 1999.

U.S. GAO, 2000. U. S. *Hazardous Waste: Effect of Proposed Rule's Extra Cleanup Requirements is Uncertain*, U.S. General Accounting Office, GAO-01-67, October 2000.

U.S. GAO, 2003. *Long-Term Commitments: Improving the Budgetary Focus on Environmental Liabilities*, U.S. General Accounting Office, GAO-03-219, January 2003.

U.S. OMB, 1995. *Improving Federal Facilities Cleanup*. Office of Management and Budget, October 1995. clinton2.nara.gov/OMB/inforeg/iffc-2.html

# Chapter 9
# Demand for Remediation of States and Private Party Sites

The cleanup market includes thousands of sites managed by states and private parties. Non-federal agency sites that are not being cleaned up under the Comprehensive Environmental Response, Compensation, Liability Act (CERCLA), Resource Conservation and Recovery Act (RCRA) Corrective Action, and Underground Storage Tank (UST) Programs, but still need attention, become the responsibility of state cleanup programs, private parties, or local jurisdictions. Most private party sites are remediated under state voluntary cleanup programs (VCPs). State sites can vary from sites that are similar to NPL sites to small sites with low levels of contamination.

The majority of states have enforcement authority to compel cleanups and state cleanup funding mechanisms dedicated to financing the cleanup of abandoned sites. It has been estimated that as of December 2000, about 23,000 non-National Priority List (NPL) sites were known or suspected to be contaminated and need further attention requiring additional evaluation and/or some level of cleanup (ELI 2002). The extent of contamination at these sites is largely unknown. However, information in this chapter about state sites that have been remediated indicates the likely characteristics of these sites.

In addition to direct state cleanups, many state sites are cleaned up by private parties in accordance with state cleanup standards. To encourage private party cleanups, almost all states have created voluntary cleanup programs that often provide incentives for private parties to assess and cleanup their sites, with state oversight. Most states have also created brownfield programs that target the cleanup and redevelopment of properties that have been abandoned or are underused because of the potential for contamination.

***Highlights***

- There may be as many as ½ to1 million brownfield sites, 85–90% of which have not been evaluated or cleaned up.
- Based on data from EPA's brownfields grant projects, 350,000 to 700,000 of these may require cleanup. The exact percentage is unknown.
- About 5,000 cleanups are typically completed annually under state mandatory and voluntary control programs. At this rate, 150,000 sites can be completed in 30 years.
- Annual expenditures for these cleanups are estimated to average about $1 billion. If states with limited funds want to accelerate the pace of work, they will likely have to rely on private party actions, voluntary cleanups, and cost recovery.
- The Brownfields Revitalization Act will likely lead to an expansion in the number of sites assessed and cleaned up.
- The federal brownfields program has served as a catalyst for other development that use private, state, and local funds. EPA's investment in brownfields, more than $700 million since 1995, has leveraged more than $5 billion in cleanup and redevelopment funding.
- State site cleanup and redevelopment involves coordination of many disciplines and stakeholders, which has led remediation firms to form alliances with firms and consultants with other specialties.
- The use of advanced remediation techniques appears to have grown in recent years, although data are scant.
- There is a need to screen many sites to determine whether or not they have contamination problems.

In recent years, an average of about 5,000 cleanups have been completed annually under direct state cleanups, voluntary cleanup programs, and brownfield programs. During 2000, states spent more than $505.6 million (38 states reporting) for remediation of NPL and non-NPL sites. Most of these funds were for direct state cleanups at non-NPL sites. Despite this progress in completing cleanups, the backlog of sites to be cleaned up has been stable, primarily because new sites are still being identified.

## 9.1 Programs Addressing State Sites

The cleanup of state and private party sites is strongly influenced by a myriad of state and federal programs that seek to encourage site investigations, cleanup, and redevelopment. The structure and operations of these programs vary widely from state-to-state and many of them preexist the federal brownfield program. These programs typically can require cleanups of certain types of contamination and provide incentives for cleanup, redevelopment, and long-term stewardship. There are two types of state hazardous waste programs: programs that primarily address enforcement issues and oversee cleanups of abandoned sites, and state voluntary cleanup and brownfield programs. In addition, federal programs actively encourage and assist states in their efforts to evaluate and clean up contaminated sites.

### 9.1.1 State Hazardous Waste Cleanup Programs

Almost all states have established hazardous waste programs to ensure that potentially contaminated sites are assessed and, if necessary, cleaned up. Information on these state programs, numbers of contaminated sites, and the status of those sites has been derived from existing published information and state web sites. Contacting individual states to obtain data was outside the scope of this study.

Three key sources provide extensive information about the state programs, *An Analysis of State Superfund Programs: 50-State Study, 2001 Update*, and *An Analysis of State Superfund Programs: 50-State Study, 1998 Update*, and *An Analysis of State Superfund Programs: 50-State Study, 1995 Update*. These studies, prepared by EPA and the Environmental Law Institute are based on information collected from the 50 states, Puerto Rico, and the District of Columbia. For convenience, these are referred to as 52 "states." These studies describe each of the states' programs, including enabling legislation, enforcement provisions, staffing levels, funding, and other aspects of the programs. Exhibit 9-1, which is based on data in the *50-State Study* summarizes the prevalence of the major state programs.

Unlike some environmental statutes which mandate minimum national standards that could be administered by the states after their programs are approved by a federal agency, each state cleanup program is developed according to the state's criteria. Nevertheless, most state hazardous waste programs include authorities similar to the federal Superfund program. They typically include provisions for emergency response and long-term remedial actions; cleanup funds or other mechanisms to finance site investigation and remedial activities; enforcement authorities to compel responsible parties to conduct or pay for studies and site remediations; staff to administer state-lead cleanup activities and to oversee remediations conducted by other parties; and efforts to ensure public participation in decision-making regarding site cleanup and

reuse. About half the states also authorize long-term stewardship under their statutes (ELI 2002). Many states have been cleaning up land contaminated by hazardous substances, or overseeing such cleanups, for about two decades.

**Exhibit 9-1. State Cleanup Program Summary [a]**

| State Program | Number of States | Explanation |
|---|---|---|
| Cleanup Funds | 49 | Idaho, Nebraska, and the District of Columbia do not have cleanup funds. |
| Voluntary Cleanup Program (VCP) | 50 | North Dakota and Vermont do not have formal programs; however, they allow private parties to initiate voluntary cleanups. |
| Brownfields Program | 31 | In addition to the 31 states with formal brownfield programs, 14 target brownfields through their VCPs. |
| Long-term Stewardship Program | 41 | Most of these states have committed scant resources to date. |

[a] Based on 50 states plus Puerto Rico and the District of Columbia, referred to as "52 states."

Sources: U.S. EPA, *2002, An Analysis of State Superfund Programs: 50-State Study,* 2001 Update, November 2002.

### *State Cleanup Funds*

As of December 2000, 49 states, including Puerto Rico, have established cleanup funds or provide another mechanism to pay for the cleanup of non-NPL sites where no responsible party is available, able, or willing to do so. Only Idaho, Nebraska, and the District of Columbia do not have an authorized state cleanup fund. Thirty-six states have more than one fund for cleaning up contaminated waste sites, resulting in a total of 117 state cleanup funds. There are a variety of reasons that states have more than one fund. A state may have multiple funds to differentiate sources or uses of funds. For example, funds may receive money through appropriations, penalties, cost recoveries, or proceeds from a hazardous waste fee. Some funds may apply only to specific uses, such as for emergency response, brownfields, a voluntary cleanup program, or a specific type of site or waste. For example, a number of states have established funds dedicated to dry cleaning sites.

### *State Site Databases*

State site lists are a potential source with which to evaluate the extent of the state remediation market. Many state statutes authorize the development of a priority list, inventory, or registry of state sites. Some states use these compilations to determine the order in which sites will be cleaned up. By the end of 2000, about 40 states had some kind of list, registry, or inventory, with a total of 15,000 sites. However, because the approaches and definitions used by the states vary widely, the aggregation of these data is neither useful for this market assessment nor to make comparison among states. Some states list all known and suspected sites, others include only those that have completed a long evaluation process, and others include only sites where cleanup

is funded directly by the state. Some states' lists may be useful for contractors seeking opportunities for site investigation or remediation work in selected states.

#### *Long-Term Stewardship*

Forty-one state cleanup programs explicitly address long-term stewardship for sites where hazardous substances are to remain in place at levels that do not allow for unrestricted use. The statutes of these states are designed to protect the public health, safety, and the environment at such sites. Institutional controls are the most common mechanism used for long-term stewardship. These include property-law-based restrictions such as restrictive covenants and easements; information systems such as signs, educational materials, published notices, warnings about consumption of fish or wildlife, and site databases; and governmental controls such as zoning, local ordinances, building permits, and groundwater and well-drilling restrictions. Although forty-one states have long-term stewardship programs for one or more of their cleanup programs, most states have committed scant resources to monitoring institutional controls.

#### *Liability*

Most state statutes provide a means for charging parties, such as owners, operators, generators, and transporters, with liability for cleanups. These are the same parties usually charged under CERCLA. Liability may be charged under state hazardous waste laws or under another statute, such as a solid waste, water pollution control, or imminent danger statutes.

Many state statutes include provisions for retroactive, strict, and/or joint and several liability (CERCLA has all three). Forty-three states impose retroactive liability. That is, the state can impose liability for cleanup of hazardous substances disposed of prior to the enactment of the statute. Forty-one states have strict liability standards and 36 states use joint and several liability to allocate liability among multiple responsible parties. Under a strict liability standard, liability is based solely on the occurrence of a release and does not require proof of fault, such as through negligence. Under joint and several liability, the state may pursue one or more responsible party for the full amount of the cleanup. These provisions are potentially powerful incentives for companies to undertake site remediations.

Given the prevalence of strict, joint and several, and retroactive liability, the potential for cleanup cost liability is a significant obstacle to redevelopment and, in some cases, to cleanup. Many state voluntary cleanup and brownfield programs include mechanisms for mitigating the potential liability of responsible parties, prospective purchasers, owners, and developers. These programs are described in the next section.

### 9.1.2 Voluntary Cleanup and Brownfield Programs

Voluntary cleanup programs, a major component of state cleanup efforts, encourage private parties to voluntarily clean up sites rather than expend state resources or cleanup fund money on enforcement actions or remediations. VCPs are designed to reduce factors that tend to discourage voluntary cleanups, such as liability for cleanups, lack of control over the remediation, and cost. These programs began as innovative programs created by states to respond to requests by landowners and others for state assistance in facilitating private cleanups of their sites. By the end of 2000, 50 states (including the District of Columbia and Puerto Rico) had established

formal VCPs through statute, regulation, or policy. Although the structure, formality, and operating practices of VCPs differ from state-to-state, there are a number of common elements. States will generally establish eligibility requirements for participation, clear cleanup standards, and closure procedures; provide timely oversight; and offer incentives to encourage participation.

The most common forms of incentives are liability release mechanisms, an expedited cleanup oversight process, and financial incentives, such as low-interest loans, grants, and tax credits. Liability protection is the most common of these incentives. Liability protection is provided by covenants not to sue, no further action letters, certificates of completion, and other mechanisms. States typically limit the protection only to contamination addressed by the cleanup activities, excluding unknown or pre-existing contamination, or new releases of hazardous substances. The Small Business Liability Relief and Brownfields Revitalization Act, signed into law in January 2002, clarifies state and federal roles for overseeing cleanups by providing federal CERCLA liability protection for parties who conduct a cleanup of certain properties under a state response program designed specifically for protection of human health and the environment. Prior to this provision, a state could provide state liability protection for brownfields cleaned up under its own laws, but a state could not provide federal liability protection.

Most states require a participant to reimburse the state for the cost of overseeing a voluntary cleanup. Most states also supplement the fees with state and federal funds. The 2002 brownfields law also provides states with new resources for VCPs. As much as $50 million may be appropriated annually over the next four years to states and tribes to help them establish and enhance VCPs and similar response programs.

Of the 50 states that have VCPs, 14 target brownfields through their VCPs, and 31 states have established brownfield programs that are separate from their VCPs. States define brownfields in a variety of ways, but the term typically refers to industrial or commercial facilities that are abandoned or underutilized due, in part, to environmental contamination or fear of contamination. This differs somewhat from the definition under the 2002 brownfields law (See Section 9.1.3 below). The scope of the various state programs also vary. States use a wide range of approaches and tools to facilitate the investigation and cleanup of brownfields. For example, some states emphasize site investigations or financial incentives, but do not authorize cleanups, while others may take a more active role in remediations.

It is often difficult to distinguish between a brownfield program and a VCP. Many brownfield sites are addressed by volunteers. Also, some states are reluctant to identify brownfields that are not already being remediated because property owners are concerned about the stigma associated with this designation, which may affect property values. This reluctance has led some states to carefully control lists or to not publish a list of sites. State brownfield programs are supplemented by a substantial federal brownfields initiative, which is described in the next section.

### 9.1.3 Federal Initiatives Affecting State Cleanups

The federal government has actively encouraged and assisted states in their efforts to clean up their contaminated properties. EPA's program dedicated to help states address brownfields has already affected a large number of sites and will probably affect many more in the future. EPA defines "brownfield" as "real property, the expansion, redevelopment, or reuse of which may be complicated by the presence or potential presence of a hazardous substance, pollutant, or contaminant." These sites are usually abandoned, idled, or under-used industrial and commercial facilities. Many brownfields are located in urban areas and are generally associated with -declining property values, increased unemployment, and movement of industries to the suburbs. EPA estimates that there are between 500,000 and one million brownfield sites.

Where past use of a site raises the possibility that the site may be contaminated, fear of being caught in the Superfund liability net often stymies further development at the site. Lenders, developers, and prospective purchasers are discouraged from getting involved with a site because of the risk of a delay in site development or having to pay cleanup costs. Current brownfield owners often are not willing to conduct an assessment of their sites for fear of finding contamination that may have been a result of their activities or those of past owners. Many brownfields end up as the property of local governments through foreclosure.

The central focus of the federal effort is the Brownfields Program and Small Business Liability Relief and Brownfield Revitalization Act, which was signed into law in January 2002.

#### *Brownfields Program*

The EPA Brownfields Program provides technical and financial support for brownfields revitalization. EPA's brownfields efforts are based on four themes: protecting the environment; promoting partnerships; strengthening the marketplace; and sustaining reuse. EPA's investment in brownfields, more than $700 million since 1993, has leveraged more than $5.1 billion in cleanup and redevelopment funding, generated more an 25,000 jobs and assessed more than 4,300 properties. The Small Business Liability Relief and Brownfields Revitalization Act (2002) provides the Brownfields Program with Congressional authorization, increased funding, strengthened liability protections for certain property owners, and expanded assistance for State and Tribal response programs.

First, the Brownfields Program protects the environment by providing grants for assessment and cleanup to states, tribes, local governments, redevelopment authorities, and in some cases, non-profit organizations. Assessment grants of up to $200,000 per entity can fund efforts to inventory, characterize, assess, and conduct planning and community involvement related to brownfields. Cleanup Revolving Loan Fund grants of up to $1million per eligible entity help capitalize local funds that can provide both loans and subgrants for property cleanup. Direct cleanup grants were added by the brownfields law and provide up to $200,000 per site to public and nonprofit entities, who must own the site to be eligible. The brownfields law added petroleum contamination to the list of sites eligible for brownfields funding and directed that 25 percent of brownfields funds be used for petroleum sites. The Brownfields Program also gives technical assistance and targeted assessments to help communities.

Partnership efforts are a second key aspect of the Brownfields Program. At the federal level, the Brownfields National Partnership brings together more than 20 federal agencies to help communities with issues related to brownfields revitalization. For example, the Department of Housing and Urban Development and the Economic Development Administration provides funds to help with the redevelopment activities beyond EPA's programs, such as acquiring property and helping rebuild infrastructure. The National Oceanic and Atmospheric Administration leads an interagency "Portfields" project that focuses on interagency collaboration to revitalize port and waterfront areas. The Brownfields Program provides $50 million a year to support state and tribal response programs and has signed Memoranda of Agreement with many states to clarify regulatory responsibilities. The Brownfields Program works with a wide range of organizations to conduct research, training, and technical assistance for communities, including grants of up to $200,000 to communities for Brownfields Job Training. The annual Brownfields Conference, co-sponsored by EPA, brings together the entire range of stakeholders—more than 4,200 people attended Brownfields 2003 in Portland, Oregon.

Third, the Brownfields Program works to strengthen the private sector marketplace for brownfields. The brownfields law provides liability protections for innocent landowners, prospective purchasers and contiguous property owners. Enforcement policies and tools have helped change perceptions that discouraged brownfields revitalization. As required under the brownfields law, EPA is developing regulatory standards for "all appropriate inquiries" that will specify actions property developers and owners must take prior to a property transfer to qualify for liability protections. The private sector is further supported by financial tools such as brownfields tax incentives and new insurance and risk management vehicles.

Lastly, the Brownfields Program is a strong force for sustainable development. A study conducted by George Washington University shows that every acre of brownfields redeveloped saves 4.5 acres of greenspace. The Brownfields Program has worked closely with Smart Growth advocates and Green Building experts to conduct pilot projects and encourage redevelopment that provides long-term economic and environmental benefits.

## 9.2 Factors Affecting Demand for Cleanups

The state market for remediation services is largely dependent upon the pace of development, the commitment and ability of states and private companies to establish and manage hazardous waste programs and to finance cleanups, and the extent of state and federal efforts to encourage or compel responsible parties to clean up sites.

- Increases and decreases in state cleanup funds will affect the number and complexity of remedial actions undertaken by the states. Total funding to state cleanup funds has remained steady in recent years, which indicates that many states will have to rely on their ability to either compel private parties or encourage voluntary cleanup actions. State assurance funds may be impacted by economic and political conditions that influence state revenues.[1]

[1] In a survey of 231 cities of all sizes published in 2000, 90 percent of the cities identified lack of funding for cleanup as the most important impediment to cleanup and redevelopment. (U.S. Conference of Mayors 2000).

- Although total funding to state cleanup funds has remained steady, there have been shifts in funding levels among different types of funds. For example, dry cleaner funds have grown in recent years.

- The Brownfields Revitalization Act is expected to expand the number of sites to be assessed and/or cleaned up. The law greatly mitigates the potential liability of innocent (not responsible for pollution) property owners; reduces financial uncertainties for investors and property owners; and directly funds various projects and programs, which serve as examples, case histories, and lessons learned for other sites.

- By removing obstacles that cause investment capital to flee from brownfields, the Brownfields Revitalization Act is expected to foster new opportunities for site characterization, cleanup, and redevelopment, especially in the following situations:

  ÷ Communities that use smart growth and infill strategies, and that are seeking to improve community-wide quality of life;
  ÷ Sites with "relatively low risk" petroleum contamination, which previously were generally not eligible for federal assistance;
  ÷ Sites where cleanup and development have been hampered by an inability to obtain financing or insurance because of uncertainties in remediation costs;
  ÷ States without effective voluntary and other cleanup programs or those whose programs have been hampered by a lack of funding; and
  ÷ Sites where cleanup and redevelopment had previously been hampered by a potential for Superfund liability.

- The new law strengthens liability protections for innocent purchasers, contiguous property owners, and prospective purchasers, thereby encouraging more brownfield site assessments, cleanups, and redevelopment. The 1986 amendments to CERCLA (SARA) attempted to provide protection to "innocent landowners" through the addition of Section 101(35). This provision applies if a party that acquired real property after the disposal of hazardous substances did not know about the hazardous substances on, in, or at the property when it was acquired. However, this authority was used only infrequently because it was difficult to establish a legal defense. The new brownfields amendments provide significant statutory changes affecting the potential liability of owners, developers, and prospective purchasers of real estate. It is expected that the law will reduce the potential liability and transaction costs of owners, developers, and prospective purchasers of brownfield sites.

- The pace of development in a community or region will influence the number of brownfield and voluntary sites that need to be evaluated and/or cleaned up. Because there are an estimated hundreds of thousands of potentially contaminated brownfield sites that have not been located, most development in populated areas are likely to encounter contaminated sites from time-to-time.

- As neighborhoods become revitalized and as communities grow, the demand for, and price of, land will increase. Higher property values can support more investments in site cleanups.

- Given the potentially large number of brownfields compared to the number of voluntary cleanup program and brownfield sites addressed in recent years (7,100 cleanups underway and 2,200 completed in FY 2000), brownfield cleanups are likely to continue for many years.

- The growing popularity of smart growth policies is likely to advance the demand for the state and brownfield cleanups, since infill development and the preservation of greenfields are primary components of smart growth programs.

- Forty-one states have long-term stewardship programs for one or more of their cleanup programs. These programs are important because of the widespread use of remedies that allow hazardous substances to remain on site, so long as land-use restrictions are implemented. States have been establishing and enhancing their long-term stewardship programs. One of the greatest needs are systems to keep track of sites requiring stewardship.

- Considering the growing use of risk-based corrective action and the practice of leaving waste on site, there is a perceived need for enhancement of long-term stewardship programs.

Over approximately the past decade, the U.S. capacity to address brownfields has grown enormously. A decade ago, few developers and investors were willing to consider potentially contaminated properties. Today, there is an expanding cadre of developers, planners, consultants, engineering and construction firms, attorneys, and public officials with the expertise to evaluate, cleanup, and revitalize brownfield properties. The increasing acceptance of the practicability of cleaning up and revitalizing brownfield sites has the potential for enlarging the market for site characterization and cleanup services.

## 9.3 Number and Characteristics of Sites

This subsection presents estimates of the number of state and private party sites expected to require remediation under state mandatory hazardous waste remediation programs and voluntary cleanup and brownfield programs.

### 9.3.1 State Mandatory Hazardous Waste Programs

The 50-State Studies present the results of surveys in which each state was asked to identify the total number of "known and suspected sites" and "sites needing attention." The number of known and suspected sites generally is the largest number of potentially contaminated sites known to the state and includes, in some states, sites that have not yet undergone any type of assessment. This category is useful in determining the outer limit of the universe of state sites. The sites needing attention are known and suspected sites that have been evaluated by the state and determined to require some level of further evaluation or cleanup. This category is the best indicator of the workload facing each state's cleanup program. The studies do not present estimates of the number of sites that definitely require remedial action. Exhibit 9-2 presents trends in these variables and Exhibit 9-3 shows each state's estimate for both categories of sites.

The total number of **known and suspected** sites reported in 2000 was 63,000 (up from 59,000[2] in 1997 and down from 79,000 in 1995). Because a number of states have reclassified their sites over the years, it is difficult to establish a firm trend. However, it appears that the universe of sites is stable and that the states are continuing to identify new sites. The number of known and suspected sites ranges from zero to 5,416 (Connecticut). Twenty-six states reported increases in known and suspected sites while eight reported decreases. The states with the largest increases between 1997 and 2000 were Connecticut, Florida, Louisiana, Missouri, New Mexico, Oregon, Rhode Island and South Carolina; and the states with the largest decreases were Alaska, Arizona, New Jersey, Washington, and Wisconsin.

**Exhibit 9-2. Sites in State Hazardous Waste Programs**




Source: Environmental Law Institute, *An Analysis of State Superfund Programs: 50-State Study, 2001 Update*, November 2002.

Although states are progressing to clean up their sites, they continue to identify new ones. The total number of sites needing further attention in 2000 was 23,000, an increase from 19,000 in 1997.[3] During this time, states completed cleanup of over 19,000 sites. While some of the data reflects progress in completing cleanups, it also reflects reclassification of sites by some states and a decline in the number of states reporting. The number of sites needing attention ranges from zero to 3,900 (New Jersey).Only five states report having more than 1,000 sites needing attention– Connecticut, Florida, Kentucky, Massachusetts, and New Jersey.

Of the sites reporting in both 1997 and 2000, 23 had increases and 12 states had decreases in sites needing attention. The states with the largest increases between 1997 and 2000 were Connecticut, Florida, Georgia, Kentucky, and South Carolina. The states with the largest decreases were Alaska, Arizona, New Jersey, Washington, and Wisconsin. After considering reporting discrepancies, such as those in the footnotes, it appears the total universe of sites needing attention is stable, or growing slightly. (50-State Study 2000).

[2] The 1998 50-State Study reported 69,000. However since then, the State of New Jersey subtracted 10,000 home-owner tanks sites from the list.

[3] The 1998 50-State Study reported 23,000; however, the 2000 study revised the data, primarily because of reclassification of sites and because two states that reported in 1997 did not report in 2000. Counting only the states that provided data in both years, the total for 1997 is 20,100 and the total for 2000 is 22,700.

## Exhibit 9-3. Number of Non-NPL State Hazardous Waste Sites

| Known & Suspected Sites[a] | | | Sites Needing Attention[b] | |
|---|---|---|---|---|
| State | 1997 | 2000 | 1997 | 2000 |
| Alabama | 700 | 730 | 125 | 125 |
| Alaska | 1,625 | 968 | 1,206 | 783 |
| Arizona | 900 | 71 | 75 | 38 |
| Arkansas | 363 | 415 | 98 | 67 |
| California | 3,247 | 3,603 | 420 | 522 |
| Colorado | 624 | 495 | 178 | 200 |
| Connecticut | 3,029 | 5,416 | 668 | 2,107 |
| Delaware | 600 | 532 | 185 | 331 |
| District of Columbia | NA | NA | NA | NA |
| Florida | 1,900 | 2,646 | 1,094 | 2,460 |
| Georgia | 1,012 | 1,280 | 126 | 422 |
| Hawaii | 524 | 558 | 103 | 105 |
| Idaho | NA | NA | NA | NA |
| Illinois | 5,000 | 5,000 | 140 | 159 |
| Indiana | NA | 200 | NA | 61 |
| Iowa | 400 | 475 | 200 | 210 |
| Kansas | 720 | NA | 484 | NA |
| Kentucky | 1,900 | 2,200 | 850 | 1,500 |
| Louisiana | 410 | 730 | 120 | 130 |
| Maine | 465 | 475 | 128 | 83 |
| Maryland | 440 | 440 | 33 | 33 |
| Massachusetts | 2,679 | 2,305 | 2,679 | 2,305 |
| Michigan | NA | NA | 2,789 | NA |
| Minnesota | 3,000 | 3,000 | 219 | 100 |
| Mississippi | 960 | 1,100 | 500 | 500 |
| Missouri | 1,475 | 2,321 | 225 | 250 |
| Montana | NA | NA | 187 | 288 |
| Nebraska | 400 | 475 | 200 | 225 |
| Nevada | 129 | 112 | 129 | 12 |
| New Hampshire | 474 | 388 | 474 | 388 |
| New Jersey [c] | 5,177 | 5,000 | 4,915 | 3,900 |
| New Mexico | 344 | 1,210 | 133 | 153 |
| New York | 1,567 | 1,628 | 769 | 851 |
| North Carolina | 1,040 | 1,122 | 793 | 730 |
| North Dakota | NA | NA | NA | NA |
| Ohio | 1,460 | 1,884 | 403 | 403 |
| Oklahoma | 793 | 850 | 124 | 170 |
| Oregon | 1,933 | 2,469 | 306 | 499 |
| Pennsylvania | 50 | 50 | 20 | 20 |
| Puerto Rico | NA | NA | NA | NA |
| Rhode Island | 400 | 1,200 | 100 | 150 |
| South Carolina | 603 | 1,037 | 150 | 516 |
| South Dakota | 1,424 | 1,342 | NA | 229 |
| Tennessee | 1,360 | 1,501 | 234 | 210 |
| Texas | 388 | 611 | 52 | 48 |
| Utah | 325 | 390 | 40 | 50 |

**Exhibit 9-3. Number of Non-NPL State Hazardous Waste Sites (Continued)**

| State | Known & Suspected Sites[a] 1997 | Known & Suspected Sites[a] 2000 | Sites Needing Attention[b] 1997 | Sites Needing Attention[b] 2000 |
|---|---|---|---|---|
| Vermont | 362 | 390 | 255 | 250 |
| Virginia | 2,015 | 2,015 | 411 | 411 |
| Washington | 1,493 | 946 | 1,006 | 623 |
| West Virginia | 600 | NA | 150 | NA |
| Wisconsin | 5,000 | 3,000 | 600 | NA |
| Wyoming | 140 | NA | NA | NA |
| **Total** | **59,450** | **62,580** | **24,096** | **22,617** |

Notes:

[a] Known and suspected sites are those that states have identified as being potentially contaminated. Many of these sites will not require action beyond a preliminary assessment. Site numbers are derived from Table IV-3 of the 2001 *50-State Study* and Table V-3 of the 1997 *50-State Study*, unless otherwise noted. The totals include an unknown, but small, percentage of UST and RCRA sites.

[b] Sites needing attention are those known and suspected sites that have been assessed and determined to require further assessment or cleanup. Many of these sites will require removal or remedial actions. Site numbers are derived from Table IV-3 of the 2001 *50-State Study* and Table IV-3 of the 1997 *50-State Study,* unless otherwise noted. The totals include an unknown, but small, percentage of UST and RCRA sites.

[c] The 1998 50-state Study reported 69,000 sites in New Jersey. However, since then, the state subtracted 10,000 homeowner tank sites from the list.

NA Indicates that data were not provided.

Sources:

Environmental Law Institute, *An Analysis of State Superfund Programs: 50-State Study, 2001 Update*, November 2002.

Environmental Law Institute, *An Analysis of State Superfund Programs: 50-State Study, 1998 Update*.

The total number of sites determined to need further attention includes an unknown but small percentage of RCRA and UST sites, which are addressed in Chapters 4 and 5 of this report. During collection of data from the states, authors of the *50-State Study* requested that the states exclude RCRA and UST sites from their reports, if they could. However, some states were unable to separate the RCRA and UST site data from other hazardous waste sites.

### 9.3.2 Voluntary Cleanup and Brownfield Programs

The 50-State Studies also asked states to report the number of voluntary cleanup and brownfield sites. Exhibit 9-4 presents the national totals from the survey data. Since the inception of their programs, states have completed cleanup at 11,600 sites under their voluntary programs and 17,300 sites under their mandatory programs. In FY 2000, states completed 2,200 voluntary cleanups and 2,400 mandatory-program cleanups, and had a total of 15,600 cleanups underway.

By the end of 2000, the reporting states had identified 18,700 brownfields, had cleanups underway at over 1,000 brownfield sites, and had redeveloped over 700 sites. To avoid double counting some sites, this study does not add the data on brownfield sites to the above figures, since many are cleaned up under voluntary and mandatory programs. Nevertheless, many sites identified by a brownfields program may not have been reported on a voluntary or mandatory program list. Thus, the estimates of total state and private party site market may be understated somewhat. Another factor that may contribute to the underestimation of brownfields sites is the fact that some states are reluctant to identify brownfields that are not already being remediated

because property owners are concerned about the stigma associated with this designation, which may affect property values.

Based on these data, total state cleanups under all state programs has averaged approximately 5,000 per year in recent years. Despite the progress in completing many cleanups in recent years, the known number of sites listed as needing attention or entered into a voluntary program has remained approximately stable. As of the end of FY 2000, this inventory of sites was about 30,000 (22,600 from Exhibit 9-3 +7,100 from Exhibit 9-4). This apparent discrepancy is attributed to the fact that state regulatory agencies are continuing to identify new sites and new sites are continuing to enter voluntary and brownfields programs. In addition, some of the 18,700 brownfield sites identified by states are not included in this figure, in order to avoid potential double-counting of some sites. Thus, the currently identified inventory of sites likely to need remediation (30,000) is probably underestimated.

**Exhibit 9-4. Voluntary and Mandatory Cleanup Program Status**




Source: Environmental Law Institute, *An Analysis of State Superfund Programs: 50-State Study, 2001 Update*, November 2002.

Based on the above data, about 44,500 state sites have been identified, including those that have completed or are undergoing remediation. Although it is anticipated that many brownfields will not require remediation, the actual number is unknown. An indication of the percentage of sites needing cleanup is provided from data EPA has collected from recipients of EPA brownfields pilot grants. Of 5,000 sites targeted by previous grants, about two-thirds required further investigation and/or remediation beyond a Phase I and Phase II site assessment (EPA 2003). This figure implies that, even if the percentage of future sites needing cleanup is lower, it is still likely to represent a substantial number of sites; and at the current rate of 5,000 cleanup completion annually in all state programs, it will take many years to remediate all the brownfield sites.

### 9.3.3 Contaminants and Media

A central source of information on the types and quantities of contaminants and media found at state sites is not available. Three sources provide information on technologies used at state sites across the country. Although none of these sources is based on a comprehensive survey, they provide a picture of the types of contaminants and technologies likely to be found at state sites. In addition, some information on contaminants found are available from a number of states.

The first source, *The XL Environmental Land Reuse Report 2002*, and *The XL Environmental Land Reuse Report 2001*, are reports on a unique data collection conducted by XL Environmental, Inc. and the International Economic Development Council. These studies are based on a literature search of media coverage of brownfield-related stories. The researchers used online newspaper and journal archives, such as Lexis-Nexis, to search for articles that mention brownfields issues. The search identified 331 brownfield-related articles between July 2001 and June 2002 discussing 428 brownfield sites; and 317 articles between July 2000 and May 2001 discussing 346 sites. Chemicals, metals, and petroleum are the most frequently mentioned contaminants. Solvents and pesticides were also an issue at some sites. (Exhibit 9-5)

The second source is the Brownfields Management System, a database containing information about brownfield properties that are in EPA's grant programs. As of December 2002, contaminant data are available for only approximately 90 sites. Metals are the most frequently identified category of pollutant. VOCs, SVOCs (including PAHs and PCBs) and petroleum products were also frequently identified.

**Exhibit 9-5. Contaminants Found at a Sample of Brownfield Sites**

| Contaminant | 2001 | | 2002 | | Total | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Chemicals | 86 | 25% | 56 | 13% | 142 | 18% |
| Metals | 61 | 18% | 25 | 6% | 86 | 11% |
| Other | 55 | 16% | 43 | 10% | 98 | 13% |
| Petroleum | 35 | 10% | 50 | 12% | 85 | 11% |
| Solvents | 13 | 4% | 10 | 2% | 23 | 3% |
| Pesticides | 4 | 1% | 3 | 1% | 7 | 1% |
| No. of Sites in sample [a] | 346 | | 428 | | 774 | |

[a] Not all articles provided information on contaminants. Thus, this data is an indication of the types of contaminants and perhaps their relative frequency, rather than a precise accounting. There may be more than one contaminant reported per site.

Source: XL Insurance, Inc. and the International Economic Development Council, *The XL Environmental Land Reuse Report 2002*, and *The XL Environmental Land Reuse Report 2001*. XL Environmental, Inc.

The types of contaminants present at some state sites can also be inferred from sites listed in EPA's CERCLA Information System (CERCLIS), EPA's database of potentially contaminated sites. EPA has performed preliminary assessments at these sites to screen them for potential listing on the federal NPL. The majority of these sites (those not listed on the NPL) are deferred to the states for action. CERCLIS data show that the most prevalent wastes at these sites are organic chemicals, metals, solvents, and oily waste (U.S. EPA 1991).

In addition to national data sources, some states with established, well-funded programs are able to produce this type of information. For example, the California Department of Toxic Substances Control, within the state's Environmental Protection Agency, publishes extensive information about its site mitigation programs as well as access to its Site Mitigation and Brownfields Reuse Program Database on its web site. The database contains information on almost 10,000 potential and known sites (CALEPA 2003).

## 9.4 Estimated Cleanup Costs

The cost of cleaning up state mandatory and voluntary cleanup program sites is determined by the number of state sites and the amount of remediation work at each site. As described in Section 9.3, the number of potential state sites is so large relative to state and private resources that it is likely to take a number of decades to complete all the cleanups. Thus, a key determinant of cleanup activity in a given year will be resources available, primarily in state cleanup funds, which account for most state-funded cleanups. This section describes the trends in state expenditures, the status of state cleanup funds, and an estimate of the total cost to complete the cleanup of all known and likely to be discovered state sites over a period of 30 years.

### 9.4.1 Status and Capacity of State Cleanup Funds

A fund is an essential element of a state's program to clean up sites. It is a readily available source of money separated from other state operations that allows activities to continue without the need for annual appropriations or other legislation. It allows a state to avoid disruptions to cleanups and to investigate, plan, design, and conduct emergency response and remedial actions at sites where immediate action is required or where responsible parties are unavailable, unable, or unwilling to conduct or pay for remedial actions. Forty-nine states have established cleanup funds or provided a mechanism for the state agency to pay for one or more types of cleanup activities at non-NPL sites. Idaho, Nebraska and the District of Columbia are the only states without cleanup funds that are authorized to pay for cleanups. Although most state-financed cleanups are paid from a state cleanup fund, some are funded by direct appropriations. Thus, the estimate of state expenditures may understate the actual expenditures.

The combination of fund balances, additions to funds, and expenditures can indicate the capability and stability of a state cleanup program. Exhibit 9-6 compares the fund balances, additions to funds, and expenditures of the states in 1995, 1997, and 2000. Total fund balances for all states in 2000 was $1.2 billion. The trends in fund balances are confounded by the fact that in each survey there are some states that do not provide data and they differ from one survey to another. Comparing only the states that provided data in both 1997 and 2000, the decrease would be about 10 percent. Fund balances have been declining since 1990.

Most of the state fund balances (including bonding authority) are concentrated in a relatively few states. In 2000, eight states (Alaska, California, Massachusetts, Michigan, New Jersey, New York, Pennsylvania, and Texas) accounted for $909 million (73.5 percent) of the total fund balances for all states. This concentration has been observed since this survey was first conducted in 1991. The annual contributions to state funds fluctuated from year to year, but have

averaged between $400 and $500 million. As with fund balances, the amounts added to funds are concentrated in a relatively few states.

**Exhibit 9-6. State Fund Activity**
**1995, 1997, and 2000 ($ millions)**

| | 1995 | 1997 | 2000 |
|---|---|---|---|
| Total Fund Balances [a] | $1,464.9 | $1,413.0 | $1,240.0 |
| Additions to Funds | $444.6 | $538.3 | $436.2 |
| Expenditures | $386.1 | $565.1 | $505.6 |
| Obligations | $363.4 | $448.0 | $564.4 |
| Number of Known and Suspected Sites | 79,387 | 59,000 | 63,000 |
| Number of Sites Needing Attention | 29,000 | 24,000 | 23,000 |

[a] Fund balances include both money in the fund and authority to sell bonds to raise additional monies. The expenditures and obligations totals are likely to be understated for two reasons: Between 35 and 38 states out of 49 provided 2000 data for most of these items. The response rate for 1997 was higher. In addition, some states did not report expenditures for all their funds.

Exhibit 9-7 presents the Superfund balances for each state as of December 2000 and 1997 and provides the total expenditures and obligations of funds by each state for hazardous waste activities in 2000 and 1997. The state fund balances totaled $1.2 billion in 2000, including bond authorizations (authority by state law to issue bonds and spend the proceeds on cleanups). While the average state site cleanup costs less than a quarter million dollars, many sites can cost more than $1 million. While almost all states have some cleanup funds, fund balances in some states are quite small. These funds could pay for little more than emergency responses and removal actions. At the end of 2000, 6 states had fund balances of less than $1 million (Alabama, Iowa, Mississippi, North Dakota, Oklahoma, and Utah). Another 8 states had balances between $1 million and $5 million; 3 between $5 million and $10 million; 15 between $10 million and $50 million; and 8 had balances over $50 million.

Although a state's fund balance indicates its ability to pay for a cleanup at any given time, this indication is only an approximation of cleanup activity in a state in a given year. The level of cleanup activity also depends on the rate that funds flow into and out of the fund, which differs from one state to another. Thus a state that rapidly replenishes its funds, for example by recovering cleanup costs from responsible parties, would have a high level of cleanup activity relative to the balance of the fund at any given time. Also, states may supplement funds with appropriations for specific projects.

Another indication of state's ability to manage mandatory cleanups and oversee voluntary cleanup programs is the level of state cleanup program staffing. In 2000, total state cleanup program staffing (3,344) was about the same level as in 1991 (3,394). Over those years, they have fluctuated only within a range of about 3 percent.

## Exhibit 9-7. State Hazardous Waste Funds Expenditures and Balances 2000 and 1997

| State | Expenditures [a] | | Fund Balances [b] | |
|---|---|---|---|---|
| | 1997 | 2000 | 1997 | 2000 |
| Alabama | 199,290 | 332,700 | 615,590 | 450,000 |
| Alaska | 20,830,212 | 7,720,413 | 76,154,222 | 64,955,963 |
| Arizona | 4,488,566 | 15,275,703 | 813,192 | 17,895,429 |
| Arkansas | 201,174 | c | 8,798,191 | c |
| California | 228,000 | c | 2,411,121 | 84,548,000 |
| Colorado | 1,200,000 | 2,452,380 | 19,000,000 | 16,119,065 |
| Connecticut | c | c | 13,500,000 | 24,170,610 |
| Delaware | 2,670,000 | 3,500,000 | 8,400,000 | 13,000,000 |
| District of Columbia | c | c | c | c |
| Florida | 22,199,865 | 4,337,746 | 24,529,984 | 15,006,808 |
| Georgia | 17,589,411 | 10,484,945 | 1,073,451 | 12,762,010 |
| Hawaii | 711,096 | 1,200,288 | 225,000 | 1,981,063 |
| Idaho | c | c | c | c |
| Illinois | 8,800,000 | 17,452,500 | 21,900,000 | 24,033,600 |
| Indiana | 4,284,377 | 12,514,959 | 24,511,554 | 41,350,404 |
| Iowa | 650,391 | 328,080 | 1,060,868 | 89,484 |
| Kansas | 1,516,000 | c | c | c |
| Kentucky | 1,800,000 | 700,000 | 4,000,000 | 1,500,000 |
| Louisiana | 200,790 | 6,497,001 | 1,693,995 | 3,851,299 |
| Maine | 2,267,436 | 1,991,420 | 7,400,000 | 9,270,375 |
| Maryland | c | 7,000 | 500,000 | 1,816,898 |
| Massachusetts | 7,100,000 | 35,900,000 | 86,300,000 | 53,900,000 |
| Michigan | 40,088,000 | 46,330,000 | 7,644,000 | 133,172,000 |
| Minnesota | 5,144,005 | 7,897,000 | 5,300,398 | 12,800,000 |
| Mississippi | 2,280,000 | 2,681,383 | 750,000 | 112,800 |
| Missouri | 2,700,000 | 3,500,000 | (1,300,000) | 2,900,000 |
| Montana | 7,312,614 | 7,312,614 | 14,506,467 | 14,506,467 |
| Nebraska | c | c | c | c |
| Nevada | 300,000 | c | 1,000,000 | c |
| New Hampshire | 1,700,000 | 2,100,000 | 1,500,000 | 7,800,000 |
| New Jersey | 81,300,000 | 25,130,961 | 114,700,000 | 189,093,523 |
| New Mexico | 230,412 | 440,836 | 1,659,814 | 1,623,000 |
| New York | 158,794,899 | 122,081,213 | 612,041,042 | 215,009,586 |
| North Carolina | 938,311 | 582,972 | 4,823,533 | 10,430,858 |
| North Dakota | c | c | 160,000 | 163,000 |
| Ohio | 16,841,377 | c | 31,081,540 | c |
| Oklahoma | 877,718 | 1,339,036 | 17,168 | 313,451 |
| Oregon | 11,080,828 | 13,625,860 | 12,142,352 | 21,242,558 |
| Pennsylvania | 37,397,633 | 39,000,000 | 120,026,484 | 110,000,000 |
| Puerto Rico | c | c | c | c |
| Rhode Island | 300,000 | c | 50,000 | c |
| South Carolina | 630,613 | 3,100,000 | 25,077,100 | 5,000,000 |
| South Dakota | c | 1,183,092 | 1,750,000 | 2,835,732 |
| Tennessee | 7,209,656 | 11,316,640 | 9,559,569 | 12,082,752 |
| Texas | 41,242,559 | 24,002,551 | 69,898,478 | 55,721,609 |
| Utah | 500,000 | 0 | 1,500,000 | 400,000 |
| Vermont | 5,200,000 | 7,219,000 | 4,800,000 | 1,696,000 |
| Virginia | 123,422 | 6,500 | 3,569,781 | 0 |
| Washington | 42,682,982 | 28,731,105 | 44,867,955 | 14,374,009 |

**Exhibit 9-7. State Hazardous Waste Funds Expenditures and Balances 2000 and 1997 (Continued)**

| | Expenditures [a] | | Fund Balances [b] | |
|---|---|---|---|---|
| **State** | **1997** | **2000** | **1997** | **2000** |
| West Virginia | 758,585 | c | 1,800,000 | c |
| Wisconsin | 2,567,000 | 9,076,600 | 21,381,000 | 26,542,200 |
| Wyoming | c | c | c | c |
| **Total** | **565,137,222** | **477,352,498** | **1,413,193,849** | **1,224,520,553** |

Notes:
[a] Includes funds spent by the states in 1997 and 2000 for NPL and non-NPL site cleanups. Totals differ slightly from those in the 2001 50-State Study because of rounding.
[b] Includes bonding authority. Totals differ slightly from those in the 2001 50-State Study because of rounding.
c Indicates that data were not provided

Sources: Environmental Law Institute, *An Analysis of State Superfund Programs: 50-State Study, 2001 Update*, November 2002.
Environmental Law Institute, *An Analysis of State Superfund Programs: 50-State Study, 1998 Update*.

## 9.4.2 Annual and Projected Cleanup Costs

The estimate of the cost of cleanup is based on trends in state and private party cleanups over the past six years.

- It has been estimated that there are between ½ and 1 million brownfield sites in the U.S. (Section 9.1.3). However, the percentage of sites that will need cleanup is unknown. About 70 percent of the 5,400 properties that have been part of a federal brownfield assistance program and that have completed site assessments require cleanup activities. However, this percentage is likely to be lower for sites not yet in a federal brownfields program. Thus, the 70 percent (or 350,000 to 700,000 sites) is the estimated upper limit of the potential market.

- Non-NPL cleanup expenditures by states have typically been about $500 million annually. This figure is the total of mostly non-NPL expenditures for 37 states that reported this item separately in the 2001 *50 State Study* (ELI 2002a). This figure does not include 13 states for which data are not available, nor does it include direct appropriations for specific cleanup projects. On the other hand the total includes some costs for administration and Superfund site cleanups.

- Responsible party expenditures are estimated to be equal to state expenditures, based on a 1994 EPA/ASTSWMO study (U.S. EPA 1994). Cost data submitted for 3,395 sites listed in CERCLIS during the period 1980-1992 indicated that responsible parties paid $555 million and the states paid $650 million to clean up these sites. Responsible parties' expenditures appear to be roughly equal to state expenditures at state sites. No centralized source of data are available that includes private party expenditures for cleanups through the states' voluntary cleanup or brownfield programs.

- Adding the above figures indicates that total cleanup expenditures at state sites has been averaging about $1 billion annually in recent years. During this same period, cleanup has been completed at about 5,000 state and private party sites annually. At this rate, about 150,000 sites can be completed over the next 30 years, at a cost of $30 billion (Exhibit 9-8).

- This level of effort may or may not be sufficient to address cleanup at all state sites within 30 years. If a small percentage of the ½ to 1 million brownfield sites require cleanup, this level of effort may be sufficient to clean up all state sites. However, if the percentage of sites that require remediation approaches those in the EPA brownfield assistance programs (70 percent), this level of funding will only pay for ¼ to ½ of the required cleanups.

Thus, total expenditures for both state and privately-funded remediation is estimated to be $30 billion (Exhibit 9-8). If more than 150,000 sites need cleanup it will likely take more than 30 years, unless additional funding becomes available. There may also be sites addressed by private parties which are not under the auspices of a state or federal program. Nationwide data on these sites are not available.

**Exhibit 9-8. Estimated Total Cost of State Site Cleanups ($Millions)**

| | Annual Average | 30-Year Total |
|---|---|---|
| State Expenditures | $500 | $15,000 |
| Private Expenditures | $500 | $15,000 |
| Total Expenditures | $1,000 | $30,000 |

Source: See explanation in text.

## 9.5 Market Entry Conditions

The following factors will be important to the success of vendors seeking to operate in the state and brownfield site characterization and cleanup market:

- By the end of 2000, about 40 states had some kind of list, registry, or inventory of state sites, with a combined total of 15,000 sites (ELI 2002). Some states use these compilations to determine the order in which sites will be cleaned up. Some states list all known and suspected sites, others include only those that have completed a long evaluation process, and others include only sites where cleanup is funded directly by the state. Some states' lists may be useful for contractors seeking opportunities for site investigation or remediation work in selected states.

- The Brownfields Revitalization Act mandates that, as a prerequisite for certain CERCLA liability protections provided to certain sites cleaned up under state response programs, and to receive certain federal assistance funds, states must maintain a public record of sites addressed through their brownfield programs. These records, once established, may serve as a source for vendors to review for prospective remediation needs. Some existing state site lists do not include all sites that are likely to require investigation and cleanup. Nevertheless they provide a method to quickly identify potential projects and issues.

- The operating practices of state cleanup, brownfields, and voluntary programs vary from state-to-state. Remediation technology vendors could benefit by knowledge of the practices and trends in each state, and perhaps forming alliances and partnerships with developers in specific areas. Much development is done by local or regional firms with knowledge of local markets. Information on state programs is available in several publications by the Northeast-Midwest Institute, EPA, the General Accounting Office, and the state web sites (Bartch 2000, Bartch 2002, GAO 2000, EPA 2002a).

- Some states have cleanup funds, such as an emergency response fund or a drycleaning site fund. These funds are potential sources of information about potential cleanup projects and technology needs.

- Companies interested in R&D, site assessment, cleanup, or revitalization at a brownfield site may encourage their communities or state to apply for funds from one or more of the federal or state programs.

- Often, the site investigation and cleanup is only a small portion of the total cost of a development project. A site may not even enter into a cleanup program until development occurs in the area. For example, a public works project such as a pipeline or sewer line may call for environmental assessments which result in the discovery of contaminated materials. Remediation vendors would benefit from comprehensive knowledge of development projects in their areas.

- Development of brownfields often involves the integration of diverse disciplines (urban and transportation planners, developers, real estate professionals, environmental engineers, remediation experts, community involvement experts) and cooperation of many stakeholder groups (developers, residents, local businesses, state and federal environmental regulators, local zoning and planning officials). Thus, firms that specialize in remediation may form alliances with firms that specialize in other aspects of brownfield projects. A number of firms with both remediation and development capabilities have emerged over the past decade.

## 9.6 Remediation Technologies

Three sources provide information on technologies used at state sites. Although none of these sources is based on a comprehensive survey, they provide a picture of the types of contaminants and technologies likely to be found at state sites.

The first source, *The XL Environmental Land Reuse Report 2002* and *The XL Environmental Land Reuse Report 2001*, are reports on a unique data collection conducted by XL Environmental, Inc. and International Economic Development Council. These studies are based on a literature search of media coverage of brownfield-related stories. The researchers used online newspaper and journal archives, such as Lexis-Nexis, to search for articles that mention brownfield issues. The search identified 331 brownfield-related articles between July 2001 and June 2002 discussing 428 brownfield sites; and 317 articles between July 2000 and May 2001 discussing 346 sites. The most frequently used remediation approaches are shown in Exhibit 9-9.

Demolition, excavation, and capping were the most frequently used techniques. Lead paint and asbestos are the most common contaminants in buildings. Excavation is the removal and offsite disposal of contaminated soil from the property. Capping was used on many sites intended for public recreation or ecological use, such as ballparks, golf courses, and nature reserves. About one-third of the capping applications were on former landfills. More advanced methods, such as SVE, thermal desorption, and bioremediation were mentioned infrequently. These approaches are fairly new, and are more difficult for most developers and communities to understand. However, the incidence of the use of innovative technologies at brownfield sites may be understated in the source articles because reporters have chosen not to address the remediation aspects of the projects. Because most of the articles are written for the general public, remediation techniques and technical details are not the main focus of many articles.

Since there are numerous potential site characterization and cleanup situations that may arise at a given state site, and since many of the sites to eventually be cleaned up are still unidentified, it is impossible to detail the specific technologies that will be needed. Technologies that will accelerate the pace of development or reduce remediation costs or the total cost of a project will be needed. Real estate developers put a premium on saving time and completing projects quickly. Delays tend to be very expensive, since they can drive up the cost of projects. EPA's Technology Innovation Program has published a useful reference to help developers, communities, and remediation professionals engage the process of cleanup and redevelopment. This document, *Road Map to Understanding Innovative Technology Options for Brownfields Investigation and Cleanup,* is available from the EPA web site (U.S. EPA 2001). The document also provides links to state brownfield programs.

**Exhibit 9-9. Remediation Techniques Used at a Sample of Brownfield Sites**

| Remediation Technique | 2001 | | 2002 | | Total | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Demolition | 46 | 38 | 31 | 46 | 77 | 41 |
| Excavation/ Removal | 44 | 36 | 16 | 23 | 60 | 32 |
| Caps | 17 | 14 | 14 | 21 | 31 | 17 |
| SVE | 5 | 4 | 1 | 2 | 6 | 3 |
| Natural Attenuation | 3 | 2 | 1 | 2 | 4 | 2 |
| Soil Flushing | 2 | 2 | 1 | 2 | 3 | 2 |
| Thermal Desorption | 2 | 2 | 1 | 2 | 3 | 2 |
| Solvent Extraction | 1 | 1 | NA | NA | 1 | 1 |
| Slurry Walls | 1 | 1 | NA | NA | 1 | 1 |
| Bioremediation | NA | NA | 1 | 2 | NA | NA |
| No. of Sites Reporting [a] | 121 | 100% | 66 | 100% | 187 | 100% |

[a] Not all articles provided information on remediation technologies. Out of 772 sites, technology information was available for 187 sites. Thus, this data is an indication of the types of approaches rather than a precise accounting.

Source: XL Environmental, Inc. and the International Economic Development Council. *The XL Environmental Land Reuse Report 2002*, and *The XL Environmental Land Reuse Report 2001*.

## 9.7 References

Bartch, Charles and Bridget Dorfman, 2000. *Guide to Federal Brownfields Programs, Northeast-Midwest Institute*, Washington, D.C. October 2000.

Bartch, Charles and Rachel Deane, 2002. *Brownfields State of the States, An End of Session Review of Initiatives and Program Impacts in the 50 States, Northeast-Midwest Institute*, Washington, D.C. December 2002.

California Environmental Protection Agency (CALEPA 2003) Department of Toxic Substances Control, Site Mitigation and Brownfields Reuse Program Database. http://www.dtsc.ca.gov/SiteCleanup/Brownfields/index.html#Voluntary%20Cleanup%20Program

ELI (Environmental Law Institute and U.S. EPA), 1996. *An Analysis of State Superfund Programs: 50-State Study, 1995 Update*, EPA-540-R-96-036, PB96-963249, July 1996.

ELI (Environmental Law Institute and U.S. EPA), 1998. *An Analysis of State Superfund Programs: 50-State Study, 1998 Update*.

ELI (Environmental Law Institute and U.S. EPA), 2002a. *An Analysis of State Superfund Programs: 50-State Study, 2001 Update*, November 2002.

National Association of Environmental Professionals (NAEP), 2003. *Environmental Practice*, Special Issue on Brownfields, March 2003, ISSN 1466-0466. http://www.envpra.oupjournals.org

U.S. Conference of Mayors, 2000. *Recycling America's Lands: A National Report on Brownfields Redevelopment, Volume III*, February 2000.

U.S. Congress, 2002. *Small Business Liability Relief and Brownfields Revitalization Act of 2001* (PL 107-118, 11 January 2002). http://www.epa.gov/brownfields/sblrbra.htm

U.S. EPA, 1991. *Superfund CERCLIS Characterization Project: National Results*, EPA/540/8-91/080, U.S. Environmental Protection Agency, Office of Emergency and Remedial Response, November 1991.

U.S. EPA, 1994. *A Report on State/Territory Non-NPL Hazardous Waste Site Cleanup Efforts for the Period 1980-1992,* OSWER Pub. 9242.2-09, EPA/540/R-94/001, U.S. Environmental Protection Agency, Office of Solid Waste and Emergency Response and Association of State and Territorial Solid Waste Management Officials, July 1994.

U.S. EPA, 2001. *Road Map to Understanding Innovative Technology Options for Brownfields Investigation and Cleanup, Third Edition,* EPA-B-01-001, U.S. Environmental Protection Agency, Office of Emergency and Remedial Response.

U.S. EPA, 2002. *President Signs Legislation to Clean Environment and Create Jobs*, U.S. Environmental Protection Agency press release January 11, 2002.

U.S. EPA, 2003. Brownfields Management System, U.S. Environmental Protection Agency, tabulation, June, 2003.

U.S. GAO, 1995. *Community Development: Reuse of Urban Industrial Sites*, RCED-95-172, U.S. General Accounting Office, June 1995.

U.S. GAO, 2000. *Brownfields, Information on the Programs of EPA and Selected States*, GAO-01-52, U.S. General Accounting Office, December 2000.

XL Environmental, Inc. and the International Economic Development Council, 2001. *The XL Environmental Land Reuse Report 2001.*

XL Environmental, Inc. and the International Economic Development Council, 2002. *The XL Environmental Land Reuse Report 2002.*

Yount, Kristen R, 2003. "What Are Brownfields? Finding a Conceptual Definition," *Environmental Practice, March 2003.* ISSN 1466-0466. http://www.envpra.oupjournals.org.

This page intentionally left blank

# Chapter 10
# Demand for Remediation of Manufactured Gas Plants and Related Coal Tar Sites

Before the United States had a network of natural gas pipelines and electricity, fuel for lighting, heating, and cooking was manufactured from coal and petroleum at thousands of manufacturing facilities across the country. As a result of these activities, hazardous materials are likely to be present in the subsurface and groundwater at thousands of locations. While some of these sites, especially those currently owned and operated by large gas and electric utility companies, are being addressed, most of the former manufactured gas sites have not been identified.

There is no separate remediation program for the characterization and remediation of MGP and other coal tar sites. MGP sites may be addressed under any of the remediation programs, such as Superfund, RCRA, or a state environmental program, depending on the nature and extent of the contamination and other site-specific factors. Because these sites may be managed under different remediation programs, the estimates of the MGP market should not be added to those in the previous chapters of this report. Adding these estimates would be double-counting sites and, therefore, overestimating the scope of the market.

This chapter provides information to help vendors, regulators, and other stakeholders understand the potential sources of risk to people and the environment that may have resulted from past MGP operations. It provides background for site investigators to understand potential sources of NAPLs, coal tars and other pollutants. The effectiveness and efficiency of site investigations and remdiations could benefit from a good understanding of this defunct industry.

## 10.1 History

From the early 1800s through the mid-1900s manufactured gas plants (MGP) were operated nationwide to provide gas from coal or petroleum for lighting, heating, and cooking. The first manufactured gas plant built in the United States was in Baltimore in 1816. By the turn of the 20th century almost every good-sized city had its own manufactured gas plant (Gonzalo, 1995). Larger cities had more than one plant.

A 2003 EPA report estimated that as many as 50,000 plants were built during the over 140 years of MGP operations (U.S. EPA 2003). The first plants were located in downtown areas adjacent to waterways and rail spurs for easy access to coal (EI Digest, 1995). As the technology developed, it became a common source of light, heat and fuel for a variety of industrial and commercial facilities and residences. After electricity and piped in natural gas became common, many of the larger MGP properties were converted for new uses by the utilities and other companies that owned them. In addition to the commercial MGPs, many railroad companies, military installations, large institutions (e.g. hotels, hospitals, prisons, schools), industrial facilities, and large private homes were equipped with gas plants (Heritage Research, 2002).

The manufacturing practices at the time left an environmental legacy of hazardous waste contamination in groundwater, soil, sediment, sludge, and surface water. Because almost all MGPs were decommissioned over 50 years ago, prior to most federal environmental regulations, it is difficult to assess the nature and scope of the environmental legacy left behind. MGP sites represent a potentially significant market for site characterization and remediation technologies.

## 10.2 Gas Manufacturing Processes

Manufactured gas was produced primarily by three processes; coal carbonization, carburetted water gas, and oil gas (NYDEC, 2003). Coal carbonization, was used exclusively until 1875. In this process, the coal was heated in a closed oven with limited air contact. The volatile products of this oxygen-deficient heating was driven off as a gas which was collected, cooled, and purified for use. The gas was then measured, stored, and delivered to customers via underground pipes. The solid remains would become coke, a fuel which burned hotter and more cleanly than coal.

The carburetted water gas process was introduced in the 1875. The process involved heating coal or coke in a closed vessel into which steam was injected. This resulted in a flammable gas mixture of methane and carbon monoxide. Then gas works napthalene or light oil petroleum products were sprayed into this gas mixture, resulting in petroleum constituents that were cracked to form methane, a gas that burned hotter and brighter.

The most common oil gas process was patented in 1889. It is similar to the carburetted water gas process with a vaporizer replacing the carburetor. Oil is added to the reactor thereby generating more heat. The oil vapors are thermally cracked and fixed into gases.

After 1928 the Northeast was subjected to shortages of both coke and light carbureting oils and a wide variety of newly developed oil-based gas manufacturing processes came into being. These processes were prominent until the 1950s when reliable supplies of natural gas were in place.

## 10.3 Number and Characteristics of Sites

As with other types of sites, former MGP sites are subject to current environmental regulations, and, when discovered, may be managed under either the federal Superfund, RCRA Corrective Action, Underground Storage Tank, or other federal or state programs. However, no single source provides definitive information on the number and characteristics of former MGP sites, nor on the number that may require remediation. Until further investigation is conducted, the number of MGP facilities that are likely to require remediation can only be estimated.

According to the U.S. Bureau of the Census' 1910 *Manufactures Report for Principal Industries*, there were 1,296 MGP plants, mostly owned by corporations and municipalities, selling manufactured gas in the country. Most of the sites were in the Northeast quadrant of the United States (Heritage Research, 2002). In 1985 EPA estimated that there were a total of 1,500 MGP plants in North America (*Brown's Directory of North American Gas Plants* - from 1887). This tally however did not include plants that were not members of gas associations, those that did not report information to the directory's publisher, or multiple plants owned by the same entity. A

more recent estimate by the Electric Power Research Institute (1995) indicates that there may be as many as 2,500 MGP sites that are now associated with modern electric and gas utility properties. Con Edison estimates that in New York State alone there are approximately 250 former gas manufacturing sites related to utility operations. An extensive proprietary database with data on approximately 7,000 MGP and other coal tar sites provides additional information on the potential universe of sites that may still require some sort of site characterizations and/or remediation (Hatheway 1997).

Based on these sources, it is estimated that from 1800 to the mid-1900s between 36,000 and 55,000 manufactured gas plants and related coal tar sites operated in the United States. These sites varied in size from less than one acre to approximately 200 acres. Exhibit 10-1 identifies the types of sites, their typical sizes, and an estimate of the number of sites for each site type. These site types vary greatly in size, volume of releases, and location. For example, commercial MGPs tended to be medium-to-large plants located in urban areas where they piped gas to consumers, businesses, and municipalities. This gas was primarily used for lighting, heating, and cooking. In contrast, there were many more institutional and residential gas machines owned by hotels, hospitals, universities, private estates, and other entities, that manufactured gas for their own use. These sites ranged from several hundred square feet to a few acres.

Although most of the former MGP properties are now vacant or being used for other purposes, many of them have not been investigated for potential soil or groundwater contamination resulting from previous MGP activities. Nevertheless, based on the manufacturing practices at the time, it is believed that most of these facilities had releases of contaminants to the environment. The aforementioned sources were reviewed to estimate how many of the 36,000 to 55,000 sites were likely to have had releases and the number of those that had not been investigated or remediated.

By subtracting the estimated number of sites that have been found to require no further action planned (NFRAP), those that are enrolled in a state voluntary cleanup program (VCP), and those that have completed remediation under a federal or state program, the balance of the sites represent those that have not been investigated, and are likely to require characterization and remediation work.[1] These estimates are shown in Exhibit 10-2 and the calculations in Appendix Exhibit D-1. As the exhibit indicates, approximately 88 percent of the sites are suspected to have had releases of contaminated materials to the environment. It is estimated that only a small percentage of these sites have been identified and entered into a federal or state remediation program. Thus it is likely that the remaining 30,000 to 45,000 sites have not been investigated and represent a significant potential for site characterization and remediation work. Approximately 50 percent of these sites are in industrial/commercial areas, 30 percent are in residential areas, and the balance are in recreational and vacant areas (Appendix Exhibit D-1).

***Estimated Land Use Around MPG Sites***

| | |
|---|---|
| Industrial/commercial | 50% |
| Residential | 30% |
| Recreational & vacant | 20% |

1 A keyword search of EPA's CERCLIS database indicated that about 800 NFRAP sites were former MGP and coal tar sites. Although these sites did not become candidates for listing on the NPL, they may still require remediation under other environmental authorities such as RCRA or state laws.

**Exhibit 10-1. Types and Numbers of Former Manufactured Gas Plants & Related Coal Tar Facilities in the U.S.**

| Site Type | Description/Use | Site Size Range & (Average) | Time frame | Number of Sites |
|---|---|---|---|---|
| Commercial MGPs | Produced and sold gas for lighting, heating & cooking<br>Small: <5 million cu ft per yr.<br>Med. : 5-100 mil. cu ft per yr.<br>Large: >100 mil. cu ft per yr. | 1-3 acres (2)<br>3-10 (5)<br>10-100 (40) | 1816-1950s | 3,500 |
| District Gas Holders | Held & distributed gas beyond commercial MGPs original distribution radius | 1-4 acres (1.5) | 1860-1910 | 500 - 1,500 |
| Rail Yard Pintsch Oil-Gas Plants | Produced illuminating gas for rail passenger cars | 0.5- 1.5 acres (1) | 1873-1960 | 100-150 |
| Military Gas Plants | Produced illuminating and fuel gas for use at military posts, naval stations, arsenals, and munitions plants | 0.5-1.5 acres (1) | 1849-1993 | 150-250 |
| Ice & Refrigeration Plants with Gas Producers | Commercial block ice and commodity refrigeration; used coal-gas ammonia as a refrigerant | 1-2 acres (1.5) | 1870-1940 | 200-400 |
| Institutional Gas Machines | Hotels, resorts, hospitals, universities, asylums, monasteries, private schools | 500-1500 sq ft (700 sq ft); Mostly indoors | 1850-1950 | 5,000-10,000 |
| Domestic/Residential Gas Machines | Mansions and country estates | 400-1000 sq ft (600 sq ft); Basements & exterior bldg | 1890-1950 | 10,000-15,000 |
| Captive Gas Producers (both Pressure &Suction) | Fuel gas for wide variety of industrial plants with furnaces/kilns and smelters | 600 to 30,000 sq ft; highly Variable; Most enclosed | 1880-1950 | 11,000-15,000 |
| Bottled Manufactured Gas Plants | Manufactured oil-enriched water gas or solvent vapor gas | 1-3 acres (1.5); Variable; most enclosed | 1912-1940 | 100 |
| Kerosene Refiners | Distilled lamp oil from soft coal | 1-2 acres (1.5) | 1850-1870 | 100-150 |
| Compressed Fuel Briquette Plants | Bound by-product with tars and compressed solid fuel | 1-2 acres (1.5) Variable; enclosed | 1910-1950 | 100 |

**Exhibit 10-1. Types and Numbers of Former Manufactured Gas Plants & Related Coal Tar Facilities in the U.S. (Continued)**

| Site Type | Description/Use | Site Size Range & (Average) | Time frame | Number of Sites |
|---|---|---|---|---|
| Beehive Coke Works | Produced coke without recovery of by-products | 40-100 acres; Highly variable | 1800-1930 | 2,000-4,000 |
| Merchant and Utility Coke Works | Produced coke with recovery of coal tar by-products | 40-100 acres; variable | 1890-1996 | 250-300 |
| Charcoal Plants | Produced charcoal as fuel | 10-100 acres (25); Highly variable | 1820-1960 | 2,000-3,000 |
| Tar Distilleries | Converted tar residues to industrial chemicals | 10-100 acres (15); Variable | 1900-1960 | 200-400 |
| WWI Federal Wood-Tar Distillation Plants | Produced cellulose acetate aircraft fabric dope | 40-200 acres (80); Variable | 1918-1921 | 11 |
| WWI Federal Toluene Plants | Produced munitions and fuel-grade toluene from gas-works benzol | 80-200 acres (100); Variable | 1918-1920 | 10 |
| Wood Preservation Plants | Pressure and non-pressure impregnation of timber with coal tar products | 10-200 acres (40); Highly variable | 1880-1960 | 800-1,000 |
| U.S. Bureau of Mines coal Gasification Plants | coal gasification plants to exploit WWII German technologies; operated mainly by universities and industrial grantees | 10-40 acres (20); Variable | 1947-1990 | 37-55 |
| U.S. Department of Energy Coal Gasification Plants | Coal & oil shale gasification pilot projects | 10-40 acres (20); Variable | 1970-1985 | 63-75 |
| Total | | | | 36,121 -55,001 |

Notes:
- Acetylene gas plants were common from 1890 to 1940, for use in rural small-town, business and residential markets. These plants are not included in these tabulations since they are not regarded as having produced or left environmentally-hazardous wastes.

Source: Hatheway, Allen W. "Estimated Number of Manufactured Gas and Other Coal-Tar Sites in the United States," *Environmental Engineering Geoscience*, Vol. III, No. 1, Spring 1997, pp. 141-142 and personal communication with the author, February-March 2003. The data are based on Dr. Hatheway's database on MGPs which includes information on approximately 7,000 sites, assembled from *Brown's Directory of North American Gas Plants*, historic gas industry literature, Sandborn Fire Insurance maps, state agencies, and direct on-site observations.

## Exhibit 10-2. Estimated Magnitude & Disposition of Former Manufactured Gas Plants & Other Coal Tar Sites in the U.S.

| Site Type [a] | Original Number of Sites | Number of Sites w/Releases | No. of Sites Not Yet Investigated |
|---|---|---|---|
| Commercial MGPs | 3,500 | 3,500 | 2,275+ |
| District Gas Holders | 500-1,500 | 500-1,500 | 450-1,350+ |
| Rail Yard Pintsch Oil-Gas Plants | 100-150 | 100-150 | >85-129 |
| Military Gas Plants | 150-250 | 150-250 | 150-250- |
| Ice & Refrigeration Plants w/Gas Producer | 200-400 | 150-300 | 143-285 |
| Institutional Gas Machines | 5,000-10,000 | 2,500-5,000 | 2,375-4,750 |
| Domestic/Residential Gas Machines | 10,000-15,000 | 10,000-15,000 | 9,800-14,700+ |
| Captive Gas Producers - Pressure & Suction | 11,000-15,000 | 11,000-15,000 | 10,450-14,250 |
| Bottled Manufactured Gas Plants | 100 | 50 | 50 |
| Kerosene Refiners | 100-150 | 100-150 | 93-140+ |
| Compressed Fuel Briquette Plants | 100 | 50 | 50 |
| Beehive Coke Works | 2,000-4,000 | 2,000-4,000 | 1,800-3,600+ |
| Merchant & Utility Coke Works | 250-300 | 250-300 | 125-150 |
| Charcoal Plants | 2,000-3,000 | 2,000-3,000 | 1,800-2,700 |
| Tar Distilleries | 200-400 | 200-400 | 160-320 |
| WWI Federal Wood Tar Distillation Plants | 11 | 11 | 6 |
| WWI Federal Toluene Plants | 10 | 10 | 5 |
| Wood Preservation Plants | 800-1,000 | 800-1,000 | 440-550 |
| U.S. Bureau of Mines - Coal Gasification Plants | 37-55 | 37-55 | 33-49 |
| U.S. Dept. of Energy - Coal Gasification Plants | 63-75 | 63-75 | 57-67 |
| **Total** | 36,121-55,001 | 33,471- 49,801 | 29,975-44,926 |

a See Table 1 for descriptions of the site types.

Source: Hatheway, Allen W, "Estimated Number of Manufactured Gas and Other Coal-Tar Sites in the United States," *Environmental Engineering Geoscience*, Vol. III, No. 1, Spring 1997, pp. 141-142 and personal communication with the author, February-March 2003. The data are based on Dr. Hatheway's database on MGPs which includes information on approximately 7,000 sites, assembled from *Brown's Directory of North American Gas Plants*, historic gas industry literature, Sandborn Fire Insurance maps, state agencies, and direct on-site observations.

## 10.4 Waste Types and Quantities

The gas manufacturing processes resulted in a variety of residuals, some of which were converted to by-products, while others, many of which are hazardous, were managed as wastes. Some of the by-products were sold to other industries. For example, coke was sold to the steel industry. Others materials were transported offsite for disposal. It was common practice to dump coal tar and other wastes into on-site pits or ponds, bury it, or use it as fill to adjust the grade of the gas yard. The gas manufacturing process also involved the use of wood chips and iron filings to remove sulfur and cyanide from the gas. These chips and filings were also disposed of in pits or buried. As a result of these practices, wastes from manufactured gas processing can be found in soil, sediment, groundwater and surface water.

These wastes pose potential risks to humans and the environment. A critical concern with regard to coal tar is the fact that less than 40 percent of the mass of coal tar constituents can be quantified using common organic chemistry extraction and chromatographic techniques. The remaining 60 percent known as "pitch" are comprised of aromatic compounds with high molecular weight and relatively low aqueous solubility. The compounds that make up this pitch are of concern since many are suspected to cause mutagenic and/or carcinogenic effects. In addition, the presence of pitch can influence the rates of release of the more soluble coal tar constituents. Some researchers who are now looking at tar as a "supercompound" with a potent combination of carcinogens, much like cigarette smoke, instead of studying its individual constituents (WDNR, 1999).

The types of wastes produced depended upon the production processes and the period in which the plants operated. Coal tar, a by-product of all MGP sites, is a dense, non-aqueous phase liquid (DNAPL). When released into an aquifer, it migrates downward until it encounters a low-permeability layer. This dense substance does not dissolve in the aquifer and releases constituents into the water. The lighter oil by-products (LNAPLs) of the manufactured gas process migrate through the groundwater. They tend to float on top of the water, contaminating it from above.

Exhibit 10-3 shows the types and estimated quantities of residuals and wastes remaining in the soil and groundwater at MGP and coal tar sites. The most common releases are liquids, solids, sludges, and tar. The quantity estimates are based on information from public and private databases cited in the footnote to the exhibit.

From 1880 to 1950, MGPs produced approximately 15 trillion cubic feet of gas and approximately 11 billion gallons of tar as a by-product resulting in thousands of contaminated acres of land and millions of gallons of impacted water (Fischer et al, 1999).

**Exhibit 10-3. Estimated Quantities of Residuals and Wastes Released at Former MGP & Other Coal Tar Sites in the U.S.**

| Site Type [a] | Original Number of Sites | Number of Sites With Releases | Type of Releases | Volume of Residuals/Waste Per Site (000) |
|---|---|---|---|---|
| Commercial MGPs | 3,500 | 3,500 | Liquids & Solids | 2,000-50,000 $m^3$ |
| District Gas Holders | 500-1,500 | 500-1,500 | Liquid Leaks, Solids inside | 100 -500 $m^3$ |
| Rail Yard Pintsch Oil-Gas Plants | 100-150 | 100-150 | Liquids & Solids | 500-10,000 $m^3$ |
| Military Gas Plants | 150-250 | 150-250 | Liquids & Solids | 500-1,000 $m^3$ |
| Ice & Refrigeration Plants w/Gas Producer | 200-400 | 150-300 | Liquids & Limited Solids | 500-1,000 $m^3$ |
| Institutional Gas Machines | 5,000-10,000 | 2,500-5,000 | Liquids | <100 $m^3$ |
| Domestic/Residential Gas Machines | 10,000-15,000 | 10,000-15,000 | Limited Liquids[b] &Solids | <50 $m^3$ |
| Captive Gas Producers - Pressure & Suction | 11,000-15,000 | 11,000-15,000 | Tars & Solids | 100-10,000 $m^3$ |
| Bottled Manufactured Gas Plants | 100 | 50 | Limited Sludges | 100-500 $m^3$ |
| Kerosene Refiners | 100-150 | 100-150 | Liquids & Sludges | 100-1,000 $m^3$ |
| Compressed Fuel Briquette Plants | 100 | 50 | Limited Liquids & Sludges | 100-1,000 $m^3$ |
| Beehive Coke Works | 2,000-4,000 | 2,000-4,000 | Tars | 1,000-10,000 $m^3$ |
| Merchant & Utility Coke Works | 250-300 | 250-300 | Tars & Solids | 5,000-100,000 $m^3$ |
| Charcoal Plants | 2,000-3,000 | 2,000-3,000 | Tars | 1,000-5,000 $m^3$ |
| Tar Distilleries | 200-400 | 200-400 | Liquids & Tar Sludges | 1,000-100,000 $m^3$ |
| WWI Federal Wood Tar Distillation Plants | 11 | 11 | Liquids & Tar Sludges | 1,000-10,000 $m^3$ |
| WWI Federal Toluene Plants | 10 | 10 | Liquids & Sludges | 1,000-10,000 $m^3$ |
| Wood Preservation Plants | 800-1,000 | 800-1,000 | Liquids & Sludges | 1,000-10,000 $m^3$ |

**Exhibit 10-3. Estimated Quantities of Residuals and Wastes Released at Former MGP & Other Coal Tar Sites in the U.S. (Continued)**

| Site Type [a] | Original Number of Sites | Number of Sites With Releases | Type of Releases | Volume of Residuals/Waste Per Site (000) |
|---|---|---|---|---|
| U.S. Bureau of Mines-Coal Gasification Plants | 37-55 | 37-55 | Liquids & Sludges | 500-1,000 $m^3$ |
| U.S. Department of Energy-Coal Gasification Plants | 63-75 | 63-75 | Limited Liquids & Sludges | 500-1,000 $m^3$ |
| Total | 36,121-55,001 | 33,471-49,801 | | |

Notes:
a See Exhibit 10-1 for definitions of site types.
b Limited connotes a few hundred to one thousand gallons over the period of weeks to a few months.

Source: Hatheway, Allen W, "Estimated Number of Manufactured Gas and Other Coal-Tar Sites in the United States," *Environmental Engineering Geoscience*, Vol. III, No. 1, Spring 1997, pp. 141-142 and personal communication with the author, February-March 2003. The data are based on Dr. Hatheway's database on MGPs which includes information on approximately 7,000 sites, assembled from *Brown's Directory of North American Gas Plants*, historic gas industry literature, Sandborn Fire Insurance maps, state agencies, and direct on-site observations.

Six major constituent classes are potentially present in MGP residuals (Middleton, 1995):

- polynuclear aromatic hydrocarbons (PAHs);
- volatile aromatics (BTEX);
- phenolics;
- inorganic nitrogen (including cyanide compounds);
- inorganic sulfur; and
- trace metals.

## 10.5 Remediation Technologies

Investigation and remediation at many MGP sites are complicated by the:

- Nature and variety of waste materials and media, including the fact that the constituents of concern tend to interact differently in different media;
- Location of the sites (i.e near waterways or in the heart of residential neighborhoods); and
- Condition of the sites (i.e. infrastructure at the sites, lack of surface features and mixed debris is subsurface).

A variety of site investigation techniques are available to address some of these complications. They include ground penetrating radar (GPR), Electromagnetic (EM) Induction, Infrared Monitoring (IM), and Seismic Reflection and Refraction to detect and measure buried debris or other subsurface anomalies. Direct Push Sampling and Seismic Reflection and Refraction may

be used to produce a geophysical profile of the subsurface. Flame Ionization Detectors (FID) and Photoionization Detectors (PID) are used to screen soil for contamination. Once the location and profile of the waste is determined, many of the same sampling techniques are employed to test both soil and water. These include Direct Push sampling which can be used for any constituent, drilling both for the collection of samples and the installation of groundwater wells; Immunoassay test fits to detect and quantify contaminants by measuring compound reactions; Laser-Induced Fluorescence/Cone Penetrometry using a fiber optics-based chemical system to screen primarily for petroleum contamination in the field; and, X-ray Fluorescence (XRF) to detect and quantify individual metals in the field. In addition, soil gas surveys are used to identify and quantify individual organic compounds (VOCs and SVOCs) that occur between particles of the earth and soil with the help of a portable gas chromatograph (Fischer 1999).

Both established and innovative technologies are being used to remediate former MGPs. Most of the technologies involve thermal desorption, biological processes, and/or chemical oxidation processes (Brown et al, 1995). A number of the technologies can be applied either in situ or ex situ. In some cases, these technologies serve to recover fuels for recycling.

A variety of remediation alternatives are available for use at former MGP sites. Exhibit 10-4 enumerates many of these alternatives and their application by waste stream category and contaminant/media. According to the Institute for Gas Technology, wastes from former MGP sites fall into six major categories; pumpable liquid free product (free tars & oils); organic waste or tar/oil-contaminated waters; organic waste or tar-contaminated soil and sediments; non-pumpable tars and sludges; purifier box (or spent oxide) waste; and, demolition debris (Fischer 1999).

## Exhibit 10-4. Remediation Alternatives by Category of Waste at Former Manufactured Gas Plants

| Waste Category | Remediation Alternatives | Contaminants and Media |
|---|---|---|
| Organic waste or Tar-Contaminated Soils and Sediments | Soil vapor extraction - use of vacuum to separate contaminants from soil | VOCs and some SVOCs |
| | Bioremediation (in-situ or ex-situ) | PAHs |
| | Bioventing (combines SVE and Bioremediation) | Petroleum products |
| | Excavation & Aeration | VOCs, some SVOCs |
| | Low Temperature Thermal Desorption | VOC, SVOC, & petroleum contaminated soil |
| | High Temperature Thermal Desorption | SVOCs in impacted soil, some VOCs |
| | Incineration | VOCs & SVOCs in impacted soil |
| | Soil washing | Metals, gasoline, & fuel oils |
| | Solvent extraction | PCBs, VOCs, halogenated organics, & petroleum from soil, sediments, & sludges |
| | Soil flushing | Heavy metals, halogenated organics, aromatics, & PCBs |
| | Clean Soil Process (CSP) | Coal Tar |
| Non-pumpable tars and sludges | Excavation & soil mixing - to dilute the concentration of TPAHs - removal to RCRA class D landfill - daily cover | Petroleum hydrocarbons |
| Purifier box (or spent oxide) waste | Spent wood chips - burnt and ash dumped | Other spent purification media |
| | Spent oxides - some sold for Vitriol - most removed to RCRA class D landfill | Sulphur-related PH conditions that can release cyanide |
| Demolition Debris | Scanned and steam cleaned - removal to RCRA Class D landfill | NA |

**Exhibit 10-4. Remediation Alternatives by Category of Waste at Former Manufactured Gas Plants (Continued)**

| Waste Category | Remediation Alternatives | Contaminants and Media |
|---|---|---|
| Pumpable liquids (free tars & oils)source material | Solvent extraction (separates or removes hazardous organic contaminants) | Sediments, sludges, soil with primary organic contaminants (PCBs, VOCs, halogenated organic compounds) |
| | Surfactant flushing - increases solubility and mobility of contaminants in water | Groundwater with NAPLs |
| Organic waste or tar/oil-contaminated waters | Bioremediation (in-situ or ex-situ) (use of microorganisms to break down hazardous substances) | PAHs |
| | Air sparging - captures contaminants by vapor extraction | Volatile contaminants |
| | Treatment wall | Chlorinated solvents, metals or radioactive contaminants |
| | Groundwater extraction using a system of wells and pumps w/ UV oxidation, activated carbon treatment, or air stripping | VOCs and SVOCs |
| | Surfactant flushing | NAPLs |

Sources:
- Fischer, Corey L.J., Schmitter, Robert D., and Lane, Eliesh O'Neil, 1999, *Manufactured Gas Plants: The Environmental Legacy*, South & Southwest Hazardous Substance Research Center, Georgia Institute of Technology, Atlanta, GA, November.
- Personal communication with Allen W. Hatheway.

## 10.6 Estimated Cleanup Costs

MGP cleanup costs have been documented to range from a few hundred thousand dollars to $86 million for a single site. No single source provides a total nation-wide estimate of MGP cleanup costs. To estimate the potential value of the market for cleaning up MGP and other coal tar sites, estimates of ranges of costs for each site type were developed and multiplied by the estimated number of sites of each type. The estimates of average costs were developed from published information on MGP remediation costs and from analysis of data in a proprietary database containing data on thousands of MGP and other coal tar sites (Hatheway, 1997).

The published sources provide cleanup costs for specific projects or averages for specific utility companies that have a number of MGP sites. In 1995 the Electric Power Research Institute estimated that cleanup and containment costs for approximately 2,500 former MGP properties to be between $25 and 75 billion and that it would take over 30 years to clean them up (Murarka, 1995). The MGP sites in this study are those that are now part of modern utilities. This report implies an average cost of $10-30 million per site. Other reports estimate that most per site cleanups fall in the $3-10 million range. For example, a 2001 article reports that per site cleanup for MGPs are in the $3-5 million range, although many sites have run much higher (Ginsburg, 2001). In 1995, the Niagara Mohawk Power Corporation of New York estimated its environmental liability from the legacy of 55 sites in 24 cities and towns to be more than $200 million, or an average of $3.6 million per site (Neuhauser, 1995). The estimated cost varied widely from site to site, with the cost of one site estimated as high as $86 million (Ginsburg, 2001). The Atlanta Gas Light Company is expected to spend $186 million to clean up 12 MGP sites in Florida and Georgia, or $15.5 million per site.

The Hatheway database provided ranges of costs for a number of sites for the various site types (Hatheway, 1997). Some engineering judgement was used to apply these to the various site types, and to eliminate outliers (i.e., the few cases that have extremely high costs and tend to bias the average). These estimates do not include the cost of contamination resulting from activities at the sites after the MGP operations were closed down, nor do they consider legal costs or awards for potential damages. The published data generally confirmed the data from this database.

> It is estimated that should the 30,000-45,000 MGP and other coal tar sites require cleanup, it could cost $26-$128 billion.

The results of this analysis is presented in Exhibit 10-5, which shows the range of estimated average remediation cost for each site type, along with the typical contaminants and contaminated media. The estimated number of sites that have yet to be investigated is taken from Exhibit 10-2. Based on these estimates, the cleanup of between 30,000 and 45,000 MGP and other coal tar sites would cost between $26 billion and $128 billion. Captive gas producer plants account for 44 percent of the total and commercial plants account for 23 percent. Although the average cleanup cost for captive producer plants is about a third of that of commercial plants, there are 5 to 7 times as many captive plants sites.

## Exhibit 10-5. Estimated Average Remediation Cost by Site Type

| Site Type | Range of Site Size | Number of Sites Not Investigated | Average Per Site Remediation Cost $ Millions |
|---|---|---|---|
| Commercial MGPs | small (1-100 acres) | 2,275+ | 3.0 - 100.0 |
| District Gas Holders | 1-4 acres | 450-1350+ | 0.25 - 1.5 |
| Rail Yard Pintsch Oil-Gas Plants | 0.5-1.5 acre | 95-142 | 0.5 - 5.0 |
| Military Gas Plants | 0.5-1.5 acre | 150-250 | 1.0 - 4.0 |
| Ice & Refrigeration Plants with Gas Producers | 1-2 acres | 147-294 | 0.5 - 1.5 |
| Institutional Gas Machines | 500-1500 $ft^2$ | 2,450-4,900 | 0.2 - 0.75 |
| Domestic Residential Gas Machines | 400-1000 $ft^2$ | 9,800-14,700 | 0.05 |
| Captive Gas Producers (Pressure & Suction) | 20/30 ft to 50x600 ft | 10,450-14,250 | 1.0 - 10.0 |
| Bottled Manufactured Gas Plants | 1-3 acres | 50 | 0.2 - 0.5 |
| Kerosene Refiners | 1-2 acres | 95-142 | 1.0 - 5.0 |
| Compressed Fuel Briquette Plants | 1-2 acres | 50 | 0.5 - 1.0 |
| Beehive Coke Works | 40-100 acres | 1,900-3,800 | 0.5 - 2.0 |
| Merchant & Utility Coke Works | 40-100 acres | 100-120 | 10.0 - 100.0 |
| Charcoal Plants | 10-100 acres | 1,900-2,850 | 0.5 - 2.0 |
| Tar Distilleries | 10-100 acres | 150-300 | 10.0 - 100.0 |
| WWI Federal Wood Tar Distillation Plants[c,d] | 40-200 acres | 11 | 1.0 - 2.0 |
| WWI Federal Toluene Plants[c,d] | 80-200 acres | 10 | 1.0 - 5.0 |
| Wood Preservation Plants | 10-200 acres | 480-600 | 5.0 - 20.0 |
| U.S. Bureau of Mines - Coal Gasification Plants[c] | 10-40 acres | 33-49 | 1.0 - 2.0 |
| U.S. Department of Energy - Coal Gasification Plants[c] | 10-40 acres | 57-67 | 1.0 - 2.0 |

Source: Appendix Table D-2.

These data provide a reasonable estimate of a range of probable cleanup costs for all MGPs, should they require cleanup. However, because these costs vary widely, and because the above values of the number of MGP sites remaining to be cleaned up are estimates, the cost estimates provided here are considered a general indication of the market size.

## 10.7 References

American City & County, 2001. "The Problem of Manufactured Gas Plants," roundtable discussion, *American City & County*, March 1, 2001. http://www.americancityandcounty.com/ar/government_problem_manufactured_gas

Brown, Richard A., M. Jackson, and M. Loucy, 1995. "A Rational Approach to the Remediation of Soil and Groundwater at Manufactured Gas Plants," *Land Contamination & Reclamation,* Vol. III, No. 4.

EI Digest, 1995. "Manufactured Gas Plants," *EI Digest*, p.1, May 1995.

Fischer, et. al., 1999. *Manufactured Gas Plants: The Environmental Legacy,* Fisher, Corey L.J., Schmitter, Robert D., and Lane, Eliesh O'Neil, South & Southwest Hazardous Substance Research Center, Georgia Institute of Technology, Atlanta, GA, November, 1999. http://www.hsrc.org/hsrc/html/tosc/sswtosc/mgp.html

Ginsburg, Janet, 2001. "A Deadly Legacy of Poisons from the Past," *Business Online*, July 2, 2001. http://www.businessweek.com/magazine/content/01_27/b3739186.htm

Hatheway, Allen W., 1997. "Estimated Number of Manufactured Gas and Other Coal-Tar Sites in the United States," *Environmental & Engineering Geoscience*, Vol. III, No. 1, Spring, pp. 141-142 (and 2003 updated and expanded version). http://www.allen@hatheway.net

Hatheway, Allen W., 2002. "Geoenvironmental protocol for site and waste characterization of former manufactured gas plants; worldwide remediation challenge in semi-volatile organic wastes," *Engineering Geology* 64, pp. 317-338.

Heritage Research Center, Ltd., 2002. *A Brief History of the Manufactured Gas Industry in the United States*. http://www.heritageresearch.com/manufactured_gas_F.htm

Middleton, Andrew C., 1995. "Historical Overview of Manufactured Gas Processes Used in the United States," *Land Contamination & Reclamation*, Vol. III, No. 4.

Mon, Gonzalo J., 1995. "History of the Manufactured Gas Business in the United States," in "International Symposium and Trade Fair on the Clean-up of Manufactured Gas Plants," *Land Contamination & Reclamation*, Vol. III, No. 4.

Murarka, Ishwar P., 1995. "Site Management Trends and Research Directions in the United States of America," *Land Contamination & Reclamation*, Vol. III, No. 4.

Neuhauser, Edward, 1995. "Manufactured Gas Plant Site Ownership in the 1990s," *Land Contamination & Reclamation*, Vol. III, No. 4.

NYDEC, 2003. New York State Department of Environmental Conservation, web site on General Information About MGPs. http://www.dec.state.ny.us/website/der/mgp/mgp_faq.html

U.S. EPA, 2003. *Report on the Innovative Approaches to Manufactured Gas Plant Site Characterization,* EPA-542-R-01/003, U.S. Environmental Protection Agency, Office of Solid Waste and Emergency Response, Technology Innovation Office.

WDNR, 1999. Wisconsin Department of Natural Resources, *Contaminants of Concern from MGP Waste and By-products.*
http://www.dnr.state.wi.us/org/water/wm/wqs/sediment/assessment/mgp

# Chapter 11
# Demand for Remediation of Mining Sites

The thousands of abandoned, inactive, and operating mines in the United States present serious potential risks to human health and the environment. The extraction and processing of metals, nonmetal minerals, and coal result in the generation of large quantities of contaminated solid wastes, wastewater, and air emissions which cause significant environmental impacts, including groundwater and surface water contamination, soil erosion, and soil contamination. Mining wastes have been detected many miles downstream from their source. This Chapter presents estimates of the extent of mining waste environmental problems in the U.S. and its implications for the demand for remediation technologies.

There is no separate remediation program for the characterization and remediation of mining sites. Mining sites may be addressed under one or more of the major remediation programs, such as Superfund, RCRA, or a state environmental program, depending on the nature and extent of the contamination and other site-specific factors. Because these sites may be managed under different remediation programs, the estimates of the market should not be added to those in the previous chapters of this report. Adding these estimates would be double-counting sites and, therefore, overestimating the scope of the market. Addressing mining sites across all remediation programs provides vendors and regulators information from the unique perspective addressing the hazardous waste challenges facing a specific industrial sector.

The Mine Safety and Health Administration reports that, as of 2001, there were approximately 14,500 operating coal, metal, and nonmetal mineral mines in the U.S. The Bureau of Land Management (BLM), a component of the Department of Interior, estimates that there are between 100,000 and over 500,000 small and mid-sized abandoned hard rock (metals and nonmetal minerals) mines on private, state and federal lands in the west and approximately 13,000 abandoned coal mines, mostly small and mid-sized, in the east. Many of these properties continue to threaten human health and the environment because of the materials left behind and because mined-out areas and materials are exposed to the elements. There is a wide range of estimates and opinions on how many of these properties pose a serious environmental risk and are likely candidates for remediation. The most promising estimates indicate that approximately 5 to 10 percent of abandoned mines pose a significant risk to the environment and people.

## 11.1 Industry Description

Identifying, prioritizing, and implementing the necessary cleanup actions at thousands of sites across the country is expected to take many years. To understand the nature of and potential extent of the cleanup effort, it is necessary to understand the nature of mining operations in the U.S. This section summarizes the basic characteristics of mining operation in the U.S. and their environmental impacts, including the types of mines, common production processes and their likely waste streams, and the regulatory programs that address them.

### 11.1.1 Types of Mining

The Department of Commerce identifies three major segments of the mining industry: metal ore mining, nonmetallic mineral mining, and coal mining. The term "mining" is used in the broad sense to include ore extraction, quarrying, and beneficiation (e.g., crushing, screening, washing, sizing, concentrating, and floatation), customarily done at the mine site. The term "hardrock mining" refers primarily to the extraction and processing of metals (e.g., copper, gold, iron, lead, magnesium, silver, uranium, zinc) and nonmetallic, non-fuel minerals (e.g., asbestos, gypsum, phosphate rock, sulfur). Hardrock minerals are key raw materials used in many industrial products. Non-hardrock mineral mines, such as sand, gravel, and limestone are not addressed in this study.

Most of the minerals and coal extraction in this country is done with surface mining techniques, primarily open pit mining. Underground techniques may be used when the deposits are hundreds or thousands of feet below surface level. Non-metallic mineral deposits generally have far less waste rock and foreign materials associated with them than metallic deposits. Wastes associated with non-metallic minerals and waste rock are generally of lower toxicity and more manageable than those associated with hardrock or coal mining wastes.

### 11.1.2 Mining Processes

Mining generally involves three basic processes–extraction, beneficiation, and processing–each of which can seriously impact the environment and human health (U.S. EPA 2000).

**Extraction** is the removal of rock and other materials that contain the target ore/mineral. There are three basic types of extraction used today: surface, underground, and in-situ solution mining. A fourth type, placer mining, is no longer used in the U.S.

- Surface mining accounts for the greatest volume of mined materials in the U.S. It involves rock removal, blasting, mucking (removal and transport of ore), crushing, and hauling. The open pit method is the most common form of surface mining. This technique allows access to the ore bodies by removing the surface covering (overburden) of soil and rock. Ore-bearing rock is then removed for further processing to extract the target mineral. After the ore body is exhausted, open pits and huge mounds of finely-ground tailings and coarser waste rock are usually left behind. The extraction process generates large volumes of waste rock because of the high waste-to-product ratios associated with most ores.

  Strip mining is likely to be used to extract horizontal, close to the surface deposits. It has been used for phosphate mining and coal mining. The strip mining technique is usually more efficient but also more environmentally destructive than underground mining. In this process, the soil and rock above the seam of coal or other target mineral are removed. The seam is then blasted, the target material is scooped up by huge front end loaders or power shovels and transported to a processing plant where it is subjected to physical and/or chemical processes to separate the target material from waste rock and other materials. The coarser waste rock is piled up adjacent to the mined out area, and the finer tailings from the plant are discharged as a thick slurry into an impoundment. After the mining operations

have ceased, the mine is reclaimed by regrading waste rock and other wastes to approximate the original contours of the land and replanting the area with native vegetation. Mountaintop mining, a relatively new variant of strip mining, is common in locations where valleys adjacent to the areas being mined can serve as repositories for the soil and waste rock.

- Underground mining involves digging tunnels and shafts to reach mineral-rich ore. The most common scenario is to sink vertical shafts or dig adits (horizontal entrances into hillsides) to reach into the mineral deposit and then bore a series of horizontal tunnels to access the entire deposit. Underground techniques may be used when the deposits are hundreds or thousands of feet below surface level. After the ore body is exhausted, underground tunnel complexes are left behind. In order to support the roof rock of coal tunnels, about 50 percent of the coal is often left behind in the form of pillars. A variant of this technique, in which hydraulic jacks are used to support the roof, allows for an 80 to 90 percent recovery rate; although this technique can result in subsidence once the equipment is removed. Tunneling generates considerable amounts of waste rock which are either disposed of underground or are placed in waste rock piles.

- Underground mining is more expensive than surface mining, requiring more skilled workers and specialized equipment. Coal, salt, and potash are often mined underground. As with hardrock mining, the minerals must be separated from the waste rock.

- in-situ solution mining involves drilling wells and circulating a solvent into an ore body left in place to extract minerals. Although this causes little surface physical disturbance, the solvents and pumping may adversely affect groundwater quality.

- Placer mining, a gold mining technique that was once common in the United States, is still being used to extract surface deposits of gold in Alaska. In this technique, miners dam small streams and dig up and process stream sediments to extract gold.

**Beneficiation** involves separating the target ore from waste rock. Beneficiation activities generally do not change the mineral values themselves other than by reducing (e.g. crushing or grinding) or enlarging (pelletizing or briquetting) particle size to facilitate processing. Some common types of beneficiation include:

- Gravity separation relies on large differences in density between the target metal and the surrounding materials. This techniques utilizes devices such as trommels, sluices, cyclones, jigs, and shaker tables.
- Magnetic separation is applied in the ore milling industry for iron, columbium and tantalum, and tungsten. Among other things, it is used for the separation of multiple valuable minerals recovered from complex ores.
- Electrostatic separation involves taking ore that is charged and dropping the charged particles onto a conductive rotating drum. The particles lose the charge quickly and are thrown off and collected.

- Flotation, the most common beneficiation method, involves adding a reagent chemical to ore slurry causing minerals to become less dense than the waste rock or other worthless material and rise to the top of the tank.
- Leaching involves extracting a soluble metallic compound by dissolving the ore with a solvent, such as sulfuric acid (copper) or sodium cyanide solution (gold).

**Processing** is the refining of ore after beneficiation to extract the target material. Mineral processing operations can be based on high temperatures (i.e. smelting, roasting), hydrometallurgical (the use of liquid reagents in the treatment or reduction of ores), or electrometallurgical techniques (the use of electric and electrolytic processes to purify metals or reduce metallic compounds to metals). The most common of these processes is smelting which involves applying heat to a batch of ore to separate and refine the metal.

### 11.1.3 Types of Wastes

The extraction, beneficiation, and processing steps can result in four types of wastes: mine water, waste rock, overburden, and tailings.

**Mine water** consists of all water that collects in mine works, both surface and underground, as a result of inflow from precipitation and surface water and groundwater seepage. In active mining operations this water can be pumped out and used for other mining activities or discharged to surface water under a water discharge permit. At inactive or abandoned mines the water accumulates in the mine pit and saturates the fill material. Depending on the source of the water and the regional and hydrological conditions, this mine water can have high concentrations of heavy metals and total dissolved solids as well as elevated temperatures and altered pH, which may contaminate down-gradient groundwater and surface water.

**Waste rock** consists of non-mineralized and low-grade mineralized rock removed from an ore body during extraction. It includes granular, broken rock that range in size from fine sand to large boulders and is typically piled or disposed in piles or dumps near the point of extraction. The geochemistry of waste rock varies widely from mine to mine and may even vary significantly at individual mines over time. Generally, waste rock contains some concentration of the target mineral, along with other metals and minerals. Waste rock can be a source of acid rock drainage and heavy metals such as arsenic. Acid rock drainage occurs when precipitation or runoff leaches sulfuric and other materials from waste rock. The resulting contaminated water can flow offsite, where it may contaminate soil, surface waters, and groundwater.

**Overburden** is the surface rock and soil removed to expose the ore at surface mines. As long as this material is salvaged and returned to the mine site during closure or decommissioning it is exempt from Resource Conservation and Recovery Act (RCRA) regulations.

**Tailings** are the coarsely and finely ground waste portions of mined material remaining after beneficiation. The physical and chemical characteristics of tailings vary according to the ore being mined and the beneficiation process used. Tailings have traditionally been disposed of in a variety of configurations including impoundments, piles, in backfill for underground mines, and under water. Subaqueous disposal is currently prohibited by the Clean Water Act (CWA).

Like mineral mining, coal mining generates large quantities of solid waste materials which are piled on the surface and subject to saturation and runoff resulting in an increase of total suspended solids in water bodies, acid drainage into surface and groundwater, and increased build-up of sediments in local waters. At the processing stage, the impurities removed during the screening and washing of the coal are also placed in waste piles, thereby adding to the hazardous waste problems of the coal mining process. Coal piles are flammable, susceptible to spontaneous combustion, and prone to erosion which leads to highly acidic runoff and seepage.

### 11.1.4 Regulatory Programs

Mining activities, including the investigation and cleanup of abandoned mine sites, are managed in accordance with a complex web of jurisdictions, laws, and regulations covering several environmental media. Generally, the Comprehensive Environmental Response Compensation and Liability Act (CERCLA) and CWA are the most prevalent statutes that are applicable to mine cleanup programs. For coal mining, the Surface Mining Control and Reclamation Act of 1977 is the primary authority on mining operations and reclamation. Depending on the circumstances of any specific mine site, its operations and/or cleanup may also be governed by the provisions of RCRA, National Environmental Policy Act (NEPA), the Clean Air Act, the Emergency Planning and Community Right to know Act, the Safe Drinking Water Act, the Atomic Energy Act, the Toxic Substances Control Act, and state or local statutes. Cleanup requirements may further be complicated by land ownership and tenancy issues, such as whether it is on federal, state, or tribal land.

This document concentrates on the environmental aspects of mining sites. Many mine sites also contain physical hazards, such as open shafts and unstable slopes and buildings. Although these safety hazards are not the focus of this report, they also deserve consideration in developing site management strategies since they are part of the overall responsibility of site owners.

**CERCLA.** CERCLA's main applicability to mining activities is that it provides EPA with the authority to conduct or require a private party to conduct a removal or remedial activity. Federal agencies that are responsible for land must comply in the same manner as private parties with the provisions of CERCLA (and RCRA). This responsibility is especially important for the Department of Interior (BLM, Fish and Wildlife Service, National Park Service, Bureau of Indian Affairs, and Bureau of Reclamation) and USDA (U.S. Forest Service), DOD, and DOE, each of which is responsible for management of mining sites. Their responsibilities also extend to many non-NPL mining sites. Where a site crosses property boundaries between private and federal ownership, all parties generally coordinate to develop agreements that specify the responsibilities of all parties. Inactive sites classified as having the most severe environmental problems are placed on the NPL. As of December 2002, close to 90 mining and processing sites were listed on the NPL.

Under CERCLA, EPA can require compliance with appropriate regulations adopted under other relevant and appropriate regulations (ARARs), which may include state standards as well as other federal regulations such as RCRA. EPA has published a manual outlining all potential federal ARARs that may be requirements at Superfund sites (CERCLA Compliance With Other Laws Manual, Part I, August, 1988, and Part II, August 1989).

**Clean Water Act (CWA).** The CWA provides a mandate for controlling discharges from point sources and non-point sources of pollution. The Act prohibits any pollution discharges from "point sources" into navigable waters of the United States (33 U.S.C. § 1251-1387). A point source includes any "discernible, confined, and discrete conveyance, including such structures as pipes, ditches, and channels." All point source discharges to surface waters must be permitted by EPA or authorized states, in accordance with the National Pollutant Discharge Elimination System (NPDES). This requirement is especially important to the mining industry, since waters coming into contact with mining materials often become acidic or contaminated with other materials. The CWA also regulates the construction of impoundments that serve as repositories for tailings and treatment of waste from mining and mineral processing operations. Although mining permits are issued by the states, EPA's Office of Water may review these permits to ensure compliance and proper application of guidelines. A landowner is liable for pollution stemming from activities that took place prior to his/her ownership of the land.

**RCRA.** Section 3001(b)(3)(A)(ii) of RCRA excluded certain solid wastes from mining and processing from regulation as a hazardous waste under Subtitle C, pending certain studies by EPA. Congress included this provision, also known as the "Bevill Amendment," to apply to "high-volume, low-hazard waste."[1] In 1989 EPA promulgated regulations defining the criteria for "high volume, low hazard" and published a list of waste types that are no longer excluded. EPA also stated that it may conduct evaluations of additional waste streams in the future to determine whether they should remain excluded (40 CFR Part 26, Mining Waste Exclusion, 54 FR 36592, September 1, 1989). The rule does not impose Subtitle C requirements on mineral processing wastes that were disposed prior to the effective date of the rule.

As a result of these regulatory proceedings, wastes from the extraction and beneficiation processes continue to be excluded from Subtitle C requirements. Only 20 wastes from mineral processing are exempt from RCRA (40 CFR 261.4(b)(7)). Today, relatively little mining waste is subject to RCRA regulation as hazardous waste. Overburden is exempt from RCRA regulations, so long as it is returned to the mine site.

**Surface Mining Control and Reclamation Act (SMCRA).** The SMCRA was passed in 1977 to ensure that coal mines are operated in a manner that protects citizens and the environment during mining, ensure that the land is restored to beneficial use following mining, and mitigate the effects of past mining by aggressively pursuing reclamation of abandoned mine lands. The Surface Mining Law gives primary responsibility for regulating surface coal mine reclamation to the states, a responsibility that 31 states have chosen to exercise.

The Office of Surface Mining (OSM) was established within the Department of the Interior to help carry out the SMCRA. The OSM handles enforcement on federal lands and Indian Reservations and in coal states that have not set up regulatory programs. Funds for reclamation of abandoned mines come from tonnage-based fees paid by active coal mines - 35¢/ton of surface mined coal, 15¢/ton of coal mined underground, and 10¢/ton of lignite. The fund consists of fees, contributions, late payment interest, penalties, administrative charges, and interest earned

[1] The Bevill Amendment was Section 7 of Public Law 96-482, which was enacted on October 21, 1980, to include several amendments to RCRA.

on investment of principal. From January 1978 when the first fees were paid through March 2003 over $6.7 billion has been collected. As of March 2003 the balance of unappropriated funds is in excess of $1.4 billion (DOI, 2003). States that have completed the reclamation of coal mines can apply unused funds for the remediation of safety and environmental hazards at hardrock and other non-coal sites.

### 11.1.5 Mines on Federal Lands

Hardrock and non-coal mining exist in all 50 states. A significant number of both active and abandoned mines are located on public lands. Three of the four major land managing agencies - the Bureau of Land Management, the National Park Service, and the Fish and Wildlife Service - are part of the Department of the Interior. The fourth agency, the Forest Service (USFS), is part of the Department of Agriculture (USDA). Most federal lands are managed by the BLM and the USFS.

Most of the BLM-managed 264 million acres are in 12 western states, and 90 percent of this land is open to mining. The Bureau administers 700 million acres of sub-surface mineral assets throughout the nation. The Bureau has a budget of $1.8 billion and a workforce of about 9,000 employees. The USFS manages 163 million acres in the west of which about 80 percent is open to mining. Together, the two land management agencies are responsible for 38 percent of the total area of the western states. These lands are important for their minerals, timber, and grazing resources; as a source of clean water; as a location for recreational activities; and as wildlife habitats and scenic areas, among other purposes. Regulations promulgated by the BLM (1980) and the Forest Service (1974), require that once mining activities are completed, mine operators must reclaim all areas disturbed by their operations (U.S. GAO, 1996). Prior to these regulations, state laws required reclamation of mined sites.

With regard to coal mines, OSM is responsible for enforcement of SMCRA on federal lands and Indian reservations and in coal states that have not set up regulatory programs. As noted above, the Surface Mining Law gives primary responsibility for regulating surface coal mine reclamation to the states, a responsibility that 31 states have chosen to exercise.

#### *Funding Cleanups*

Unlike coal mining, there is no single source of federal funding for the reclamation of abandoned hardrock mining lands. However, as noted above, states with both coal and non-coal mines may use funds left over from the coal mining reclamation funds for non-coal mining remediation.

There have been a number of efforts over the years to pass Good Samaritan and/or a hardrock mines reclamation fund legislation.[2] A bill proposed in 2002 (HR 4078) would have created a sliding scale fee on existing mining operations and a permit program detailing cleanup

[2] A "Good Samaritan" provision would protect a remediating agency or "Good Samaritan" who does not otherwise have liability for abandoned or inactive mine sites, and that attempts to improve the conditions at these sites even though all impacts from the site will not be eliminated, from becoming legally responsible, under section 301(a) and section 402 of the Clean Water Act, for any continuing discharges from the mined land after completion of a cleanup project. This potential liability is an overwhelming disincentive to voluntary remedial activities financed or conducted by public entities to address the serious problems associated with abandoned or inactive mined lands.

requirements and liability limits of parties undertaking voluntary cleanup of the sites. Proponents of this legislation estimate that the program outlined in this bill would generate approximately $45 million annually to clean up abandoned mines. At least one other proposal in committee excludes the funds and focuses solely on the Good Samaritan issue.

#### *The Role of Watershed Management*

In the 1990s, the DOI and USDA, in conjunction with the EPA, began to focus environmental remediation on the nation's watersheds and the problems caused by abandoned mines on federally administered lands. Investigations into watersheds involve surface and groundwater sampling, adit discharges, surface runoff, mine wastes, and surrounding rock to locate and characterize the contamination. Biological assessments are conducted on local species, engineering cost estimates for reclamation are developed, and searches are performed to identify potentially responsible parties. This interagency effort eventually led to a cooperative agreement between the National Mining Association, Western Governors Association and Department of Energy resulting in the establishment of the Abandoned Mine Land Initiative. The goal of this Initiative is to increase public and private investment in remediation and consolidate financial resources and technological expertise to promote cleanup. By 1999 DOE's Federal Energy Technology Center, now known as the National Energy Technology Laboratory, signed an agreement with the Office of Surface Mining to share technical services, expertise, and information on mining and environmental issues (Greeley, 1999).

## 11.2 Factors Affecting Demand

The following primary factors influence the market for remediation of mine lands.

- Federal and state agencies that manage mine lands are constrained by budget considerations. The reclamation budgets for the federal agencies are small in comparison to the magnitude of the abandoned mine waste problem. The OSM fund is designated primarily for coal mines, and there is very little left for non-coal mining. In addition, the law mandates that priority be given to addressing safety, health and general welfare rather than environmental problems.

- A growing market for first or second homes in previously sparsely-populated mining areas may foster increased demand for cleanup of some sites. Because mine wastes can travel long distances, contamination from abandoned mines can affect areas many miles downstream from the source.

- Increase of recreational activities on public lands, in the vicinity of many abandoned mine sites, may spark increased demand for cleanup or restrictions on park use.

- The transfer of properties in mining areas where complete control of the source of the pollution has not been achieved may require institutional controls to ensure that prospective purchasers or developers are aware of any potential risks resulting from a mining operation. Thus, there is a growing need for methods to ensure compliance with institutional controls.

- A number of the over 14,000 active and inactive mine sites that are not abandoned also may require remediation. Releases of contaminants into the environment can result from inadequately designed facilities such as tailings dams, accidents, leaks and spills, or failure to properly operate a facility. Thus some portion of these sites are likely to require remediation of soil, groundwater, and/or surface water, among other things.

- The passage of Good Samaritan legislation would probably encourage more state and local governments to undertake some remediation. This point is explained in Section 11.1.5.

## 11.3 Number of Sites

All mining operations have the potential for releasing hazardous materials to the environment. However because data collection practices vary widely among various sources, it is difficult to establish the number of mines in the U.S. Moreover, not all of these facilities will actually require remediation. Until further investigation, the number of mining sites and the number of these sites that are likely to require remediation can only be estimated.

### *Active Mines*

Information on the numbers and production levels of active mines are available in Department of Interior, Department of Energy, Department of Labor and the National Mining Association data. Exhibit 11-1 summarizes these numbers by type of mining operation for the year 2001. The 1,714 active coal mines operating in 26 states produced a total of 1,121.3 million short tons, 66.2 percent at surface mines and 33.8 percent at underground mines. The fees that these mines pay into the Office of Surface Mining reclamation fund for abandoned mines is based on this tonnage. Almost 92 percent of active non-coal mines are stone and sand/gravel operations. Metal and non-metal mineral mines account for 1,039 sites, or almost 8 percent the mines and processing facilities. Nevertheless, these non-coal mining activities, which operate in all fifty states, are responsible for the production of between 1 and 2 billion tons of mine waste annually. In the nine western states, where most of the hardrock mines are concentrated, the industry is responsible for polluting 3,400 miles of streams and over 440,000 acres of land (U.S. EPA 2000b). Although remediation will probably be needed at active mines, no quantitative estimate is available.

### *Abandoned Mines*

There are an estimated 13,000 abandoned coal mines, mostly small and mid-sized in the east (Stone, 2001). Reclamation work at these sites may be funded in part by the Abandoned Mine Land Fund. However, by law, the bulk of the funding (86 percent in FY 2002) is given to priority 1 and 2 sites, sites with problems that pose a threat to the health, safety and general welfare of people. Only 16 percent in FY 2002 went to funding priority 3, environmental hazards. If a state has completed its 1 and 2 priority sites, funding can be applied to priority 3 sites. According to the 2002 annual report, $13.9 million went to funding watershed projects and another $1.6 million in the form of watershed cooperative agreements for acid mine drainage treatment programs.

**Exhibit 11-1. Number of Active Mining Sites - 2001**

| | Underground Mines | Surface Mines | Total Active Mines | Processing Facilities | Total |
|---|---|---|---|---|---|
| Coal | 777 | 937 | 1,714 | 418 | 2,122 |
| Metal | 78 | 124 | 202 | 72 | 274 |
| Non-metal mineral | 44 | 542 | 586 | 179 | 765 |
| Stone | 113 | 3,914 | 4,027 | 228 | 4,255 |
| Sand/Gravel | NA | 7,069 | 7,069 | NA | 7,069 |
| Total | 1,012 | 12,586 | 13,416 | 897 | 14,485 |

Source: National Mining Association, (updated 2003), reprinted from the U.S. Department of Labor, Mine Safety & Health Administration, Number of Coal and Non-Fuel Mineral Operations in the United States

Since the definition of abandoned hardrock and non-metal mineral mines is slightly different from state to state and from agency to agency, it is difficult to accurately establish the number of these mines around the U.S. In some states, multiple shafts and openings in one location are considered a single mine. In other cases, each opening, shaft, or disturbance is considered a separate mine. Several organizations have attempted to estimate the number of mines, mostly based on data from individual states, federal agencies, and USGS maps. However, these numbers cannot be added for an estimate of the total number of sites. Because of the built-in uncertainties, most analyses of the scope of the abandoned mine problem are presented in terms of ranges (Exhibit 11-2).

The BLM estimates that 5 percent (5,000-25,000) of the 100,000 - 500,000 abandoned hard rock mines on the public lands which the Bureau administers, has caused or could cause environmental damage, mostly in the form of water pollution (Stone, 2001). The Forest Service estimated that 5 percent of the approximately 25,000 - 35,000 abandoned mine sites on its lands would require cleanup under CERCLA and about 12 percent would require remediation of non-CERCLA water quality problems (Greeley, 1999 and U.S.GAO, 1996). The Mineral Policy Center estimates that approximately 15,000 of the 557,000 sites have surface or groundwater contamination, and an undetermined number have other environmental hazards (Lyon et al, 1993 and 2003). Based on discussions with officials at land management agencies, states, and EPA regional staff, EPA estimates that approximately 5 to 10 percent of abandoned mine lands require site investigation and cleanup.

Given these data, between, 7,700 and 31,000 abandoned mining sites are likely to require cleanup. This wide range in the estimate is due primarily to the fact that most sites have not been evaluated and, therefore, there is a wide range of estimates regarding how many will require remediation.

**Exhibit 11-2. Comparison of Estimates of Number of Abandoned Hard Rock Mining Sites**

| Source | Estimated Number of Sites | Explanations/Comments |
|---|---|---|
| **Federal Agencies** | | |
| Bureau of Land Management (Department of Interior) 1996, 2003 | 100,000-500,000 | On lands managed by BLM; based on targeted surveys conducted by BLM and states, and the Abandoned Mine Land Inventory which is not yet completed. |
| Forest Service (Department of Agriculture) 1996, 1999 | 25,000-34,500 | On lands within FS boundaries; based on aerial photos, fieldwork, and Dept. of Agriculture data. |
| National Park Service (Department of Interior) 1996 | 2,500 | Actual count in some states, not including Alaska and part of California |
| Fish and Wildlife (Department of Interior) 1996 | 240 | Based on department files and field office confirmation |
| Bureau of Mines (defunct agency) 1996 | 15,300 on Dept. of Interior lands; 12,500 on Dept. of Agriculture lands | Based on database of past mineral deposit activities |
| US Geological Survey (Department of Interior) 1996 | 88,000 on Dept. of Interior lands | Based on data assembled from agencies and Western Governors' Association estimates |
| **Other Organizations** | | |
| Mineral Policy Center 1993, 2003 | 557,700 | Based on 32 western states; compiled from state databases and records |
| Western Governors' Association 1998, 2003 | No total estimates given | Estimates for 13 of the 15 states involved, if added would total 263,000; some state numbers based on inventory; range from 150 in North Dakota to 100,000 in Arizona; wide variations in definition of mines. |

Sources:
- U.S. GAO, 1996. *Federal Land Management, Information on Efforts to Inventory Abandoned Hard Rock Mines,* GAO-RCED-96-30, February 1996.
- Stone, George, 2001. Bureau of Land Management, *Overview of Mining in the USA* , Abandoned Mines. Problems, Issues and Policy Challenges for Decision Makers, Santiago, Chile (Updated in conversation in May 2003).
- Greeley, Michael N., 1999. US Department of Agriculture - Forest Service, *National Reclamation of Abandoned Lands*.
- Western Governors Association (1998 ), *Cleaning Up Abandoned Mines: A Western Partnership* (Updated in conversation in May 2003).
- Lyon, James S., Hilliard, Thomas J., and Bethell, Thomas N., 1993, *Burden of Gilt*. Mineral Policy Center, (Updated in 2003 draft report on Cleaning Up Western Watersheds).

## 11.4 Market Entry Conditions

The great majority of the sites will be cleaned up under state and local programs, or by private parties. Federal agencies, since they are often the land managers, will also be involved. Although their remediation budgets are small, they may participate in negotiations with stakeholders, seek cost recovery, or may participate in cost sharing.

Superfund site contracting may differ depending on whether the cleanup is fund-lead or PRP-lead. For fund-lead sites, the EPA or state site manager will have information on the status of the site, the characterization already done on the site, any treatability studies that might be needed, and contracting plans and options. For PRP-lead sites, the RPM will be able to refer a vendor to the PRPs and their contractors. Large PRP-lead sites are usually handled by national architectural and engineering firms who tend to contract out elements of the cleanup to local operators. Technology vendors might contact these firms directly for targeted opportunities within larger cleanup efforts.

## 11.5 Estimated Cleanup Costs

No single source provides information on remediation costs for mining sites. Some sources deal with a specific category of sites, while others fold mining remediation costs into an overall estimate for total reclamation. Because most of the latter category of estimates include costs for activities beyond remediation, such as correcting safety hazards and landscaping, the amount of the costs attributable to remediation is unknown.[3]

The Mineral Policy Center does break down cleanup costs by category and provides estimates for surface and groundwater cleanup and for cleanup of Superfund sites. According to the MPC, cleanup of 14,400 surface water contaminated sites would run $1-3 million per site, cleanup of 500 groundwater contaminated sites would run $7.5-12.5 million per site, and Superfund sites would run $250-350 million per site. However, the MPC analysis does not consider other media, its estimates are based on only 32 states, and the per site range of cost estimated for Superfund sites is considerably higher than estimates from other sources both inside and outside of the EPA. A reasonable estimate can be developed by combining the MPC's non-Superfund estimates with per site Superfund cleanup estimates derived from Resources for the Future and EPA records. These estimates are derived from data from EPA's regional offices. Based on these data, the cost of remediating all hardrock mines is estimated to be between $20 and $54 billion. NPL sites account for about $3.5 billion of this amount. These estimates are shown in Exhibit 11-3.

These estimates represents costs necessary to clean up sites according to current regulatory standards and practices. However, if current levels of funding at the federal, state, and local levels continue, these sites are not likely to be cleaned up in 30 years. Total federal, state, and PRP outlays for mining site remediation has been averaging no more than $100-150 million

[3] Nevertheless, these data provide some useful insight. These estimates range from $165 million for the National Park Service, $4.7 billion for the Forest Service, and $4 to $35.3 billion for the Bureau of Mines (GAO, 1996). The Mine Waste Technology Program Annual Report for 2000 contains estimated remediation costs for all abandoned non-coal mine sites in the 15 western states (EPA 2000b). The report estimates that the cost of cleaning up these sites will be between $4 and $45 billion.

annually in recent years. At this rate of expenditures, no more than 8-20 percent of all the cleanup work could be complete in 30 years.

**Exhibit 11-3. Estimated Remediation Costs for U.S. Hardrock Mines**

| Type of Site | Number of Sites | Average Cost Per site ($Millions) | Cost ($Billions) |
|---|---|---|---|
| Surface water contamination[a] | 14,400 | 1 - 3 | 14.4 - 43.2 |
| Groundwater contamination[a] | 500 | 7.5 - 12.5 | 2.5 - 7.5 |
| Superfund Mega sites[b] | 20 | 100 | 2.0 |
| Superfund Non-mega sites[b] | 70 | 22[c] | 1.5 |
| Total | | | 20.4 - 54.2 |

[a] Source: Lyon, James S., Hilliard, Thomas J., and Bethell, Thomas N.,, *Burden of Gilt*. Mineral Policy Center, Washington, D.C., 1993. This estimate may not include costs for soil and debris remediation.
[b] Source: Approximation based on EPA report, supplemented with updated data (EPA 2000a)
[c] Source: Probst, Katherine N., Konisky, David M., Hersh, Robert, Batz, Michael B., and Walker, Katherine D., (2001). *Superfund's Future What Will It Cost?*, Resources for the Future, Washington, D.C.

## 11.6 Remediation Technologies

There are a number of conventional technologies, both treatment and containment/diversion, that have become standard practice in the mining and mineral processing industries. Treatment technologies which involve changing the composition of the contaminant or limiting its mobility include chemical treatment (i.e. lime to neutralize acid drainage), stabilization (i.e pH adjustment), solidification (i.e. solidifying contaminant using cement), solvent extraction (i.e. leaching), soil washing, and soil flushing. When treatment technologies cannot control the contaminants to an acceptable level, collection, diversion, and containment technologies are used. These include landfill disposal, a variety of cutoff walls (i.e. slurry, cement, sheet piling), pumping groundwater for treatment, capping, diversion and erosion controls.

The prevalent technology today for the single most addressed issue in the remediation of mining waste is physical/chemical treatment of wastewater using settling agents in clarifying tanks to precipitate the heavy metals. This treatment costs between $0.5 to $1.00 per thousand gallons treated. A similar but somewhat less expensive and less successful method involves adding the chemicals to wastewater in a settling pond. A more innovative technology, mostly still in pilot or field scale operation, is the anaerobic bioreactor. This process involves adding biological nutrients to stimulate natural bioorganisms to stabilize heavy metals. Thus far, this technology has not caught on, probably because early models of the technology failed. The estimated costs for this treatment is $0.05 per 1,000 gallons.

## 11.7 Research and Development

There are two distinct EPA sponsored programs that focus on mining and mine waste. They work jointly on some projects and with other government, academic and private entities on a variety of research programs.

The Mine Waste Technology Program (MWTP) in Butte Montana is funded by EPA and jointly administered by EPA and DOE. MSE Technology Applications, Inc. is the principal contractor for the MWTP, with Montana Tech serving as a subcontractor for many of the projects. The Bureau of Land Management and Forest Service provide sites for demonstrations of technologies. The objective of the program is to develop and prove technologies that provide satisfactory short- and long-term solutions to the remedial problems facing abandoned mines and the ongoing compliance problems associated with active mines. Its activities include testing and evaluation at bench- and pilot-scale and education in training and technology transfer. Priority areas for research include source control technologies such as sulfate-reducing bacteria and transport control/pathway interruption techniques; short-term end-of-pipe treatment options for immediate alleviation of severe environmental problems; and, resource recovery options. http://www.mtech.edu; and http://www.epa.gov/ord/nrmrl/std/mtb/mwtpannual00.pdf

The Rocky Mountain Regional Hazardous Substance Research Center in Denver, with oversight from U.S. EPA Region 8, consists of a consortium made up of Colorado State University, Colorado School of Mines, Montana Tech, and a variety of participants from academe and the private sector from all over the U.S. and Canada. The center focuses on geochemical, biological, hydrological/mineralogical and engineering aspects of environmental problems associated with mining and mine waste. Research is divided into five areas including site characterization and contaminant transport/transformation; surface water and sediment transport; treatment processes; technologies; and, ecological and human health toxicity. http://www.engr.colostate.edu/hsrc/

In addition to the targeted mining programs, EPA sponsors the Superfund Innovative Technology Evaluation (SITE), administered by EPA's ORD National Risk Management Research Laboratory. SITE encourages the development and implementation of innovative treatment technologies for hazardous waste site remediation and monitoring and measuring. Technology is field tested on hazardous waste materials and engineering and cost data are gathered so that potential users can assess the technology's applicability to a particular site. EPA prepares reports evaluating all available information on the technology. SITE works closely with Montana Tech, helping to leverage funding for projects. http://www.epa.gov/ord/site/

U.S. DOE's, National Energy Technology Laboratory  conducts in-house and contracted research and development including on technologies that identify and treat sources of water and air contamination at coal sites and watershed mapping. It works jointly with EPA on the Mine Waste Technology Program. http://www.netl.doe.gov

The National Mine Land Reclamation Center (NMLRC), headquartered at West Virginia University, addresses reclamation issues for both abandoned and active coal mine sites. Program participants perform research on acid mine drainage, prime farmland restoration, subsidence

control, and groundwater purification. The NMLRC provides technical support to local watershed initiatives. www.nrcce.wvu.edu/nmlrc

## 11.8 References

Barringer, S. 1999. *Mining Regulatory Programs in the Western United States: A Survey of State Laws and Regulations.* Unpublished, 87 pp.

Buck, Stuart and David Gerard, 2001. Cleaning Up Mining Waste, Political Economy Research Center. http://www.perc.org/pdf/rs01_1.pdf

BLM, 1999. *Surface Management Regulations for Locatable Mineral Operations: Draft Environmental Impact Statement, U.S. Department of Interior,* Bureau of Land Management.

Clean Air Task Force, 2001. *Cradle to Grave: The Environmental Impacts from Coal*. http://www.catf.us/publications/reports/cradle_to_grave.php

Custer, Kelly, 2003. *Cleaning up Western Watersheds*, Mineral Policy Center, May 2003.

Greeley, Michael N., 1999. *National Reclamation of Abandoned Lands*, U.S. Department of Agriculture, U.S. Forest Service. http://www.fs.fed.us/geology/amlpaper.htm

Heritage Research Center, 2003. *Mining and the Environment*. http://www.heritageresearch.com

Interstate Mining Compact Commission, 1997. *Noncoal Mineral Resource Report*.

Kodish, Jeffrey A., 2002. *Restoring Inactive and Abandoned Mine Sites: A Guide to Managing Environmental Liabilities*, http://www.restorationtrust.org/legal_guide.pdf

Lyon, James S., et. al., 1993. *Burden of Gilt*. (Updated in 2003 draft report on Cleaning Up Western Watersheds), James S. Lyon, Hilliard, Thomas J., and Bethell, Thomas N., Mineral Policy Center.

McElfish, J. M., T. Bernstein, S. P. Bass, and E. Sheldon, 1996. *Hard Rock Mining: State Approaches to Environmental Protection*, Environmental Law Institute, Washington, D.C.

National Research Council, 1999. *Hardrock Mining on Federal Lands*, National Academy Press, Washington, D.C.

Northwest Mining Association, 1997. *Permitting Directory for Hard Rock Mineral Exploration.* Spokane, Washington.

Probst, Katherine N., D.M. Konisky, R. Hersh, M.B. Batz, and K.D. Walker, 2001. *Superfund's Future What Will It Cost?*, Resources for the Future, Washington, D.C.

Stone, George, Bureau of Land Management, 2001. overview of mining in the USA at the Abandoned Mines Problems, Issues and Policy Challenges for Decision Makers Conference, Santiago, Chile. www.mineralresourcesforum.org/news_events/release/abandmines1001.htm

U.S. DOI, 2003. Personal communication, U.S. Department of Interior, Office of Surface Mining Reclamation and Enforcement (OSMRE), June 2003.

U.S. EPA (Environmental Protection Agency), 1989. *Mining Waste Exclusion*, 40 CFR Part 26, 54 FR 36592, September 1, 1989.

U.S. EPA, 1997. *National Hardrock Mining Framework,* Mine Waste Task Force.

U.S. EPA, 2000a. *Abandoned Mine Site Characterization and Cleanup Handbook*, EPA 910-B-00-001, http://www.epa.gov/oerrpage/superfund/resources/remedy/pdf/amscch.pdf

U.S. EPA, 2000b. *The Mine Waste Technology Program Annual Report*, http://www.epa.gov/ord/nrmrl/std/mtb/mwtpannual00.pdf

U.S. EPA, 2003. *EPA and Hardrock Mining: A Source book for Industry in the Northwest and Alaska,* Region 10, January 2003.

U.S. EPA, Office of Wastewater Management publications on mining, mining wastes, environmental impact, and regulations, http://www.epa.gov/npdes/pubs

U.S. GAO, 1996. *Federal Land Management, Information on Efforts to Inventory Abandoned Hard Rock Mines*, GAO-RCED-96-30, U.S. General Accounting Office, February 1996.

Western Governors' Association, 1998. *Cleaning Up Abandoned Mines: A Western Partnership*. http://www.westgov.org/wga/initiatives/aml/aml.htm

### *General Web Sites on Mining*

Mineral Policy Center at http://www.mineralpolicy.org

National Mining Association at http://www.nma.org

U.S. Department of Energy, Energy Information Administration.http://www.eia.doe.gov

U.S. DOI, Office of Surface Mining Reclamation and Enforcement: information on coal mining and the Abandoned Mine Lands Program including the inventory system, AML grants, the AML fund, and annual reports. http://www.osmre.gov

U.S. DOI, Bureau of Land Management: information on the Abandoned Mine Lands Program in the western states, including project descriptions and the inventory system, http://www.blm.gov/aml

U.S. Department of Labor, Mine Safety and Health Administration at http://www.msha.gov

# Chapter 12
# Demand for Remediation of Drycleaner Sites

There are approximately 30,000 active commercial drycleaning facilities in the United States (IFI, 2003). It has been estimated that soil and groundwater contaminated with drycleaning solvent are associated with about 75 percent of these facilities (Schmidt, 1999). This does not imply that all of these facilities will require active remediation, but that further investigation is warranted. In addition, there is an undetermined number of inactive, or former drycleaning locations, many of which have not been identified. Because most drycleaning facilities are in urban and suburban areas, drycleaning solvent contamination has impacted many water supply wells and threatens many others. Addressing this problem will require the deployment of site characterization and remediation technologies at many diverse locations.

Drycleaning sites may be addressed under any of the remediation programs, such as Superfund, RCRA, or a state environmental program, depending on the nature and extent of the contamination and other site-specific factors. Because these sites may be managed under different remediation programs, the estimates of the drycleaning site remediation market should not be added to those in the previous chapters of this report. Adding these estimates would be double-counting sites and, therefore, overestimating the scope of the market.

***Highlights***
- An estimated 15,750 active drycleaners require cleanup at an estimated cost of $6.3 billion.
- In addition to active drycleaners, there may be between 9,000 and 90,000 inactive drycleaner sites (the facilities closed, moved, or otherwise disappeared) that have not been discovered.
- About 90% of active drycleaners use PCE as their primary solvent. Older facilities used petroleum solvents, which are LNAPLs.
- Cleanup costs at drycleaner sites range from $19,000 to $3 million per site and average $402,000, based on expenditure data from 50 sites with completed remediations.
- On average, about 28% of cleanup costs are for site assessment.
- Twelve states have dedicated programs and cleanup funds for drycleaners and several other states participate in industry activities through other environmental programs in their states.
- The cooperative efforts between EPA and states with dedicated drycleanling programs have fostered the sharing of substantial amounts of information about site characterization and cleanup technologies and costs, state cleanup program operating practices, and drycleaning industry trends.

## 12.1 Industry Description

Drycleaning is the washing of fabrics in non-aqueous solvents. The drycleaning industry provides garment cleaning, pressing, finishing, and related services, primarily to households. Although the sizes of drycleaning facilities vary, most are single-facility, family-owned businesses. This section summarizes the types of drycleaning processes, wastes produced, regulatory programs that affect demand, and industry efforts to address the contamination issues.

### 12.1.1 Drycleaning Processes

Drycleaning operations generally consist of three processes: precleaning, drycleaning, and finishing. In addition, many drycleaning establishments also do conventional laundering.

#### *Precleaning*

Prior to being dry cleaned, heavily stained garments are usually pre-cleaned, or "spotted." Spot cleaning may also be performed after fabrics are drycleaned and stains still remain on the fabric. A wide variety of chemicals may be used in spotting, depending on the type of stain and fabric.

Spotting is generally done on a "spotting board," where spotting agents, steam, and compressed air are used to clean stained fabrics. The board is supplied with steam and compressed air to allow steam or warm air to be applied to fabrics. Wastes are disposed of through a vacuum line and a drain receptacle mounted on the base of the spotting board. The spotting agents are contained in bowls or containers placed on or mounted on the board. The chemicals used depend on the type of stain and fabric being cleaned. There are three general types:

- Agents to clean water-soluble stains, including synthetic detergents; alkaline agents such as lye, ammonia, potassium hydroxide, and sodium hydroxide; and protein formula detergents containing digester enzymes and acid agents, such as acetic acid, hydrofluoric acid, glycolic acid, and sulfuric acid;
- Non-aqueous solvents and alcohols, such as tetrachloroethylene (PCE), trichloroethylene (TCE), trichloroethane (TCA), carbon tetrachloride, methylene chloride, amyl acetate, and petroleum solvents. These solvents tend to be of great concern from an environmental and regulatory standpoint.
- Bleaches, such as sodium perborate, hydrogen peroxide, sodium percarbonate, sodium hypochlorite, sodium bisulfite, sodium hydrosulfite, titanium sulfate, and oxalic acid.

> ***Facts About PCE***
>
> - Manufacturers: Dow Chemical (trade name DowPer) Vulcan Chemicals (PerSec), PPG Industries, Ineos Chlor Americas (Perklone).
> - Although not normally corrosive, PCE can cause corrosive problems when in the presence of heat and moisture, or other chlorinated compounds, such as trichloroethane (TCA), which has been used in spotting agents.
> - To mitigate corrosion, small quantities (0.05-0.2% by volume) of stabilizers, such as nemethylmorpholine, diallylamine, tripropylene, cyclohexene oxide, benzotiriazeole, and betaethoxypropylnitrile are used.
> - PCE used in dry cleaning may also be accompanied by other potential pollutants, since some dry cleaners may use reclaimed PCE, which can contain 1-5% impurities (SCRD 2001).Typical impurities include methyl ethyl ketone, mineral spirits, toluene, TCA, other chlorinated solvents, and butylated hydroxytoluene (BHT). Non-reclaimed PCE is generally 99.9% pure. The impurities are other chlorinated hydrocarbons.

#### *Drycleaning Machine Processing*

The drycleaning process is physically similar to the home laundry process, except that clothes are washed in a non-aqueous solvent instead of water. Drycleaning is usually done in a drycleaning machine that agitates the fabric in solvent, extracts the solvent by spinning it, and dries it through a combination of aeration, heat, and tumbling. Over the past century and a half, a number of different solvents and machines have been used (See text box on the history of dry cleaning). Today, about 80 percent of the drycleaning machines use PCE as the solvent. Solvent

usage has become significantly more efficient over the years, declining from 82 pounds of PCE to 10 pounds to clean 1,000 pounds of clothing (National Clothesline, 2002). Coin operated drycleaning machines, introduced in the 1960s by Whirlpool Corporation, are no longer being manufactured. However, they are still being used, primarily in laundromats.

### *History of Drycleaning*

**Nineteenth Century:** The drycleaning industry first emerged in Europe in the first half of the nineteenth century. Over the years, a number of different compounds have been used as drycleaning solvents, most of them petroleum-based. The most widely used solvents were petroleum naphtha, benzene, kerosene, and white gasoline. White gasoline was the predominant drycleaning solvent in the United States from the late 1800s until the early 1920s. Because of the high volatility of gasoline, many fires and explosions were associated with drycleaning operations. Drycleaning facilities were unable to obtain insurance and many cities banned drycleaning operations within their city limits.

**1920s:** During the 1920s, drycleaners began using Stoddard solvent, a less volatile petroleum solvent (flash point of 100 degrees Fahrenheit). From the late 1920s until the 1950s, Stoddard solvent was the predominant drycleaning solvent in the United States. This solvent is a mixture of petroleum distillate fractions (petroleum naphtha) which is composed of over 200 different compounds. These solvents are composed primarily of alkanes and cycloalkanes, with some aromatic compounds. Over the years, the trend has been toward the introduction of higher flash point solvents which have very low aromatics content.

To mitigate biodegradation of petroleum drycleaning solvents, bacteriacides or biocides are added to the system, usually in detergents. The biocides used today are similar to those used in shampoos, laundry products and cosmetics (SCRD, 2001). In the past, perchloroethylene (PCE) was added to drycleaning soaps as a bacterial inhibitor.

**1920s-1960s:** From the 1920s until the early 1960s, a number of chlorinated solvents were introduced into drycleaning operations.

- Carbon tetrachloride was used in the United States from the 1920s until early 1950s. Because of its high toxicity and tendency to corrode equipment, carbon tetrachloride is no longer used as a drycleaning solvent (SCRD, 2001).

- Trichloroethylene (TCE) was introduced as a drycleaning solvent in 1930. Because it causes bleeding of some acetate dyes, it is no longer used as a primary drycleaning solvent (SCRD, 2001).

- Perchloroetylene was introduced as a drycleaning solvent in 1934. In 1948, PCE surpassed carbon tetrachloride use in drycleaning operations. By the early 1960s, PCE had become the predominant drycleaning solvent in the U.S. (Linn, 2002b).

**Today:** It is estimated that over 90 percent of the commercial drycleaners in the United States use PCE (IFI, 2003).

Over the years, several other drycleaning solvents have been marketed, but never attained a large market share. For example, in the late 1960s, Dupont began marketing a chlorofluorocarbon as a drycleaning agent (trade name: valclene, also known as fluorocarbon 113). These are no longer being manufactured, largely because of the restrictions on chlorofluorocarbons in the Montreal Protocols. In the early 1980s, Dow Chemical introduced TCA as a solvent. It was used by only a small number of drycleaners, particularly for leather cleaning. This solvent proved to be unstable and to cause equipment corrosion. It is no longer being used as a drycleaning solvent.

Beginning in the 1990s, several new solvents were developed, including TYNEX (dipropylene glycol tertiary-butyl ether), liquid carbon dioxide, GreenEarth™ (a silicone-based solvent called decameethylcyclopentasiloxane), and PureDry (a mixture of petroleum hydrocarbons, hydrofluoroethanes, and perfluorocarbons).

An important influence on the design of drycleaning machines, drycleaning practices, and solvent usage are regulations promulgated under the Clean Air Act (CAA) Amendments of 1990. The primary CAA regulatory standards for controlling airborne emissions of PCE are the National Emission Standards for Hazardous Air Pollutants (NESHAP), which was promulgated in September 1993. These regulations require mandates for retrofitting or replacing certain types of drycleaning equipment that are based on PCE, record keeping, inspections, and reporting. They have encouraged the upgrading or replacement of much equipment in the industry. The newer drycleaning machines use considerably less solvent per pound of clothing than older machines. Detergents are also used in the drycleaning process to aid in the removal of water-soluble soil, to suspend the soil after it has been removed from the fabric, and as a spotting agent to penetrate the fabric, thereby allowing the solvent and water to remove stains. Detergents are added to comprise typically 1-2 percent of the drycleaning solvent. The earliest drycleaning detergents were soaps, usually composed of surfactant, Stoddard Solvent (see box), free fatty acids, and some water to create an emulsion. By the early 1950s, liquid soaps were rapidly being replaced by synthetic detergents.

### *Finishing*

After drycleaning, fabrics are generally pressed with a steam press. The press is supplied with steam lines and serviced by vacuum lines which create a partial vacuum at the bottom of the press to hold fabrics in place. Steam from the pressing operation is vented to the atmosphere and steam condensate is collected in a tank.

In addition to pressing, a drycleaner's service may include the application of one or more garment-treating chemicals, including sizing, waterproofing, flame retardants, stain repellants, and fabric conditioners. Sizing is a finish used to impart body to a fabric. It is usually applied by textile and garment manufacturers, but becomes depleted after several cleanings. Sizing used in drycleaning operations consists of polymers or polymer blends and often uses a petroleum naphtha carrier. Often, anti-static agents and optical brighteners are added to sizing. The sizing can be applied in the drycleaning machine, by dipping fabrics in a tank of sizing, or by spraying in an aerosol form.

Waterproofing agents are usually wax-based products and the predominant carrying agents utilized have been PCE and petroleum solvent. Some of the chemicals used in flame retardants include decabromodiphenyl oxide (DBDPO), organo-phosphates, phosphate salts, and phosphated esters. Stain retardants are generally silicon based and the carrying agents are trichloroethane (TCA) or petroleum naphtha (IFI, 1994). These agents may be applied by several methods, such as immersion in a dip tank, spraying in the form of an aerosol spray, and in an auxiliary tank in the drycleaning machine. Drycleaning solvent may also be used as the carrying agent.

### *Conventional Laundry Operations*

Many drycleaning establishments also have conventional laundries. If clothing is pre-cleaned with solvents prior to laundering, the washwater may contain solvents.

### 12.1.2 Types of Wastes and Waste Management Practices

The wide variety of chemicals and processes at drycleaning facilities results in a variety of wastes. Most of the wastes, especially those from chlorinated solvent drycleaning operations, are hazardous (Linn, 2002a). Releases of these wastes to the environment have caused soil and groundwater contamination at drycleaning sites. Prior to the enactment of the RCRA in 1980, almost none of the waste generated at drycleaning facilities was regulated. The primary wastes that contain hazardous materials include the following:

**Contact Water.** Contact water is any water that has come into contact with drycleaning solvents, solvent vapors or other hazardous materials. The primary sources of contact water are:

- Separator water. Separator water is generated during solvent recovery processes such as distillation. Distillation is used to capture solvent vapors and purify spent solvent. The distillation unit is usually incorporated into the modern drycleaning machines, although it is a separate piece of equipment in some older machines.
- Vacuum Water. Vacuum water results from the steam and condensate from steam pressing. This water generally contains drycleaning solvent. Vacuum water samples collected from PCE drycleaning operations generally contain PCE in concentrations in the tens of parts per billion range, although some samples have exceeded 100 parts per billion (Linn p. 2002b).
- Mop water. It is common to have spills and leaks within a drycleaning facility. When the floors are mopped, the solvent and other residues will saturate the mop water.
- Boiler Blowdown Water. This is water from water and steam used to clean the boilers daily. Because some drycleaners have disposed of separator water to the boiler, solvent residues can remain in the boiler.
- Conventional Laundry Water. As previously mentioned, the washwater may contain residues from pre-cleaning chemicals.

Historically, sanitary sewers and septic tanks have been the most common discharge points for contact water. Over 70.7 percent of 909 respondents to a 1988 survey conducted by the International Fabricare Institute indicated that separator water was being discharged either to a sanitary sewer or septic tank (Linn, 2002a). A study of drycleaning contamination in California in the early 1990s concluded that "the main discharge point for drycleaners is the sewer line" (Izzo, 1992). Studies in California have found evidence of free-phase PCE in sewer lines serving drycleaner facilities. Since sewers, especially older ones, have been known to leak, this could be a conduit for discharge of PCE and other chemicals to the environment.

Other disposal practices for contact water have included discharge to the ground, storm sewers, soakage pits, blind drains, cooling towers, and boilers at the drycleaning plant. Separator water has also been known to be used to mop floors (Linn 2002a). Contact water can also be filtered, followed by evaporation or misting to the atmosphere; or removed by a hazardous waste management firm. Filtering materials are usually granular activated carbon or polymers, which, after use, are considered hazardous waste.

**Still Bottoms.** Still bottoms and cooked powder residues are generated from the distillation process. They contain grease, oil, detergent, dyes, sizing, waxes, filter materials, and non-volatile

residues. Distillation residues can contain up to 75 percent solvent by weight and are hazardous waste managed under RCRA. Prior to the mid-1980s, most of these wastes were either disposed of in landfills or discharged to the ground (Linn 2002b).

**Muck.** Muck is the filter waste generated by the purification and recovery of spent solvents by filtration using a powder filtering material. Muck, which can contain considerable solvent, is usually produced at petroleum-solvent drycleaning operations. Prior to the mid-1980s, most of these wastes were either disposed of in landfills or discharged to the ground.

**Spent Filters.** Spent cartridge filters can contain up to a gallon of solvent. Spent filters can be allowed to drain in a drycleaning machine overnight prior to being changed. Because this practice is not always followed, spent solvent is often spilled during filter changes. In the past, spent cartridge filters were stored in cardboard boxes or on the ground outside the facility prior to being discarded in the trash. Solvent tends to drain from these discarded filters if they have not been drained prior to disposal.

**Spent Solvent.** Spent solvents are those used as carriers for finishing agents (e.g., PCE) and petroleum solvents that have biodegraded. At drycleaning operations that use PCE as a carrier for waterproofing or other agents, oils, fats, and other non-volatile residues from the fabrics would accumulate in the dip tank and periodically the spent waterproofing agent, which contains solvent, would have to be discarded.

**Spent Vapors.** A considerable amount of solvent is lost to the atmosphere in the form of vapors from the drycleaning machine.

**Spotting Residues.** These wastes are generated from the leaks, splashes, and spills during spotting operations, and can contain a wide variety of solvents, bleaches, detergents, and other agents. These wastes have been discharged to floor drains, which usually go to a sanitary sewer, septic tanks, or into the ground.

**Lint.** Lint is generated at various points in drycleaning operations, such as from the button trap or pump strainer. Historically, the lint, which contains drycleaning solvent, has been disposed of with trash or discharged to the ground on the property.

### 12.1.3 State and Industry Drycleaner Site Cleanup Programs

Like other generally small sites, drycleaner sites may be remediated under one or more state or federal cleanup programs, such as RCRA Corrective Action, Superfund, and state mandatory or voluntary cleanup programs. A number of states have established programs dedicated to drycleaner sites and some of these programs include funds earmarked for the investigation and cleanup of these sites. Twelve states have legislation specific to the investigation and remediation of drycleaner sites (Alabama, Florida, Illinois, Kansas, Minnesota, Missouri, North Carolina, Oregon, South Carolina, Tennessee, Texas, and Wisconsin).

The 12 states with dedicated drycleaner programs comprise the State Coalition for Remediation of Drycleaners (SCRD), formed in 1998 to provide a forum, share information, and encourage

the use of innovative technologies in drycleaner site remediation. Also active in the Coalition are California and New York, which do not have formal drycleaner programs, but are active in drycleaner remediation under other authorities. One-third of the nation's drycleaners are located in states that are participating in SCRD. SCRD, which operates with support from the U.S. EPA's Office of Superfund Remediation and Technology Innovation and the National Ground Water Association, provides a valuable forum for states to share programmatic, technical and environmental information to improve the characterization and remediation of drycleaner sites (http://www.drycleancoalition.org/). Much of the information in this chapter is derived from their research, analysis and forums.

Although the practices and procedures of each state program differ, they all share the same basic premise: drycleaners and, in some states, solvent suppliers pay fees in exchange for financial relief and/or liability protection, to clean up contaminated sites. The level of financial relief, type and amount of fees, and who conducts the site investigations and cleanups differ from one state to another. Some states, such as Florida and Kansas, hire and direct the activities of an environmental contractor that investigates and remediates drycleaner sites. Most states develop some sort of scoring system to prioritize sites. In other states, such as Wisconsin, the program is a reimbursement or insurance program in which the drycleaner is responsible for investigating and remediating the site. Usually, there is some cap on the amount of reimbursement per site and, sometimes, a deductible.

Some states require drycleaner facilities to register with the state, while others require licenses. Each state program also includes requirements for pollution prevention measures. Most states also charge drycleaner facilities annual fees, usually based on gross receipts from drycleaner services, and solvents fees per gallon of solvent used. The solvent fee has also provided an incentive for drycleaners to use solvents as efficiently as possible.

Drycleaner sites in other states or sites that are not eligible for these state drycleaner programs are investigated and remediated under other state authorities, such as state superfund, RCRA, brownfield, or voluntary cleanup programs. These programs are described in other chapters of this report.

## 12.2 Factors Affecting Demand for Remediation

- The declining use of PCE by drycleaners will mean fewer discharges to the environment in the future. The decline is the result of several developments: First, newer drycleaning machines require substantially less PCE per pound of fabric cleaned than older machines. Second, a number of new drycleaning solvents have become available in the last decade (Section 12.1.1). Third, there are movements in a number of communities around the country to ban the use of PCE in drycleaning. For example, California's South Coast Air Quality Management District has voted to phase out PCE by 2020. A bill has been introduced in the California Legislature to increase fees on PCE and provide grants for drycleaners to switch to non-PCE cleaning processes. In February, 2003, Environment Canada published new regulations for PCE drycleaners that, among other things, requires that new cleaning machines have a "manufacturer's design rating" of PCE consumption

equal to less than 10 kilograms, or 6.2 liters, per 1,000 kilograms of clothing cleaned. This is equivalent to 1,350 pounds of clothing per gallon of solvent.

The use of solvents has been decreasing primarily by the industry's switching to new more efficient machines that use significantly less solvent. Perchloroethylene use by drycleaners dropped from 268 million pounds in 1985 to 47 million pounds in 2002 (National Clothesline, 2003). These data are based on a survey conducted by the Textile Care Allied Trades Association. Most of this decrease is due to conversion to newer drycleaning machines, although a smaller portion of the change may be due to the use of alternative solvents.

- For the 12 states with drycleaner remediation funds, the money available to the fund will influence the pace of site investigation and remediation work.

- For other states, general availability of state cleanup funds, as discussed in Chapter 9 (State Sites), will be the deciding factor for many cleanups. Drycleaners have average revenues of about $250,000; remediation costs can run hundreds of thousands of dollars; and several have cost over a million dollars. Even a moderate-cost cleanup can amount to several years of profit for the average drycleaner.

- In addition to active drycleaner facilities, many inactive facilities may have had releases of hazardous substances to the environment that have resulted in contaminated soil and groundwater that have not been discovered. Although data on these facilities are sparse, estimates range from 9,000 to 90,000 sites (See Section 12.3.2).

- The level of assessment and cleanup is directly related to the cleanup standards adopted by the individual states. Many states have adopted risk-based cleanup standards for soil and groundwater.

## 12.3 Number and Characteristics of Sites

### 12.3.1 Active Drycleaning Facilities

The drycleaning industry includes three types of operations: commercial, industrial, and coin-operated. The commercial facilities are by far the most prevalent and include full-service, retail operations located in shopping centers, urban neighborhoods, and other densely populated areas. Commercial facilities typically clean small quantities of garments from individuals and only a small minority clean furs or leathers. Exhibit 12-1 indicates the scale of the various types of operations. Commercial laundries tend to be located in urban areas because of the greater demand for drycleaning in these areas.

According to the International Fabricare Institute, there are about 30,000 active drycleaning facilities in the U.S. Almost all of these are commercial facilities, which are primarily small, neighborhood businesses whose primary customers are individuals. Based on data for a "model" drycleaning plant in a 1998 EPA study, it is assumed that the average commercial drycleaner facility cleans 26 tons of fabric, and produces 660 gallons of hazardous waste annually, mostly

PCE and PCE-containing materials from distillation residues and from filters (EPA 1998). Based on information from a hazardous waste treater, EPA estimated that this waste is, on average, 40 percent PCE.[1]

**Exhibit 12-1. Number and Types of Active Drycleaners in the United States**

| | No. of Facilities | Average Tons Per Facility/year | Hazardous Waste Average Gal./Year | Hazardous Waste Total Gal./Year |
|---|---|---|---|---|
| Commercial | 30,000 [a] | 26 [b] | 660 [b] | 19,800,000 [c] |
| Industrial | 325 [d] | 578 [d] | 14,672 [e] | 4,768,000 [c] |
| Coin-Operated | 100 [d] | 1.6 [d] | 40 [d] | 4,000 [c] |
| Total | | | | 24,572,000 |

Notes:
[a] International Fabricare Institute, web site, 2003, http://www.IFI.org
[b] EPA, 1998
[c] Product of Column 2 and column 4
[d] EPA, 1995
[e] Based on gallons per output for commercial facilities

Industrial drycleaners, which tend to be larger than commercial facilities, clean uniforms, restaurant linens, wiping towels, floor mats, work gloves and other items for institutional, professional, and industrial customers. In many cases, industrial drycleaning firms also rent uniforms and other industrial clothing. Based on a 1995 EPA report, these facilities are assumed to average 578 tons of clothing annually (U.S. EPA1995). Assuming the same ratios of waste to output as for commercial cleaners, industrial cleaners average 14,672 gallons of hazardous waste annually. Industrial drycleaning is included within the Census category Industrial Laundry Services. About one-quarter of these establishments include drycleaning. The remainder are exclusively wet laundries.

Coin-operated drycleaners use machines that are self-service or are run by an attendant in self-service laundromats. Coin operated machines, which were introduced in the 1960s by Whirlpool Corporation, are no longer being manufactured. In 1993, EPA estimated that there were 3,000 coin-operated drycleaners (U.S. EPA 1993), although a 1995 EPA report speculated that there are fewer than 100 in operation (U.S. EPA 1995). For this report, it is assumed that there are 100. Based on the same ratios used for commercial cleaners above, the average coin-operated facility would average 40 gallons of hazardous waste annually.

[1] There are a number of uncertainties associated with these averages. Discharges vary widely from one drycleaning facility to another, because of differing processing technology, equipment, and operating practices. Thus, releases from a specific facility in the real world may not compare with these averages. Moreover, equipment and practices at many facilities have changed since the data upon which these estimates are based were collected (early 1990s). Nevertheless, these averages reflect the approximate discharges to be expected.

Another potential source of groundwater, surface water, and soil contamination is contact wastewater discharges. Most drycleaning contact water is discharged to sewer systems or directly to the ground. Because many sewer systems are known to leak, PCE can contaminate groundwater downstream from drycleaning facilities.

A 1999 study by SCRD estimates that about 75 percent of active commercial drycleaners have some level of contamination. Although not all of these sites will require remediation, they will probably require site investigation. Assuming that 70 percent of these will ultimately require remediation, there are about 15,750 active sites that will need remediation.[2] *This estimate does not include inactive sites.*

### 12.3.2 Inactive Drycleaning Facilities

In addition to releases of hazardous materials by active drycleaning facilities, there are a substantial number of sites that were formerly occupied by drycleaners that have moved or gone out of business. Some drycleaners have moved within the same shopping center or city block, thereby confounding site investigations. Another factor that may complicate site investigations and remediations is the fact that many drycleaners have changed the cleaning processes over the years, including changes in the solvents, other chemicals, and equipment, especially drycleaning machines.

> In addition to about 30,000 active drycleaners, there may be between 9,000 and 90,000 inactive drycleaner sites that have not been discovered.

One indication of the number of inactive sites can be discerned by observing trends in the number of drycleaner facilities. According to the Economic Census, the number of drycleaner facilities has fluctuated over time, from a peak of 30,525 in 1967 to a low of 21,257 in 1987, before growing to 27,939 in 1997.[3] This implies that at least 9,268 sites have closed over time (30,525 - 21,257). Since it is unlikely that newer establishments opened in the same location as the old ones, these figures imply that there are *at least* 9,000 inactive facilities. There are probably more than 9,000 facilities because the Census data do not indicate how many have moved or been replaced by another nearby dry cleaner. There are no data regarding how many of these may have been remediated over the years. Compounding these uncertainties is the fact that Census does not account for the fact that a drycleaning facility may move within the same shopping center or block, a fact that can easily elude site investigation efforts. Moreover, Census did not collect information on drycleaners prior to the 1960s and many drycleaners probably moved or closed before that time. Thus, there are at least, and probably many more than, 9,000 inactive sites that have not been explicitly identified. Some estimates, which are based on field experience with drycleaner sites, indicate that there could be 3 to 5 times as many inactive sites

---

2 The 70% estimate is based on conversations with four states with active drycleaner programs (Florida, Kansas, Oregon, and Wisconsin).

3 This figure differs from the other estimate used in this report for currently active facilities (30,000) because of differences in survey methodology and industry definitions.

as active sites.[4] Older dry cleaners consumed, and released to the environment, substantially more solvent per pound of clothing processed than newer ones. The older dry cleaners tended to use more petroleum solvent and less PCE.

## 12.4 Market Entry Considerations

- The operating practices of drycleaner site cleanup programs vary from state to state. Some states have a fund dedicated to drycleaner site investigations and cleanups. These programs often have considerable information about potential drycleaner site projects and technology needs.

- Some states engage one or more contractors to address all sites under their drycleaner sites program. In other states, the property owner or operator is responsible for conducting the cleanup.

- Most states, including states that do not have formal drycleaner remediation programs, have drycleaner trade associations, which are a potential source of contacts and information on potential cleanups needed. Most of these are available through links available on the SCRD web site. http://www.drycleancoalition.org/links.cfm#industry

## 12.5 Estimated Cleanup Costs

To estimate the value of the drycleaner remediation market, EPA estimated the average remediation cost actually incurred from a sample of sites and multiplied this average by the estimated number of drycleaner sites likely to require remediation (15,750 sites estimated in Section 12.3). Only active sites were considered, since data on inactive sites are sparse.

EPA analyzed data on 50 drycleaner sites that reported total site cost data, as well as other site information to the SCRD. Total cost data includes site assessment, remediation, and O&M. While this sample was not scientifically designed, it is drawn from a number of different states and represents a wide variety of site conditions, and site assessment and remediation technologies. The costs vary from $19,000 to over $3 million, and average $402,400 per site (Exhibit 12-2).

Based on this average, the total value of the U.S. drycleaner remediation market would be $6.3 billion. This estimate does not include the potentially thousands of inactive drycleaner sites–properties that are either vacant or are being used for other purposes.

## 12.6 Remediation Technologies

Drycleaner sites have unique characteristics that need to be considered in site characterization and remediation work. A drycleaning facility may have used a chlorinated solvent, such as PCE, petroleum hydrocarbons, or a combination of chemicals. Sometimes the current owner may not

---

4 Based on personal communications with four members of SCRD (Florida, Kansas, Oregon, and Wisconsin).

know what solvents were used in the past at the site, especially if it is an old facility. PCE, TCE, carbon tetrachloride, TCA, and Freon113 are DNAPLs and petroleum hydrocarbons are LNAPLs. A knowledge of the history of drycleaning processes may help identify what to look for. For example, earlier petroleum hydrocarbon solvents contained aromatic compounds. Over the years, the proportion of these compounds have been reduced, and the later petroleum drycleaning solvents contain little or no aromatic compounds (SCRD, 2001).

**Exhibit 12-2. Estimated Drycleaner Site Remediation Costs**

| | | |
|---|---|---|
| Average of 50 sites | $402,400 | 50 sites reporting |
| Range | $19,000 - 3.3 million | 50 sites reporting |
| Percent Site Assessment Cost | 28.2% | 38 sites reporting |
| Percent O&M Cost | 16.8% | 38 sites reporting |
| Estimated National Total (active drycleaners requiring cleanup) [a] | $6.3 billion | 15,750 sites estimated [a] |

**Range Detail**

| Total Cleanup Cost | Number of Sites | Percent |
|---|---|---|
| $5,000 - 100,000 | 11 sites | 22% |
| $100,000 - 250,000 | 17 sites | 34% |
| $250,000 - 500,000 | 16 sites | 32% |
| $500,000 - 1 million | 3 sites | 6% |
| Over $1 million | 3 sites | 6% |

[a] Estimate from Section 12.3. No estimate is provided for inactive sites, as described in the text, though there may be thousands of them.
Source: Analysis of site profile data from State Coalition for Remediation of Drycleaners (SCRD, 2003)

Site investigators often use information on the location of the discharge point of contaminants to facilitate identification of the contaminant source areas. However, for inactive sites where the building has been razed or is being used for a different purpose, it may be impossible to locate these discharge points. Sampling and analysis for the above types of contaminants often must be conducted in and around active businesses, usually retail. To accommodate these businesses, the work may be scheduled after business hours or on weekends. Work space is often limited and samples must be collected from beneath building floor slabs.

In addition, a site investigation or remediation may need to address contaminated groundwater that has migrated off site. A study of site assessments conducted at 150 contaminated drycleaner sites in Florida found that contaminated groundwater had migrated off the property at about 57 percent of the sites (Linn 2002b). In an urban or suburban area, this could require obtaining site

access to public areas, such as roads and parks, as well as other commercial or residential properties.

### 12.6.1 Site Assessment Technologies

In 1999, the SCRD conducted a survey of all states to determine what site investigation and remediation technologies were used at drycleaner sites (Jurgens, 1999). The 28 states that responded reported that they have employed 18 site assessment technologies (Exhibit 12-3). These include five media sampling techniques, such as gas surveys and direct push; five geophysical techniques, such as ground penetrating radar, soil conductivity analysis, and induced laser fluoroscopy, to assist in interpreting subsurface conditions; five sample analysis approaches, such as fixed laboratories, mobile laboratories, and portable gas chromatography, to determine the relative or actual concentrations of contaminants in the sampled media; and three techniques for the analysis of DNAPLs.

**Exhibit 12-3. Site Assessment Technologies Used at Drycleaner Sites**

| Technology | Percent of States |
|---|---|
| **Sampling Tools** | |
| Monitoring Well/boring | 91 |
| Direct Push | 87 |
| Active Soil Gas | 78 |
| Passive Soil Gas | 39 |
| Microwells | 26 |
| **Geophysical Techniques** | |
| Soil Conductivity Surveys | 39 |
| Ground Penetrating Radar | 30 |
| Magnetometer | 30 |
| Induced Laser Fluoroscopy | 17 |
| Electrical Resistivity Survey | 13 |
| **Analytical Techniques** | |
| Fixed Laboratory | 91 |
| Mobile Laboratory | 61 |
| Portable Gas Chromatography | 48 |
| Immunoassay | 30 |
| Colorimetric Tube | 17 |
| **DNAPL Detection** | |
| Ultraviolet Fluorescence | 17 |
| Hydrophobic Dye | 17 |
| Partition Interwell Tracer Set | 4 |

Source: Jurgens, Bob, et. al. *Study of Assessment and Remediation Technologies for Drycleaner Sites,* State Coalition for Remediation of Drycleaners, with support from the Technology Innovation Office, U.S. Environmental Protection Agency, 1999.

In addition, the respondents identified several other techniques that could be used. These techniques include fracture trace analysis, an inexpensive method of identifying fracture zones with aerial photographs and knowledge of area geology; sonic drilling, an expensive method of drilling that can penetrate consolidated and unconsolidated formations; and video cameras to inspect the inside of sewer lines to help identify joints, cracks, or holes in the lines that may allow the release of solvent-contaminated waste water. Cameras are also used in boreholes to identify fractures and dissolution zones (Jurgens, 1999).

### 12.6.2 Remediation Technologies

The SCRD survey also identified 18 remediation technologies that had been employed in the states (Exhibit 12-4). These include three soil remediation techniques, five general groundwater remediation techniques, six groundwater techniques that use bioremediation or chemical oxidation, and four groundwater techniques that use in-situ flushing or thermal treatment.

**Exhibit 12-4. Site Remediation Technologies Used at Drycleaner Sites**

| Technology | Percent of States |
|---|---|
| **Soil Remediation** | |
| Excavation | 86 |
| Soil Vapor Extraction | 86 |
| Bioventing | 29 |
| **Groundwater Remediation: General** | |
| Natural Attenuation | 71 |
| Air Sparging | 67 |
| Multi-Phase Extraction | 33 |
| Permeable Wall | 14 |
| Recirculating Well | 14 |
| **Groundwater Remediation: Bioremediation & Chemical Oxidation** | |
| Hydrogen Release Compound (HRC) | 29 |
| Hydrogen Peroxide | 24 |
| Potassium Permanganate | 19 |
| Organic Release Compounds (ORC) | 10 |
| Recirculating Well | 10 |
| Potassium Permanganate | 5 |
| **Groundwater Remediation: In-Situ Flushing & Treatment** | |
| Surfactant Flush | 14 |
| Co-Solvent Flush | 5 |
| Steam Injection | 5 |
| Electrical Heating | 5 |

Source: Jurgens, Bob, et. al. *Study of Assessment and Remediation Technologies for Drycleaner Sites,* State Coalition for Remediation of Drycleaners, with support from the Technology Innovation Office, U.S. Environmental Protection Agency, 1999.

## 12.7 References

Cardimone, 2001. *Drycleaner Remediation Programs: An Overview and Case Studies*, U.S. Environmental Protection Agency, Technology Innovation Office, August 2001.

HSIA, 2003. *Amended Rule 1421 – Control of Perchloroethylene Emissions from Dry Cleaning Operations*, Halogenated Solvents Industry Alliance. http://www.hsia.org/scaqmd.htm

IFI, 2003. *Profile of the Fabricare Industry*, International Fabricare Industry, web site. http://www.ifi.org/industry/industry-profile.html

Jurgens, Bob, et.al., 1999. *Study of Assessment and Remediation Technologies for Drycleaner Sites,* State Coalition for Remediation of Drycleaners, with support from the Technology Innovation Office, U.S. Environmental Protection Agency. http://www.drycleancoalition.org/tech

Linn, William J. and K. Mixell, 2002a. *Leaks, Spills, and Discharges At Florida Drycleaning Sites*, State Coalition for Remediation of Drycleaners. http://www.drycleancoalition.org/download/leaks

Linn, William, et. al., 2002b. *Conducting Contaminant Assessment Work at Drycleaning Sites,* State Coalition for Remediation of Drycleaners. http://www.drycleancoalition.org/chemicals

National Clothesline, 2002. "Cleaners' Perc use Continues to Decline," *National Clothesline*, August 2002. http://www.natclo.com/0208/aa10.htm

National Clothesline, 2003. "PERC Demand Continues 17-Year Decline," *National Clothesline*, August 2003. http://www.natclo.com/0308/aa90.htm

Schmidt, Robin, R. DeZeeuw, L. Henning, and D. Trippler, 1999. *State Programs to Clean Up Drycleaner*, State Coalition for Remediation of Drycleaners. http://www.drycleancoalition.org/survey

SCRD, 2002. *Chemicals Used in Drycleaning Operations*, State Coalition for Remediation of Drycleaners, January, 2002.

SCRD, 2003. *Site Profiles*, State Coalition for Remediation of Drycleaners. http://www.drycleancoalition.org/profiles

U.S. Census Bureau, 1998. *Economic Census: Comparative Statistics of the United States for Service Industries,* U.S. Department of Commerce.

U.S. EPA, 1991. *Dry Cleaning Facilities - Background Information for Proposed Standards, Draft EIA*, U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, November 1991.

U.S. EPA, 1993. *Economic Analysis of Regulatory Controls in the Dry Cleaning Industry*, Final, EPA 450/3-91-021b, U.S. Environmental Protection Agency, September, 1993.

U.S. EPA, 1995. *EPA Office of Compliance Sector Notebook Project Profile of the Dry Cleaning Industry*, EPA/310-R-95-001, U.S. Environmental Protection Agency, Office of Enforcement and Compliance Assistance, September, 1995.

U.S. EPA, 1998. *Cleaner Technologies Substitutes Assessment: Professional Fabricare Processes*, U.S. Environmental Protection Agency, Office of Pollution Prevention and Toxic Substances, Washington, D.C., June 1998.

# Chapter 13
# Demand for Site Characterization Services

Site characterization is usually the first step in the remediation of soil and groundwater pollution and continues throughout all aspects of the cleanup process. Site characteristics data are crucial to locating the sources of contamination, predicting where chemicals may migrate, developing risk assessments and remediation strategies, influencing community reactions, evaluating reuse options, monitoring progress of remediation efforts, and conducting long-term monitoring. Although site characterization is usually a small part of total remediation costs, it lays the foundation for the entire project and can substantially affect the total project effectiveness, cost, and schedule.

This chapter examines the market for sampling and analysis technologies used to investigate the nature and extent of contamination at hazardous waste sites in the U.S. and its implications for the continued demand for newer, streamlined technologies. Sampling and analysis is an integral component of all site investigations and remediations, whether the work is conducted under Superfund, RCRA, or another cleanup program. Thus, the market estimates in this chapter should not be added to those in the previous chapters of this report. Adding these estimates would be double-counting sites and, therefore, overestimating the scope of the market.

In recent years, the use of more timely and more accurate site characterization approaches has been growing. Many analyses that previously were conducted in laboratories can now be done in the field. Better methods can reduce the time and cost needed to evaluate sites and result in more efficient remediation designs. These new technologies can be applied in conjunction with systematic planning and dynamic work plans that are used to manage the site from initial site assessment through remediation and closeout. The integration of these three strategies is referred to as the Triad approach to hazardous waste site cleanups. The use of the Triad approach has significantly reduced the overall cleanup costs and time at many sites.

## 13.1 Market Description

Site characterization is the process of identifying, quantifying and describing the nature, extent, and fate and transport of hazardous substances released into the environment to detect their impacts on human health and the environment. The information developed in site characterization studies have a profound influence on all future activities at a site. For example, underestimation of the nature and extent of the contamination, or inaccurate description of geological conditions, may lead to response actions that are inadequate to protect human health and the environment. If additional contamination is discovered during remedial action, costly construction delays and redesign of the remedy may be necessary. Conversely, if the nature and extent of contamination is overestimated, the remedy may be over-designed, causing greater remediation expenditures than necessary to protect human health and the environment. A more

effective site characterization, even if greater sampling and analysis costs are incurred, can lead to lower total cleanup costs.

Site characterization information affects all stages of site management, from site discovery to close out. Specifically, site characterization is an important component in the following five steps of the site management process.

**Phase One Site Assessment.** The purpose of a Phase One site assessment is to determine the likelihood of environmental contamination at a property. This type of assessment is often done when a site is reported to a regulatory authority or in conjunction with the development, purchase, lease, sale, or other means of transfer of a property. Property purchasers and lenders hire environmental firms to conduct these assessments as part of their due diligence responsibility. A Phase One assessment is not expected to provide a detailed description of the contamination; its function is to indicate whether further study is warranted. Environmental samples are rarely collected at this point. This phase is approximately, but not precisely, equivalent to the 1994 American Society of Testing Materials (ASTM) industry standard E-1527 for Phase I environmental site assessments.

The structure and role of the ASTM standard may change as a result of new requirements under the Small Business Liability Relief and Revitalization Act (the "Brownfields Law") of 2002. Among other things, the law revises some of the provisions of CERCLA Section 101(35) clarifying requirements necessary to establish the innocent landowner defense under CERCLA and provides Superfund liability limitations for bona fide prospective purchasers and contiguous property owners. Among the requirements added to CERCLA is the requirement that such parties undertake "all appropriate inquiry" into prior ownership and use of a property at the time at which a party acquires the property. EPA plans to promulgate federal standards for "all appropriate inquiry." These standards may replace the ASTM standards in many, if not most, real estate industry practices.

The Phase One site assessment is similar to, but not precisely equivalent to, the Preliminary Assessment (PA) which is performed on every site listed in the CERCLA Information System (CERCLIS), and the RCRA Facility Assessment (RFA). The RFA is conducted for hazardous waste treatment, storage, and disposal facilities and other locations that may be subject to corrective action under the RCRA Corrective Action program. PAs are generally conducted by a state, or federal agency to distinguish, based on limited data, between sites that clearly pose little or no threat to human health or the environment and sites that may pose a threat and require further investigation. The PA also identifies sites requiring assessment for possible emergency response actions. If the PA results in a recommendation for further investigation, a Site Inspection is performed.

RFA's are conducted or directed by a state or federal regulatory agency to identify solid waste management units (SWMUs) that are, or are suspected to be, the source of a release to the environment. This information is used to determine whether a RCRA Facility Investigation (RFI), interim measures, or other corrective measures are needed.

Phase One assessments generally include the following components:

- Review of fundamental information about the site, such as that available from aerial photography, public information, and other sources;
- A review of historical documents and records search to determine whether there is any publicly available information on actual or potential contamination on or related to the property;
- A physical tour of the property to record visual, olfactory, and tactile observations. The tour may include interviews with on-site personnel who may have knowledge of past and present environmental practices; and
- A written report documenting the process and results of the Phase One assessment.

In addition to serving as a screening mechanism, the information collected during Phase One can be used to develop a preliminary conceptual site model (CSM), which is generally refined as work at the site continues. A CSM is a planning tool that organizes what is already known about the site and helps the site management team identify additional information needed to make the decisions that will achieve the project's goals.

**Phase Two Site Assessment.** The Phase Two site assessment includes further investigation of possible contamination discovered during phase one to confirm the presence of contamination. It may include on-site environmental testing and laboratory analysis. The investigation may require extensive sampling and analysis in several stages to obtain the required information. The ASTM standard appears in *E 1903, Standard Guide for Environmental Site Assessments: Phase II Environmental Site Assessment Process*. The Phase Two site assessment is similar to, but not precisely equivalent to, the Site Inspection (SI) which is often, but not always, performed on sites listed in CERCLIS; the sampling portion of the RFA, which is conducted for hazardous waste treatment, storage, and disposal facilities and other locations that may be subject to corrective action under the RCRA Corrective Action program; and tier evaluations of a risk-based corrective action (RBCA) at UST sites.

SIs are generally conducted by a state or federal agency to provide or augment the data needed for Hazard Ranking System (HRS) scoring and documentation. The HRS score is an important input to the decision of whether to list a site on the NPL. If a site receives an HRS score greater than 28.5, it is eligible for listing on the NPL. SI investigators may collect samples of soil, water, free product, and other media to determine if hazardous substances are present, and if there is human exposure or contamination of sensitive environments. The EPA publication *Guidance for Performing Site Inspections Under CERCLA; Interim Final*, September 1992, (NTIS PB92-963375, EPA 9345.1-05) provides more information on conducting SIs. This publication may be found at: http://www.epa.gov/superfund/whatissf/sfproces/pasi.htm

Phase Two assessments generally include one or more of the following components:

- Soil sampling to determine if a release has impacted site soil;
- Groundwater sampling to determine if a release has impacted groundwater;
- Drums and waste materials testing;
- Asbestos testing;

- Indoor air quality testing;
- Underground tank testing to determine whether tanks and associated piping have leaked or are likely to leak, and whether the tanks meet federal and state requirements; and
- A written report documenting the process, quality assurance procedures, and results of the Phase Two assessment.

**Phase Three Site Assessment.** A Phase Three site assessment is generally required if the results of Phase Two reveal the presence of contamination. The purpose of the Phase Three analysis is to quantify and characterize the full extent of the contamination, determine the risk, and select an appropriate remedy. The Phase Three site assessment is approximately, but not precisely, equivalent to the Remedial Investigation/Feasibility Study (RI/FS) which is performed on Superfund sites and the RFI/Corrective Measures Study (CMS) which is conducted for facilities that may be subject to corrective action under the RCRA Corrective Action program.

RI/FSs are generally conducted by potentially responsible parties, states, or EPA after a site is listed on the NPL. RFIs/CMS are generally conducted by the facility owners or operators, with oversight by a state or federal regulatory agency. For state voluntary cleanup program or underground storage tank sites the Phase Three assessment is generally conducted by the facility owners, with state oversight.

The RI and FS are generally done interactively. The RI serves as the mechanism for collecting data to characterize site conditions and further refine the conceptual site model; determine the nature of the waste; assess risk to human health and the environment; and provide data necessary for treatability studies. The FS is the mechanism for the development, screening, and detailed evaluation of alternative remedial actions. Data collected in the RI influence the development of remedial alternatives in the FS, which in turn affect the data needs and scope of treatability studies and additional field investigations. Treatability testing is conducted under the FS to evaluate the potential performance and cost of the treatment technologies being considered. This interactive approach encourages the continual scoping of the site characterization effort, which minimizes the collection of unnecessary data and maximizes data usability.

Generally, the more thorough and accurate the conceptual site model developed during the RI or RFI, the more cost effective the cleanup will be. The greater the uncertainty in the CSM, the greater the likelihood that problems will arise during the implementation of the remedy. For example, if the sampling plan during the RI caused investigators to overlook contaminated material, the contamination might be discovered during construction of the remedy. The contractor would then have to conduct additional sampling and analysis, revise cleanup plans and, perhaps, select different treatment technologies. These activities would cause delays and drive up cleanup costs.

It is generally impossible to completely collect and document information about all aspects of a site with 100 percent certainty because an RI or RFI can be expensive and time-consuming. Site investigators must address both sampling uncertainty and analytic uncertainty. Sampling uncertainty refers to the ability of the sample to represent the true site conditions, and generally is directly related to the density of sampling points and number of samples taken. Analytic uncertainty refers to the ability of the sample analysis techniques to accurately describe the

constituents in the sample. Typically, site investigators and managers use their best judgement to determine how much effort to put into characterization on a case-by-case basis. There is a tradeoff between the level of effort invested in characterization and the probability of missing contaminants that may cause unforseen problems during remediation or uncorrected health risks.

**Remedial Design and Construction.** Although it may not be explicitly regarded as site characterization, sampling and analysis is necessary during remedy design and construction or other corrective measures at most sites. Sampling is used to confirm that various aspects of the remediation were successful and, sometimes, to revise the original site characterization plans based on site conditions that were not anticipated prior to construction. Site characterization during remedial design and construction would generally use sampling and analysis technologies that are similar to those used during the Phase Three site investigations.

**Operations and Maintenance (O&M).** The use of site characterization technologies also may occur during the O&M phase of the site. O&M measures related to waste containment and control are initiated after the remedy has been constructed in accordance with the ROD or other site agreements and is determined to be operational and functional based on state and federal agreement. For Superfund-lead sites, remedies are considered operational and functional either one year after construction is complete or when the remedy is functioning properly and performing as designed, whichever is earlier.

Typical remedy components requiring long-term O&M measures include landfill covers and liners; gas extraction, treatment, and monitoring systems; water collection, treatment, and monitoring systems; and permeable reactive barriers. The remedy and reuse plans must allow for access necessary for sampling, inspection, and repair of these components. O&M monitoring may include five types of activities: inspection, sampling and analysis, routine maintenance and small repairs, reporting, and five-year reviews. The five-year reviews are primarily a requirement for some Superfund sites. The most likely demands for site characterization technologies include periodic topographic surveys to measure the rate of movement or settlement, the collection and chemical analysis of gas, air, and water samples from wells, probes and other collection means.

## 13.2 Site Characterization Tools

Site characterization technologies can be grouped into those related to accessing, collecting, and analyzing samples and environmental data and geophysical tools that can sometimes be used to directly locate contamination such as a leachate plume or buried drums but are more often used to refine the CSM with regards to site stratigraphy. These technologies are supported by computer software and other decision support tools that facilitate efficient and effective data management, interpretation, and decision making as data are collected and analyzed. In addition, it is important to consider how the deployment of each technology is integrated into a characterization program, and ultimately into the general site management process. A number of newer characterization technologies have made possible more efficient and flexible site management processes. Conversely, site managers are using scientifically designed, systematic approaches to planning and conducting site investigations and cleanups which optimize the effectiveness of the technologies. A systematic approach to site characterization can ensure that

data collected are appropriate, reduce the time and cost it takes to initiate cleanup, and reduce overall remediation costs.

The large number of characterization techniques makes it impossible to describe them all in this report. Exhibit 13-1 lists the major groups of tools. The publications *Field Sampling and Analysis Technologies Matrix* (FRTR 1998, http://www.frtr.gov/site) and Field Analytical Technologies Encyclopedia (EPA 2003) provide more detailed descriptions of the categories, the commonly used and proven techniques, conditions under which they tend to be used, and other useful information. The following four subsections provide an overview of these technologies.

**Exhibit 13-1: Major Characterization Technology Subcategories**

***Sample Access Tool Groups***
- Drilling methods - unconsolidated materials
- Drilling methods - consolidated materials
- Drive methods utilize a hydraulic device
- Sampling installations for portable samplers
- Portable in-situ groundwater samplers
- Fixed in-situ samplers cover
- Destructive sampling methods

***Sample Collection Tool Groups***
- Hand-held methods (soil)
- Portable positive displacement pumps
- Other portable groundwater sampling pumps
- Portable grab samplers (water)
- Extractive collection methods
- Gas/air collection methods

***Sample Analysis Tool Groups***
- Ex-situ methods for analyzing VOCs and SVOCs
- In-situ methods for analyzing VOCs and SVOCs
- Ex-situ methods for analyzing metals
- Ex-situ and in-situ methods for analyzing radionuclides
- Ex-situ methods for analyzing explosives

***Geophysical Tools***
- Electromagnetic
- Resistivity
- Conductance
- Ground Penetrating Radar
- Seismic

***Decision Support Tool Groups***
- Computer software to aid decision-tree analysis for CSMs
- Software that integrates geographic information systems, global positioning systems, imaging, analytical technologies, and databases to assist in modeling of site conditions and evolution of the CSM
- Statistical methods or sampling design and analysis

### 13.2.1 Sample Access and Collection Technologies

The access and collection techniques enable site investigators to access soil, groundwater and other media for the purpose of collecting samples; physically remove samples; and directly extract contaminants of concern from soil for subsequent analysis. Exhibit 13-1 above lists the major types of access and collection techniques.

### 13.2.2 Sample Analysis Technologies

Qualitative chemical analysis is used to determine whether chemicals of concern are present in a sample. Once it is known that chemicals of concern may be present, quantitative analysis is used to determine the identities and concentrations of the chemicals in the sample. To determine the extent and type of analyte to collect and the extent of quantitative analysis to conduct, site investigators first develop explicit data quality objectives (DQOs) early in the project. Exhibit 13-1 above lists the major types of sample analysis techniques.

### 13.2.3 Field Technologies

The technology groups listed in Exhibit 13-1 include both "traditional" technologies and newer technologies. In the traditional phased engineering approach samples are collected, shipped offsite for analysis, and the data are returned long after the sample collection staff have gone. The newer technologies allow sampling and analysis of groundwater and soil to be done on site to a greater extent, and more rapidly, than ever before. These newer approaches have been made possible by technological advances such as computerization, microfabrication, and biotechnology. Site investigators now have the capability to conduct analyses in the field that previously could only be done in a laboratory. By rapidly characterizing contaminated soil and groundwater on site, site staff are able to make immediate decisions which can guide characterization efforts, accelerate site assessment schedules, monitor progress of remediation efforts, and conduct confirmation sampling at closeout at reduced cost. Field analytical technologies also provide greater flexibility in responding to changes in conditions that are discovered during construction of the remedy.

Examples of the common field technologies are listed in Exhibit 13-2. Because of the advantages of field analytical technologies, especially when combined with adaptive site management strategies (described below), their use has been growing over the past decade. EPA has been promoting their use as a means of achieving faster, better, and more efficient cleanups, and expects them to replace the traditional phased engineering approach in many future cleanup projects.

### 13.2.4 Adaptive Site Management Approaches

Field analytical technologies provide site staff with the capability to use an adaptive sampling strategy, which feeds the previous day's results into the decision-making process to help direct the collection of the next round of samples. This strategy is typically implemented through a systematic planning process that relies on dynamic work strategies that are carefully aligned to provide data to support on-site decisions. A dynamic work strategy incorporates all known information about the site into a conceptual site model (CSM) and decision-making framework, such as a decision tree. This approach permits rapid location and definition of hot spots, guides the removal or treatment of contaminated media, and quickly identifies when enough information has been collected to address the site decision. It also helps avoid unnecessary treatment and the collection and analysis of uninformative samples, and to determine when enough information has been collected to meet site management goals. The use of field technologies, combined with a dynamic work strategy often allow some projects to be completed in only one field mobilization.

By rapidly characterizing contaminated soil and groundwater on site, site staff are able to make immediate decisions which can guide characterization efforts, accelerate site assessment schedules, monitor progress of remediation efforts, and conduct confirmation sampling at closeout at reduced cost.