**IN THE UNITED STATES COURT**
**OF FEDERAL CLAIMS**

| | |
|---|---|
| **SEVENSON ENVIRONMENTAL SERVICES, INC.,**<br>**Plaintiff,**<br>**vs.**<br>**THE UNITED STATES,**<br>**Defendant,**<br>**and**<br>**SHAW ENVIRONMENTAL, INC.,**<br>**Defendant-Intervenor.** | **Case No.: 05-1075C**<br>**Judge Thomas C. Wheeler** |

**<u>SEVENSON ENVIRONMENTAL SERVICES, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY ADJUDICATION RELATING TO INFRINGEMENT</u>**

Brian E. Ferguson
McDERMOTT WILL & EMERY LLP
600 13th Street, N.W.
Washington, D.C. 20005
(202) 756-8000
bferguson@mwe.com

WEBSTER SZANYI LLP
Kevin A. Szanyi
Nelson Perel
1400 Liberty Building
Buffalo, New York 14202
(716) 842-2800
nperel@websterszanyi.com

Attorneys for Plaintiff, Sevenson Environmental Services, Inc.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..... 1

II. STATEMENT OF RELEVANT FACTS ..... 3

A. National Hazardous Waste Cleanup Initiatives ..... 3

B. Sevenson's Patents ..... 5

1. The Sevenson Patented Method Reduces The Amount Of Leachable Lead To Acceptable EPA Levels Using Phosphates And Sulfates ..... 5

2. The Sevenson Patents Teach That The Phosphate And Sulfate Can Be Applied In A Single-Step Or Two-Step Process ..... 6

3. The Sevenson Patents Instruct The Person Of Ordinary Skill In The Art To Experiment With The Amounts Of Sulfate And Phosphate Necessary To Successfully Reduce The Amount Of Leachable Lead To Below EPA Standards ..... 7

4. The Sevenson Patents Teach That Phosphoric Acid Alone Can Provide The Group One And Group Two Treatment Additives ..... 8

C. The Colonie Site ..... 11

D. The Phosphoric Acid Used At The Colonie Site ..... 12

E. The Treatment Method Used At The Colonie Site ..... 12

III. LEGAL STANDARDS ..... 13

A. Summary Judgment Standard ..... 13

B. Infringement Standards ..... 14

IV. ARGUMENT ..... 15

A. The Treatment Method At The Colonie Site Meets The Claimed Requirement Of The Presence Of Phosphate And Sulfate In The Treatment Method ..... 16

1. Prayphos P5 Phosphoric Acid Is A "First Mixture" ..... 17

2. Prayphos P5 Phosphoric Acid Mixed With The Contaminated Soil Is A "Second Mixture" ..... 18

**TABLE OF CONTENTS**
(continued)

**Page**


3. Prayphos P5 Phosphoric Acid Contains The Claimed "First Component" ....... 18

4. Prayphos P5 Phosphoric Acid Contains The Claimed "Second Component" ....... 19

5. The Use Of Prayphos P5 Reduced The Amount Of Leachable Lead To Below The EPA Standard ....... 19

B. The Analysis For Claim 1 Of The '982 Patent Applies To The Other Asserted Claims Of The Sevenson Patents ....... 19

C. There Is No "Minimum" Amount Of Sulfate Or Phosphate Required In The Claims; The Patents Teach That Very Small Quantities Of Each Will Successfully Reduce The Amount Of Leachable Lead To Below EPA Standards ....... 20

V. CONCLUSION ....... 23

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......... 13

*C.R. Bard, Inc. v. United States Surgical Corp.*, 388 F.3d 858 (Fed. Cir. 2004) .......... 6

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) .......... 13

*Desper Prods., Inc. v. QSound Labs, Inc*., 157 F.3d 1325 (Fed. Cir. 1998). .......... 13

*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp*., 2007 U.S. App. LEXIS 12197 (Fed. Cir. May 25, 2007) .......... 20

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995), (en banc), *aff'd*, 517 U.S. 370 (1996). .......... 14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574 (1986) .......... 13

*Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261 (Fed. Cir. 1986) .......... 14

*NeoMagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062 (Fed. Cir. 2002) .......... 8

*Northern Telecom Ltd. v. Samsung Electronics Co., Ltd.*, 215 F.3d 1281 (Fed. Cir. 2000) .......... 15

*Northern Telecom. Inc. v. Datapoint Corp.*, 908 F.2d 931 (Fed. Cir. 1990) .......... 14, 17

*Pennwalt Corp. v. Durand-Wyland, Inc.*, 833 F.2d 931 (Fed. Cir. 1987) (en banc), *cert. denied*, 485 U.S. 1009 (1988). .......... 14

*Sevenson Environmental Services, Inc. v. Shaw Environmental, Inc*., 477 F.3d 1361 (Fed. Cir. 2007) .......... 11

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) .......... 14

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997) .......... 15

**Other Authorities**

Cleaning Up the Nation's Waste Sites: Markets and Technology Trends," (EPA, 2004 ed.), Executive Summary at v ("EPA Publication" .......... 3

**TABLE OF AUTHORITIES**
(continued)

**Page**

**Regulations**

40 C.F.R. § 261.24 ....................................................................................................4

40 C.F.R. § 300.5 ......................................................................................................4

On May 30, 2007, plaintiff Sevenson Environmental Services, Inc. ("Sevenson"), defendant the United States ("the Government") and defendant-intervenor Shaw Environmental, Inc. ("Shaw") filed a *Joint Proposed Schedule for Further Proceedings*. (Dkt. No. 55). In that filing, the parties agreed that they:

> have identified a potentially dispositive issue with respect to the application of the Court's claim construction of March 28, 2007, to the soil remediation process used at the Colonie, New York FUSRAP site ["the Colonie site"]. Generally, the issue is whether the asserted claims as construed by the Court allow for the phosphoric acid treatment at the Colonie site to serve as a source of both sulphate anions and also phosphate anions.

*Id*. As set forth in a *Statement of Stipulated Facts*, filed June 25, 2007 (Dkt. No. 57), the parties agreed on a set of facts relevant to the agreed issue ripe for resolution at this time. On these facts, Sevenson moves for summary adjudication that the Government's use of phosphoric acid at the Colonie site to reduce the amount of leachable lead in the soil to acceptable regulatory levels falls within the scope of the asserted claims of the Sevenson patents-at-issue.

## I. INTRODUCTION

As recited in the Court's March 28, 2007 Opinion and Order regarding Claim Construction (hereinafter "Op. at ___"), the five Sevenson patents-in-suit[1] describe methods for treating soil or other environmental media that become contaminated with toxic waste, such as lead and radioactive materials. (Op. at 2). By reducing the leachability of these hazardous materials, the patented Sevenson treatment methods render the soil non-hazardous according to

---

[1] The five Sevenson patents are U.S. Patent Nos. 5,527,982 ("the '982 patent"); 5,732,367 ("the '367 patent"); 5,916,123 ("the '123 patent"); 5,994,608 ("the '608 patent"); and 6,139,485 ("the '485 patent"). They are attached to the *Declaration of Brian E. Ferguson in Support of Sevenson's Motion for Partial Summary Adjudication Relating to Infringement* ("Ferguson Decl.") filed concurrently herewith as Exhibits 1-5.

regulatory standards established by the United States Environmental Protection Agency ("EPA"). *Id.*

Of import here, the Sevenson patents are based upon treatment methods employing phosphate and sulfate[2] as treatment chemicals. *Id.* at 6. In particular, "the patents disclose and claim the use of phosphoric acid, which acts as a source of both phosphate and sulphate, to treat contaminated soil." *Id.* "By contacting the contaminated soil with sulphate and phosphate, the amount of leachable lead is reduced to below the EPA's standard of 5.0 mg/l." *Id.* at 6-7.

The relevant facts for purposes of Sevenson's Motion have been stipulated to by the parties. (*See Statement of Stipulated Facts*, filed June 25, 2007, docket no. 57) (hereinafter, "Stip. Fact ¶ ___"). The Government used phosphoric acid (with the tradename "Prayphos P5") at the Colonie Site. (Stip. Fact ¶ 10). Prayphos P5 phosphoric acid contains, *inter alia*, phosphate anions and sulfate. *Id.*, ¶ 11. Using Prayphos P5 phosphoric acid, the Government was successful in reducing the amount of leachable lead to below the EPA's standard of 5.0 mg/l using the TCLP test criteria. *Id.*, ¶ 13.

Thus, the following is undisputed: first, the Sevenson patents disclose and claim a treatment process whereby phosphoric acid acts as a source of both phosphates and sulfates to treat hazardous lead-based materials to below the EPA standard; second, the Government used phosphoric acid having both phosphates and sulfates to treat hazardous lead-based materials at the Colonie site to below the EPA standard. By this Motion, Sevenson asks the Court to

---

[2] As the Court noted, the words "sulphate" and "sulfate" are used interchangeably. (Op. at 6, n. 3). This memorandum will use the latter unless quoting sources using the former.

summarily adjudicate that the Government's use of the Prayphos P5 phosphoric acid at the Colonie Site falls within the scope of the asserted Sevenson patent claims.[3]

## II. STATEMENT OF RELEVANT FACTS

The following facts are taken directly from the parties' stipulated facts. Any additional information is taken from the Court's claim construction Order or the patents themselves.

### A. National Hazardous Waste Cleanup Initiatives

This case involves cleanup and remediation work at one of the many waste disposal sites in the United States that are contaminated with hazardous waste and petroleum products from a variety of industrial sources. *See generally* "Cleaning Up the Nation's Waste Sites: Markets and Technology Trends," (EPA, 2004 ed.), Executive Summary at v ("EPA Publication"). (Stip. Fact ¶ 1).[4]

There are thousands of sites in the United States undergoing or targeted for hazardous waste cleanup. (Op. at 4-5, *citing* EPA Publication at viii). The environmental media most likely to contain contaminants at such sites are soil and groundwater. (Op. at 5, *citing* EPA Publication at 1-14). More than three-fourths of sites have contaminated soil or groundwater, or both. *Id.* There are many types of contaminants that may be present at a hazardous site. Volatile organic compounds (VOCs), metals, and radioactive materials are common. (Op. at 5, *citing* EPA Publication at 1-14, 1-15).

---

[3] The Government has refused to stipulate to facts that are relevant to other claim limitations appearing in the Sevenson patent claims. Accordingly, Sevenson's Motion is limited to the specific issue addressed above concerning whether the use of phosphoric acid at the Colonie site falls within the scope of the Sevenson patent claims requiring sources of phosphate and sulfate as treatment chemicals.

[4] The referenced EPA Publication was filed as part of Sevenson's claim construction submissions. An additional copy will be provided to the Court upon request.

A variety of solutions exists for handling contaminated media at hazardous sites, such as treatment, containment, and control. (Op. at 5, *citing* EPA Publication at 2-1). Relevant to the issues here, "treatment" includes the use of technologies such as chemical treatment and thermal desorption on site. *Id.* The term "treatment technology" means any operation or series of operations that alters the composition of a hazardous substance, pollutant, or contaminant through chemical, biological, or physical means to reduce the toxicity, mobility, or volume of the contaminated materials being treated. (Op. at 5). Treatment technologies are an alternative to land disposal of hazardous wastes without treatment. (Op. at 5, *citing* EPA Publication at 2-2; *see also* 40 C.F.R. § 300.5, "Definitions"). The general trend since 1985 has been to increase the use of treatment technologies. (Op. at 5). On-site technologies often are more cost-effective than off-site approaches which require the excavation and handling of hazardous materials. On-site technologies reduce the level of exposure to contaminated substances because no excavation is required. As on-site treatment technologies are used more frequently, site managers and remediation professionals are more willing to use them as a reliable approach. (Op. at 5, *citing* EPA Publication at 2-5).

The EPA has established methods for determining whether an environmental medium is contaminated and requires action. Method 1311, the "Toxicity Characteristic Leaching Procedure" (TCLP), is designed to determine "the mobility of both organic and inorganic analytes present in liquid, solid, and multiphase wastes." EPA Publication, TCLP Method 1311 (effective November 8, 1990). To determine "toxicity," EPA's regulations identify 40 possible contaminants and regulatory levels. If any of the contaminants in a representative sample exceeds the regulatory level, the sample is considered to be a Resource Conservation and Recovery Act (RCRA) hazardous waste. 40 C.F.R. § 261.24, Table 1. As relevant here, the

regulatory level for lead is 5.0 milligrams per liter (mg/l). (Stip. Fact ¶ 2; *see also* Op. at 5). Lead is present at hazardous levels at 40 percent of all NPL/Superfund sites. (Op. at 5).

## B. Sevenson's Patents

The five Sevenson patents contested in this action are all related. The issue dates of the five patents are as follows: '982 patent – June 18, 1996; '367 patent – March 24, 1998; '123 patent – June 29, 1999; '608 patent – November 30, 1999; '485 patent – October 31, 2000. The '982 patent contains 31 claims, of which Sevenson is asserting claims 1-5 and 9. The '367 patent contains 16 claims, of which Sevenson is asserting claims 11, 13, 14, and 16. The '123 patent contains 28 claims, of which Sevenson is asserting claims 1-7 and 15-20. The '608 patent contains 40 claims, of which Sevenson is asserting claims 20-24 and 26-30.[5] The '485 patent contains 36 claims, of which Sevenson is asserting claims 1-6 and 15-36. (Stip. Fact ¶ 6).

### 1. The Sevenson Patented Method Reduces The Amount Of Leachable Lead To Acceptable EPA Levels Using Phosphates And Sulfates

One objective of Sevenson's patented technology is to reduce the amount of leachable lead at a hazardous site to below EPA's TCLP standard. *See* '982 Patent, col. 3, lines 42-48 ("It is an object of the present invention to provide a method of treating metal-bearing materials, contaminated soils and waste effluent, and solid wastes containing hazardous levels of leachable metal. It is a further object to provide a method which decreases the leaching of lead in lead-bearing materials to levels below the regulatory limit of 5 mg/l by TCLP test criteria."). (Stip. Fact ¶ 5; *see also* Op. at 6).

---

[5] Sevenson withdraws it allegations that the Government has infringed claims 1-7 and 11-19 of the '608 Patent at the Colonie site. Sevenson reserves the right to re-assert those claims against the Government at a later time if discovery or independent investigation reveals that the Government is infringing those claims at other locations.

### 2. The Sevenson Patents Teach That The Phosphate And Sulfate Can Be Applied In A Single-Step Or Two-Step Process

Sevenson's patents claim a one-step or two-step process involving the mixing of the lead-bearing material with a mixture or additive. A first component of the mixture supplies sulfate and a second component supplies phosphate. (Op. at 7). Sevenson's technology is based upon chemical bonding reactions involving lead and radionuclides with a combination of treatment chemicals, such as a combination of sulfates and phosphates. (Stip. Fact ¶ 4; *see also* Op. at 6). By contacting the contaminated soil with sulfate and phosphate, the amount of leachable lead is reduced to below the EPA's standard of 5.0 mg/l. (Op. at 6-7; *see also* Stip. Fact ¶ 5).

The patents generally refer to the first and second components as "treatment additives" or "treatment chemicals." (*See*, e.g., '982 Patent, Abstract ("treatment additives"); FIG. 1 and FIGS. 2a, 2b ("treatment chemicals"); col. 3, line 4-5 ("one or more treatment additives"); col. 3, line 16 ("treatment chemicals"); col. 4, line 63 ("treatment chemicals and additives")).

The patents are explicit in their teaching that the treatment additives ("components") may be simultaneously applied to the hazardous material to be treated in a single-step process: "the present invention discloses a process comprising a single step mixing of one or more treatment additives" ('982 Patent, Abstract; *see also Summary of the Invention*, col. 3, lines 3-5 (same));[6] "yet another object of the present invention is to provide a treatment method for metal-bearing wastes, particularly lead-bearing wastes, which comprises a single step mixing process") ('982 Patent, *Summary of the Invention*, col. 3, lines 56-59); "the ingredients of group one and group

[6] As the Court noted in its claim construction Order, "statements that describe the invention as a whole are more likely to be found in certain sections of the specification, such as the Summary of the Invention." (Op. at 19, *quoting C.R. Bard, Inc. v. United States Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004)).

two[7] can be added to the hazardous waste materials simultaneously, and they are pre-mixed and added in a single step" ('982 Patent, *Treatment Method*, col. 5, lines 46-48).

**3. The Sevenson Patents Instruct The Person Of Ordinary Skill In The Art To Experiment With The Amounts Of Sulfate And Phosphate Necessary To Successfully Reduce The Amount Of Leachable Lead To Below EPA Standards**

Sevenson's patents teach that the sources and amounts of sulfates and phosphates to be employed in the treatment process vary depending upon different factors, such as the nature of the material to be treated, the leachable lead content of the material, and the total quantity of lead present:

> The quantity of phosphate-supplying reagent employed will vary with the characteristics of the solid waste being treated, including particularly such factors as leachable lead content, total lead, and buffering capacity, among other factors.

('982 Patent, col. 6, lines 27-31).

> Therefore, those skilled scientists and engineers learning this art from this patent, must make an economic judgement for each lead contaminated process material and waste stream which chemical quantity from each group would be most effective in rendering the treated material non-hazardous.

('982 Patent, col. 11, lines 48-53).

> The treatment operations can be carried out at any level – bench, engineering, pilot and full-scale, on relatively small amounts of hazardous waste material in laboratory to large amounts of contaminated process materials, soils, solid wastes, waste waters, sludges, slurries and sediments outdoor on-site. The process is applicable in-situ as well as ex-situ.

('982 Patent, col. 14, lines 20-26; *see also* Op. at 7). There are no numerical limitations set forth concerning the minimum amount of contaminated soil that must be treated to infringe upon the asserted claims. Accordingly, there is no minimum required amount of either treatment additive

---

[7] "The treatment chemicals useful in the present invention may be divided into two groups. . . . A first group, 'group one,' comprises a source of sulfate . . . . The second group, 'group two,' comprises a source of phosphate anion. . . ." ('982 Patent, Col. 4, line 65 – col. 5, line 6).

that is necessary to meet the claim language. Indeed, in one of the examples given in the patents, 100 grams of contaminated soil were successfully treated using the patented method:

> A lead contaminated soil from a battery cracking, burning, and recycling abandoned site was obtained and treated with group one and group two chemicals in one single step at bench scale. . . . To each 100 g lot of lead hazardous waste soil, sufficient amounts of group one and group two treatment chemicals and reagents were added as illustrated in Table III, in order to render it non-hazardous. . . ."

('982 Patent, col. 10, lines 21-36).[8] For this reason, the patents require only that the group one treatment additive should provide "at least one sulfate ion for contacting waste particles" and "at least one phosphate ion for reacting with said leachable lead." ('982 Patent, *Summary of the Invention*, col. 2, lines 28-35).

**4. The Sevenson Patents Teach That Phosphoric Acid Alone Can Provide The Group One And Group Two Treatment Additives**

Consistent with their express teaching that the group one and group two treatment additives may be added to the soil in a single-step process,[9] the Sevenson patents also explicitly teach that in many instances phosphoric acid alone successfully acts as a source of both sulfate (group one) and phosphate (group two) in order to reduce the amount of leachable lead to below EPA standards. (*See* Op. at 6: "the patents disclose and claim the use of phosphoric acid, which acts as a source of both phosphate and sulphate, to treat contaminated soil;" Op. at 7: "[a] first component of the mixture supplies sulphate and a second component supplies phosphate. . . .

---

8 100 grams equals 3.53 ounces. *See* http://www.onlineconversion.com/weight_common.htm. Thus, the patents specifically describe and encompass methods wherein as little as 3.53 ounces of contaminated soil were treated using the claimed method. *See NeoMagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002) ("it is elementary that a claim construction that excludes the preferred embodiment is rarely, if ever, correct").

9 "The ingredients of group one and group two can be added to the hazardous waste materials simultaneously, and they are pre-mixed and added in a single step." ('982 Patent, col. 5, lines 46-48).

Phosphoric acid is a mixture that contains both sulphate and phosphate . . . . The patents contain examples to show that phosphoric acid may be sufficient to treat lead contaminated soils under the EPA's TCLP test").

The patents repeatedly describe the use of phosphoric acid as the source of both treatment additives. "The invention relates to treatment methods employed to chemically convert leachable lead in lead bearing solid and liquid waste materials to a non-leachable form by mixing the material with lime, gypsum, *and/or phosphoric acid*." ('982 Patent, Abstract).[10] "The invention relates to treatment methods employed to chemically convert leachable metal in metal-bearing solid and liquid waste materials to a non-leachable form by mixing the material with *one or a combination* of components, for example, lime or gypsum and phosphoric acid." ('982 Patent, *Summary of the Invention*, col. 2, lines 57-61). "The present invention discloses a process comprising a single step mixing of *one or more treatment additives*. . . ." (*Id.*, col. 3, lines 2-5). "[T]he metal-bearing material is mixed with *one or more treatment chemicals* in sufficient quantity so as to render the metal substantially non-leachable, that is, to levels below the regulatory threshold limit under the TCLP test criteria for the USEPA." (*Id.*, col. 3, lines 32-36). "In the preferred embodiment, soils or contaminated materials containing radionuclides and radioactive wastes are contacted with technical grade phosphoric acid (TGPA) which contains sulfates as an impurity." ('367 Patent, Abstract). "In the preferred embodiment, technical grade phosphoric acid (TGPA) is used in a one step process. TGPA contains sulfate as an impurity in addition to a phosphate anion source." ('367 Patent, *Summary of the Invention*, col. 5, lines 15-19; *see also* col. 8, lines 33-37).

---

10 All emphasis added unless otherwise noted.

In certain examples described in the patents, phosphoric acid alone successfully leached lead below the EPA threshold. In "Example 1" in the '982 Patent, lead contaminated soil was treated with group one and group two chemicals "in one single step." ('982 Patent, col. 10, lines 23-26). Test Run XII applied 15.1% phosphoric acid only to the hazardous soil; the results show that the amount of leachable lead was reduced from 3236.0 mg/L (untreated control sample) to 3.6 mg/L (below the EPA threshold of 5.0 mg/L). (*Id.*, Table III). As the patent teaches, "it is obvious from TCLP analyses of fifteen test runs that the single step mixing of at least one component of either or both group one and group two treatment chemicals is very effective in diminishing the TCLP lead values." (*Id.*, col. 10, lines 57-61). This is reinforced by multiple examples in Table VI (cols. 13-16),[11] wherein phosphoric acid alone was successful in reducing the amount of leachable lead to below the EPA criteria. *See* Table VI, showing phosphoric acid alone was successful in treating lead contaminated waste found in "old dirt," "carbon with lead dross," "wire fluff, "wire chip," "casings and soil," and "industrial process soil (B)."

In other examples given in the patent, phosphoric acid alone did not successfully reduce the amount of leachable lead to below the EPA criteria. *See*, *e.g.*, '982 Patent, col. 16, lines 44-49. This simply reinforces the patent's teaching that "bench scale treatability studies for each solid waste considered will be necessary to determine the optimum levels of the materials that are employed. . . . Those skilled in the art are knowledgeable of such bench studies, which are usually carried out as precursors to full scale treatment." ('982 Patent, col. 19, lines 51-61). This is exactly what the Government did before deciding on the treatment method used at the Colonie site:

---

[11] "TABLE VI illustrates different types of waste matrix that have been successfully treated employing the one step and two step mixing treatment additives from group one and group two." ('982 Patent, col. 14, lines 5-8).

> The Corps of Engineers awarded an initial contract to ICF Kaiser Engineers, Inc. ("ICF Kaiser") for cleanup work at the Colonie site. ICF Kaiser retained Kiber Environmental Services, Inc. ("Kiber") *to conduct a study for treating the lead contaminated materials at the Colonie site*. In March 1999, Kiber produced a report *recommending the use of phosphoric acid* to treat the soil after evaluating other potential treatment alternatives.

(Op. at 7; *see also Sevenson Environmental Services, Inc. v. Shaw Environmental, Inc*., 477 F.3d 1361, 1363, fn. 2 (Fed. Cir. 2007) ("it was ICF Kaiser's subcontractor, Kiber Environmental Services, that first performed a treatability study at the Colonie site and recommended use of the accused phosphoric acid method")).

### C. The Colonie Site

The Colonie site is owned by the United States Government Department of Energy ("DOE"), and has been designated for remediation under the Formerly Utilized Sites Remedial Action Program ("FUSRAP") that the Army Corps of Engineers executes for the DOE. The hazardous substances found at the Colonie site include, *inter alia*, lead and radionuclides. The contaminated soil resulted from activities conducted at the Colonie site from 1930 until the 1980s. (Stip. Fact ¶ 7).

The Corps of Engineers awarded an initial contract to ICF Kaiser for cleanup work at the Colonie site. In April 1999, the IT Group, Inc. acquired the Colonie site remediation contract from ICF Kaiser. IT Corporation ("IT") then acquired the contract from the IT Group, and performed the remediation work for the Corps of Engineers at the Colonie site. On January 16, 2002, IT filed for bankruptcy. Shaw obtained the assets of certain IT companies on May 3, 2002, and continued performing the cleanup work at the Colonie site. (Stip. Fact ¶ 8).

At the Colonie site, some of the excavated soils contained lead which leached above the RCRA TCLP criteria of 5.0 mg/l. (Stip. Fact ¶ 9).

**D. The Phosphoric Acid Used At The Colonie Site**

The Army Corps of Engineers used "Prayphos P5" phosphoric acid at the Colonie site. This product was manufactured by the purified wet-process, where phosphate minerals, largely calcium phosphate minerals, within the phosphate rock are reacted with or without weak phosphoric acid, and sulfuric acid. Sulfuric acid contains sulfate. (Stip. Fact ¶ 10).

Prayphos P5 phosphoric acid contains phosphoric acid, aqueous phosphate, phosphate anions, phosphate compounds and impurities as a result of the incomplete chemical reactions, purification steps, and mechanical separation. The product is concentrated liquid containing about 75 percent $H_3PO_4$ based on phosphate content and density, that is readily miscible in water and other polar solvents, and thus will contain aqueous phosphate when in the presence of water. Impurities in this product include sulfate, and may include calcium sulfate, iron sulfate, sulfate ions, calcium ions, calcium salts of sulfate, phosphate and fluoride, gypsum, fluoride ions, and sulfuric acid. (Stip. Fact ¶ 11).

**E. The Treatment Method Used At The Colonie Site**

The method of treatment at the Colonie site comprised the following relevant steps. Excavated soil at Colonie was staged in soil piles of approximately 250 $yd^3$. These piles were screened by field instruments measuring radioactivity (in counts-per-minute). A representative sample was extracted from each soil pile for off-site TCLP testing for lead. Soil piles deemed to be "characteristic" (e.g., TCLP lead > 5.0mg/l) were subjected to the on-site soil lead stabilization process. Prayphos P5 phosphoric acid, diluted with water to three parts water to one part phosphoric acid, was mixed with an amount of the lead-contaminated soil in a device called a pugmill. The contaminated soil and diluted Prayphos P5 phosphoric acid were then allowed to cure, and shortly thereafter a sample for post-treatment TCLP for lead was taken. (Stip. Fact ¶ 12).

In some instances, the treatment method used at the Colonie site was successful in reducing the amount of leachable lead to below the EPA's standard of 5.0 mg/l using the TCLP test criteria. In other instances, the treatment method failed to reduce the level of toxicity in the soil to below the required regulatory level. On such occasions, the soil was returned to the pugmill and treated with additional Prayphos P5 phosphoric acid, and allowed to cure, until the amount of leachable lead was reduced to below the EPA standard. (Stip. Fact ¶ 13).

## III. LEGAL STANDARDS

### A. Summary Judgment Standard.

Summary judgment is appropriate if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). When the moving party shows the absence of an issue of material fact, the nonmoving party must go beyond the pleadings to demonstrate the existence of a genuine dispute of fact. *Id.* at 24. No genuine issues of material fact exist, however, where the record as a whole could not lead the trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Where, as here, the composition of the allegedly infringing process is undisputed, a literal infringement determination is amenable to summary judgment. *Desper Prods., Inc. v. QSound Labs, Inc*., 157 F.3d 1325, 1332-33 (Fed. Cir. 1998).

**B. Infringement Standards**

Determining whether an accused product or method infringes the claims of a patent is a two-step inquiry. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1581-82 (Fed. Cir. 1996). First, a claim must be construed to determine its proper scope and meaning. This step, claim construction, is the exclusive province of the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), (en banc), *aff'd*, 517 U.S. 370 (1996). The Court has performed this step, *see generally* Claim Construction Opinion.[12]

The second step is to compare the construed claim to the accused device, composition, or method to determine whether each and every element or limitation is found in the accused device, composition or method. In order to find literal infringement, the accused device or product must meet each and every element or limitation of a properly construed claim. *Markman,* 52 F.3d at 976; *Pennwalt Corp. v. Durand-Wyland, Inc.*, 833 F.2d 931, 934 (Fed. Cir. 1987) (en banc), *cert. denied*, 485 U.S. 1009 (1988). The patent holder can prove direct infringement by circumstantial evidence. *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261 at 1272 (Fed. Cir. 1986) (direct infringement circumstantially shown by sales of the accused product and dissemination of an instruction sheet and manual teaching the use of the accused product in accordance with the patented method).

Importantly, infringement may not be avoided simply by adding features or components not required by the claims. As the Federal Circuit held in *Northern Telecom. Inc. v. Datapoint Corp.*, 908 F.2d 931, 945 (Fed. Cir. 1990), "[t]he addition of features does not avoid infringement, if all the elements of the patent claims have been adopted."

[12] While governed by the Court's claim constructions for purposes of this motion, Sevenson reserves the right to appeal the correctness of those constructions at the appropriate time.

In determining whether a claim limitation is present in an accused product or method, the Court must take care to avoid reading unstated limitations into the claims. *See Northern Telecom Ltd. v. Samsung Electronics Co., Ltd.*, 215 F.3d 1281, 1290 (Fed. Cir. 2000) ("this court has repeatedly and clearly held that it will not read unstated limitations into claim language"). Thus, unless a claim specifically requires a minimum quantity of material to meet the claim, even "trace" amounts of a claimed material found in the accused product or method will literally meet the claim. *Id.* at 1290-91 (holding that there is no "minimum quantity of aluminum that must be etched to meet the claim").

Even if an accused product does not literally infringe a claim, it may still infringe under the doctrine of equivalents, if there are insubstantial differences between the accused product and the claim. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997). One method to determine whether there are insubstantial differences is to assess whether the accused product performs substantially the same function, in substantially the same way, to yield substantially the same result. *Id.*

## IV. ARGUMENT

Application of the Court's claim construction to the parties' stipulated facts shows that the use of phosphoric acid at the Colonie site falls within the literal scope of the claims.[13] Sevenson respectfully requests the Court summarily adjudicate this issue in Sevenson's favor. Doing so will greatly reduce the complexity of the case and the number of contested issues for trial.

---

[13] Sevenson's Motion is limited to the issue of whether the phosphoric acid treatment falls within the literal scope of the claim language. Sevenson does not address the issue of infringement under the doctrine of equivalents, but reserves its right to do so at trial, and in opposition to any motion by the Government.

**A. The Treatment Method At The Colonie Site Meets The Claimed Requirement Of The Presence Of Phosphate And Sulfate In The Treatment Method**

Generally speaking, all the asserted claims require mixing the contaminated soil with phosphate and sulphate. The asserted claims do *not* require application of sulfate and phosphate in a sequential two-step process; instead, the sulfate and phosphate may be applied simultaneously and from a single source. (*See* pp. 6-7, *supra*). This contrasts with those (non-asserted claims) which specifically require a two-step process of applying sulfate first and phosphoric acid second. *Compare* '982 Patent, asserted claim 1 (one-step process, single mixture) with non-asserted claim 12 (two-step process, two mixtures).

Thus, claim1 of the '982 Patent is illustrative as to whether all asserted claims contain limitations met by the Government's use of phosphoric acid at the Colonie site. Claim 1 requires, *inter alia*, "mixing a metal [lead]-bearing material with a first mixture comprising a first component and a second component to form a second mixture." ('982 Patent, claim 1, col. 20, lines 5-14). Relevant to the issue here, the first mixture is phosphoric acid. This mixture supplies the first component, sulfates, and the second component, at least one phosphate anion, to lead bearing contaminated soil. *Id.*

The stipulated facts undisputedly demonstrate that the treatment method at the Colonie site meets this claim language:

- Lead-bearing contaminated soil was subject to the on-site lead stabilization process used at the Colonie site (Stip. Fact ¶¶ 7, 9, 12);
- The phosphoric acid used at the Colonie site is a "mixture" that is mixed with the contaminated soil (Stip. Fact ¶¶ 12: "Prayphos P5 phosphoric acid, diluted with water to three parts water to one part phosphoric acid, was mixed with an amount of the

lead-contaminated soil in a device called a pugmill");[14] Op. at 7 ("Phosphoric acid is a mixture that contains both sulphate and phosphate");

- Phosphoric acid contains a first separate and distinct compound, sulfate (Stip. Fact ¶¶ 10-11: "impurities in this product [Prayphos P5] include sulfate");
- Phosphoric acid contains a second separate and distinct compound, phosphate anions (Stip. Fact ¶ 10: "Prayphos P5 phosphoric acid contains phosphoric acid, aqueous phosphate, phosphate anions, phosphate compounds"); and
- Using this treatment method reduced the TCLP leachable lead level in the soil to below 5.0 mg/l. (Stip. Fact ¶ 13).

Accordingly, the facts establish the use of phosphoric acid at the Colonie site meets the claim limitations of "mixture" comprising a "first component" and "second component" as set forth in claim 1 of the '982 Patent.

### 1. Prayphos P5 Phosphoric Acid Is A "First Mixture"

Prayphos P5 phosphoric acid meets the Court's definition of a "first mixture." The Court defined "first mixture" to mean "the first component plus the second component mixed together." (Op. at 27). Here, Prayphos P5 is "concentrated liquid containing about 75 percent $H_3PO_4$ based on phosphate content and density . . . . Impurities in this product include sulfate, and may include calcium sulfate, iron sulfate, sulfate ions, calcium ions, calcium salts of sulfate,

---

[14] The use of water at the Colonie site does not change the infringement analysis. *Northern Telecom. Inc. v. Datapoint Corp.*, 908 F.2d 931, 945 (Fed. Cir. 1990) ("[t]he addition of [unclaimed] features does not avoid infringement"). At any rate, the Sevenson patents specifically instruct adding water to the treatment additives. *See* '982 Patent, col. 4, lines 66-67 ("the addition of water with the additives may facilitate the ultimate mixing and reaction"); '367 Patent, col. 8, lines 38-42 ("the addition of water aids in the dispersion and percolation of TGPA throughout the contaminated host matrix. Water can be added at any point of the process, either before or after the TGPA addition, or by diluting the TGPA and applying the dilute TGPA to the target matrix"); *see also* '367 Patent, col. 13, lines 45-49.

phosphate and fluoride, gypsum, fluoride ions, and sulfuric acid." (Stip. Fact ¶ 11). The product was manufactured by the purified wet-process, where phosphate rock (a first component) is mixed with sulfuric acid (a second component). (Stip. Fact ¶ 10). As the Court noted, "phosphoric acid is a mixture. . . ." (Op. at 7).

### 2. Prayphos P5 Phosphoric Acid Mixed With The Contaminated Soil Is A "Second Mixture"

The Prayphos P5 phosphoric acid and water mixture, when combined with the contaminated soil in the pugmill, results in a second mixture. (*See* Stip. Fact ¶ 12: "Prayphos P5 phosphoric acid, diluted with water to three parts water to one part phosphoric acid, was *mixed* with an amount of the lead-contaminated soil in a device called a pugmill").

### 3. Prayphos P5 Phosphoric Acid Contains The Claimed "First Component"

The Court defined the "first component" to be "a separate and distinct compound capable of supplying at least one of the listed members." (Op. at 11-14). Prayphos P5 phosphoric acid contains sulfates. (Stip. Fact ¶ 11). The sulfate component results from the mixing of phosphate rock with sulfuric acid. (Stip. Fact ¶ 10). The sulfate components are thus a "separate and distinct" compound found in Prayphos P5 (*i.e.*, separate and distinct from other compounds found therein). The parties agree that the chemical formula for sulfates is $(SO_4)^{2-}$. (*See* Op. at 25). A "compound" is "a substance composed of atoms or ions of two or more elements in chemical combination." (Op. at 26, *quoting Hawley's Condensed Chemical Dictionary*, 302 (11th ed. 1987)). Sulfate is a "compound" because it is composed of one atom of sulfur (S) to four atoms of oxygen (O).[15] *See also* Ferguson Decl., Exhibit 6 (*American Heritage Dictionary*,

---

[15] The Court can find a useful, interactive periodic table at www.webelements.com.

2d Coll. Ed. (Houghton-Mifflin Co. 1982) ("sulfate: n. A chemical *compound* containing the bivalent group $SO_4$").

**4. Prayphos P5 Phosphoric Acid Contains The Claimed "Second Component"**

Similarly, the Court defined the "second component" to be "a separate and distinct compound capable of supplying a source of phosphate anion." (Op. at 15-16). Prayphos P5 phosphoric acid supplies phosphate anions. (Stip. Fact ¶ 11). Phosphate anions are a "separate and distinct" compound found in Prayphos P5 (*i.e.*, separate and distinct from other compounds found therein, such as the sulfate compound). The parties agree that the chemical formula for a phosphate anion is $(PO_4)^{3-}$. (*See* Op. at 16-17). A phosphate anion is a "compound" because it is composed of one atom of phosphorus (P) to four atoms of oxygen (O). *See also* www.phosphatefacts.org: "phosphates are *compounds* of phosphorus and oxygen that occur in many forms and are usually combined with other elements - e.g., metals such as sodium, potassium, calcium, and aluminum."

**5. The Use Of Prayphos P5 Reduced The Amount Of Leachable Lead To Below The EPA Standard**

Not surprisingly, given the Sevenson patents' repeated teaching that phosphoric acid (such as Prayphos P5) can successfully treat lead-contaminated soil to below the EPA threshold of 5.0 mg/l (*see* pp. 5-11 *supra*), the parties agree that the Government's use of Prayphos P5 "was successful in reducing the amount of leachable lead to below the EPA's standard of 5.0 mg/l using the TCLP test criteria." (Stip. Fact ¶ 13).

**B. The Analysis For Claim 1 Of The '982 Patent Applies To The Other Asserted Claims Of The Sevenson Patents**

While the language used in the asserted claims of the five Sevenson patents varies, they all fundamentally require applying a combination of sulfate and phosphate to the contaminated

material. The analysis regarding claim 1 of the '982 Patent above may thus be applied to the other asserted claims. Set forth in the attached Appendix hereto is a chart of the asserted independent claims,[16] with one exception,[17] with the relevant claim language on the left, the Court's claim construction for the relevant terms in the middle, and the undisputed facts concerning the Colonie site on the right.

### C. There Is No "Minimum" Amount Of Sulfate Or Phosphate Required In The Claims; The Patents Teach That Very Small Quantities Of Each Will Successfully Reduce The Amount Of Leachable Lead To Below EPA Standards

Sevenson anticipates the Government will argue that, while Prayphos P5 phosphoric acid contains sulfates, the amount of sulfate present is too low to meet the claim language requiring "reactive" sulfate ions. The Court's Claim Construction Order suggested this as well: "to convert leachable metals into non-leachable form, more than a single molecule [of reactive sulfate ions] is required." (Op. at 41).

There are several reasons why the Government's anticipated argument is flawed. First and foremost, there is no "minimum" amount specified in any of the claims. In this regard, the Federal Circuit's analysis in *Northern Telecom* is instructive. There, the claim required aluminum to be etched in a semiconductor process. 215 F.3d at 1289-90. The accused infringer argued that the "aluminum" must be present in at least a layer, otherwise the "absurd" result

---

[16] If a claim limitation is met in an independent claim, it necessarily is met in any claims that depend from that claim. Accordingly, Sevenson analyzes herein only the asserted independent claims. *See Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 2007 U.S. App. LEXIS 12197, *28 (Fed. Cir. May 25, 2007) ("Of course**,** infringement of a dependent claim also entails infringement of its associated independent claim").

[17] Independent claim 28 of the '485 Patent requires a combination of sulfuric acid and phosphate. As it currently stands, the issue of whether Prayphos P5 contains sulfuric acid (as opposed to sulfate) is an open one requiring further discovery. (*See* Stip. Fact ¶ 11). Accordingly, Sevenson does not include claim 28 in the current motion.

would be that the claim would cover even "trace" amounts of aluminum present in the accused products. *Id.* at 1290. The Federal Circuit rejected the infringer's argument: "Not only is the term 'layer' not found in claim 1, but neither is a limitation that establishes a minimum quantity of aluminum that must be etched to meet the claim. This court has repeatedly and clearly held that it will not read unstated limitations into claim language." *Id.*

*Manning v. Paradis*, 296 F.3d 1098 (Fed. Cir. 2002), cited by the Court (Op. at 18) is not to the contrary. First, that case was before the Court in an interference context – to determine which person was entitled to a patent – not in an infringement context, as here. Second, the Court stated that Manning had failed to appreciate that his invention supplied effective amounts of oxygen to the heart as the claim in question required. Thus, Manning was not entitled to the patent.

Here, in contrast, the Sevenson patents clearly and unambiguously state that all that is necessary is that there be "at least one sulfate ion for contacting waste particles and reacting with said leachable lead" ('982 Patent, Summary of the Invention, col. 2, lines 28-29), and "at least one phosphate ion for reacting with said leachable lead" (*id.*, col. 2, lines 33-34). This is because the chemical bonding reactions occur at the molecular level. The patents explicitly describe this:

$$\text{Pb-Micelle} + CaSO_4.2H_2O \longrightarrow \underset{\text{Anglesite}}{PbSO_4} + \text{Ca-Micelle} + 2H_2O \qquad (1)$$

$$Pb(HCO_3)_2 + CaSO_4.2H_2O \longrightarrow \underset{\text{Anglesite}}{PbSO_4} \pm CaCO_3 + 3H_2O + CO_2 \qquad (2)$$

The above portion of the '982 Patent (*see* col. 6) shows the reaction of hazardous lead (Pb) with calcium sulfate ($CaSO_4$) and water. The result on the right shows that the lead has bonded with the *single* sulfate ion $SO_4$ to create lead sulfate. (*See* '982 Patent, col. 5, line 59 – col. 6, line 65). The patents show the same with respect to the reactive phosphate ions (*see* col. 6, lines 41-65).

Thus, the inventive feature of the patents lies in the recognition that these chemical reactions would occur – not in any specified amounts of sulfates and phosphates used. It would be meaningless to specify in the claims the amounts of phosphate and sulfate that would be required for any given treatment site because the amounts of each would of course increase as the amount of leachable lead in the treated material increased, as the patents repeatedly teach (*see* pp. 7-8, *supra*).

Accordingly, what is important for purposes of the instant motion is that a single molecule of sulfate can effectively react with a single molecule of lead. As it is undisputed that the Prayphos P5 phosphoric acid at the Colonie site contains sulfates as an impurity,[18] Sevenson has met its burden as the moving party and summary adjudication in its favor should be granted.

[18] Nor does it matter that the sulfates are present in Prayphos P5 as an impurity. The patents expressly teach that phosphoric acid contains sulfates as an impurity and therefore can be a source of both components. (*See* '367 Patent, Abstract; col. 5, lines 15-19).

## V. CONCLUSION

For the foregoing reasons, Sevenson respectfully requests the Court summarily adjudicate that the use of phosphoric acid at the Colonie site meets the limitations in the asserted patent claims as set forth in the above table.

Respectfully submitted,

Dated: __July 2, 2007_____

_s/Brian E. Ferguson_____________________

Brian E. Ferguson
McDERMOTT WILL & EMERY LLP
600 13th Street, N.W.
Washington, D.C. 20005
(202) 756-8000
bferguson@mwe.com

WEBSTER SZANYI LLP
Kevin A. Szanyi
Nelson Perel
1400 Liberty Building
Buffalo, New York 14202
(716) 842-2800
nperel@websterszanyi.com

Attorneys for Plaintiff, Sevenson Environmental Services, Inc.

# APPENDIX

| **ASSERTED CLAIM (Relevant Language)** | **Court's Claim Construction** | **Undisputed Facts Concerning Colonie Site** |
|---|---|---|
| '982 Patent, claim 1: | | |
| mixing a metal-bearing material with a first mixture comprising a first component and a second component | "first mixture" means the first component and second component are mixed together (Op. at 27) | Prayphos P5 is "concentrated liquid containing about 75 percent $H_3PO_4$ based on phosphate content and density . . . . Impurities in this product include sulfate, and may include calcium sulfate, iron sulfate, sulfate ions, calcium ions, calcium salts of sulfate, phosphate and fluoride, gypsum, fluoride ions, and sulfuric acid." (Stip. Fact ¶ 11). The product was manufactured by the purified wet-process, where phosphate rock (a first component) is mixed with sulfuric acid (a second component). (Stip. Fact ¶ 10). *See also* Op. at 7: "phosphoric acid is a mixture. . . ." |
| to form a second mixture, | "second mixture" means a metal-bearing material plus the first mixture mixed together (Op. at 28) | The parties agree that the Prayphos P5 phosphoric acid and water mixture, when combined with the contaminated soil in the pugmill, results in a mixture. (*See* Stip. Fact ¶ 12: "Prayphos P5 phosphoric acid, diluted with water to three parts water to one part phosphoric acid, was *mixed* with an amount of the lead-contaminated soil in a device called a pugmill"). |
| said first component supplies at least one member selected from the group consisting of sulphates | "first component" means a separate and distinct compound capable of supplying at least one of the listed members (sulfates) (Op. at 11-14) | Prayphos P5 phosphoric acid contains sulfates. (Stip. Fact ¶ 11). The sulfate component results from the mixing of phosphate rock with sulfuric acid. (Stip. Fact ¶ 10). Sulfates are thus a "separate and distinct" compound found in Prayphos P5 (*i.e.*, separate and distinct from other compounds found therein). The parties agree that the chemical formula for sulfates is $(SO_4)^{2-}$. (*See* Op. at 25). A "compound" is "a substance composed of atoms or ions of two or more elements in chemical combination." (Op. at 26, *quoting Hawley's Condensed Chemical Dictionary*, 302 (11th ed. 1987). |

| | | |
|---|---|---|
| | | Sulfate is a "compound" because it is composed of one atom of sulfur (S) to four atoms of oxygen (O). *See also* Ferguson Decl., Exhibit 6 (*American Heritage Dictionary*, 2d Coll. Ed. (Houghton-Mifflin Co. 1982) ("sulfate: n. A chemical *compound* containing the bivalent group $SO_4$"). |
| said second component supplies at least one phosphate anion; | "second component" means a separate and distinct compound capable of supplying a source of phosphate anion (Op. at 15-16) | Prayphos P5 phosphoric acid supplies phosphate anions. (Stip. Fact ¶ 11). Phosphate anions are a "separate and distinct" compound found in Prayphos P5 (*i.e.*, separate and distinct from other compounds found therein, such as the sulfate compound). The parties agree that the chemical formula for a phosphate anion is $(PO_4)^{3-}$. (*See* Op. at 16-17). A phosphate anion is a "compound" because it is composed of one atom of phosphorus (P) to four atoms of oxygen (O). *See also* www.phosphatefacts.org: "phosphates are *compounds* of phosphorus and oxygen that occur in many forms and are usually combined with other elements - e.g., metals such as sodium, potassium, calcium, and aluminum." |
| such that TCLP metal level for said leachable metal in the cured material is below 5.0 mg/l | | The Government's use of Prayphos P5 "was successful in reducing the amount of leachable lead to below the EPA's standard of 5.0 mg/l using the TCLP test criteria." (Stip. Fact ¶ 13). |
| '367 Patent, Claim 11:<br><br>contacting said host material | "host material" means debris, soil, sludges, and solid materials containing leachable radionuclides and radioactive compounds (Op. at 28) | "The hazardous substances found at the Colonie site include, inter alia, lead and radionuclides." (Stip. Fact ¶ 7). |

| | | |
|---|---|---|
| with a single reactant | "single reactant" means one entity in a chemical reaction (Op. at 29) | Prayphos P5 is an entity involved in a chemical reaction (Stip. Fact ¶¶ 12-13). |
| comprising a source of a sulfate ion | "source of a sulfate ion" means one or more compounds which supplies a reactive sulfate ion, wherein a sulfate ion is the negative ion $(SO_4)^{2-}$ (Op. at 30) | Prayphos P5 is a source of a sulfate ion. *See* analysis of "first component" in claim 1, '982 Patent above. |
| and a phosphate ion | "source of a phosphate ion" means one or more compounds which supplies a reactive phosphate ion, wherein a phosphate anion is the negative ion $(PO_4)^{3-}$ (Op. at 30) | Prayphos P5 is a source of a phosphate ion. *See* analysis of "second component" in claim 1, '982 Patent above. |
| '123 Patent, claim 1:<br><br>mixing a metal-bearing material with a treatment additive | "treatment additive" means first component and second component mixed together (Op. at 34) | Prayphos P5 is a treatment additive because it is a mixture having the first and second component mixed together. Prayphos P5 is a "concentrated liquid containing about 75 percent $H_3PO_4$ based on phosphate content and density . . . . Impurities in this product include sulfate, and may include calcium sulfate, iron sulfate, sulfate ions, calcium ions, calcium salts of sulfate, phosphate and fluoride, gypsum, fluoride ions, and sulfuric acid." (Stip. Fact ¶ 11). The product was manufactured by the purified wet-process, where phosphate rock (a first component) is mixed with sulfuric |

| | | |
|---|---|---|
| | | acid (a second component). (Stip. Fact ¶ 10; *see also* Op. at 7: "phosphoric acid is a mixture. . . ."). |
| comprising a first component and a second component to form a mixture, | "mixture" means the first component and second component are mixed together (Op. at 27) | Prayphos P5 and the metal-bearing material at the Colonie site were mixed together. (Stip. Fact ¶ 12). Prayphos P5 comprises a first component (sulfate) and a second component (phosphate anions). (Stip. Fact ¶ 11). |
| wherein said first component supplies at least one member from the group consisting of sulphates | "first component" means a separate and distinct compound capable of supplying at least one of the listed members (sulfates) (Op. at 11-14) | *See* "first component" analysis from '982 Patent, claim 1 above. |
| and wherein said second component supplies at least one phosphate anion; and | "second component" means a separate and distinct compound capable of supplying a source of phosphate anion (Op. at 15-16) | *See* "second component" analysis from '982 Patent, claim 1 above. |
| the leachable metal level in said cured material is below 5.0 mg/l | | "[T]he treatment method used at the Colonie site was successful in reducing the amount of leachable lead to below the EPA's standard of 5.0 mg/l using the TCLP test criteria." (Stip. Fact ¶ 13). |
| '123 Patent, claim 15: | | |
| mixing [a] waste matrix with a treatment additive | "treatment additive" means first component and second | Prayphos P5 is a treatment additive because it is a mixture having the first and second component mixed together. Prayphos P5 is a |

| | | |
|---|---|---|
| | component mixed together (Op. at 34) | "concentrated liquid containing about 75 percent $H_3PO_4$ based on phosphate content and density . . . . Impurities in this product include sulfate, and may include calcium sulfate, iron sulfate, sulfate ions, calcium ions, calcium salts of sulfate, phosphate and fluoride, gypsum, fluoride ions, and sulfuric acid." (Stip. Fact ¶ 11). The product was manufactured by the purified wet-process, where phosphate rock (a first component) is mixed with sulfuric acid (a second component). (Stip. Fact ¶ 10; *see also* Op. at 7: "phosphoric acid is a mixture. . . ."). |
| comprising a first component and a second component to form a mixture, | "mixture" means the first component and second component are mixed together (Op. at 27) | Prayphos P5 and the waste matrix at the Colonie site were mixed together. (Stip. Fact ¶ 12). Prayphos P5 comprises a first component (sulfate) and a second component (phosphate anions). (Stip. Fact ¶ 11). |
| wherein said first component supplies at least one member from the group consisting of sulphates, | "first component" means a separate and distinct compound capable of supplying at least one of the listed members (sulfates) (Op. at 11-14) | *See* "first component" analysis from '982 Patent, claim 1 above. |
| and wherein said second component supplies at least one phosphate anion; and | "second component" means a separate and distinct compound capable of supplying a source of phosphate anion (Op. at 15-16) | *See* "second component" analysis from '982 Patent, claim 1 above. |
| the leachable metal level in said cured material is below 5.0 mg/l | | "[T]he treatment method used at the Colonie site was successful in reducing the amount of leachable lead to below the EPA's standard of 5.0 mg/l using the TCLP test criteria." (Stip. Fact ¶ |

| | | |
|---|---|---|
| | | 13). |
| '608 Patent, Claim 20:<br><br>A process for treating a material that contains leachable radioactive substances, said process comprising the steps of: | "material" means debris, soil, sludges, and solid materials containing leachable radioactive substances" (Op. at 35-36) | "The hazardous substances found at the Colonie site include, *inter alia*, lead and radionuclides." (Stip. Fact ¶ 7). |
| contacting said material with a treatment additive | "treatment additive" means first component and second component mixed together (Op. at 34) | Prayphos P5 is a treatment additive because it is a mixture having the first and second component mixed together. Prayphos P5 is a "concentrated liquid containing about 75 percent $H_3PO_4$ based on phosphate content and density . . . . Impurities in this product include sulfate, and may include calcium sulfate, iron sulfate, sulfate ions, calcium ions, calcium salts of sulfate, phosphate and fluoride, gypsum, fluoride ions, and sulfuric acid." (Stip. Fact ¶ 11). The product was manufactured by the purified wet-process, where phosphate rock (a first component) is mixed with sulfuric acid (a second component). (Stip. Fact ¶ 10; *see also* Op. at 7: "phosphoric acid is a mixture. . . ."). |
| comprising a first component and a second component to form a mixture | "mixture" means the first component and second component are mixed together (Op. at 27) | Prayphos P5 and the waste matrix at the Colonie site were mixed together. (Stip. Fact ¶ 12). Prayphos P5 comprises a first component (sulfate) and a second component (phosphate anions). (Stip. Fact ¶ 11). |
| wherein said first component supplies at least one member selected from the group consisting of sulphates, | "first component" means a separate and distinct compound capable of supplying at least one of the | *See* "first component" analysis from '982 Patent, claim 1 above. |

| | | |
|---|---|---|
| halites, silicates, alum and calcium oxide | listed members (sulfates) (Op. at 11-14) | |
| and wherein said second component supplies phosphate anion | "second component" means a separate and distinct compound capable of supplying a source of phosphate anion (Op. at 15-16) | *See* "second component" analysis from '982 Patent, claim 1 above. |
| '485 Patent, claim 1: | | |
| mixing a lead-bearing material containing leachable lead with a treatment additive | "treatment additive" means first component and second component mixed together (Op. at 34) | Prayphos P5 is a treatment additive because it is a mixture having the first and second component mixed together. Prayphos P5 is a "concentrated liquid containing about 75 percent $H_3PO_4$ based on phosphate content and density . . . . Impurities in this product include sulfate, and may include calcium sulfate, iron sulfate, sulfate ions, calcium ions, calcium salts of sulfate, phosphate and fluoride, gypsum, fluoride ions, and sulfuric acid." (Stip. Fact ¶ 11). The product was manufactured by the purified wet-process, where phosphate rock (a first component) is mixed with sulfuric acid (a second component). (Stip. Fact ¶ 10; *see also* Op. at 7: "phosphoric acid is a mixture. . . ."). |
| comprising a first component and a second component to form a mixture, | "mixture" means the first component and second component are mixed together (Op. at 27) | Prayphos P5 and the lead-bearing material at the Colonie site were mixed together. (Stip. Fact ¶ 12). Prayphos P5 comprises a first component (sulfate) and a second component (phosphate anions). (Stip. Fact ¶ 11). |
| wherein said first component supplies at least one member | "first component" means a separate and distinct | *See* "first component" analysis from '982 Patent, claim 1 above. |

| | | |
|---|---|---|
| from the group consisting of sulphates | compound capable of supplying at least one of the listed members (sulfates) (Op. at 11-14) | |
| and wherein said second component supplies at least one phosphate anion | "second component" means a separate and distinct compound capable of supplying a source of phosphate anion (Op. at 15-16) | *See* "second component" analysis from '982 Patent, claim 1 above. |
| in solution form; and | "solution form" means a homogeneous liquid mixture in which the components are uniformly distributed throughout the mixture (Op. at 39-40) | "[Prayphos P5] is concentrated liquid containing about 75 percent H3PO4 based on phosphate content and density, that is readily miscible in water and other polar solvents, and thus will contain aqueous phosphate when in the presence of water." (Stip. Fact ¶ 11). |
| wherein . . . the leachable lead level in said cured material is below 5.0 mg/l | | "[T]he treatment method used at the Colonie site was successful in reducing the amount of leachable lead to below the EPA's standard of 5.0 mg/l using the TCLP test criteria." (Stip. Fact ¶ 13). |
| '485 Patent, claim 15:<br><br>mixing [a] waste matrix with a treatment additive | "treatment additive" means first component and second component mixed together (Op. at 34) | Prayphos P5 is a treatment additive because it is a mixture having the first and second component mixed together. Prayphos P5 is a "concentrated liquid containing about 75 percent $H_3PO_4$ based on phosphate content and density . . . . Impurities in this product include sulfate, and may include calcium sulfate, iron sulfate, |

| | | |
|---|---|---|
| | | sulfate ions, calcium ions, calcium salts of sulfate, phosphate and fluoride, gypsum, fluoride ions, and sulfuric acid." (Stip. Fact ¶ 11). The product was manufactured by the purified wet-process, where phosphate rock (a first component) is mixed with sulfuric acid (a second component). (Stip. Fact ¶ 10; *see also* Op. at 7: "phosphoric acid is a mixture. . . ."). |
| comprising a first component and a second component to form a mixture, | "mixture" means the first component and second component are mixed together (Op. at 27) | Prayphos P5 and the waste matrix at the Colonie site were mixed together. (Stip. Fact ¶ 12). Prayphos P5 comprises a first component (sulfate) and a second component (phosphate anions). (Stip. Fact ¶ 11). |
| wherein said first component supplies at least one member from the group consisting of sulphates | "first component" means a separate and distinct compound capable of supplying at least one of the listed members (sulfates) (Op. at 11-14) | *See* "first component" analysis from '982 Patent, claim 1 above. |
| and wherein said second component supplies at least one phosphate anion | "second component" means a separate and distinct compound capable of supplying a source of phosphate anion (Op. at 15-16) | *See* "second component" analysis from '982 Patent, claim 1 above. |
| in solution form; and | "solution form" means a homogeneous liquid mixture in which the components are uniformly distributed throughout the mixture (Op. at 39-40) | "[Prayphos P5] is concentrated liquid containing about 75 percent H3PO4 based on phosphate content and density, that is readily miscible in water and other polar solvents, and thus will contain aqueous phosphate when in the presence of water." (Stip. Fact ¶ 11). |

| | | |
|---|---|---|
| wherein . . . the leachable lead level in said cured material is below 5.0 mg/l | | "[T]he treatment method used at the Colonie site was successful in reducing the amount of leachable lead to below the EPA's standard of 5.0 mg/l using the TCLP test criteria." (Stip. Fact ¶ 13). |
| '485 Patent, claim 22:<br><br>contacting contaminated soils or solid waste materials with a treatment additive | "treatment additive" means first component and second component mixed together (Op. at 34) | Prayphos P5 is a treatment additive because it is a mixture having the first and second component mixed together. Prayphos P5 is a "concentrated liquid containing about 75 percent $H_3PO_4$ based on phosphate content and density . . . . Impurities in this product include sulfate, and may include calcium sulfate, iron sulfate, sulfate ions, calcium ions, calcium salts of sulfate, phosphate and fluoride, gypsum, fluoride ions, and sulfuric acid." (Stip. Fact ¶ 11). The product was manufactured by the purified wet-process, where phosphate rock (a first component) is mixed with sulfuric acid (a second component). (Stip. Fact ¶ 10); *see also* Op. at 7: "phosphoric acid is a mixture. . . ."). |
| comprising a first component and a second component to form a mixture, | "mixture" means the first component and second component are mixed together (Op. at 27) | Prayphos P5 and the contaminated soil material at the Colonie site were mixed together. (Stip. Fact ¶ 12). Prayphos P5 comprises a first component (sulfate) and a second component (phosphate anions). (Stip. Fact ¶ 11). |
| wherein said first component includes one or more reactive sulphate ions | "first component" means a separate and distinct compound capable of supplying at least one or more reactive sulphate ions (a compound containing a | *See* "first component" analysis from '982 Patent, claim 1 above. |

| | | |
|---|---|---|
| | reactive sulfate ion, $(S0_4)^{2-}$) (Op. at 11-14, 40-41) | |
| and wherein said second component is a phosphate supplying reagent | "second component" means a separate and distinct compound capable of supplying a source of phosphate anion (Op. at 15-16) | *See* "second component" analysis from '982 Patent, claim 1 above. |
| wherein . . . the leachable lead level in said cured material is below 5.0 mg/l | | "[T]he treatment method used at the Colonie site was successful in reducing the amount of leachable lead to below the EPA's standard of 5.0 mg/l using the TCLP test criteria." (Stip. Fact ¶ 13). |
| '485 Patent, claim 30: | | |
| contacting contaminated soils or solid waste materials with a combination of a sulfate reagent | "sulfate reagent" means a separate and distinct compound capable of supplying a sulfate ion, $(S0_4)^{2-}$ that participates in a chemical reaction (Op. at 42-43) | Prayphos P5 phosphoric acid contains sulfates. (Stip. Fact ¶ 11). Sulfates are thus a "separate and distinct" compound found in Prayphos P5 (*i.e.*, separate and distinct from other compounds found therein). The parties agree that the chemical formula for sulfates is $(SO_4)^{2-}$. (*See* Op. at 25). The sulfates in Prayphos P5 participate in the chemical reaction at the Colonie site because chemical bonding reactions involving lead and sulfates and phosphates occur at the molecular level. (*See* Stip. Fact ¶ 4; *see also* Sevenson Memorandum in Support, pp. 20-22 *supra*). |
| which includes one or more reactive sulfate ions | "one or more reactive sulfate ions" means a compound containing a reactive sulfate ion, $(S0_4)^{2-}$ (Op. at 40-41) | *See* analysis of "sulfate reagent" above. The claim construction for the terms "sulfate reagent" and "one or more reactive sulfate ions" is largely redundant. |

| | | |
|---|---|---|
| and a phosphate supplying reagent | | Prayphos P5 phosphoric acid supplies phosphate anions. (Stip. Fact ¶ 11). Phosphate anions are a "separate and distinct" compound found in Prayphos P5 (*i.e.*, separate and distinct from other compounds found therein, such as the sulfate compound). The parties agree that the chemical formula for a phosphate anion is $(PO_4)^{3-}$. (*See* Op. at 16-17). |