**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| SEVENSON ENVIRONMENTAL SERVICES, INC., Plaintiff, | ) | |
| v. | ) | No. 05-1075C<br>Judge Thomas C. Wheeler |
| THE UNITED STATES Defendant | ) | |
| and | ) | |
| SHAW ENVIRONMENTAL, INC., Defendant-Intervenor. | ) | |

**DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT**

PETER D. KEISLER
Assistant Attorney General

JOHN J. FARGO
Director

JOSHUA B. BRADY
Attorney
Civil Division
U.S. Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0285
Facsimile: (202) 307-0345

OF COUNSEL:
Susan Mitchell
Attorney
U.S. Department of Justice

Attorneys for Defendant the United States

RUSSEL O. PRIMEAUX
Kean Miller Hawthorne D'Armond
McCowan & Jarman LLP
One American Place, 22nd Floor
Post Office Box 3513
Baton Rouge, LA 70821-3513
(225) 387-0999

Attorney for Shaw Environmental, Inc.

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES . . . iv

APPENDIX . . . vii

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT . . . 3

STATEMENT OF THE CASE . . . 3

I. Introduction . . . 3

II. Factual Background . . . 5

A. The Colonie, New York FUSRAP Site . . . 5

1. Kiber Treatability Study . . . 5

2. Colonie Treatment Process . . . 6

B. Prayon's Prayphos P5 . . . 7

C. Sevenson's Patents . . . 8

ARGUMENT . . . 12

I. Summary judgment of non-infringement against Sevenson is appropriate. . . . 12

II. The Colonie treatment process does not infringe any claims because it did not use a "first component" "separate and distinct" from a "second component" as claimed in Sevenson's Patents. . . . 16

A. The Sevenson patents at issue require a "first component" that is "separate and distinct" from a "second component." . . . 16

B. Prosecution history estoppel bars arguing that sulfate impurities inherent in Prayphos P5 are a "first component" for "supplying" sulfate, or alternatively that phosphoric acid may be both the "first component" and the "second component." . . . 18

1. Prosecution History of the Parent, the '936 Patent . . . 19

**Page**


2. Prosecution History of the '982 Patent . . . . . . . . . . . . . . . . . . . . . . . . . 21

3. Prosecution History of the '485 Patent . . . . . . . . . . . . . . . . . . . . . . . . . 22

4. Conclusions From Prosecution History of the Sevenson Patents . . . . . 23

C. The Colonie treatment process did not have a "first component" and a "second component" as claimed in Sevenson's patents. . . . . . . . . . . . . . . . . . . 24

D. The sulfate impurities inherent in Prayphos P5 are not an equivalent for the claim limitation of a "first component" for "supplying" sulfate. . . . . . . 25

E. Conclusions as to whether sulfate impurities within a purified phosphoric acid are a "first component." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

III. The Colonie treatment process does not "supply" a sulfate ion for the stabilization process, and therefore does not infringe any patents claiming a component that "supplies" sulfate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

A. The sulfate impurities in Prayphos P5 are far too negligible to be made available for the stabilization process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

B. Prayphos P5 does not "supply" a "reactive sulfate ion." . . . . . . . . . . . . . . . . . . 29

C. Sevenson is barred by prosecution history estoppel from arguing that sulfate impurities inherent in phosphoric acid are covered by the claim requirements of supplying a sulfate ion for the stabilization process. . . . . . . . . . . . . . . . . . . 30

IV. The Colonie process does not infringe any patents claiming a "mixture" of components, as the only component used for on-site lead stabilization was the commercially-available phosphoric acid Prayphos P5. . . . . . . . . . . . . . . . . . . . . . . . 31

A. The Sevenson patents require a deliberate mixing or joining of two components, which did not occur during the Colonie treatment process. . . . . . 31

B. The Colonie treatment process did not involve bringing sulfuric acid into close relationship with Prayphos P5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

C. Sevenson is barred by prosecution history estoppel from arguing that phosphoric acid meets these claim limitations . . . . . . . . . . . . . . . . . . . . . . . . . 33

V. Since the Colonie treatment process is a one-step process, it does not infringe claim 1 of the '608 Patent that requires addition of the components in two steps. . . . . . . . . . . 33

**Page**

VI. The Colonie treatment process does not infringe claim 13 of the '367 Patent or claim 11 of the '608 Patent because Prayphos P5 is not TGPA as defined in the patents and as properly construed by this Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

VII. Sevenson cannot prove that the Colonie treatment process infringes either the '608 Patent or the '367 Patent because there is no evidence of any decrease in the concentration of leachable radionuclides in TCLP extract. . . . . . . . . . . . . . . . . . . . . . . . . 37

VIII. As volume change was never measured during the Colonie FUSRAP project and the only related evidence suggests volume expansion, Sevenson cannot prove that the Colonie treatment process infringes the '123 Patent, which require a reduction in volume. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF AUTHORITIES

## CASES

**Page**

*Advanced Cardiovascular Sys. v. Medtronic, Inc.*,
265 F.3d 1294 (Fed. Cir. 2001) ........................................................................ 15

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 251 (1986) ............................................................................... 13

*AquaTex Indus. v. Techniche Solutions*,
419 F.3d 1374 (Fed. Cir. 2005) ........................................................................ 18

*Athletic Alternatives, Inc. v. Prince Mfg., Inc.*,
73 F.3d 1573 (Fed. Cir. 1996) ......................................................................... 13

*Bai v. L&L Wings, Inc.*,
160 F.3d 1350 (Fed. Cir. 1998) ........................................................................ 13

*Celotex Corp. v. Catrett*,
477 U.S. 317, 322–24, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986) .................................. 12

*Cook Biotech Inc. v. Acell, Inc.*,
460 F.3d 1365 (Fed. Cir. 2006) ........................................................................ 12

*Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*,
868 F.2d 1251 (Fed. Cir. 1989) ........................................................................ 13

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
192 F.3d 973 (Fed. Cir. 1999) ............................................................... 15, 19, 24

*Golan v. Pingel Enter.*,
310 F.3d 1360 (Fed. Cir. 2002) ........................................................................ 12

*Jonsson v. The Stanley Works*,
903 F.2d 812 (Fed. Cir. 1990) ......................................................................... 15

*Laitram Corp. v. Rexnord, Inc.*,
939 F.2d 1533 (Fed. Cir. 1991) ........................................................................ 13

*Lockheed Martin Corp. v. Space Sys./Loral, Inc.*,
324 F.3d 1308 (Fed. Cir. 2003) ........................................................................ 14

**Page**

*Markman v. Westview Intr., Inc.*,
52 F.3d 967 (Fed. Cir. 1995),
*aff'd* 517 U.S. 370 (1996) .................................................. 15

*Moore U.S.A., Inc. v. Std. Register Co.*,
229 F.3d 1091 (Fed. Cir. 2000) .................................................. 14

*Motionless Keyboard Co. v. Microsoft Corp.*,
2007 U.S. App. LEXIS 12351 (Fed. Cir. 2007) .................................................. 14

*Ortho-McNeil Pharm., Inc. v. Caraco Pharm. Labs., Ltd.*,
476 F.3d 1321 (Fed. Cir. 2007) .................................................. 12

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .................................................. 15

*Phillips Petroleum Co. v. Huntsman Polymers Corp*,
157 F.3d 866 (Fed. Cir. 1998) .................................................. 26

*Primos, Inc. v. Hunter's Specialties, Inc.*,
451 F.3d 841 (Fed. Cir. 2006) .................................................. 14

*Sevenson Envtl. Servs., Inc. v. United States*,
76 Fed. Cl. 51, 2007 U.S. Claims LEXIS 94 (Fed. Cl. Mar. 28, 2007) .................. passim

*Southwall Techs., Inc. v. Cardinal IG Co.*,
54 F.3d 1570 (Fed. Cir. 1995) .................................................. 16

*Spectrum Int'l, Inc. v. Sterilite Corp.*,
164 F.3d 1372 (Fed. Cir. 1998) .................................................. 15

*TechSearch, L.L.C. v. Intel Corp.*,
286 F.3d 1360 (Fed. Cir. 2002),
*cert. denied*, 123 S. Ct. 436 (2002) .................................................. 13, 14

*Ventana Med. Sys. v. Biogenex Labs, Inc.*,
473 F.3d 1173 (Fed. Cir. 2006) .................................................. 15

*Wang Lab, Inc. v. Mitsubishi Elecs. Am.*,
103 F.3d 1571 (Fed. Cir. 1997) .................................................. 15

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
520 U.S. 17 (1997) .................................................. 13, 14

## STATUTES & RULES

**Page**

RCFC 56 .......... 1, 4

35 U.S.C. 102(b) .......... 21

# APPENDIX

| Exhibit | Document | Pages |
|---|---|---|
| **1** | Table of Arguments | |
| **2** | Final Operations Work Plan for Colonie FUSRAP Site | G001446–001539 |
| **3** | Kiber Treatability Study Final Report, March 1999 | G000110–000138 |
| **4** | Kiber Treatability Study Final Report, May 1999 | G000079–000089 |
| **5** | Prayon's Specification Data Sheet for Prayphos P5 | 1–2 |
| **6** | Declaration of Gary Pierzynski, Ph.D. | 1–7 w/ attachments |
| **7** | Certificates of Analysis for Prayphos P5 | SH041201, SH041245, SH041293 |
| **8** | Chart of Sevenson's Family of Patents | 1–2 |
| **9** | Excerpts of Prosecution History of '982 Patent | G002960–2963; 003024–3056 |
| **10** | O'Hara Patent | |
| **11** | Excerpts of Prosecution History of '485 Patent | G004558–4563; 004651–4665 |
| **12** | Stanforth Patent | |
| **13** | Excerpts of Prosecution History of '936 Patent | G002439–2460 |
| **14** | '936 Patent | |
| **15** | Excerpts of Deposition of Anthony Sheeran | 1, 4–6, 92–93, 99–100 |

Note: Defendant-Intervenor Shaw Environmental, Inc., hereby waives confidentiality of Exhibit 7 and Exhibit 15, without waiving confidentiality to any remaining documents or depositions under the Protective Order.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| SEVENSON ENVIRONMENTAL SERVICES, INC., Plaintiff, v. THE UNITED STATES Defendant and SHAW ENVIRONMENTAL, INC., Defendant-Intervenor. | ) | No. 05-1075C<br>Judge Thomas C. Wheeler |

**DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT**

This is a patent infringement case brought by Sevenson Environmental Services against the United States. Sevenson alleges that the lead stabilization treatment process at the Colonie, New York Formerly Utilized Site Remedial Action Program ("FUSRAP") site infringed claims 1–5 and 9 of the '982 Patent; claims 11, 13, 14, and 16 of the ''367 Patent; claims 1–7 and 15–20 of the '123 Patent; claims 1–7, 11–24, and 26–30 of the '608 Patent; and claims 1–6 and 15–36 of the '485 Patent. Defendants jointly move pursuant to RCFC 56 for summary judgment on the grounds that the Colonie treatment process does not infringe any of the asserted claims of Sevenson's patents.

Specifically, Defendants seek summary judgment on the following grounds:

1. While the asserted claims of Sevenson's patents require a "first component" that is "separate and distinct" from a "second component," the Colonie treatment process involved only a single component– phosphoric acid. The sulfate impurities inherent in the phosphoric acid are insufficient to constitute the "first component," and Sevenson is

barred by prosecution history estoppel from arguing infringement by the doctrine of equivalents. Thus, the Colonie treatment process does not infringe these claims literally or under the doctrine of equivalents.

2. While asserted claims of Sevenson's patents require a "first component" to "supply" *inter alia* sulfate, the Colonie treatment process supplied only phosphoric acid. The *de minimis* amount of sulfate impurities present in the phosphoric acid is insufficient to meet this limitation, within the proper scope of the claims, and Sevenson is barred by prosecution history estoppel from arguing infringement by the doctrine of equivalents. Thus, the Colonie treatment process does not infringe these claims literally or under the doctrine of equivalents.

3. While asserted claims of Sevenson's patents require a "first mixture," "treatment additive" or "combination" of two "separate and distinct" components, the Colonie treatment process involved only one single component, phosphoric acid. Sevenson is barred by prosecution history estoppel from arguing infringement by the doctrine of equivalents. Thus, the Colonie treatment process does not infringe these claims literally or under the doctrine of equivalents.

4. While the asserted claims of the '608 Patent require a two-step process, the Colonie treatment process involved addition of a single component, phosphoric acid, in a *single step*. Further, re-treatment of soil that failed a post-treatment TCLP test is not a second step within the proper scope of the claims. Therefore, the Colonie treatment process does not infringe these claims literally or under the doctrine of equivalents.

5. While asserted claims of the '367 Patent and '608 Patent require a single treatment chemical called "technical grade phosphoric acid," having a defined range of sulfate concentrations, the concentration of sulfate impurities inherent in the phosphoric acid used at Colonie was far too *de minimis* to fit into the patents' definition of "technical grade phosphoric acid." The Colonie treatment process does not infringe these claims literally or under the doctrine of equivalents.

6. While asserted claims of the '367 Patent and '608 Patent require a decrease in the concentration of leachable radionuclides, the Colonie treatment process never treated for leachable radioactive constituents, nor did the process ever include measuring TCLP extracts for radioactive concentration. There is no evidence from which a trier of fact can conclude that the Colonie treatment process meets this limitation, and therefore Colonie treatment process does not infringe these claims literally or under the doctrine of equivalents.

7. While asserted claims of the '123 Patent require a volume reduction after treatment, the only evidence relating to volume changes at the Colonie site indicate volume *increase* after lead stabilization treatment. There is no evidence from which a trier of fact can conclude that the Colonie treatment process meets this limitation, and therefore Colonie treatment process does not infringe these claims literally or under the doctrine of equivalents.

The accompanying Memorandum in Support of Defendants' Motion for summary Judgment addresses each of these arguments more fully, and are supported by the Appendix, which includes the Declaration of Gary Pierzynski, Ph.D.

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT

## *STATEMENT OF THE CASE*

### I. Introduction

This is a patent infringement case brought by Sevenson against the United States.[1] Sevenson alleges that the lead stabilization process used by the U.S. Army Corps of Engineers at the Colonie, New York FUSRAP site infringed U.S. Patents 5,527,982 (the '982 Patent); 5,732,367 (the '367 Patent); 5,916,123 (the '123 Patent); 5,994,608 (the '608 Patent); 6,139,485 (the '485 Patent). Sevenson claims that the Colonie treatment process infringed claims 1–5 and 9 of the '982 Patent; claims 11, 13, 14, and 16 of the '367 Patent; claims 1–7 and 15–20 of the '123 Patent; claims 1–7, 11–24, and 26–30 of the '608 Patent; and claims 1–6 and 15–36 of the '485 Patent.

The Colonie treatment process did not infringe any of the asserted claims for reasons that are simple but numerous.[2] First, the treatment at Colonie involved the use of a single component applied in a single step. The single component was Prayon's Prayphos P5, a purified phosphoric acid containing sulfate impurities at a concentration no greater than 350 parts-per-*million* (ppm),

---

[1] This brief refers to the United States and Defendant-Intervenor Shaw Environmental, Inc. collectively as "Defendants."

[2] Defendants have included a table identifying the claims subject to each argument presented in this brief. (Ex. 1.)

that is manufactured using a wet process. Second, given the *de minimis* sulfate impurities, Prayphos P5 does not fall within the definition of technical grade phosphoric acid as described in the patents and as properly construed by this Court.[3] Third, there was no "mixture" of a first component for supplying sulfate with a second component for supplying phosphate, nor did the Colonie process "supply" a "reactive sulfate" within the scope and meaning of the claims. What *de minimis* sulfate was present in the Colonie treatment process arrived as a latent impurity in the Prayphos P5, not from a "separate and distinct" "first component" as claimed in Sevenson's patents and properly defined by this Court. Fourth, the Colonie process for lead stabilization was a one-step process; re-treatment of any soil pile that did not pass the TCLP using the same one-step process is not the second step of treatment claimed in the Sevenson's patents. Fifth, the application of diluted Prayphos P5 to soil piles was to stabilize lead; the remedial actions at the Colonie site did not involve reducing the concentration of leachable radionuclides. At no point was the radioactivity of a TCLP extract measured. There is no evidence of a decrease in the concentration of leachable radionuclides. Finally, there is no evidence that the lead stabilization resulted in a volume reduction as claims in the '123 patent. In fact, the only evidence regarding volume changes suggests that soil volume increased after treatment.

Accordingly, defendants jointly move pursuant to RCFC 56 for summary judgment on the grounds that the accused process at the Colonie FUSRAP site did not infringe any of the asserted claims of Sevenson's patents.

---

[3] *Sevenson Envtl. Servs., Inc. v. United States*, 76 Fed. Cl. 51, 2007 U.S. Claims LEXIS 94, at *43 (Fed. Cl. Mar. 28, 2007).

## II. Factual Background

### A. The Colonie, New York FUSRAP Site

This Court's prior Opinion construing claim terms provides general background on the Colonie site and changes in the contracting parties over time. *Sevenson*, 2007 U.S. Claims LEXIS 94, at *15–16. The Corps characterized the Colonie site contaminants into two categories, radiological and chemical constituents. (Ex. 2 at G001462.) The radiological constituents included Uranium-238 and Thorium-232, while the chemical constituents included lead. *Id.* Preliminary testing indicated that some soil at the Colonie site contained lead that leached above the applicable TCLP criteria of 5.0 mg/l. (Stipulated Facts ¶ 9.) In association with the Corps project team, the contractor implemented a phased remedial approach that included excavating contaminated soil, surveying for radiological constituents, treating for lead contamination, and disposing of contaminated soil off-site. (Ex. 2 at G001454.)

#### *1. Kiber Treatability Study*

Kiber Environmental Services ("Kiber") produced a Final Report in March of 1999 ("March report"), recommending the use of phosphoric acid to treat soil after evaluating other potential treatment chemicals. (Ex. 3); *see also Sevenson*, at *16. In this study, Kiber evaluated "traditional" treatment designs and "phosphate based" treatment designs, using soil samples from the Colonie site. (Ex. 3 at G000113.) These included Portland cement, hydrated lime, fly ash, phosphoric acid, and a combination of phosphoric acid and ferrous sulfate ($FeSO_4$). (Ex. 3 at G000136–137.) Several treatment designs satisfied TCLP testing on the Colonie soil samples, (Ex. 3 at G000126.) however Kiber concluded that "[b]ased on the results and potential cost effectiveness, the optimum treatment design would consist of the addition of phosphoric acid solution." (*Id.* at G000129.)

Kiber also measured volumetric expansion and reported results ranging from 11% to 37%, observing that "higher reagent addition rates resulted in higher volumetric expansion values." (Ex. 3 at G000125.) As Table 6 of the March report shows, each candidate mixture exhibited a volumetric increase – no treatment resulted in a decrease in volume. (Ex. 3 at G000137.) In an attempt to further optimize the treatment design, Kiber issued a Revised Treatability Study Final Report in May of 1999 ("May report"). (Ex. 4.) Table 1 of the May report shows the measured volumetric expansion for each concentration and addition rate of phosphoric acid. (Ex. 4 at G000086.) As in the March report, each candidate mixture in the May report exhibited a volumetric increase. *Id.*

### ***2. Colonie Treatment Process***.

The selection of phosphoric acid for the Colonie on-site lead stabilization process was the result of Kiber's recommendation. (Ex. 2 at G001489.) The Colonie site treatment process involved the following relevant steps. Following initial radiological surface scans, the contractor excavated and staged soil in piles of approximately 250 cubic yards. (Stipulated Facts ¶ 12.) The contractor then screened these piles using field instruments and used correlation data to correlate between counts-per-minute and U-238 and Th-232 concentrations. (Ex. 2 at G001488.) The contractor assigned each pile a radiological status of either "hot," "warm," or "cold" based on certain criteria. (Ex. 2 at G001489.) The contractor marked each soil pile's radiological status using spray paint applied directly to the soil pile. (*Id.* at G001482.) The contractor eventually disposed of the soil piles in appropriate areas depending upon the radiological status. (*Id.* at G001488.)[4]

---

[4] *See* Ex. 2 at G001537, Figure 7 page 1 for a flow chart of the process for segregating radiological soil at Colonie. (Ex. 2 at G001537.)

The contractor took a representative sample from each soil pile for off-site TCLP testing. Soil piles deemed to be "characteristic" pursuant to Resource Conservation and Recovery Act ("RCRA") standards (e.g., TCLP lead > 5.0mg/l) were subjected to the on-site soil stabilization process. (Ex. 2 at G001488.) The contractor used Prayon's Prayphos P5 for the lead stabilization process. (Stipulated Facts ¶ 10.) Prayphos P5 phosphoric acid, diluted to three parts water to one part phosphoric acid, was mixed with an amount of the lead-contaminated soil in a device called a pugmill. (Stipulated Facts ¶ 12.) The contaminated soil and phosphoric acid mixture was then allowed to cure, and shortly thereafter a sample was taken to confirm post-treatment TCLP lead levels. (Stipulated Facts ¶ 12.) The contractor did not release stabilized soil piles for off-site disposal until TCLP analysis confirmed a reduction of leachable lead level to below 5.0 mg/l. (Ex. 2 at G001477; G001489.) Any treated soil pile that failed post-treatment TCLP testing for lead underwent re-treatment using the same process. (*Id.* at G001490.) Thus, all soil piles shipped for off-site disposal had a post-treatment TCLP lead level less than 5.0 mg/l. (Ex. 2 at G001490.)[5]

At no point did Shaw Environmental or predecessor IT measure the radioactivity of a TCLP extract. During the deposition of Anthony Sheeran, the Shaw Environmental's project manager for the Colonie site, Mr. Sheeran confirmed that the leachability of radioactive constituents was never measured after treatment for lead. (Ex. 16 at page 100, lines 10–15.)

B. Prayon's Prayphos P5.

Prayphos P5 is a phosphoric acid manufactured by Prayon, Inc., using its purified wet-process. (Stipulated Facts ¶ 10.) In its proprietary purified wet process, Prayon carries out

---

[5] *See* Ex. 2 at G001538–39, Figure 7 pp. 2–3 for flow charts of the lead stabilization processes for soil piles segregated by radioactivity. (Ex. 2 at G001538–39.)

additional acid purification steps by using a mixed organic solvent to extract impurities such as sulfate, fluorine, and arsenic, thereby increasing the concentration of the phosphoric acid and decreasing impurity concentrations. (Ex. 6 at ¶ 17.) Prayon refers to Prayphos P5 as "purified phosphoric acid," as seen on Prayon's Product Specification Data Sheet for Prayphos P5 (Ex. 5.) Despite purification technology, no wet process manufacturing of phosphoric acid can completely remove sulfate, fluoride or other impurities. (Ex. 6 at ¶ 18.) All phosphoric acid produced by a wet process will include some level of sulfate as impurities. *Id.*

Prayon states the phosphoric acid impurity concentrations in parts-per-million (ppm), whereas the patents in suit state values as a percent by weight. In his attached Declaration, Dr. Gary Pierzynski explains the mathematical relationship between ppm and percent by weight (% (wt.)), (Ex. 6 at ¶ 6) then converts the concentration of sulfate impurities identified in the certificates of analysis for Prayphos P5. (Ex. 7.) The results of this conversion are reproduced below.

**Table 1. Summary of Sulfate Impurity Concentration in Prayphos P5 Certificates of Analysis**

| | Guaranteed | | Typical | | Result | |
|---|---|---|---|---|---|---|
| | **ppm** | **% (wt)** | **ppm** | **% (wt)** | **ppm** | **% (wt)** |
| **Attachment 2 COA** (Marked as SH041201) | 350 (max) | 0.035% | 230 | 0.023% | 13 | 0.0013% |
| **Attachment 3 COA** (Marked as SH041245) | 350 (max) | 0.035% | 230 | 0.023 % | 203 | 0.0203% |
| **Attachment 4 COA** (Marked as SH041293) | 350 (max) | 0.035% | 230 | 0.023 % | 187 | 0.0187% |

(Ex. 6 at ¶ ¶ 13–14.)

C. Sevenson's Patents.

Sevenson's patents claim a two-component chemical treatment method for stabilizing

leachable metal (or leachable radionuclides in the case of the '367 and '608 patents). The patents have nearly identical specifications, and share the same drawings. The claims, written descriptions and drawings for each of the patents are all consistent with a two-component system, wherein the "first component" "supplies" a member of a first group of treatment chemicals, such as sulfate, and a "separate and distinct" "second component" "supplies" phosphate. *Compare, e.g.*, the '982 patent *with* the '485 patent.

Each asserted patent identifies a "first group of treatment chemicals" for supplying the first component, including "lime, gypsum, alum, halites, Portland cement, and other similar products that can supply sulfates, halides, hydroxides and/or silicates." '982 Patent, col. 3, lines 16–19; '367 Patent, col. 4, lines 4–7; '123 Patent, col. 3, lines 26–29; '608 Patent, col. 3, lines 30–34; '485 Patent, col. 4, lines 46–49. Similarly, the patents identify various "second group" treatment chemicals for supplying the second component, phosphate anions, including "products such as phosphoric acid, pyrophosphates, triple super phosphate (TSP), trisodium phosphate, potassium phosphates, ammonium phosphates and/or others capable of supplying phosphate anion …." '982 patent, col. 3, lines 20–26; '367 patent, col. 4, lines 9–14; '123 patent, col. 3, lines 30–38; '608 patent, col. 3, lines 35–41; '485 patent, col. 4, lines 50–56).

As the Court noted in its Claim Construction Opinion, "the specification of each patent also indicates that each Markush group member is a 'compound.'" *Sevenson* , at *27. The patents also interchangeably refer to the constituents of the Markush groups for the first and second groups, such as, *inter alia*, "products," *e.g.* '982 Patent, Fig. 1; "chemicals," *e.g.*, '982 Patent, col. 4, lines 16; "agents," *e.g.*, '123 Patent, col. 4 line 63; "additives," '608 Patent, col. 3, lines 19; "components," *e.g.*, '982 Patent, col. 5 line 39; "ingredients," *e.g.*, '982 Patent, col. 5 line 53; and again "compounds," *e.g.*, '982 Patent, col. 13, line 5 (stating that "one or more

compounds of the same group can be used together ….”). This wide variation in terminology for, and the contrast between the first and second components shows that the first and second components are truly “separate and distinct.”

The “separate and distinct” nature of the first and second components is highlighted by the references each patent makes to phosphoric acid. None of the patents list phosphoric acid as a member of the “first group of treatment chemicals.” Each patent, however, *does* include phosphoric acid in the “second group” of treatment chemicals. *See, e.g.*, '982 Patent, col. 3, lines 20–22 (“A second group consists of treatment chemicals … includes products such as phosphoric acid ….”); '123 Patent, col. 13, line 4 (describing phosphoric acid as “an additive from group two”). The patents also claim phosphoric acid as the *second* component in dependent claims, *see, e.g.* , claim 9 of the '982 Patent (“said second component is phosphoric acid”), but never as the “first component.”

Further, Sevenson’s patents teach away from using phosphoric acid as a single component. As reported under Example 5 in the '982 Patent, “[s]ingle application of phosphoric acid… was short of meeting the regulatory threshold of 5.0 mg/l by TCLP Test criteria for lead.” '982 Patent, col. 16, lines 53–56. Each patent includes the teaching that phosphoric acid, without an additional source of sulfate, is insufficient to reduce the leachability of lead to satisfy the TCLP test. *See also* '367 Patent, col. 20, lines 49–62; '123 Patent, col. 17, lines 1–15; '608 Patent, col. 20, lines 38–52; '485 Patent, col. 19, lines 26–40. It is clear that the patentees considered phosphoric acid as a member of the second group of treatment chemicals, and never a member the first group for supplying sulfate or another compound from the first group, with only one exception.

The one exception is in the case of what the patentees termed “technical grade

phosphoric acid." Of the five patents, only two teach that the sulfate impurities in a particular compound, technical grade phosphoric acid ("TGPA") are a sufficient source for sulfate ions, and therefore TGPA may be used as a single reactant to reduce leachability of radionuclides. '367 Patent, col. 6, lines 52–57; '608 Patent, col. 6, lines 6–11. These patents do not teach TGPA for treating lead. In both of these patents the inventors clearly define the TGPA which they considered to be a sufficient source of sulfate, *see* '367 Patent, col. 6, lines 52–57; '608 Patent, col. 6, lines 6–11, and this Court has properly construed the term TGPA as used in Sevenson's patents. *Sevenson*, at *43. Not only do both of these patents specifically identify the minimum amount sulfate sufficient for classification as TGPA, both the '367 Patent and the '608 Patent teach away from using phosphoric acid as a single component:

> Evaluation of a single treatment chemical in one step reveals that phosphoric acid was most effective in fixation of leachable lead followed by granular super-phosphate…. *However, neither treatment effectively treated leachable lead to the USEPA treatment standard of 5.0 mg/l by TCLP methodology*.

'367 Patent, col. 20, lines 49–55; '608 Patent, col. 20, lines 38–45 (discussing results of single step, single treatment chemicals in Table VII) (emphasis added).

It is clear that the two-component invention claimed in the Sevenson patents involves separate and distinct components, i.e. compounds originating from separate sources, such as separate feed tanks or containers. This "two-tank" invention is consistent with the three drawings common to all five of the asserted patents.[6] As the Court noted in its Claim Construction, "[t]he drawings accompanying each of the patents also show a separate and distinct group of treatment chemicals." *Sevenson*, at *27–28. Each drawing clearly identifies a tank for the "Group One Treatment Chemicals," separate and distinct from a tank for the "Group

[6] Figures 1, 2a and 2b are identical for all five patents, and clearly demonstrate the separate and distinct sources of the first and second components, as two different feed tanks.

Two Treatment Chemicals." The "two-tank" source of the first and second components is also evident by reviewing the plethora of references to "group one" chemicals and "group two" chemicals included in the specifications of each of the patents. Although the components may reach the contaminated material together, at some point they originate from separate and distinct sources, such as containers of calcium sulfate powder or phosphoric acid tanks. Even the various examples included in the patents reference group one components as separate and distinct from group two components or, in other words, chemicals coming from separate sources. *See, e.g.,* '982 Patent, col. 10, lines 61–63 ("In test run I, mixing of lime and gypsum *from group one additives* and phosphoric acid *from group two* ….").

***ARGUMENT***

**I. Summary judgment of non-infringement against Sevenson is appropriate.**

"Summary judgment is appropriate when there are no issues of material fact and the moving party is entitled to judgment as a matter of law." *Golan v. Pingel Enter.*, 310 F.3d 1360, 1367 (Fed. Cir. 2002) (citations omitted). Although infringement is a question of fact, "[i]n the summary judgment setting, the proper inquiry is whether or not, drawing all justifiable inferences in favor of the non-moving party, the evidence is such that a reasonable jury could return a verdict for the non-movant." *Ortho-McNeil Pharm., Inc. v. Caraco Pharm. Labs.*, Ltd., 476 F.3d 1321, 1326 (Fed. Cir. 2007) (*citing Cook Biotech Inc. v. Acell, Inc*., 460 F.3d 1365, 1373 (Fed. Cir. 2006)).

"Where the party opposing summary judgment bears the burden of proof at trial, however, it must show more than a mere metaphysical doubt regarding the material facts." *Golan*, 310 F.3d at 1367–68 (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)). Thus, to avoid summary judgment in the present case, Sevenson

must "show the existence of a genuine issue of material fact, which exists only if the evidence is such that a reasonable jury could reach a verdict in its favor." *Id.* at 1368 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Sevenson cannot meet this burden.

To establish infringement, Sevenson bears the burden of proving by a preponderance of the evidence that the Colonie treatment process satisfies the "all-elements rule," where "every limitation set forth in a patent claim [is] found in an accused product or process exactly or by a substantial equivalent." *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991) (*citing Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1259 (Fed. Cir. 1989)). Defendants are entitled to summary judgment of non-infringement with respect to any claim of any patent at issue if this Court finds that the Colonie treatment process does not satisfy any one of the numerous limitations of that claim. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997); *see also TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1367, 1372–73 (Fed. Cir. 2002) (holding that where one limitation of a claim was not met, "on that basis alone," no reasonable juror could find the claim infringed."), *cert. denied*, 123 S. Ct. 436 (2002).

Whether the Colonie treatment process satisfies a limitation of any of the claims asserted by Sevenson, literally or under the doctrine of equivalents is, in general, a question of fact. *Bai v. L&L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998). Where Sevenson does not dispute a fact, or fails to offer contradictory evidence, relating to the Colonie treatment process, summary judgment is appropriate. *Athletic Alternatives, Inc. v. Prince Mfg., Inc.* , 73 F.3d 1573, 1578 (Fed. Cir. 1996) (holding a claim to be "amenable to summary judgment" where the parties did not dispute relevant facts but disagreed over the meaning of a claim). However, since Sevenson bears the burden of proof on the issue of infringement, it cannot "overcome a grant of summary

judgment by merely offering conclusory statements" asserting that the Colonie treatment process satisfies a claim limitation. *Moore U.S.A., Inc. v. Std. Register Co.*, 229 F.3d 1091, 1112–13 (Fed. Cir. 2000). Sevenson must show infringement literally or equivalently for each and every claim limitation and "general assertions of facts, general denials, and conclusory statements are insufficient to shoulder the non-movant's burden." *TechSearch*, 286 F.3d at 1372.

To avoid a grant of summary judgment denying infringement under the doctrine of equivalents, the patentee must present particularized evidence and linking argument as to the insubstantiality of the differences between the claimed invention and the accused device, or with respect to the "function, way, result' test." *Motionless Keyboard Co. v. Microsoft Corp.*, 2007 U.S. App. LEXIS 12351 (Fed. Cir. 2007) (citations omitted). However, the "all-elements rule" restricts application of the doctrine of equivalents by preventing its application when doing so would vitiate a claim limitation. *Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 850 (Fed. Cir. 2006) (citing *Warner-Jenkinson*, 520 U.S. at 29 (stating that the doctrine of equivalents cannot be applied broadly so as to "effectively eliminate that [claim] element in its entirety"); *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1321 (Fed. Cir. 2003) ("[I]f a court determines that a finding of infringement under the doctrine of equivalents 'would entirely vitiate a particular claim element,' then the court should rule that there is no infringement under the doctrine of equivalents." (citation omitted)).

Also appropriate for summary judgment is the issue of whether Sevenson is barred from asserting the doctrine of equivalents due to prosecution history estoppel. "Prosecution history estoppel acts as one check on application of the doctrine of equivalents, by precluding a patentee from regaining, through litigation, coverage of subject matter relinquished during prosecution of the application for the patent." *Wang Lab, Inc. v. Mitsubishi Elecs. Am.*, 103 F.3d 1571, 1578

(Fed. Cir. 1997) (citations omitted). The applicability of prosecution history estoppel is a question of law, and should this Court "determine, upon reviewing the relevant prosecution history, that estoppel applies, doctrine of equivalents infringement is precluded as a matter of law, and summary judgment of non-infringement is appropriate." *Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1380 (Fed. Cir. 1998) (citing *Wang Lab*, 103 F.3d at 1577).

This Court may consider statements made during the prosecution of ancestor patents or related patents when considering the effect of prosecution history estoppel. As the Federal Circuit explained in *Ventana Med. Sys. v. Biogenex Labs, Inc*., the Court may "examine the patent's prosecution history, when placed in evidence, to determine whether the inventor disclaimed a particular interpretation of a claim term during the prosecution of the patent in suit or during the prosecution of an ancestor application." 473 F.3d 1173, 1182 (Fed. Cir. 2006) (*citing Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005); *Advanced Cardiovascular Sys. v. Medtronic, Inc.*, 265 F.3d 1294, 1305-06 (Fed. Cir. 2001)). "When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999) (*citing Jonsson v. The Stanley Works,* 903 F.2d 812, 817-818 (Fed. Cir. 1990)). Further, "[a]rguments made during the prosecution of a patent application are given the same weight as claim amendments." *Elkay*, 192 F.3d at 979 (citation omitted).

To the extent this motion raises claim construction issues not considered in the Court's prior Opinion, such a construction is a matter of law. *Markman v. Westview Intr., Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996). "Claim interpretation, as a question of pure law, is amenable to summary judgment and disagreement over the meaning of a

term within a claim does not necessarily create a genuine issue of material fact." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995).

## II. The Colonie treatment process does not infringe any claims because it did not use a "first component" "separate and distinct" from a "second component" as claimed in Sevenson's Patents.

### A. The Sevenson patents at issue require a "first component" that is "separate and distinct" from a "second component."

All but two of the independent claims asserted by Sevenson require a "first component" to supply one of the listed Markush group compounds, such as sulfate, and a "second component" to supply phosphate anions.[7, 8] The Colonie treatment process does not infringe these claim limitations because the contractor used only one treatment chemical, Prayphos P5, a phosphoric acid. There was no "first component" that was "separate and distinct" from a "second component." The sulfate impurities inherent in phosphoric acid are not "separate and distinct" from phosphoric acid. Sevenson is barred by prosecution history estoppel from arguing

---

[7] Claim 11 of the '367 Patent requires a "single reactant comprising a source of a sulfate ion and a phosphate ion to form a mixture." This claim, and the reasons the Colonie treatment process did not infringe it, are discussed below, *infra* III., VI., and VII.

Claim 28 of the '485 Patent requires a "combination of sulfuric acid and a phosphate supplying reagent." The reasons the Colonie treatment process did not infringe it, are discussed below, *infra* IV.B.

[8] This brief treats "sulfate reagent" as used in the '485 Patent and "reagent" as used in the '608 Patent as the "first component." The Court construed the term "sulfate reagent" as used in claim 30 of the '485 Patent as "a separate and distinct compound capable of supplying a sulfate ion, $(SO_4)^{2-}$, that participates in a chemical reaction." *Sevenson*, at *99.

Similarly, although claim 1 of the '608 Patent does not specifically recite a "first component," it requires a "reagent selected from the group consisting of sulfates, halites, silicates…." Thus, the "reagent" for supplying, *inter alia*, sulfates, of claim 1 of the '608 Patent has the same definition as "first component," i.e. "a separate and distinct compound." This Court held similarly when it construed the terms "phosphate supplying reagent" and "phosphate compound" in the '485 Patent and '608 Patent, respectfully, as having the same definition as "second component." *Sevenson*, at *30.

otherwise.

This Court construed the term “first component” to mean “a separate and distinct compound capable of supplying at least one of the listed members” of the Markush group that includes sulfates. *Sevenson*, at *29. Similarly, this Court has construed the term “second component” to be “a separate and distinct compound capable of supplying at least one phosphate anion.” *Sevenson*, at *30. The Court has also determined that the terms “phosphate supplying reagent” as used in the '485 Patent, and“phosphate compound” as used in the '608 Patent, have the same definition as “second component.” *Sevenson*, at *30 n. 4.

Clearly, the “first component” must be a compound or chemical separate from the compound or chemical comprising the “second component.” In other words, the two components must have must have been separate from each other at some point in the process, *e.g.*, a two-tank system that supplies “separate and distinct” treatment chemicals. As discussed above, the patents make numerous contrasting references to the compounds, additives, products, chemicals, etc. that comprise the first and second groups. *See supra* <u>Sevenson’s Patents</u>, II.C. The patents treat phosphoric acid as a member of only the second group. Phosphoric acid is consistently referred to as a group two member, and several dependant claims select phosphoric acid as the second component, but never the first component for supplying, *inter alia*, sulfate. *See*, *e.g.*, '982 Patent, claim 5; '123 Patent, claim 5; '608 Patent, claim 29; '485 Patent, claim 5.

This is also consistent with the prosecution history of this family of patents, discussed *infra* II.D., wherein the inventors distinguished prior art processes using phosphate compounds alone, such as phosphoric acid on the grounds that these processes did not employ a second component supplying, for example, sulfate. (*See, e.g.,* Ex. 8 at G003055.) The only exception to the “separate and distinct” supply of a “first component” and a “second component” is in the

case of TGPA for reducing leachable radionuclides as claimed in the ‘367 and ‘608 patents. However, as discussed below, *infra* VI., the Prayphos P5 used in the Colonie treatment process is not TGPA as taught in the Sevenson patents and properly construed by this Court.

Not only do Sevenson’s patents teach two components, and identify phosphoric acid as a member of the second group of treatment chemicals for supplying phosphate, but also <u>each of the asserted patents</u> teaches away from using phosphoric acid as a single component. '982 Patent, col. 16, lines 44–5; '367 Patent, col. 20, lines 49–62; '123 Patent, col. 17, lines 1–15; '608 Patent, col. 20, lines 38–52; '485 Patent, col. 19, lines 26–40. Thus, it is clear that the proper scope of the first and second components as claimed in Sevenson’s patents are truly “separate and distinct,” i.e., they originated from separate sources.

B. <u>Prosecution history estoppel bars arguing that sulfate impurities inherent in Prayphos P5 are a “first component” for “supplying” sulfate, or alternatively that phosphoric acid may be both the “first component” and the “second component.”</u>

It is readily apparent that the USPTO allowed Sevenson’s claims to a two-component treatment on the basis that the claims did not cover use of phosphoric acid as the only treatment chemical. Further, the inventors[9] made several statements during the prosecution of the parent '936 Patent, the '982 Patent, and the '485 Patent that bar Sevenson from asserting any theory under the doctrine of equivalents. Prosecution history estoppel bars a patent applicant “from relying on the doctrine of equivalents when the patentee relinquishes subject matter during the prosecution of the patent, either by amendment or argument.” *AquaTex Indus. v. Techniche Solutions*, 419 F.3d 1374, 1382 (Fed. Cir. 2005) (citation omitted). In this case, the inventors distinguished the invention claimed by the Sevenson patents from prior art by arguing that the prior art processes involved only one component, *such as phosphoric acid*, whereas the

[9] “Inventors” refers to the applicants prosecuting Sevenson’s patents.

Sevenson process employed two components, such as phosphoric acid *and component for supplying sulfate*.

Further, as this Court noted, all of the Sevenson patents at issue are related. *Sevenson*, at *15. *See also* Ex. 9 (showing the Sevenson family of patents). Inspection of the specifications for each patent reveals nearly identical specifications, and identical drawings, to support the claims. Thus, with respect to similar claim limitations, the prosecution history regarding a claim limitation "applies with equal force to subsequently issued patents that contain the same claim limitation." *Elkay Mfg.*, 192 F.3d at 980. The prosecution history related to the limitations of "first component" and "second component," along with synonymous limitations such as "phosphate compound," '608 Patent, claim 1, "sulfate reagent" and "phosphate supplying reagent," '485 Patent, claim 30,[10] among any of the Sevenson patents, even those not at issue, apply with equal force to all of the subsequently issued patents.

**1. Prosecution History of the Parent, the '936 Patent**.

The inventors made prosecution history statements consistent with the distinction between the two-component invention claimed in Sevenson's patents and the one-component Colonie treatment process during the re-examination proceedings of another patent in the family of patents, the 5,193,936 Patent ("the '936 Patent") (Ex. 14).[11] The '936 Patent claims a process for stabilizing leachable lead that, just like the patents at issue in this case, uses a sulfate compound and a phosphate compound. In fact, all of the Sevenson patents share nearly identical

---

[10] The Court has already ruled that the terms "phosphate supplying reagent," as used in the '485 Patent, and "phosphate compound," as used in the '608 Patent, have the same meaning as "second component" as used in each of the patents. *Sevenson*, at *30.

[11] The '936 Patent is the parent application for all five of the patents at issue in this case. (*See* Ex. 8.)

specifications (there are some exceptions with respect to the radioactive material patents, '367 and '608), and the '936 Patent invention claims mixing the solid waste with a "sulfate compound" and a "phosphate reagent." (Ex. 14 claim 1.)

The Patent Office granted a reexam of the '936 Patent on the grounds that U.S. Patent 4,737,356 to O'Hara ("O'Hara patent") (Ex. 10) questions of patentability. (Ex. 13.) Per its abstract, the O'Hara Patent teaches addition of water soluble phosphate, *especially phosphoric acid*, to immobilize lead and cadmium so as to make residues from burning solid wastes comply with certain toxicity tests. (Ex. 10, abstract.) The inventors attempted to argue around the O'Hara Patent by citing to O'Hara's statement that "data in Table 8 [of the O'Hara Patent] shows unequivocally that phosphate is unique; <u>neither sulfuric nor nitric acids immobilize lead</u> and cadmium, <u>nor do their salts</u>," (Ex. 13 at G002451) (emphasis original). In this declaration of on of the inventors, Karl Yost, states "[t]he tests conducted by O'Hara were intended to show that other acids were not a suitable substitute for phosphoric acid in his process. In contrast, the present invention uses a sulfate source *in addition to phosphoric acid*."[12] (Ex. 13 at G002451) (emphasis added).

This is a clear and unmistakable surrender of any argument that phosphoric acid alone meets the claim limitations of the asserted claims. Sevenson is barred by prosecution history estoppel from arguing both that a process employing only phosphoric acid infringes its patented two-component system, and also that the sulfate impurities in the phosphoric acid used in the Colonie treatment process meet the claim limitation of the "first component" for "supplying" sulfate. This even includes TGPA, since TGPA, as defined by the patents and properly

---

[12] Here, the argument to the examiner recognized that phosphoric acid contains sulfate impurities by use of the phrase "in addition to …."

construed by this Court, is a specific type of phosphoric acid having sulfate impurities as low as 2.5 % (by weight).

**2. Prosecution History of the '982 Patent**.

The inventors made similar narrowing arguments during prosecution of the '982 Patent. The Examiner cited the to O'Hara (Ex. 10) as the basis for rejecting the '982 Patent under 35 U.S.C. § 102(b). (Ex. 9.) In response to the rejection, the inventors cited a statement in the O'Hara Patent that "data in Table 8 [of the O'Hara Patent] shows unequivocally that phosphate is unique; neither sulfuric nor nitric acids immobilize lead and cadmium, nor do their salts," as the basis for their argument that "[t]he sulfates supplied by the first component in the ['982 Patent] is neither taught nor suggested by O'Hara." (Ex. 9 at G003055–3056.)

The O'Hara process uses flue gas scrubber product ("FGSP") common in mass burning plants as one treatment additive. As taught in the O'Hara Patent and confirmed by the inventors during prosecution of the '982 Patent, (Ex. 9 003055) FGSP reacts with latent sulfur dioxide during the scrubber process to form calcium sulfate. Calcium sulfate is a member of the Markush group that defines Sevenson's "first group of treatment chemicals." However, the inventors argued that although the O'Hara process included this inherent calcium sulfate, it "[taught] away from using calcium sulfate as taught in the ['982 Patent]." (Ex. 9 at G003055.) Since O'Hara clearly disclosed use of a phosphate, "especially phosphoric acid," (Ex. 10, abstract), and contained calcium sulfate, the inventors effectively argued that the O'Hara process did not anticipate the '982 invention because the '982 invention involved a sulfate component in addition to a phosphate component, phosphoric acid. (Ex. 9 at G003055.)

Thus, by distinguishing the O'Hara Patent on the ground that the O'Hara process used phosphoric acid, but not a "separate and distinct" source of sulfate like the claimed process, the

inventors clearly narrowed the scope of their invention and surrendered any equivalency argument that phosphoric acid may also serve as the "first component" for supplying, *inter alia*, sulfate. Accordingly Sevenson is barred by prosecution history estoppel from arguing that a process employing only phosphoric acid, including TGPA, infringes its patented two-component system. This means that Sevenson cannot argue that phosphoric acid is also a "first component" for "supplying" sulfate. Further, because the phosphoric acid in the O'Hara process must have included some amount of sulfate impurities, Sevenson is also barred by prosecution history estoppel from arguing that the sulfate impurities in the phosphoric acid used in the Colonie treatment process meet the claim limitation of the "first component."

**3. Prosecution History of the '485 Patent**.

Similarly, during the prosecution of the '485 Patent, the inventors faced rejections to the '485 Patent as anticipated by, or alternatively obvious over, U.S. Patent 5,202,033 to Stanforth ("the Stanforth Patent") (Ex. 12). (*See* Ex. 11.) The Stanforth Patent teaches a soil method of treating solid waste in soil or solid disposed waste containing unacceptable levels of leachable metals, such as lead, cadmium, arsenic, zinc, copper and chromium, that includes mixing the solid waste or soil in place with a phosphate source or a carbonate source or ferrous sulfate. Again, the inventors made arguments to distinguish their invention on the ground that the prior art taught the use of only one component, phosphoric acid, whereas the invention claimed in the Sevenson applications required two components.

The inventors argued around the Stanforth Patent by first noting how Stanforth "discloses a process that: 'consists of introducing a treatment additive consisting of a phosphate additive **or** carbonate additive **or** a chemical reducing additive such as a ferrous sulfate into the soil or waste.'" (Ex. 11 at G004661) (*citing* Ex. 12 at col. 5, lines 39–42) (emphasis original). Stanforth

specifically claims phosphoric acid as one of the phosphate additives. (*E.g.*, Ex. 12 claim 6.) In fact, the inventors brought this to the Examiners attention: "Stanforth also discloses that '[t]he treatment additives are any of the following used individually or in combination: sodium phosphate, … phosphoric acid, polyphosphoric acid …." (Ex. 11 at G004661) (*citing* Ex. 12 at col. 5, lines 56–63) (emphasis added). Thus, according to the inventors, "Stanforth does not teach the use of a phosphate *and* a sulfate for the treatment of lead contaminated soils and waste materials." (Ex. 11 at G004661) (emphasis added).

The inventors clearly distinguished the '485 Patent from the Stanforth Patent by claiming that the Stanforth process employed only one additive, such as phosphoric acid, whereas the '485 process employed a phosphate additive and a sulfate additive. Thus, the inventors again clearly and unmistakenly surrendered any equivalency argument that phosphoric acid may serve as the "first component" for supplying, *inter alia*, sulfate. Accordingly, Sevenson is barred by prosecution history estoppel from asserting that use of phosphoric acid, including TGPA, meets the claim limitations of "first component" and "second component" as claimed in the patents.

**4. Conclusions From Prosecution History of the Sevenson Patents**.

During the prosecution history of the parent '936 Patent, the '982 Patent, and the '485 Patent, the inventors of the process claimed in Sevenson's patents made narrowing arguments to overcome rejections based on prior art processes. These statements were consistent with the distinction that is at the heart of this case: Sevenson's patents claim a process employing two separate and distinct components, whereas the Colonie treatment process employed only a single component. The inventors distinguished their invention on the ground that none of the prior art processes taught a phosphate component, such as phosphoric acid, in addition to a sulfate component. These arguments have the same weight as claim amendments. *Elkay*, 192 F.3d at

979. As the '936 Patent is the ancestral patent for all of the Sevenson patents at issue, it was the first to issue, it shares a nearly identical specification as the patents at issue, and the claim terms are the same. (*See* Ex. 8.) The clear and unmistakable disavowal that phosphoric acid alone can be both the first and the second components in the claimed process, in the prosecution history of the '936 Patent, applies to all of the subsequent patents in the family, including all of the patents at issue. *Elkay* at 980. The same logic applies to the statements made during prosecution of the '982 Patent, as it is ancestral to the remaining patents at issue, *e.g.* issued first, shares a nearly identical specification, and uses the similar claim terminology. Therefore Sevenson is barred by prosecution history estoppel from arguing that the sulfate impurities inherent in phosphoric acid can "supply" the "first component" from the first group of treatment chemicals. Sevenson is also barred from now attempting to recapture what the inventors surrendered during the prosecution of this family of patents, that is, that phosphoric acid alone meets the claim limitations of "first component" and "second component" (or the analogous limitation "sulfate reagent," "phosphate supplying reagent" or "phosphate compound").

C. The Colonie treatment process did not have a "first component" and a "second component" as claimed in Sevenson's patents.

While Sevenson's patents claim a two-component process, the Colonie treatment process employed only one component, Prayphos P5, a purified phosphoric acid. (Stipulated Facts ¶¶ 10, 12.) Like all phosphoric acids manufactured by a wet process, this commercial product contains sulfate impurities. (Ex. 6 at ¶ 18.) As shown in the Prayon Specification Data Sheet for Prayphos P5, however, the maximum concentration of sulfate impurities is 350 ppm, or 0.0350% (by weight). (Ex. 5); (Ex. 6 at ¶¶ 13, 20). The certificates of analysis for Prayphos P5 actually used at the Colonie site show sulfate impurity concentrations in the "results" column are even lower, between 13 ppm, or 0.0013% (by weight), to 203 ppm, 0.0203% (by weight). (Ex. 7);

(Ex. 6 at ¶ 13–14, discussing conversion from ppm to percent weight). At this concentration, the sulfate impurities are *de minimis*, and would not participate meaningfully in any chemical reactions as required by the patents. (Ex. 6 at ¶ 21.) The sulfate impurities are too *de minimis* to be the "first component" within the proper scope of the claims. Further, as impurities, they are not a "separate and distinct" compound as within the proper scope of the claims.

In fact, by successfully reducing leachable lead to below the TCLP limit using only phosphoric acid, the Colonie treatment process is contrary to the statement in each of the Sevenson patents that single treatment chemical phosphoric acid applied in one step does not sufficiently immobilize lead. '982 Patent, col. 16, lines 44–50; '367 Patent, col. 20, lines 49–55; '123 Patent, col. 17, lines 1–7; '608 Patent, col. 20, lines 39–45; '485 Patent, col. 19, lines 26–32. The Colonie treatment process successfully met TCLP lead levels using only a single component, phosphoric acid, and in only a single step. As this is contrary to the express teachings of the patent, phosphoric acid cannot simultaneously meet the limitations of "first component" and "second component."

As the only treatment chemical used at Colonie was diluted Prayphos P5, (Stipulated Facts ¶ 12), there is no"separate and distinct" component for supplying sulfate in the Colonie treatment process. There was no sulfate source involved in the on-site stabilization process "separate and distinct" from the phosphoric acid. Accordingly, the process used at Colonie cannot literally infringe any asserted claim.

D. The sulfate impurities inherent in Prayphos P5 are not an equivalent for the claim limitation of a "first component" for "supplying" sulfate.

The sulfate impurities in Prayphos P5, at such a *de minimis* concentration, are insufficient to meet the claim limitation of a "first component" that supplies a sulfate ion, literally or under the doctrine of equivalents. In *Phillips Petroleum Co. v. Huntsman Polymers Corp.*, the Court of

Appeals for the Federal Circuit faced the issue of whether impurities present in the defendants' products met the patent's claim limitations for a block copolymer. 157 F.3d 866, 877 (Fed. Cir. 1998). The Federal Circuit held that the *de minimis* impurities in the defendants' products, at concentrations up to 60 ppm, "would not be sufficient for the products to be classified as block copolymers within the scope of the claims." *Id.* at 877. The concentration of impurities in *Phillips Petroleum* were of the same order of magnitude as other impurities in the product, and several orders of magnitude smaller than the recognized meaning of "block copolymer" in the prior art. *Id*.

At 350 ppm or 0.0350% (by weight) the concentration of sulfate impurities in Prayphos P5 is far below the lower end of the TGPA sulfate concentration defined by the patents and construed by this Court, 2.5% (by weight), or 25,000 ppm. Thus, by the very definition of TGPA as a sufficient source of sulfate, the sulfate impurities inherent in Prayphos P5 fall short of meeting the limitation of a "first component." At a maximum concentration of 350 ppm, the sulfate impurities in Prayphos P5 are similar in magnitude to other impurities, such as 10.0 ppm of fluoride or iron. (*See* Ex. 5.) More importantly, the sulfate impurities are well below the *lower* limit of sulfate in the definition of TGPA. *De minimis* sulfate impurities do not perform the same function, in the same way, and get the same results, as the "first component" claim limitation in the asserted patents. This negligible concentration of sulfate impurities is simply not sufficient to allow Prayphos P5 to be an equivalent of the "separate and distinct" "first component."

Accordingly, the sulfate impurities inherent in Prayphos P5 are insufficient to meet the claim limitations of "first component" for "supplying" sulfate, "sulfate reagent" or "reagent."

E. Conclusions as to whether sulfate impurities within a purified phosphoric acid are a "first component."

The Colonie treatment process does not meet the claim limitations of a "first component" (or "sulfate reagent" as used in the '485 Patent, or "reagent" as used in the '608 Patent) for "supplying" sulfate that is a "separate and distinct compound" from a "second component" as required by Sevenson's patents. This is because the Colonie treatment used only a one-component treatment chemical– phosphoric acid, Prayphos P5. There was no "first component" that separately "supplied" sulfate in the Colonie treatment process. The *de minimis* sulfate impurities inherent in phosphoric acid are *not* "separate and distinct compounds" within the scope of these claims. Additionally, Sevenson is barred by prosecution history estoppel from arguing that phosphoric acid (or TGPA) satisfies these claim limitations.

Accordingly, since the Colonie treatment process did not literally or under the doctrine of equivalents meet the claim limitations of a "first component" (or "sulfate reagent" or "reagent") that is "separate and distinct" from a "second component" (or "phosphate reagent" or "phosphate supplying reagent"), this Court should grant summary judgment of non-infringement of claims 1–5 and 9 of the '982 Patent, claims 1–7 and 15–20 of the '123 Patent, claims 1–7 and 11-30 of the '608 Patent, and claims 1–6, 15–36 of the '485 Patent.

## III. The Colonie treatment process does not "supply" a sulfate ion for the stabilization process, and therefore does not infringe any patents claiming a component that "supplies" sulfate.

### A. The sulfate impurities in Prayphos P5 are far too negligible to be made available for the stabilization process.

The Court has construed the term "supply(ies)(ing)" as "to make available for the stabilization process. *Sevenson*, at *51. This term is at issue in claim 1 of the '982 Patent, claims 1 and 15 of the '123 Patent, and claims 1, 15 and 22 of the '485 Patent (along with the associated dependent claims at issue).

The Sevenson patents make clear that a member of the first group of treatment chemicals,

such as sulfate, is an important element of the invention. For example, the "Summary of the Invention" for the '982 Patent explains that a sulfate compound "reacts with leachable lead to produce a substantially insoluble lead composition, such as anglesite and/or calcium-substituted anglesite." '982 Patent, col. 2, lines 29–31. The '123 Patent discloses that "[t]he reaction of lead with gypsum forms a "hard sulfate" which crystallizes into a mineral species … insoluble in water." '123 Patent, col. 6, lines 14–17. Review of the various examples in the patents demonstrates that the invention claimed in these patents involves supplying sulfate ions in more than a negligible quantity. *See, e.g.*, '982 Patent col. 12, lines 51–55. This is also the distinguishing factor the inventors cited in the prosecution history. *See, supra* II.B.

If any sulfate ions were present in the Colonie treatment process, they were present at *extremely* low concentrations as *inherent impurities* in the phosphoric acid. Prayphos P5, the phosphoric acid used at the Colonie site, is manufactured by a purified wet-process. (Stipulated Facts ¶ 10.) Despite additional purification steps, no phosphoric acid made by the wet process will be completely free of sulfate impurities. (Ex. 6 at ¶¶ 17, 18; 20–21.) The inventors knew this when they disclaimed using only phosphoric acid. *See supra* II.C. Nonetheless, the sulfate impurities in Prayphos P5 are present at concentrations less than 350 ppm, or 0.0350 % (by weight). (Exs. 5, 7; Ex. 6 at ¶¶ 14, 20). As Dr. Pierzynski explains:

> [T]he concentration of sulfate in Prayphos P5 is, from a chemical reaction point of view, negligible, and would not participate meaningfully in any chemical reactions. Thus, Prayphos P5 is not TGPA as defined in Sevenson's patents and as construed by the Court, and Prayphos P5 does not contain any meaningful amount of sulfate."

(Ex. 6 at ¶ 21.) The inherent sulfate impurities in Prayphos P5, at such a negligible concentration, are too small to be "supplied" for the stabilization process within the proper scope of the claims.

Accordingly, the Colonie treatment process does not meet the claim limitations of

"supplying" a sulfate to the stabilization process, literally or under the doctrine of equivalents, and this Court should grant summary judgment of non-infringement of claim 1, and associated dependent claims 4–5 and 9, of the '982 Patent; claims 1–2 and 15–20 of the '123 Patent; and claims 1–6, 15–27 of the '485 Patent.

B. Prayphos P5 does not "supply" a "reactive sulfate ion."

Claim 11 of the '367 Patent requires a "source of a sulfate ion," which this Court has properly construed as "one or more compounds which supplies a reactive sulfate ion, wherein a sulfate ion is the negative ion $(SO_4)^{2-}$." *Sevenson*, at *70. Similarly, independent claim 22 of the '485 Patent requires that the "first component includes one or more reactive sulphate (sic) ions," and independent claim 30 of the '485 Patent requires the sulfate reagent to "include[] one or more reactive sulfate ions." The Colonie treatment process does not infringe these claims because the sulfate impurities found in Prayphos P5 are far too negligible to "supply" "reactive sulfate ions" consistent with the Court's Claim Construction.

This Court explained that "the reactive sulfate ion must be present in large enough quantities to participate measurably in the chemical reactions defined in the patents." *Sevenson*, at *69–70. Further, the Court noted that "in the typical range of sulfate impurities defined by the patentee (2.5% to 7%), the TGPA as defined herein satisfies this standard." *Id.* at 70. With a maximum concentration of sulfate impurities of 350 ppm, and typical sulfate impurities of concentrations of 230 ppm, Prayphos P5 is not TGPA as defined in the patents and as properly construed by this Court. *See infra* IV; (Ex. 6 at ¶ 20). The sulfate impurities in Prayphos P5 are far too small to meet the standard of participating "measurably." (Ex. 6 at ¶ 21.) Thus the Colonie treatment process does not provide "reactive sulfate ions" that meet the standard of "participating measurably in the chemical reactions defined in the patents."

Negligible impurities are not within the scope of the claimed invention. Just as "more than a single molecule of sulfate is required" to reduce leachability, *Sevenson*, at *69, more than *de minimis* impurities are required.

C. Sevenson is barred by prosecution history estoppel from arguing that sulfate impurities inherent in phosphoric acid are covered by the claim requirements of supplying a sulfate ion for the stabilization process.

Based on the statements in the prosecution history of the patents at issue and related parent patent, Sevenson is barred from asserting that the sulfate impurities inherent in phosphoric acid meet the claim limitations of "supplying" a sulfate compound, or any other "first component," to the stabilization process. *See* discussion of prosecution history estoppel, *supra* II.B. The inventors distinguished the invention claimed in Sevenson's patents over prior art by arguing that prior processes employing only a phosphate compound, such as phosphoric acid, do not supply sulfate as claimed in the present invention. In order for the sulfate impurities inherent in Prayphos P5 to meet the claim requirement of "supplying" sulfate for the stabilization process, Sevenson must argue that the phosphoric acid equivalently "supplied" sulfate through inherent impurities, as claimed in the patents. Yet, since the inventors unmistakenly surrendered this equivalent during prosecution, Sevenson is barred from making this argument.

As one example, during prosecution of the '982 Patent, the inventors faced a rejection based on the O'Hara Patent. The O'Hara process taught use of water soluble phosphate, such as phosphoric acid, to immobilize lead in residue generated from combustion of waste. *See supra* II.B.2. This process included calcium sulfate impurities. *Id.* The inventors of the '982 Patent argued that the O'Hara process of a phosphate component and inherent sulfate did not anticipate the '982 invention because the '982 invention involved a sulfate component *in addition to* a phosphate component. (Ex. 9 at G003055.) Therefore neither the calcium sulfate impurity in the process, nor any sulfate impurity in the phosphoric acid, could be the "first component" as

claimed in the Sevenson patents.

Thus, the inventors' argument around the O'Hara Patent narrowed the scope of Sevenson's invention, and Sevenson is barred from arguing that sulfate impurities in phosphoric acid meet the claim limitation of "supplying" a "first component" or a "reactive sulfate ion" for the stabilization process. Therefore the Colonie treatment process cannot meet the this claim limitation, and the Court should grant summary judgment of non-infringement of the '982 Patent, the '123 Patent, claims 11, 13, 14 and 16 of the '367 Patent, claims 22–27 and 30–36 of the '485 Patent, and claims 1–6, 15–27 of the '485 Patent.

**IV. The Colonie process does not infringe any patents claiming a "mixture" of components, as the only component used for on-site lead stabilization was the commercially-available phosphoric acid Prayphos P5.**

A. <u>The Sevenson patents require a deliberate mixing or joining of two components, which did not occur during the Colonie treatment process</u>.

Claim 1 of the '982 Patent requires "a first mixture comprising a first component and a second component." This Court properly construed the term "first mixture" as the "first component plus the second component mixed together." *Sevenson*, at *59–60. Similarly, claims 1 and 15 of the '123 Patent requires "a treatment additive comprising a first component and a second component." The same requirement of a "treatment additive" exists in claim 20 of the '608 Patent, claims 1, 15, and 22 of the '485 Patent. This Court properly construed the term "treatment additive" as the "[f]irst component plus the second component mixed together." *Sevenson*, at *76. Likewise, claims 28 of the '485 Patent requires a "combination of sulfuric acid and a phosphate supplying reagent," while claim 30 of the '485 Patent requires a "combination of a sulfate reagent which includes one or more reactive sulfate ions and a phosphate supplying reagent." This Court property construed "combination" as "a result or product of bringing two or more entities into close relationship." *Sevenson*, at *96.

It is evident from the numerous references to chemicals of the first group of treatment additives, such as sulfate, being "separate and distinct" from the members of the second group of treatment additives, that the claim limitations of "first mixture," "treatment additive" and "combination" require a deliberate mixing or joining of two separate chemicals.[13] In the Joint Claim Construction, the parties agreed that "mix" means "to combine or join two or more things." Thus, for a "first component" to be joined or combined with a "second component," the components must have existed independent of each other in a "separate and distinct" manner. Such is not the case with the Prayphos P5 used at the Colonie site.

The Colonie treatment process used only Prayon's purified phosphoric acid, diluted with water, to reduce the leachability of lead. (Stipulated Facts ¶ 12.) At no point did Defendants mix or join any other component with this phosphoric acid. Therefore the Colonie treatment process does not meet the claim limitations of "first mixture," "treatment additive" or "combination" as claimed in the Sevenson patents.

B. The Colonie treatment process did not involve bringing sulfuric acid into close relationship with Prayphos P5.

Claim 28 of the '485 Patent requires a "combination of sulfuric acid and a phosphate supplying reagent." This Court construed the term "combination" as "a result of bringing two or more entities into close relationship." *Sevenson*, at *96. The Colonie treatment process can infringe this claim only if the treatment must have involved sulfuric acid "brought into close relationship" with a second entity, such as phosphoric acid. However, the Colonie treatment process involved only Prayphos P5; sulfuric acid was never introduced to the Colonie treatment

[13] For example, the "Treatment Method" section of the specification teaches "[t]he ingredients of group one and group two can be added … simultaneously, and they are pre-mixed and added in a single step. Alternatively, the components of group one and two can be added sequentially …." '982 Patent, col. 5, lines 46–50.

process, nor was sulfuric acid ever "brought into close relationship" with Prayphos P5. Further, due to the narrowing arguments made during the prosecution history, discussed above, *supra* II.B., Sevenson is barred from arguing that sulfate impurities inherent in phosphoric acid meet the claim limitations of a "combination" of "sulfuric acid" and a "phosphate supplying reagent" as claimed in the '485 Patent. The Colonie process does not meet this claim limitation.

C. Sevenson is barred by prosecution history estoppel from arguing that phosphoric acid meets these claim limitations.

The inventors of Sevenson's patents made several clear and unmistakable disavowals during prosecution of these patents. *Supra* II.B. By arguing that the prior art processes disclosed in the O'Hara and Stanforth processes, which included phosphoric acid, did not meet the two-component invention of Sevenson's patents, the inventors surrendered the argument that phosphoric acid, alone, can be the claimed "first mixture," "treatment additive" or "combination" of two "separate and distinct components." Thus, this Court should grant summary judgment of non-infringement of claims 1–5 and 9 of the '982 Patent; claims 1–7 and 15–20 of the '123 Patent; claims 20–30 of the '608 Patent; and claims 1–6 and 15–36 of the '485 Patent.

**V. Since the Colonie treatment process is a one-step process, it does not infringe claim 1 of the '608 Patent that requires addition of the components in two steps.**

The Colonie treatment process involved a one-step addition of diluted phosphoric acid to soils that failed the TCLP test for lead. (Stipulated Facts ¶ 12.) In some instances, a soil pile failed the TCLP test *after* treatment, and was therefore subjected to re-treatment using *the same one-step process*. (Stipulated Facts ¶ 13.) Claim 1 of the '608 Patent requires a two-step process. Since the Colonie treatment process did not involve addition of two components in two separate steps, and since re-treatment using the same process is *not* a second step, the Colonie treatment process did not infringe claim 1 of the '608 Patent.

The process of claim 1 of the '608 Patent is clearly a two-step process. First, the practitioner contacts a material with a reagent to form the "first mixture." Second, the practitioner contacts the "first mixture" with a "phosphate compound" to produce a "second mixture." The Court did not construe the term "first mixture" as used in the '608 Patent.[14] Defendants contend that this term, as used in claim 1 of the '608 Patent, means precisely what is stated in the claim: "material plus reagent selected from the group consisting of sulfates … to produce a first mixture." Similarly, the Court has not defined the term "second mixture" as used in the '608 Patent, but a plain reading of claim 1 leads to the conclusion that "second mixture" is "material plus reagent plus phosphate compound, mixed together."

To succeed in showing infringement of claim 1 of the '608 Patent, Sevenson must meet its burden of proving by a preponderance of the evidence that the Colonie treatment process involved a two-step addition of two components, a "reagent" (such as a source of sulfate) and a "phosphate compound." Clearly, Sevenson cannot meet this burden as the *only* component involved in the Colonie treatment process was diluted phosphoric acid, applied in a single step. (Stipulated Facts ¶ 12.)

Re-treating a soil pile using the same component is not a second step, as taught by the '608 Patent and within the proper scope of the claims. In Example 3, "Retreatability and Single Step Mixing," the inventors show test results of treating a particular material with their claimed invention. '608 Patent, col. 16, line 22 – col. 17 line 17. The inventors first used "4.2 % phosphoric acid and 1 % lime … added during step I and II respectively." '608 Patent, col. 16,

[14] Although this Court construed the term "first mixture" as used in the '982 Patent as "first component plus the second component mixed together," *Sevenson*, at *59–60, claim 1 of the '608 Patent use of the term "first mixture" is considerably different and needs a separate construction.

lines 41–42. When the resulting sample failed the TCLP test for lead, the "treated material from [the previous test] [was] retreated … using sufficient amounts to [sic] phosphoric acid (an additive from group two) …." '608 Patent, col. 16, lines 45–49. This shows that the inventors did not consider re-treatment of a sample that failed a post-treatment TCLP test as a second step. Further, this claim requires addition of two different materials– a "reagent" and "phosphate compound." The Colonie process used only one compound, phosphoric acid, regardless of whether the soil pile was undergoing a first treatment or a re-treatment. Therefore, any argument that re-treatment of Colonie soil that failed post-treatment TCLP testing can be the second step is contrary to the express teachings of the '608 Patent.

Accordingly, the Court should grant summary judgment of non-infringement of claims 1–7 and 11–19 of the '608 Patent, since the Colonie process does not meet the two-step requirement of these claims.

**VI. The Colonie treatment process does not infringe claim 13 of the '367 Patent or claim 11 of the '608 Patent because Prayphos P5 is not TGPA as defined in the patents and as properly construed by this Court.**

Dependent claim 13 of the '367 Patent reads "[t]he process of claim 11, wherein said single reactant is technical grade phosphoric acid (TGPA)." Similarly, dependent claim 11 of the '608 Patent reads "The process of claim 1, wherein said phosphate compound is technical grade phosphoric acid."

This Court properly construed the term "technical grade phosphoric acid" as used in the patents as "phosphoric acid that contains up to 70% (by weight) phosphate (as $P_2O_5$) and sulfate ($SO_4^{2-}$), typically as sulfuric acid in the range of 2.5% to 7% (by weight) as an impurity. *Sevenson*, at *43–44. Thus, to meets its burden of proving infringement of claim 13 of the '367 Patent and claim 11 of the '608 Patent, Sevenson must show by a preponderance of the evidence that the phosphoric acid used in the Colonie on-site lead stabilization treatment process contains

sulfate impurities "in the range of 2.5% to 7% (by weight)." The evidence shows, however, that the phosphoric acid used at Colonie contained significantly less sulfate than prescribed in Sevenson's patents.

The phosphoric acid used in the Colonie treatment process was Prayphos P5, a "purified phosphoric acid." (Ex. 5.) As reported by the manufacturer, the maximum concentration of sulfate, $SO_4$, in Prayphos P5 is 350 parts-per-million (ppm). *Id.* The "typical analysis" column reports the concentration of sulfate in Prayphos P5 as 230 ppm. *Id.* Converting between ppm and percent by weight requires use of the relationship that 10,000ppm = 1.0 % (by weight). (Ex. 6 at ¶ 6.) Thus, for the sulfate impurities in Prayphos P5 reported in the Specification Data Sheet:

Guaranteed: 350 ppm sulfate = 0.0350 % (by weight) sulfate
Typical: 230 ppm sulfate = 0.0230 % (by weight) sulfate

Whereas the minimum range of sulfate impurities prescribed in the Sevenson patents is 2.5 % (by weight), the sulfate impurities in Prayphos P5 according to the Specification Data Sheet are, at a *maximum*, 0.0350 % (by weight). Thus, the phosphoric acid used at Colonie contains, *at most*, 1.4% of the *minimum* amount of sulfate impurities for TGPA as taught in Sevenson's patents, 2.5% (by weight). To illustrate this in terms of ppm, the TGPA taught in Sevenson's patents contains sulfate impurities at a concentration of:

2.5 % (by weight) x (10,000 ppm / 1.0 % (by weight)) = 25,000 ppm

Clearly, at a *maximum* concentration of 350 ppm, the sulfate impurity in Prayphos P5 is well below the 25,000 ppm *minimum* concentration of sulfate to be considered TGPA under both this Court's claim construction, and the specifications of the '367 Patent and the '608 Patent.

The distinction between the TGPA envisioned by the inventors of Sevenson's patents and Prayphos P5 becomes even more clear after inspection of the certificates of analysis for actual shipments of Prayphos P5 used at the Colonie site. (Ex. 7.) The actual concentrations of sulfate

impurities in Prayphos P5 reported in the attached Certificates of Analysis are 13 ppm, 203 ppm, and 187 ppm. *Id.* Expressed in percent weight, they are 0.0013 % (wt), 0.0203 % (wt), and 0.0187 % (wt), respectively. (Ex. 6 at. ¶ ¶ 14, 20–21.) According to Dr. Pierzynski, "Prayphos P5 is not TGPA as defined in Sevenson's patents and as construed by the Court, and Prayphos P5 does not contain any meaningful amount of sulfate." (Ex. 6 at ¶ 21.)

Given the negligible concentration of sulfate impurities in Prayphos P5, it is clear that the phosphoric acid used in the Colonie treatment process is not considered TGPA according to both the Court's proper construction of the term, as well as the very definition found within the patents at issue. Accordingly, this Court should grant summary judgment of non-infringement of claim 13 of the '367 Patent and claim 11 of the '608 Patent.

## VII. Sevenson cannot prove that the Colonie treatment process infringes either the '608 Patent or the '367 Patent because there is no evidence of any decrease in the concentration of leachable radionuclides in TCLP extract.

The independent claims of the '608 Patent at issue, claims 1 and 20, include the limitation that "the concentration of leachable radioactive substances … so treated is decreased …." Similarly, the only independent claim of the '367 Patent at issue, claim 11, includes the similar limitation that "the concentration of leachable radionuclides and radioactive materials is decreased."

This Court properly construed both the term "concentration of leachable radionuclides and radioactive compounds" as it appears in the '367 Patent, and also the term "concentration of leachable radioactive substances" as it appears in the '608 Patent, to mean "the amount of picocuries per liter (pCi/l) in the TCLP extract of a sample." *Sevenson*, at *72–73. Thus, to establish a *prima facie* case of infringement of these claims, Sevenson bears the burden, and must show by a preponderance of the evidence, that there was a post-treatment decrease in

concentration, measured in picocuries per liter, of leachable radioactive materials or radionuclides, in the TCLP extract of Colonie soil. However, there is no evidence whatsoever that the concentration of radionuclides decreased, and therefore this Court must grant summary judgment of non-infringement of claims 1 and 20 of the '608 Patent, and claim 1 of the '367 Patent, along with the associated dependent claims.

Other than segregating radiologically "hot," "warm" and "cold" soil piles to determine the ultimate disposal site, the remedial work at Colonie did not involve treatment to reduce the leachability of radionuclides or radioactive components. (Ex. 2 at G001446–1539.) The on-site stabilization process employing Prayphos P5 was used on soil piles that failed TCLP testing for lead; Defendants did not measure the radioactivity of any TCLP extract at any point during the remedial work at the Colonie FUSRAP site. (*Id.* at G001488.) During Sevenson's deposition of Anthony Sheeran, the Shaw Environmental project manager for the Colonie FUSRAP site, Mr. Sheeran confirmed that the contractors never measured the leachability of radioactive constituents after the phosphoric acid treatment for lead:

> Q. In any event, to your knowledge, it's (leachability of radioactive constituents) never been tested post pug mill?
> A. That's correct.

(Ex. 15 at page 100, lines 13–15.)

Sevenson cannot point to any evidence to carry its burden and establish infringement of each element of these patents. Thus, there is no evidence from which a reasonable jury could conclude that the lead stabilization process at the Colonie site also resulted in a decrease in the concentration of leachable radionuclides in TCLP extract. Accordingly, the Court should grant summary judgment of non-infringement on both the '608 Patent and also the '367 Patent.

**VIII. As volume change was never measured during the Colonie FUSRAP project and the only related evidence suggests volume *expansion*, Sevenson cannot prove that the Colonie treatment process infringes the '123 Patent, which require a reduction in volume.**

Claim 1 of the '123 Patent requires "the volume of said metal-bearing material [be] reduced as a result of treating and curing." Similarly, the only other asserted independent claim of the '123 Patent, claim 15, requires "the volume of said waste matrix [be] reduced as a result of treating and curing." Sevenson cannot any offer evidence to meet its burden to show that the Colonie process meets these limitations.

To prove infringement of the '123 Patent, Sevenson must offer evidence to show, by a preponderance of the evidence, that soil treated by the Colonie on-site stabilization process experienced a volume reduction. However, there is no evidence whatsoever upon which Sevenson can rely to meet this burden. The contractors at the Colonie FUSRAP site did not measure weight or volume of soil pre-lead stabilization or post-lead stabilization. During Sevenson's deposition of the Shaw Environmental project manager at the Colonie site, Mr. Sheeran confirmed that volume change was not measured:

Q. Sure. I want to know if you measure or weigh what's being put into the pug mill and what comes out of the pug mill to determine what you've added to it in terms of volume?
A. No, we do not.
Q. If you don't weigh it, do you try and measure the change in volume
in some other way?
A. No, we do not.
Q. Do you know as you sit here today what volumetric expansion takes place as a result of being treated through the pug mill and the addition of acid and water?
A. No.
Q. Is there some volumetric expansion?
A. We don't measure it.

(Ex. 15 at page 92 line 20–page 93 line 9.) In fact, the only evidence related to volume change of treated soil is that the treatment process causes a volume expansion.

One objective of the Kiber treatability study was to minimize volumetric expansion of the stabilized soil. (Ex. 2 at G001477.) Clearly, Defendants expected some volume expansion. All

of the measured volume changes during Kiber's treatability study showed volumetric expansion. (Ex. 3 at G000125) (reporting volumetric expansion ranging from 11% to 37%). Defendants are aware of no evidence relating to volume decrease at Colonie.

Thus, as the only evidence pertaining to volume change resulting from the Colonie treatment process suggests that volume increased, a reasonable jury cannot possibly conclude that the Colonie process meets the claim requirements of decreasing volume in the '123 Patent. As Sevenson cannot offer any evidence suggesting a decrease in volume following the Colonie treatment process, the Court should grant summary judgment of non-infringement of independent claims 1–7 and 15–20 of the '123 Patent.

## ***CONCLUSION***

For the reasons discussed above, the accused lead stabilization treatment process at the Colonie, New York FUSRAP site does not infringe the asserted claims of Sevenson's patents, either literally or under the doctrine of equivalents. Accordingly, this Court should grant summary judgment of non-infringement of 1–5 claims and 9 of the '982 patent; claims 11, 13, 14, and 16 of the '367 patent; claims 1–7 and 15–20 of the '123 patent; claims 1–7, 11–24, and 26–30 of the '608 patent; and claims 1–6 and 15–36 of the '485 patent.

Respectfully submitted,

Dated: July 2, 2007

PETER D. KEISLER
Assistant Attorney General

JOHN J. FARGO
Director

s/ Joshua B. Brady
JOSHUA B. BRADY
Attorney
Civil Division
U.S. Department of Justice

OF COUNSEL:
Susan Mitchell
Attorney
U.S. Department of Justice

Washington, D. C. 20530
Telephone: (202) 307-0285
Facsimile: (202) 307-0345

Attorneys for Defendant the United States

Dated: July 2, 2007

___s/ Russel O. Primeaux____________________

Russel O. Primeaux
Kean Miller Hawthorne D'Armond
McCowan & Jarman LLP
One American Place, 22nd Floor
Post Office Box 3513
Baton Rouge, LA 70821-3513
(225) 387-0999
Russel.Primeaux@keanmiller.com

Attorney for Shaw Environmental, Inc.