# Exhibit 13

Docket: SES-3

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Reexamination of: Pal et al.
Control No.: 90/003,305
Filed: January 13, 1994
Patent Under Reexam.: 5,193,936
For: FIXATION AND STABILIZATION OF LEAD IN CONTAMINATED SOIL AND SOLID WASTE

Group Art Unit: 3501
Examiner: D. Corbin

CERTIFICATE OF MAILING BY "EXPRESS MAIL"
"Express Mail" Mailing Label No. EB596155747
Date of Deposit SEPT. 8, 1994
I hereby certify that this paper or fee is being deposited with the United States Postal Service "Express Mail Post Office to Addressee" Service under 37 C.F.R.§1.10 on the date indicated above and is addressed to the Commissioner of Patents and Trademarks, Washington, D.C. 20231
Print Name KEVIN E. McDERMOTT
Signature [signature]

Hon. Commissioner of Patents
and Trademarks
Washington, D.C. 20231

PATENT OWNER'S RESPONSE TO THE OFFICE
ACTION IN REEXAMINATION UNDER 37 C.F.R. §1.550

Sir:

In response to the Office Action dated June 16, 1994 in the above referenced reexamination, the patent owner submits the following Amendments and Remarks.

Please amend the claims as follows:

2. (Amended) The treatment process of claim 1, wherein said sulfate compound is selected from the group consisting of calcium sulfate dihydrate, [gypsum,] sulfuric acid and alum.

16. (Amended) A treatment process for treating lead contaminated soil [solid wastes] to stabilize leachable lead contained therein, said process comprising the steps of:

mixing a solid waste containing leachable lead with calcium sulfate dihydrate [gypsum] to produce a first mixture, said first mixture containing a substantially insoluble lead compound of mineral species; and

mixing said first mixture with phosphoric acid for

reacting with leachable lead remaining in said first mixture to produce a second mixture, said second mixture containing a substantially insoluble lead compound or mineral species;

curing said second mixture for a period such that the material so treated is substantially solid in form at the end of curing, the material passes the paint filter test, TCLP lead levels are decreased below 5.0 mg/l, the volume of said solid waste is reduced as a result of treatment and curing, and no secondary waste streams are generated.

17. (Amended) The treatment process of claim 16, wherein the calcium sulfate dihydrate [gypsum] is employed in an amount of up to about 30 percent of the weight of waste material being treated.

REMARKS

The amendments to the claims were made to better define the invention in the present patent under reexamination, U.S. Patent No. 5,193,936 to Pal et al. (hereinafter "the '936 patent"). The term gypsum has been deleted since gypsum exists in two different forms, an anhydrite ($CaSO_4$) and a dihydrate ($CaSO_4 \cdot 2\ H_2O$). The anhydrite form does not react with lead and can not be used in the present invention. The dihydrate form is disclosed in the specification of the '936 patent at col. 6, lines 19 and 20 and reacts with lead to form mineral species.

Claim 16 has been amended to particularly point out the solid waste that is being treated as a contaminated soil. This distinguishes the process disclosed in this claim from U.S. Patent No. 4,737,356 to O'Hara et al. which discloses a process for treating solid residue arising from

the burning of solid wastes and does not teach or suggest the treatment of lead contaminated soil. Support for this amendment is found at col. 5, lines 28 to 30 of the '936 patent.

The patent owner submits herewith a declaration by Karl Yost, one of the co-inventors, that discusses the technical differences between the prior art cited by the examiner and the present invention (a copy is attached hereto as Exhibit A). In summary, Mr. Yost provides evidence that shows that the calcium sulfate produced as part of the FGSP is non-reactive calcium sulfate anhydrite and not the calcium sulfate dihydrate disclosed in the patent under reexamination. The FGSP calcium sulfate anhydrite disclosed by O'Hara does not react with lead and therefore, could not be used in the present invention as a source of sulfate compound having at least one sulfate ion for reacting with lead.

Claims 1-4, 7-12 and 14 have been rejected under 35 U.S.C. 102(b) as being anticipated by O'Hara. As discussed in Mr. Yost's declaration, O'Hara merely discloses (at col. 5, lines 52 and 53) that the FGSP typically will contain such materials as calcium sulfate and several other compounds. O'Hara makes no further reference to the calcium sulfate in the entire patent and there is no teaching or suggestion that calcium sulfate is used in O'Hara's process.

O'Hara is quite explicit in his teachings that the FGSP is used as a source of calcium hydroxide and that when

calcium hydroxide is not contained in the FGSP in sufficient amounts, it is supplemented by the addition of lime (col. 5, lines 54 to 61). One skilled in the art would not find that O'Hara teaches or suggests the use of calcium sulfate dihydrate in his process. O'Hara merely states that calcium sulfate is present in the FGSP and even then, it is only present in the anhydrite form. There is nothing in the O'Hara patent that teaches or suggests the reaction between calcium sulfate dihydrate and lead that is taught by the '936 patent.

Claims 13 and 15 have been rejected under 35 U.S.C. 103 as being unpatentable over O'Hara. The time periods taught in the '936 patent for curing the treated material would not be obvious because the two processes are chemically different. O'Hara adds a soluble phosphate to the solid residue being treated in the presence of calcium hydroxide. In contrast, the '936 patent teaches a two step process in which a sulfate compound with at least one sulfate ion for reacting with leachable lead is added to a waste material and then a phosphate reagent having at least one phosphate ion for reacting with leachable lead is added. These two processes are chemically distinct and have different rates of reaction. Therefore, the curing time for the process in the '936 patent would not be obvious from the curing times disclosed by O'Hara.

Claims 16-20 have been rejected under 35 U.S.C. 103 as being unpatentable over O'Hara in view of U.S. Patent

No. 4,804,147 to Hooper. Hooper teaches using gypsum as an immobilizing agent in one step of a multiple step process for forming cementatious agglomerations. Hooper binds the ash residues resulting from the incineration of municipal solid waste to form weak agglomerations (claim 1).

There is no basis for reading O'Hara in view of Hooper. In Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561 (Fed. Cir. 1987), the court stated:

> "Clarity in the law requires universal application of the same legal standards to fact-finding functions performed en route to final § 103 conclusions.
> Among legal standards for determining scope and content of the prior art, for example, are: a prior patent must be considered in its entirety, i.e., as a whole, including portions that would lead away from the invention in suit, W.L. Gore & Associates, Inc. v. Garlock, Inc., 721 F.2d 1540, 1550, 220 USPQ 303, 311 (Fed. Cir. 1983), cert. denied, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984); elements of separate prior patents cannot be combined when there is no suggestion of such combination anywhere in those patents, ACS Hospital Systems, Inc. v. Montefiore Hospital, 732 F.2d 1572, 1577 221 USPQ 929, 933 (Fed. Cir. 1984); and a court should avoid hindsight, W.L. Gore & Associates, Inc., 721 F.2d at 1553, 220 USPQ at 313."

The gypsum reference taught by Hooper is contradicted by O'Hara. Gypsum is a salt formed by the reaction of sulfuric acid and calcium oxide, as such, it is a sulfuric acid salt. O'Hara specifically teaches at col. 10, lines 58-60 that "neither sulfuric nor nitric acids immobilize lead and cadmium, nor do their salts." Therefore, O'Hara leads away from using gypsum to immobilize lead and the combination with Hooper is not proper.

The patent owner respectfully submits that O'Hara does not teach or suggest the use of calcium sulfate dihydrate and requests that the examiner withdraw his rejections based on O'Hara and find that the claims as amended are patentable.

Respectfully submitted,

Kevin E. McDermott

Kevin E. McDermott, Esq.
Reg. No. 35,946
Wyatt, Gerber, Burke & Badie
645 Madison Avenue
New York, New York 10022
(212) 826-0171

KEM/eeh/60/69

Exhibit A

Docket: SES-3

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In Reexamination of: Pal et al. ) Group Art Unit: 3501

Control No.: 90/003,305 ) Examiner: D. Corbin

Filed: January 13, 1994 )

Patent Under Reexam.: 5,193,936 )

For: FIXATION AND STABILIZATION OF LEAD IN CONTAMINATED SOIL AND SOLID WASTE )

CERTIFICATE OF MAILING BY "EXPRESS MAIL"
"Express Mail" Mailing Label No. FB59615574
Date of Deposit SEPT. 8, 1994
I hereby certify that this paper or fee is being deposited with the United States Postal Service "Express Mail Post Office to Addressee" Service under 37 C.F.R.§1.10 on the date indicated above and is addressed to the Commissioner of Patents and Trademarks, Washington, D.C. 20231
Print Name KEVIN E. McDERMOTT
Signature [signature]

Hon. Commissioner of Patents
and Trademarks
Washington, D.C. 20231

**DECLARATION UNDER RULE 132**

SIR:

Karl Yost declares:

1) I am one of the persons named as a co-inventor in the above-identified patent involved in the present reexamination.

2) Dhiraj Pal and I jointly invented the subject matter claimed in U.S. Patent No. 5,193,936 (hereinafter "the '936 patent").

3) I have read the June 16, 1994 U.S. Patent Office action in said reexamination and I am aware of the fact that: (a) certain claims have been rejected under 35 U.S.C. §102 (b) as being anticipated by U.S. Patent No. 4,737,356 to O'Hara et al.; (b) certain claims have been rejected under 35 U.S.C. §103 as unpatentable over O'Hara et al.; and (c) certain claims have been rejected under 35

U.S.C. §103 as being unpatentable over O'Hara et al. in view of U.S. Patent No. 4,804,147 to Hooper.

4) I graduated from the Albion College in 1977 with the degree of Bachelor of Arts in Biology and a minor in Chemistry. Since 1979, I have been continuously involved in the field of hazardous waste treatment management. I worked for MAECORP Incorporated and its predecessor corporation from 1985 to 1993 as Vice President of Technical Services and since 1993, I have held the position of Director of Treatment Services with Sevenson Environmental Services, Inc.

5) I believe that our invention as claimed in the '936 patent is based on the discovery that lead contained in lead toxic wastes and soils (col. 2, line 42) can be fixated and stabilized by a process that employs the use of a sulfate compound in the first step and a phosphate compound in the second step. Further, the preferred sulfate compound is calcium sulfate dihydrate ($CaSO_4 \cdot 2H_2O$), commonly referred to as gypsum, or another sulfate ion source in the presence of calcium (Pal et al., col. 6, line 42), where the sulfate ion reacts with the leachable lead (Pal et al., col. 5, lines 33 to 38).

6) I have reviewed the '356 patent to O'Hara et al. and find that it discloses a process for immobilizing cadmium and lead in solid residues arising from the burning of solid wastes by contacting the residue with a water

soluble phosphate in the presence of a free lime source added on the basis of its calcium hydroxide content.

7) Claims 1-4, 7-12, and 14 have been rejected under 35 U.S.C. §102(b) as being anticipated by O'Hara et al. O'Hara treats solid residues arising from the burning of solid wastes that contain lead with a water soluble phosphate in the presence of a free lime source in an amount sufficient to furnish from about 1 to 25 parts of calcium hydroxide per 5 parts by weight of fly ash. O'Hara discloses at col. 5, lines 52 to 54 that the flue gas scrubber product (FGSP) typically contains "such materials as calcium sulfate, calcium sulfite, calcium chloride and calcium carbonate." O'Hara's invention, however, concerns only the amount of calcium hydroxide in the FGSP. O'Hara does not teach or suggest that the presence or absence of any other material in the FGSP is of significance, including calcium sulfate. O'Hara teaches at col. 5, lines 58-61 that "lime or FGSP will be added to fly ash in an amount . . . based on its calcium hydroxide content." One skilled in the art would not find that calcium sulfate is required to practice the method disclosed by O'Hara and the fact that O'Hara mentions that it is present in the FGSP would not teach or suggest its use in the invention.

8) O'Hara teaches (col. 5, lines 52 and 53) that calcium sulfate is one of several materials present in the FGSP and that it is formed by the reaction of lime and

sulfur compounds in the flue gas scrubber when the flue gas is contacted with calcium oxide (lime) (col. 4, lines 10 to 15). This process is controlled at an elevated temperature in the absence of water to insure that the sulfur dioxide does not form sulfuric acid which would corrode the equipment. As a result, the calcium sulfate that is formed is anhydrite, i.e. it does not contain water, and its chemical formula is $CaSO_4$ (hydrated calcium sulfate becomes anhydrite when subjected to temperatures above 163°C or 325.4°F - see attached Exhibit A). U.S. Patent No. 4,397,742 to Minnick (attached hereto as Exhibit B) discloses the reaction that forms calcium sulfate anhydrite from the combining of lime and sulfur dioxide at col. 6, lines 36-43:

> "When the resulting quicklime component is subjected to the sulphur dioxide emanating from the burned coal and to the molecular oxygen existing in the combustion air, an anhydrous calcium sulfate reaction product is for[m]ed by the following reaction:
>
> $2CaO + 2SO_2 + O_2 \rightarrow 2CaSO_4$ (anhydrite)"

Calcium sulfate anhydrite can not be used in our process. In contrast, the present invention uses calcium sulfate dihydrate ($Ca\ SO_4 \cdot 2H_2O$) (see '936 patent at col. 6, lines 19 and 20) which is significantly different from the anhydrite form. Moreover, the anhydrite form of calcium sulfate cannot be substituted for the hydrated form since it is non-reactive and only slightly soluble in water. That is

why calcium sulfate dihydrate is specifically defined in the '936 patent at col. 6, lines 19-21 by its chemical formula. Thus, even if O'Hara did teach that calcium sulfate was required in his method, which he does not, the calcium sulfate anhydrite found in the FGSP is chemically different from the calcium sulfate dihydrate disclosed in the present invention and would not react with lead to form insoluble mineral species.

9) The calcium sulfate anhydrite in FGSP is non-reactive and will not react with lead in the same manner as the calcium sulfate dihydrate disclosed in the '936 patent (col. 6, lines 19 and 20). The reason that the calcium sulfate anhydrite in the FGSP is non-reactive is explained by Minnick in U.S. Patent No. 4,397,742 (copy attached as Exhibit B) at col. 6, lines 46 to 50 and 56 to 59:

> "The $CaSO_4$ anhydrite is formed about the outer surface of the CaO particles and thus forms a shell which encapsulates the quicklime (CaO). The thickness of this shell is dictated by the length of exposure of the quicklime to the $SO_2$ . . . This factor distinguishes FBCR from other lime reaction products and provides a problem in that the $CaSO_4$ shells must be broken before the quicklime component of the residue can be released."

10) The invention of the patent under reexamination uses a sulfate compound such as calcium sulfate dihydrate or sulfuric acid to immobilize lead. The O'Hara patent teaches away from the use of sulfuric acid and its salts in the immobilization of lead and cadmium. This

would include calcium sulfate since calcium sulfate is a salt formed when sulfuric acid reacts with a calcium compound. At column 10, lines 61 to 64 O'Hara teaches:

> "The data in Table 8 shows unequivocally that phosphate is unique; neither sulfuric nor nitric acids immobilize lead and cadmium, nor do their salts." (emphasis added)

The tests conducted by O'Hara were intended to show that other acids were not a suitable substitute for phosphoric acid in his process. In contrast, the present invention uses a sulfate source in addition to phosphoric acid. However, it is clear from O'Hara's statement that he discounted the use of both sulfuric acid and calcium sulfate for the immobilization of lead. This is contrary to our invention which teaches the use of calcium sulfate to form anglesites ($PbSO_4$) that immobilize lead. (See col. 6, lines 56 to 64). Other mineral species are also formed by our process wherein lead is immobilized, such as mixed calcium lead phosphate sulfate. (See col. 8, lines 59 to 66). The '936 patent teaches at col. 6, lines 20-22 that:

> "Calcium sulfate dihydrate powder reacts with leachable and mobile lead species in wastes to form hard sulfates."

O'Hara neither teaches nor suggests the formation of these mineral species and one skilled in the art would find O'Hara teaches away from our invention. O'Hara clearly teaches that neither sulfuric acid nor its salt, calcium sulfate, immobilizes lead. My tests and experiments as disclosed in

the '936 patent prove that O'Hara was wrong.

11) The amount of calcium sulfate present in the FGSP will depend on the refuse material that is burned since the refuse material is usually the sole source of the sulfate. Also, it is well known that calcium sulfate is not present in lime. O'Hara discloses at col. 1, lines 21 or 39 that the solid waste material burned is raw garbage. The sulfur content of this garbage is not controllable and so there is no way to determine the amount of calcium sulfate in the FGSP. Also, because of the uncertain composition of the garbage being burned, it is possible that the FGSP will contain hundreds of different materials. If O'Hara considered the presence of calcium sulfate to be important to his method, he would have made a provision to supplement the amount present in the FGSP with another source, just as he provided for the addition of lime to supplement the calcium hydroxide content of the FGSP (see col. 5, lines 54 to 61). Because of this, one skilled in the art would not find that O'Hara teaches the use of calcium sulfate in his process. Instead, one skilled in the art would find that O'Hara only mentions calcium sulfate once in the patent as one of the materials contained in the FGSP and that if a low sulfur garbage was burned, the FGSP would contain only negligible amounts of calcium sulfate. Moreover, one skilled in the art would find that O'Hara does not teach that the amount of calcium sulfate makes any difference

whatsoever. O'Hara does not disclose the effect of the absence or the presence of calcium sulfate in any of his tests. The mere mention that "typically the FGSP will contain such materials as calcium sulfate" (anhydrite) would not teach or suggest the use of calcium sulfate dihydrate in the manner that it is used in the present invention.

12) O'Hara states at col. 3, lines 43 to 48 that:

> "Our method does not change the particulate nature of the untreated solid residue; it generates no cement-like mass. Our method does not generate calcium phosphate as the metal binder; substitution of calcium phosphate for our soluble phosphate fails to immobilize lead and cadmium."

This disclosure is in contrast to the invention disclosed in the '936 patent which does changes the particulate nature of the untreated solid residue. The present invention discloses at col. 6, lines 66 to 68, col. 7, lines 30 to 34 and col. 8, lines 12 and 14 that as a result of the process, crystals of various lead mineral species are formed at a reduced volume from the pretreated material (see col. 12, line 51 to col. 13, line 10).

Moreover, contrary to O'Hara, the present invention does "generate calcium phosphate as the metal binder." Evidence of this is provided in the '936 patent's disclosure of equations (3a) and (3b) at col. 7, lines 36 to 46 and equations (4) and (5) at col. 8, line 59 to col. 9, line 10, which teach the formation of various calcium

phosphate minerals that bind lead in an insoluble mineral species.

13) O'Hara teaches that the treated solid residue will have an alkaline pH after the addition of a water soluble phosphate source. At col. 6, lines 17 to 20, O'Hara discloses that:

> "Sometimes it is desirable to use a less acidic source of phosphate, and in fact it is essential that the phosphate source and use level be such that a substantial part of the lime is not neutralized."

O'Hara discloses the pH range of the treated solid residue having acceptable levels of lead in Example 1, at col. 7, lines 38 to 40:

> "It was observed that the EPA limits for Pb were met only within the pH range 6.7-12.0."

These results are contrary to the results disclosed in the present invention at Table IV, col. 14, lines 3 to 31 where the pH of the solid waste after treatment and curing is found to have a pH range of from 4.5 to 6.3. Thus, the higher pH ranges taught by O'Hara would teach away from the present invention, since we have found that the mineral species form at a pH level below the pH level of 6.7 that O'Hara discloses as essential to his method.

14) Claims 13 and 15 have been rejected under 35

U.S.C. §103 as being unpatentable over O'Hara based on the effects of aging noted in column 10. The results of O'Hara's test are disclosed in Table 7 where he measures the lead in leachate for the first time after a phosphate source is added and then for a second time after either 3, 4 or 5 days, i.e. 72, 96 or 120 hours. In contrast, the present invention discloses a curing time of 3 to 5 hours. In fact, of the 10 phosphate sources O'Hara tested, 3 (the sixth, eight and tenth) showed an increase in lead level as they cured. Although, in hindsight, it may be said that O'Hara shows that lead levels are reduced as the treated material cures, there is nothing in O'Hara that teaches or even suggests that the curing time could be as short as 3 to 5 hours. O'Hara teaches that the treated material is allowed to cure for at least 72 hours and up to 120 hours. The disclosure of the 3 to 5 hour curing time in the present invention is not obvious from O'Hara since it would require additional testing to determine the optimum curing time. Therefore, the curing times disclosed in the present invention are not obvious from O'Hara.

15) O'Hara measures the levels of lead and cadmium using the 1980 EP (Extraction Procedure) Toxicity Test method described at col. 6, lines 45-67) of his patent. This test procedure is now obsolete and it was replaced by the Toxicity Characteristic Leaching Procedure (TCLP), USEPA Method 1311 (see '936 patent at col. 1, lines 46-67. The

TCLP Test is much more rigorous - and is more uniformly applicable to a larger number of parameters - than the EP Toxicity Test (see '936 patent at col. 2, lines 6-8).

The USEPA replaced the EPTOX test with the TCLP test in March 1990, as announced in the Federal Register and USEPA's Environmental Reporter. The EPA had found that the acidic leaching or "extraction" fluid of the EP Toxicity test method failed to overcome the buffering capacity and/or associated high pH values found in highly buffered or basic (alkaline) materials. This was critical to the classification of waste under RCRA as long-term exposure of treated material to acidic leachate in landfill environments overcame the buffering capacity of the treated materials. The treated material would then degrade and leach into groundwater at improperly constructed landfills. In the EP Toxicity test method, a volume of acetic acid and water was added to adjust the pH of the sample material to approximately 5.0. The pH was checked during the sample tumbling and more fluid was added to maintain a pH level of 5 until a maximum volume had been added. Sample materials with high pH and buffering capacity retained elevated pH values. The EPA determined that the test method did not allow for the conditions that the materials would be subjected to when interned in landfills.

In contrast, the TCLP method measures both the pH and buffering capacity of the sample material prior to

extraction. One of two different extraction fluids is selected based upon the pre-extraction tests. One fluid is more highly buffered than the other, one fluid has a pH level of approximately 2.88 and the other has a pH of approximately 4.93. Thus, the more acidic and buffered fluid is applied to a more highly buffered alkaline sample. The TCLP test method subjects sample material to much more severe and harsh conditions which overcome the buffering capacity of the sample matrix. The TCLP test method is intended to more closely simulate landfill conditions and overcome the short-comings of the EP Toxicity Test.

I conducted tests to compare the EP Toxicity Test to the TCLP Test using solid waste samples containing leachable lead and 20 different treatment chemicals. The results of these tests are presented in Table III at col. 11, lines 20-45 of the '936 patent. The results show that the TCLP Test method consistently reported higher levels of lead as compared to the EP Toxicity Test and the order of magnitude was from 3.18 to 5.9 times greater. The two tests are not the same as they subject sample materials to distinctly different chemical conditions.

16) I have reviewed the test results disclosed by O'Hara and find that the lead contaminated waste that O'Hara tested had relatively low levels of lead prior to treatment. For example, Tables 1 and 2 show that O'Hara treated materials having 5.6 mg/l (slightly above the toxic EPA's

level threshold of 5.0 mg/l) to 17.0 mg/l of lead. The tests reported in Tables 4, 6 and 8 show maximum pretreatment lead levels of 14.9, 11.8 and 12.16 mg/l respectively, while Table 5 does not disclose the pretreatment lead level and so has little significance. Table 7 shows a lead level of 44 mg/l but the data is incomplete since O'Hara omits the pH levels. In contrast, the tests reported in the '936 patent show that the materials treated by the '936 patent process had pretreatment lead levels that were significantly higher than those disclosed by O'Hara. Table II of the '936 patent shows pre-treatment lead levels of 46, 495 and 520 mg/l. Table IV characterizes pre-treatment lead levels as low, moderate and high for levels of 8, 61 and 3,659 mg/l respectively. Table VI shows solid waste materials with pre-treatment lead levels between 7.5 and 542 mg/l. Thus, the highest pre-treatment lead level of the materials tested by O'Hara was 17.0 mg/l, while the highest pre-treatment lead level of the materials tested in the '936 patent was 3,659 mg/l, or an order of magnitude of 215 times greater than O'Hara.

O'Hara's test results do not show that his method could be used successfully on materials containing high levels of lead. As shown in Table IV of the '936 patent, a lead level of 17.0 mg/l is categorized as slightly above "low lead contamination." In comparison, "moderate lead

contamination" is about 61 mg/l and "high lead contamination" is about 3,659 mg/l.

Therefore, a review of the O'Hara patent by one skilled in the art would only teach that O'Hara reduces the relatively low lead levels in solid residues arising from the burning of solid wastes. However, O'Hara does not teach or suggest that his method can reduce high lead levels in other materials.

17) Claims 16-20 have been rejected under 35 U.S.C. §103 as being unpatentable over O'Hara et al. in view of U.S. Patent No. 4,804,147 to Hooper. Hooper teaches a process for manufacturing aggregate from ash residue that includes the addition of a heavy metal immobilizing agent such as gypsum. Hooper does not disclose any test data to show that his immobilization process reduces the leachable heavy metal levels to below the toxic level established by the EPA. Moreover, test results disclosed in the '936 patent at col. 11, lines 20-46, show that gypsum alone <u>does not</u> immobilize lead sufficiently to meet EPA requirements. Hooper is immobilizing heavy metals by a cementatious process in which the heavy metals are prevented from leaching by the cement agglomeration that is formed. See col. 6, lines 15 to 42.

18) I further declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and

further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of the application or any patent issuing thereon.

8 September 1994
DATE

KARL YOST

KEM/ceh/60/63