IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

| | |
|---|---|
| **SEVENSON ENVIRONMENTAL SERVICES, INC.,**<br>**Plaintiff,**<br>**vs.**<br>**THE UNITED STATES,**<br>**Defendant,**<br>**and**<br>**SHAW ENVIRONMENTAL, INC.,**<br>**Defendant-Intervenor.** | **Case No.: 05-1075C**<br>**Judge Thomas C. Wheeler** |

**<u>SEVENSON ENVIRONMENTAL SERVICES, INC.'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT</u>**

Brian E. Ferguson
McDERMOTT WILL & EMERY LLP
600 13th Street, N.W.
Washington, D.C. 20005
(202) 756-8000
bferguson@mwe.com

WEBSTER SZANYI LLP
Kevin A. Szanyi
Nelson Perel
1400 Liberty Building
Buffalo, New York 14202
(716) 842-2800
nperel@websterszanyi.com

Attorneys for Plaintiff, Sevenson Environmental Services, Inc.

# TABLE OF CONTENTS

Page


I. INTRODUCTION AND SUMMARY OF THE ARGUMENT....................................1

II. RESPONSE TO DEFENDANTS' ARGUMENTS ....................................................5

A. The Treatment Method At The Colonie Site Meets The Court's Claim Construction Of "First Component" And "Second Component" ..........................5

1. Defendants' Invitation To Re-Write The Claims And The Court's Construction Should Be Declined ..........................................................6

2. Defendants' Arguments Concerning The Specification Are Unavailing..........................................................................................8

3. Defendants' Prosecution History Estoppel Argument Is Meritless .........11

a. There Was No Prosecution History Estoppel During Prosecution Of The '936 Patent.................................................12

b. There Was No Prosecution History Estoppel During Prosecution Of The '982 Patent.................................................14

c. There Was No Prosecution History Estoppel During Prosecution Of The '485 Patent.................................................15

d. The Prior Art Relied On By Defendants Does Not Teach The Use Of Phosphoric Acid Having A Phosphate Component And A Sulfate Component As The Sevenson Patents Claim..............................................................15

B. Defendants' "de minimus" Argument Concerning The Amount Of Sulfate Is Contrary To The Evidence And Should Be Rejected ....................................17

C. Defendants' Argument Concerning The Colonie Site's Alleged Lack Of The Claimed "Mixture" Is Contradicted By The Stipulated Facts ......................24

D. Defendants' Argument Concerning The Claims Requiring Technical Grade Phosphoric Acid Is Off-Base, As Prayphos P5 Is Technical Grade Phosphoric Acid....................................................................................26

E. The Government's Argument Concerning The Asserted Claims Of The '123 Patent, Which Calls For A Reduction In Volume Of The Treated Material, Is Based On Erroneous Evidence And Contradicted By The Science Of The Patented Method ....................................................................28

**TABLE OF CONTENTS**
(continued)

**Page**

F. The Evidence Shows The Government Did Use Sevenson's Patented Methods To Treat Radioactive Soil At The Colonie Site ....................................30

G. Claim 28 Of The '485 Patent And Claim 1 Of The '608 Patent .........................32

III. CONCLUSION ..........................................................................................................33

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298 (Fed. Cir. 2003)..............11

*Aquatex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374 (Fed. Cir. 2005)............................12

*Autogiro Co. of Am. v. United States*, 384 F.2d 391 (Ct. Cl. 1967).............................................7

*Beachcombers, International, Inc. v. WildeWood Creative Prods., Inc.*, 31 F.3d 1154 (Fed. Cir. 1994).........................................................................................................8

*Biogen, Inc. v. Berlex Labs, Inc.*, 318 F.3d 1132 (Fed. Cir. 2003)............................................13

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339 (Fed. Cir. 2003).........................................................................................................4

*Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352 (Fed. Cir. 2003).......................................4

*Electro Medical Sys., S.A. v. Cooper Life Sciences*, 34 F.3d 1048 (Fed. Cir. 1994).....................7

*Electro Sci. Indus. v. Dynamic Details, Inc.*, 307 F.3d 1343 (Fed. Cir. 2002)............................11

*Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565 (Fed. Cir. 1983)...................................11

*Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327 (Fed. Cir. 2004)....................................19

*Hilgraeve Corp. v. McAfee Assocs.*, 224 F.3d 1349 (Fed. Cir. 2000)...................................2, 20

*Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512 (Fed. Cir. 1996) (*en banc*), *reversed on other grounds*, 517 U.S. 17 (1997)..................................................31

*Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575 (Fed. Cir. 1996)..............................31

*Hughes Aircraft Co. v. United States*, 140 F.3d 1470 (Fed. Cir. 1998).....................................12

*Hughes Aircraft Co. v. United States*, 717 F.2d 1351 (Fed. Cir. 1983).......................................4

*Insituform Techs., Inc. v. Cat Contracting, Inc.*, 385 F.3d 1360 (Fed. Cir. 2004).......................14

*Intervet America, Inc. v. Kee-Vet Laboratories, Inc.*, 887 F.2d 1050 (Fed. Cir. 1989).................7

*Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052 (Fed. Cir. 2005)................................13

*Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855 (Fed. Cir. 1989)............................17

*North American Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335 (Fed. Cir. 2005).......................................................................................................19

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Northern Telecom Ltd. v. Samsung Electronics Co., Ltd.*, 215 F.3d 1281 (Fed. Cir. 2000) ....19

*Perricone v. Medicis Pharm. Co.*, 432 F.3d 1368 (Fed. Cir. 2005) ....16

*Phillips Petroleum Co. v. Huntsman Polymers Corp.*, 157 F.3d 866 (Fed. Cir. 1998) ....20

*PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235 (Fed. Cir. 2002) ....17

*Rhone-Poulenc Agro Sa v. Dekalb Genetics Corp.*, 272 F.3d 1335 (Fed. Cir. 2001) ....2, 21

*SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107 (Fed. Cir. 1985) (*en banc*) ....10

*York Prods., Inc. v. Central Tractor Farm & Family Center*, 99 F.3d 1568 (Fed. Cir. 1996) ....19

**Rules**

Fed. R. Civ. P. 56(f) ....29, 31

# TABLE OF EXHIBITS

Exhibit 1: Selected Pages from the File History of U.S. Patent No. 5,193,936

Exhibit 2: Selected Pages from the File History of U.S. Patent No. 5,527,982

Exhibit 3: A. Sheeran, J. Moore, K. Dufek, *The Colonie FUSRAP Site: CY2002 Situation Report*, WM'03 Conference, Tucson, AZ (Feb. 23-27, 2003)

Exhibit 4: Colonie Site Remediation Approach, SH001664-83 (July 20, 1998)

Exhibit 5: Certificate of Analysis and Purchase Orders for Prayphos P5 (Sheeran Deposition Exhibits 6 and 7)

Exhibit 6: Website Print-Outs of Technical Grade Phosphoric Acid Products

Exhibit 7: Selected Pages from the Deposition of Bradley Eaton, February 20, 2001

Exhibit 8: Selected Pages from the Deposition of John Franz, August 12, 2004

Exhibit 9: Selected Pages from the Deposition of Anthony Sheeran, August 11, 2004

## I. INTRODUCTION AND SUMMARY OF THE ARGUMENT

Plaintiff Sevenson Environmental Services, Inc. ("Sevenson") hereby responds to and opposes defendants' joint motion for summary judgment of infringement.[1] For the reasons set forth herein, defendants' Motion should be denied.

When the parties approached the Court concerning a proposed schedule for summary judgment briefing, the Court rightly expressed concern that the parties' proposal was unusual because "the question of infringement would be an issue of fact." (June 8, 2007 Tr. at 4). The parties advised the Court that they were working on a set of stipulated facts that would form the basis for their arguments. *Id.* at 6 ("if you can do it on stipulated facts, that would be wonderful"). Sevenson kept its end of the bargain; it based its motion solely on the patents and the stipulated facts, and purposely did not over-extend the scope of its motion into any ground that would be subject to competing factual analyses beyond the stipulated facts. In contrast, defendants' Motion relies very little on the stipulated facts, and instead presents the Court with a myriad of arguments, evidence and opinions beyond the agreed-to facts. As Sevenson shows herein, defendants' evidence is more than countered with evidence and opinions proffered by Sevenson, that at a minimum creates a genuine issue of material fact requiring denial of defendants' Motion.[2]

---

[1] Defendant United States will be referred to herein as "the Government" and defendant-intervenor Shaw Environmental, Inc. as "Shaw." Defendants' motion is identified as "Motion at ___" and the attached exhibits as "Def. Ex. __." The Court's Claim Construction Opinion is identified herein as "Op. at __."

[2] Sevenson incorporates by reference in its entirety its Motion for Partial Summary Adjudication relating to Infringement, Memorandum in Support, and Declaration of Brian E. Ferguson with exhibits. Sevenson refers herein to its Motion as "Sevenson Memo. at ___."

For example, one of the issues in this case involves the presence of sulfates in the phosphoric acid treatment method used at the Colonie Site. There is, and can be, no dispute that the treatment method at the Colonie Site applies sulfates to the contaminated soil. (Stip. Fact ¶¶ 10-11). Unable to dispute this fact, defendants therefore argue that there is not *enough* sulfate present in the Colonie Site treatment method to fall within the scope of the Sevenson patent claims. There are multiple reasons why defendants' argument should be rejected.

First, defendants offer no *scientific* rationale for why the Colonie treatment method does not fall within the scope of the claims and the Court's construction thereof. The best defendants can muster is an unsupported, conclusory statement by an expert that the amount of sulfate used at the Colonie Site "would not participate meaningfully in any chemical reactions."[3] This is exactly the type of conclusory expert opinion that the Federal Circuit has condemned on numerous occasions.[4] Moreover, as detailed herein and explained by Sevenson's expert, defendants' position is wrong from a chemical perspective.[5] A single molecule of sulfate will act as a catalyst in the chemical reactions defined in the patents because it will bond with one or more hazardous lead molecules and render them non-leachable, exactly as taught and claimed in the Sevenson patents. (*See* Sevenson Memo. at 21-22).[6] As the molecular and chemical science

---

[3] Pierzynski declaration, Def. Ex. 6.

[4] *See*, *e.g.*, *Hilgraeve Corp. v. McAfee Assocs.*, 224 F.3d 1349, 1354 (Fed. Cir. 2000) (conclusory opinion not based on substantial evidence cannot support a finding of non-infringement); *Rhone-Poulenc Agro Sa v. Dekalb Genetics Corp.*, 272 F.3d 1335, 1358 (Fed. Cir. 2001) ("some evidentiary support must be offered beyond an expert's conclusory opinion").

[5] Declaration of Karl Yost ("Yost Decl."), ¶¶ 5, 22, 42-55, filed concurrently herewith.

[6] It is for exactly this reason that Sevenson's Motion should be granted. Sevenson's Motion, based solely on the stipulated facts, merely asks the Court to adjudicate that the treatment method at the Colonie Site – which undeniably applies more than one molecule of sulfates to the contaminated soil – falls within the scope of the claim limitations requiring a

(continued…)

principles underlying the patented methods prove, the sulfate ions act as a catalyst in the reactions, which result in the immobilization of leachable, hazardous lead.[7] Thus, and as explained in detail herein and in the Yost Declaration, the Prayphos P5 technical grade phosphoric acid used at the Colonie Site falls within the chemical reactions defined and claimed in the Sevenson patents.

Second, defendants' argument is contrary to the Court's claim constructions and contradicted by the plain language of the Sevenson patent claims. Pursuant to the Court's claim construction, Sevenson must only show that the sulfates in the phosphoric acid "participate measurably in the chemical reactions defined in the patents." (Op. at 31-32). There is no numerical limitation required in either the independent claims or the Court's construction regarding "how much" sulfate must be present. As is stated repeatedly throughout the asserted claims and the specification of the Sevenson patents, and as recognized in the Court's constructions, at least one sulfate ion may be sufficient.[8] Defendants' attempt to read an unspecified numerical limitation into the claim and the Court's construction is at odds with decades of precedent.

Defendants' other arguments also do not support summary judgment in their favor. Defendants argue that prosecution history estoppel prevents Sevenson from asserting

---

treatment component comprising sulfates. This determination can be made in a summary judgment context because it is based on stipulated facts and the Court's claim construction.

7 Yost Decl., ¶¶ 42-52.

8 *See* '485 Patent, claim 22: "wherein said first component includes *one or more* reactive sulphate ions;" *see also* '982 Patent, *Summary of the Invention*, col. 2, lines 21-35: "According to the present invention, a process for treating lead-toxic solid wastes in order to stabilize the leachable lead is disclosed, comprising the steps of: (i) mixing the solid waste with a sulfate compound . . . having *at least one* sulfate ion for contacting waste particles and reacting with said leachable lead. . ." (all emphasis added herein unless otherwise specified).

infringement under the doctrine of equivalents. However, far from creating an estoppel, the prosecution history of the Sevenson patents supports Sevenson, not defendants. At a minimum, the statements in the file history are "amenable to multiple reasonable interpretations," and thus do not constitute the required "clear and unmistakable surrender" of subject matter required to establish prosecution history estoppel. *See Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1359 (Fed. Cir. 2003).[9] A thorough reading of the prosecution history shows that Sevenson did not surrender any claim scope involving the use of phosphoric acid as the source of both sulfates and phosphates. Sevenson was the first to discover this patentable invention.

Defendants' arguments regarding the radioactive claims (of the '367 and '608 Patents) and the claims discussing the post-treatment volume of the material ('123 Patent) also do not justify summary judgment. As to the first, and contrary to defendants' arguments, it is a scientifically proven fact that the treatment method employed at the Colonie Site reduced the amount of hazardous radioactive materials in the treated soil. (Yost Decl., ¶¶ 65-66). As to the latter, and as explained by Sevenson's expert, the tests relied upon by defendants to assert that there was volumetric expansion of the treated soil do not support defendants' position. (Yost Decl., ¶¶ 67-71). Instead, it is well-known that the treatment method used at the Colonie Site reduces the volume of treated soil following curing. *Id.* In either case, there exists, at a

[9] The question of infringement under the doctrine of equivalents is an intensely factual one, and focuses on whether, in the absence of literal infringement, the accused method is "insubstantially different" from the claimed method. *See*, *e.g.*, *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1351 (Fed. Cir. 2003); *Hughes Aircraft Co. v. United States*, 140 F.3d 1470, 1475 (Fed. Cir. 1998). Defendants limit their arguments regarding doctrine of equivalents to the legal question of prosecution history estoppel, and thus Sevenson only addresses the same in this Opposition. Sevenson reserves the right to present a case of infringement under the doctrine of equivalents during later proceedings in this case.

minimum, a factual dispute which makes summary judgment in defendants' favor on these particular claims inappropriate.

## II. RESPONSE TO DEFENDANTS' ARGUMENTS

### A. The Treatment Method At The Colonie Site Meets The Court's Claim Construction Of "First Component" And "Second Component"

Defendants' first argument is that the asserted claims requiring a "first component" and a "second component" are not met by the treatment method at the Colonie Site.[10] (Motion at 16). The Court construed these limitations to mean "a separate and distinct compound capable of supplying at least one of the listed members (sulfates)" and "a separate and distinct compound capable of supplying a source of phosphate ion." (Op. at 11-16). According to defendants, there was no first component that was "separate and distinct" from a second component in the treatment method at the Colonie Site. (Motion at 16). In making this argument, defendants ignore the stipulated facts concerning the treatment method used at the Colonie site, and impermissibly read limitations into the claims and the Court's construction that are simply not there.

The claims require treatment of the soil with a "first mixture" comprising the first component and the second component. Defendants do not, and cannot, dispute that Prayphos P5

---

[10] *See*, *e.g.*, '982 Patent, claim 1: "mixing a metal-bearing material with a first mixture comprising a first component and a second component . . . wherein said first component supplies . . . sulphates . . . and wherein said second component supplies at least one phosphate anion. . . ."

is a "first mixture" as the claims require. (*See* Stip. Fact ¶ 12; Op. at 7 ("phosphoric acid is a mixture. . .")).[11]

The next requirement is that the first and second components be "separate and distinct compounds." (Op. at 11-16). Prayphos P5 contains sulfate compounds – $(S0_4)^{2-}$ – that are separate and distinct from phosphate compounds – $(P0_4)^{3-}$ – also found in Prayphos P5. (*See* Sevenson Memo. at 18-19; *see also* Stip. Fact ¶ 10-11; Yost Decl., ¶¶ 16-19). Accordingly, Prayphos P5 is "a first mixture comprising a first component and a second component . . . wherein said first component supplies . . . sulphates . . . and wherein said second component supplies at least one phosphate anion" exactly as the claims require. No one, not even defendants, can seriously dispute that the phosphate compounds and sulfate compounds in Prayphos P5 are "separate and distinct" from one another in Prayphos P5. This is demonstrated by defendants' own evidence, which shows that the amount of sulfates and phosphates present in Prayphos P5 are each measurable (*see* Def. Ex. 6 (accompanying exhibits 2-6) and 7). If the sulfates and phosphates were not "separate and distinct" they would not be subject to separately measurable analysis, nor could the manufacturer of Prayphos P5 attempt to remove some of the sulfate to make a more "pure" product. (*See* Yost Decl., ¶¶ 19).

**1. Defendants' Invitation To Re-Write The Claims And The Court's Construction Should Be Declined**

Knowing this, defendants are reduced to arguing that the Court should change either the wording of the claims or the Court's construction thereof. Without providing any citation, defendants argue that "clearly, the 'first component' must be a compound or chemical separate

---

11 While Prayphos P5 is called a "phosphoric acid" product, the facts show that pure phosphoric acid $(H_3P0_4)$ comprises about 75% of the product, with the remaining 25% made up of other materials and compounds. (*See* Stip. Fact ¶ 10-11; Def. Ex. 7).

from the compound or chemical comprising the 'second component.' In other words, the two components must have must have [sic] been separate from each other at some point in the process, *e.g.*, a two-tank system that supplies 'separate and distinct' treatment chemicals." (Motion at 17).

Thus, what defendants are really arguing is that either the claims or the Court's construction thereof actually require a "first mixture" comprising the first component and a "second mixture" comprising the second component. The problem, of course, is that is not what either the claims or the Court's construction says. Defendants' argument therefore invites error. *See Autogiro Co. of Am. v. United States*, 384 F.2d 391, 395-96 (Ct. Cl. 1967) ("No matter how great the temptations of fairness or policy making, courts do not rework claims. They only interpret them"); *Electro Medical Sys., S.A. v. Cooper Life Sciences*, 34 F.3d 1048, 1054 (Fed. Cir. 1994) **("**although the specifications may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments"); *Intervet America, Inc. v. Kee-Vet Laboratories, Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989) **("**courts cannot alter what the patentee has chosen to claim as his invention").

Further, defendants' argument must be rejected because it ignores the fact that other, non-asserted claims in the Sevenson patents contain the very limitations that defendants seek to read into the asserted claims. For example, claim 12 of the '982 Patent requires mixing the contaminated material with a phosphate reagent to create a first mixture, and then mixing the first mixture with a second component (such as sulfate) to form a second mixture. (*See* '982 Patent, col. 20, lines 48-67). When the patentee clearly intends claims to have different scope, as here, it is error to interpret the claims in a manner that would blur the distinctions between the

claims. *See*, *e.g.*, *Beachcombers, International, Inc. v. WildeWood Creative Prods., Inc.*, 31 F.3d 1154, 1162 (Fed. Cir. 1994) (an interpretation of a patent claim that would render another claim in the patent "superfluous" is "presumptively unreasonable").

**2. Defendants' Arguments Concerning The Specification Are Unavailing**

Defendants ignore the plain language of the Court's claim construction and return to the patents' specification as allegedly supporting their non-infringement argument. Defendants' highly selective citation to the specification, however, does not change the unavoidable fact that the accused treatment method at the Colonie Site has at least two "separate and distinct" components present in the Prayphos P5 product. For example, defendants argue that the specification of the patents "teaches away" from using a single product such as phosphoric acid as a source of the separate and distinct sulfate and phosphate ions. (Motion at 18). In making this argument, defendants ignore those portions of the patents which teach exactly the opposite, as the Court previously recognized. (*See* Op. at 6: "the patents disclose and claim the use of phosphoric acid, which acts as a source of both phosphate and sulphate, to treat contaminated soil;" Op. at 7: "[a] first component of the mixture supplies sulphate and a second component supplies phosphate. . . . Phosphoric acid is a mixture that contains both sulphate and phosphate . . . . The patents contain examples to show that phosphoric acid may be sufficient to treat lead contaminated soils under the EPA's TCLP test;" *see also* Yost Decl., ¶¶ 33-35).

Indeed, contrary to defendants' assertion, the patents repeatedly describe the use of phosphoric acid as the source of both treatment additives, and the Court's claim construction does not preclude it. "The invention relates to treatment methods employed to chemically convert leachable lead in lead bearing solid and liquid waste materials to a non-leachable form by mixing the material with lime, gypsum, *and/or phosphoric acid*." ('982 Patent, Abstract). "The invention relates to treatment methods employed to chemically convert leachable metal in

metal-bearing solid and liquid waste materials to a non-leachable form by mixing the material with *one or a combination* of components, for example, lime or gypsum and phosphoric acid." ('982 Patent, *Summary of the Invention*, col. 2, lines 57-61).[12] "The present invention discloses a process comprising a single step mixing of *one or more treatment additives*. . . ." (*Id.*, col. 3, lines 2-5). "[T]he metal-bearing material is mixed with *one or more treatment chemicals* in sufficient quantity so as to render the metal substantially non-leachable, that is, to levels below the regulatory threshold limit under the TCLP test criteria for the USEPA." (*Id.*, col. 3, lines 32-36). "In the preferred embodiment, soils or contaminated materials containing radionuclides and radioactive wastes are contacted with technical grade phosphoric acid (TGPA) which contains sulfates as an impurity." ('367 Patent, Abstract). "In the preferred embodiment, technical grade phosphoric acid (TGPA) is used in a one step process. TGPA contains sulfate as an impurity in addition to a phosphate anion source." ('367 Patent, *Summary of the Invention*, col. 5, lines 15-19; *see also* col. 8, lines 33-37).

In certain examples described in the patents, phosphoric acid alone successfully leached lead below the EPA threshold. In "Example 1" in the '982 Patent, lead contaminated soil was treated with group one and group two chemicals "in one single step." ('982 Patent, col. 10, lines 23-26). Test Run XII applied 15.1% phosphoric acid only to the hazardous soil; the results show

---

[12] These examples defeat defendants' argument that phosphoric acid is only identified in the specification as a source of the "group one" component, and never a source of the "group two" component. To the contrary, the specification and claims make it clear that at least one compound from both group one and group two is required. Since the specification expressly teaches that lime, gypsum *or* phosphoric acid may be the treatment source, the person of ordinary skill will readily recognize that phosphoric acid alone may be the source of both the phosphate and sulfate components. And, this is expressly taught in the '367 Patent, *see* col. 5, lines 15-19 ("technical grade phosphoric acid (TGPA) is used in a one-step process. TGPA contains sulfate as an impurity in addition to a phosphate anion source").

that the amount of leachable lead was reduced from 3236.0 mg/L (untreated control sample) to 3.6 mg/L (below the EPA threshold of 5.0 mg/L). (*Id*., Table III). As the patent teaches, "it is obvious from TCLP analyses of fifteen test runs that the single step mixing of at least one component of either or both group one and group two treatment chemicals is very effective in diminishing the TCLP lead values." (*Id*., col. 10, lines 57-61). This is reinforced by multiple examples in Table VI (cols. 13-16),[13] wherein phosphoric acid alone was successful in reducing the amount of leachable lead to below the EPA criteria. *See* Table VI, showing phosphoric acid alone was successful in treating lead contaminated waste found in "old dirt," "carbon with lead dross," "wire fluff, "wire chip," "casings and soil," and "industrial process soil (B)."

In other examples given in the patent, phosphoric acid alone did not successfully reduce the amount of leachable lead to below the EPA criteria. *See*, *e.g*., '982 Patent, col. 16, lines 44-49. Not surprisingly, it is only these examples on which the defendants base their arguments. But they cannot detract from the fact that the patents also teach that, in many circumstances, a single product, such as phosphoric acid, may successfully act as the source of both the phosphate and sulfate compounds. (*See also* Sevenson Memo. at 10-11; Yost Decl., ¶¶ 33-35).

Defendants also argue that the figures of the patents show separate sources for the first and second components. Once again, defendants' argument seeks to have the Court change its claim construction to require the first and second components be from physically separate sources. Such a re-writing of the claim construction would be improper. Moreover, the figures are merely illustrative of the invention; they do not limit the claim scope. *See SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (*en banc*) ("If structural claims

---

[13] "TABLE VI illustrates different types of waste matrix that have been successfully treated employing the one step and two step mixing treatment additives from group one and group two." ('982 Patent, col. 14, lines 5-8).

were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims"); *Electro Sci. Indus. v. Dynamic Details, Inc.*, 307 F.3d 1343, 1348-49 (Fed. Cir. 2002) ("Claim language defines claim scope. . . . In the context of the entire specification, the depiction of separate workpieces in Figure 6 does not limit the claim language" to that embodiment). As stated succinctly in *SRI Int'l*: **"**Specifications teach. Claims claim." 775 F.2d at 1121, n.14. Defendants ignore this fundamental principle in their push for summary judgment.[14]

**3. Defendants' Prosecution History Estoppel Argument Is Meritless**

In an effort to short-circuit any Sevenson argument concerning infringement under the doctrine of equivalents, defendants argue that prosecution history estoppel precludes Sevenson from asserting that the treatment method used at the Colonie Site equivalently infringes the asserted claims.[15] (Motion at 18).

To invoke prosecution history estoppel, the prosecution history "must evince a *clear and unmistakable* surrender of subject matter. To determine if subject matter has been relinquished, an objective test is applied, inquiring whether a competitor would reasonably believe that the

---

[14] The figures are illustrative of the two-step embodiment claimed in the '936 Patent and certain non-asserted claims in the patents-in-suit. (*See* Yost Decl., ¶¶ 25-28, 31, 35). There is no requirement in the patent law that a figure be included for every claimed embodiment. *Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306-07 (Fed. Cir. 2003) ("the mere fact that the patent drawings depict a particular embodiment of the patent does not operate to limit the claims to that specific configuration").

[15] As defendants concede, prosecution history estoppel is a limitation only on infringement under the doctrine of equivalents. (Motion at 18). It has no applicability to whether the limitations in the asserted claims *literally* read on the Colonie Site treatment method. *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1571 (Fed. Cir. 1983) (doctrine of prosecution history estoppel is "irreleveant" to a determination of literal infringement). Sevenson's Motion for Partial Summary Adjudication is based on such a literal reading. As set forth in footnote 9, *supra*, Sevenson reserves the right to present a case of infringement under the doctrine of equivalents at a later stage in this case, if necessary.

applicant had surrendered the relevant subject matter." *Aquatex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1382 (Fed. Cir. 2005). The "subject matter" in question is the technology which the patentee later asserts infringes in litigation. If the device or method later accused of infringement does not fall within the range of subject matter allegedly surrendered, prosecution history estoppel does not preclude infringement under the doctrine of equivalents. *See*, *e.g.*, *Hughes Aircraft Co. v. United States*, 140 F.3d 1470, 1476-77 (Fed. Cir. 1998).

As set forth below, prosecution history estoppel has no applicability here. First, the statements made in the file histories do not evince a clear and unmistakable surrender of any subject matter relevant to this case. Second, even if there was prosecution history estoppel, the prior art on which defendants base their arguments – the O'Hara and Stanforth patents (Def. Exs. 10 and 12) – does not teach or describe the treatment method used at the Colonie Site, such that an estoppel would not apply to the facts here.

**a. There Was No Prosecution History Estoppel During Prosecution Of The '936 Patent**

Defendants correctly note that Sevenson's U.S. Patent No. 5,193,936 (Def. Ex. 14) is part of a related family of patents that includes the five patents asserted here. However, in an effort to relate the comments made during prosecution of the '936 Patent to the asserted patents, defendants misrepresent the scope of the '936 Patent claims.

There are several different embodiments described in the Sevenson patents. All of the '936 Patent claims are directed solely to a "two-step" embodiment wherein a product containing sulfate, such as gypsum, is first mixed with the contaminated waste to create a "first mixture," and then another product, such as phosphoric acid, is mixed with the first mixture to create a "second mixture." (*See* '936 Patent, claims 1-20; *see also* Yost Decl., ¶ 25). Thus, the '936 Patent claims all distinguish from the asserted claims in this case, which involve a "one-step"

treatment process wherein the treatment components (sulfate and phosphate) are found in a single mixture. (Yost Decl., ¶¶ 33-34).

As such, any statements made during prosecution of the ‘936 Patent have little, if any, relevance to the asserted claims in this case. *See Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1078 (Fed. Cir. 2005) (“the prosecution of one claim term in a parent application will generally not limit different claim language in a continuation application”); *Biogen, Inc. v. Berlex Labs, Inc.*, 318 F.3d 1132, 1141 (Fed. Cir. 2003) (“when an applicant is seeking different claims in a divisional application, estoppel generally does not arise from the prosecution of the parent”).

The statements made during the re-examination of the ‘936 Patent are limited to the two-step process. This was made clear to the PTO: “the ‘936 patent teaches a *two step process* in which a sulfate compound with at least one sulfate ion for reacting with leachable lead is added to a waste material and *then* a phosphate reagent having at least one phosphate ion for reacting with leachable lead is added.” (Def. Ex. 13, p. 4). The accompanying Yost declaration emphasizes this same point, as limited to the claims of the ‘936 Patent: “I believe that our invention *as claimed in the ‘936 patent* is based on the discovery that lead contained in lead toxic wastes and soils (col. 2, line 42) can be fixated and stabilized by a process that employs the use of a sulfate compound in the *first step* and a phosphate compound in the *second step*.” (*Id.*, Yost Declaration, p. 2; *see also* Yost Decl. included with this opposition, ¶¶ 36-41).

Further, as Yost stated in his declaration to the PTO during the ‘936 Patent re-examination, the O’Hara patent did not anticipate or render obvious the claims of the ‘936 Patent because O’Hara failed to recognize that sulfate can play a role in the immobilization of leachable lead: “O’Hara clearly teaches that neither sulfuric acid or its salt, calcium sulfate, immobilizes

lead. My tests and experiments as disclosed in the '936 patent prove that O'Hara was wrong." (Def. Ex. 13, p. 7). Defendants have failed to demonstrate why Yost's comments during prosecution of the '936 Patent, which are limited to the two-step process and which merely pointed out to the PTO that the O'Hara reference does not teach the use of sulfate in a treatment method, constitute a "clear and unmistakable surrender" of the subject matter used at the Colonie Site. Accordingly, there is no prosecution history estoppel as it relates to the '936 Patent.

#### b. There Was No Prosecution History Estoppel During Prosecution Of The '982 Patent

Defendants fare no better with their arguments concerning the prosecution of the claims of the asserted '982 Patent. Once again, the prior art patent in question was O'Hara. Following the PTO's rejection, the inventors amended their claims to eliminate hydroxides, lime and Portland cement as material that could supply the "first component." While this may have created an estoppel concerning those materials, the Colonie Site treatment method does not use hydroxides, lime and Portland cement. Accordingly, assuming *arguendo* there is an estoppel in the '982 Patent file history, it has no applicability to the facts here. *See Insituform Techs., Inc. v. Cat Contracting, Inc*., 385 F.3d 1360, 1370 (Fed. Cir. 2004) (estoppel did not apply because the amendment made to the claim was not related to accused product). The full text of passage relied upon by defendants makes this clear:

> O'Hara teaches a method of immobilizing lead and cadmium in solid residues arising from the burning of solid wastes by mixing the fly ash and bottom ash with water soluble phosphate in the presence of a free lime source. The present invention discloses a method of treating various metal bearing materials with a first component and a second component to stabilize the leachable metals. The first component supplies a member from a group that includes hydroxides as taught by O'Hara. To avoid the rejection based on O'Hara the claims have been amended to delete references to hydroxides, lime and Portland cement. The remaining group that makes up the first component no longer includes a member that is taught by O'Hara. O'Hara does not teach a first component that comprises either sulphates, halites or silicates.

(Def. Ex. 9, March 1, 1995 Amendment at 31). This passage merely sets forth what defendants do not dispute – that the O'Hara reference does not teach or suggest sulfates as a first component in a treatment method. It must be pointed out that the PTO agreed with this assessment, and allowed the '982 Patent claims to issue. (*See* Ex. 2 hereto, selected pages from '982 Patent file history). Thus, only Sevenson recognized and patented a treatment method that uses a sulfate component and phosphate component to treat lead-contaminated soil. O'Hara, and the statements in the '982 Patent file history regarding O'Hara, are irrelevant to the issues presented in this case.

**c. There Was No Prosecution History Estoppel During Prosecution Of The '485 Patent**

Essentially identical arguments apply to the prosecution history of the '485 Patent. In this instance, the prior art is the Stanforth patent. As with O'Hara, the Stanforth patent fails to teach or disclose the use of sulfate to treat hazardous lead materials. The comments on which defendants rely merely point out this fact: "Stanforth does not teach the use of a phosphate and a sulfate for the treatment of lead contaminated soils and waste materials. Stanforth's only teaching of a sulfate is for the treatment of chromium and not lead." (Def. Ex. 11, March 21, 2000 Amendment, Remarks section). As the Colonie Site treatment method has nothing to do with the treatment of chromium, the statements in question have no applicability to this case and prosecution history estoppel does not apply. *See Insituform*, *supra*.

**d. The Prior Art Relied On By Defendants Does Not Teach The Use Of Phosphoric Acid Having A Phosphate Component And A Sulfate Component As The Sevenson Patents Claim**

Defendants state that the O'Hara and Stanforth references form the basis for prosecution history estoppel arguments because both teach the use of phosphoric acid to treat lead contaminated materials. Defendants argue that as a result, Sevenson is estopped from claiming

the Colonie Site treatment method infringes the asserted claims under the doctrine of equivalents. This argument is seriously flawed. Completely missing from both the O'Hara and Stanforth references is any recognition of a one-step treatment method that has both sulfate and phosphate components to treat lead and radioactive materials, as the asserted Sevenson patent claims cover. (*See generally* Yost Decl., ¶¶ 36-41).[16]

O'Hara's teaching is limited to a two-step process wherein the first step applies lime to fly ash to create a mixture, and a second step applies water soluble phosphate (which may be in the form of phosphoric acid) to that mixture. (*See* Def. Ex. 10, col. 3, lines 58-68). There is no recognition at all in O'Hara that sulfates may be used to immobilize leachable lead, much less that those sulfates may be present in a phosphoric acid product. To the contrary, O'Hara teaches that sulfate cannot be used to stabilize lead. (*Id.*, col. 10, lines 50-53; Yost Decl., ¶¶ 38-40).

Stanforth has similar shortcomings. Stanforth discloses methods for treating metal-contaminated waste with a variety of different chemicals. Critically, however, Stanforth is silent on the use of sulfate to treat anything other than chromium. (Def. Ex. 12, col. 4, lines 17-19). Moreover, and contrary to defendants' assertion, Stanforth does not describe a method that uses solely phosphoric acid to treat lead-contaminated waste. (Yost Decl., ¶ 41). While Stanforth contains multiple examples of different treatment applications (*see id.*, Table 2 at col. 9), there is not a single example in Stanforth showing that application of phosphoric acid successfully

---

16 *See Perricone v. Medicis Pharm. Co.*, 432 F.3d 1368, 1378 (Fed. Cir. 2005) (new uses of old products or processes are indeed patentable subject matter). Here, while phosphates and sulfates were of course old materials, it was Sevenson who was the first to discover that the combination of the two (in whatever form) worked to reduce the leachability of hazardous lead and radionuclides. Neither O'Hara nor Stanforth disclosed or suggested this discovery.

leached lead to below the TCLP threshold. That recognition was Sevenson's alone. (*See* Yost Decl., ¶ 24).[17]

**B. Defendants' "*de minimus*" Argument Concerning The Amount Of Sulfate Is Contrary To The Evidence And Should Be Rejected**

Defendants spend pages arguing that there is not "enough" sulfate present in the Prayphos P5 product used in the Colonie Site treatment method to fall within the scope of the asserted Sevenson claims. (*See* Motion at 24-31). To make this argument, defendants simply ignore the plain language of the Sevenson claims and specification and the Court's claim construction.

There is no numerical limitation required in the claims regarding "how much" sulfate must be present. Nor is there any numerical requirement in the Court's claim construction. For example, claim 11 of the '367 Patent requires "a source of sulfate ion" which the Court construed to mean "*one or more* compounds which supplies a reactive sulfate ion, wherein a sulfate ion is the negative ion $(S0_4)^{2-}$." (Op. at 30; *see also* claim 30 of the '485 Patent, requiring a "sulfate reagent" and the court's claim construction therefore at Op. 42-43).[18] Thus, the claims

---

[17] The Federal Circuit has held that a prior art's "passing reference" to the use of two compounds in combination did not anticipate a patent's claims, which require a physical mixture of two compounds. *See PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1245 (Fed. Cir. 2002). Here, there is not even a "passing reference" in Stanforth or O'Hara that phosphoric acid containing both sulfate and phosphate compounds may be used to treat soil contaminated with lead or radioactive materials.

[18] The only possible exception to this is the Court's claim construction for "technical grade phosphoric acid," which the Court construed as requiring sulfates "typically . . . in the range of 2.5% to 7% (by weight) as an impurity." (Op. at 19-20). *See* Sevenson's argument at pp. 26-27, *infra*. This limitation, however, appears only in two dependent claims – claim 13 of the '367 Patent and claim 11 of the '608 Patent (which Sevenson is no longer asserting in this case). And even if that numerical range is required for those claims, it would be improper to include in the independent claims (which do not have such a range either in the claims themselves or in the Court's claim construction) limitations appearing in the dependent claims. *See Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855, 866 (Fed. Cir. 1989) (the doctrine of claim

(continued…)

on their face, as construed by the Court, *literally* encompass any amount of reactive sulfate that is at or above one molecule in the accused treatment process. The amount of sulfate in Prayphos P5 falls within the literal scope of the claims.

This is completely consistent with the patents and their file histories. The asserted claims and the specification of the Sevenson patents repeatedly state that at least one sulfate ion may be sufficient. *See* '485 Patent, claim 22: "wherein said first component includes *one or more* reactive sulphate ions;" *see also* '982 Patent, *Summary of the Invention*, col. 2, lines 21-35: "According to the present invention, a process for treating lead-toxic solid wastes in order to stabilize the leachable lead is disclosed, comprising the steps of: (i) mixing the solid waste with a sulfate compound . . . having *at least one* sulfate ion for contacting waste particles and reacting with said leachable lead. . . ."

The prosecution history of the Sevenson patents is consistent in this regard. During prosecution of the original claims in the '936 Patent, claim one required mixing solid waste "with a sulfate compound having at least one sulfate ion for reacting with said leachable lead. . . ." (Exhibit 1 hereto). Dependent claim 11 stated that the "amount of sulfate composition employed is from about 0-30 percent of the weight of the waste material being treated." *Id.* The PTO rejected claim 11 because "the range '0-30 percent' contradicts the limitations of claims 1 and 14 since the components could not be mixed if '0 percent' were employed." *Id.* In response,

differentiation precludes reading a "square" or "polygonal" limitation from dependent claims into an independent claim requiring only a "noncircular" cross-section). Moreover, the weight reference in the '367 Patent was never intended to delineate a preferred level of sulfate necessary to trigger the chemical reactions defined in the '367 patent, much less any of the other patents. Instead, as the Court noted, the reference is to a "typical" amount, and the TGPA referred to in the specification is to a phosphoric acid product that was readily available on the commercial market. (Yost Decl., ¶ 61).

Sevenson amended claim 11 such that the sulfate composition was employed "in an amount of up to about 30 percent" of the weight of the waste material. *Id.* As Sevenson noted, "the Examiner agreed that the changes shown above to these claims overcomes this rejection." Id. The PTO thereafter allowed these claims. Thus, the PTO expressly agreed that any amount of sulfate over zero – even one ion – would meet the claim language. (*See* Yost Decl., ¶ 55).

Defendants' argument to the contrary is at odds with decades of precedent. The Federal Circuit has repeatedly held that numerical limitations should not be read into claims, even when they appear in the preferred embodiments. *See*, *e.g.*, *North American Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1348-49 (Fed. Cir. 2005) (district court erred by improperly importing "recommended dimensions" from the specification into the claims); *York Prods., Inc. v. Central Tractor Farm & Family Center*, 99 F.3d 1568, 1575-76 (Fed. Cir. 1996) (district court erred in interpreting "plurality" as meaning "more than three"); *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1331-32 (Fed. Cir. 2004) (claims were directed to a rotating lamp, and the accused infringer argued that the claims should be limited to lamps that rotated 360 degrees; the Federal Circuit disagreed: "we have outright rejected the notion that disclosure of a single embodiment necessarily limits the claims. . . . Thus, we are unpersuaded by Wal-Mart's contention that the written description compels us to import into claim 11 the requirement of rotation through 360 degrees").

Nor does defendants' argument that the amount of sulfate present in Prayphos P5 is allegedly *de minimus* change the analysis. A similar argument was rejected by the Federal Circuit in *Northern Telecom Ltd. v. Samsung Electronics Co., Ltd.*, 215 F.3d 1281 (Fed. Cir. 2000). There, the claim required aluminum to be etched in a semiconductor process. *Id.* at 1289-90. The accused infringer argued that the "aluminum" must be present in at least a layer,

otherwise the "absurd" result would be that the claim would cover even "trace" amounts of aluminum present in the accused products. *Id.* at 1290. The Federal Circuit rejected the infringer's argument: "Not only is the term 'layer' not found in claim 1, but neither is a limitation that establishes a minimum quantity of aluminum that must be etched to meet the claim. This court has repeatedly and clearly held that it will not read unstated limitations into claim language." *Id.*[19]

So it is here. Other than providing self-evident mathematical conversions, defendants have offered no scientific basis for asserting that the sulfate that is undeniably present in Prayphos P5 does not contribute to reducing the amount of leachable lead and radioactive materials at the Colonie Site. The only argument defendants muster in this regard is Dr. Pierzynski's *opinion* that "the concentration of sulfate in Prayphos P5 is, from a chemical reaction point of view, negligible, and would not participate meaningfully in any chemical reactions." (Motion at 28). This conclusory opinion, not backed up with any scientific data or evidence, cannot form the basis for a grant of summary judgment in defendants' favor. *Hilgraeve Corp. v. McAfee Assocs.*, 224 F.3d 1349, 1354 (Fed. Cir. 2000) (conclusory opinion not based on substantial evidence cannot support a finding of non-infringement); *Rhone-Poulenc*

---

19 The only authority cited by the Government in this regard is wholly inapposite. In *Phillips Petroleum Co. v. Huntsman Polymers Corp.*, the patent claims were directed to a block copolymer product. In order to be classified as a "block copolymer product," the evidence showed that a significant quantity of block copolymer molecules needed to be present in the product. 157 F.3d 866, 877 (Fed. Cir. 1998). The accused products had a maximum of 25-60 parts per million of block copolymer molecules. As this was not sufficient to qualify the accused products as a block copolymer product, they did not infringe the asserted patent. Here, other than "one ion," there is not a minimum amount of sulfate specified in the asserted claims that sets such a threshold. For this reason, the present case is more akin to the facts presented in *Northern Telecom.*

*Agro Sa v. Dekalb Genetics Corp.*, 272 F.3d 1335, 1358 (Fed. Cir. 2001) ("some evidentiary support must be offered beyond an expert's conclusory opinion").

To the contrary, evidence shows that the sulfates in Prayphos P5 do work to immobilize leachable lead and thus do "contribute meaningfully" to the Colonie Site stabilization process. (Yost Decl., ¶¶ 42-62).

Mr. Yost's declaration sets forth in exhaustive detail exactly how the chemical reactions occur in immobilizing leachable lead using the patented Sevenson sulfate-phosphate process. (*See* Yost Decl., ¶¶ 44-46). Apatite (phosphate-based) and Barite (sulfate-based) minerals, through crystallographic twinning, precipitate as mixed mineral forms within the lead-sulfate-phosphate system. For the Barite minerals, lead sulfate (anglesites) forms orthorhombic symmetric mineral forms. Through twinning, these align in replication of the lead-phosphate hexagonal apatite crystal forms. In the process substitution within dissolution-precipitation reactions, sulfates are consumed first and the reaction-series shift occurs changing to apatite reaction-series that incorporate phosphate forms.[20] These reactions occur at the molecular ionic level. As crystal nucleation continues, reactants (ions of lead, phosphate, and sulfate) are consumed until equilibrium is reached. The reaction series begins when an ion of each species are brought into solution with each other. It ends when the supply of a reactant is exhausted. That point of exhaustion is typically predicted by means of treatability studies where optimization of treatment additives is determined. For the Sevenson process, sulfate and phosphate ions are provided at optimal ratios for each specific untreated material until the

[20] *See also* Yost Exhibit F, a 1994 paper co-authored by Mr. Yost that explains the history and science behind the patented inventions. As noted in that paper, the sulfate ions react first with the leachable lead, and once the sulfate ions are consumed, the reactions shift to the phosphate molecules. (Yost Ex. 6, p. 6).

reactive lead is consumed in the formation of the lead-sulfate-phosphate mineral system. Those lead ions that are not fully reacted with phosphate and sulfate are leachable and quantified within the extract of the EP TOX or TCLP methods at the part per million (mg/L) level. For a waste to be classified under RCRA as toxic for lead, only 0.1 mg/L of lead is required in the extract above the 5.0 mg/L regulated limit.

As Mr. Yost describes, the immobilization of leachable lead occurs at the molecular level and sulfates act as a catalyst in that reaction. Chemical stoichiometry shows that for each sulfate ion provided as a reactant, four (4) lead ions are incorporated into the end product (non-leachable) mineral. The ratio of sulfate to lead in soil with high natural organic content also shows efficiency of the process reactions in that three (3) lead ions are incorporated into the mixed mineral end product for each sulfate ion. This demonstrates that for each part per million (ppm) of sulfate within or supplemented to the reaction process of the technology with phosphates, three (3) or four (4) ppm of lead can be rendered non-leachable. (Yost Decl., ¶ 48).

Mr. Yost provides an apt analogy to explain why defendants' argument is scientifically faulty. (*See* Yost Decl., ¶51). Assume one million dominos each represents one ion of lead, radionuclide or other heavy metal (lead, *et. al.*), sulfate or phosphate. Set them up in close proximity so that they have the ability to come in contact with each other as in soil or solid waste. The reactions taught by the Sevenson patents show that at least one ion of each is required for the reactions to proceed. Assume that only one of the million dominoes is sulfate. All the rest are lead, soil micelles, phosphate, calcium, and other soil or waste constituents. The reactions proceed, starting with lead and sulfate, when all components are present and mixed. The one sulfate domino will tip when mixed and initiate the fall of the other 999,999. If there were 13, 230, or more "falling" sulfate dominos (initiating reactants), then the rest of the

dominos representing lead (et. al.) will fall that much faster with greater certainty of progression to the reactions' equilibrium completion than if there was only one. Regardless, only one sulfate molecule in the presence of lead (et. al.) and phosphate will allow the reactions to proceed. While this analogy replicates a parts per millions (ppm) scenario, it is validated by the reaction of ions at the molecular level, one at a time.[21]

Mr. Yost's declaration, which must be viewed in a light most favorable to Sevenson as the non-movant, at the very least creates a genuine issue of material fact requiring denial of defendants' motion.[22] Actually, Mr. Yost's declaration stands as the only evidence on this issue; it is not refuted by any statements in Mr. Pierzynski's declaration and firmly establishes the role

---

21 As another analogy (Yost Decl., ¶ 52), water without a seed or substrate will not freeze when its temperature is lowered significantly below its freezing point. Only when a seed is present will ice crystals rapidly form across the liquid as crystals will not nucleate without a surface on which to precipitate or nucleate. Sevenson's reactions likewise yield mineral crystals at the molecular and microscopic level. As discussed in Yost Ex. F, lead and sulfate initially form anglesite minerals. As the reactions proceed and lead is consumed by the formation of anglesite crystals, these geometrically similar structures "twin" and process reaction-series shift to a phosphate driven reaction series whereby lead ions are scavenged and apatites are formed. As the reactions proceed through the point where lead is rendered non-leachable in various solvents such as TCLP extraction fluid, the lead sulfates (anglesites) and lead phosphates (apatites) become more stable mixed mineral forms in the lead-sulfate-phosphate system as taught by the patents. One ion that bonds with one or more other ions initiating the nucleation of a required seed crystal is not *de minimus*.

22 Defendants also repeat their prosecution history estoppel arguments in order to avoid infringement under the doctrine of equivalents. (Motion at 30-31). However, defendants more boldly misrepresent the facts concerning the prosecution in this section, arguing that "the inventors of the '982 Patent argued that the O'Hara process of a phosphate component and inherent sulfate did not anticipate the '982 invention. . . . " (Motion at 30). This is simply untrue. At no point did the inventors ever describe O'Hara as a process that uses "a phosphate component and inherent sulfate." Instead, as pointed out earlier herein, the inventors distinguished O'Hara in that it required a phosphate-hydroxide-lead treatment process and specifically taught away from the recognition that sulfate played any role in the leachability of hazardous lead. (*See* pp. 11-17 *supra*; *see also* Yost Decl., ¶¶ 24, 32-41). It is unfortunate defendants resort to mischaracterizing the record in this fashion.

played by the sulfates in the Prayphos P5 product used at the Colonie Site to effectively treat the contaminated soil to within EPA levels.

### C. Defendants' Argument Concerning The Colonie Site's Alleged Lack Of The Claimed "Mixture" Is Contradicted By The Stipulated Facts

Defendants next argue that the Colonie Site treatment method does not contain a "mixture" of the first component and second component. (Motion at 31). This argument is belied by the Court's claim construction, by the Stipulated Facts, and by common sense.

Certain of the asserted claims require the contaminated material be mixed with a "mixture." For example, claim 1 of the '982 Patent states "mixing a metal-bearing material with a first mixture comprising a first component and a second component. . . ." The Court defined the claimed "first mixture" as requiring that "the first component and second component are mixed together." There can be no doubt that the sulfate ions and phosphate ions are "mixed together" in the Prayphos P5 product. This is confirmed by the Stipulated Facts: Prayphos P5 is "concentrated liquid containing about 75 percent $H_3PO_4$ based on phosphate content and density . . . . Impurities in this product include sulfate, and may include calcium sulfate, iron sulfate, sulfate ions, calcium ions, calcium salts of sulfate, phosphate and fluoride, gypsum, fluoride ions, and sulfuric acid." (Stip. Fact ¶ 11). Thus, Prayphos P5 is a mixture of many different components, the two of relevance here being sulfate and phosphate. (*See also* Yost Decl.,¶¶ 16-19).

Defendants ignore this, and repeat their argument that the sulfate and phosphate components must be from separate *sources* that are mixed together (bringing to mind a test tube of sulfate and a test tube of phosphate being poured together into a beaker). This argument ignores the Court's claim construction, which does not require the sulfates and phosphates be separately added to the metal-bearing material at the time of treatment; consistent with the claim

language, the Court's construction requires that the sulfates and phosphates be mixed together in the first mixture, which unquestionably occurs in Prayphos P5. Thus, defendants' argument seeks to read additional requirements into the Court's claim construction and/or read unclaimed limitations into the claims, which is improper (*see* pp. 10-11, *supra*).

Moreover, even assuming defendants' position were correct, it still does not help defendants avoid infringement because Prayphos P5 is made by a process that brings together phosphates and sulfates from separate sources. As has been stipulated to by the parties, Prayphos P5 was manufactured by the purified wet-process, where phosphate minerals (a first component) within phosphate rock are reacted with sulfuric acid which contains sulfate (a second component). (Stip. Fact ¶ 10; *see also* Yost Decl., ¶ 19). If there was any doubt, the Court has previously noted the obvious: "phosphoric acid is a mixture. . . ." (Op. at 7).[23]

[23] This argument also has no applicability to asserted claims 11 of the '367 Patent and 30 of the '485 Patent, neither of which require a "mixture."

### D. Defendants' Argument Concerning The Claims Requiring Technical Grade Phosphoric Acid Is Off-Base, As Prayphos P5 Is Technical Grade Phosphoric Acid

Defendants assert that dependent claims 13 of the '367 Patent and 11 of the '608 Patent (no longer asserted) are not infringed because they call for a treatment method using "technical grade phosphoric acid" ("TGPA") which the Court construed as "phosphoric acid that contains up to 70% (by weight) phosphate (as P2O5) and sulfate (SO42-), typically as sulfuric acid in the range of 2.5% to 7% (by weight) as an impurity." According to defendants, Prayphos P5 does not fall into this definition of TGPA because the amount of sulfates present do not fall within the specified range. (Motion at 35).

What defendants ignore in the Court's construction is the qualifier "typically." As the Court noted in adopting defendants' proposed construction, its definition "does not preclude" sulfates that fall outside the specified range. (Op. at 19). In this regard, evidence establishes that Prayphos P5 is understood in the industry to be TGPA. For example, the "certificate of analysis" for the Prayphos P5 phosphoric acid supplied by S.A. Manning to Shaw for use at the Colonie Site specifically identifies the product as "technical" grade. (Exhibit 5 hereto).[24] Further, in a paper published by Shaw witness Mr. Sheeran[25] concerning the treatment activities at the Colonie Site, he stated that TGPA was used:

> Kiber Environmental conducted a bench scale study of the Colonie waste materials and recommended the use of phosphoric acid as the single stabilization agent. IT Corporation (who assumed ICFKaiser's contacts on or about April

---

[24] Sevenson apologizes for the quality of the first page of Exhibit 5; this was how it was produced by Shaw during discovery. As Shaw's witness Anthony Sheeran testified, S.A. Manning supplied all the Prayphos P5 product used at the Colonie Site. (Exhibit 9, p. 62). Mr. Sheeran identified a shipment of Prayphos P5 that corresponded to the certificate of analysis. (*Id.*, pp. 63-72).

[25] Mr. Sheeran was Shaw's project manager for the Colonie Site. (Motion at 38).

> 1999) requested and the Army approved self-performance of the on-site stabilization systems. NYSDEC[26] bulk storage permits for on-site storage of up to 7,500 gallon of *technical grade phosphoric acid* where received in support of the stabilization system.

(Exhibit 3, p. 6).

Moreover, as Sevenson's expert Mr. Yost stated, purified phosphoric acid, like Prayphos P5, is commonly known as being TGPA. (Yost Decl., ¶ 17). This is borne out by the fact that there are numerous sources of commercially available phosphoric acid. Exhibit 6 hereto collects a sampling of phosphoric acid products available for purchase. These products define different "grades" of phosphoric acid, such as food grade, technical grade, and semiconductor grade. As these examples show, phosphoric acid that typically has 65-85% by weight $H_3P0_4$ and sulfates ($S0_4$) in the range of 50-500 ppm is commonly referred to and marketed as *technical grade* phosphoric acid. *Id*. These ranges are consistent with the make-up of Prayphos P5.[27]

Accordingly, the evidence does not support defendants' assertion that Prayphos P5 is not TGPA within the meaning of the Sevenson patent claims and the Court's claim construction.

---

26 New York State Department of Environmental Conservation. *See* www.dec.ny.gov.

27 This evidence confirms that it would be improper to ignore the modifier "typically" appearing in the Court's construction of TGPA and impose strict numeric limits on the definition of TGPA as used in the Sevenson claims. To a person of ordinary skill in the art, the chemical make-up of Prayphos P5 qualifies it as TGPA, and its use would thus fall within the scope of the Sevenson patent claims requiring TGPA. (Yost Decl., ¶ 17). The example of TGPA given in the Sevenson patents is merely that – an example, and it is inconsistent with the knowledge of the person of ordinary skill in the art for defendants to assert that any TGPA with less than 2% of sulfates is outside the scope of the Sevenson claims.

### E. The Government's Argument Concerning The Asserted Claims Of The '123 Patent, Which Calls For A Reduction In Volume Of The Treated Material, Is Based On Erroneous Evidence And Contradicted By The Science Of The Patented Method

Defendants assert that the claims of the '123 Patent, which require that the volume of the treated material be reduced following treatment and curing, are not met by the treatment method used at the Colonie Site. (Motion at 39).

Defendants' argument is incorrect. The science underlying the Sevenson patented methods teaches that volume will be reduced. Prior to their invention, the Sevenson inventors understood that many conventional processes increased mass and volume of the impacted material. (Yost Decl., ¶ 67). This was an advantageous aspect of their invention. Using ASTM geotechnical test methods that integrate soil moisture content, grain-size, compactive effort, and density curve data, Mr. Yost has confirmed that volume reduction occurs as a result of treatment with phosphoric acid. (Yost Decl., ¶¶ 67-68, 71). By limiting the mass of treatment additives, and by the nature of the dehydration properties and acidity provided by phosphoric acid to enhance capillary drying and evaporation, and destroy carbonates, respectively, treated material mass increase would be greatly limited. *Id.*

The specifications for the treatment of the soil at the Colonie Site specifically identified the limiting of volume expansion ("swell") as a stated objective in order to limit the costs of transportation and disposal. (Yost Decl., ¶ 68). This was one of the reasons why the selection of Sevenson's treatment technology was particularly well-suited for the soil stabilization project at the Colonie Site. *Id.*

Defendants' reference to the Kiber treatability study as proof that treatment with technical grade phosphoric acid increased volume is meaningless because the Kiber analysis was based on faulty test methods. As shown by Table 1 of its report at footnote 3 (Def. Ex. 4,

G000086), Kiber tested volume expansion "immediately following mixture development." This is not what the Sevenson '123 Patent claims require. The claims require volume reduction following treatment *and curing*. (*See*, *e.g.*, claim 1: "curing said mixture for a period of time to form a cured material; wherein . . . the volume of said metal-bearing material is reduced as a result of treating and curing").

As the patents note, the reactions are not complete until typically several hours after mixing and that volume decreases will continue over time. (*See* '123 Patent, col.18, lines 26-49; col. 19, lines 55-60). The curing process necessarily involves a loss of water (phosphoric acid is a dehydration agent) by evaporation and capillary drying. (*Id.*; *see also* Yost Decl., ¶ 69).

In addition, Kiber used invalid testing methods to test volume expansion. The pocket penetrometer used by Kiber (*see* Section 4.3 of its report) is not relevant to volume change determinations. (Yost Decl., ¶ 70). It is used as a screening tool to determine a material's relative compactive strength and resistance to an applied point-source load. If Kiber had used conventional geotechnical ASTM methods to determine optimum moisture content:density curves on both untreated and treated material, and compacted each to consistent air void content accordingly, volume reductions would have been demonstrated. (Yost Decl., ¶ 71). As Mr. Yost, who has personal experience with treatment methods like that employed at the Colonie Site declares, "in my experience with this technology where phosphoric acid is used as a treatment additive at ALL sites where soil has been similarly treated, included sites similar to those at the Colonie site soil, a volume reduction has always been the case." *Id.*

Thus, defendants are not entitled to summary judgment on this point. At a minimum, as Sevenson has not had the opportunity to take any discovery in this case, defendants' motion on this point is premature and should be denied for that basis as well. *See* Fed. R. Civ. P. 56(f).

**F. The Evidence Shows The Government Did Use Sevenson's Patented Methods To Treat Radioactive Soil At The Colonie Site**

Defendants assert that there is no evidence that the treatment method used at the Colonie Site reduced the leachability of radionuclides or radioactive components. (Motion at 37). To the contrary, both the evidence, and unrebuttable scientific principles, prove otherwise.

To begin with, both the Government and Shaw understood that the soil that would be treated with the Prayphos P5 product on-site contained hazardous radioactive material and that the treatment method used would remediate *both* the lead and the radioactive materials. The Army Corps of Engineers' Project Manager for the Colonie Site (Bradley Eaton) testified that "the material on the site that we're remediating is *depleted uranium and lead*." (Exhibit 7, pp. 7). Uranium is one of the radioactive materials identified in the Sevenson patents. ('367 Patent, col. 24, line 44 *et. seq*.). This was confirmed by Shaw's Project Manager for the Baltimore TERC contract that covers the Colonie Site, John Franz. Mr. Franz testified that all the soil that went through the pug mill at the Colonie Site (*i.e*., treated with Prayphos P5) had some minimum level of radioactivity that was high enough that it could not stay on-site. (*See* Exhibit 8, pp. 107-108).

Moreover, a document entitled "Colonie Site Remediation Approach" produced by Shaw describes how soil at the Colonie Site containing "greater than 35 pCi/g U-238 [uranium] . . . would be *staged for treatment* as needed prior to offsite disposal." (Exhibit 4, p. 4 (SH001669)). Obviously, one reason to treat this soil would be to reduce the leachability of the U-238 material. Defendants also knew as early as July 1998 that the Sevenson treatment methods "could be applied in bulk to the DA [designated area], stabilizing the leachable metals, *including radionuclides*." (*Id*., p. SH001678 (mis-spelling Sevenson as "Severnson").

Finally, it is a scientific fact that use of phosphoric acid will reduce the leachability of Uranium – whether or not the defendants bothered to measure to prove this scientific fact is therefore utterly irrelevant. The laws of science establish that the Prayphos P5 treatment reduced the concentration of radionuclides in the contaminated soil at the Colonie Site. (Yost Decl., ¶ 66). It is elementary knowledge in the field of chemistry that uranium naturally decays to lead. As disclosed in the '367 patent and '608 patents, the leachability of uranium (U-235 and U-238) and its natural unavoidable decay product – lead (Pb210, Pb212, and Pb214) are reduced by the process. (*See* '367 Patent, col. 24, line 44 *et. seq*.; Yost Decl., ¶ 66). Defendants treated soil that contained uranium and leachable lead, and reduced the leachability of lead as tested. Some of that lead was unavoidably radioactive, thus the defendants reduced the leachability of at least one radioactive species. (Yost Decl., ¶ 66). It matters not whether defendants *intended* to reduce the amount of radionuclides or measured to determine whether they were in fact reduced. Patent infringement is a strict liability tort. *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1583 (Fed. Cir. 1996). Unintentional infringement is infringement nonetheless. *Hilton Davis Chem. Co. v. Warner-Jenkinson Co*., 62 F.3d 1512, 1519 (Fed. Cir. 1996) (*en banc*), *reversed on other grounds*, 517 U.S. 17 (1997) ("Intent is not an element of infringement. . . . A patent owner may exclude others from practicing the claimed invention, regardless of whether infringers even know of the patent").

Thus, defendants are also not entitled to summary judgment on this point. Moreover, this is another issue for which Sevenson has not had the opportunity to take any discovery in this case. As such, defendants' motion on this point is premature and should be denied for that basis as well. *See* Fed. R. Civ. P. 56(f).

### G. Claim 28 Of The '485 Patent And Claim 1 Of The '608 Patent

Defendants allege that claim 28 of the '485 Patent is not infringed because it requires sulfuric acid. Defendants' motion in this regard is premature, as the facts have not sufficiently established one way or other whether sulfuric acid is present in Prayphos P5. However, there is at least circumstantial evidence which supports the assertion that sulfuric acid is in fact present. (*See* Stip. Fact, ¶10: Prayphos P5 is made by reacting phosphate rock with sulfuric acid; Stip. Fact, ¶ 11: Prayphos P5 may include sulfuric acid). More discovery on this issue is necessary before it may be disposed of on summary judgment.

Finally, defendants' analysis concerning claim 1 of the '608 Patent is irrelevant because Sevenson has withdrawn that claim, and those dependent from it, from the case.[28]

[28] Defendants also argue that the re-treatment of soil at the Colonie Site, when a first treatment was not enough to render the hazardous lead to below EPA requirements, does not meet the claims requiring a "two-step" treatment process. Sevenson disagrees (see Yost Decl., ¶¶ 63-64); however, in light of the evidence showing defendants' use of a treatment method that infringes the one-step claims, Sevenson does not assert any of the two-step claims in this case.

## III. CONCLUSION

Defendants' motion should be denied in its entirety as it is based on evidence and opinion that is wholly extraneous from the stipulated facts agreed to by the Parties. As defendants' arguments are contrary to the Court's claim construction, the specification and claims of the Sevenson patents, scientific principles underlying the patented technology, and other evidence in existence, defendants are not entitled to the relief sought in their motion.

Respectfully submitted,

Dated: __July 30, 2007_____

s/Brian E. Ferguson____________________

Brian E. Ferguson
McDERMOTT WILL & EMERY LLP
600 13th Street, N.W.
Washington, D.C. 20005
(202) 756-8000
bferguson@mwe.com

WEBSTER SZANYI LLP
Kevin A. Szanyi
Nelson Perel
1400 Liberty Building
Buffalo, New York 14202
(716) 842-2800
nperel@websterszanyi.com

Attorneys for Plaintiff, Sevenson Environmental Services, Inc.

WDC99 1427559-1.057200.0012