ISSUE CLASSIFICATION: Class 588, Subclass 256

5527982

| UTILITY SERIAL NUMBER | PATENT DATE | PATENT NUMBER |
|---|---|---|
| 08 031461 | JUN 18 1996 | 5527982 |

| SERIAL NUMBER | FILING DATE | CLASS | SUBCLASS | GROUP ART UNIT | EXAMINER |
|---|---|---|---|---|---|
| 08/031,461 | 03/15/93 | 210 | | ~~1308~~ 3506 | Corsit |

APPLICANTS: DHIRAJ PAL, CHICAGO HEIGHTS, IL; KARL W. YOST, CRETE, IL.

**CONTINUING DATA*********************
VERIFIED THIS APPLN IS A CIP OF 07/721,935 07/23/91 PAT 5,193,936
WHICH IS A CIP OF 07/494,774 03/16/90 ABN

ote

**FOREIGN/PCT APPLICATIONS************
VERIFIED

NONE ote

NOTE-DISCLAIMER
The term of this patent shall not extend beyond the expiration date of Pat. No. 5,193,936.

FOREIGN FILING LICENSE GRANTED 09/20/93 ***** SMALL ENTITY *****

| Foreign priority claimed ☐ yes ☒ no; 35 USC 119 conditions met ☐ yes ☐ no; Verified and Acknowledged (Examiner's initials: ote) | AS FILED | STATE OR COUNTRY | SHEETS DRWGS. | TOTAL CLAIMS | INDEP. CLAIMS | FILING FEE RECEIVED | ATTORNEY'S DOCKET NO. |
|---|---|---|---|---|---|---|---|
| | → | IL | 2 | 20 | 2 | $420.00 | 66751-3 |

ADDRESS: KEVIN E. MCDERMOTT
~~645 MADISON AVE.~~
~~NEW YORK, NY 10022~~

WYATT GERBER, BURKE & BADIE
99 PARK Avenue
6th FLOOR
NEW YORK N.Y. 10016

TITLE: FIXATION AND STABILIZATION OF METALS IN CONTAMINATED MATERIALS

U.S. DEPT. of COMM.-Pat. & TM Office—PTO-436L (rev. 10-78)

PARTS OF APPLICATION FILED SEPARATELY

Applications Examiner

NOTICE OF ALLOWANCE MAILED: 8-11-95

Assistant Examiner

CLAIMS ALLOWED: Total Claims 31; Print Claim 1+12

ISSUE FEE: Amount Due $605.00; Date Paid 10-30-95

George A. Suchfield
GEORGE A. SUCHFIELD
PRIMARY EXAMINER
ART UNIT 356
Primary Examiner

DRAWING: Sheets Drwg. 3; Figs. Drwg. 4; Print Fig. 2a

ISSUE BATCH NUMBER: Z99

PREPARED FOR ISSUE

FORM PTO-1267 (Rev. 11-92) U.S. Department of Commerce, Patent and Trademark Office

DISCLAIMER LABEL

Application No. 08/031,461

A terminal disclaimer has been entered and recorded under 35 U.S.C. 253 in this file.

DO NOT DESTROY

WARNING: The information disclosed herein may be restricted. Unauthorized disclosure may be prohibited by the United States Code Title 35, Sections 122, 181 and 368. Possession outside the U.S. Patent & Trademark Office is restricted to authorized employees and contractors only.

Form PTO-436A (Rev. 8/92)

(FACE)

**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address : COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 08/031,461 | 03/15/93 | PAL D | 66751-3 |

EXAMINER: ~~CORBIN, D~~

C5M1/0105

KEVIN E. MCDERMOTT
645 MADISON AVE.
NEW YORK, NY 10022

| ART UNIT | PAPER NUMBER |
|---|---|
| 3501 | #7 |

DATE MAILED: 01/05/94

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☒ This application has been examined ☐ Responsive to communication filed on ________ ☐ This action is made final.

A shortened statutory period for response to this action is set to expire THREE month(s), 0 days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**Part I THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☐ Notice of References Cited by Examiner, PTO-892.
2. ☒ Notice re Patent Drawing, PTO-948.
3. ☒ Notice of Art Cited by Applicant, PTO-1449.
4. ☐ Notice of Informal Patent Application, Form PTO-152.
5. ☐ Information on How to Effect Drawing Changes, PTO-1474.
6. ☐ ________

**Part II SUMMARY OF ACTION**

1. ☒ Claims 1-20 are pending in the application.

   Of the above, claims ________ are withdrawn from consideration.

2. ☐ Claims ________ have been cancelled.
3. ☐ Claims ________ are allowed.
4. ☒ Claims 1-20 are rejected.
5. ☐ Claims ________ are objected to.
6. ☐ Claims ________ are subject to restriction or election requirement.
7. ☐ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.
8. ☐ Formal drawings are required in response to this Office action.
9. ☐ The corrected or substitute drawings have been received on ________. Under 37 C.F.R. 1.84 these drawings are ☐ acceptable. ☐ not acceptable (see explanation or Notice re Patent Drawing, PTO-948).
10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on ________ has (have) been ☐ approved by the examiner. ☐ disapproved by the examiner (see explanation).
11. ☐ The proposed drawing correction, filed on ________, has been ☐ approved. ☐ disapproved (see explanation).
12. ☐ Acknowledgment is made of the claim for priority under U.S.C. 119. The certified copy has ☐ been received ☐ not been received ☐ been filed in parent application, serial no. ________ ; filed on ________.
13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.
14. ☐ Other

33D

EXAMINER'S ACTION

PTOL-326 (Rev. 9-89)

Claims 1-20 are rejected under the judicially created doctrine of obviousness-type double patenting as being unpatentable over claims 1-20 of U.S. Patent No. 5,193,936. Although the conflicting claims are not identical, they are not patentably distinct from each other because the differences in the claims would have been obvious to one of ordinary skill in the art. As to claims 1-11, the particular number of mixing steps could readily be determined by one of ordinary skill in the art and to employ only one mixing step would have been obvious since this would be simpler and less time consuming. As to claims 12-20, the selection of the second component from a group consisting of more than sulfates would have been obvious in order to provide a greater selection of materials.

The obviousness-type double patenting rejection is a judicially established doctrine based upon public policy and is primarily intended to prevent prolongation of the patent term by prohibiting claims in a second patent not patentably distinct from claims in a first patent. *In re Vogel*, 164 USPQ 619 (CCPA 1970). A timely filed terminal disclaimer in compliance with 37 C.F.R. § 1.321(b) would overcome an actual or provisional rejection on this ground provided the conflicting application or patent is shown to be commonly owned with this application. See 37 C.F.R. § 1.78(d).

The following is a quotation of the appropriate paragraphs of 35 U.S.C. § 102 that form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless --
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

Claims 1, 2, 4, 5, 8-13, 15, 16, and 18-20 are rejected under 35 U.S.C. § 102(b) as being anticipated by Stanforth (#5,037,479). Stanforth teaches the use of magnesium hydroxide and calcium carbonate.

The following is a quotation of 35 U.S.C. § 103 which forms the basis for all obviousness rejections set forth in this Office action:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.
>
> Subject matter developed by another person, which qualifies as prior art only under subsection (f) or (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.

Claims 3, 6, 7, 13, 14, and 17 are rejected under 35 U.S.C. § 103 as being unpatentable over Stanforth #479. The particular test for the material (claims 3 and 14) is given little patentable weight as is the curing time (claims 6 and 17) and the waste moisture content (claim 7). For example, the paint filter test would be a common test which would be employed in such a process. As to the curing time and moisture content, one of ordinary skill in the art could readily determine the desired time and content for a given waste material.

Applicant's Information Disclosure statement filed August 20, 1993 is acknowledged and has been considered.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to David H. Corbin whose telephone number is (703) 308-2168.

Any inquiry of a general nature or relating to the status of this application should be directed to the Group receptionist whose telephone number is (703) 308-2168.

031461.1

David H. Corbin
David H. Corbin
Primary Examiner
Art Unit 3501

5/13

APR 29 1994

Docket: SES-1

9/B

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Application of: Pal et al. | Group Art Unit: 3501 |
| Serial No.: 08/031,461 | Examiner: D.H. Corbin |
| Filed: March 15, 1993 | |
| For: FIXATION AND STABILIZATION OF METALS IN CONTAMINATED MATERIALS | |

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to: Commissioner of Patents and Trademarks, Washington, D.C. 20231, on the date shown below.

(Registration No. 35,946)

Date: April 25, 1994

Hon. Commissioner of Patents
and Trademarks
Washington, D.C. 20231

REPLY UNDER 37 C.F.R. §1.111

SIR:

In response to the Office Action dated January 5, 1994, the assignee of the entire interest submits the attached Terminal Disclaimer under 37 C.F.R. §1.321(b) to overcome the rejection based on U.S. Patent No. 5,193,936 and the following Amendment.

RECEIVED
MAY 12 1994
GROUP 3500

AMENDMENT

Please Amend the claims as follows:

Claims 1: Delete "hydroxides" from line 11.

Claim 12: Delete "hydroxides" from line 16.

REMARKS

The assignee of the present application is also the assignee of the entire interest of U.S. Patent No.

336

5,193,936 which was filed on July 23, 1991. The present application is a continuation-in-part of the '936 patent application which is a continuation in part of application Ser. No. 494,774, filed March 16, 1990 and now abandoned. The filing of the Terminal Disclaimer should overcome the Examiner's rejection based on obviousness-type double patenting and it is therefore requested that this objection be withdrawn.

Claims 1, 2, 4, 5, 8-13, 15, 16, and 18-20 have been rejected under §102(b) as being anticipated by Stanforth (#5,037,479) which teaches the use of magnesium hydroxide and calcium carbonate. Independent Claims 1 and 12 of the present application teach the use of a first component selected from the group consisting of sulphates, halites, hydroxides and silicates. Stanforth does not teach or suggest the use of halites or silicates. The use of sulphates in the present application is supported by the parent application, serial no. 494,774, filed March 16, 1990, that is now abandoned. Furthermore, Stanforth does not teach or suggest the use of sulphates.

The applicants have amended the claims to drop hydroxides from the group of first components. Since the present invention does not use calcium carbonate as a first component, none of the claims as amended are anticipated by Stanforth's teaching of the use of magnesium hydroxide and calcium carbonate. The applicant's, therefore, respectfully

request that the Examiner's rejection based on Stanforth be withdrawn.

The applicants submit that the claims as amended and the terminal disclaimer filed herewith overcome the Examiner's rejections and respectfully request that the claims now be allowed.

Respectfully submitted,

Kevin E. McDermott

Kevin E. McDermott, Esq.
Reg. No.: 35,946
Wyatt, Gerber, Burke & Badie
645 Madison Avenue
New York, New York 10022
(212) 826-0171

KEM/ech/208



338

**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address : COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 08/031,461 | 03/15/93 | PAL | D 66751-3 |

EXAMINER: CORBIN, L

C5M1/0811

KEVIN E. MCDERMOTT
645 MADISON AVE.
NEW YORK, NY 10022

| ART UNIT | PAPER NUMBER |
|---|---|
| 3501 | 11 |

m.s

DATE MAILED: 08/11/94

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☐ This application has been examined ☒ Responsive to communication filed on 04/29/94 ☐ This action is made final.

A shortened statutory period for response to this action is set to expire THREE month(s), 0 days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**Part I THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☒ Notice of References Cited by Examiner, PTO-892.
2. ☐ Notice re Patent Drawing, PTO-948.
3. ☐ Notice of Art Cited by Applicant, PTO-1449.
4. ☐ Notice of Informal Patent Application, Form PTO-152.
5. ☐ Information on How to Effect Drawing Changes, PTO-1474.
6. ☐ ______

**Part II SUMMARY OF ACTION**

1. ☒ Claims 1-20 are pending in the application.

   Of the above, claims ______ are withdrawn from consideration.

2. ☐ Claims ______ have been cancelled.
3. ☐ Claims ______ are allowed.
4. ☒ Claims 1-20 are rejected.
5. ☐ Claims ______ are objected to.
6. ☐ Claims ______ are subject to restriction or election requirement.
7. ☐ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.
8. ☐ Formal drawings are required in response to this Office action.
9. ☐ The corrected or substitute drawings have been received on ______. Under 37 C.F.R. 1.84 these drawings are ☐ acceptable. ☐ not acceptable (see explanation or Notice re Patent Drawing, PTO-948).
10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on ______ has (have) been ☐ approved by the examiner. ☐ disapproved by the examiner (see explanation).
11. ☐ The proposed drawing correction, filed on ______, has been ☐ approved. ☐ disapproved (see explanation).
12. ☐ Acknowledgment is made of the claim for priority under U.S.C. 119. The certified copy has ☐ been received ☐ not been received ☐ been filed in parent application, serial no. ______ ; filed on ______.
13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.
14. ☐ Other

353

EXAMINER'S ACTION

The terminal disclaimer filed on April 29, 1994 disclaiming the terminal portion of any patent granted on this application which would extend beyond the expiration date of Patent No. 5,193,936 has been reviewed and is NOT accepted for the following reason(s):

There is no statement by the assignee specifying that the evidentiary documents have been reviewed and certifying that, to the best of the assignee's knowledge and belief, title is in the assignee seeking to take action. 37 CFR 3.73(b).

The following is a statement of 37 CFR 3.73, which became effective on September 04, 1992:

**37 CFR 3.73 Establishing right of assignee to prosecute.**

(a) The inventor is presumed to be the owner of a patent application, and any patent that may issue therefrom, unless there is an assignment. The original applicant is presumed to be the owner of a trademark application unless there is an assignment.

(b) When the assignee of the entire right, title, and interest seeks to take action in a matter before the Office with respect to a patent application, trademark application, patent, registration, or reexamination proceeding, the assignee must establish its ownership of the property to the satisfaction of the Commissioner. Ownership is established by submitting to the Office documentary evidence of a chain of title from the original owner to the assignee or by specifying (e.g. reel and frame number, etc.) where such evidence is recorded in the Office. Documents submitted to establish ownership may be required to be recorded as a condition to permitting the assignee to take action in a matter pending before the Office. In addition, the assignee of a patent application or patent must submit a statement specifying that the evidentiary documents have been reviewed and certifying that, to the best of assignee's knowledge and belief, title is in the assignee seeking to take the action.

It should be noted that applicant is <u>not</u> required to pay another disclaimer fee as per 37 CFR 1.20(d) when submitting a replacement or supplemental terminal disclaimer.

Claims 1-20 are again rejected under the judicially created doctrine of obviousness-type double patenting as being unpatentable over claims 1-20 of U.S. Patent No. 5,193,936, as set forth in the last office action.

The obviousness-type double patenting rejection is a judicially established doctrine based upon public policy and is primarily intended to prevent prolongation of the patent term by prohibiting claims in a second patent not patentably distinct from claims in a first patent. *In re Vogel*, 164 USPQ 619 (CCPA 1970). A timely filed terminal disclaimer in compliance with 37 C.F.R. § 1.321(b) would overcome an actual or provisional rejection on this ground provided the conflicting application or patent is shown to be commonly owned with this application. See 37 C.F.R. § 1.78(d).

The text of those sections of Title 35, U.S. Code not included in this action can be found in a prior Office action.

Claims 1-20 are rejected under 35 U.S.C. § 102(b) as being anticipated by O'Hara et al #4,737,356.

Applicant's arguments filed April 29, 1994 have been fully considered but they are deemed to be moot in view of the above new ground of rejection.

Any inquiry concerning this communication or earlier communications from the examiner should be directed to David H. Corbin whose telephone number is (703) 308-3407.

Any inquiry of a general nature or relating to the status of this application should be directed to the Group receptionist whose telephone number is (703) 308-2168.

David H. Corbin
Primary Examiner
Art Unit 351

TO SEPARATE, HOLD TOP AND BOTTOM EDGES, SNAP-APART AND DISCARD CARBON

FORM PTO-892 (REV. 2-92)

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE

NOTICE OF REFERENCES CITED

| SERIAL NO. | GROUP ART UNIT | ATTACHMENT TO PAPER NUMBER |
|---|---|---|
| 08/031,461 | 3501 | 10 |

APPLICANT(S): PAL ET AL

U.S. PATENT DOCUMENTS

| * | | DOCUMENT NO. | DATE | NAME | CLASS | SUB-CLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | A | 4737356 | 4-1988 | O'HARA ET AL | 588 | 256 | |
| | B | | | | | | |
| | C | | | | | | |
| | D | | | | | | |
| | E | | | | | | |
| | F | | | | | | |
| | G | | | | | | |
| | H | | | | | | |
| | I | | | | | | |
| | J | | | | | | |
| | K | | | | | | |

FOREIGN PATENT DOCUMENTS

| * | | DOCUMENT NO. | DATE | COUNTRY | NAME | CLASS | SUB-CLASS | PERTINENT SHTS. DWG | PP. SPEC. |
|---|---|---|---|---|---|---|---|---|---|
| | L | | | | | | | | |
| | M | | | | | | | | |
| | N | | | | | | | | |
| | O | | | | | | | | |
| | P | | | | | | | | |
| | Q | | | | | | | | |

OTHER REFERENCES (Including Author, Title, Date, Pertinent Pages, Etc.)

| | |
|---|---|
| R | |
| S | |
| T | |
| U | |

| EXAMINER | DATE | |
|---|---|---|
| DAVID H. CORBIN | 7/21/94 | 343 |

* A copy of this reference is not being furnished with this office action.
(See Manual of Patent Examining Procedure, section 707.05 (a).)

MAIL ROOM
MAR 6 1995
PAT. & TRADEMARK OFF.

3/10 R.M.

3501

Docket: SES-1

15/10

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Application of: Pal et al. | ) Group Art Unit: 3501 |
| Serial No.: 08/031,461 | ) Examiner: D.H. Corbin |
| Filed: March 15, 1993 | ) |
| For: FIXATION AND STABILIZATION OF METALS IN CONTAMINATED MATERIALS | ) |

I hereby certify that this correspondence is being deposited with the United States Postal Service as first class mail in an envelope addressed to: Commissioner of Patents and Trademarks, Washington, D.C. 20231 on the date shown below.
George E. McDermott
(Registration No. 35,946)
Date: March 1, 1995

Hon. Commissioner of Patents
and Trademarks
Washington, D.C. 20231

AMENDMENT

Sir:

In response to the Communication from the Examiner dated February 23, 1995 and the Office Action dated August 11, 1994, please amend the application as follows:

Please change the attorney docket number from "66751-3" to "SES-1".

RECEIVED
MAR 9 1995
GROUP 3500

IN THE SPECIFICATION:

Please revise the specification as indicated below:

Already entered in Paper No. 5, Amendment A

Page 2, line 3: after "July 23, 1991," add "now U.S. Patent No. 5,193,936,"

Page 2, line 5: delete "now U.S. Patent No. 5,193,936" and replace with "abandoned."

Page 4, line 8: add the following paragraphs after "hazardous wastes":

414

The present invention relates to a chemical treatment technology for immobilizing leachable lead in contaminated soils and solid waste materials. According to the present invention, a process for treating lead-toxic solid wastes in order to stabilize the leachable lead is disclosed, comprising the steps of: (i) mixing the solid waste with a sulfate compound, such as calcium sulfate dihydrate (gypsum powder) or sulfuric acid, having at least one sulfate ion for contacting waste particles and reacting with said leachable lead to produce a substantially insoluble lead composition, such as anglesite and/or calcium-substituted anglesite; and, (ii) mixing said solid waste and sulfate compound with a phosphate reagent, such as phosphoric acid, having at least one phosphate ion for reacting with said leachable lead to produce a substantially insoluble lead composition. The treated material from this process is substantially solid in form and passes the Paint Filter Test while satisfying the regulatory standard for TCLP lead. In all instances, application of this process has been found very reliable in meeting the treatment objectives and in consistently decreasing waste volume.

It is an object of the present invention to provide a technology for treatment of lead-containing solid waste and soil that produces an acceptably low level of leachable lead in the final product to comply with the statutory requirements of TCLP and to pass the Paint Filter Test.

D1 cont.

Another object of the invention is to provide such a process while producing no wastewater or secondary waste streams during said process.

Still another object of the invention is to provide such a process which also causes the solid waste material to undergo a volume reduction as a result of treatment.

Yet another object of the invention is to cause fixation of the leachable lead in the solid waste that is permanent under both ordinary and extreme environmental conditions.

Page 7, line 23: Add the following paragraph after "metal levels":

D2

The treatment technology according to another embodiment of the present invention consists of a two step process for treating contaminated soils and/or solid waste materials with chemical treating agents that convert leachable lead to synthetic (man-made) substantially insoluble lead mineral crystals. As used here, "substantially insoluble" means the leachable lead content in the treated waste sample is less than 5.0 mg/l in the extract by the TCLP Test.

Page 8, line 5: add the following paragraphs after "phosphate anion.":



24

416

The first step of this novel process comprises the reaction of leachable lead in contaminated soils or solid waste materials with a gypsum powder, calcium sulfate dihydrate ($CaSO_4 \cdot 2H_2O$). Calcium sulfate dihydrate powder reacts with leachable and mobile lead species in wastes to form hard sulfates, which are relatively insoluble in water. In the invention, the powder form of dry calcium sulfate dihydrate, or gypsum, is preferred for blending with lead contaminated materials because it provides a uniform cover or dry coating over the surfaces of the waste particles and aggregates under low moisture conditions. The greatest benefit and fastest reaction is achieved under conditions wherein 95% of the powder is passable through a 100 mesh sieve, and the remaining 5% is passable through a 20 mesh sieve.

The amount of gypsum powder employed is typically from 0-30 percent of the weight of solid waste material being treated. The actual amount employed will vary with the degree and type of lead contamination in the waste material or soil, and with the initial composition as well as the condition of the waste material, among other factors.

Alternatively, sulfuric acid, or alum in liquid or powder form can also be used as sources of sulfate ion in certain solid wastes that contain sufficient calcium prior to treatment.

Page 8, line 22: add the following paragraphs after "paint filter test.:

In the first step of the instant process, a thorough and uniform mixing of gypsum powder with the solid waste is accomplished by mixing shredded and screen waste particles with small gypsum particles in, for example, a grizzly or other mixing device. The calcium ions from the gypsum powder displace lead from soil complexes and organic micelles present in the contaminated soil and solid waste material The following equations (1) and (2) describe the reaction of leachable lead with gypsum.

D4

$$\text{Pb-Micelle} + CaSO_4 \cdot 2H_2O \longrightarrow \underset{\text{Anglesite}}{PbSO_4} + \text{Ca-Micelle} + 2H_2O \quad (1)$$

T3(CX

$$Pb(HCO_3)_2 + CaSO_4 \cdot 2H_2O \longrightarrow \underset{\text{Anglesite}}{PbSO_4} \pm CaCO_3 + 3H_2O + CO_2 \quad (2)$$

The reaction of lead with gypsum forms a "hard sulfate" which crystallizes into mineral species of the barite family -- anglesites and calcium-substituted anglesites -- which are insoluble in water. The solubility product of lead sulfate is $1.8 \times 10^{-8}$, indicating that anglesite crystals would continue to develop over the geologic periods.



31

418

In the second step of the process, the solid waste material as amended with gypsum powder is treated with a phosphate-supplying reagent, such as (for example), phosphoric acid. Upon contact with the soil or solid waste, the phosphate-supplying reagent reacts chemically to immobilize the remaining leachable lead. The phosphate-supplying reagent includes phosphate ion sources having one or more reactive phosphate ions, such as phosphoric acid, trisodium phosphate, a potassium phosphate and monobasic or dibasic calcium phosphates.

The quantity of phosphate-supplying reagent employed will vary with the characteristics of the solid waste being treated, including particularly such factors as leachable lead content, total lead, and buffering capacity, among other factors. It has been determined that in most instances a quantity of phosphoric acid up to 30 percent of the weight of the waste material is sufficient. The concentration of phosphoric acid in solution will typically range from about 2-75 percent by weight. The solution and treatment process are maintained above 30° F. to permit the handling of the phosphoric acid as a liquid reagent. Below 30° F., the phosphoric acid tends to gel while water freezes to form ice, thus creating material handling problems.

Free lead, along with calcium ions found in the solid waste (including those imparted through the first step of the process), reacts with the phosphate to form insoluble

superhard rock phosphates or calcium substituted hydroxy lead apatites as shown in equation (3a and b):

$$4PbCO_3 + CaCO_3 + 3H_3PO_4 \longrightarrow Pb_4Ca(OH)(PO_4)_3 + 5CO_2 + 4H_2O \quad (3a)$$

Hydroxy Lead Apatites

$$4PbCO_3 + CaSO_4 \cdot 2H_2O + 3H_3PO_4 \longrightarrow Pb_4Ca(OH)(PO_4)_3 + \underline{H_2SO_4} + 4CO_2 + 5H_2O \quad (3b)$$

Hydroxy Lead Apatites

The phosphate ions are added to the contaminated soils in solution form; for example, phosphoric acid may be added to water in amounts ranging from about 2 percent to about 75 percent by weight. Phosphoric acid decomposes carbonates and bicarbonates in wastes leading to the synthesis of apatites and evolution of carbon dioxide gas. Destruction of carbonates and bicarbonates contributes to desirable volume reductions.

Although water molecules are generated during the carbonate and bicarbonate decomposition process, it is preferred to have soil moisture at about 10 per cent to about 40 per cent by weight of the soil in order to accelerate the fixation of the leachable lead with the phosphate ions. At this moisture range, material handling is also easy and efficient. It is apparent from Equations

(2), (3a) and (3b) that gypsum and phosphoric acid decompose carbonates and bicarbonates during synthesis of new stable minerals of the barite, apatite, and pyromorphite families in soils (as shown in Table I). Decomposition of carbonates and bicarbonates is usually associated with the evolution of carbon dioxide, formation of hydroxyl group, (OH-), and the release of water molecules. As the water evaporates and carbon dioxide molecules are lost to the atmosphere, the treated waste mass and volume are decreased significantly.

The solid sulfate powder and the phosphate-supplying reagent are added to contaminated soil and solid waste material having a typical moisture content ranging from about 10 percent to about 40 percent by weight. At a moisture level within the foregoing range, the curing time of the treated materials is approximately 4 hours, which provides adequate time for chemical reactions to occur and immobilize the leachable lead species. Crystals of various lead mineral species begin to form immediately, but will continue over long time periods with an excess of treatment chemicals present. This contributes to "self-healing," as noted during treatability studies as well as full scale treatment operations.

Under the foregoing conditions, the immobilization of leachable lead occurs in a relatively dry environment because no wet byproducts, slurries or wastewater are produced by the process of the present invention. Operation

of the process under relatively dry conditions beneficially allows cost-efficient handling of the contaminated soils and the waste materials. This allows compliance with Paint Filter Test for solid wastes required by USEPA and RCRA approved solid waste landfill facilities. Effective mechanical mixing, as by a pug mill or other such mixing device, eliminates the need for diffusion in the nonaqueous solid waste matrix.

The water resistant and insoluble lead minerals synthesized in soils and solid wastes according to this process are stable, and would behave like naturally occurring rock phosphates and hard sulfates. A list of these synthetic lead mineral species and complexes is presented in Table I below, in order of the relative abundance found during characterization of treated soil by x-ray florescence spectrometry, polarized light microscopy (PLM) and scanning electron microscopy (SEM).

TABLE I

Synthetic Mineral Species of Lead Detected in a Treated Sample (Listed in Decreasing Order of Abundance)

| | |
|---|---|
| 31-41% | Calcium Substituted Hydroxy Lead Apatites, $Ca_{0.5-1.5}\ Pb_{3.5-4.5}\ (OH)(PO_4)_3$ |
| 28-29% | Mixed Calcium Lead Phosphate Sulfates, $Ca_{0.05-0.2}Pb_{0.8-0.95}(PO_4)_{0.15-0.5}(SO_4)_{0.25-0.75}$ |
| 22-22% | Mixed Calcium Anglesites, $Ca_{0.05-0.3}Pb_{0.7-0.95}(SO_4)$ |

| | |
|---|---|
| 3-6% | Anglesites, $PbSO_4$ |
| 2-7% | Lead Hydroxy/Chlor Apatite, $Pb_5(PO_4)_3(OH)_{0.5}Cl_{0.5}$ |
| 1-3% | Pyromorphite, $Pb_3(PO_4)_2$ |
| 1-2% | Organo-Lead Phosphate Sulfate, Humus-o-$Pb_3(PO_4)(SO_4)$ |

Some of the chemical reactions that occur during the curing stage, and lead to the development of mixed minerals containing both sulfates and phosphates, are illustrated in equations (4) and (5).

$$18PbCO_3 + 5CaSO_4 \cdot 2H_2O + 12H_3PO_4 \xrightarrow[\text{Temperature (>30° F.) \& Pressure}]{\text{Cure Time = 4 hrs under Ambient}} \quad (4)$$

$$20Ca_{0.1}Pb_{0.9}(PO_4)_{0.5}(SO_4)_{0.25} + Ca_3(PO_4)_2 + 18CO_2 + 28H_2O$$

<u>Mixed Calcium Lead Phosphate Sulfate</u>

$$6Pb[Humus] + 2CaSO_4 2H_2O + 3H_3PO_4 \xrightarrow[\text{Temperature ( > 30° F.) \& Pressure}]{\text{Cure Time = 4 hrs under Ambient}} \quad (5)$$

$$Ca(9H)[Humus]\text{-}Pb_3(PO_4 + SO_4 +$$

<u>Organo-Lead Phosphate Sulfate</u>

$$2H_2O + Ca_{0.3}Pb_{0.7}SO_4 + Ca_{0.7}Pb_{2.3}(PO_4)_2$$

<u>Anglesite</u> <u>Pyromorphite</u> <u>(Ca substituted)</u>

The process of the present invention beneficially decreases the volume of the waste materials through: (i) the evolution of carbon dioxide during the chemical decomposition of carbonates and bicarbonates, upon reaction with the acidic components in gypsum and phosphoric acid, and (ii) hardening and chemical compaction as a result of the synthesis of new minerals which result in changes in interstitial spaces and interlattice structures. Applications of the process on a lead contaminated soil was associated with pore space decrease from 38.8% to 34.3% by volume. A decrease in pore space was associated with increased compaction of the treated soils and a decrease in overall waste volume ranging from 21.4% to 23.0%. For different waste types, the volume decrease varies with the amount of treatment chemicals used in the process. In another lead toxic solid waste, application of this process resulted in a volume decrease of the order of 36.4% while decreasing the leachable lead to levels below the regulatory threshold.

This reduction in volume of the contaminated soil and the solid waste material makes the process of the present invention particularly beneficial for off-site disposal in a secured landfill by cutting down the costs of transportation and storage space. The process can be accomplished at a cost-efficient engineering scale on-site or off-site for ex-situ treatment of lead-toxic solid wastes. This innovative



37

424

treatment technology also offers a great potential for in-situ application to immobilize lead most economically without generation of any wastewater or byproducts.

FIG. 3 illustrates schematically the process of the present invention. The lead-contaminated uncontrolled hazardous waste site 10 with lead-toxic wastes is subject to excavation and segregation 20 of waste piles based on their total lead and TCLP lead contents into (a) heavily contaminated pile 30A, (b) moderately contaminated waste pile 30B and (c) least contaminated waste pile 30C. The staged soil and solid waste material in piles 30A, 30B and 30C is subjected to grinding, shredding, mixing 40 and screening 50 through an appropriately sized mesh sieve. The screening yields particles that are usually less than 5 inches in diameter for mixing with gypsum powder 60 in a grizzly that allows a uniform coating of gypsum over the soil particles and waste aggregates during the grinding, shredding and/or mixing step. Alternatively, as shown by the dashed line, gypsum powder 10 may be added continuously to the screened solid waste material in prescribed amounts as determined during treatability trials. Most of the leachable lead binds chemically with gypsum at molecular level to form lead sulfate, which crystallizes into a synthetic nucleus of mixed calcium anglesite and pure anglesite minerals identified in the treated material by chemical microscopy techniques.



32

425

The gypsum-coated waste particles and aggregates are then transported on a belt conveyor 70 or other conveying means to an area where an effective amount of phosphoric acid solution 80 of specified strengths in water 90 is added or sprayed just prior to thorough mixing in a pug mill 100 (or other mixing means). The temperature of the phosphoric solution is preferably maintained above 30°F. to prevent it from gelling. The treated soil and wastes are subject to curing 110 and drying 120 on a curing/drying pad, or may less preferably be cured and dried using thermal or mechanical techniques. The end product of the process passes the Paint Filter Test. During the curing time of about four hours, various "super-hard phosphate" mineral species, such as calcium-substituted hydroxy lead-apatites and mixed calcium-lead phosphate-sulfate mineral species, are formed in treated waste media 130. Crystals of these mineral species (in early stages of development) have been identified in the treated soil materials and solid wastes by geo-chemical and microscopy techniques like PLM and SEM.

The proportions of waste materials and reagents used in the process may be varied within relatively wide limits. For example, the amount of gypsum powder should be sufficient to produce lead sulfate in contaminated solid or solid waste material. In addition, the amount of phosphate-supplying reagent is prescribed in an amount sufficient to produce mineral species such as hydroxy-lead apatite in



D4 cont.

39

4216

contaminated soil or solid waste material during a relatively short curing time of 4 hours, usually ranging from about 3 to about 5 hours. Further drying of the treated material may take 24 to 96 hours, but has not been required in any application to date. Table II documents the optimum curing time of 4 hours for the process. In all instances, the leachable lead as measured by the EP Toxicity Test Procedure was found below 0.6 mg/l and the differences between analytical values below this level and statistically insignificant.

TABLE II

Documentation of Optimum Curing Time
Using EP Toxicity Test criteria for lead fixation

| Waste Matrix Category | EP Toxic Pb (Untreated Sample) mg/l | EP Toxic Pb Concentration in mg/l found in processed sample at a Curing Time of | | |
|---|---|---|---|---|
| | | 4Hrs. mg/l | 48Hrs. mg/l | 96Hrs. mg/l |
| Pb Toxic Soil A | 495 | 0.4 | 0.4 | 0.6 |
| Pb Toxic Soil B | 46 | 0.3 | 0.2 | 0.2 |
| Pb Toxic Soil C | 520 | 0.3 | 0.5 | 0.5 |

The amount of the gypsum powder and the phosphoric acid employed will be dependent on the amount of contaminant present in the soil, initial characteristics of the solid



D4 cont
T400X
40
427

waste material, whether the material is in-situ or is excavated and brought to an off-site facility for treatment; the same is true for other sulfate compounds and phosphate reagents. The following Example I describes various ratios of the chemical reagents for application to the excavated lead-contaminated solid wastes in order to render the leachable lead substantially insoluble; i.e., to reduce the leachable lead to levels below 5.0 mg/l by EP Toxicity Test lead and TCLP Test criteria now in force under current land-ban regulations.

Page 9, line 9: Change "Example I:" to "Example 1:"

Page 9, line 21: Change "Table I" to "Table III"

Page 10, line 1: Change "Table I" to "Table III"

Page 12, line 3: Change "Example II" to "Example 2"

Page 12, line 12: Change "Table II" to "Table IV"

Page 13, line 1: Change "Table II" to "Table IV"

Page 13, line 18: Change "Example III" to "Example 3"



428

Page 13, line 25: Delete "Exhibit III" and replace with "Table V"

Page 13, line 30: Change "Table III" to "Table V"

Page 14, line 14: Change "Table III" to "Table V"

Page 15, line 1: Change "Example IV" to "Example 4"

Page 15, line 4: Change "Table IV" to "Table VI"

Page 16, line 1: Change "Exhibit IV" to "Table VI"

Page 17, after Table VI: Add the following:

EXAMPLE 5

Nearly twenty (20) different chemicals and products from various vendors and supply houses were screened for chemical fixation of leachable lead in hazardous solid waste samples. Only six (6) of these treatments chemicals were found effective in decreasing the leachable lead as measured by: (1) the EP Toxicity Test and (2) the TCLP Test. Table VII presents a summary of leachable lead found in untreated and treated waste samples allowed to cure for a minimum of 4

hours after treatment with at least one of the effective chemicals. Treatment chemicals found relatively ineffective for lead fixation included a variety of proprietary products from American Colloid Company and Oil Dri, different sesquioxides like alumina and silica, calcium silicate, sodium silicate, Portland cement, lime, and alum from different vendors. Results for these ineffective chemicals are not shown in Table VII.

TABLE VII

Relative effectiveness of various treatment chemicals screened to decharacterize the lead-toxic solid wastes

| | Treatment Chemical (Step) | Leachable Lead in mg/l: Toxicity Test | Leachable Lead in mg/l: EP TCLP Test |
|---|---|---|---|
| I. | Untreated Control | 221.4 | 704.5 |
| II. | Single Treatment Chemical (One Step Treatment) | | |
| | a. Sulfuric Acid (I) | 11.7 | 39.8 |
| | b. Phosphoric Acid (I) | 1.0 | 5.9 |
| | c. Superphosphate Granular (I) | 2.7 | 11.4 |
| | d. Liquid Phosphate Fertilizer (I) | 19.4 | 64.3 |
| | e. Gypsum Powder (I) | 24.9 | 81.8 |
| | f. Sodium Phosphate (I) | 28.7 | 93.9 |



43 430

| | | | |
|---|---|---|---|
| III. | Two Step Treatment | | |
| | g. Sulfuric (I) & Lime (II) | 20.6 | 68.1 |
| | h. Gypsum Powder (I) & Alum (II) | 3.9 | 15.3 |
| | i. Sodium Phosphate (I) & Phosphoric (II) | 3.1 | 12.6 |
| | j. Gypsum (I) & Phosphoric (II) | N.D.* | 1.6 |
| IV. | Three Step Treatment | | |
| | k. Gypsum (I), Alum (II) & Sodium Phosphate (III) | 12.8 | 43.3 |
| | l. Gypsum (I), Phosphoric (II) & Sodium Phosphate (III) | N.D.* | 1.4 |

*N.D. means non-detectable at <0.50 mg/l.

Evaluation of a single treatment chemical in one step reveals that phosphoric acid was most effective in fixation of leachable lead followed by granular super-phosphate, a fertilizer grade product available in nurseries and farm supply houses. However, neither treatment effectively treated leachable lead to the USEPA treatment standard of 5.0 mg/l by TCLP methodology.

Although both phosphoric acid and granular superphosphate were effective in meeting the now obsolete EP Toxicity Test criteria at 5.0 mg/l, this test has been replaced by TCLP Test criteria for lead of 5.0 mg/l. Single application of the phosphoric acid, granular superphosphate or any other chemical was short of meeting the regulatory threshold of 5.0 mg/l by TCLP Test criteria for lead.

In a two-step treatment process, application of gypsum during Step I and treatment with phosphoric acid in Step II



44

431

resulted in decrease of TCLP-lead consistently and repeatedly below the regulatory threshold of 5.0 mg/l. The results of this two-step treatment process utilizing gypsum in Step I and phosphoric acid in Step II are most reliable and hence, the two-step process may be applied to a wide variety of lead contaminated wastes as exhibited in Example II.

A three-step process, as set forth in Table VII, was not perceived to be as economically viable as a two-step treatment process, despite its ability to reduce lead levels in satisfaction of the TCLP Test criteria. A process that employees the beneficial combination of treatment first with a sulfate compound and then with a phosphate reagent in accord with the present invention, in combination with one or more additional treatment steps, may nevertheless be within the scope of the invention.

In order to illustrate the relative proportions of two chemicals, e.g., gypsum and phosphoric acid, needed for treatment of lead-toxic wastes, three soil samples from a lead contaminated test site were processed using the present invention, in which gypsum powder was used in the first step, and phosphoric acid solution in water at concentrations of about 7, 15 and 22 percent by weight in the second step. The soil was measured for lead content in accordance with the EP Toxicity Test before and after treatment. A level of leachable lead below 5 mg/l was

considered non-hazardous according to this procedure. During these test runs, the EP Toxicity Test criteria were in force for treated waste material. The results of these tests are set forth in Table VIII:

TABLE VIII

Effectiveness in Fixation and Stabilization of Leachable Lead in Lead Toxic Soils

| | PROCESS STEPS | | EP TOXIC LEAD TEST RESULTS | |
|---|---|---|---|---|
| Soil Sample (Lead-toxic waste) | Gypsum Step I (g/kg soil) | Phosphoric Step II (g/kg soil) | Before Treat-ment mg/l | After Treat-ment mg/l |
| 1. Low lead contamination | 20 | 10 | 8 | <0.1 |
| 2. Moderate contamination | 30 | 20 | 61 | <0.1 |
| 3. High lead contamination | 40 | 30 | 3,659 | 1.7 |

The foregoing results demonstrate that the process of the present invention was effective in all three samples, representing 3 different levels of lead contamination. The process is flexible and is usually optimized during bench scale treatability studies for each waste type to immobilize the leachable lead and to decharacterize or transform the lead-toxic waste into non-toxic solid waste acceptable to TSD facilities



46 423

under current land ban regulations. A net reduction of 36.4% in waste volume through use of the instant process has been observed. Typical volume reductions are set forth in Table IX.

TABLE IX

Changes in Solid Waste Volume as a Result of Treatment with the Two-Step Process

| SOLID WASTE MATERIAL (Treatment Scale) | SOLID WASTE VOLUME: Initial (Before Application of Process) | Final (After Application of Process and Curing) | Decrease in Waste Volume (%) |
|---|---|---|---|
| 1. Low toxic soil (full scale) | 3850 cu.yd. | 2450 cu. yd. | 36.4 |
| 2. Lead-toxic Solid Waste (Bench Scale) | | | |
| Test Run I | 106.1 cu. in. | 81.51 cu.in. | 23.0 |
| Test Run II | 22.0 cu. in. | 17.3 cu. in. | 21.4 |

The most profound effect of the process of the present invention is at a structural level, where the break-down of granular aggregates is associated with a loss of fluffiness and a decrease in pore space and increased compaction due to physical, mechanical and chemical forces at different levels. At a molecular level, phosphoric acid breaks down the minerals containing carbonates and bicarbonates, including cerussites, in



47 434

stoichiometric proportions. Soon after the addition of phosphoric acid to a solid waste containing cerussites, extensive effervescence and frothing becomes evident for several minutes and sometimes for a few hours. The phosphoric acid breaks down the acid sensitive carbonates and bicarbonates leading to the formation of carbon dioxide, water and highly stable and insoluble sulfate and phosphate mineral compounds. Thus, structural changes due to interlattice reorganization as well as interstitial rearrangement in waste during processing are associated with an overall decrease in waste volume. Depending on the extent of carbon dioxide loss from the breakdown of carbonates and bicarbonates present in the lead-toxic solid waste, the process may lead to a slight loss of waste mass as well. Water generated during the chemical reactions is lost by evaporation, which further decreases the mass and volume of the treated solid wastes and soils.

The cost of the process of the present invention is moderate to low, depending upon (i) waste characteristics, (ii) treatment system sizing, (iii) site access, (iv) internment of final disposition of treated material and (v) site support requirements. The costs of treatment and disposal are presently on the order of $115 per ton of lead-toxic waste, as compared to off-site conventional treatment and disposal costs of over $250 per ton if no treatment in accord with the invention had been performed. Moreover, recent land ban regulations would prohibit the disposal of all lead-toxic wastes in landfills. The



47

435

foregoing Example makes clear that the process of the present invention provides an efficient technology that is economically attractive and commercially viable in meeting regulatory criteria for landfills.

EXAMPLE 6

The process of the present invention was applied on bench scale to five different lead-toxic waste materials that were characterized for total lead, TCLP-lead, moisture content and pH before and after treatment. A curing time of 5 hours was allowed for completion of the treatment process. The results compiled in Table X exhibit the profound effects of the process in decreasing the TCLP lead in a wide range of lead-toxic soils and solid wastes containing total lead as high as 39,680 mg/kg and TCLP lead as high as 542 mg/l. In each of the five cases, the instant process immobilizes the leachable lead to levels below the regulatory threshold of 5 mg/l set by the TCLP Test criteria for lead currently in force under the land ban regulations of the United States Environmental Protection Agency.



44

436

TABLE X

Typical changes in solid waste characteristics due to process effects

| SOLID WASTE HARACTERISTICS | | MEASURED VALUES Before Treatment | After Treatment & Curing |
|---|---|---|---|
| I. | Lead-toxic SW-A | | |
| | Total lead, % | 1.442 | 1.314 |
| | TCLP-Lead, mg/l | 542.0 | 2.0 |
| | Moisture, % | 23.0 | 33.0 |
| | pH, S.U. | 8.1 | 4.8 |
| II. | Lead-toxic SW-B | | |
| | Total lead, % | 0.847 | 0.838 |
| | TLCP-Lead, mg/l | 192.0 | 2.4 |
| | Moisture, % | 27 | 36 |
| | pH, S.U. | 8.0 | 5.3 |
| III. | Lead-toxic SW-C | | |
| | Total lead, % | 3.968 | 3.066 |
| | TLCP-Lead, mg/l | 257.6 | 1.0 |
| | Moisture, % | 10.0 | 18.1 |
| | pH, S.U. | 7.2 | 4.5 |
| IV. | Lead-toxic SW-D | | |
| | Total lead, % | 2.862 | 2.862 |
| | TLCP-Lead, mg/l | 245.3 | 0.38 |
| | Moisture, % | 71.6 | 84.1 |
| | pH, S.U. | 8.1 | 6.3 |
| V. | Lead-toxic SW-E | | |
| | Total lead, % | 0.16 | 0.12 |
| | TLCP-Lead, mg/l | 7.5 | 1.87 |
| | Moisture, % | 12.3 | 23.0 |
| | pH, S.U. | 7.0 | 5.4 |

It is obvious from Table X that the instant process operates over a wide range of moisture and pH conditions. It is



D5t. cut

T56CX

56

437

associated with 8 to 11% rise in moisture content. The end product of the treatment process may contain moisture in a typical range of 18% to 36% on a dry weight basis. The end product passes the Paint Filter Test for solids and there are not other byproducts or side streams generated during the process. The treated solid waste is cured in 4 to 5 hours and may be allowed to dry for 2 to 3 days after treatment for loss of unwanted moisture prior to final internment and disposition. This time is sufficient for the TCLP Tests to be completed as part of the disposal analysis under land ban regulations enforced by the USEPA.

It is necessary to establish the quantities of gypsum and phosphate reagent on a case-by-case basis, because the consumption of these materials will depend not only upon the initial lead level in the waste or soil, but also upon other waste characteristics such as cation exchange capacity, total buffering capacity, and the amounts of carbonates and bicarbonates present, among others. Bench scale treatability studies for each solid waste considered will be necessary to determine the optimum levels of the materials that are employed. The treatability studies are designed to optimize the amount and grade of gypsum powder (or other sulfate compound) needed during step I, and the amount and concentration of phosphoric acid (or other phosphate compound) needed in step II for cost-effective operation of the treatment system. Those skilled in the art are knowledgeable of such bench studies, which are usually carried

out as precursors to full scale treatment.

Although the present invention has been described in connection with preferred embodiments, it will be appreciated by those skilled in the art that additions, modifications, substitutions and deletions not specifically described may be made without departing from the spirit and scope of the invention defined in the appended claims.

IN THE CLAIMS:

Please amend the claims as follows:

CLAIM 4:

Delete -- "lime," -- and -- "portland cement," -- from line 3.

CLAIM 5:

Add -- "of" -- before "phosphoric acid" in line 3.

CLAIM 8:

(Amended) A method according to claim 1, wherein said first component is at least [one of lime and] gypsum.

CLAIM 15:

Add -- "of" before "phosphoric acid" in line 3.

CLAIM 16:

Delete -- "lime," -- and -- "portland cement," -- from line 3.

CLAIM 19:

(Amended) A method according to claim 12, wherein said second component is at least [one member selected from the group



452

439

consisting of lime and] gypsum.

(Amended)

21. A method of treating metal-bearing soil to stabilize leachable metal contained therein, said method comprising the steps of:

mixing a metal-bearing soil with a first mixture comprising a first component and a second component to form a second mixture, wherein said metal-bearing soil contains at least one leachable metal selected from the group consisting of lead, aluminum, arsenic (III), barium, bismuth, cadmium, chromium (III), copper, iron, nickel, selenium, silver and zinc, wherein said first component supplies at least one member selected from the group consisting of sulphates, halites and silicates, and wherein said second component supplies at least one phosphate anion;

curing said second mixture for a period to form a cured material such that TCLP metal level for said leachable metal in the cured material is below 0.5 mg/l and no secondary waste streams are generated.

22. (Amended) A method according to claim 21, wherein said first component is at least one member selected from the group consisting of gypsum, alum, halites, sulphates of iron, and sulphates of aluminum.

23. (Amended) A method according to claim 21, wherein said second component is at least one member selected from the group

consisting of phosphoric acid, trisodium phosphate, triple super phosphate, pyrophosphates, potassium phosphates and ammonium phosphates.

24. (Amended) A method according to claim 21, wherein said first component is gypsum.

25. (Amended) A method according to claim 21, wherein said second component is phosphoric acid.

26. (Amended) A method of treating metal-bearing soil to stabilize leachable metal contained therein, said method comprising the steps of:

mixing a metal-bearing soil containing leachable metal with a phosphate reagent having at least one phosphate anion for reacting with leachable metal in said metal-bearing soil to produce a first mixture, wherein said leachable metal comprises at least one metal selected from the group consisting of lead, aluminum, arsenic (III), barium, bismuth, cadmium, chromium (III), copper, iron, nickel, selenium, silver and zinc, said first mixture containing a substantially insoluble metal compound or mineral species;

mixing said first mixture with a second component to form a second mixture, said second component supplying at least one member selected from the group consisting of sulphates, halites and silicates; and

curing said second mixture for a period to form a cured material such that TLCP metal levels in the cured material are below 5.0 mg/l and no secondary waste streams are generated.



441

27. (Amended) A method according to claim 26, wherein said phosphate reagent is at least one member selected from the group consisting of phosphoric acid, trisodium phosphate, triple super phosphate, pyrophosphates, potassium phosphates and ammonium phosphates.

28. (Amended) A method according to claim 26, wherein said second component is at least one member selected from the group consisting of gypsum, alum, halites, sulphates of iron, and sulphates of aluminum.

29. (Amended) A method according to claim 26, wherein said phosphate reagent is phosphoric acid.

30. (Amended) A method according to claim 26, wherein said second component is gypsum.

31. (Amended) A method of treating metal-bearing soil to stabilize leachable metal contained therein, said method comprising the steps of:

mixing a metal-bearing soil with a first mixture comprising gypsum and a second component comprising a phosphate source to form a second mixture, wherein said metal-bearing soil contains at least one leachable metal selected from the group consisting of lead, aluminum, arsenic (III), barium, bismuth, cadmium, chromium (III), copper, iron, nickel, selenium, silver and zinc, and wherein said second component supplies at least one phosphate anion;

curing said second mixture for a period to form a cured material such that TCLP metal level for said leachable

metal in the cured material is below 5.0 mg/l and no secondary waste streams are generated.

REMARKS

The applicants have amended the specification to add portions of the specification from the parent application of which the present application is a continuation-in-part. The additions to the specification have support in the issued parent application, now U.S. Patent No. 5,193,936 as follows:

| Additions to Spec. | U.S. Patent No. 5,193,936 |
|---|---|
| page 4 to 6 | col. 5, lines 28 to 65 |
| page 11 | col. 6, lines 8 to 16 |
| page 12 to 13 | col. 6, lines 17 to 42 |
| page 13 to 24 | col. 6, lines 43 to col. 10, line 68 |
| page 34 to 44 | col. 11, line 1 to col. 14, line 64 |

The applicants have amended the claims to narrow the scope of their invention in view of U.S. Patent No. 4,737,356 to O'Hara et al. (hereinafter "O'Hara") cited by the Examiner. The applicants have also amended claims 21 to 31 to delete the underlines in response to the Examiner's comments.

O'Hara teaches a method of immobilizing lead and cadmium in solid residues arising from the burning of solid wastes by mixing the fly ash and bottom ash with water soluble phosphate in the presence of a free lime source. The present

invention discloses a method of treating various metal bearing materials with a first component and a second component to stabilize the leachable metals. The first component supplies a member from a group that includes hydroxides as taught by O'Hara. To avoid the rejection based on O'Hara the claims have been amended to delete references to hydroxides, lime and portland cement. The remaining group that makes up the first component no longer includes a member that is taught by O'Hara. O'Hara does not teach a first component that comprises either sulphates, halites or silicates.

O'Hara teaches the addition of lime based on the calcium hydroxide content at col. 5, lines 45 to 58:

> "Using fly ash as an example of the solid residue to be treated, the fly ash is mixed with lime. By lime we mean calcium oxide (dry lime), calcium hydroxide (hydrated lime), a lime source or any mixture thereof. Where flue gas is scrubbed with lime, the flue gas scrubber product (FGSP) may be either the sole source of lime or may be used only in part as the lime source. In addition to containing calcium hydroxide, the FGSP typically will contain such materials as calcium sulfate, calcium sulfite, calcium chloride, and calcium carbonate. The percentage of calcium hydroxide in the FGSP is itself subject to broad variation, and the amount of FGSP used will depend in part on the amount of calcium hydroxide present."

O'Hara teaches that lime is added to the fly ash or, when the flue gas is scrubbed with lime, the FGSP may provide a source of lime. O'Hara adds FGSP based on the amount of calcium hydroxide present.

It is well known to those knowledgeable in the art of flue gas scrubbers that lime is contacted with flue gases to remove



444

toxic pollutant gases. Typically, the lime (calcium oxide) is slaked with water to form calcium hydroxide ($Ca\ (OH)_2$) prior to the scrubbing. During the scrubbing process, the slaked lime reacts with sulfur dioxide, carbon dioxide, carbon monoxide and other components of the flue gas to form the materials identified by O'Hara at col. 5, lines 53 and 54, i.e. "such materials as calcium sulfate, calcium sulfite, calcium chloride, and calcium carbonate." The slaked lime that does not react with the flue gas during the scrubbing is present in the FGSP as unreacted calcium hydroxide. O'Hara adds FGSP to the solid residue being treated based on the amount of unreated calcium hydroxide present (col. 5, lines 56 to 58) in the FGSP. O'Hara teaches that his process adds FGSP based on the amount of unreacted calcium hydroxide contained in the FGSP and not based on the materials (such as calcium sulfate) formed by the reacted calcium hydroxide. Moreover, a high proportion of calcium sulfate in the FGSP would result in a lower proportion of calcium hydroxide in the FSGP and O'Hara having to add more lime. For O'Hara's process, a high proportion of calcium sulfate in the FGSP would be undesirable since it would decrease the amount of calcium hydroxide essential to O'Hara's process. Thus, O'Hara teaches away from using calcium sulfate as taught in the present invention.

The sulfates supplied by the first component in the present invention is neither taught nor suggested by O'Hara. At col. 5, line 53, O'Hara disclose that the FGSP typically contains such

materials as calcium sulfate but he does not teach or suggest its use in his process. On the contrary, O'Hara specifically states that his experiments show that calcium sulfate cannot be used to immobilize lead or cadmium.

Calcium sulfate is a salt formed in the flue gas scrubbing process by the reaction of the calcium hydroxide with sulfur dioxide. Calcium sulfate is also a salt formed by a sulfuric acid reaction with calcium. At col. 10, lines 56 to 58, O'Hara states:

> "The data in Table 8 shows unequivocally that phosphate is unique; neither sulfuric nor nitric acids immobilize lead and cadmium, nor do their salts."

O'Hara teaches away from the use of calcium sulfate in a process for the immobilization of lead and cadmium by unambiguously stating that it does not immobilize these metals. Thus, the applicants' discovery that calcium sulfate can be used to immobilize metals is neither taught nor suggested by O'Hara.

The applicants respectfully submit that the amendments that have been made to the claims overcome the Examiner's rejection based on O'Hara and request that the claims be allowed.

Respectfully submitted,

Kevin E. McDermott

Kevin E. McDermott, Esq.
Reg. No.: 35,946
Wyatt, Gerber, Burke
& Badie L.L.P.
99 Park Avenue
New York, New York 10016
(212) 681-0800

KEM/eeh/60/95



4446

UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 08/031,461 | 03/15/93 | PAL | D 66751-3 |

EXAMINER: SUCHFIELD

C5M1/0811

KEVIN E. MCDERMOTT
WYATT GERBER, BURKE & BADIE
99 PARK AVENUE 6TH FLOOR
NEW YORK N.Y. 10016

| ART UNIT | PAPER NUMBER |
|---|---|
| 3506 | 21 |

DATE MAILED: 08/11/95

## NOTICE OF ALLOWABILITY

**PART I.**

1. [X] This communication is responsive to 11/10/94; 3/6/95; 8/9/95 Communications.
2. [X] All the claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice Of Allowance And Issue Fee Due or other appropriate communication will be sent in due course.
3. [X] The allowed claims are 1-31.
4. [ ] The drawings filed on ______ are acceptable.
5. [ ] Acknowledgment is made of the claim for priority under 35 U.S.C. 119. The certified copy has [_] been received. [_] not been received. [_] been filed in parent application Serial No. ______, filed on ______.
6. [ ] Note the attached Examiner's Amendment.
7. [ ] Note the attached Examiner Interview Summary Record, PTOL-413.
8. [ ] Note the attached Examiner's Statement of Reasons for Allowance.
9. [ ] Note the attached NOTICE OF REFERENCES CITED, PTO-892.
10. [ ] Note the attached INFORMATION DISCLOSURE CITATION, PTO-1449.

**PART II.**

A SHORTENED STATUTORY PERIOD FOR RESPONSE to comply with the requirements noted below is set to EXPIRE THREE MONTHS FROM THE "DATE MAILED" indicated on this form. Failure to timely comply will result in the ABANDONMENT of this application. Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

1. [ ] Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL APPLICATION, PTO-152, which discloses that the oath or declaration is deficient. A SUBSTITUTE OATH OR DECLARATION IS REQUIRED.
2. [X] APPLICANT MUST MAKE THE DRAWING CHANGES INDICATED BELOW IN THE MANNER SET FORTH ON THE REVERSE SIDE OF THIS PAPER.
   a. [X] Drawing informalities are indicated on the NOTICE RE PATENT DRAWINGS, PTO-948, attached hereto ~~or~~ (and) ~~to~~ Paper No. 11. CORRECTION IS REQUIRED.
   b. [X] The proposed additional drawing ~~correction~~ figure filed on 11/10/94 has been approved by the examiner. ~~CORRECTION IS REQUIRED.~~
   c. [ ] Approved drawing corrections are described by the examiner in the attached EXAMINER'S AMENDMENT. CORRECTION IS REQUIRED.
   d. [ ] Formal drawings are now REQUIRED.

---

Any response to this letter should include in the upper right hand corner, the following information from the NOTICE OF ALLOWANCE AND ISSUE FEE DUE: ISSUE BATCH NUMBER, DATE OF THE NOTICE OF ALLOWANCE, AND SERIAL NUMBER.

**Attachments:**

- _ Examiner's Amendment
- _ Examiner Interview Summary Record, PTOL-413
- _ Reasons for Allowance
- _ Notice of References Cited, PTO-892
- _ Information Disclosure Citation, PTO-1449
- _ Notice of Informal Application, PTO-152
- X Notice re Patent Drawings, PTO-948
- _ Listing of Bonded Draftsmen
- _ Other

404

George A. Suchfield
GEORGE A. SUCHFIELD
PRIMARY EXAMINER
ART UNIT 356

PTOL-37 (REV. 4-89) * USCOMM-DC 89-3789

Form PTO 948 (Rev. 10-94) U.S. DEPARTMENT OF COMMERCE - Patent and Trademark Office Application No. 08/031,461

(ADDITIONAL)

# NOTICE OF DRAFTSPERSON'S PATENT DRAWING REVIEW

PTO Draftpersons review all originally filed drawings regardless of whether they are designated as formal or informal. Additionally, patent Examiners will review the drawings for compliance with the regulations. Direct telephone inquiries concerning this review to the Drawing Review Branch, 703-305-8404.

The drawings filed (insert date) 11/10/94 are:
A.______ not objected to by the Draftsperson under 37 CFR 1.84 or 1.152.
B.______ objected to by the Draftsperson under 37 CFR 1.84 or 1.152 as indicated below. The Examiner will require submission of new, corrected drawings when necessary. Corrected drawings must be submitted according to the instructions on the back of this Notice.

1. DRAWINGS. 37 CFR 1.84(a): Acceptable categories of drawings: Black ink. Color.
   - ___ Not black solid lines. Fig(s)______
   - ___ Color drawings are not acceptable until petition is granted. Fig(s)______
2. PHOTOGRAPHS. 37 CFR 1.84(b)
   - ___ Photographs are not acceptable until petition is granted. Fig(s)______
   - ___ Photographs not properly mounted (must use brystol board or photographic double-weight paper). Fig(s)______
   - ___ Poor quality (half-tone). Fig(s)______
3. GRAPHIC FORMS. 37 CFR 1.84 (d)
   - ___ Chemical or mathematical formula not labeled as separate figure. Fig(s)______
   - ___ Group of waveforms not presented as a single figure, using common vertical axis with time extending along horizontal axis. Fig(s)______
   - ___ Individuals waveform not identified with a separate letter designation adjacent to the vertical axis. Fig(s)______
4. TYPE OF PAPER. 37 CFR 1.84(e)
   - ___ Paper not flexible, strong, white, smooth, nonshiny, and durable. Sheet(s)______
   - ___ Erasures, alterations, overwritings, interlineations, cracks, creases, and folds copy machine marks not accepted. Fig(s)______
   - ___ Mylar, velum paper is not acceptable (too thin). Fig(s)______
5. SIZE OF PAPER. 37 CFR 1.84(f): Acceptable sizes:
   - 21.6 cm. by 35.6 cm. (8 1/2 by 14 inches)
   - 21.6 cm. by 33.1 cm. (8 1/2 by 13 inches)
   - 21.6 cm. by 27.9 cm. (8 1/2 by 11 inches)
   - 21.0 cm. by 29.7 cm. (DIN size A4)
   - ___ All drawing sheets not the same size. Sheet(s)______
   - ___ Drawing sheet not an acceptable size. Sheet(s)______
6. MARGINS. 37 CFR 1.84(g): Acceptable margins:

Paper size

| | 21.6 cm. X 35.6 cm. (8 1/2 X 14 inches) | 21.6 cm X 33.1 cm. (8 1/2 X 13 inches) | 21.6 cm. X 27.9 cm. (8 1/2 X 11 inches) | 21.0 cm. X 29.7 cm. (DIN Size A4) |
|---|---|---|---|---|
| T | 5.1 cm. (2") | 2.5 cm. (1") | 2.5 cm. (1") | 2.5 cm. |
| L | .64 cm. (1/4") | .64 cm. (1/4") | .64 cm. (1/4") | 2.5 cm. |
| R | .64 cm. (1/4") | .64 cm. (1/4") | .64 cm. (1/4") | 1.5 cm. |
| B | .64 cm. (1/4") | .64 cm. (1/4") | .64 cm. (1/4") | 1.0 cm. |

Margins do not conform to chart above.
Sheet(s)______
___Top (T) ___ Left (L) ___Right (R) ___Bottom (B)

7. VIEWS. 37 CFR 1.84(h)
   REMINDER: Specification may require revision to correspond to drawing changes.
   - ___ All views not grouped together. Fig(s)______
   - ___ Views connected by projection lines or lead lines. Fig(s)______
   Partial views. 37 CFR 1.84(h) 2
   - ___ View and enlarged view not labled separatly or properly. Fig(s)______
   Sectional views. 37 CFR 1.84 (h) 3
   - ___ Hatching not indicated for sectional portions of an object. Fig(s)______
   - ___ Cross section not drawn same as view with parts in cross section with regularly spaced parallel oblique strokes. Fig(s)______
8. ARRANGEMENT OF VIEWS. 37 CFR 1.84(i)
   - ___ Words do not appear on a horizontal, left-to-right fashion when page is either upright or turned so that the top becomes the right side, except for graphs. Fig(s)______
9. SCALE. 37 CFR 1.84(k)
   - ___ Scale not large enough to show mechanism with crowding when drawing is reduced in size to two-thirds in reproduction. Fig(s)______
   - ___ Indication such as "actual size" or scale 1/2" not permitted. Fig(s)______
10. CHARACTER OF LINES, NUMBERS, & LETTERS. 37 CFR 1.84(l)
   - ✓ Lines, numbers & letters not uniformly thick and well defined, clean, durable, and black (except for color drawings). Fig(s) 3
11. SHADING. 37 CFR 1.84(m)
   - ___ Solid black shading areas not permitted. Fig(s)______
   - ___ Shade lines, pale, rough and blurred. Fig(s)______
12. NUMBERS, LETTERS, & REFERENCE CHARACTERS. 37 CFR 1.84(p)
   - ✓ Numbers and reference characters not plain and legible. 37 CFR 1.84(p)(1) Fig(s) 3 (LABEL)
   - ___ Numbers and reference characters not oriented in same direction as the view. 37 CFR 1.84(p)(1) Fig(s)______
   - ___ English alphabet not used. 37 CFR 1.84(p)(2) Fig(s)______
   - ___ Numbers, letters, and reference characters do not measure at least .32 cm. (1/8 inch) in height. 37 CFR(p)(3) Fig(s)______
13. LEAD LINES. 37 CFR 1.84(q)
   - ___ Lead lines cross each other. Fig(s)______
   - ___ Lead lines missing. Fig(s)______
14. NUMBERING OF SHEETS OF DRAWINGS. 37 CFR 1.84(t)
   - ___ Sheets not numbered consecutively, and in Arabic numerals, beginning with number 1. Sheet(s)______
15. NUMBER OF VIEWS. 37 CFR 1.84(u)
   - ___ Views not numbered consecutively, and in Arabic numerals, beginning with number 1. Fig(s)______
   - ___ View numbers not preceded by the abbreviation Fig. Fig(s)______
16. CORRECTIONS. 37 CFR 1.84(w)
   - ___ Corrections not made from prior PTO-948. Fig(s)______
17. DESIGN DRAWING. 37 CFR 1.152
   - ___ Surface shading shown not appropriate. Fig(s)______
   - ___ Solid black shading not used for color contrast. Fig(s)______

COMMENTS:

410

ATTACHMENT TO PAPER NO. 21 REVIEWER LAM DATE 08/09/95

PTO Copy

UNITED STATES DEPARTMENT OF COMMERCE
Patent and Trademark Office

Address: Box ISSUE FEE
COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

# 21

KEVIN E. MCDERMOTT
WYATT GERBER, ...
... PARK AVENUE
NEW YORK N.Y. ...

C311/0811

# NOTICE OF ALLOWANCE AND ISSUE FEE DUE

☐ Note attached communication from the Examiner
☐ This notice is issued in view of applicant's communication filed ______

| SERIES CODE/SERIAL NO. | FILING DATE | TOTAL CLAIMS | EXAMINER AND GROUP ART UNIT | | DATE MAILED |
|---|---|---|---|---|---|
| 08/031,461 | 03/1. | 031 | SUCHFIELD, G | 3506 | 08/11/95 |

First Named Applicant: PAL, DHIRAJ

TITLE OF INVENTION: FIXATION AND STABI... OF METALS IN CONTAMINATED MATERIALS

| | ATTY'S DOCKET NO. | CLASS-SUBCLASS | BATCH NO. | APPLN. TYPE | SMALL ENTITY | FEE DUE | DATE DUE |
|---|---|---|---|---|---|---|---|
| 3 | 66751-3 | 588 | 000 / 499 | UTILITY | YES | $605.00 | 11/13/95 |

***THE APPLICATION IDENTIFIES ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT. PROSECUTION ON THE MERITS IS CLOSED.***

***THE ISSUE FEE MUST BE PAID WITHIN THREE MONTHS FROM THE MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS STATUTORY PERIOD CANNOT BE EXTENDED.***

## HOW TO RESPOND TO THIS NOTICE:

I. Review the SMALL ENTITY Status shown above. If the SMALL ENTITY is shown as YES, verify your current SMALL ENTITY status:

A. If the status is changed, pay twice the amount of the FEE DUE shown above and notify the patent and Trademark Office of the change in status, or
B. If the Status is the same, pay the FEE DUE shown above.

If the SMALL ENTITY is shown as NO:
A. Pay FEE DUE shown above, or
B. File verified statement of Small Entity Status before, or with, pay of 1/2 the FEE DUE shown above.

II. Part B of this notice should be completed and returned to the Patent and Trademark Office (PTO) with your ISSUE FEE. Even if the ISSUE FEE has already been paid by charge to deposit account, Part B should be completed and returned. If you are charging the ISSUE FEE to your deposit account, Part C of this notice should also be completed and returned.

III. All communications regarding this application must give series code (or filing date), serial number and batch number. Please direct all communication prior to issuance to Box ISSUE FEE unless advised to contrary.

***IMPORTANT REMINDER: Patents issuing on applications filed on or after Dec. 12, 1980 may require payment of maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.***

PATENT AND TRADEMARK OFFICE COPY

4603

PTOL-85B (REV. 4-94) (0651-0033)

625.00 - 242
30.00 - 561

**PART B—ISSUE FEE TRANSMITTAL**

**[MAILI]NG INSTRUCTIONS:** This form should be used for transmitting the ISSUE FEE. Blocks 2 through 6 should be completed where appropriate. [Fu]rther correspondence including the Issue Fee Receipt, the Patent, advance orders and notification of maintenance fees will be mailed to addressee [ent]ered in Block 1 unless you direct otherwise, by: (a) specifying a new correspondence address in Block 3 below; or (b) providing the PTO with a separate "[FE]E ADDRESS" for maintenance fee notifications with the payment of Issue Fee or thereafter. **See reverse for Certificate of Mailing.**

1. CORRESPONDENCE ADDRESS

KEVIN E. MCDERMOTT
WYATT GERBER, BURKE & BAD[ARACCO]
[6]45 PARK AVENUE 6TH FLOOR
NEW YORK N.Y. 10016

M1/0811

2. INVENTOR(S) ADDRESS CHANGE (Complete only if there is a change)

INVENTOR'S NAME
Street Address
City, State and ZIP Code
CO-INVENTOR'S NAME
Street Address
City, State and ZIP Code

☐ Check if additional changes are on reverse side

| SERIES CODE/SERIAL NO. | FILING DATE | TOTAL CLAIMS | EXAMINER AND GROUP ART UNIT | | DATE MAILED |
|---|---|---|---|---|---|
| 08/031,461 | 03/15/93 | 031 | SUCHFIELD, G | 3506 | 08/11/95 |

First Named Applicant: PAL, DHIRAJ

TITLE OF INVENTION: FIXATION AND STABILIZATION OF METALS IN CONTAMINATED MATERIALS

| | ATTY'S DOCKET NO. | CLASS-SUBCLASS | BATCH NO. | APPLN. TYPE | SMALL ENTITY | FEE DUE | DATE DUE |
|---|---|---|---|---|---|---|---|
| 3 | 66751-3 | 588-256.000 | Z99 | UTILITY | YES | ~~$605.00~~ 625.00 | 11/13/95 |

3. Correspondence address change (Complete only if there is a change)

4. For printing on the patent front page, list the names of not more than 3 registered patent attorneys or agents OR, alternatively, the name of a firm having as a member a registered attorney or agent. If no name is listed, no name will be printed.

1 KEVIN E. McDERMOTT
2 ________
3 ________

050 MH 11/15/95 08031461 — 1 242 625.00 CK
050 MH 11/15/95 08031461 — 1 561 30.00 CK

DO NOT USE THIS SPACE

5. ASSIGNMENT DATA TO BE PRINTED ON THE PATENT (print or type)

(1) NAME OF ASSIGNEE: SEVENSON ENVIRONMENTAL SERVICES, INC.

(2) ADDRESS: (CITY & STATE OR COUNTRY) NIAGARA FALLS, NEW YORK

A. ☐ This application is NOT assigned.
☒ Assignment previously submitted to the Patent and Trademark Office.
☐ Assignment is being submitted under separate cover. Assignments should be directed to Box ASSIGNMENTS.

***PLEASE NOTE:*** Unless an assignee is identified in Block 5, no assignee data will appear on the patent. Inclusion of assignee data is only appropriate when an assignment has been previously submitted to the PTO or is being submitted under separate cover. Completion of this form is NOT a substitute for filing an assignment.

6a. The following fees are enclosed:
☒ Issue Fee ☒ Advance Order - # of Copies 10

6b. The following fees should be charged to:
DEPOSIT ACCOUNT NUMBER 23-3428
(ENCLOSE PART C)
☐ Issue Fee ☐ Advance Order - # of Copies ____
☒ Any Deficiencies in Enclosed Fees

The COMMISSIONER OF PATENTS AND TRADEMARKS is requested to apply the Issue Fee to the application identified above.

(Authorized Signature) Kevin E. McDermott (Date) 10-26-95

NOTE: The Issue Fee will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the Patent and Trademark Office.

**TRANSMIT THIS FORM WITH FEE-CERTIFICATE OF MAILING ON REVERSE**

PTOL-85B (REV. 4-94) (0651-0033)

4109