IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

SEVENSON ENVIRONMENTAL SERVICES, INC., )
)
Plaintiff, )
)
VS. ) No. 02-CV-0527A
)
SHAW ENVIRONMENTAL, INC., )
)
Defendant. )

APPEARANCES:

MR. KEVIN A. SZANYI,
MR. TODD M. SCHIFFMACHER,
Attorneys for the plaintiff

MR. GEOFFREY D. KRESSIN,
Attorney for the defendant

DEPOSITION OF JOHN P. FRANZ

AUGUST 12, 2004

HARPER & ASSOCIATES
COURT REPORTERS
P. O. BOX 1484
KNOXVILLE, TENNESSEE 37901
TELEPHONE (865) 546-8640

LASER BOND FORM B PENGAD • 1-800-631-6989 • www.pengad.com

INDEX


| EXHIBIT | | DESCRIPTION | PAGE |
|---|---|---|---|
| No. 1 | | Notice of deposition | 17 |
| No. 2 | * | Task Order DA-02 | 22 |
| No. 3 | * | Modification number one to Task Order DA-02 | 22 |
| No. 4 | * | Kansas City PRAC-3 contract | 25 |
| No. 5 | * | Baltimore TERC-1 contract | 25 |
| No. 6 | * | Slides used for Army meeting presentation | 43 |
| No. 7 | * | Pre-meeting communications re: Army meeting | 44 |
| No. 8 | * | Purchase prices for Colonie site equipment | 65 |
| No. 9 | * | Documentation for $260,000.00 equipment value | 66 |
| No. 10 | * | All Shaw monthly invoices to Army | 70 |
| No. 11 | | 9/21/99 memo to Brad Eaton from Tony Sheeran | 86 |


* Denotes late filed exhibits



LASER BOND FORM B PENGAD • 1-800-631-6989 • www.pengad.com

DEPOSITION

The deposition of JOHN P. FRANZ, taken by notice, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, before Walter E. Harper, Jr., Shorthand Reporter and Notary Public in and for the State of Tennessee at Large, on the 12th day of August, 2004, at the law offices of Luedeka, Neely & Graham, 1871 Riverview Tower, Knoxville, Tennessee.

It is agreed that the reporter may swear the witness, that he may take the deposition in machine shorthand, and reduce his notes to typewritten form.

All objections except as to the form of the question are reserved until the time of hearing.

Formalities as to caption, certificate, and transmission are expressly waived.

JOHN P. FRANZ,

having been first duly sworn, was examined and deposed as follows:

LASER BOND FORM B PENGAD • 1-800-631-6989 • www.pengad.com

(Deposition start time: 9:00 A.M.)

EXAMINATION

BY MR. SZANYI:

Q. Is it F-R-A-N-Z?
A. Correct.
Q. Mr. Franz, we met yesterday. My name's Kevin Szanyi, and I represent Sevenson Environmental Services. I'm going to ask you some questions. If you don't understand them, please tell me. I'll be happy to repeat or rephrase them as best I can. All right?
A. All right.
Q. And you know you need to give an audible response; correct?
A. I do.
Q. If you need a break at any time, I'm more than happy to accommodate you. Where do you live, sir?
A. In Alexandria, Virginia.
Q. What's your current position?
A. Program manager for the Kansas City PRAC-3 contract and Baltimore TERC contract.
Q. PRAC. What does that stand for?
A. It's an acronym for Preplaced Remedial Action

LASER BOND FORM B PENGAD • 1-800-631-6989 • www.pengad.com

Contract.

Q. I'm sorry?

A. Preplaced Remedial Action Contract.

Q. What does TERC stand for?

A. Total Environmental Restoration Contract.

Q. So you have these two different projects or phases?

A. Programs. I'm also a director, so I have oversight of other programs.

Q. When you say you're a director, what does that mean? A director of what?

A. It's a position in the company that means you have oversight responsibilities. There are program management responsibilities, which means you have actual contract management responsibilities to the government, you're named on a contract, and then a director is a company position for oversight of performance of other contracts.

Q. It's not a board of directors director?

A. No.

Q. Which company do you work for?

A. Shaw Environmental.

Q. How long have you been employed by Shaw Environmental?

A. Since it was purchased -- they purchased

LASER BOND FORM B PENGAD • 1-800-631-6989 • www.pengad.com

you were just managing different contracts?

A. Essentially, yes.

Q. The Baltimore TERC contract that you mentioned earlier, when did that contract come into being?

A. I guess that was first awarded to ICF Kaiser in '95. August of '95.

Q. And just generally speaking - I know the acronym you've told me - but in layman's terms, what is a TERC? What is that type of a contract?

A. Well, it's a contract that enables the contractor to provide full environmental services to the client, in this case the Army, including investigations, design, and remedial activities, versus the RAC contract, which is just a remedial action contract.

Q. Does a TERC contract cover a specific area as opposed to specific sites?

A. No, it would have its geographic limitations depending upon how the contract is scoped. Each contract has its own geographic scope to it. Some have nationwide scopes; some have a scope only to the district that is awarding the contract.

Q. All right. And you I assume became aware of this what we've called the Baltimore TERC when IT acquired Kaiser?

LASER BOND FORM B PENGAD • 1-800-631-6989 • www.pengad.com

A. Correct.
Q. And then was it immediately transferred to you as program manager?
A. Not immediately, no.
Q. When did it come to you?
A. That occurred in the end of July of '99.
Q. And who was the program manager prior to July of 1999?
A. Well, there was two. Chuck DeBelius was the original program manager, and he had a deputy by the name of Bruce Howard. And then Chuck moved to another position, and Bruce Howard took on the program manager.
Q. Chuck DeBelius and Bruce Howard. Were they Kaiser employees?
A. Correct.
Q. And then in July of '99, you assumed the duties from Bruce Howard?
A. Correct.
Q. Do Chuck DeBelius or Bruce Howard currently work for Shaw?
A. No.
Q. So as of July '99, you're the program manager for the Baltimore TERC; correct?
A. Correct.
Q. And what is the scope of the Baltimore TERC

LASER BOND FORM B PENGAD • 1-800-631-6989 • www.pengad.com

contract?
A. Well, as I just mentioned, the scope of service is to --
Q. I'm sorry. I know the scope of service, but what is the geographic scope of the contract?
A. It is to provide our services particularly in the Baltimore area of the Baltimore District. But since Baltimore was also designated as a lead environmental district, it was able to provide services to other locations within the North Atlantic Division. So essentially it was providing the services to other locations in the North Atlantic Division outside of what typically would have been Baltimore District's jurisdiction.
Q. The site we're here today to talk about is the Colonie, New York site; correct?
A. Correct.
Q. I assume that's outside the Baltimore District?
A. Correct.
Q. But within the North Atlantic Division?
A. Correct.
Q. Was that particular site already in operation or in some phase when you took over as program manager?
A. Correct.

LASER BOND FORM B PENGAD • 1-800-631-6989 • www.pengad.com

Q. What stage was it in when you took over in July of '99?

A. It was in mobilization.

Q. I understand the mobilization phase, but what phases would you say kind of characterize a project like this? What are the various phases? Would it be like investigation, mobilization, et cetera?

A. Well, typically you would do work plan development. You would bring equipment that you would need to start the work, you know, at least when you know what the initial work would be, bring people, then you would proceed with your approved work plans. And at that time, as I recall, they were fully engaged in bringing equipment and people on board.

Q. Had the work plan already been developed when you took over?

A. I believe it had been.

Q. Had it been finalized and approved?

A. I believe so. I can't be for sure.

Q. I know that you were the program manager for the entire TERC, and therefore, I assume, had like overall responsibility at the company for the Colonie site; is that right?

A. Correct.

Q. In terms of the chain of command under you



LASER BOND FORM B PENGAD • 1-800-631-6989 • www.pengad.com

directly related to the Colonie site, who would be the next person under you?

A. Tony Sheeran.

Q. So he reported directly to you?

A. Right.

Q. As of July '99?

A. Correct.

Q. He said he started there in April '99.

A. Correct. At the end of July technically, because at that time, Bruce and I had a relatively slow transition because I still had work I was doing on my Atlantic contract because they wanted me to transition out slowly and there was other work going on that demanded my attention, so Bruce maintained a lot of contact with the work associated with the other work, so there was things going both ways in terms of management and administration of the contracts.

MR. SZANYI: Okay. Mark that for me.

(Exhibit Number 1 was marked.)

Q. I'm going to show you Exhibit Number 1 to today's deposition, which is the notice of the deposition for today. Have you seen this before?

A. Yes.

Q. And I've been told that you are being produced today with respect to items one, two, and seven



LASER BOND FORM B PENGAD • 1-800-631-6989 • www.pengad.com

degree?

A. I think they have soil there that was to the level that it did not need to be removed off-site.

Q. But it all has some readings in it, as he testified?

A. Probably background readings.

Q. I think he also testified that all of the soil that's been through the pug mill has some radioactive readings?

A. Well, anything that would have gone through the pug mill would have been soil that would have been destined to go off-site, I believe.

Q. So it would have a minimum level of radioactivity; right?

A. Correct.

Q. And the level was high enough that it couldn't stay on-site; true?

A. Correct.

Q. But it also had the metals problem, which is why it's going through the pug mill?

A. Right.

Q. When Shaw acquired the assets of IT, including this contract to do work at Colonie, at that moment in time, you were certainly aware of Sevenson's claims of patent infringement; correct?

LASER BOND FORM B PENGAD • 1-800-631-6989 • www.pengad.com

A. Correct.

Q. And a decision was made at that time to continue using the same phosphoric acid treatment process at Shaw that had been used at IT; correct?

A. Correct.

Q. So there was in fact a conscious decision, "It's a new company, we know about Sevenson's claims, but we don't think it's being infringed, so we're going at it." True?

MR. KRESSIN: Object to compound question.

A. You could call it a conscious decision in the sense that the decision was made not to change the process.

Q. A conscious decision not to do anything different; right?

A. Right. Because the same personnel were in place between the two companies.

Q. So this is not a situation where Shaw decided to move ahead unaware of Sevenson's patent; they certainly knew about it when they took over; right?

MR. KRESSIN: Object to the form of the question. Compound. Beyond the scope of this deposition.

A. Shaw as a company, the personnel in the

LASER BOND FORM B PENGAD • 1-800-631-6989 • www.pengad.com