IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

| | |
|---|---|
| SEVENSON ENVIRONMENTAL SERVICES, INC.,<br>Plaintiff,<br>vs.<br>THE UNITED STATES,<br>Defendant,<br>and<br>SHAW ENVIRONMENTAL, INC.,<br>Defendant-Intervenor. | Case No.: 05-1075C<br>Judge Thomas C. Wheeler |

**DECLARATION OF KARL W. YOST**

I make this declaration under the penalties of perjury pursuant to 28 U.S.C. § 1746:

1. I am the Environmental Services Manager for Wilder Construction Company ("Wilder") where I have been employed since January 1997. Prior to employment with Wilder, I was the Director of Treatment Services for Sevenson Environmental Services, Inc. ("Sevenson"). I started employment in 1993 when Sevenson acquired the assets from the bankruptcy court of MAECORP Incorporated (MAECORP). At MAECORP I was the Vice President of Treatment Services.

2. Since June 2004, I have been retained as an expert by Sevenson in connection with legal proceedings arising out of a soil remediation project undertaken by the United States (the "Government") and its contractor IT Corporation/Shaw Environmental Services, Inc. ("Shaw") at a site located in Colonie, New York (the "Site").

A. **Summary of Testimony**

3. I have reviewed the summary judgment motion papers filed by Sevenson and the Government/Shaw in the Court of Federal Claims. I have also reviewed the Court's March 28, 2007 decision construing terms in the patents. As discussed more fully below, based on my personal knowledge and expertise with the patented technology and, in addition, the materials reviewed since June 2004, I submit this declaration in support of the following facts.

4. First, the Prayphos P5 phosphoric acid product used at the Site is a first mixture comprising separate and distinct compounds of sulfates and phosphates as these terms have been defined in the Court's decision. As one of the inventors of the patented technology and, in addition, in my role as technical director, or supervising manager of soil treatment projects for MAECORP, and later Sevenson, and now with Wilder, I have personal knowledge concerning MAECORP/Sevenson/Wilder's use of phosphoric acid to treat lead contaminated soil and other environmental media. Contrary to the positions asserted by the Government: (a) the inventors contemplated, and the patents claim, the use of phosphoric acid having sulfate and phosphate components as the "First Mixture"; (b) MAECORP, Sevenson, and Wilder used phosphoric acid to supply sulfates and phosphates to lead contaminated soil; (c) purer and lesser grade phosphoric acid each worked to reduce the amount of leachable lead to levels below the criteria established by EPA; and, (d) the co-inventors never disclaimed the use of phosphoric acid to overcome the prior art.

5. Second and contrary to the assertion of the Government expert, the sulfates in the Prayphos P5 phosphoric acid were present in adequate quantities to participate measurably in the chemical reactions defined in the patents. As the inventors proved, sulfates serve as an initiating reactant for the lead-sulfate-phosphate reaction taught by the patents. We advised the Patent

Office that as little as one ion of sulfate is enough to initiate the reaction resulting in the chemical stabilization process. It was on this basis that the Patent Office approved the patents. A treatability study for a particular site would determine whether a purer grade phosphoric acid, such as the Prayphos P5 product, could be used or whether such a product required supplemental sulfate. In fact, Kiber's treatability study report states they used a "laboratory or reagent grade phosphoric acid". This type of acid is even more pure and costly than the Prayphos P5 product, and yet, Kiber demonstrated its effectiveness in the lead-sulfate-phosphate technology taught by the patents. In most cases, the decision whether to use a purer or lesser grade phosphoric acid product at a site depends more on issues concerning cost and availability of the product. In my opinion, as based on basic foundations principles of chemistry and various experiments demonstrating reactions at the molecular level, the sulfate in the Prayphos P5 product was sufficient to initiate the lead-sulfate-phosphate reactions defined in the patents resulting in the reduction of leachable lead levels in the soil at the Site to below EPA's criteria. While the Prayphos P5 product predictably treated the Colonie material, it was also an unnecessarily more costly reagent to the Government's project, and used at full-scale implementation by Shaw contrary to the recommendation of Kiber and the teachings of the patents.

6. Third, the patents teach that re-treatment using additional sulfates and phosphates contained in phosphoric acid is the preferred method when initial treatment fails to reduce the leachable heavy metals to below 5.0 mg/L. This is an example of the two-step method claimed by the patents.

7. Fourth, the science applicable to the lead-sulfate-phosphate treatment method claimed by the patents teaches that concentrations of leachable radionuclides in the lead contaminated soil will be reduced. It also teaches that the total volume of material will be

reduced. The contrary positions asserted in the Government's papers are contrary to fundamental laws of science and, in the case of the volume reduction issue, based on faulted test methods that failed to replicate actual conditions and performances executed at full-scale in the field.

## B. Personal Knowledge Of The Facts Presented In This Declaration And Qualifications For Expert Opinions

8. In 1977, I received a Bachelor of Arts degree from Albion College in Biology with an emphasis and minor in Chemistry.

9. In 1989, Dr. Dhiraj Pal and I co-invented a chemical treatment technology, trademarked as the MAECTITE® chemical treatment, which, for the first time, claimed a lead-sulfate-phosphate system to reduce the leachability of heavy metals such as lead found at hazardous waste levels in soils and other solid wastes. Dr. Pal was instrumental in the realization of sulfate, calcium, gypsum and other related species in the inventions' reactions. I contributed the phosphate component and the mixed mineral formation concept, as well as operational and incidental parallel benefits such as aqueous reagent forms for dust control, mixing/reagent dispersion, ease of application and metered control. At MAECORP, the technology was applied in a variety of remedial projects that primarily targeted leachable lead in soils, sludges, battery casings, and other materials at uncontrolled waste sites. MAECORP clients included public sector owners at the federal and state level, as well as numerous private companies.

10. When Sevenson acquired the assets of MAECORP, including the MAECTITE® patents and applications, Sevenson hired many MAECORP employees on my staff, and others from other areas of the company. Sevenson continued to support, market and develop the technology. Development of the technology resulted in patent improvement applications that subsequently progressed to patent issuance by the U.S. Patent Office and foreign countries.

Many of the patent improvement applications were prepared, in a state of preparation and/or patents issued while I was employed by Sevenson. Several applications and subsequent patents were not prepared or issued until I had departed Sevenson's employment in 1997, however, I was involved with some review of these later patent applications, and assigned my rights in them to Sevenson.

11. Since I have been employed by Wilder, Wilder has applied the MAECTITE® treatment technology on a variety of competitively bid projects including National Priority List Superfund and other sites in the western United States. I have no financial interest in the MAECTITE® technology, or Sevenson. As part of my duties at Wilder, I am responsible for prudent evaluation of treatment efficacy and competitive utilization of technologies that may be applicable for the various competitive bid opportunities we encounter. Wilder purchased MAECTITE® (phosphoric acid) directly from Sevenson for projects where Wilder proposed the MAECTITE® treatment process for leachable lead processing and was awarded remedial project contracts. To date, I still have yet to find a more cost effective, efficient, and reliable treatment technology for the treatment of leachable lead in soils and solid waste where end-product geotechnical properties are not critical to the project.

12. Other technologies that I have actively evaluated and/or pursued through successful full-scale implementation at contaminated waste sites during the course of my career include, in part: thermal desorption/incineration; reverse osmosis; InSitu Vitrification; UV-Peroxidation; insitu sparging; cement and other pozzolanic stabilization; bioremediation; chemical oxidation and reduction; and low permeability MatCon® asphalt pavement for RCRA caps. MatCon® asphalt pavement is a proprietary and patented technology I co-invented while at Wilder (U.S. Patent 7,077,602)

13. I have been responsible for the evaluation, development, testing and/or full-scale implementation of various innovative and off-the-shelf technologies that reduced the volume, mass and/or toxicity of waste streams to reduce the cost of environmental site remedies for various clients. The success of these technologies is based upon: accurate and effective treatability studies and standard laboratory procedures; an understanding of material handling and processing methods; full-scale system controls; and a working knowledge of applicable federal and state environmental regulations.

14. Attached at Exhibit "A" is a copy of my resume. Attached as Exhibit "B" is a list of representative publications that I authored or co-authored concerning the lead-sulfate-phosphate treatment method taught by the patents. Attached as Exhibit "C" is a list of U.S. Patents that have been issued for the inventions I co-invented and assigned to Sevenson. Attached as Exhibit "D" is a list of prior art patents that I have reviewed including the O'Hara '356 and Stanforth '033 patents identified in the Government's brief. Attached at Exhibit "E" is a list of other materials that I have reviewed since June 2004, in connection with this case. Attached as Exhibit "F" is a copy of a paper I co-authored in 1994 for the 49th Annual Purdue Industrial Waste Conference.

15. In summary, I have personal knowledge concerning the invention, development and use of the MAECTITE® technology to treat lead contaminated wastes. This knowledge includes the invention of the patented MAECTITE® lead-sulfate-phosphate technology for treating lead contaminated soil, including the role of sulfates in the technology. It includes all matters relating to the patents and prosecution history at least until my departure from Sevenson in 1997. Such matters included our ability to distinguish the MAECTITE® technology from the lead-phosphate-hydroxide system taught by the O'Hara '356 and Stanforth '033 patents. It

extends to the commercial application of the technology including the realization that either purer or lesser grade phosphoric acid in a single step may supply the required sulfates and phosphates. In addition, I have reviewed the stipulated facts concerning the Prayphos P5 phosphoric acid used at the Site and the Kiber treatability study upon which such use was based.

## C. The Inventors Contemplated The Use Of Phosphoric Acid As A Method To Practice The Single-Step Claims In The Patents

### 1. Prayphos P5 Phosphoric Acid Is A Mixture That Satisfies Claim 1 Of The '982 Patent.

16. The Prayphos P5 phosphoric acid product used by the Government infringes the single-step claims in the patents. Simply put, the Prayphos P5 product is a first mixture comprising a first and second component. One component includes separate and distinct compounds of sulfate. Another component includes separate and distinct compounds of phosphate.

17. Generally speaking, phosphoric acid is a mixture of compounds and contains the sulfate and phosphate required to practice the patented technology. Within the chemical manufacturing industry, Prayphos P5 is considered a "technical grade" of purified phosphoric acid. The Government's assertion that Prayphos P5 is a "purified" acid is correct and consistent with the manufacturer, however, it does not mean the product is not considered "technical grade". The term, "technical grade" phosphoric acid covers a wide spectrum of different phosphoric acid quality. In my opinion, "analytical", "laboratory" or "reagent" grade phosphoric acid has the purity to be considered outside of the industry-accepted nomenclature of a "technical grade" phosphoric acid.

18. Regardless of purity, phosphoric acid has a sulfate component that is separate and distinct from the phosphate component. The sulfate ($SO_4^{-2}$) component contains sulfur and has a

-2 charge in its ionic state. The phosphate ($PO_4^{-3}$)component contains phosphorus and has a -3 charge in its ionic state. They have different bonding strengths, and radii at the molecular level. They are not similar chemically and are, therefore, separate and distinct compounds.

19. The Prayphos P5 phosphoric acid product reflects these characteristics. It is manufactured by taking phosphate rock that contains phosphate and calcium and mixing this material with sulfuric acid (sulfates + hydronium ions) under controlled temperature and pressures. The resulting phosphoric acid is purified using solvents and other means to remove sulfates, fluorides and other "impurities" to the extent possible. Sulfuric acid is a liquid. Phosphoric acid is a liquid. Acids consist of hydronium ions (to a greater degree) and hydroxide ions (to a lesser degree) along with their respective "namesake" anions (phosphate and sulfate). Not all sulfates are removed. Phosphoric acid constituents in the Prayphos P5 product, thus, include: hydronium ions, phosphate ions and sulfate ions. This product is a mixture of acids containing components of the predominant phosphates and sulfates in acid form including hydronium ions and phosphate ions as phosphoric acid and sulfate ions as sulfuric acid. Further, and unequivocally, Prayon removes sulfates from its product separately and distinctly from the phosphates that are left behind. If sulfates were not separate and distinct, they could not be removed, and Prayon would not have the high quality technical grade "purified" product that they market and profitably sell as Prayphos P5.

**2. Evolution Of The Patented MAECTITE® Technology**

**(a) Invention Of The MAECTITE® Technology**

20. When Dr. Pal and I first set out to develop a treatment approach for leachable lead in soil and solid waste we did so with the following criteria as limits:

- The process had to reduce the toxicity of lead (decharacterize) in the material to allow for its disposal at a licensed Subtitle D landfill, instead of a licensed

Subtitle C landfill (i.e. the waste could not exhibit lead toxicity characteristics when tested in accordance with the EP TOX and total lead extract as established by SW-846 methods and RCRA.) EPA subsequently changed the sample extraction procedure to Toxic Characteristic Leaching Procedure (TCLP), replacing the EP TOX method.

- The costs of on-site processing coupled with the costs of waste transportation and waste disposal at a licensed Subtitle D landfill had to be less than the transportation and disposal costs at a licensed Subtitle C landfill.

- The process could not yield any secondary or partially treated waste streams that potentially could contain or generate costly to handle materials and unacceptable levels of lead (e.g. contaminated wash water, wet soils etc.)

- The process had to yield an end-product that contained no free liquids when subjected to the paint filter test to accommodate landfill regulations banning the internment of free liquids.

- The process had to yield an end-product (soil-like) that could be easily retreated without the need to crush and/or otherwise resize monolithic structures common to cementitious process end-products.

- The process had to yield an acceptable end-product within a expedient and suitable time frame to enable rapid verification of treatment so that the need to store material onsite and place job site resources on standby was minimal.

- The process had to be technically sound and readily reproducible to gain acceptance by the state and federal regulators, and simplistic for contractor personnel to easily implement.

21. After reviewing a number of existing techniques, Dr. Pal and I focused on chemical treatment. During this phase of the research and process development, we referred to the Handbook of Chemistry and Physics to gain valuable information related to solubility products of various inorganic compounds and salts, particularly lead, in water. This provided a basis for reagent selection, however, we learned that pH of the solvent:solute system and the affinity of solvent ions with the solute ions was critical to successful processing. The Handbook provided solubility products for various salts in water and other solvents, including phosphate and sulfate compounds. However, the reference provided no insight as to solubility product

stability in solvents similar to a buffered acetic acid as called for by the EP TOX procedure. Initial attempts to supplement waste with various forms of calcium, sulfate and phosphate yielded encouraging, yet unreliable results. Reagents that we worked with that yielded favorable results were listed in the patents, however, we found that various doses of sulfates and phosphates were most effective when applied in dissolved liquid states, and when the reagent was acidic. We found that the acidity provided by the acid favorably disassociated various lead compound species that were partially soluble in water, but more fully leachable in the EP TOX extraction fluid. When treated with acidic reagents, the these lead compounds would disassociate and dissolve and the resultant lead cations would be free to react with the reagent anions, both sulfate and/or phosphate.

22. To fully understand the chemistry and geochemistry of the invention reactions, we submitted cured samples to electron microscopy evaluation. These results, presented in part in the patents, revealed minerals in both the apatite/pyromorphite (phosphate) and anglesite/barite (sulfate) mineral families. These results enabled us to work through the chemical form of the reactants, and the stoichiometry of the pursuant reactions on a molecular basis. We were able to show that just one molecule of sulfate is able to react with one or more molecules of lead. Although the stoichiometry we identified clearly shows that four lead cations can be tied up by only three phosphate anions in a much more efficient ratio of reactants, we also presented in our Purdue paper that mineral twinning of rhombic structures at the molecular crystal level by barites/anglesites yielded pseudo-hexagonal apatites with similar stability behavioral characteristics. This demonstrated the importance of only trace amounts of reactants in the sulfate and phosphate groups, that are manifested at the molecular and ionic level, the basic foundation of all chemical reactions. As published in numerous marketing and technical

MAECTITE® papers and presentations, and taught by the patents, this technology is a chemical treatment process that relies upon the chemical bonds between ions and molecules, and not an entrapment stabilization or hydration solidification system that relies upon binding mechanisms.

23. As we became more proficient and confident with the full-scale processing of soils containing lead in the field we found we were able to apply the invention reactions and chemistry using simple equipment and methods such as excavators, pumps and water to aid in reagent dispersement. Incidental dust control benefits of liquid phosphoric acid and water were not lost on those practiced and familiar with the process implementation in the field at contaminated remedial sites. Water is also a key component to the successful progression of the invention's chemical reactions where it serves as a mixing aid, and facilitates compound disassociation to reactive ions, and the contact of target metal cations with reactive anions in soil:soil, soil:liquid, or liquid:liquid states.

24. In summary, Dr. Pal and I invented a lead-sulfate-phosphate technology for treating heavy metals in solid wastes. This technology represented a departure from existing phosphate treatment methods. All then-existing methods, including those described in the O'Hara '356 and Stanforth '033 patents, teach a lead-phosphate-hydroxide technology. Such methods teach the need for hydroxides to maintain a required alkaline pH in order for the phosphates and hydroxides to react with the heavy metals. These methods did not overlap or reflect the teaching of our invention where lead and radionuclide solubility and leachability are reduced as a result of sulfate and phosphate reactions. The lead-phosphate-hydroxide system had been known for some time. The lead-sulfate-phosphate system was new and previously unknown prior to our invention.

**(b) Discovery Of A Single-Step Application Of Phosphoric Acid To Supply The Required Sulfates And Phosphates**

25. The original '936 patent claimed only a two step process. The first-step involved mixing the contaminated material with sulfate. The second step involved the addition of phosphate. The diagrams in this patent, and later patents, reflected this two-step process. As our understanding developed, we demonstrated that phosphoric acid alone supplied the necessary sulfates and phosphates to render contaminated material non-hazardous. Several examples of these "tests" are disclosed in the '982 patent and recited in Sevenson's brief. We further established the commercial viability of using phosphoric acid in a single-step to supply sulfate and phosphate to render a material non-hazardous.

26. In the fall of 1992, MAECORP was awarded a competitively bid cleanup of the Traub Battery NPL site directly by EPA under their Pre-Qualified Offerors Procurement Strategy contracting mechanism. MAECORP performed a treatability study to optimize the technology. During that study a sample of phosphoric acid was used. We did identify at the time that the acid contained sulfates during a review of the product's Material Safety Data Sheet and some "lot" analytical assay data. The results of the study indicated that phosphoric acid alone, and phosphoric acid with gypsum both treated the waste rendering TCLP lead levels to below 5.0 mg/L with untreated soil characterized for TCLP lead levels in excess of 3200 mg/L. However, during the up-scaling of the results to full-scale production levels, MAECORP was not willing to take the financial or contractual risk that using phosphoric acid alone would adequately perform at full-scale on TCLP lead levels of this magnitude on all soils and material onsite. MAECORP, therefore, provided for the full-scale proportional addition of both phosphoric acid and gypsum reagents into a mixer. Acid was delivered by pump from a tank, and gypsum was added from a silo via a programmable weigh-belt feeder.

27. During full-scale operations, the logic controller and silo augur malfunctioned and prevented gypsum addition. It was noticed that material treated with only phosphoric acid still passed the TCLP test. During the winter of 1992-93, after the Traub project, we performed additional treatability studies to expand the results of our Traub treatability study in efforts to confirm our findings on a full-scale project. This effort culminated directly in our patent improvement amendment to our March 15, 1993 patent application (issued as patent '982) for the single-step reagent addition of phosphoric acid, and its full reversibility, or, in the alternative, the two-step process involving the addition of gypsum or other sulfate material.

28. After the '982 patent, the single-step use of phosphoric acid became the primary method to practice the patented MAECTITE® treatment method. Often, we used a less pure phosphoric acid containing a higher amount of sulfates as impurities. For large treatment jobs, the less pure phosphoric acid was more available and cheaper compared to a product such as Prayphos P5. The higher sulfate content in the phosphoric acid simply meant that it was less likely that we would need to supplement the treatment method with, for example, gypsum.

29. For smaller jobs, availability and cost generally requires the use of a phosphoric acid similar to the Prayphos P5 product. Treatability studies were conducted to determine whether such a product adequately rendered the material non-hazardous. In particular and while at Wilder, I supervised a treatability study using reagent grade phosphoric acid as an initial evaluation tool for the efficacy of the process on soil from a former steel scrap yard. While the laboratory grade acid predictably worked to reduce TCLP lead leachability, the study was successfully repeated for optimization using a product sample of the phosphoric acid that was supplied for full-scale to Wilder by Sevenson. As Kiber also demonstrated during its treatability on soil from the Colonie site, and as Shaw demonstrated at full-scale, we found that a single-step application of the higher grade phosphoric acid worked. If it would not, we preferably planned to retreat the material with additional phosphoric acid or, with less desire, supply additional sulfate. Notably, the '982 patent specifically refers to re-treatment with additional phosphoric acid as a means to have the technology work.

**(c) Summary**

30. As the patented MAECTITE® treatment process evolved, MAECORP/Sevenson discovered that a single-step application of phosphoric acid supplied the sulfates and phosphates needed to reduce the amount of leachable heavy metals in contaminated soils and solid waste. Experimentation showed that both less pure and higher grade phosphoric acid worked. Less pure phosphoric acid is used more frequently because of its greater availability in bulk quantities at a lower cost. More pure forms can be used for smaller jobs because lesser grades are generally available only in bulk. Where the more pure form phosphoric acid was used, a treatability study would show whether additional sulfate and/or re-treatment would be required. Where less pure acid was utilized after our discovery, it was not.

31. The single-step and two-step claims in the '982 (and subsequent) patents reflect this discovery. The single-step claims were expressly designed to include the mixture phosphoric acid based on its ability to supply sulfates and phosphates to the untreated material. The two-step claims continued to be asserted for the situation where additional sulfate was required.

### 3. The Government's Argument That Phosphoric Acid May Not Be Used To Practice The Single-Step Claims Is Without Merit

32. The Government argues that MAECORP/Sevenson disclaimed the single step application of phosphoric acid in its patents and to the USPO. This position is based on a misunderstanding of the lead-sulfate-phosphate technology taught by the patents and our ability to distinguish the lead-hydroxide-phosphate method taught by O'Hara '356 and Stanforth '033.

33. The entire purpose of the '982 patent was to establish for the first time that the MAECTITE® process claimed the single-step application of a mixture such as phosphoric acid. Otherwise, there would have been no reason to file this continuation-in-part. The '936 patent already claimed the two-step process involving the separate application of sulfate (e.g. gypsum) and phosphate (e.g. phosphoric acid). The inventors clearly never intended to disclaim the single-step application of phosphoric acid in the application for the '982 patent and we did not.

34. The '982 patent contains only one negative reference to the single-step application of phosphoric acid. At Col. 16, lines 45-65, we simply stated that in the one test example, the single-step application of phosphoric acid did not work and that a two-step treatment process involving the addition of gypsum would be necessary. This discussion of one example was never intended as a general disclaimer against a single-step application of phosphoric acid. It was limited only to the one example and was included to demonstrate the flexibility of the technology whereby other reagents can be used to supply the required reactants

of the lead-sulfate-phosphate system. Notably, the ‘982 patent contained numerous examples showing that the single-step application of phosphoric acid worked. Moreover, this discussion underscores the difference between the one-step claims (e.g. Claim 1) and the two-step claims (e.g. Claim 12) of the ‘982 patent. It shows that the two-step process was the one that involved the use of a separate mixing step to introduce gypsum into the treatment process. It is further evidence that the one-step process involved a single mixture such as phosphoric acid.

35. The Government’s reference to the patented MAECTITE® process as a two-tank system where phosphoric acid can only supply the Group II chemical (i.e. phosphate) is erroneous. The discussion of the two-tank system in the patents and the use of phosphoric acid to supply the Group II chemical simply refers to the two-step claims in the ‘982 patent. They refer to a method to practice the two step claims that involved the use of gypsum to supply sulfates and phosphoric acid to supply phosphates. They do not embody the evolving process and discovery that phosphoric acid may supply sulfates and phosphates in a single-step process.

36. Finally, the Government argues that Sevenson advised the U.S. Patent Office that its patents did not cover the single-step application of phosphoric acid in order to overcome the prior art of O’Hara ‘356 and Stanforth ‘033. I was personally involved in these communications with the U.S. Patent Office and deny that Sevenson made any such disclaimer.

37. The O’Hara ‘356 and Stanforth ‘033 patents teach an entirely different technology. Both patents teach that lead is stable in the presence of hydroxides and phosphates. The O’Hara ‘356 patent, for example, requires the use of calcium oxide or hydroxide to control the pH level of the reaction at between 7.5 and 12.0 Standard Unit (“S.U.”). Similarly, Stanforth ‘033 requires the presence of magnesium oxide or hydroxide to control pH and ensure that it is in

a similar alkaline range as a result of hydroxide concentration. These are examples of the lead-phosphate-hydroxide technology.

38. The prosecution history shows that Sevenson overcame O'Hara '356 by filing a patent application amendment deleting hydroxides, lime and Portland cement and their references and claims from a reagent group required for the Sevenson patents. As a result of this deletion, the remaining components of the reagent group are limited to sulfates, gypsum, halites, alum and/or other items that can supply sulfates, halites and/or silicates. O'Hara '356 does not teach that any of these remaining constituents are required for his technology. This amendment eliminated any possibility that there was an overlap of the Sevenson and O'Hara patents with respect to lime and hydroxides. Thus, Sevenson did not overcome O'Hara by disclaiming the use of phosphoric acid as a mixture that can be used to supply sulfates and phosphates.

39. The Government refers to one sentence from page six of my fifteen page declaration to the US Patent Office dated September 8, 1994 where I stated that "the present invention uses a sulfate source in addition to phosphoric acid" as evidence that the Sevenson patents overcame O'Hara '356 by disclaiming use of phosphoric acid as a source of sulfates and phosphates. This is a distortion and out-of-context reading of this statement. The referenced statement simply emphasized a critical difference between O'Hara '356 and the MAECTITE® process. Because O'Hara required control of pH at an alkaline level, the presence of sulfate was an impediment to his process. In contrast, the MAECTITE® process specifically demands the presence of sulfate and its process works *regardless* of pH. To overcome O'Hara '356, Sevenson deleted all references to lime and/or hydroxide as a Group I treatment chemical. Sevenson never disclaimed the use of phosphoric acid as a source of both sulfates and phosphates.

40. The Government misconstrues Sevenson's discussion of O'Hara '356 in the document attached at Exhibit "9" at Bates Numbers G003054-3056. In this discussion, Sevenson simply points to O'Hara's address of the presence of sulfate in his process which he viewed as a negative. Sulfate presence in an acidic system is an indicator of sulfuric acid, which O'Hara teaches, prevents the desired immobilization of lead. The entire discussion was included simply to highlight the contrast between the two patents – in Sevenson's patent, the sulfate in the presence of phosphate promoted the chemical reaction whereas in O'Hara, the presence of sulfate (excess acidity from sulfuric acid thus low pH) needed to be controlled in order for the lead-phosphate-hydroxide reaction to work. Nothing in this discussion remotely suggests that phosphoric acid alone could not be used as a source of both sulfates and phosphates. In fact and contrary to Sevenson's technology, O'Hara could not render lead non-leachable when the pH was acidic without hydroxide. Clearly, phosphoric acid alone without adequate hydroxide to maintain an alkaline pH was not effective.

41. Similarly, Sevenson overcame the lead-phosphate-hydroxide system covered by Stanforth '033 by filing a patent application amendment deleting hydroxides, lime and Portland cement and their references and claims from a reagent group required for the Sevenson patents covered by this amendment. As a result of this deletion, the components of the reagent group was limited to sulfates, chlorides, fluorides, halites, halides and silicates that were not anticipated by Stanforth '033. Again, Sevenson did not overcome or distinguish Stanforth on the ground that its process used more than one additive to supply sulfates and phosphates. As the discussion on Exhibit "12" at G004661 makes clear, Sevenson overcame Stanforth by deleting hydroxides which was a critical and necessary feature of the patented Stanforth technology. Nothing in this

patent application amendment states that phosphoric acid could not be used in a single-step to supply the sulfates and phosphates necessary to practice the patented MAECTITE® technology.

**D. The Sulfates In The Prayphos P5 Phosphoric Acid Product Would Have Participated Meaningfully In The Lead Stabilization Process At The Site**

42. The Government claims that the amount of sulfate in the Prayphos P5 phosphoric acid product was too negligible to participate meaningfully in the lead stabilization process at the Site. This is incorrect. The science supporting the MAECTITE® technology establishes that the sulfate levels in the Prayphos P5 product were sufficient to serve as an initiating reactant and participate measurably in the chemical reactions defined in the patents and in the effective and successful stabilization process at the Site.

**1. The Applicable Science Establishes That The Sulfate In The Prayphos P5 Product Participated Meaningfully In The Stabilization Process At The Site**

43. The Summary of the Invention (Col. 2, Lines 25-35) of the'982 patent discloses the reaction of lead with a sulfate ion and a phosphate ion in two steps to render lead non-leachable in accordance with the TCLP extraction method. While the patent also teaches single step mixing, it is clear that the importance of both sulfate and phosphate ions to reduce the leachability of lead is identified. The Sevenson technology process can best be described from a chemist's perspective. Examination of the process reactions between lead, phosphate, and sulfate and their resultant end product minerals, reveal the incorporation of the reactants into the mixed mineral species at the molecular level.

44. In a simplistic review of chemical formula and reactions, *Modern Chemistry* (1966), a high school chemistry textbook, teaches that lead sulfate ($PbSO_4$) is composed of one lead ion and one sulfate ion as follows: $Pb^{+2} + SO_4^{-2} \rightarrow PbSO_4$. Further, review of prior art, expresses the importance of process reactions at the ionic molecular level. In fact, the entire

formation of stable non-leachable lead mineral forms in this case is based upon the field of geochemical mineral formation from the reaction of lead ions with other reactant ions.

45. While it is true that one ion of lead cannot be quantified by analytical methods, and that the lead-sulfate-phosphate mineral product containing this lead ion would also not be detectable, the process taught by the Sevenson patents is based on these reactions, where as, in similar, but more limiting fashion the lead-hydroxide-phosphate system relies on reactions of ions, but with sufficient supply of hydroxide ions to maintain an alkaline pH. Sevenson's process has no such limiting factor for sulfate, as does both O'Hara and Stanforth for hydroxide. With respect to lead presence, in fact, it was not until samples of soil with percent levels of leachable lead were treated and studied that Dr. Pal and I were able to confirm sulfates, in the presence of phosphates, were essential to the reduction of lead leachability. We verified the mixed lead-sulfate-phosphate minerals in end products by geochemical mineralogical spectrometry and microscopy techniques. It was from this data that we were able to identify the synthesized mixed lead-phosphate-sulfate minerals for the first time.

46. Yost, et. al. (Purdue 1994, Exhibit F) discuss the importance of mineral nucleation at the molecular level where Apatite and Barite minerals, through crystallographic twinning, precipitate as mixed mineral forms within the lead-sulfate-phosphate system. For the Barite minerals, lead sulfate (anglesites) forms orthorhombic symmetric mineral forms. Through twinning, these align in replication of the lead-phosphate hexagonal apatite crystal forms. In the process substitution within dissolution-precipitation reactions, sulfates are consumed and the reaction-series shift occurs changing to apatite reaction-series that incorporate phosphate forms. These reactions occur at the molecular ionic level. As crystal nucleation continues, reactants (ions of lead, phosphate, and sulfate) are consumed until equilibrium is reached. The reaction

series begins when an ion of each species are brought into solution with each other. It ends when the supply of a reactant is exhausted. That point of exhaustion is typically predicted by means of treatability studies where optimization of treatment additives is determined. For the Sevenson process, sulfate and phosphate ions are provided at optimal ratios for each specific untreated material until the reactive lead is consumed in the formation of the lead-sulfate-phosphate mineral system. Those lead ions that are not fully reacted with phosphate and sulfate are leachable and quantified within the extract of the EP TOX or TCLP methods at the part per million (mg/L) level. For a waste to be classified under RCRA as toxic for lead, only 0.1 mg/L of lead is required in the extract above the 5.0 mg/L regulated limit.

47. The Sevenson patents show that lead in the presence of sulfates and phosphates form, in part, mixed calcium lead phosphate sulfates. Table 1 (Col 7, line 50) of the '982 patent lists various lead mineral forms that were identified by x-ray fluorescence (XRF), polarized light microscopy (PLM), and scanning electron microscopy. Soil containing lead was treated with phosphoric acid and gypsum (suppliers of both phosphates and sulfates). The treated samples were submitted for mineralogical assay using the aforementioned techniques. The results were remarkably clear that in accordance with relative abundance lead hydroxy apatites (31-41%), mixed calcium lead phosphate sulfates (28-29%), and mixed calcium lead anglesites (22%) were the predominant identifiable species within the treated matrix. This was the first time that lead minerals consisting of a lead-sulfate-phosphate composition had been identified after treatment and subsequent mineral synthesis within a waste matrix, and that the minerals would behave like naturally occurring rock phosphates and hard sulfates. Prior to this teaching, no other prior art anticipated, identified, or taught how to synthesize such mixed mineral suites that contain lead, phosphates, and sulfates, and that are resistant to leaching as tested by the USEPA's EP TOX or

TCLP extraction methods. When looking at Table I mineral forms that contained lead-sulfate-phosphate forms, the combined abundance was 29-31% as confirmed by geochemical mineralogical assay characterization. It is clear from this data, that approximately 30% of the immobilized lead was in the form of lead-phosphate-sulfate forms for this example. It is also clear that when one looks at the chemical reactions, the reactants and end products are based upon the reaction of molecules in various soluble, disassociated ionic forms.

48. The'982 patent also provided some examples of the chemical reactions that take place as a result of the process. One reaction end product formed from the treatment of lead carbonate in soil yielded mixed calcium lead phosphate sulfate (Col. 8, Line 8). In this reaction, the stoichiometry shows that for each sulfate ion provided as a reactant, four (4) lead ions are incorporated into the end product mineral. A second reaction from the treatment of a lead-humus (organic) soil yielded organo-lead phosphate sulfate (Col. 8, Line 14). The ratio of sulfate:lead in soil with high natural organic content also shows efficiency of the process reactions in that three (3) lead ions are incorporated into the mixed mineral end product for each sulfate ion. From these, it can be clearly seen that for each part per million of sulfate within or supplemented to the reaction process of the technology with phosphates, three (3) or four (4) ppm of lead can be rendered non-leachable.

49. In the '367 patent, the geochemical structure of apatites are reviewed along with their various ion substitution mechanisms. The general apatite structure $(AB)_5(XO_4)_3Z$ consists of a variety of cations including lead and radionuclides and anions including phosphates and sulfates (Col. 6, Lines 5, 11, 17, 21, 23, and 27). In Column 6, Lines 54-57, it is clearly taught that one phosphate ion and one sulfate ion can be sourced from technical grade phosphoric acid

to fulfill the need for both reactant species that fit within the general apatite structure, assuming that lead and/or radionuclides are present. Line 66 of the same column also states that,

> *"as a true chemical process, an object of the invention relies upon molecular bonding and crystal nucleation principles to reduce nuclide solubility..."*

50. As for the Government's use of Prayphos P5 phosphoric acid with 'only a few parts per million (ppm) of sulfate after dilution', Sevenson's process is based upon optimization of reactants that include both phosphates and sulfates. Whether or not Shaw diluted the acid prior to its addition to soil, or if they had added the acid as it was purchased and added supplemental water to the soil as well, the acid Shaw used still provided either 62 parts of sulfate per million parts of acid (ppm) according to one data sheet (S.A. Manning – 2003 for Prayon SA) and 230-350 ppm sulfate per another (Prayphos P5 Purified Phosphoric Acid – 2003). Sevenson also teaches the addition of water to disperse the reagent and aid in mixing. Regardless of the amount, all the process requires at a minimum is at least one ion of sulfate and at least one ion of phosphate in the presence of lead (and radionuclides) for lead to be rendered an insoluble. The Government certainly provided sulfates and phosphates in concentrations well in excess of one ion. The simplest form of the lead-sulfate-phosphate technology is taught by the reactions presented in the Sevenson patents. It is at the molecular level that ions react. As the number of reactive ions increase to a quantifiable concentration at which point they can be measured, not at the molecular level, but in parts per trillion, part per billion, parts per million or as a percent of the entire whole, and still even at the later, the reactions still proceed one ion at a time and sulfate is one of the initiating reactants that start these reactions. This fundamental principle is true for all chemical reactions, not just those taught by Sevenson with respect to the lead-sulfate-phosphate system.

51. As an analogy, take a million dominos and assume that each one represents an ion of lead, radionuclide or other heavy metal (lead, *et. al.*), sulfate or phosphate. Set them up in close proximity so that they have the ability to come in contact with each other as in soil or solid waste. The reactions taught by Sevenson show that at least one ion of each is required for the reactions to proceed. Assume that only one of the million dominoes is sulfate. All the rest are lead (et. al), soil micelles, phosphate, calcium, and other soil or waste constituents. The reactions proceed, starting with lead and sulfate, when all components are present and mixed. The one sulfate domino will tip when mixed and initiate the fall of the other 999,999. Granted, if there were 13, 230, or more "falling" sulfate dominos (initiating reactants), then the rest of the dominos representing lead (et. al.)will fall that much faster with greater certainty of progression to the reactions' equilibrium completion than if there was only one. Regardless, only one sulfate molecule in the presence of lead (et. al.) and phosphate will allow the reactions to proceed. While this analogy replicates a parts per millions (ppm) scenario, it is validated by the reaction of ions at the molecular level, one at a time.

52. As another analogy, water without a seed or substrate will not freeze when its temperature is lowered significantly below its freezing point. Only when a seed is present will ice crystals rapidly form across the liquid as crystals will not nucleate without a surface on which to precipitate or nucleate. Sevenson's reactions yield mineral crystals at the molecular and microscopic level. (See data.) These reactions teach that sulfate, phosphate and lead (et al.) are required for the mineral crystals to form. As discussed in the Purdue paper (1994, Exhibit F) lead (et. al.) and sulfate initially form anglesite minerals. As the reactions proceed and lead (et. al.) is consumed by the formation of anglesite crystals, these geometrically similar structures "twin" and process reaction-series shift to a phosphate driven reaction series whereby lead ions

are scavenged and apatites are formed. As the reactions proceed through the point where lead is rendered non-leachable in various solvents such as TCLP extraction fluid, the lead sulfates (anglesites) and lead phosphates (apatites) become more stable mixed mineral forms in the lead-sulfate-phosphate system as taught by the patents. These mixed mineral forms will have incorporated lead (et al) that is not released to TCLP extraction fluid. One ion that bonds with one or more other ions initiating the nucleation of a required seed crystal is not *de minimus* as the Government stipulates.

53. There should be no doubt that the sulfate "impurities" in the Prayphos P5 product were reactive. When diluted with water, the corrosivity of the concentrated phosphoric acid increased. At the Colonie Site, the Government added water to dilute the phosphoric acid. This facilitated the dissolution of "impurities", *e.g.* sulfate compounds, to reactive forms. As a practical example, those knowledgeable in the field of acid handling know that pipe and pump materials must be more chemically resistant to increased corrosivity when the acid is in a dilute form than when it is concentrated.

54. The classification of the sulfate in the Prayphos P5 (or any other phosphoric acid) product as an impurity is relevant only to the chemical industry's marketable product "phosphoric acid." It has no meaning in determining whether the sulfate is reactive in the lead-sulfate-phosphate method taught by the patented MAECTITE® process. The sulfate impurities in Prayphos P5 are reactive because they are of inherent and intrinsic chemical value in the process and, as shown by the science underlying this process, serve to convert leachable metal into non-leachable form. Simply put, the sulfate impurities are used stoichiometrically in the MAECTITE® process to react with leachable lead, metals and radioactive substances by forming salts that are insoluble in the EPTOX and TCLP extraction fluids.

### 2. **The US Patent Office Recognized That The Addition Of One Ion Of Sulfate To The Reaction May Be Sufficient To Practice The MAECTITE® Process**

55. The US Patent Office originally rejected the application leading to the '936 patent because it was based on the addition of sulfates in a range between 0 to 30%. As shown in the Prosecution History for this patent, on August 11, 1992, there was a meeting with the patent examiner to discuss the grounds for rejection of the application on this and other grounds. As a result, the application was amended for sulfate to recite "are each employed in an amount of up to 30% percent by weight." This amendment reflected the understanding among the patent examiner and MAECORP that while some new sulfate must be added to the contaminated material, the amount added could be as little as one ion or up to 30%. This broad range reflected the teaching above and the reaction initiating qualities and properties that only a small amount of sulfate would provide to the reaction-series. It supports the conclusion that the amount of sulfate in the Prayphos P5 product would have participated meaningfully in the process.

### 3. **The Kiber Treatability Study Provides Further Proof That The Soil Stabilization Project At The Site Involved The MAECTITE® Process Taught By The Sevenson Patents**

56. As described above, the prior art consisted of the lead-hydroxide-phosphate method for treating hazardous waste. The MAECTITE® process involved a single-step application of phosphoric acid to supply sulfates and phosphates across the entire pH scale. In Example 4 of the '982 patent (Col. 14), for example, a wide range of applications and process flexibility was demonstrated that applied one step and two step mixing of treatment additives from group one and group two (sulfates and phosphates). Resultant data presented in Table VI shows leachable lead was rendered non-hazardous by RCRA definition (TCLP Pb $\leq$ 5.0 mg/L). The first sample in the table, "Old Dirt" teaches that not only was phosphoric acid alone applied, but it also teaches that phosphoric acid was the only additive and the preferred embodiment of

what Sevenson teaches. It is clear from the data that leachable lead was reduced from 164.4 mg/L to 1.5 mg/L using 3.4% phosphoric acid. The Government, and its contractors Shaw/Kiber, should have learned from this early patent that the technology they applied at the Site was previously taught and patented by Sevenson.

57. The Kiber treatability study contains data showing that the dosages of phosphoric acid used by the Government are similar to those demonstrated by Sevenson in Example 4. It further shows that the levels of leachable lead before and after treatment were similar. Notably, the pH of the system used by the Government is also consistent with the teaching of Sevenson. In the Kiber treatability study report, pH of the untreated material ranged from 7.8 to 8.2 S.U. Material treated with phosphoric acid had a pH of 3.92 and 4.90 S.U. The end product pH from the process used by the Government, therefore, does not replicate the end product pH taught by the lead-hydroxide-phosphate system. As taught by these systems, the pH of end product is reduced to this level after EPTOX or TCLP test is performed on treatment end product. The Government's end product pH replicates the process as taught by Sevenson where the presence of hydroxides is not required for the reduction in lead or radionuclide leachability. While the Sevenson technology does not teach pH, the pH of the Government's end product is indicative of the Sevenson's lead-sulfate-phosphate system without hydroxide.

58. The Kiber work is also noteworthy because it supports the science showing that even small amounts of sulfate were sufficient to render the leachability of lead and radionuclide material at the Site non-hazardous. On the last page of its May 17, 1999 letter (Government Ex."4" Bates No. G000084), Kiber stated that it successfully treated the material from the Site with a "reagent grade" or purer form of phosphoric acid. It then states that a less pure form could be used to "achieve effective treatment." This is precisely the conclusion taught by the

MAECTITE® process. In other words, the sulfate in both pure and less pure phosphoric acid products are often both sufficient to inititate the reactions resulting in successful treatment of lead and radionuclide contaminated material.

59. Indeed, the reagent grade phosphoric acid used in the Kiber treatability study was even purer than the Prayphos P5 product used at the Site. Reagent grade phosphoric acid contains $\leq 0.001\%$ sulfate impurities. Using Dr. Pierzynski's calculations in reverse, this equates to $\leq 0.1$ g of sulfate in the phosphoric acid, over two magnitudes lower than that used at the Site. In its tables, Kiber showed that this purer grade phosphoric acid reduced levels of TCLP lead, consistent with the reactions. This analysis further demonstrates that the amount of sulfates necessary to participate measurably in the stabilization reaction can be very small and depends mainly on the characteristics of the untreated material.

### 4. The Government's Argument That The Sulfate In The Prayphos P5 Product Would Not Have Participated Meaningfully In The Process Is Without Merit

60. The Government argues that the sulfate in the Prayphos P5 product would not have participated meaningfully in the soil stabilization project at the Site. For support, the Government makes two arguments. First, it argues that the amount of sulfates necessary to practice the patented MAECTITE® process must be in a typical range of 2500 ppm to 7000 ppm based on a single reference to such a sulfate level in the '367 patent. Second, it repeatedly relies on the statement of Gary M. Pierzynski, Ph.D. that "the concentration of sulfate in Prayphos P5 is, from a chemical reaction point of view, negligible, and would not participate meaningfully in any chemical reactions." The Government's arguments are wrong.

61. First, the reference to the sulfate content in a lesser grade phosphoric acid in the '367 patent was never intended as a benchmark to determine whether the sulfate in a purer grade

phosphoric acid will or will not participate meaningfully in the stabilization process. This reference simply provided an example in a case where the lesser grade phosphoric acid was used to treat radionuclide contaminated wastes. The decision whether to use a lesser grade phosphoric acid is based on cost and availability. In most cases, it is the preferred method because the additional sulfate present in such products enhances the reaction. The '982 patent did not contain any limitation to a required sulfate content. As reflected in the science underlying the patents, the specified range for sufficient sulfate to trigger the reaction process is "up to" 30%. Thus, even small amounts of sulfate, as shown for example by the Kiber Treatability Study for the Site, could and did result in effective treatment of the contaminated soil at the Site. The amount of sulfate in the Prayphos P5 product was enough to support the chemical reactions defined in the patents and, in addition, enough to achieve effective treatment of the contaminated soil at the Site. Kiber confirmed that it would work and it did.

62. Second, the declaration supplied by Dr. Pierzynski consists largely of his correct analysis of comparative measurements and the manufacturing process for Prayphos P5. However, he devotes only one paragraph (para. 21), to his conclusory opinion that the sulfates in this product have no effect on the stabilization process, which is contrary to basic reaction equilibrium mechanisms taught at the high school chemistry level. There is no indication of his refuting, or even his acknowledgement of understanding, the geochemical reactions that take place within the Sevenson technology. There is no indication that he reviewed any of Sevenson's technical papers, co-authored or otherwise, including the Purdue paper, written jointly by a Ph'D in soil chemistry (Dhiraj Pal), a registered professional geologist (Steven Chisick), a licensed professional engineer (Walter Jesernig), and myself that firmly and clearly establish the role played by the addition of even minimal amounts of sulfate to initiate the

reactions resulting in the reduction of lead leachability. Dr. Pierzynski's opinion is faulted and in error, likely stemming from his review of only limited information provided for his consideration. He failed to consider the wealth of available historic technical papers published by numerous peer researchers that delve into the geochemistry of lead (et. al.), sulfates, phosphates,and hydroxides at the mineral level, none of which teach the art brought forth by Sevenson.

**E. The Government's Re-Treatment Of Material At The Site Supplied Additional Sulfate and Phosphate And Infringed The Two-Step Claims In The Patents**

63. In the stipulated facts, the Government admits that on certain occasions, the Prayphos P5 product failed to reduce the level of toxicity in the soil to below the required regulatory level. On such occasions, the soil was returned to the pugmill and treated with additional Prayphos P5 phosphoric acid, and allowed to cure, until the amount of leachable lead was reduced to below the EPA standard.

64. The re-treatment of material at the Site was specifically contemplated by the patents. In Example "3" (Col. 12) of the '982 patent, the MAECTITE® process teaches that if the single-step application of phosphoric acid was insufficient, a second-step application of additional phosphoric acid would often result in effective treatment. The application of additional phosphoric acid supplied supplemental sulfate and phosphate to react with the remaining soluble lead. This second-step is no different than if Sevenson decided separately to add gypsum in order for the reaction to proceed. The need to re-treat, like the need to add gypsum, is a function of the characteristics of the untreated material which, as in the case of Colonie, was not entirely uniform. Thus, certain soil piles would be rendered non-hazardous after a single-step application of the Prayphos P5 product, whereas other soil piles required a second-step application to supply additional sulfate and phosphate compounds.

**F. The Science Applicable To The Patented MAECTITE® Process Teaches That The Concentration Of Radionuclides In The Contaminated Soil Will Be Reduced. The Failure To Test For Such A Reduction Does Not Alter This Law Of Science**

65. The Government argues that because there was no testing of radionuclide concentration in the treated material, Sevenson cannot prove that it occurred. This is incorrect.

66. The laws of science establish that the Prayphos P5 treatment reduced the concentration of radionuclides in the contaminated soil at the Site. It is elementary knowledge in the field of chemistry that uranium naturally decays to lead. As disclosed in the '367 patent and '608 patents, the leachability of uranium ($U^{235}$ and $U^{238}$) and its natural unavoidable decay product – lead ($Pb^{210}$, $Pb^{212}$, and $Pb^{214}$) are reduced by the process. The Government treated soil that contained uranium and leachable lead, and reduced the leachability of lead as tested. Some of that lead was unavoidably radioactive and as the Government tested the soil after treatment to confirm reduction in lead leachability, the Government did, in fact, reduce the leachability of at least one radioactive species. In my opinion, the Government also reduced the leachability of uranium and other radioactive members of its decay-series that are also taught by the patented MAECTITE® technology.

**G. The Patented MAECTITE® Process Would Have Resulted In A Reduction In The Volume Of The Material Treated. The Government's Contrary Claim Is Based on Erroneous Calculations**

67. The Government's argument that in the absence of testing, Sevenson cannot prove a reduction in the volume of the material after treatment is incorrect for the same reason. The science underlying the patented MAECTITE® technology teaches that volume will be reduced. As an inventor, I realized that many conventional processes increased mass and volume of the impacted material. Using ASTM geotechnical test methods that integrate soil moisture content, grain-size, compactive effort, and density curve data, volume reduction was evidenced as a result

of treatment with phosphoric acid. By limiting the mass of treatment additives, and by the nature of the dehydration properties and acidity provided by phosphoric acid to enhance capillary drying and evaporation, and destroy carbonates, respectively, treated material mass increase would be greatly limited.

68. Reducing volume is critical to the overall cost of waste transportation and disposal and was an important component of our invention. In fact, the specifications for the treatment of the soil at the Site specifically identified the limiting of volume expansion ("swell") as a stated objective in order to limit the costs of transportation and disposal. This was one of the reasons why the selection of the MAECTITE® treatment technology was particularly well-suited for the soil stabilization project at the Site.

69. The Government also refers to the Kiber treatability study as proof that treatment with reagent grade phosphoric acid increased volume. The Kiber analysis, however, was based on faulty test methods and performed on samples prior to sufficient completion of the reactions as was allowed at the Site and is, therefore, moot. As shown by Table 1 of its report at footnote 3 (G000086), Kiber tested volume expansion "immediately following mixture development." As taught by the patents, the reactions are not complete until three to five hours after mixing and that volume decreases will continue over time. The curing process necessarily involves a loss of water (phosphoric acid is a dehydration agent) by evaporation and capillary drying. At the Site, it would have been impossible to generate passing lab results on material that was treated immediately after blending. The TCLP procedure requires at least 16 hours of agitation in an tumbling agitator device before lead is even quantified in the resultant extraction fluid. One must also account for the time it took to generate a 250 CY pile of treated material, the time it took to collect a representative sample of the pile, the time it took to confirm the test data was

valid within QC/QC limits, and the time it took to review the validated data for authorization to dispose the treated material, let alone the transport vehicle loading and haul time by rail to the disposal facility in the western United States. During the entire duration of these events, the process reactions continue to contribute to volume reduction. While the reaction time as taught by the patents is only 3-5 hours to render lead sufficiently non-leachable to comply with the lead toxicity limit, so to is volume reduction characteristic of treated waste at this point in the process. The U.S. Government cannot neither state that volume reduction did not occur nor that a volume increase was evidenced at the Colonie site. The process used by the U.S. Government/Shaw in the field at full-scale was not monitored for volume reduction and where volume change was tested, it was done in a manner that did not replicate practices and time durations implemented in the field.

70. In addition, Kiber used invalid testing methods to test volume expansion. The pocket penetrometer used by Kiber (*see* Section 4.3 of its report) is not relevant to volume change determinations. It is used as a screening tool to determine a material's relative compressive strength and resistance to an applied point-source load. If Kiber had used conventional geotechnical ASTM methods to determine optimum moisture content:density curves on both untreated and treated material, and compacted each to consistent air void content accordingly, volume reductions would have been demonstrated.

71. Lastly, a simple survey of the pre and post treated piles as taught in the patents would have also shown volume reduction caused specifically by the Government's use of the technology. No such data was gathered, and the Government is only relying on treatability data conducted on soil quantities contained within limited capacity labware to show volume reduction. Kiber's test methods cannot likely be reproduced or validated within conventional

statistical norms. In my experience with this technology where phosphoric acid is used as a treatment additive at ALL sites where soil has been similarly treated, including sites similar to those at the Colonie site soil, a volume reduction has always been the case.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 30th day of July, 2007 in Anacortes, WA.

Karl Yost

WDC99 1430038-1.057200.0012