**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| SEVENSON ENVIRONMENTAL SERVICES, INC., Plaintiff, | ) | |
| v. | ) | No. 05-1075C<br>Judge Thomas C. Wheeler |
| THE UNITED STATES Defendant | ) | |
| and | ) | |
| SHAW ENVIRONMENTAL, INC., Defendant-Intervenor. | ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY ADJUDICATION RELATING TO INFRINGEMENT**

PETER D. KEISLER
Assistant Attorney General

JOHN J. FARGO
Director

JOSHUA B. BRADY
Attorney
Civil Division
U.S. Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0285
Facsimile: (202) 307-0345

OF COUNSEL:
Susan Mitchell
Attorney
U.S. Department of Justice

Attorneys for Defendant the United States

RUSSEL O. PRIMEAUX
Kean Miller Hawthorne D'Armond
McCowan & Jarman LLP
One American Place, 22nd Floor
Post Office Box 3513
Baton Rouge, LA 70821-3513
(225) 387-0999

Attorney for Defendant-Intervenor Shaw Environmental, Inc.

# TABLE OF CONTENTS


TABLE OF AUTHORITIES . . . . . -iv-

APPENDIX . . . . . -vi-

I. INTRODUCTION . . . . . 3

II. RELEVANT FACTS . . . . . 3

III. SEVENSON IS BARRED BY PROSECUTION HISTORY FROM ARGUING THAT PHOSPHORIC ACID, ALONE, MEETS THE CLAIM LIMITATIONS. . . . . . 4

A. Summary judgment regarding prosecution history disclaimer and estoppel is appropriate and applies to each of the patents at issue. . . . . . 5

B. During prosecution, the patentees distinguished prior art on the ground that the claimed invention uses a "separate and distinct" sulfate compound in addition to phosphoric acid. . . . . . 7

1. The inventor's revision to the '774 application shows that phosphoric acid, alone, does not meet the claim limitations. . . . . . 8

2. The patentees surrendered subject matter during the prosecution of the parent patent, the '936 patent . . . . . 9

3. The patentees disclaimed subject matter during the prosecution of the '982 patent, which also bars Sevenson from arguing that phosphoric acid, alone, meets the claim limitations. . . . . . 11

4. Narrowing arguments made during the prosecution of the '485 patent also bar Sevenson from arguing that phosphoric acid, alone, meets the claim limitations. . . . . . 13

C. Based on the Prosecution History, this Court should deny Sevenson's Motion for Partial Adjudication. . . . . . 15

IV. THE PROPER SCOPE OF SEVENSON'S PATENTS DOES NOT COVER THE PHOSPHORIC ACID USED AT THE COLONIE TREATMENT PROCESS. . . . . . 16

A. The claims require a process that employs a "first component" that is "separate and distinct" from a "second component." . . . . . 16

1. Sevenson's patents teach that phosphoric acid is only a "second component." . . . . . 17

2. The patents teach the addition of two "separate and distinct" components in either a one-step or two-step process. . . . . . . . . . . . . . . . . . . . . . . . . . 20

3. The examples showing successful use of phosphoric acid, alone, show that Sevenson's patented two-component process is not necessary for every contaminated media. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

B. The Colonie treatment process used only a single component: diluted phosphoric acid. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

C. Prayphos P5 is not Technical Grade Phosphoric Acid ("TGPA"). . . . . . . . . . . . 25

D. The Colonie treatment process involved no "first mixture" of a "first component" and a "second component" as required by the patents. . . . . . . . . . . . . . . . . . . . . 27

E. The Colonie treatment process did not "supply" sulfate to the stabilization process as required by Sevenson's patents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

1. Sulfate must be present in large enough quantity to participate measurably in the reactions, i.e. stabilize leachable metal. . . . . . . . . . . . . . . . . . . . . . 29

2. *De minimis* amounts of sulfate do not meet the claim requirements. . . . 31

3. The only mention of sulfate impurities in Sevenson's patents is in the discussion of TGPA for use in stabilizing radionuclides. . . . . . . . . . . . . 33

4. The sulfate impurity in Prayphos P5 is *de minimis* and therefore does not "supply" sulfate within the scope of the asserted claims. . . . . . . . . . . . . 34

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

# TABLE OF AUTHORITIES

## CASES

*Advanced Cardiovascular Sys. v. Medtronic, Inc.*,
265 F.3d 1294 (Fed. Cir. 2001) . . . . . . 7

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
345 F.3d 1318 (Fed. Cir. 2003) . . . . . . 5

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) . . . . . . 1

*Ekchian v. Home Depot, Inc.*,
104 F.3d 1299 (Fed. Cir. 1997) . . . . . . 5, 16

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
192 F.3d 973 (Fed. Cir. 1999) . . . . . . passim

*Jonsson v. The Stanley Works*,
903 F.2d 812, 817–18 (Fed. Cir. 1990) . . . . . . 7

*Maxwell v. Baker*,
86 F.3d 1098 (Fed. Cir. 1996) . . . . . . 22

*Northern Telecom Ltd. v. Samsung Electronics Co., Inc.*,
215 F.3d 1281 (Fed. Cir. 2000) . . . . . . 29, 30

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) . . . . . . 5, 6

*Ortho-McNeil Pharm., Inc. v. Caraco Pharm. Labs., Ltd.*,
476 F.3d 1321 (Fed. Cir. 2007) . . . . . . 3

*Phillips Petroleum Co. v. Huntsman Polymers Corp.*,
157 F.3d 866 (Fed. Cir. 1998) . . . . . . 31, 32

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) . . . . . . 6

*Rheox, Inc. v. Entact, Inc.*,
276 F.3d 1319 (Fed. Cir. 2002) . . . . . . 5–6

*Seachange Intl., Inc. v. C-COR Inc.*,
413 F.3d 1361 (Fed. Cir. 2005) . . . . . . 5, 6

*Sevenson Envtl. Servs., Inc. v. United States*,
76 Fed. Cl. 51, 2007 U.S. Claims LEXIS 94 (Fed. Cl. Mar. 28, 2007) . . . . . . . . . . passim

*Spectrum Int'l, Inc. v. Sterilite Corp.*,
164 F.3d 1372 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Ventana Med. Sys. v. Biogenex Labs, Inc.*,
473 F.3d 1173 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Wang Lab, Inc. v. Mitsubishi Elecs. Am.*,
103 F.3d 1571 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 14

**STATUTES**

35 U.S.C. 102(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## APPENDIX

| Exhibit | Document | Pages |
|---|---|---|
| **1** | Table of Arguments | |
| **2** | Final Operations Work Plan for Colonie FUSRAP Site | G001446–001539 |
| **3** | Kiber Treatability Study Final Report, March 1999 | G000110–000138 |
| **4** | Kiber Treatability Study Final Report, May 1999 | G000079–000089 |
| **5** | Prayon’s Specification Data Sheet for Prayphos P5 | 1–2 |
| **6** | Declaration of Gary Pierzynski, Ph.D. | |
| **7** | Certificates of Analysis for Prayphos P5 | SH041201, SH041245, SH041293 |
| **8** | Chart of Sevenson’s Family of Patents | 1–2 |
| **9** | Excerpts of Prosecution History of ’982 Patent | G002960–2963; 003024–3056 |
| **10** | O’Hara Patent | |
| **11** | Excerpts of Prosecution History of ’485 Patent | G004558–4563; 004651–4665 |
| **12** | Stanforth Patent | |
| **13** | Excerpts of Prosecution History of ’936 Patent | G002439–2460 |
| **14** | ’936 Patent | |
| **15** | Excerpts of Deposition of Anthony Sheeran | 1, 4–6, 92–93, 99–100 |
| **16** | Additional Declaration of Gary Pierzynski, Ph.D. | |
| **17** | 07/494,774 Application | SH039529–544 |
| **18** | Letter from Inventor Dhiraj Pal, Ph.D. | DG0161–93 |

Note: Defendant-Intervenor Shaw Environmental, Inc., hereby waives confidentiality of Exhibit 7 and Exhibit 15, without waiving confidentiality to any remaining documents or depositions under the Protective Order.

Exhibits 1–15 are contained in the Appendix to Defendants’ Motion for Summary Judgment, filed July 2, 2007. (Dkt. No. 61). Exhibit 16–18 are additions to the Defendants’ Appendix.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| SEVENSON ENVIRONMENTAL SERVICES, INC.,<br>Plaintiff,<br>v.<br>THE UNITED STATES<br>Defendant<br>and<br>SHAW ENVIRONMENTAL, INC.,<br>Defendant-Intervenor. | No. 05-1075C<br>Judge Thomas C. Wheeler |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY ADJUDICATION RELATING TO INFRINGEMENT**

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims ...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The allegation of Sevenson Environmental Services, Inc. ("Sevenson) that the purified phosphoric acid used at the Colonie site, Prayphos P5, "falls within the scope of the asserted Sevenson patent claims," is such a claim. Sevenson's patents claim a process for reducing either leachable metals or leachable radionuclides using two "separate and distinct" components. Prayphos P5 is a single component, purified phosphoric acid, that contains sulfate impurities at maximum concentration of 350 ppm. This single component process does not fall within the scope of Sevenson's patents.

Plaintiff's Motion for Partial Summary Adjudication Relating to Infringement should be denied for the following reasons. First, Sevenson is barred by the prosecution history from

arguing that phosphoric acid, alone, meets the claim limitations. The patentees surrendered this argument during the prosecution of the ‘936, ‘982 and ‘485 patents. This clear disavowal of the subject matter applies to all of the patents at issue. *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999). Sevenson cannot now reclaim the subject matter that the patentees surrendered during prosecution of these patents.

Second, there is no “first component” that is “separate and distinct” from a “second component,” as required by Sevenson’s patents and properly construed by this Court. *Sevenson Envtl. Servs., Inc. v. United States*, 76 Fed. Cl. 51, 2007 U.S. Claims LEXIS 94, at *24–30 (Fed. Cl. Mar. 28, 2007). As the patentees argued during prosecution of the ‘936, ‘982 and ‘485 patents, and as it is abundantly clear from the specifications, drawings and claims of the patents at issue, Sevenson’s claims require a first component “separate and distinct” from, *inter alia*, phosphoric acid. The Colonie treatment process used only phosphoric acid, and therefore cannot meet these claim limitations.

Third, there is no “mixture” of two “separate and distinct” components as required by Sevenson’s patents. The claims require that the two “separate and distinct” components be mixed together to form a “first mixture,” “treatment additive,” or “combination.” As the Colonie process used only a single component, phosphoric acid, the Colonie treatment process involved no such mixing of two “separate and distinct” components as required by the claims and as properly construed by this Court.

Fourth, the Colonie treatment process does not “supply” sulfate for the stabilization process claimed by Sevenson’s patents. It is clear from the specifications that the sulfate ions must be supplied “in large enough quantities to participate measurably in the chemical reactions

defined in the patents." *Sevenson*, at *69–70. The sulfate impurities inherent in Prayphos P5 are far too *de minimis* to meet the limitations within the proper scope of the claims.

This Opposition to Plaintiff's Motion for Partial Summary Adjudication Relating to Infringement addresses each of these arguments more fully, and are supported by the Appendix, which includes a Declaration of Gary Pierzynski, Ph.D.

## I. INTRODUCTION

Sevenson's Motion for Partial Summary Adjudication Relating to Infringement is an attempt to improperly expand the scope of the patent claims at issue, despite the clear disclaimers made during prosecution by the patentees, and despite the clear distinction between the two-component process claimed in the patents and the one-component process used at the Colonie site. In its supporting Memorandum, Sevenson erroneously argues that it is "undisputed" that "the Sevenson patents disclose and claim a treatment process whereby phosphoric acid acts as a source of both phosphates and sulfates to treat hazardous lead-based materials to below the EPA standard." Dkt. No. 59, at 2. This statement is wrong in two ways. First, the Government and Defendant-Intervenor Shaw Environmental, Inc. (hereinafter "Defendants") do in fact dispute Sevenson's assertion that phosphoric acid, alone, meets the limitations of the patent claims at issue. This is the fundamental issue that the parties seek this Court to resolve on summary judgment. Second, Sevenson's asserted patent claims do not, and can not, cover a process that employs only a single component, phosphoric acid. This is the reason that this Court should deny Sevenson's Motion for Partial Adjudication.

## II. RELEVANT FACTS

The facts relevant to the issue of whether phosphoric acid used at the Colonie treatment process falls within the scope of the asserted claims are undisputed, making this issue ideal for

summary judgment. *Ortho-McNeil Pharm., Inc. v. Caraco Pharm. Labs.*, Ltd., 476 F.3d 1321, 1326 (Fed. Cir. 2007). The Army Corps of Engineers used diluted Prayphos P5 to reduce the leachability of lead at the Colonie site. Stip. Fact ¶¶ 10, 12. Prayphos P5 is a phosphoric acid manufactured by Prayon, Inc., using its purified wet-process. Stip. Fact ¶ 10. In its proprietary purified wet process, Prayon carries out additional acid purification steps by using a mixed organic solvent to extract impurities such as sulfate, fluorine, and arsenic, thereby increasing the concentration of the phosphoric acid and decreasing impurity concentrations. Ex. 6 at ¶ 17. Prayon refers to Prayphos P5 as "purified phosphoric acid," as seen on Prayon's Product Specification Data Sheet for Prayphos P5. Ex. 5. Despite purification technology, no wet process manufacturing of phosphoric acid can completely remove sulfate, fluoride or other impurities. Ex. 6 at ¶ 18. All phosphoric acid produced by a wet process will include some level of sulfate as impurities. *Id.*

Prayon states the phosphoric acid impurity concentrations in parts-per-million (ppm), whereas the patents in suit state values as a percent by weight. Prayon's Product Specification Data Sheet for Prayphos P5 shows that the maximum concentration of sulfate impurities ($SO_4$) is 350 ppm, and the "typical analysis" concentration is 230 ppm. Ex. 5. In his Declaration, Dr. Gary Pierzynski explains the mathematical relationship between ppm and percent by weight (% (wt.)). Ex. 6 at ¶ 6. Applying this relationship to the ppm concentrations from the Product Specification Data Sheet results in a maximum sulfate impurity concentration of 0.0350 % (wt.), and a "typical analysis" concentration of 0.0230% (wt.). Ex. 6 at Table 1.

## III. SEVENSON IS BARRED BY PROSECUTION HISTORY FROM ARGUING THAT PHOSPHORIC ACID, ALONE, MEETS THE CLAIM LIMITATIONS.

The fundamental issue before this Court is the application of the claim construction of the "first component" and "second component" claim limitations, particularly whether sulfate

impurity in phosphoric acid is a "separate and distinct compound." Sevenson argues that Prayphos P5 meets the "first component" and "second component" claim limitations, and is therefore the "first mixture." Dkt. No. 59, at 17–19. According to Sevenson, the sulfate impurity is a "separate and distinct compound" because "it is composed of one atom of sulfur (S) to four atoms of oxygen (O)," and is "separate and distinct from other compounds found [in Prayphos P5]." *Id.* at 18. This interpretation of the claims is barred by the prosecution history, as the patentees clearly and unambiguously disclaimed that phosphoric acid, alone, meets the claim limitations requiring a "first component" that is "separate and distinct" from a "second component."[1]

### A. Summary judgment regarding prosecution history disclaimer and estoppel is appropriate and applies to each of the patents at issue.

"The doctrine of prosecution disclaimer is well established in Supreme Court precedent, precluding patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (citations omitted). Under the doctrine of prosecution history disclaimer, arguments in the prosecution history used to distinguish the claimed invention from the prior art also serve to narrow the scope of the claims. *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 345 F.3d 1318, 1328 (Fed. Cir. 2003) (citing *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997)). In construing a claim, a court must "examine the entire prosecution history to determine 'whether the patentee disclaimed or disavowed subject matter, narrowing the scope of the claim

---

[1] The "first component" and "second component" limitations appear in the '982 patent, claim 1; '123 patent, claims 1, 15; '608 patent, claim 20; ''485 patent, claims 1, 15, 22. Analogous claim limitations also relevant here include: "source of sulfate," '367 patent, claim 1; "sulfuric acid" and "phosphate supplying reagent," '485 patent claim 28; "sulfate reagent" and phosphate supplying reagent," '485 patent, claim 30.

terms.'" *Seachange Intl., Inc. v. C-COR Inc.*, 413 F.3d 1361, 1372 (Fed. Cir. 2005) (citing *Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1326 (Fed. Cir. 2002) and *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979 (Fed. Cir. 1999)). "Where an applicant argues that a claim possesses a feature that the prior art does not possess in order to overcome a prior art rejection, the argument may serve to narrow the scope of otherwise broad claim language." *Seachange*, 413 F.3d at 1372–73 (citations omitted). Such a disclaimer must be clear and unambiguous. *Seachange*, 413 F. 3d at 1373 (citing *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323–25 (Fed. Cir. 2003)).

Similarly, "prosecution history estoppel acts as one check on application of the doctrine of equivalents, by precluding a patentee from regaining, through litigation, coverage of subject matter relinquished during prosecution of the application for the patent." *Wang Lab, Inc. v. Mitsubishi Elecs. Am.*, 103 F.3d 1571, 1578 (Fed. Cir. 1997) (citations omitted). The applicability of prosecution history estoppel is a question of law, and should this Court "determine, upon reviewing the relevant prosecution history, that estoppel applies, doctrine of equivalents infringement is precluded as a matter of law, and summary judgment of non-infringement is appropriate." *Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1380 (Fed. Cir. 1998) (citing *Wang Lab, Inc. v. Mitsubishi Elecs. Am.*, 103 F.3d 1571, 1577 (Fed. Cir. 1997)).

This Court may consider statements made during the prosecution of ancestor patents or related patents when considering the effect of prosecution history estoppel. *Ventana Med. Sys. v. Biogenex Labs, Inc.*, 473 F.3d 1173, 1182 (Fed. Cir. 2006) (citations omitted). The Federal Circuit has explained that the Court may also "examine the patent's prosecution history, when placed in evidence, to determine whether the inventor disclaimed a particular interpretation of a

claim term during the prosecution of the patent in suit or during the prosecution of an ancestor application." *Id*. (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) *and Advanced Cardiovascular Sys. v. Medtronic, Inc.*, 265 F.3d 1294, 1305 (Fed. Cir. 2001)). "When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation." *Elkay*, 192 F.3d at 980 (*citing Jonsson v. The Stanley Works*, 903 F.2d 812, 817–18 (Fed. Cir. 1990)). Further, "[a]rguments made during the prosecution of a patent application are given the same weight as claim amendments." *Elkay*, 192 F.3d at 979 (citation omitted).

### B. During prosecution, the patentees distinguished prior art on the ground that the claimed invention uses a "separate and distinct" sulfate compound in addition to phosphoric acid.

The patentees made clear and unambiguous disclaimers during the prosecution of the parent '936 patent, the '982 patent, and the '485 patent that now bar Sevenson from asserting that phosphoric acid, alone, meets the claim limitations. The inventors distinguished the invention claimed by the Sevenson patents from prior art by arguing that the prior art processes involved only one component, *such as phosphoric acid*, whereas the Sevenson process employed two components, such as phosphoric acid *and component for supplying sulfate*. In other words, because the USPTO subsequently allowed the claims after receiving these arguments, the USPTO allowed Sevenson's claims to a two-component treatment on the basis that the claims did not cover use of phosphoric acid as the only treatment chemical.

As this Court noted, all of Sevenson's patents at issue are related. *Sevenson*, at *15; *see also* Ex. 9 (showing the Sevenson family of patents). The specifications for each patent are nearly identical, and the drawings are identical. Thus, with respect to similar claim limitations,

the prosecution history regarding a claim limitation "applies with equal force to subsequently issued patents that contain the same claim limitation." *Elkay Mfg.*, 192 F.3d at 980. Here, the prosecution history applies with equal force to all of the claim limitations analogous to "first component" and "second component," such as "phosphate compound," in claim 1 of the '608 patent, "sulfate reagent" and "phosphate supplying reagent" in claim 30 of the '485 patent.[2]

1. <u>The inventor's revision to the '774 application shows that phosphoric acid, alone, does not meet the claim limitations.</u>

All of the Sevenson patents at issue claim priority to U.S. Patent Application Serial No. 07/494,774 ("the '774 application"), filed March 16, 1990, now abandoned. The '774 application disclosed a method for immobilizing lead using a solid powder for supplying reactive sulfate ions and a phosphate reagent. Ex. 17, SH039542. This application lists phosphoric acid as one of the "phosphate supplying reagents," but never as a compound in the first group for supplying sulfate. *Id.* at SH039535–36.

One of the inventors wrote a "completely revised" application to reflect the change in the EPA's regulations, replacing the EP toxicity test with the TCLP regulations. Ex. 17. This new application, written by inventor Dr. Dhiraj Pal, included the following paragraph:

> Experimental results from MAECTITE- Treatment Process (MTP) show that phosphoric acid alone fails to pass the TCLP lead criteria for lead contaminated soils, and addition of lime (calcium oxide), to phosphoric acid treated soils further increases the TCLP lead levels.

*Id.* at DG0169. "MAECTITE" is the tradename for the process claimed in Sevenson's patents. *See, e.g.,* '367 patent, Table VI (titled "Universe of Application for the Invention Maectite Treatment Process").

---

[2] This Court has already ruled that the terms "phosphate supplying reagent," as used in the '485 Patent, and "phosphate compound," as used in the '608 Patent, have the same meaning as "second component" as used in each of the patents. *Sevenson*, at *30.

This confirms that a treatment process of only one component, phosphoric acid, is not within the scope of the patentees' invention. Although the '936 patent draws heavily on Dr. Pal's revised application, this paragraph is not present in the application that issued as the '936 patent, nor the '936 patent itself. However, the prosecution history of the '936 patent includes arguments that show that phosphoric acid, alone, does not meet the limitations of the claimed process.

2. The patentees surrendered subject matter during the prosecution of the parent patent, the '936 patent.

The patentees also made an argument during the prosecution of the reexamination of the 5,193,936 patent ("the '936 patent") distinguishing the two-component invention claimed in Sevenson's patents from the one-component treatment processes.[3] Ex. 14. The '936 patent claims a process for stabilizing leachable lead that, just like the patents at issue in this case, uses a sulfate compound and a phosphate compound. The '936 patent claims mixing the solid waste with a "sulfate compound" and a "phosphate reagent," and has a nearly identical specification as the patents at issue. Ex. 14, claim 1.

The Patent Office granted a reexamination of the '936 patent on the ground that U.S. Patent 4,737,356 to O'Hara ("the O'Hara patent"), Ex. 10, raised substantial new questions of patentability. Ex. 13. The O'Hara patent teaches addition of water soluble phosphate, *especially phosphoric acid*, to immobilize lead and cadmium so as to make residues from burning solid wastes comply with certain toxicity tests. Ex. 10, abstract. During the reexamination, the inventors attempted to argue around the O'Hara patent by citing to O'Hara's statement that "data in Table 8 [of the O'Hara patent] shows unequivocally that phosphate is unique; neither sulfuric

[3] The '936 patent is ancestral to all five of the patents at issue in this case. *See* Ex. 8.

nor nitric acids immobilize lead and cadmium, nor do their salts," Ex. 13 at G002451 (emphasis original). The declaration of one of the inventors, Karl Yost, states that:

> The tests conducted by O'Hara were intended to show that other acids were not a suitable substitute for phosphoric acid in his process. In contrast, the present invention uses a sulfate source *in addition to phosphoric acid*.

Ex. 13 at G002451 (emphasis added).[4] Here again, the patentees disclaimed the possibility that phosphoric acid, alone, falls within the scope of the claims. Further, however, with respect to the O'Hara patent statement that flue gas scrubber product ("FGSP") "typically will contain such materials as calcium sulfate," Ex. 10, col. 5, lines 52–53, the patentees stated that "the FGSP [in the O'Hara process] would contain only negligible amounts of calcium sulfate. Moreover, one skilled in the art would find that O'Hara does not teach that the amount of calcium sulfate makes any difference whatsoever." Ex. 13 at G002369–70.

These statements, by an inventor, are clear and unmistakable disavowals of any argument that phosphoric acid, alone, satisfies the claim limitations of the asserted claims. Mr. Yost's declaration confirms that the invention claimed in the patents at issue must include a "first component" that is "separate and distinct" from a "second component," such as phosphoric acid. As Dr. Pierzynski explains in his additional Declaration, at the time of filing the application that issued as the '936 patent, the person of ordinary skill in the art would know that any phosphoric acid will have some level of sulfate impurities. (Ex. 16, ¶ ¶4–6). Thus, the patentees' argument that O'Hara contains only "negligible amounts" of a sulfate compound, Ex. 13 at G002369–70, would be understood by the skilled artisan as teaching that the sulfate impurities in phosphoric

[4] Here, the argument to the Examiner recognized that phosphoric acid contains sulfate impurities by use of the phrase "in addition to …." As early as 1990, a person of ordinary skill in the art would understand that phosphoric acid, such as that mentioned in Mr. Yost's Declaration, has some amount of sulfate impurities. See Ex. 16.

acid certainly do not satisfy the "first component" limitation. If phosphoric acid, with its impurities, combined with the "negligible amount of calcium sulfate" in O'Hara does not satisfy the claims, then phosphoric acid alone certainly does not.

The prosecution history therefore bars Sevenson from arguing both that a process employing only phosphoric acid infringes the claimed two-component system, and also that the sulfate impurities in the phosphoric acid such as that used in the Colonie treatment process meet the claim limitations of the "separate and distinct" "first component" for "supplying" sulfate. This even includes technical grade phosphoric acid ("TGPA"), since TGPA, as defined by the patents and properly construed by this Court, is a specific type of phosphoric acid having sulfate impurities as low as 2.5 % (by weight). *Sevenson*, at *43–44. Further, as the '936 patent is ancestral to all of the patents at issue, and contains the "sulfate compound" and "phosphate reagent" limitations, this prosecution history estoppel applies to all of the patents at issue. *Elkay Mfg.*, 192 F.3d at 980.

3. <u>The patentees disclaimed subject matter during the prosecution of the '982 patent, which also bars Sevenson from arguing that phosphoric acid, alone, meets the claim limitations.</u>

The patentees made similar narrowing arguments during prosecution of the '982 patent, which is an ancestor to all of the other patents at issue. *See* Ex. 8. The Examiner cited the O'Hara patent as the basis for rejecting the U.S. Patent Application 08/031,461 ('461 application") under 35 U.S.C. § 102(b). Ex. 9. (This application later issued as the '982 patent.) In response to the rejection, the patentees again cited the statement in the O'Hara patent that "data in Table 8 [of the O'Hara patent] shows unequivocally that phosphate is unique; neither sulfuric nor nitric acids immobilize lead and cadmium, nor do their salts," as the basis for their

argument that "[t]he sulfates supplied by the first component in the ['461 application] is neither taught nor suggested by O'Hara." Ex. 9 at G003055–3056.

The O'Hara process uses flue gas scrubber product ("FGSP") common in mass burning plants as one treatment additive. As taught in the O'Hara patent and confirmed by the inventors during prosecution of the '982 patent, FGSP reacts with latent sulfur dioxide during the scrubber process to form calcium sulfate. *See* Ex. 9 at G003055. Calcium sulfate is a member of the Markush group that defines Sevenson's "first group of treatment chemicals." '982 patent, col. 2, line 27. However, the patentees argued that although the O'Hara process included calcium sulfate, it "[taught] away from using calcium sulfate as taught in the ['982 Patent]." Ex. 9 at G003055.

To avoid the rejection based on O'Hara, the patentees removed hydroxides, lime and portland cement from the Markush group for the "first component." Ex. 9 at G003054. After doing so, the patentees explained that "[t]he remaining group that makes up the first component *no longer includes a member* that is taught by O'Hara." *Id.* (emphasis added). According to the inventors, "[t]he sulfates supplied by the *first component* in the ['982 patent] is neither taught nor suggested by O'Hara." Ex. 9, G003055 (emphasis added). Even though O'Hara clearly disclosed use of a phosphate, "especially phosphoric acid," *see* Ex. 10, abstract, and contained calcium sulfate, the inventors effectively argued that the O'Hara process did not anticipate the '982 patent because the '982 patent involved a sulfate *component in addition to* a phosphate component, such as phosphoric acid. Ex. 9 at G003055.

Thus, the applicants distinguished the O'Hara patent on the ground that the O'Hara process did not use a "separate and distinct" "first component," as required by Sevenson's patents, despite the presence of calcium sulfate, phosphoric acid, and the sulfate impurities in

phosphoric acid. By doing so, the inventors clearly narrowed the scope of their invention and disclaimed the subject matter allowing for phosphoric acid to serve as the "first component" for supplying, *inter alia*, sulfate, as well as the "second component." Accordingly, Sevenson is barred by the prosecution history from arguing that a process employing only phosphoric acid, such as TGPA, infringes its patented two-component system. Sevenson cannot argue that phosphoric acid is also a "first component" for "supplying" sulfate. Because the phosphoric acid in the O'Hara process would have included some amount of sulfate impurities, *see* Ex. 16, Sevenson is also barred from arguing that the sulfate impurities in the phosphoric acid used in the Colonie treatment process meet the claim limitation of the "first component." This bar applies to all of the patents at issue because the '982 patent is an ancestor to all of the patents at issue, and contains the "first component" and "second component" claim limitations. *Elkay Mfg.*, 192 F.3d at 980.

4. Narrowing arguments made during the prosecution of the '485 patent also bar Sevenson from arguing that phosphoric acid, alone, meets the claim limitations.

Similarly, during the prosecution of the '485 patent, the patentees faced anticipation and obvious rejections based on U.S. Patent 5,202,033 to Stanforth ("the Stanforth patent"), Ex. 12. *See* Ex. 11. The Stanforth patent teaches a method of treating solid waste in soil or solid disposed waste containing unacceptable levels of leachable metals, such as lead, cadmium, arsenic, zinc, copper and chromium, that includes mixing the solid waste or soil in place with a phosphate source or a carbonate source or ferrous sulfate. Ex. 12, abstract. As they did during the prosecution of the '936 and '982 patents, the patentees made narrowing arguments to distinguish the claimed invention on the ground that the prior art taught the use of only one component, phosphoric acid, whereas the invention claimed in the Sevenson applications

required two “separate and distinct” components, *e.g.* phosphoric acid *and* a “separate and distinct” sulfate component of “first component.”

The inventors argued around the Stanforth patent by first noting how Stanforth “discloses a process that: ‘consists of introducing a treatment additive consisting of a phosphate additive **or** carbonate additive **or** a chemical reducing additive such as a ferrous sulfate into the soil or waste.’” Ex. 11 at G004661 (*citing* Ex. 12 at col. 5, lines 39–42) (bold in original). Stanforth *specifically* claims phosphoric acid as one of the phosphate additives. *E.g.*, Ex. 12 claim 6. In fact, the inventors brought this to the Examiner’s attention: “Stanforth also discloses that ‘[t]he treatment additives are any of the following used individually or in combination: … phosphoric acid….” Ex. 11 at G004661 (*citing* Ex. 12 at col. 5, lines 56–63). Thus, according to the inventors, “Stanforth does not teach the use of a phosphate *and* a sulfate for the treatment of lead contaminated soils and waste materials.” Ex. 11 at G004661 (emphasis added).

The inventors clearly distinguished the ’485 patent from the Stanforth patent by arguing that the Stanforth process employed only one component, such as phosphoric acid, whereas the ’485 process employed a phosphate additive and a sulfate additive. Thus, the inventors again clearly and unmistakenly surrendered the subject matter allowing for phosphoric acid to serve as the “first component” for supplying, *inter alia*, sulfate, as well as the “second component.” Having relinquished this subject matter during prosecution of the ’485 patent, Sevenson may not use litigation to expand the claimed invention to include a process that employs only one component, phosphoric acid. *Wang Lab*, 103 F.3d at 1578. Accordingly, Sevenson is barred by

the prosecution history from asserting that use of phosphoric acid, including TGPA, meets the claim limitations of "first component" and "second component" as claimed in the patents.[5]

### C. Based on the Prosecution History, this Court should deny Sevenson's Motion for Partial Adjudication.

During the prosecution history of the parent '936 patent, and the '982 and '485 patents, the patentees made narrowing arguments to overcome rejections based on prior art processes. These statements are consistent with the distinction that is at the heart of this case: Sevenson's patents claim a process employing two "separate and distinct" components, whereas the Colonie treatment process employed only a single component, phosphoric acid. The inventors distinguished their invention on the ground that none of the prior art processes taught a phosphate component, such as phosphoric acid, *in addition to* a sulfate component. *E.g.*, Ex. 13 at G002451. These arguments have the same weight as claim amendments. *Elkay*, 192 F.3d at 979.

The clear and unmistakable disavowal that phosphoric acid alone can be both the first and the second components in the claimed process, in the prosecution history of the '936 patent, applies to all of the subsequent patents in the family, including all of the patents at issue. *Elkay* at 980. The same is true with the statements made during prosecution of the '982 patent, in which phosphoric acid *and* calcium sulfate impurities in the O'Hara patent did not meet the "first component" limitation, as the '982 patent is an ancestor to the remaining patents at issue, shares a nearly identical specification, and uses the similar claim terminology. Ex. 8. Therefore Sevenson is barred by the prosecution history from arguing that the sulfate impurities inherent in phosphoric acid can "supply" the "first component" from the first group of treatment chemicals.

[5] This bar also applies to analogous claim limitations, such as "phosphate supplying reagent" and "phosphate compound." *Sevenson*, at 30 n. 4.

Sevenson is also barred from now attempting to recapture what the inventors surrendered during the prosecution of this family of patents, that is, that phosphoric acid alone meets the claim limitations of "first component" and "second component" (or the analogous limitation "sulfate reagent," "phosphate supplying reagent" or "phosphate compound"). "Since, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover, he is by implication surrendering such protection." *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997). The clear and unambiguous disclaimers in the prosecution history are dispositive of Sevenson's Motion for Partial Adjudication, and on this basis alone this Court can and should deny Sevenson's Motion.

## IV. THE PROPER SCOPE OF SEVENSON'S PATENTS DOES NOT COVER THE PHOSPHORIC ACID USED AT THE COLONIE TREATMENT PROCESS.

Not only should this Court deny Sevenson's Motion on the grounds of prosecution history disclaimer and estoppel, but it should also deny Sevenson's Motion because the single-component process used at the Colonie site does not fall within the scope of the asserted claims. The claimed invention requires two "separate and distinct" components, a first for supplying, *inter alia*, sulfate, and a second for supplying phosphate. The treatment process at the Colonie site employed only a single component, phosphoric acid. There was no "mixture" of two "separate and distinct" components at the Colonie site, as taught by and required in the patents, and the sulfate impurities were too *de minimis* to "supply" sulfate to reduce leachable lead within the proper scope of the patents.

### A. The claims require a process that employs a "first component" that is "separate and distinct" from a "second component."

This Court construed the term "first component" to mean "a separate and distinct compound capable of supplying at least one of the listed members" of the Markush group that

includes sulfates. *Sevenson*, at *29. Similarly, this Court has construed the term "second component" to be "a separate and distinct compound capable of supplying at least one phosphate anion." *Sevenson*, at *30. The Court has also determined that the terms "phosphate supplying reagent" as used in the '485 patent, and"phosphate compound" as used in the '608 patent, have the same definition as "second component." *Sevenson*, at *30 n. 4.

The prosecution history, discussed at III, *supra*, makes it clear that the invention claimed in Sevenson's patents requires a sulfate component in addition to phosphoric acid. The patents teach that phosphoric acid is a member of the Markush group of compounds that supply phosphate, *i.e.* a "second component." This is also apparent from the patents' disclosure of adding the two components in either a single step or a two-step process. The conclusion from this is clear– phosphoric acid, alone, does not meet the limitations of the asserted claims.

1. <u>Sevenson's patents teach that phosphoric acid is only a "second component."</u>

Sevenson's patents claim a two-component chemical treatment method for stabilizing leachable metal (or leachable radionuclides in the case of the '367 and '608 patents). The patents have nearly identical specifications, and share the same drawings. The claims, written descriptions and drawings for each of the patents are all consistent with a two-component system, wherein the "first component" "supplies" a member of a first group of treatment chemicals, such as sulfate, and a "separate and distinct" "second component" "supplies" phosphate. *Compare*, *e.g.*, the '982 patent *with*, *e.g.*, the '485 patent.

Each asserted patent identifies a "first group of treatment chemicals" for supplying, *inter alia*, sulfate, including "lime, gypsum, alum, halites, Portland cement, and other similar products that can supply sulfates, halides, hydroxides and/or silicates." '982 patent, col. 3, lines 16–19; '367 patent, col. 4, lines 4–7; '123 patent, col. 3, lines 26–29; '608 patent, col. 3, lines 30–34;

’485 patent, col. 4, lines 46–49. Similarly, the patents identify various “second group” treatment chemicals for supplying the phosphate anions, including “products such as phosphoric acid, pyrophosphates, triple super phosphate (TSP), trisodium phosphate, potassium phosphates, ammonium phosphates and/or others capable of supplying phosphate anion.…” ’982 patent, col. 3, lines 20–26; ’367 patent, col. 4, lines 9–14; ’123 patent, col. 3, lines 30–38; ’608 patent, col. 3, lines 35–41; ’485 patent, col. 4, lines 50–56.

This Court noted that the members of the first and second groups are “compounds.” *Sevenson*, at *33. The patents also interchangeably refer to the constituents of the Markush groups for the first and second groups, such as, *inter alia*, “products,” *e.g.* ’982 patent, Fig. 1; “chemicals,” *e.g.*, ’982 patent, col. 4, lines 16; “agents,” *e.g.*, ’123 patent, col. 4 line 63; “additives,” ’608 patent, col. 3, lines 19; “components,” *e.g.*, ’982 patent, col. 5 line 39; “ingredients,” *e.g.*, ’982 patent, col. 5 line 53; and again “compounds,” *e.g.*, ’982 patent, col. 13, line 5 (stating that “one or more compounds of the same group can be used together ….”). This wide variation in terminology for, and the contrast between, the first and second components shows that the first and second components are truly “separate and distinct” compounds. Further, it shows that sulfate impurities inherent in phosphoric acid do not make phosphoric acid two “separate and distinct compounds” within the proper scope of the patents.

The “separate and distinct” nature of the first and second components is highlighted by the references each patent makes to phosphoric acid. *None* of the patents list phosphoric acid as a member of the “first group of treatment chemicals.” Each patent, however, *does* include phosphoric acid in the “second group” of treatment chemicals. *See, e.g.*, ’982 patent, col. 3, lines 20–22 (“A second group consists of treatment chemicals … includes products such as phosphoric acid ….”); ’123 patent, col. 13, line 4 (describing phosphoric acid as “an additive

from group two"). The patents go so far as to claim phosphoric acid as the *second* component in dependent claims for supplying phosphate. *E.g.* , claim 9 of the '982 patent ("said second component is phosphoric acid"). However, none of the patents claim phosphoric acid as the "first component."

Even the drawings common to all of the patents at issue show the "separate and distinct" nature of the two components claimed in Sevenson's patents. As the Court noted in its Claim Construction, "[t]he drawings accompanying each of the patents also show a separate and distinct group of treatment chemicals." *Sevenson*, at *27–28. Each drawing clearly identifies a tank for the "Group One Treatment Chemicals," that is "separate and distinct" from a tank for the "Group Two Treatment Chemicals." *E.g.,* '982 patent, Figs. 1–3. The "two-tank" source of the first and second components is also evident by reviewing the plethora of references to "group one" chemicals and "group two" chemicals included in the specifications of each of the patents. Although the components may reach the contaminated material together, during the treatment process they originate from separate and distinct sources, such as containers of calcium sulfate powder or phosphoric acid tanks. Even the various examples included in the patents reference "group one" components as "separate and distinct" from "group two" components or, in other words, chemicals coming from separate sources. *See, e.g.,* '982 patent, col. 10, lines 61–63 ("In test run I, mixing of lime and gypsum *from group one additives* and phosphoric acid *from group two* ….") (emphasis added).

It is clear that the patentees considered phosphoric acid as a member of the second group of treatment chemicals, and never a member of the first group for supplying sulfate or another compound from the first group. This is consistent with the patentee's arguments to distinguish

their invention from prior art processes using only phosphoric acid during prosecution. *See* discussion of Prosecution History Estoppel, *supra* III.

2. The patents teach the addition of two "separate and distinct" components in either a one-step or two-step process.

The patents at issue disclose a process of mixing two "separate and distinct" compounds in either a single-step process, or a two-step process. *E.g.*, '982 patent, abstract. Sevenson has admitted as much in its supporting Memorandum by stating that "[t]he patents are explicit in their teaching that the treatment *additives* ("*components*") may be *simultaneously* applied to the hazardous material to be treated in a single-step process." Dkt. No. 59, at 6 (emphasis added). Regardless of whether the treatment process is a single step, or multiple steps, the claimed invention requires two "separate and distinct" compounds. In the "Treatment Method" section, the '982 patent teaches that "[a]t least one component from group one is added to the mixing vessel or reactor ... [and] [a]t least one component from group two is added to the mixing vessel or reactor." '982 patent, col. 5, lines 39–45.

In the two-step process, the contaminated media is mixed with a "first component" for supplying, *inter alia*, sulfate, then with a "second component" for supplying phosphate. '982 patent, col. 2, lines 23–35. While the two-step process may be reversed, such that the contaminated media is first mixed with the "second component" and then subsequently with the "first component," *e.g.* '982 patent, col. 5, lines 45–53, the specification and drawings make it clear that the process requires two "separate and distinct" compounds. *Compare* '982 patent, Fig. 2a, *with* '982 patent, Fig. 2b (showing reversibility of the two-step process).

The patents also disclose a one-step process, which like the two-step process requires the addition of two "separate and distinct" compounds to a contaminated media. '982 patent, col. 5, lines 46–48. Unlike the two-step process, however, the one-step process mixes or combines the

two "separate and distinct" components prior to contact with the contaminated media. '982 patent, col. 5, lines 47–48. "Figure 1 exhibits the single step mixing method of treatment chemicals," '982 patent, col. 4, lines 25–26, and clearly depicts two "separate and distinct" compounds, one from the "group one treatment chemicals," and a second from the "group two treatment chemicals." '982 patent, Fig. 1. The fact that the two "separate and distinct" components may be combined prior to treatment, or added in separate steps, confirms that the components must originate from "separate and distinct" sources, consistent with the drawings common to all of the patents. This logic also shows that the proper scope of the "first component" limitation does not include impurities contained in the "second component."

Claim 1 of the '982 patent, which requires "mixing a metal-bearing material with a first mixture," is demonstrative of a single-step process. This "first mixture" is the "first component plus the second component mixed together." *Sevenson*, at * 59. Thus, a component of the first group that supplies sulfate, such as gypsum, is mixed with a component of the second group that supplies phosphate, such as phosphoric acid. '982 patent, col. 3, lines 16–26; *see also* '982 patent, claim 5 (listing a Markush group for the "first component" that includes gypsum); '982 patent, claim 6 (listing a Markush group for the "second component" that includes phosphoric acid).

3. <u>The examples showing successful use of phosphoric acid, alone, show that Sevenson's patented two-component process is not necessary for every contaminated media.</u>

Some of the examples in Sevenson's patents show successful use of only phosphoric acid. In Example 1, the patentees report results of adding in a single step "sufficient amounts" of group one and group two treatment chemicals and reagents to soil contaminated with lead. '982 patent, col. 10, lines 23–36 and Table III. The treatment additive for Test Run XII is 15.1%

phosphoric acid, which reduced the TCLP level to 3.6 mg/l. The patentees conclude that "[a]lthough the treatment chemicals of group two are more effective in decreasing the TCLP lead than the treatment chemicals of group one ... the combined effect of both groups is even more pronounced in decreasing the leachable lead." '982 patent, col. 10 line 65–col. 11, line 3. This example continues to explain the advantages of using two components, particularly lime (group one) and phosphoric acid (group two). '982 patent, col. 11, lines 15–61. There are some entries in Table IV in which phosphoric acid, alone, successfully reduced leachability. '982 patent, Table IV.

However, the examples showing successful use of only one component are quite distinct from the invention as claimed in the patents at issue and as described in the prosecution history. The claimed invention clearly calls for two "separate and distinct" components, one selected from a first group, and one selected from a second group. *E.g.*, '982 patent, col. 2, lines 21–35 (summarizing the invention as mixing the solid waste with a sulfate compound, such as gypsum powder, with a phosphate reagent, such as phosphoric acid). The patents even contain claim limitations requiring a "first component" for supplying, *inter alia*, sulfate, that is "separate and distinct" from a "second component" for supplying phosphate. *E.g.*, '982 patent, claim 1.

The patents repeatedly list phosphoric acid as a member of the second group of components, for supplying phosphate. The examples using only phosphoric acid show that not all contaminated media require Sevenson's two-component invention to meet TCLP criteria. The contaminated soil at Colonie was such a media, as it did not require an additional component for supplying sulfate to meet TCLP criteria.[6] Further, the patentees' disclosure of

[6] In the Final Treatability Study, Kiber considered a component for supplying sulfate, ferrous sulfate, but ultimately concluded that phosphoric acid alone would be sufficient. Ex. 3 at G000136–137.

successful tests using only phosphoric acid, but failure to claim a treatment process using only one component, such as phosphoric acid, constitutes a dedication of that subject matter to the public. *Maxwell v. Baker*, 86 F.3d 1098, 1106 (Fed. Cir. 1996) (stating the well-established rule that “subject matter disclosed but not claimed in a patent application is dedicated to the public.”) (quoting *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1562–63 (Fed. Cir. 1991)).

The patentees’ acknowledgment that phosphoric acid, alone, may be sufficient in certain circumstances, is also consistent with the prosecution history. The patentees distinguished their invention from prior art by arguing that the invention uses a sulfate source *in addition to phosphoric acid*.” Ex. 13 at G002451 (emphasis added). This distinction is also the only way to reconcile the explicit statement in each patent that phosphoric acid, alone, does not reduce leachable lead to below the regulatory maximum:

> [s]ingle application of phosphoric acid… was short of meeting the regulatory threshold of 5.0 mg/l by TCLP Test criteria for lead.” '982 Patent, col. 16, lines 53–56. Each patent includes the teaching that phosphoric acid, without an additional source of sulfate, is insufficient to reduce the leachability of lead to satisfy the TCLP test.

’982 patent, col. 16, lines 53–56; ’367 patent, col. 20, lines 49–62; ’123 patent, col. 17, lines 1–15; ’608 patent, col. 20, lines 38–52; ’485 patent, col. 19, lines 26–40. Of particular importance is the fact that a person of ordinary skill in the art would understand that phosphoric acid, as mentioned in the patents and prosecution history, includes some amount of sulfate impurities. Ex. 16, ¶ ¶4–6. Therefore, while Sevenson’s patents claim a process employing two components, such as a sulfate component and a phosphate component, the patents disclose but do not claim that a single-component process may be sufficient to stabilize certain contaminated media. The soil at the Colonie site was such a media.

**B. The Colonie treatment process used only a single component: diluted phosphoric acid.**

The Colonie treatment process does not fall within the scope of the claims because the process involved only one treatment chemical, a phosphoric acid, trade named Prayphos P5. Stip. Facts ¶¶ 10, 12. There was no additional component "separate and distinct" from this phosphoric acid. The accused process can not meet the claim limitations of a "first component" that is "separate and distinct" from a "second component," and therefore does not fall within the scope of the asserted claims.

Sevenson argues that the sulfate impurity in the phosphoric acid is a "separate and distinct" component. Dkt. No. 59, at 18. This argument lacks any support in the patents or the prosecution history.. The "first component" for supplying sulfate must be "separate and distinct" from the "second component." Yet, the sulfate that, as Sevenson agrees, is a "separate and distinct" "first component" in Prayphos P5 is in fact an impurity arising in the manufacture of any wet process acid. Stip. Facts ¶ 11. The sulfate impurity inherent in phosphoric acid is not a "separate and distinct" compound from phosphoric acid. It is worth repeating that Sevenson is barred by the prosecution history from arguing that a process employing only phosphoric acid, such as the Colonie treatment process, falls within the scope of the claims. *See* discussion of Prosecution History, *supra* III.

Clearly, the "first component" must be a compound or chemical that is physically "separate and distinct" from the compound or chemical comprising the "second component." In other words, the two components must have been separate from each other at some point in the process, *e.g.*, a two-tank system that supplies "separate and distinct" treatment chemicals. As discussed above, the patents make numerous contrasting references to the compounds, additives, products, chemicals, etc. that comprise the first and second groups. *See* discussion of

Sevenson's patents, *supra* IV.A. The patents consistently refer to phosphoric acid as a member of only group two, and several dependant claims select phosphoric acid as the second component, but never the first component for supplying, *inter alia*, sulfate. '982 patent, claim 5.

As the only treatment chemical used at Colonie was diluted Prayphos P5, Stip. Facts ¶ 12, there is no "separate and distinct" component for supplying sulfate in the Colonie treatment process. There was no sulfate source involved in the on-site stabilization process "separate and distinct" from the phosphoric acid. The Colonie process did not involve "mixing [a] solid waste and sulfate compound with a phosphate reagent, such as phosphoric acid," as taught in and claimed by the patents at issue. '367 patent, col. 3, lines 20–21. Accordingly, the process used at Colonie cannot possibly fall within the scope of any of the asserted claims.

**C. Prayphos P5 is not Technical Grade Phosphoric Acid ("TGPA").**

Sevenson suggested that the disclosure of TGPA as a sufficient source for both sulfate and phosphate in the '367 and '608 patents serves as a basis for concluding that the patents at issue claim a process employing only phosphoric acid. Dkt. No. 59, at 8. First, the '367 and '608 patents claim a method for reducing leachable radioactive materials, not leachable heavy metals. More importantly, though, is the fact that Prayphos P5 is not TGPA as that term has been defined in the patents and properly construed by this Court.

This Court properly construed the term "technical grade phosphoric acid" as used in the patents as "phosphoric acid that contains up to 70% (by weight) phosphate (as $P_2O_5$) and sulfate ($SO_4^{2-}$), typically as sulfuric acid in the range of 2.5% to 7% (by weight) as an impurity. *Sevenson*, at *43–44. As is clear from the specification, the patentees envisioned that TGPA would work as both the "first component" and the "second component" for stabilizing radionuclides because TGPA has sufficient sulfates to function as a "first component" while also

serving as the "second component." The evidence shows, however, that the phosphoric acid used at Colonie contained significantly *less* sulfate than prescribed in Sevenson's patents.

The phosphoric acid used in the Colonie treatment process, sold under the trade name Prayphos P5, is a "purified phosphoric acid" with a maximum sulfate impurity concentration 350 ppm, and a "typical results" concentration of 230 ppm. Ex. 5. Converting between ppm and percent by weight requires use of the relationship that 10,000 ppm = 1.0 % (by weight). Ex. 6 at ¶ 6. Thus, for the sulfate impurities in Prayphos P5 reported in the Specification Data Sheet:

Guaranteed: 350 ppm sulfate = 0.0350 % (by weight) sulfate

Typical: 230 ppm sulfate = 0.0230 % (by weight) sulfate

Whereas the minimum range of sulfate impurities prescribed in the Sevenson patents is 2.5 % (by weight), the sulfate impurities in Prayphos P5 are, at a *maximum*, 0.0350 % (by weight). Thus, the phosphoric acid used at Colonie contains, *at most*, 1.4% of the *minimum* amount of sulfate impurities for TGPA as taught in Sevenson's patents, 2.5% (by weight).

This distinction is also apparent when viewing the sulfate concentrations in terms of ppm. TGPA contains sulfate impurities at a concentration of:

2.5 % (by weight) x (10,000 ppm / 1.0 % (by weight)) = 25,000 ppm $SO_4$

Clearly, at a *maximum* concentration of 350 ppm, the sulfate impurity in Prayphos P5 is well below the 25,000 ppm *minimum* concentration of sulfate to be considered TGPA under both this Court's claim construction, and the specifications of the '367 and '608 patents.

The distinction between the TGPA envisioned by the inventors of Sevenson's patents and Prayphos P5 becomes even more clear after inspection of the certificates of analysis for actual shipments of Prayphos P5 used at the Colonie site. Ex. 7. The actual concentrations of sulfate impurities in Prayphos P5 reported in the attached Certificates of Analysis are 13 ppm, 203 ppm,

and 187 ppm. *Id.* Expressed in percent weight, they are 0.0013 % (wt), 0.0203 % (wt), and 0.0187 % (wt), respectively. Ex. 6 at. ¶ ¶ 14, 20–21. According to Dr. Pierzynski, "Prayphos P5 is not TGPA as defined in Sevenson's patents and as construed by the Court, and Prayphos P5 does not contain any meaningful amount of sulfate." Ex. 6 at ¶ 21.

Given the negligible concentration of sulfate impurities in Prayphos P5, it is clear that the phosphoric acid used in the Colonie treatment process is not TGPA according to either the Court's proper construction of the term, or the very definition found within the patents at issue. More importantly, as the sulfate concentration in Prayphos P5 is "from a chemical reaction point of view, negligible, and would not participate meaningfully in any chemical reactions," Ex. 6 ¶ 21, the phosphoric acid used at the Colonie site simply does not fall within the proper scope of the "first component" limitation as required in the patents. Accordingly, a person of ordinary skill in the art would not understand Prayphos P5 to meet the any of the asserted claims.

### D. The Colonie treatment process involved no "first mixture" of a "first component" and a "second component" as required by the patents.

Generally, the patents at issue require a "first mixture" comprised of the "first component" and the "second component" mixed together. *E.g.*, '982 patent, claim 1. Sevenson argues that because Prayphos P5 is phosphoric acid which, like all phosphoric acids, contains sulfate impurities, it meets the "first mixture" claim limitation. Dkt. No. 59, at 17–18. This argument lacks support, as review of the specifications and prosecution history clearly shows that the claimed invention requires a compound from group one, i.e. "first component," to be mixed with a compound from group two, i.e. "second component." As the Colonie treatment process employed only one component, phosphoric acid, it did not, and can not, meet the limitations requiring a mixing of two "separate and distinct" components.

Claim 1 of the ’982 patent requires “a first mixture comprising a first component and a second component.” This Court properly construed the term “first mixture” as the “first component plus the second component mixed together.” *Sevenson*, at *59–60. Similarly, claims 1 and 15 of the ’123 patent requires “a treatment additive comprising a first component and a second component.” The same requirement for a “treatment additive” exists in claim 20 of the ’608 patent, claims 1, 15, and 22 of the ’485 patent. This Court properly construed the term “treatment additive” as the “[f]irst component plus the second component mixed together.” *Sevenson*, at *76. Likewise, claims 28 of the ’485 patent requires a “combination of sulfuric acid and a phosphate supplying reagent,” while claim 30 of the ’485 patent requires a “combination of a sulfate reagent which includes one or more reactive sulfate ions and a phosphate supplying reagent.” This Court property construed “combination” as “a result or product of bringing two or more entities into close relationship.” *Sevenson*, at *96.

It is evident from the numerous references to chemicals of the first group of treatment additives, such as calcium sulfate, being “separate and distinct” from the members of the second group of treatment additives, that the claim limitations of “first mixture,” “treatment additive” and “combination” require a deliberate mixing or joining of two separate chemicals.[7] In the Joint Claim Construction, the parties agreed that “mix” means “to combine or join two or more things.” Thus, for a “first component” to be joined or combined with a “second component,” the components must have existed independent of each other in a “separate and distinct” manner. Such is not the case with the Prayphos P5 used at the Colonie site.

---

[7] For example, the “Treatment Method” section of the specification teaches “[t]he ingredients of group one and group two can be added … simultaneously, and they are pre-mixed and added in a single step. Alternatively, the components of group one and two can be added sequentially ….” ’982 Patent, col. 5, lines 46–50.

The Colonie treatment process used only Prayon's purified phosphoric acid, diluted with water, to reduce the leachability of lead. Stip. Facts ¶ 12. At no point did Defendants mix or join any sulfate compound with this phosphoric acid. Sulfuric acid was never introduced to the Colonie treatment process, nor was sulfuric acid ever "brought into close relationship" with Prayphos P5. The Colonie treatment process employed no "first component" whatsoever. Therefore, the Colonie treatment process does not, and can not, meet the claim limitations of "first mixture," "treatment additive" or "combination" as claimed in the Sevenson patents. Sevenson is also barred from arguing that phosphoric acid, alone, meets the claim limitations. *See* discussion of Prosecution History Estoppel, *supra* III.

**E. The Colonie treatment process did not "supply" sulfate to the stabilization process as required by Sevenson's patents.**

1. <u>Sulfate must be present in large enough quantity to participate measurably in the reactions, i.e. stabilize leachable metal.</u>

Sevenson cited to *Northern Telecom* for the proposition that "unless a claim specifically requires a minimum quantity of material to meet the claim, even 'trace' amounts of a claimed material found in the accused product or method will literally meet the claim." Dkt. 59, at 15 (citing *Northern Telecom Ltd. v. Samsung Electronics Co., Inc.*, 215 F.3d 1281, 1290–91 (Fed. Cir. 2000)). In *Northern Telecom*, the Federal Circuit held that "it will not read unstated limitations into claim language." *Northern Telecom*, at 1290. The claimed invention involved a "process for gaseous etching of aluminum and aluminum oxide." *Id.* at 1283. Appealing the district court's claim construction that the claim term "aluminum and aluminum oxide" means pure aluminum and aluminum oxide, Samsung argued that the aluminum must be arranged in a "layer," notwithstanding that "layer" appeared nowhere in the claim. *Id.* at 1289–90. The Federal Circuit disagreed with Samsung, explaining that "[n]ot only is the term "layer" not found

in claim 1, but neither is a limitation that establishes a minimum quantity of aluminum that must be etched to meet the claim." *Id.* at 1290.

Unlike the claim at issue in *Northern Telecom*, the asserted claims of Sevenson's patents include limitations establishing a minimum quantity. This Court has already explained that interpreting the patents to require only a single anion "does not conform with the purpose of the patent." *Sevenson*, at *37. The purpose of the patents at issue is to "treat metal-bearing materials to stabilize leachable metal therein." *Id.* at 39. As this Court explained, "[a] person skilled in the art would likely understand that more than a single molecule of phosphate is required for that purpose." *Id.* "This purpose could not be accomplished with a single molecule of (PO4)3-." *Id.* at *40. The same is true for the "first component" that supplies, *inter alia*, sulfate. *Id.* at *69.

The claims require a "first component" that "supplies at least one member selected from the group consisting of sulphates [sic], halites, and silicates." '982 patent, claim 1. The "first component" must be a "separate and distinct compound." *Sevenson*, at *26. The term "supply" means "to make available for the stabilization process." *Id.* at *52. The term "stabilize" means to "convert into non-leachable form ...." *Id.* at *49. The patents teach addition of a sulfate compound, such as gypsum, to form "hard sulfates" that are insoluble in water. '982 patent, col. 5, line 59–col. 6 line 18.

This Court has already explained that "the specification establishes that the sulfate ion must be reactive in order to convert leachable metals into a non-leachable form. *Id.* at *68. "To convert leachable metal into non-leachable form, more than a single molecule of sulfate is required. *Id.* at *69. Sulfate therefore must be "present in large enough quantities to participate measurably in the chemical reactions defined in the patents." *Id.* at 69–70. In other words, the

"first component" must "supply"sufficient sulfate to "participate measurably" in the stabilization process.

2. <u>*De minimis* amounts of sulfate do not meet the claim requirements.</u>

The requirement that the "first component" must "supply" sufficient sulfate to "participate measurably" in the stabilization process is similar to the Federal Circuit's analysis in *Phillips Petroleum Co. v. Huntsman Polymers Corp.*, 157 F.3d 866 (Fed. Cir. 1998). In *Phillips Petroleum*, the Federal Circuit faced the issue of whether impurities present in the defendants' products met the patent's claim limitations that required a "block copolymer" product. *Id.* at 877. Based on the prosecution history, the Federal Circuit concluded "that the patentee intended the term 'block copolymer' to require (1) that the composition contain a threshold amount of block copolymer molecules with adjacent polymer blocks; and (2) that the polymer blocks comprise a significant portion of the molecules that make up the 'block copolymer.'" *Id.* at 873. Thus, the "patentee indicated a clear intent to limit the term 'block copolymer.'" *Id.* at 874. The Court found no support for the patentee's argument that the claim covered a product "in which block copolymer molecules are only a minor fraction of the entire product." *Id.* at 875.

The accused product of the first defendant in *Phillips Petroleum* had "25 ppm block copolymer molecules, making 99.9975% of its product other polymer substances," and the second defendant "stipulated that its product contained a maximum of 60 ppm block copolymer molecules, making 99.994% of its product other polymer substances." *Id.* at 871. The Federal Circuit held that the *de minimis* impurities in the defendants' products, at concentrations up to 60 ppm, "would not be sufficient for the products to be classified as block copolymers within the scope of the claims." *Id*. The concentration of impurities in *Phillips Petroleum* were of the same order of magnitude as other impurities in the product, and several orders of magnitude smaller

than the recognized meaning of “block copolymer” in the prior art. *Id*. Affirming the district court’s grant of summary judgment of noninfringement, the Court held that “[t]he insignificant amounts of block copolymer molecules conceded to be in the defendants' products for purposes of the summary judgment motion of noninfringement, if present, would not be sufficient for the products to be classified as block copolymers within the scope of the claims.” *Id.* at 877.

As in the *Phillips Petroleum* case, the prosecution history in the present case shows that the patentees intended to limit the claim terms. The patentees clearly meant to limit the “first component” to a compound “separate and distinct” from phosphoric acid, and a compound that supplies more than a negligible amount of sulfate. For example, one of the inventors distinguished the invention from a prior art process using phosphoric acid by stating that “the present invention uses a sulfate source *in addition to phosphoric acid*.” Ex. 13 at G002451 (emphasis added). Since phosphoric acid, alone, was insufficient to meet the claimed invention during prosecution of the ’926, ’982 and ’485 patents, any sulfate impurities in phosphoric acid must be outside the “first component” claim limitation. Moreover, since the O’Hara process would supply only “negligible amounts of calcium sulfate,” Ex. 13 at G002369–70, the “first component” must supply more than a *de minimis* amount of sulfate. *See also* discussion of Prosecution History Estoppel, *supra* III.

The patentees made these limiting statements fully knowing that phosphoric acid has sulfate impurities. The date of the correspondence with the USPTO in regards to the ’485 patent, Ex. 11, is March 21, 2000, whereas the filing date of the ‘367 patent, which discloses TGPA used to stabilize leachable radionuclides, is June 14, 1996. Further, “[a] person of ordinary skill in the art would understand that the statements regarding phosphoric acid made in the

prosecution history of U.S. Patent 5,193,936, U.S. Patent 5,527,982 and U.S. Patent 6,139,485 incorporate the knowledge that phosphoric acid contains sulfate impurities." Ex. 16 ¶ 5.

3. <u>The only mention of sulfate impurities in Sevenson's patents is in the discussion of TGPA for use in stabilizing radionuclides.</u>

The only discussion of sulfate impurities in any of the asserted patents appears in the '367 and '698 patents, which claim a process to reduce leachable radionuclides. These two patents teach that the sulfate impurities in a particular compound, technical grade phosphoric acid ("TGPA") are a sufficient source for sulfate ions, and therefore TGPA may be used as a single component to reduce leachability of radionuclides. '367 Patent, col. 6, lines 52–57; '608 Patent, col. 6, lines 6–11. These patents do not teach TGPA for treating lead. In both of these patents the inventors clearly define the TGPA which they considered to be a sufficient source of sulfate, *see* '367 Patent, col. 6, lines 52–57; '608 Patent, col. 6, lines 6–11, and this Court has properly construed the term TGPA as used in Sevenson's patents. *Sevenson*, at *43. Not only do both of these patents specifically identify the minimum amount sulfate sufficient for classification as TGPA, both the '367 and the '608 patents teach away from using phosphoric acid as a single component:

> Evaluation of a single treatment chemical in one step reveals that phosphoric acid was most effective in fixation of leachable lead followed by granular super-phosphate…. *However, neither treatment effectively treated leachable lead to the USEPA treatment standard of 5.0 mg/l by TCLP methodology*.

'367, col. 20, lines 49–55; '608, col. 20, lines 38–45 (discussing results of single step, single treatment chemicals in Table VII) (emphasis added). Prayphos P5 is not TGPA, and it contains far less sulfate than the minimum amount prescribed in the only patents to teach using a single treatment additive. *See* discussion *supra* IV.D.

4. The sulfate impurity in Prayphos P5 is *de minimis* and therefore does not "supply" sulfate within the scope of the asserted claims.

The concentration of sulfate in Prayphos P5 is *de minimis*, and therefore the phosphoric acid used at the Colonie site does not, and can not meet the claim limitations of a "first component" that "supplies" sulfate for the stabilization process. At a *maximum* concentration of 350 ppm of sulfate, Prayphos P5 does not contain anywhere near the amount of sulfate necessary to be considered TGPA as defined in the patents and as properly construed by this Court. *See* discussion *supra* IV.C. In fact, the sulfate in Prayphos P5 is "negligible." As such, the Colonie process did not involve supplying sulfate that "participated measurably" in the stabilization process.

Any sulfate ions that were present in the Colonie treatment process were present at *extremely* low concentrations as *inherent impurities* in the phosphoric acid. Prayphos P5, the phosphoric acid used at the Colonie site, is manufactured by a purified wet-process. Stip. Facts ¶ 10. Despite additional purification steps, no phosphoric acid made by the wet process will be completely free of sulfate impurities. Ex. 6 at ¶¶ 17, 18; 20–21. The person of ordinary skill in the art knew this at the time the patentees disclaimed using only phosphoric acid in the prosecution history. Ex. 16, ¶ ¶4–6; *see also* discussion of prosecution history, III, *supra*. Nonetheless, the sulfate impurities in Prayphos P5 are present at concentrations less than 350 ppm, or 0.0350 % (by weight). Exs. 5, 7; Ex. 6 at ¶¶ 14, 20. As Dr. Pierzynski explains:

> [T]he concentration of sulfate in Prayphos P5 is, from a chemical reaction point of view, negligible, and would not participate meaningfully in any chemical reactions. Thus, Prayphos P5 is not TGPA as defined in Sevenson's patents and as construed by the Court, and Prayphos P5 does not contain any meaningful amount of sulfate."

Ex. 6 at ¶ 21. The *de minimis* sulfate impurities in Prayphos P5, at such a negligible concentration, are too small to be "supplied" for the stabilization process within the proper scope

of the claims. This *de minimis* impurity is not the "first component" within the proper scope of the patents. Thus, the accused process can not meet the claim limitations of a "first component" that "supplies" sulfate for the stabilization process.

## V. CONCLUSION

For the reasons discussed above, the accused lead stabilization treatment process at the Colonie, New York FUSRAP site does not fall within the scope of the asserted claims of Sevenson's patents. Accordingly, this Court should deny Sevenson's Motion for Partial Adjudication.

Respectfully submitted,

Dated: July 30, 2007

PETER D. KEISLER
Assistant Attorney General

JOHN J. FARGO
Director

s/ Joshua B. Brady
JOSHUA B. BRADY
Attorney
Civil Division
U.S. Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0285
Facsimile: (202) 307-0345

OF COUNSEL:
Susan Mitchell
Attorney
U.S. Department of Justice

Attorneys for Defendant the United States

Dated: July 30, 2007

s/ Russel O. Primeaux
Russel O. Primeaux
Kean Miller Hawthorne D'Armond
McCowan & Jarman LLP
One American Place, 22nd Floor, P.O. Box 3513
Baton Rouge, LA 70821-3513
(225) 387-0999
Russel.Primeaux@keanmiller.com

Attorney for Intervenor-Defendant Shaw
Environmental, Inc.