**IN THE UNITED STATES COURT**
**OF FEDERAL CLAIMS**

| | |
|---|---|
| **SEVENSON ENVIRONMENTAL SERVICES, INC.,** | |
| **Plaintiff,** | |
| **vs.** | **Case No.: 05-1075C** <br> **Judge Thomas C. Wheeler** |
| **THE UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **SHAW ENVIRONMENTAL, INC.,** | |
| **Defendant-Intervenor.** | |

**SEVENSON ENVIRONMENTAL SERVICES, INC.'S REPLY**
**IN SUPPORT OF ITS MOTION**
**FOR PARTIAL SUMMARY ADJUDICATION RELATING TO INFRINGEMENT**

Brian E. Ferguson
McDERMOTT WILL & EMERY LLP
600 13th Street, N.W.
Washington, D.C. 20005
(202) 756-8000
bferguson@mwe.com

Kevin A. Szanyi
Nelson Perel
WEBSTER SZANYI LLP
1400 Liberty Building
Buffalo, New York 14202
(716) 842-2800
nperel@websterszanyi.com

Attorneys for Plaintiff, Sevenson Evironmental
Services, Inc.

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ....... 1

II. RESPONSE TO DEFENDANTS' ARGUMENTS ....... 2

A. Defendants Concede Many Of The Points Made By Sevenson ....... 2

B. Prayphos P5 Is A "First Mixture" As Defined By The Court ....... 3

C. Prayphos P5 "Supplies" Sulfate Ions, Contrary To Defendants' Argument ....... 7

D. Prayphos P5 Is Technical Grade Phosphoric Acid, Contrary To Defendants' Argument ....... 7

E. Defendants' Prosecution History Arguments Fail Because The Inventors Never Disclaimed Coverage Of Phosphoric Acid As A Source Of Both Sulfate And Phosphate ....... 9

1. The Prior Art Did Not Teach The Sevenson Invention ....... 10

2. The File History Statements Reflect The Prior Art's Failure To Disclose The Sevenson Invention ....... 11

3. Other Parts Of The File History Show No Disclaimer Took Place ....... 15

III. CONCLUSION ....... 17

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298 (Fed. Cir. 2003)................6

*Biogen, Inc. v. Berlex Labs, Inc.*, 318 F.3d 1132 (Fed. Cir. 2003)............................................12

*Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334 (Fed. Cir. 1999)..........................15

*Inverness Medical Switzerland GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 774 (Fed. Cir. 2002)..........................................................................................12

*Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052 (Fed. Cir. 2005)................................12

*In re Dillon*, 892 F.2d 1554 (Fed. Cir. 1989)..........................................................10

*In re Rucshig*, 343 F.2d 965 (CCPA 1965)..........................................................10, 13

*In re Shetty*, 566 F.2d 81 (CCPA 1977)..........................................................9

*In re Wright*, 848 F.2d 1216 (Fed. Cir. 1988)..........................................................10

*Northern Telecom Ltd. v. Samsung Electronics Co., Ltd.*, 215 F.3d 1281 (Fed. Cir. 2000)..........................................................................................7, 17

*Omega Engineering, Inc. v Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003) ……………………..14

*Rawplug Co., Inc. v. Illinois Tool Works, Inc.*, 11 F.3d 1036 (Fed. Cir. 1993) ……...……...12, 14

*SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107 (Fed. Cir. 1985) (*en banc*)............................4

*Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823 (Fed. Cir. 2003)....................................14

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996)…………………………..15

*W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1557 (Fed. Cir. 1983)………….. 4

**Statutes**

35 U.S.C. 100..........................................................................................9

35 U.S.C. 101..........................................................................................9

**INTRODUCTION**

Sevenson showed in its Motion for Partial Summary Adjudication that the plain language of the Sevenson patent claims, and the Court's relevant construction of the terms appearing therein, literally reads on the treatment method used at the Colonie Site. Recognizing this, defendants relegate their arguments concerning the actual wording of the claims and the Court's claim construction to the back of their brief. Taking center stage is defendants' new argument that Sevenson disclaimed any coverage of the treatment method used at the Colonie Site during prosecution of the patents in suit.

Defendants disclaimer theory should have been raised during the claim construction phase of this case. Regardless, defendants' position is wrong. They ignore the fact that Sevenson was the first to discover and patent the use of a sulfate-phosphate treatment method for reducing leachable lead and radionuclides. Sevenson was the first to recognize the beneficial presence of sulfates in phosphoric acid to carry out successful treatments. The PTO awarded Sevenson multiple patents on these very inventions; and at no point during prosecution of any of its patents did Sevenson disclaim the use of phosphoric acid alone from the scope of its claims. As hard as they try to spin the language in the file histories, defendants can point to no statement in the file histories by Sevenson that "our claims do not cover phosphoric acid alone" or any similar language. Indeed, such an argument would fly in the face of the disclosure of the Sevenson patents, which unambiguously describes, as a preferred embodiment, the use of phosphoric acid alone, because of the presence of sulfates therein. (*See*, e.g., '367 Patent, col. 5, lines 15-18). The evidence establishes that there is no applicable prosecution history disclaimer or estoppel here.

Based on the stipulated facts, Sevenson's motion should be granted. The claims require sulfate and phosphate ions in a mixture or additive, applied to soil with hazardous lead or radioactive material. Prayphos P5 is a mixture or additive that contains sulfate and phosphate ions. (Stip. Fact ¶¶ 10-11). It is applied to lead-contaminated soil. *Id.*, ¶ 12. It reduces the amount of leachable lead to below the EPA's standard of 5.0 mg/l. *Id.*, ¶ 13. Those are the only *material* facts at issue here, and they fully support granting Sevenson's motion.

## RESPONSE TO DEFENDANTS' ARGUMENTS

### A. Defendants Concede Many Of The Points Made By Sevenson

Through their collective silence, defendants have conceded many of the points made by Sevenson in support of its motion:

- Claim 1 of the '982 Patent requires mixing a first mixture with contaminated ("metal-bearing") material to create a "second mixture." Sevenson showed that Prayphos P5 mixed with soil at the Colonie Site met this limitation. Defendants do not dispute this in their Opposition;

- The Court's claim construction for the term "first component" appearing in many of the asserted claims is "a separate and distinct compound capable of supplying at least one of the listed members." (Op. at 11-14). One of the listed members is sulfate. Sevenson showed that the sulfate appearing in Prayphos P5 is a "compound." (Sevenson Motion at 18-19). Defendants do not dispute this. Defendants further do not dispute that sulfates are present in Prayphos P5. (Stip. Fact ¶ 11).

- Similarly, the Court's claim construction for the term "second component" is "a separate and distinct compound capable of supplying a source of phosphate anion." (Op. at 15-16). Sevenson showed Prayphos P5 contains phosphate anion compounds. Defendants did not dispute this.

- Many of the claims require that the TCLP metal level in the treated material be below 5.0 mg/l. Sevenson showed this limitation was met at the Colonie Site. (See Stip. Fact ¶ 13). Defendants did not dispute this.

Defendants instead argue that the Colonie Site does not have a "first mixture" and does not "supply" sulfates. Neither argument has merit.

**B. Prayphos P5 Is A "First Mixture" As Defined By The Court**

Claim 1 of the '982 Patent requires a "first mixture," which the Court defined as the "first component and second component mixed together." (Op. at 27). Putting together the Court's claim constructions, this requires a first "separate and distinct compound" capable of supplying sulfate and a second "separate and distinct compound capable of supplying a source of phosphate anion" mixed together.

Prayphos P5 indisputably meets this language. The sulfate and phosphate anions present in Prayphos P5 are both compounds (*see* above), and it is self-evident they are "separate and distinct" from one another in the Prayphos P5 product, otherwise they could not be separately measured. Moreover, Prayphos P5 is itself a "mixture" as defendants' own evidence shows.

(*See* defendants' exhibit 5, Product Specification Sheet for Prayphos P5, showing the chemical properties therein).[1]

Unable to contest this, defendants resort to reading words into the claim construction and claims that are not there. Defendants repeat their arguments that the sulfates and phosphates must come from separate *sources*. (Opposition at 21). The claims do not require separate sources; indeed, the plain language of the claims require either a "mixture" containing sulfate and phosphate compounds (*see*, e.g., claim 1 of the '982 Patent); a "single reactant" (*see* claim 11 of the '367 Patent);[2] a "treatment additive" (claim 1 of both the '123 and '485 Patents);[3] or simply a combination of sulfate and phosphate (claim 30 of the '485 Patent).

Defendants then turn to the specification as support for their non-infringement argument. This tactic has been repeatedly rejected by the Federal Circuit. *W.L. Gore & Associates, Inc. v. Garlock, Inc*., 721 F.2d 1540, 1557 (Fed. Cir. 1983) ("Distinguishing what infringes from what doesn't is the role of the claims**,** not of the specification"); *Sri Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (*en banc*) ("The district court correctly described the specification**,** but the difficulty is this: claims are infringed, not specifications"). The Court here has already construed the claims. Resort to the specification now is irrelevant to the question of infringement. "Infringement, literal or by equivalence, is determined by comparing an accused

---

[1] *Hawley's Condensed Chemical Dictionary* defines a "mixture" as "a heterogeneous association of substances which cannot be represented by a chemical formula. Its components may or may not be uniformly dispersed and can usually be separated by mechanical means." *See* Exhibit 7 hereto.

[2] Requiring only a "single reactant" is completely at odds with defendants' argument that the sulfate and phosphate must come from separate sources.

[3] Similarly, "a treatment additive" is a single product, such as Prayphos P5. For defendants' argument to make sense, the claim would read "treatment additives."

product not with a preferred embodiment described in the specification, or with a commercialized embodiment of the patentee, but with the properly and previously construed claims in suit." *Id.*

At any rate, defendants' highly selective citation to the specification does not help their cause. Defendants repeat the single passage from the specification that states that phosphoric acid alone did not leach lead below the EPA limit. Sevenson fully acknowledged this passage in its opening memorandum (see page 10). What defendants repeatedly ignore is the fact that the statement in question is made solely within the context of one example (example 5) (*see* '982 Patent, col. 15-16; *see also* Yost Decl., ¶ 34 (filed with Sevenson's opposition to defendants' motion for summary judgment)). Defendants ignore the many examples shown in Table VI (cols. 13-14) which unequivocally shows that phosphoric acid alone was successfully used. Moreover, and contrary to defendants' arguments, the specification makes clear that phosphoric acid contains both sulfate (group one) and phosphate (group two) treatment additives:

EXAMPLE 4

> Wide Range of Applications and Process flexibility in Curing Time, Moisture Content and Treatment Operations
>
> TABLE VI illustrates different types of waste matrix that have been successfully treated employing the one step and two step ***mixing treatment additives from group one and group two***. For these diverse waste types and process materials, total lead ranged from 0.3% to 23.5%. This example discloses the flexibility and dynamics of the treatment process of the invention in rendering non-hazardous, by RCRA definition, a wide range of lead-hazardous and other metal-hazardous materials within a relatively short period of time, usually in less than 5 hours.

('982 Patent, Col. 14, lines 1-14) (emphasis added). The referenced TABLE VI contains nine examples showing different applications of phosphoric acid alone that successfully treated lead-contaminated materials to below the 5.0 mg/l threshold. (*See* '982 Patent, cols. 13-16: old dirt; slag-lead smelter; carbon with lead dross; wire fluff; wire chip; filter cake; industrial process

material (G); soil (B); and soil (O)). The patents specifically reference that the examples in Table VI were treated using additives from group one and two.[4] Thus, the inventors clearly told the world that phosphoric acid alone contained additives from group one and two (sulfates and phosphates) and was successful in reducing lead to below the 5.0 mg/l threshold. Contrary to defendants' position, the specification clearly indicates that for many types of hazardous material, phosphoric acid, containing treatment additives from both groups one and two, is a desirable and effective treatment method. (*See also* Sevenson's Motion at 7-11).[5]

Finally on this point, defendants' argument that Prayphos P5 cannot be the first mixture because the first component and second component "must have existed independent of each other in a 'separate and distinct' manner" (opposition at 28) is puzzling at best. Defendants have stipulated that Prayphos P5 is formed when "phosphate minerals . . . within the phosphate rock are reacted with or without weak phosphoric acid, and sulfuric acid. Sulfuric acid contains sulfate." (Stip. Fact ¶ 10). Obviously, sulfuric acid and the phosphate rock "existed independent of each other in a separate and distinct manner." Accordingly, defendants' argument cannot defeat Sevenson's right to summary adjudication.

---

4 "A first group of treatment chemicals for use in the processes of the present invention includes lime, gypsum, alum, halites, Portland cement, and other similar products that can supply sulfates, halides, hydroxides and/or silicates. A second group consists of treatment chemicals which can supply phosphate ions." ('982 Patent, col. 3, lines 16-22).

5 Defendants' reliance on the figures of the patents is also unavailing. As inventor Yost set forth in his declaration at ¶¶ 25-31, the figures in the patent were primarily directed to the "two-step" process, wherein separate applications of sulfates and phosphates were applied in sequential order. But the figures are not the claims, and do not limit the scope of the claims to only that which is depicted. There is no requirement in the patent law that a figure be included for every claimed embodiment. *Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306-07 (Fed. Cir. 2003) ("the mere fact that the patent drawings depict a particular embodiment of the patent does not operate to limit the claims to that specific configuration").

### C. Prayphos P5 "Supplies" Sulfate Ions, Contrary To Defendants' Argument

Defendants also argue that Prayphos P5 does not "supply" sulfate ions. Here, defendants repeat their unsubstantiated arguments that allegedly *de minimus* amounts of sulfate cannot meet the claim language. (Opposition at 29-32). As previously set forth in Sevenson's opposition to defendants' motion for summary judgment, this argument is wrong both legally and factually. (*See* Sevenson's Opposition at 17-24). Sevenson will not repeat those arguments here, but reminds the Court that: (1) the claims and construction thereof do not require a specified amount of sulfate, and the law does not support imposing one, *see Northern Telecom Ltd. v. Samsung Electronics Co., Ltd.*, 215 F.3d 1281, 1289-90 (Fed. Cir. 2000); and (2) the science behind the patented technology shows unequivocally that even small amounts of sulfate act as catalysts in the reaction that reduces the amount of leachable lead to below EPA standards. (*See* Yost Decl., 42-62).

### D. Prayphos P5 Is Technical Grade Phosphoric Acid, Contrary to Defendants' Argument

Defendants again assert that Prayphos P5 does not fall into the Court's definition of TGPA because the amount of sulfates present do not fall within the specified range. (Opposition at 25).

To the contrary, the evidence establishes that Prayphos P5 is understood in the industry to be TGPA. The "certificate of analysis" for the Prayphos P5 phosphoric acid supplied by S.A. Manning to Shaw for use at the Colonie Site specifically identifies the product as "technical" grade. (Exhibit 5 to Sevenson's Opposition to defendants' motion for summary judgment).[6]

---

[6] As Shaw's witness Anthony Sheeran testified, S.A. Manning supplied all the Prayphos P5 product used at the Colonie Site. (Exhibit 9 to Sevenson's Opposition, p. 62). Mr. Sheeran (continued…)

Further, in a paper published by Shaw witness Mr. Sheeran concerning the treatment activities at the Colonie Site, he stated that TGPA was used:

> Kiber Environmental conducted a bench scale study of the Colonie waste materials and recommended the use of phosphoric acid as the single stabilization agent. IT Corporation (who assumed ICF Kaiser's contacts on or about April 1999) requested and the Army approved self-performance of the on-site stabilization systems. NYSDEC bulk storage permits for on-site storage of up to 7,500 gallon of *technical grade phosphoric acid* were received in support of the stabilization system.

(Exhibit 3 to Sevenson's Opposition, p. 6).

Moreover, as Sevenson's expert Mr. Yost stated, purified phosphoric acid, like Prayphos P5, is commonly known as being TGPA. (Yost Decl., ¶ 17). This is borne out by the fact that there are numerous sources of commercially available phosphoric acid. Exhibit 6 to Sevenson's Opposition includes a sampling of phosphoric acid products available for purchase. These products define different "grades" of phosphoric acid, such as food grade, technical grade, and semiconductor grade. As these examples show, phosphoric acid that typically has 65-85% by weight $H_3P0_4$ and sulfates ($S0_4$) in the range of 50-500 ppm is commonly referred to and marketed as *technical grade* phosphoric acid. *Id.* These ranges are consistent with the make-up of Prayphos P5.[7]

---

identified a shipment of Prayphos P5 that corresponded to the certificate of analysis. (*Id.*, pp. 63-72).

[7] This evidence confirms that it would be improper to ignore the modifier "typically" appearing in the Court's construction of TGPA and impose strict numeric limits on the definition of TGPA as used in the Sevenson claims. To a person of ordinary skill in the art, the chemical make-up of Prayphos P5 qualifies it as TGPA, and its use would thus fall within the scope of the Sevenson patent claims requiring TGPA. (Yost Decl., ¶ 17). The example of TGPA given in the Sevenson patents is merely that – an example, and it is inconsistent with the knowledge of the person of ordinary skill in the art for defendants to assert that any TGPA with less than 2% of sulfates is outside the scope of the Sevenson claims.

Accordingly, the evidence does not support defendants' assertion that Prayphos P5 is not TGPA within the meaning of the Sevenson patent claims and the Court's claim construction.

**E. Defendants' Prosecution History Arguments Fail Because The Inventors Never Disclaimed Coverage Of Phosphoric Acid As A Source Of Both Sulfate And Phosphate**

The bulk of defendants' opposition is directed to its arguments that Sevenson, in the patent file histories, disclaimed coverage of phosphoric acid alone. There is no support for this argument; defendants completely distort the facts and law in this regard. To understand why, it is necessary to set forth a background on the law of patentability.

Patentability is defined by 35 U.S.C. § 101, which provides that "whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the terms and conditions of this title." All of the Sevenson claims are directed to processes (i.e., methods). The patent statute tells us that "the term 'process' means process, art or method, and includes a *new use of a known process, machine, manufacture, composition of matter, or material*." 35 U.S.C. § 100(b) (emphasis added).

The Sevenson patents are not attempting to claim phosphoric acid alone. This is a critical point, and goes right to the heart of why defendants' prosecution history argument is misguided. Instead, what the Sevenson inventors did discover is a new use of a known material, phosphoric acid, based on their discovery that phosphoric acid had both sulfates and phosphates that could be used advantageously in a treatment process. (*See generally* Yost Declaration). This invention clearly qualified under the patent statute for patent protection. The cases on this are too many to list, but see *In re Shetty*, 566 F.2d 81, 86 (CCPA 1977) (method claims directed to use of old compounds for appetite suppression found patentable on appeal: "prior to appellate's disclosure,

none of the adamantine compounds in any of the [prior art] references before us suggested a use, much less a dosage, for curbing appetite"); *In re Dillon*, 892 F.2d 1554, 1569-70 (Fed. Cir. 1989) ("a new use of a composition is claimed in the form of a process or method. . . . [I]t is not pertinent whether the compositions themselves are known or new or unobvious"); *In re Wright*, 848 F.2d 1216, 1219-20 (Fed. Cir. 1988); *In re Ruschig*, 343 F.2d 965, 967 (CCPA 1965) (new use of existing compounds to combat diabetes "discovered by appellants, as a result of their systematic, extensive, and presumably expensive research" found patentable; the "vague disclosures" in the prior art "are unimportant. What is important is the fact that the utility *discovered by appellants* is not disclosed in the prior art") (emphasis in original).

This case law is pertinent to the issue at hand, because none of the prior art cited in the Sevenson patent file histories discloses the invention discovered by the Sevenson inventors. That is explained next.

**1. The Prior Art Did Not Teach The Sevenson Invention**

The prior art cited by defendants and during the prosecution of the Sevenson patents does not disclose or render obvious the discovery of the Sevenson inventors that a phosphoric acid treatment process using both sulfates and phosphates as treatment components advantageously reduced the leachability of hazardous leads in soil. Completely missing from both the O'Hara and Stanforth references is any recognition of a one-step treatment method that has both sulfate and phosphate components to treat lead and radioactive materials, as the asserted Sevenson patent claims cover. (*See generally* Yost Decl., ¶¶ 36-41).

O'Hara's teaching is limited to a two-step process wherein the first step applies lime to fly ash to create a mixture, and a second step applies water soluble phosphate (which may be in the form of phosphoric acid) to that mixture. (*See* Def. Ex. 10, col. 3, lines 58-68). There is no

recognition at all in O'Hara that sulfates may be used to immobilize leachable lead, much less that those sulfates may be present in a phosphoric acid product. To the contrary, O'Hara teaches that sulfate cannot be used to stabilize lead and must be controlled for his process to work. (*Id.*, col. 10, lines 50-53; Yost Decl., ¶¶ 38-40).

Stanforth has similar shortcomings. Stanforth discloses methods for treating metal-contaminated waste with a variety of different chemicals. Critically, however, Stanforth is silent on the use of sulfate to treat anything other than chromium. (Def. Ex. 12, col. 4, lines 17-19). Moreover, and contrary to defendants' assertion, Stanforth does not describe a method that uses solely phosphoric acid to treat lead-contaminated waste. (Yost Decl., ¶ 41). While Stanforth contains multiple examples of different treatment applications (*see id.*, Table 2 at col. 9), there is not a single example in Stanforth showing that application of phosphoric acid successfully leached lead to below the TCLP threshold. That recognition was Sevenson's alone. (*See* Yost Decl., ¶ 24).

It matters not, as defendants assert, that either Stanforth or O'Hara may have disclosed the use of phosphoric acid in a treatment method. The Sevenson patents do not claim phosphoric acid *per se*. Unlike the claimed Sevenson inventions, there is absolutely *no* evidence to show that either prior art reference discloses that sulfates and phosphates together (regardless of the source) reduce the amount of leachable lead and radionuclides.

**2. The File History Statements Reflect The Prior Art's Failure To Disclose The Sevenson Invention**

The statements in the file history merely point out the obvious: the prior art failed to disclose that the combination of sulfates and phosphates was useful in reducing the level of leachable lead and radionuclides in contaminated materials. At no point in the file histories did Sevenson ever disclaim coverage of phosphoric acid in such a treatment process, because, as

explained above, the prior art failed to disclose that the presence of sulfates in phosphoric acid would be of benefit in the treatment of leachable lead and radioactive materials.

The file histories bear this out. As inventor Yost stated in his declaration to the PTO during the '936 Patent re-examination, the O'Hara patent did not anticipate or render obvious the claims of the (non-asserted) '936 Patent[8] because O'Hara failed to recognize that sulfate can play a role in the immobilization of leachable lead: "O'Hara clearly teaches that neither sulfuric acid or its salt, calcium sulfate, immobilizes lead. My tests and experiments as disclosed in the '936 patent prove that O'Hara was wrong." (Def. Ex. 13, p. 7). These statements fall far short of evidencing any "clear and unmistakable surrender" of the subject matter used at the Colonie Site. *See Inverness Medical Switzerland GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1372 (Fed. Cir. 2002) (patentee's statement during prosecution regarding the prior art was "not a clear and unambiguous disclaimer of a claim scope"); *Rawplug Co., Inc. v. Illinois Tool Works, Inc.*, 11 F.3d 1036, 1043 (Fed. Cir. 1993) (district court erred in limiting the scope of the claims in view of a prior art reference the inventor distinguished during patent prosecution; the prior art reference "is easily distinguishable both from the [asserted] claims and [the] infringing [products]").[9]

---

[8] At any rate, statements made during prosecution of the '936 Patent have little, if any, relevance to the asserted claims in this case, because the '936 Patent claims are limited to a two-step process. *See Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1078 (Fed. Cir. 2005) ("the prosecution of one claim term in a parent application will generally not limit different claim language in a continuation application"); *Biogen, Inc. v. Berlex Labs, Inc.*, 318 F.3d 1132, 1141 (Fed. Cir. 2003) ("when an applicant is seeking different claims in a divisional application, estoppel generally does not arise from the prosecution of the parent").

[9] Defendants also misrepresent a statement in the '936 Patent re-examination regarding "negligible amounts of calcium sulfate" in the O'Hara reference (*see* opposition at 10). Defendants twist this statement into an alleged admission by the inventors that "negligible" amounts of sulfate cannot meet the claims. Not so. What defendants ignore is inventor Yost's

(continued…)

The same holds true with the statements in the file history of the '982 Patent. The full text of the passage relied upon by defendants shows that the inventors merely pointed out that O'Hara did not recognize the use of sulfates in treating hazardous lead materials:

> O'Hara teaches a method of immobilizing lead and cadmium in solid residues arising from the burning of solid wastes by mixing the fly ash and bottom ash with water soluble phosphate in the presence of a free lime source. The *present invention* discloses a method of treating various metal bearing materials with a *first component* and a *second component* to stabilize the leachable metals. The first component supplies a member from a group that includes hydroxides as taught by O'Hara. To avoid the rejection based on O'Hara the claims have been amended to delete references to hydroxides, lime and Portland cement. The remaining group that makes up the first component no longer includes a member that is taught by O'Hara. *O'Hara does not teach a first component that comprises either sulphates*, halites or silicates.

(Def. Ex. 9, March 1, 1995 Amendment at 31) (emphasis added). This passage explains that the O'Hara reference does not teach or suggest sulfates as a first component in a treatment method. It does not "clearly and unambiguously" state that the sulfates cannot come from phosphoric acid, as defendants allege. Nor is it a clear disavowal of a claim scope that covers phosphates and sulfates in phosphoric acid to treat lead-hazardous materials. O'Hara, and the statements in the '982 Patent file history regarding O'Hara, are irrelevant to the issues presented in this case.

Defendants' arguments concerning the '485 Patent file history also do not "clearly and unambiguously" disavow claim coverage of the treatment method at the Colonie Site. As with O'Hara, the Stanforth patent fails to teach or disclose the use of sulfate to treat hazardous lead materials. The comments on which defendants rely merely point out this fact: "Stanforth does

---

statement that O'Hara fails to recognize the importance of sulfates in a hazardous lead treatment method: "one skilled in the art would find that O'Hara does not teach that the amount of calcium sulfate makes any difference whatsoever." (Defendant's Ex. 13 at 2369-70). In other words, O'Hara did not understand that sulfates could be used to treat hazardous lead materials. Because the Sevenson inventors did discover this, they are entitled to patents covering it. *See In re Ruschig*, 343 F.2d at 967.

not teach the use of a phosphate and a sulfate for the treatment of lead contaminated soils and waste materials. Stanforth's only teaching of a sulfate is for the treatment of chromium and not lead." (Def. Ex. 11, March 21, 2000 Amendment, Remarks section).[10] As the Colonie Site treatment method has nothing to do with the treatment of chromium, the statements in question have no applicability to this case and there was no prosecution history disclaimer. *See Rawplug Co.,* 11 F.3d at 1043 (district court erred in limiting the scope of the claims in view of a prior art reference the inventor distinguished during patent prosecution; the prior art reference "is easily distinguishable both from the [asserted] claims and [the] infringing [products]"); *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 833 (Fed. Cir. 2003) ("we do not consider the applicants' statement to be a clear and unambiguous disavowal of claim scope as required to depart from the meaning of the term[s] provided by the written description").[11]

---

[10] It is important to note the inventors' reference to "phosphates and sulfates" in the cited passage. Defendants purposely mis-read this sentence as saying "phosphoric acid and sulfates" in order to support their argument that the inventors disclaimed coverage of phosphoric acid alone. But the passage is clear that what the inventors discovered is that both phosphates and sulfates (the compounds) must be present in the treatment process, and Stanforth failed to discover this. As such, defendants' mis-reading of the file history must be rejected. At the very least, because the statement is subject to different interpretations, the benefit of the doubt must go to Sevenson. *See Omega Engineering, Inc. v Raytek Corp.*, 334 F.3d 1314, 1325 (Fed. Cir. 2003) ("to balance the importance of public notice and the right of patentees to seek broad patent coverage, we have thus consistently rejected prosecution statements too vague or ambiguous to qualify as a disavowal of claim scope").

[11] In this regard, defendants' reliance on inventor Pal's alleged statements in a draft patent application (defendants' exhibit 18) is puzzling to say the least. The draft application is not part of the public record and as such has no relevance to the prosecution histories of the Sevenson patents. *See Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999) (the "public record" relevant to claim construction is the claims, specification and prosecution history). At any rate, the draft application is directed solely to Sevenson's "two-step" process that was eventually patented in Sevenson's '936 Patent. It therefore has no relevance to Sevenson's one-step treatment process that is at issue here. *See* footnote 8 *supra* and Yost Declaration, ¶¶ 20-30.

### 3. Other Parts Of The File History Show No Disclaimer Took Place

Finally on this point, defendants cite a few isolated passages from the file histories to make their arguments. But the totality of the file history should be considered before a finding of prosecution history disclaimer is made, *see Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 2001). And the totality of the file histories contain statements which unequivocally establish that the inventors considered their invention to cover use of a single treatment additive (such as phosphoric acid) to treat hazardous lead and radioactive waste.

During prosecution of all the patents in suit, Sevenson submitted petitions to "make special" their applications pursuant to 37 C.F.R. 1.102(c), which authorizes the PTO to accelerate the examination process for those inventions that will materially enhance the quality of the environment. *See* 37 C.F.R. 1.102(c). The PTO granted Sevenson's petitions, recognizing the importance of the claimed inventions.[12]

The petitions show that Sevenson considered the inventions to cover the use of *one* or more treatment additives to reduce the amount of hazardous lead or radionuclides in contaminated materials. As set forth in the declaration filed during prosecution of the application (s/n 08/031,461) that led to the '982 Patent (*see* Exhibit 8, pp. 1-4), Sevenson made it clear that a single component or product was included in the scope of the invention:

> As described in the specification, the present invention relates to treatment methods employed to chemically convert leachable metal in metal-bearing solid and liquid waste materials to a non-leachable form by mixing the material with *one or a combination of components*.

[12] Sevenson's declarations in support of the petitions, and the PTO's decisions on the petitions, are collectively included in Exhibit 8 hereto.

(Exhibit 8, pp. 1-2) (emphasis added). The PTO agreed that the invention met the conditions for accelerating its examination in the PTO and granted the petition. (*Id.*, p. 4).

It would be more than reasonable to expect a person of ordinary skill in the art to believe, upon reading the above statement, that the inventors considered the invention to be a treatment method that encompassed use of a single product, such as phosphoric acid, or multiple products, such as gypsum and phosphoric acid. The only limitation, of course, would be that, whatever the number of products used, sulfates and phosphates must be supplied. The amount of sulfates and phosphates required, and their source, would be determined by treatability studies assessing a variety of factors at a particular site. (*See* Sevenson's Motion at 7-8). As defendants concede, the person of ordinary skill in the art would have understood at the time this statement was made in the PTO that a commercial phosphoric acid product contained both sulfates and phosphates. (*See* defendants' opposition at 10).

The other file histories contain similar declarations, and in each instance the PTO granted the petition. (*See* Exhibit 8). For example, during prosecution of the application (s/n 08/942,803) that led to the '123 Patent, Sevenson described its invention as relating to "treatment methods employed to chemically convert leachable metal in metal-bearing solid and liquid waste materials to a non-leachable form by mixing the material with *one reagent* ***or*** a *combination of reagents*." (*Id.*, p. 8) (emphasis added). This same statement appeared in the declaration filed with the application (s/n 09/340,903) that lead to the '485 Patent. (*Id.*, p. 11). Accordingly, the file histories show that Sevenson repeatedly described its invention as encompassing the use of a single reagent or mixture. The person of ordinary skill in the art would understand these statements to encompass the use of a commercially available phosphoric acid product, having both phosphate and sulfate ions present.

In conclusion, these statements support Sevenson's position that the file histories do not clearly and unambiguously disavow the patent claims covering the treatment method used at the Colonie Site. *See*, *e.g.*, *Northern Telecom*, 215 F.3d at 1294-95 (prosecution history disclaimer does not apply because the infringers had not shown the patentee, "with reasonable clarity and deliberateness" defined "plasma etching" as excluding ion bombardment). To the contrary, the files histories establish that a single reagent or mixture, such as phosphoric acid, was within the scope of the claimed invention. Accordingly, defendants' prosecution history statements should be rejected.[13]

## CONCLUSION

The plain language of the claims, and the Court's construction thereof, unambiguously read on the treatment method used at the Colonie Site. Defendants have not submitted *material* facts which dispute this. Accordingly, Sevenson respectfully requests the Court grant its Motion for Summary Adjudication Relating to Infringement.

Respectfully submitted,

Dated: __August 13, 2007__

s/Brian E. Ferguson____________________

Brian E. Ferguson
McDERMOTT WILL & EMERY LLP
600 13th Street, N.W.
Washington, D.C. 20005
(202) 756-8000
bferguson@mwe.com

13 For the same reasons as set forth herein, and for the reasons explained in Sevenson's Opposition to defendants' motion for summary judgment at 11-17, there is no prosecution history estoppel which would prevent Sevenson from showing that the Colonie Site infringes the Sevenson claims under the doctrine of equivalents, if the Court decides that there is not literal infringement.

WEBSTER SZANYI LLP
Kevin A. Szanyi
Nelson Perel
1400 Liberty Building
Buffalo, New York 14202
(716) 842-2800
nperel@websterszanyi.com

Attorneys for Plaintiff, Sevenson Environmental Services, Inc.

WDC99 1434680-1.057200.0012