**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| SEVENSON ENVIRONMENTAL SERVICES, INC., Plaintiff, | |
| v. | No. 05-1075C<br>Judge Thomas C. Wheeler |
| THE UNITED STATES Defendant | |
| and | |
| SHAW ENVIRONMENTAL, INC., Defendant-Intervenor. | |

**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION**

PETER D. KEISLER
Assistant Attorney General

JOHN J. FARGO
Director

JOSHUA B. BRADY
Attorney
Civil Division
U.S. Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0285
Facsimile: (202) 307-0345

OF COUNSEL:
Susan Mitchell
Attorney
U.S. Department of Justice

Attorneys for Defendant the United States

RUSSEL O. PRIMEAUX
Kean Miller Hawthorne D'Armond
McCowan & Jarman LLP
One American Place, 22nd Floor
Post Office Box 3513
Baton Rouge, LA 70821-3513
(225) 387-0999

Attorney for Defendant-Intervenor Shaw Environmental, Inc.

# TABLE OF CONTENTS

Page


TABLE OF AUTHORITIES . . . . . iii

APPENDIX . . . . . v

I. Introduction and Summary of Arguments. . . . . . 1

II. Sevenson's application of "separate and distinct" to the "first component" and "second component" is at odds with the specifications, claims and this Court's claim construction. . . . . . 3

A. The treatment process at the Colonie site did not involve the "separate and distinct" first and second components as required by the patents and properly construed by this Court. . . . . . 4

B. Without an additional component, Prayphos P5 cannot be the "first mixture." . . 8

C. If the Court accepts Sevenson's tortured application of the Court's claim constructions, then Defendants do not infringe any asserted claim. . . . . . 9

III. Sevenson's attempt to avoid the effect of the Prosecution History fails. . . . . . 10

A. Summary of the O'Hara and Stanforth prior art patents. . . . . . 11

B. Both O'Hara and Stanforth explicitly teach using phosphoric acid to immobilize lead. . . . . . 12

C. The disclaimer made during the reexamination of the '936 patent applies to the patents at issue. . . . . . 13

IV. This Court has already dismissed Sevenson's theory that merely one molecule of sulfate is sufficient. . . . . . 15

V. This Court has already determined that patentee provided a specific meaning to the term "Technical Grade Phosphoric Acid." . . . . . 17

VI. Sevenson has not offered any viable evidence of a decrease in concentration of leachable radionuclides. . . . . . 18

VII. Sevenson has not offered any viable evidence of a decrease in volume. . . . . . 19

Page

VIII. Sevenson has not explained how additional discovery will save it from summary judgment of non-infringement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

IX. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## TABLE OF AUTHORITIES

### CASES

Page

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) . . . . . 20

*Autogiro Co. of Am. v. U.S.*,
384 F.2d 391 (1967) . . . . . 5

*Celotex Corp. v. Catrett*,
477 U.S. 317, 325 (1986) . . . . . 20

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
192 F.3d 973 (Fed. Cir. 1999) . . . . . 2

*Exigent Tech. v. Atrana Solutions, Inc.*,
442 F.3d 1301 (Fed. Cir. 2006) . . . . . 20

*Golan v. Pingel Enter.*,
310 F.3d 1360 (Fed. Cir. 2002) . . . . . 20

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995),
*aff'd*, 517 U.S. 370 (1996) . . . . . 16

*Moore U.S.A., Inc. v. Standard Register Co.*,
229 F.3d 1091 (Fed. Cir. 2000) . . . . . 18

*North Am. Vaccine v. American Cyanamid Co.*,
7 F.3d 1571 (Fed. Cir. 1993) . . . . . 13, 15, 16

*Northern Telecom. Inc. v. Datapoint Corp.*,
908 F.2d 931 (Fed. Cir. 1990) . . . . . 12

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) . . . . . 11

*Seachange Intl., Inc. v. C-COR Inc.*,
413 F.3d 1361 (Fed. Cir. 2005) . . . . . 2

*Sevenson Envtl. Servs., Inc. v. U.S.*,
76 Fed. Cl. 51, 2007 U.S. Claims LEXIS 94 (Fed. Cl. Mar. 28, 2007) . . . . . passim

*Simmons Oil Corp. v. Tesoro Petroleum Corp.*,
86 F.3d 1138 (Fed. Cir. 1996) . . . . . 20

Page

*TechSearch L.L.C. v. Intel Corp.*,
286 F.3d 1360 (Fed. Cir. 2002) . . . . . . . . . . 18, 19

*Ventana Med. Sys. v. Biogenex Labs, Inc.*,
473 F.3d 1173 (Fed. Cir. 2006) . . . . . . . . . . 2

*Zoltek Corp. v. United States*,
442 F.3d 1345 (Fed. Cir. 2006), *cert. denied*, 127 S. Ct. 2936 (2007) . . . . . . . . . . 2, 10

**STATUTES**

Fed. R. Civ. P. 56(c) . . . . . . . . . . 3

28 U.S.C. 1498 . . . . . . . . . . 2, 10

**OTHER AUTHORITIES**

MSN Encarta, *Air* (Aug. 7, 2007),
*available at* http://encarta.msn.com/encyclopedia_1741500785/Air.html . . . . . . . . . . 7

*Webster's New World Collegiate Dictionary*,
4th Ed. (Macmillan USA 1999) . . . . . . . . . . 6

**APPENDIX**

| Exhibit | Document | Pages |
|---|---|---|
| **1** | Table of Arguments | |
| **2** | Final Operations Work Plan for Colonie FUSRAP Site | G001446–001539 |
| **3** | Kiber Treatability Study Final Report, March 1999 | G000110–000138 |
| **4** | Kiber Treatability Study Final Report, May 1999 | G000079–000089 |
| **5** | Prayon's Specification Data Sheet for Prayphos P5 | 1–2 |
| **6** | Declaration of Gary Pierzynski, Ph.D. | |
| **7** | Certificates of Analysis for Prayphos P5 | SH041201, SH041245, SH041293 |
| **8** | Chart of Sevenson's Family of Patents | 1–2 |
| **9** | Excerpts of Prosecution History of '982 Patent | G002960–2963; 003024–3056 |
| **10** | O'Hara Patent | |
| **11** | Excerpts of Prosecution History of '485 Patent | G004558–4563; 004651–4665 |
| **12** | Stanforth Patent | |
| **13** | Excerpts of Prosecution History of '936 Patent | G002439–2460 |
| **14** | '936 Patent | |
| **15** | Excerpts of Deposition of Anthony Sheeran | 1, 4–6, 92–93, 99–100 |
| **16** | Addendum to Declaration of Gary Pierzynski, Ph.D. | |
| **17** | 07/494,774 Application | SH039529–544 |
| **18** | Letter from Inventor Dhiraj Pal, Ph.D. | DG0161–93 |
| **19** | Deposition of Karl W. Yost | 1–235 |

(*continued . . .* )

| Exhibit | Document | Pages |
|---|---|---|
| **20** | Prayphos P5 Shipping Documents | SH41265; 41270; 41275 |
| **21** | Declaration of Nicholas Bates | |
| **22** | Additional Declaration of Gary Pierzynski, Ph.D. | |

Note: Defendant-Intervenor Shaw Environmental, Inc., hereby waives confidentiality of Exhibits 7, 15 and 20, without waiving confidentiality to any remaining documents or depositions under the Protective Order.

Exhibit 19–22 are additions to the Defendants' Appendix.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| SEVENSON ENVIRONMENTAL SERVICES, INC., Plaintiff, v. THE UNITED STATES Defendant and SHAW ENVIRONMENTAL, INC., Defendant-Intervenor. | No. 05-1075C<br>Judge Thomas C. Wheeler |

**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION**

## I. Introduction and Summary of Arguments.

Sevenson argues that one reason the Defendants' arguments should be rejected is because of a lack of a "*scientific* rationale" for why the Colonie treatment method does not infringe the asserted patents. Pl. Opp'n at 2 (emphasis original). Plaintiff apparently does not appreciate that claims requiring a "first component" supplying sulfate that is "separate and distinct" from a "second component" supplying phosphate, based on specifications that disclose phosphoric acid as only a member of the group for supplying phosphate, do not cover a process that employs only phosphoric acid. In light of how Sevenson's expert, Karl Yost (also one of the named inventors of the patents in suit), agrees that prior to the critical date for the patents in suit, it was "common[] know[ledge] that sulfates are present in phosphoric acid," the patentee's arguments in the prosecution history, and the text of the patents confirm that the use of phosphoric acid, alone, at the Colonie site does not infringe the asserted claims.

First, Sevenson assumes that the "separate and distinct" nature of the "first component" and "second component" requires merely chemically-distinct species. Given this Court's claim construction, the specifications and the prosecution history and the fact that "sulfates are present in phosphoric acid," the "separate and distinct" requirement cannot be interpreted to allow the asserted claims to cover phosphoric acid used alone. More importantly, Sevenson has advanced the theory that because Prayphos P5 is made by pouring sulfuric acid on phosphate rock, it meets these claim limitations. However, Prayon manufactures Prayphos P5 in Belgium. Ex. 21. Accordingly, Defendants cannot be held liable for infringement of the claims where process claim limitations are met outside the United States. 28 U.S.C. § 1498; *Zoltek Corp. v. United States*, 442 F.3d 1345 (Fed. Cir. 2006), *cert. denied*, 127 S. Ct. 2936 (2007).

Nonetheless, Defendants also reply to Sevenson's attempts to avoid the estoppel and disclaimer effects of statements made in the prosecution history of the '936, '982 and '485 patents. While prosecuting these patents, the patentee distinguished prior art *that used phosphoric acid* on the ground that these references *did not teach the addition of a sulfate component*. As it was "commonly known that sulfates are in phosphoric acid," these arguments estop Sevenson from arguing that the claims cover a process using only phosphoric acid. *Seachange Intl., Inc. v. C-COR Inc.*, 413 F.3d 1361, 1372–73 (Fed. Cir. 2005) (citations omitted); *see also Ventana Med. Sys. v. Biogenex Labs, Inc*., 473 F.3d 1173, 1182 (Fed. Cir. 2006). This clear disavowal of the subject matter applies to all of the patents at issue. *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999).

Second, Sevenson completely disregards this Court's *Markman* decision in light of plaintiff's arguments concerning "just one ion" and "technical grade phosphoric acid." In response to Sevenson's latest proffer of inventor testimony on the "volume decrease" and

"decrease in concentration of leachable radionuclide" claim limitations, Defendants offer Dr. Pierzynski's additional Declaration to show that Sevenson has no viable evidence to meet its burden of proof, and therefore Defendants are entitled to summary judgment of non-infringement.

## II. Sevenson's application of "separate and distinct" to the "first component" and "second component" is at odds with the specifications, claims and this Court's claim construction.

The primary issue before this Court is the application of its claim construction to the allegedly infringing activity in this case, particularly whether Prayphos P5 meets the claim limitations of the "separate and distinct" "first component" and "second component" as construed by this Court. *Sevenson Envtl. Servs., Inc. v. U.S.*, 76 Fed. Cl. 51, 2007 U.S. Claims LEXIS 94 (Fed. Cl. Mar. 28, 2007). This is the issue that the parties agreed was necessary for summary judgment in the Joint Proposed Schedule for Further Proceedings. Dkt. No. 55 (May 30, 2007). The facts relevant to this issue are undisputed, making this a proper issue for summary judgment. Fed. R. Civ. P. 56(c).

Based on the prosecution history, this Court's claim construction, the patent specifications, and the claim limitations themselves, the asserted claims cannot be interpreted to cover a process employing only phosphoric acid.[1] Sevenson's arguments to the contrary are internally inconsistent. Sevenson advances one theory to distinguish the prosecution history – processes teaching only phosphoric acid did not teach using a sulfate component – yet argues a

[1] As the plaintiff's expert Mr. Yost (who is also one of the inventors of the patents at issue) explains, it was common knowledge predating the patents that "sulfates are present in phosphoric acid." Ex. 19 at page 71, lines 15–22; *see also* Ex. 6, ¶ 15; Ex. 16 ¶ ¶ 4–6. Thus, not only does Prayphos P5 have sulfate impurities, but so do the phosphoric acids included in Sevenson's Ex. 6, as well as the phosphoric acids disclosed in the patents at issue and prior art.

contradicting theory of infringement – phosphoric acid is a first component because it has sulfate impurities. Pl. Opp'n at 6, 11–17.

A. <u>The treatment process at the Colonie site did not involve the "separate and distinct" first and second components as required by the patents and properly construed by this Court.</u>

The arguments Sevenson advances to support its conclusion that sulfate ions are "separate and distinct" from phosphate ions in phosphoric acid are at odds with the claim construction, the patents at issue, and the prosecution history. First, Sevenson states that "the amount of sulfates and phosphates present in Prayphos P5 are measurable," and then argues that "[i]f the sulfates and phosphates were not 'separate and distinct' they would not be subject to separately measurable analysis.... " Pl. Opp'n at 6. Second, Sevenson argues that "[i]f sulfates were not separate and distinct, they could not be removed." Pl. Opp'n at 6. These arguments demonstrate Sevenson's misplaced theory that "separate and distinct" is equivalent to "chemically distinct."

The Plaintiff ignores the requirement that the first and second components be "separate and distinct" and instead rests its argument on a theory of chemically-distinct species. Sevenson argues that because one sulfate atom and four oxygen atoms– $SO_4$– is distinct from one phosphate atom and four oxygen atoms– $PO_4$– the ionic constituents of phosphoric acid meet the "separate and distinct" requirement. It should go without saying that sulfate ions and phosphate ions are chemically distinct species.

This Court construed the term "first component" to mean "a separate and distinct compound capable of supplying at least one of the listed members" of the Markush group that includes sulfates. *Sevenson*, at *63–64. Compounds that supply sulfate include calcium sulfate, ferrous sulfate, aluminum sulfate, and sulfuric acid. *E.g.*, '982 patent, col. 3, lines 16–19 (group

one treatment chemicals). The first component is not sulfate ions, $(SO_4)^{2-}$, as per Sevenson's theory of infringement, Pl. Opp'n at 6, but the compound that supplies those ions.

Similarly, this Court has construed the term "second component" to be "a separate and distinct compound capable of supplying at least one phosphate anion." *Sevenson*, at *66–67.[2] The second component is not the phosphate ion, $PO_4^{3-}$ as Sevenson argues. Pl. Opp'n at 6. Rather, the second component is phosphoric acid, or an equivalent compound, that supplies phosphate ions. '982 patent, col. 3, lines 20–26 (group two treatment chemicals). During his expert deposition in the New York litigation,[3] Mr. Yost stated that "[i]t's commonly known that sulfates are present in phosphoric acid." Ex. 19 at 71, lines 15–20. According to Mr. Yost, this was common knowledge that predated plaintiff's claimed inventions. *Id.* at lines 20–22. The Defendants' expert, Dr. Pierzynski agrees. Ex. 6, ¶ 15; Ex. 16 ¶ ¶ 4–6.

While this Court did not directly define the parameters of what constitutes "separate and distinct," in its claim construction, it did explain that "[t]he repeated contrast between groups one and two in these patents signifies the 'separate and distinct' nature of the first component." *Sevenson*, at *65. The same is true for the second component. *Id.* at *67. It also considered the drawings accompanying the patents as demonstrative of the "separate and distinct" nature of the "first component" and the "second component." *Id.* at 65, 67 (citing *Autogiro Co. of Am. v. U.S.*, 384 F.2d 391, 398 (1967) ("In those instances where a visual representation can flesh out words,

---

[2] The Court has also determined that the terms "phosphate supplying reagent" as used in the '485 patent, and "phosphate compound" as used in the '608 patent, have the same definition as "second component." *Sevenson*, at *66 n. 4.

[3] In May 2000, Sevenson filed suit against IT for patent infringement in the United States District Court for the Western District of New York (Buffalo Division). *See Sevenson*, at *61.

drawings may be used in the same manner and with the same limitations as the specification.") (citations omitted)).

Sevenson characterizes the drawings as "illustrative of the two-step embodiment claimed in the '936 Patent and certain non-asserted claims in the patents-in-suit." Pl. Opp'n at 11 n. 14. However, *each* patent at issue explains that "FIG. 1 exhibits the *single step* mixing method of treatment chemicals . . . ." '982 patent, col. 4 lines 25–28; '367 patent, col. 64–67; '123 patent, col. 4 lines 34–37; '608 patent, col. 7, lines 22–25; '485 patent, col. 5 lines 53–56. Consistent with the disclosure in the patents, this Court's claim construction, and the Defendants' position, Fig. 1 shows both that the group one treatment chemicals ("first component") are "separate and distinct" from the group two treatment chemicals ("second component"). Phosphoric acid, with its commonly known impurities, is a group two treatment chemical, not both a "first component" and a "second component."

"Separate" means "set apart or divided from the rest or others; not joined, united, or connected; severed," and "distinct" means "not alike; different." *E.g.*, *Webster's New World Collegiate Dictionary*, 4th Ed. (Macmillan USA 1999). Phosphoric acid is not "separate and distinct" from its sulfate impurities, as impurities are by their nature *unseparated*. There simply is no source of sulfate that is "separate and distinct" from the phosphoric acid used at the Colonie site.

Dr. Pierzynski offers a very simple analogy to compare Sevenson's theory with the Defendants' position. Ex. 22, ¶ ¶ 11–14. Air is commonly composed of nitrogen (78%), oxygen (20.95%), argon (0.93%), carbon dioxide (0.038%), and trace gases (approx. 1%). *Id.* at ¶ 11. Air could be considered a source of nitrogen, oxygen, argon, and/or carbon dioxide. *Id.* Suppose a hypothetical patent claim required a "first component for supplying nitrogen" that is a

"separate and distinct compound" from a "second component for supplying oxygen." Under Sevenson's theory of applying this Court's claim construction, air must be both the "first component for supplying nitrogen" and also the "second component for supplying oxygen." This fails, however, because air cannot simultaneously be both a source of nitrogen and also a "separate and distinct" source of oxygen. This distinction is even more pronounced if the hypothetical patent listed "air" as a member of the group of components for supplying oxygen. As different chemical species, nitrogen gas and oxygen gas are subject to a variety of procedures to measure each species. *Id.* However, the gases in air are not "separate" until each of these gases is separated from each other.[4] *Id.* at ¶ 12.

Similarly, assuming *arguendo* that Prayphos P5 may be a source of both sulfate and phosphate, Sevenson's theory would require that Prayphos P5 be a source of sulfate and simultaneously a "separate and distinct" source of phosphate. This interpretation simply defies common logic, as there is nothing "separate and distinct" about Prayphos P5, nor the molecules comprising it. As a phosphoric acid, Prayphos P5 contains impurities that are "chemically distinct," such as sulfate ions and chlorine ions. However, the sulfate impurities do not become "separate and distinct" *until* separated, such as by Prayon's process for separating calcium sulfate and increasing the concentration of phosphate. *See, e.g.*, Ex. 6 ¶ 21 (summarizing some of the steps Prayon uses to purify its product). Prior to undergoing separation by, for example Prayon's purification processes, the impurities are *unseparated*.

---

[4] For example, cold-temperature distillation is a separation process for gases. *E.g.*, MSN Encarta, *Air* (Aug. 7, 2007), *available at* http://encarta.msn.com/encyclopedia_1741500785/Air.html.

B. Without an additional component, Prayphos P5 cannot be the "first mixture."

This Court properly construed the term "first mixture" as the "first component plus the second component mixed together." *Sevenson*, at *59–60.[5] There can be no "first mixture" because there was never a "first component" that was "separate and distinct" from a "second component." Sevenson again argues that Prayphos P5 is the "first mixture" because it "contains sulfate compounds – $(S0_4)^{2-}$ [sic] – that are separate and distinct from phosphate compounds – $(P0_4)^{3-}$ [sic] – also found in Prayphos P5." Pl. Opp'n at 6. Sevenson also cites to this Court's statement that "[p]hosphoric acid is a mixture that contains both sulfate and phosphate." Pl. Opp'n at 6, 25 (citing *Sevenson*, *60). Sevenson fails to acknowledge, however the Court's clear explanation, preceding the "Factual Background" section, that these are not facts the Court has found:

> This background information is taken from the parties' representations in their briefs. The Court has not received evidence on these facts, and the parties would not be bound by any of the factual assertions herein if these facts later become material to the outcome of the case.

*Sevenson*, at *59 n. 2. Further, Sevenson argues that the claim limitation of a "first mixture" requires only "that the sulfates and phosphates be mixed together." Pl. Opp'n at 25. This misunderstanding stems from its erroneous assumption "separate and distinct" means only chemically distinct species.[6]

---

[5] Although the term "first mixture" appears in only the '982 patent, this argument also applies to the terms "treatment additive" and "combination" found in the '123 and '485 patents, respectively. *See* Def. Mot. Summ. J. at 31.

[6] Sevenson's argument that Prayphos P5 is not equivalent to the phosphoric acid as described in the specification is mere attorney argument entitled to no weight. Pl. Opp'n at 6 n. 11. Prayphos P5 is one of many commercially available phosphoric acids, and the fact that it contains sulfate impurities is of no surprise: Phosphoric acids include sulfate. Ex. 19 at 71, lines 15–22; *see also* Ex. 6, ¶ 15; Ex. 16 ¶ ¶ 4–6; *see also* Pl's Ex. 6 (showing various phosphoric acid

For the Colonie treatment process to meet the claim limitation of the "first mixture," there must have been a "separate and distinct" "first component," such as gypsum or lime, *in addition to* the phosphoric acid.

Sevenson's arguments concerning claim differentiation do not change this requirement. Pl. Opp'n at 7. The "first mixture" of the asserted claims is not the "first mixture" of claim 12, as claim 12 covers a two-step process wherein the "first mixture" is the "metal-bearing material" and the "phosphate reagent." The "second component" of claim 12 supplies, *inter alia*, sulfate.

C. If the Court accepts Sevenson's tortured application of the Court's claim constructions, then Defendants do not infringe any asserted claim.

In addition to Sevenson's unavailing argument that the "first component" is the sulfate impurities in phosphoric acid and the "second component" is phosphoric acid, Sevenson also argues that Prayphos P5 meets the "first mixture" limitation because it is "made by a process that brings together phosphates and sulfates from separate groups." Pl. Opp'n at 25. Not only is this argument contrary to the teachings of the patents,[7] but it is also futile in that Defendants would nevertheless be entitled to summary judgment of noninfringement.

---

specifications, all of which include sulfate impurities).

[7] The specifications mention nothing about the raw materials used for phosphoric acid production, yet are replete with teachings that phosphoric acid is a member of the "second group" for supplying phosphate. None of the patents list phosphoric acid as a member of the "first group of treatment chemicals." Each patent, however, *does* include phosphoric acid in the "second group" of treatment chemicals. *See, e.g.*, '982 patent, col. 3, lines 20–22; '123 patent, col. 13, line 4 (describing phosphoric acid as "an additive from group two"). The patents also claim phosphoric acid as the *second* component in dependent claims, *see, e.g.* , claim 9 of the '982 patent, but never as the "first component." This infringement theory would, effectively, grant Sevenson a patent on *only* phosphoric acid (with its "commonly known" impurities), whereas the patents clearly require two "separate and distinct" components.

"Under [28 U.S.C.] § 1498, the United States is liable for the use of a method patent only when it practices every step of the claimed method in the United States." *Zoltek Corp. v. United States*, 442 F.3d 1345, 1347 (Fed. Cir. 2006), *cert. denied*, 127 S. Ct. 2936 (2007). Sevenson has offered no evidence that Prayon manufactures Prayphos P5 in the United States. In fact, the record shows that Prayphos P5 is imported from Canada. *See* Ex. 7 (showing Prayphos P5 as imported from Quebec, Canada by Saybolt Canada); *see also* Ex. 20 (representative shipping documents show that Prayphos P5 used at the Colonie site originated from Montreal, Quebec). Nicholas Bates, chief operating officer of Prayon, Inc., a Prayon subsidiary in the U.S., confirms that Prayphos P5 is made in Puurs, Belgium, not the United States. Ex. 21. Prayon's Product Specification Data Sheet confirms this. Ex. 5; *see also* Ex. 21, ¶ 5. If the process of making phosphoric acid constitutes the first step, or results in the "first mixture," then the mixing of the first component (sulfuric acid) with the second component (phosphate rock) occurred outside of the United States. Accordingly, "not all steps of a patented process have been performed in the United States, [and] government liability does not exist pursuant to section 1498(a)." *Zoltek*, 442 F.3d at 1350.

**III. Sevenson's attempt to avoid the effect of the Prosecution History fails.**

The prosecution history shows that the patentee distinguished prior art *that used only phosphoric acid* on the ground that these references *did not teach the use of a sulfate component*. Def. Mot. Sum. J. at 18–24; Def. Opp'n at 7–15.[8] In other words, the patentee distinguished its

[8] During the reexamination of the '936 patent, Mr. Yost, Sevenson's expert and one of the inventors, stated that "[i]n contrast [to O'Hara], the present invention uses a sulfate source *in addition to phosphoric acid*." Ex. 13 at G002451 (emphasis added). In the case of the '982 patent, the patentee traversed a rejection based on O'Hara by stating that "[t]he sulfates supplied by the first component in the [application that later issued as the '982 patent] is neither taught nor suggested by O'Hara." Ex. 9 at G003055–56. (*continued . . .*)

invention as having phosphoric acid *and another component for sulfate*. The effect of these arguments is that the claims cannot now be interpreted so as to cover a process using only phosphoric acid. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) ("The doctrine of prosecution disclaimer is well established in Supreme Court precedent, precluding patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution.") (citations omitted). Sevenson's attempts to pass off the prosecution history as inapplicable are weak and even inconsistent with the opinion of their own expert.

Prior to filing the first application in the Sevenson family of patents, it was "commonly known that sulfates are present in phosphoric acid." Ex. 19 at 71, lines 15–22; *see also* Ex. 6, ¶ 15; Ex. 16 ¶ ¶ 4–6. Any phosphoric acid disclosed in the prior art must have also contained sulfate impurities. Sevenson's expert agreed that the phosphoric acid described in the O'Hara patent would have some sulfate. Ex. 19 at 182, line 17 to 183, line 2.

A. Summary of the O'Hara and Stanforth prior art patents.

U.S. Patent 4,737,356 to O'Hara ("the O'Hara patent") teaches that "[a]ddition of water soluble phosphate, *especially phosphoric acid*, increases the immobilization of lead and cadmium so as to make such residues in compliance with the toxicity tests over a substantially broader pH range." Ex. 10, abstract (emphasis added). The O'Hara patent contains numerous examples discussing the "efficacy of phosphoric acid in immobilizing both lead and cadmium." *E.g.*, Ex, 10, col. 8, lines 6–9. Sevenson's expert agrees that O'Hara's use of phosphoric acid

---

In the case of the '485 patent, the patentee traversed Stanforth by stating that "Stanforth also discloses that '[t]he treatment additives are any of the following used individually or in combination: . . . phosphoric acid . . . ." Ex. 11 at G004661 (*citing* Ex. 12 at col. 5, lines 56–63). According to the patentee, "Stanforth does not teach the use of a phosphate *and* a sulfate for the treatment of lead contaminated soils and waste materials." Ex. 11 at G004661 (emphasis added).

would infringe several of the claims at issue. Ex. 19 at 183, line 7 to 184, line 15 ('982 patent, claim 1); *id.* at 187, lines 8–23 (claim 5 of the '982 patent "if he added phosphoric acids"); *id.* at 190, lines 15–19 (claim 1 of the '123 patent); *id.* at 191, line 25 to 192, line 2 (claim 15 of the '123 patent); *id.* at 192, lines 10–19 (claim 1 of the '485 patent).

U.S. Patent 5,202,033 to Stanforth ("the Stanforth patent") teaches a method of treating solid waste in soil or solid disposed waste containing unacceptable levels of leachable metals, such as lead, that includes mixing the solid waste or soil with a phosphate source or a carbonate source or ferrous sulfate. Ex. 12, abstract. According to the Stanforth patent:

> The invention discloses the steps of introducing additives which immobilize the heavy metals by chemical reaction and precipitation in the soil or waste. The phosphate source is selected from the group consisting of sodium phosphate, sodium hydrogen phosphate, superphosphate, triple superphosphate, phosphoric acid, and polyphosphoric acid.

Ex. 12, col. 4, lines 19–25.

B. <u>Both O'Hara and Stanforth explicitly teach using phosphoric acid to immobilize lead.</u>

Sevenson attempts to distinguish this prior art by arguing that "[c]ompletely missing from both the O'Hara and Stanforth references is any recognition of a one-step treatment method that has both sulfate and phosphate components to treat lead and radioactive materials, as the asserted Sevenson patent claims cover." Pl. Opp'n at 16. It is true that O'Hara and Stanforth teach steps *in addition to* using phosphoric acid, but as Sevenson has noted, additional steps or features do not change the infringement analysis. Pl. Mot. Summ. J. at 17 n. 14 (citing *Northern Telecom. Inc. v. Datapoint Corp.*, 908 F.2d 931, 945 (Fed. Cir. 1990) ("[t]he addition of [unclaimed] features does not avoid infringement.")). Thus, the patentee's statements to

distinguish these prior art patents made during prosecution of the patents at issue are clearly relevant.

If there is any doubt, Sevenson's own expert stated, during his expert deposition from the New York litigation, that O'Hara's use of phosphoric acid would infringe several of the claims at issue. Ex. 19 at 183, line 7 to 184, line 15 (claim 1 of the '982 patent); *id.* at 187, lines 8–23 (O'Hara would infringe claim 5 of the '982 patent "if he added phosphoric acids"); *id.* at 190, lines 15–19 (claim 1 of the '123 patent); *id.* at 191, line 25 to 192, line 2 (claim 15 of the '123 patent); *id.* at 192, lines 10–19 (claim 1 of the '485 patent).

C. The disclaimer made during the reexamination of the '936 patent applies to the patents at issue.

Sevenson seeks to avoid the effects of the prosecution history of the '936 patent on the grounds that it discloses only a two-step process, whereas all of the currently asserted claims cover a one-step process. Pl. Opp'n at 12–14. According to plaintiff, Mr. Yost "believe[s] that our invention *as claimed in the '936 patent* . . . employs the use of a sulfate compound in the *first step* and a phosphate compound in the *second step*." Pl. Opp'n at 13 (citing Yost Decl. at ¶¶ 36–41) (emphasis original). This attempt to avoid the clear and unmistakable disavowal from the '936 reexamination fails for several reasons.

First, Mr. Yost's self-serving and "after-the-fact testimony is of little weight compared to the clear import of the patent disclosure itself." *North Am. Vaccine v. American Cyanamid Co.*, 7 F.3d 1571, 1577 (Fed. Cir. 1993) (citations omitted). His declaration attached to Sevenson's Opposition is, therefore, unpersuasive. The specification of the '982 patent, however, is quite persuasive. It teaches that the "first component" and "second component" can be added in any order. '982 patent, col. 5, lines 39–54. This passage summarizes both the two-step process disclosed in the '936 patent (and repeated in the '982 patent), as well as the one-step process

disclosed in the '982 patent. The two components that make up the one-step treatment are *the same two components* that make up the two-step treatment, simply "pre-mixed." '982 patent, col. 5, lines 46–48. The '936 patent also claims the two-step treatment process.

Second, both the '936 and the '982 patents include the same example and conclusion that "[e]valuation of a single treatment chemical in one step reveals that phosphoric acid was most effective in fixation of leachable lead . . . ." *Compare* '936 patent, Example 1 and Table III, *with* '982 patent, Example 5 and Table VII. The '982 patent includes other examples showing that phosphoric acid, alone, can be successful. *E.g.*, '982 patent, Table IV. The '936 patent also explicitly states that "[t]he use of phosphoric acid alone for fixing lead in solid waste and soils fails to pass the TCLP lead criteria in many cases for lead contaminated soils." '936 patent, col. 5, lines 10–11.[9]

Since the '936 patent teaches away from the use of a single-step process, then this example using phosphoric acid, which appears in both patents, must mean that the one-step process of the '982 patent requires a component *in addition to* phosphoric acid.[10] On the other hand, if the one-step process of the '982 patent *does* cover a process employing *only* phosphoric acid (such as mentioned in this example), then the '936 patent must also disclose this in Example 1 and the Yost's disavowal of a phosphoric acid-only process applies to all of the patents at issue.

---

[9] The fact that the patents teach that phosphoric acid, alone, does not always work is also contrary to Sevenson's assertion that one single molecule of sulfate is sufficient.

[10] Of course, phosphoric acid includes some amount of sulfate impurities. Ex. 19 at 71; *see also* Ex. 6, ¶ 15; Ex. 16 ¶ ¶ 4–6. This means that Prayphos P5 is no different than the phosphoric acid referenced in any of the patents or prior art, other than the amount of sulfate impurities "commonly known" to be present. Sevenson fails to mention sulfate impurities that were also necessarily present in the prior art.

Third is Sevenson's acknowledgment that "the O'Hara reference does not teach the use of sulfate in a treatment method." Pl. Opp'n at 14. Yet, O'Hara does teach the use of phosphoric acid in a treatment method. Ex. 10, abstract. Phosphoric acid includes sulfate. *E.g.*, Ex. 19 at 182, line 17 to 183, line 2. This highlights the glaring inconsistency in Sevenson's positions: the "commonly known" sulfate impurities inherent in the prior art phosphoric acid did not constitute the use of sulfate, but in the present case the sulfate impurities in phosphoric acid meet the sulfate component claim limitation. This is the very inconsistency that makes analysis of the prosecution history relevant to the interpretation of patent claims. *North Am. Vaccine v. Am. Cyanamid Co.*, 7 F.3d 1571, 1577 (Fed. Cir. 1993) ("A patent applicant cannot disclose and claim an invention narrowly and then, in the course of an infringement suit, argue effectively that the claims should be construed to cover that which is neither described nor enabled in the patent.").

Regardless of whether the statements made during the reexamination of the '936 patent apply to the patents at issue, or instead the '928 discloses a distinct process undisclosed in the '936 patent, the conclusion must be the same: the claim limitations of the "first component" and the "second component" cannot be construed so as to cover a process employing only phosphoric acid.

## IV. This Court has already dismissed Sevenson's theory that merely one molecule of sulfate is sufficient.

This Court has already dismissed Sevenson's "single molecule" argument:

> To convert leachable metals into non-leachable form, more than a single molecule is required. Thus, when viewed in the context of the patent as a whole, a person of ordinary skill in the art would likely understand that 'one or more reactive sulfate ion(s)' means 'a compound containing a reactive sulfate ion, $(SO_4)^{2-}$.'

*Sevenson*, at *84.[11]

Nonetheless, Sevenson offers another explanation for the importance of sulfate ions in the immobilization of lead – catalysis. Pl. Opp'n at 2–3, 22–24. This theory is wholly unsupported by, and inconsistent with, the disclosures in the patents. There must be a minimum amount of sulfate necessary, since the patents teach that in at least one case, a "[s]ingle application of phosphoric acid . . . was short of meeting the regulatory threshold of 5.0 mg/l by TCLP Test criteria for lead." '982 patent, col. 16, lines 53–56. Concerning Yost's explanation of how the chemical reactions work, his "after-the-fact testimony is of little weight compared to the clear import of the patent disclosure itself." *North Am. Vaccine*, 7 F.3d at 1577 (citation omitted); *see also Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 985 (Fed. Cir. 1995) (en banc) ("The subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim (except as documented in the prosecution history)."), *aff'd*, 517 U.S. 370 (1996) .

Dr. Pierzynski explains why Yost's rationale is faulty, addressing both Yost's catalysis theory and analogies. Ex.22, ¶¶19–28. Generally, the patents disclose two sets of reactions in which lead ions bond with either sulfate ions or phosphate ions to form insoluble species. E.g., '982 patent, equations 1–3. These reactions show that creation of insoluble sulfate species

[11] Similarly, the patents require that a "second component supplies at least one phosphate ion." '982, claim 1. This Court interpreted the "at least one phosphate ion" term to refer to a chemical species, as opposed to a single molecule: "The specifications, and the preambles to the independent claims, also establish that the purpose of the invention is to treat metal-bearing materials to stabilize leachable metal. This purpose could not be accomplished with a single molecule of (PO4)3-." *Sevenson*, at *68.

consumes the sulfate ions. Since the reaction consumes sulfate ions, sulfate is not a catalyst.[12] Interestingly, the word “catalyst” does not appear in any of the patents at issue.

## V. This Court has already determined that patentee provided a specific meaning to the term “Technical Grade Phosphoric Acid.”

Sevenson argues that Prayphos P5 is a technical grade phosphoric acid (“TGPA”) because “Prayphos P5 is understood in the industry to be TGPA.” Pl. Opp’n at 26. What Sevenson fails to recall, though, is that this Court has already considered this issue and held that “the patentee has provided a special definition for the term [TGPA].” *Sevenson*, at *68–69.

Despite this Court’s ruling, Sevenson offers a new and self-serving definition for TGPA: “phosphoric acid that typically has 65-85% by weight $H_3P0_4$ [sic] and sulfates ($S0_4$) [sic] in the range of 50-500 ppm is commonly referred to and marketed as *technical grade* phosphoric acid.” Pl. Opp. at 27 (emphasis original). This new definition apparently excludes the TGPA actually disclosed by the inventors of the ’367 and ’608 patents, which requires “sulfate ($SO_4^{2-}$), typically as sulfuric acid in the range of 2.5% [25,000 ppm] to 7% [70,000 ppm] (by weight) as an impurity.” ’367 patent, col. 6, lines 52–55; ’608 patent, col. 6, lines 6–9.

As Dr. Pierzynski confirms, a person of ordinary skill reading the ’367 and ’608 patents’ disclosure of TGPA would understand that term, as used in these patents, *not as an example*, but to require a phosphoric acid having sulfate impurities significantly higher than Prayphos P5. Ex. 22, ¶¶ 16–17. When the patentee prescribe TGPA as having sulfates typically in the range of 25,000 to 70,000 ppm, an impurity maximum of 350 ppm is far too remote to meet the patentee’s chosen lexicography, even in light of the “typically” modifier. *Id.* at ¶ 16.

---

[12] A catalyst is not consumed by the overall reaction. Ex. 22, ¶ 19.

## VI. Sevenson has not offered any viable evidence of a decrease in concentration of leachable radionuclides.

Claim 11 of the ’367 patent, claim 20 of the ’608 patents, and their respective dependent claims require a decrease in “the concentration of leachable radionuclides (or radioactive substances).” Sevenson asserts that “it is a scientifically proven fact that the treatment method employed at the Colonie Site reduced the amount of hazardous radioactive materials in the treated soil.” Pl. Opp’n at 4 (citing Yost Decl., ¶¶ 67–71). This assertion is wrong in several ways, and Defendants are entitled to summary judgment of non-infringement of these claim limitations.

First, the amount of hazardous radioactive materials never changes. If the Colonie treatment process immobilized any radioactive material, the amount does not change– its mobility in soil changes.

Second, Sevenson has not offered any proof that the phosphoric acid used to treat heavy metals in the Colonie soil decreased the concentration of any radioactive substances. Yost states that given the laws of science, some of the lead present in the soil was “unavoidably radioactive.” Yost Decl., ¶ 66. Dr. Pierzynski explains that this is not true. Ex. 22, ¶¶ 44–49. The only other basis Sevenson offers is Yost’s statement that “in my experience with this technology where phosphoric acid is used as a treatment additive at ALL sites . . . a volume reduction has always been the case.” Yost Decl., ¶ 71. This does not save Sevenson, as “[a] party may not overcome a grant of summary judgment by merely offering conclusory statements.” *TechSearch L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1371 (Fed. Cir. 2002) (quoting *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1112 (Fed. Cir. 2000)).

Third, Mr. Yost’s *opinion*, that the Government reduced leachability of radioactive substances does not account for the possibility of non-leachable radioactive species. Ex. 22, ¶¶

47–49. Since the leachability of a radioactive substances depends on the speciation, it is not "scientifically proven" that the Colonie treatment process meets this claim limitation. *Id.* As Sevenson can offer no viable evidence of a decrease in the concentration of leachable radioactive substances, this Court should grant summary judgment of non-infringement.

**VII. Sevenson has not offered any viable evidence of a decrease in volume.**

Similarly, this Court should grant summary judgment of non-infringement of the "volume decrease" claim limitations in the '123 patent because of Sevenson's failure to offer anything other than the conclusory opinion of their expert and inventor. *Techsearch*, 286 F.3d at 1371. It was an objective to *limit* volumetric *expansion* ("swell"), not *maximize* volumetric *decrease*. Ex. 2 at G001477. Whereas Sevenson challenges the methods Kiber used to measure the volumetric expansion, Dr. Pierzynski points out that the patents do not teach what method the skilled artisan should use to measure volume change. Ex. 22, ¶ 36. Likewise, Pierzynski explains why volumetric decrease is not a guaranteed result, leaving Sevenson with nothing other that Yost's conclusory statement. Ex. 22, ¶¶ 34–43. This is insufficient to save Sevenson from summary judgment. *TechSearch*, 286 F.3d at 1371.

**VIII. Sevenson has not explained how additional discovery will save it from summary judgment of non-infringement.**

It is disingenuous for Sevenson to complain that is has not had the opportunity to take discovery in this case. Pl. Opp'n at 29, 31. Quite to the contrary, "[d]iscovery for the Colonie, New York FUSRAP site generated over 150,000 pages of documents, and approximately 27 depositions during litigation between Sevenson and Shaw in the United States District Court for the Western District of New York (Buffalo Division) (the "Buffalo litigation")." Joint Status Report at 4. During the Buffalo litigation, Sevenson asserted claims from the same patents, and had more than sufficient opportunities to take the discovery necessary to meets its burden of

proof. Sevenson has not shown that it is entitled to further discovery on these issues. *Simmons Oil Corp. v. Tesoro Petroleum Corp.*, 86 F.3d 1138, 1144 (Fed. Cir. 1996) (citations omitted). (Under Rule 56(f), a party must demonstrate specifically how postponing a ruling on summary judgment for additional discovery will allow that part to rebut a showing of the absence of a genuine issue of fact. "It is not enough simply to assert, a la Wilkins Micawber, that 'something will turn up.'"); *Exigent Tech. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1308 (Fed. Cir. 2006) ("The burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case.") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). As Sevenson is the party bearing the burden of proof, it must "show the existence of a genuine issue of material fact, which exists only if the evidence is such that a reasonable jury could reach a verdict in its favor." *Golan v. Pingel Enter.*, 310 F.3d 1360, 1368 (Fed. Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

## IX. CONCLUSION

For the reasons discussed above, Sevenson has failed to overcome Defendants' showing that the accused lead stabilization treatment process at the Colonie, New York FUSRAP site infringes the asserted claims of Sevenson's patents. Accordingly, this Court should grant Defendants' Motion for Summary Judgment of Non-Infringement.

Dated: August 13, 2007

Respectfully submitted,
PETER D. KEISLER
Assistant Attorney General

JOHN J. FARGO
Director

s/ Joshua B. Brady
JOSHUA B. BRADY
Attorney
Civil Division
U.S. Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0285
Facsimile: (202) 307-0345

Attorneys for Defendant the United States

OF COUNSEL:
Susan Mitchell
Attorney
U.S. Department of Justice

Dated: August 13, 2007

s/ Russel O. Primeaux
Russel O. Primeaux
Kean Miller Hawthorne D'Armond
McCowan & Jarman LLP
One American Place, 22nd Floor
Post Office Box 3513
Baton Rouge, LA 70821-3513
(225) 387-0999
Russel.Primeaux@keanmiller.com

Attorney for Defendant-Intervenor
Shaw Environmental, Inc.