# Exhibit 19

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

---

| | | |
|---|---|---|
| SEVENSON ENVIRONMENTAL SERVICES, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. |
| vs. | ) | 02-CV-0527A(SC) |
| | ) | |
| SHAW ENVIRONMENTAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

---

**DEPOSITION OF KARL W. YOST**
Thursday, October 7, 2004
Seattle, Washington

COPY

**Reported by:**
**Kellie A. Smith, CCR**
**CCR No. 1950**
**Job No. 72595**

APPEARANCES

For the Plaintiff:

**KEVIN A. SZANYI**
WEBSTER SZANYI LLP
1400 Liberty Building
Buffalo, New York 14202
(716) 842-2800
(716) 845-6709 Fax
kszanyi@websterszanyi.com

**NELSON PEREL**
WEBSTER SZANYI
1400 Liberty Building
Buffalo, New York 14202
(716) 842-2800
(716) 845-6709 Fax
nperel@websterszanyi.com

For the Defendant:

**MARK S. GRAHAM**
LUEDEKA, NEELY & GRAHAM, P.C.
1871 Riverview Tower
P.O. Box 1871
Knoxville, Tennessee 37901
(865) 546-4305
(865) 523-4478 Fax
MGRAHAM@LNG-PATENT.COM

**GEOFFREY D. KRESSIN**
LUEDEKA, NEELY & GRAHAM, P.C.
1871 Riverview Tower
P.O. Box 1871
Knoxville, Tennessee 37901
(865) 546-4305
(865) 523-4478 Fax
GKRESSIN@LNG-PATENT.COM

<<<<<< >>>>>>

EXAMINATION INDEX


| EXAMINATION BY: | PAGE NO. |
| --- | --- |
| Mr. Graham | 7 |


<<<<<< >>>>>>

EXHIBIT INDEX


| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
| --- | --- | --- |
| 1 | Expert Opinion Paper of Karl W. Yost; 30 pages | 19 |
| 2 | Color-coded table depicting the expert opinion of Karl W. Yost; 67 pages | 55 |
| 3 | United States Patent Number 5,732,367, dated March 24, 1998; 20 pages | 62 |
| 4 | United States Patent Number 5,527,982, dated June 18, 1996; 15 pages | 63 |

# EXHIBIT INDEX

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 5 | United States Patent Number 5,193,936, dated March 16, 1993; 10 pages | 92 |
| 6 | Reexamination Certificate, United States Patent B1 5,193,936, dated March 19, 1996; 2 pages | 116 |
| 7 | Document entitled, "The MAECTITE PROCESS; 8 pages; | 130 |
| 8 | United States Patent Number 5,916,123, dated June 29, 1999; 15 pages | 142 |
| 9 | United States Patent Number 5,732,367, dated March 24, 1998; 22 pages | 143 |
| 10 | United States Patent Number 5,994,608, dated November 30, 1999; 22 pages | 143 |
| 11 | Declaration of Prior Invention in the United States; 12 pages | 144 |
| 12 | Declaration of Prior Invention in the United States; 12 pages | 144 |
| 13 | Letters to Karl Yost from Michael N. Lock, dated April 13, 1998; 2 pages | 155 |

# EXHIBIT INDEX


| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 14 | Declaration Under Rule 132; 15 pages | 169 |
| 15 | United States Patent Number 4,737,356, dated April 12, 1988; 9 pages | 170 |
| 16 | United States Patent Number 6,139,485, dated October 31, 2000; 17 pages | 192 |
| 17 | Treatability Report on Waste Treatment Recommended for Waste Pile Closure at Household Manufacturing, Inc. Eljer Plumbingware Division Marysville, Ohio, Site; 14 pages | 194 |
| 18 | Treatability Report on Demonstration of MAECTITE Process Application to Lee Farm Soils and Solid Waste Materials; 52 pages | 198 |
| 19 | MAECTITE Treatment Process Lead Fixation Technical Information Package; 20 pages | 204 |
| 20 | Action Plan for Secondary Basin Waste Management Unit; 253 pages | 211 |

EXHIBIT INDEX


| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 21 | Interim Report "Investigations Into Leachate Characteristics From Amended and Unamended Combined Ash and Scrubber Residues"; 161 pages | 213 |
| 22 | Chapter 10 Formation and Stability of Base Metal Phosphates in Soils And Sediments, by Jerome O. Nriagu 40 pages | 218 |
| 23 | Immobilization of Radioactive Strontium in Contaminated Soils By Phosphate Treatment; 17 pages | 222 |


WITNESS INSTRUCTED NOT TO ANSWER

(None)

INFORMATION REQUESTED

(None)

<<<<<< >>>>>>

BE IT REMEMBERED that on Thursday, October 7, 2004, at 3225 East Marginal Way South, Seattle, Washington, at 8:55 a.m., before **Kellie A. Smith, CCR**, Notary Public in and for the State of Washington, appeared **KARL W. YOST**, the witness herein;

WHEREUPON, the following proceedings were had, to wit:

<<<<<< >>>>>>

**KARL W. YOST**, having been first duly sworn by the Notary, deposed and testified as follows:

MR. SZANYI: Let me just state, before we start, this is an expert deposition. At the end of the proceeding, Mr. Yost is going to send the bill to you and you're going to pay his bill. That's our understanding; correct?

MR. KRESSIN: Well, we'll certainly look at it. We don't know what he's going to send a bill for.

MR. SZANYI: Well, you're going to pay the full hourly rate.

MR. KRESSIN: We will pay for his

deposition time.

MR. SZANYI: Correct, and for the time he spent reviewing what you asked him to review.

MR. KRESSIN: Again, I mean, all I'm saying is, if he sent us a bill for two weeks' work, we wouldn't pay that. But if he sends a bill for a reasonable amount, yes, we will agree to pay that.

MR. SZANYI: Okay. I'm just making sure we understand --

MR. KRESSIN: That was a very open-ended question, and as lawyers, you know how we've got to equivocate on things.

MR. SZANYI: Okay. That's fine. And also we're going to go today under our rules, that is a seven-hour deposition, so we may be here eight hours, take an hour for lunch, but we're going to do seven hours maximum; correct?

MR. GRAHAM: We're going to try to do that. We'll have to see how many hats Mr. Yost is wearing.

MR. SZANYI: And lastly, we'd like to reserve the opportunity for the witness to read and sign the transcript.

MR. KRESSIN: And the other thing is, I don't know if we actually brought it up, we're obviously in Washington State. The case is in Buffalo; we're from

Tennessee. I don't know what your standard procedure is as far as objections and so forth. I assume that all objections are reserved except those as to the form of a question and privilege.

MR. SZANYI: Right. Because this case is pending in the Western District, it's always been my assumption that all the depositions are under the stipulations which are common in the Western District, which are including, but not limited to, that all objections are preserved until the time of trial except for as to the form of the question, which will be raised during the deposition, and the rest of those usual stipulations, I think, are pretty common. We waive -- both of the court reporter, we waive the filing of the transcript and those types of things.

MR. KRESSIN: Okay. That's fine. That's just for her benefit more than ours.

MR. SZANYI: Right. But there has been, as I understand it, some confusion over billing, because in the Western District of New York, typically you folks would be paying for his transcript and sending us a free copy. I don't know if we've been doing that in this case, so we'll work that out and let you know at the end of the day who's paying for what, but you'll get paid.

//////////////////////////////////

EXAMINATION

BY MR. GRAHAM:

Q. Could you state your name, sir?
A. Karl Yost.
Q. Any middle initial?
A. W.
Q. What's your address, residence?
A. 2101 10th Street, Anacortes, Washington 98221.
Q. We're here today in Seattle. How far is that from the location where we are now?
A. To my residence?
Q. Yes.
A. About 90 miles.
Q. Are you employed?
A. Yes.
Q. Who is your employer?
A. Wilder Construction Company.
Q. Do you have any other employers at this time?
A. Other than through these proceedings and expert witness, no.
Q. How long have you been employed by Wilder?
A. I've been employed since January of 1997.
Q. What do you do with Wilder?
A. I'm the environmental division manager.
Q. What is Wilder's business?
A. Primarily heavy civil construction, quarries and pits,

structures work, road asphalt construction, and then we also work with contaminated properties and cleanups.
Q. About how many employees does Wilder have?
A. Does Wilder have? It varies seasonally. Most of our heavy work is in Alaska and Northwest, so during this construction season, we could be seven, 800. During off season, again, it depends on the workload or the contract, three or 400. So it ranges. It just depends on the work load we have and the size of contracts and how labor intensive they are.
Q. So currently you have more than 500 employees?
A. Currently? I don't know the answer to that. It's -- I don't know what we have going on in Alaska as we speak, because the snows have started to fall up there already, so I couldn't tell you.
Q. Say two months ago?
A. Probably over 500.
Q. As I understand it, you're one of the inventors named on the patents in this case; correct?
A. Correct.
Q. The company you work for, Wilder, I understand, has a license under these patents?
A. We don't have a license. We have the ability to purchase the chemical and the technology from Sevenson, so when we bid on a lead job, we call Sevenson and get quotations to use their material, and they provide the material for a successful

bidder.
Q. You said for what process?
A. For this treatment process.
Q. You said a lead process?
A. Lead process.
Q. Who in your company would know, besides yourself, if your company has a license?
A. For this technology?
Q. Yes.
A. I'd be the only one. I mean, it might be on file, but we don't have one.
Q. How long did you say you worked for Wilder?
A. I started employment in January of '97.
Q. Who did you work for before that?
A. I worked for Sevenson Environmental Services.
Q. And is that the same Sevenson that is the plaintiff in this litigation?
A. Yes.
Q. And how long did you work for Sevenson?
A. I started working for them in May, I believe, of 1993. May, June. Somewhere in that time frame.
Q. How did you come to be employed by Sevenson?
A. Sevenson and several other companies were suitors for the company that I was with when we first developed this technology, and through the course of that transaction and

when Sevenson acquired the assets of that company, I became -- I hired on with them.

Q. What was that company?

A. MAECORP, Incorporated.

Q. What was your initial job title with Sevenson?

A. I believe it was director of treatment services.

Q. How long did you have that job title?

A. I believe it stayed the same from when I started until I departed.

Q. What were the circumstances that caused you to leave Sevenson?

A. I had been primarily involved in the treatment of lead and using this technology on other project sites. I wanted to do other things and work with other opportunities, other types of projects within the environmental industry and the cleanup side, and this opportunity came along from Wilder, and I accepted the offer.

Q. Did Wilder seek you out?

A. They indicated -- they called me and let me know that there was this position available, and so I submitted a resume.

Q. Had you done some work with Wilder before?

A. When I was with Sevenson, we did a project for, I believe -- I don't remember who the engineering firm who we were contracted to, but it was on the facility of Fort Ord, and we were looking for a fundamental screening operation plant that

might have been somewhere in the West Coast, and at that time I was referred up to Wilder. And that's the first encounter. I hadn't heard of them before prior to that.

Q. So --

A. And I didn't know anything about them until I actually got the call and started talking with them about coming to work for them.

Q. Who did you talk to at Wilder?

A. At what time?

Q. Initially.

A. Initially, a fellow by the name of Steve Lilkala told me that the position was available.

Q. At that time, did Wilder have an environmental business?

A. Yes.

Q. What was the nature of their business?

A. Environmental cleanup and construction and restoration. That was the nature of the environmental business. It still is heavy soil and paving, asphalt, structural work.

Q. That was about '97?

A. Correct. When I started talking was in October or November of '96.

Q. What sort of technologies was Wilder using at that time?

A. For which part? Which business?

Q. For the environmental part of their business.

A. At the time? I'm not certain. It was before I was here, so

I don't know all the types of technologies they were using. Mostly they were a hard-dollar contractor, and so we bid projects in accordance with bid specifications. So it's usually prescriptive in what we do. And if it's a capability or service that we don't provide in house, we provide some contractor quotes for that component of the work.

Q. So Wilder at that time did not have any of its, quote, "own technology" for environmental --

A. Well, it had another technology that they were in the process of working out and had a patent for, and it was for a leak detection system. It was in asphalt.

Q. What kind of leaks?

A. Well, like caps and covers. It was just a low-perm asphalt leak detection system.

Q. What did they talk to you about doing or that they wanted you to do when you came to Wilder?

A. Manage the environmental division, that component of the work.

Q. Did they talk to you about developing new technologies?

A. No.

Q. Since you've come to Wilder, have you developed any technologies that you think are new?

A. Yes. We have one that we put together that is based on our core business, which is asphalt, and we've developed a system that makes impermeable asphalt.

Q. What is that used for?
A. What is that used for?
Q. Yes.
A. Capping systems in sites and containing -- can be used for containing of wastes for work surfaces. It's not a treatment technology. It's just a barrier type.
Q. Does Wilder have any treatment technologies that it claims to be a proprietary?
A. Not that I know of.
Q. You have overall responsibility for the environmental part of the business?
A. We have two areas, more geographical. We have -- roughly half of our business is performed up in Alaska, and the other half is in the Lower 48, primarily in Washington and other northwest states. Environmentally, they have a division or environmental manager up in Alaska who watches over that, so I support, technically, the operation periodically, but my main focus and responsibilities are in the Lower 48.
Q. Do you have any knowledge if Wilder has used the technology that is involved with these patents in this case?
A. Yes.
Q. Can you tell us about that?
A. We've used it in Alaska, and we've used it in the State of Washington and we've used it in the State of Utah.
Q. Who was the first instance of that?

A. I can't remember the sequence, but I believe Alaska was probably the first one.
Q. Was it pre-2000 or post-2000?
A. I'd have to look. I can't remember. It's probably pre-2000. I don't know. I can't remember the timing on that. Probably -- no, I -- in that time frame.
Q. I think in your report, which we're going to talk about in a minute, you discuss your education. As I recall, you have an undergraduate degree?
A. That's correct.
Q. Do you have any postgraduate degrees?
A. Postgraduate degrees, no.
Q. Such as a Master's or a Ph.D.?
A. No.
Q. Have you taught any courses involving any environmental technology?
A. Have I taught courses? No.
Q. Are you aware of any discussions in this case in terms of whether you might be what lawyers call a 30(b)(6) witness or a spokesperson-type witness for Sevenson?
A. Other than this case?
Q. No. Well, in this case.
A. What is that, 30?
Q. It's a type of witness that is speaking for a party. Are you aware of any discussions in terms of whether you would be a

witness in this case speaking on behalf of Sevenson, other than your expert report?
A. Not that I know of.
Q. Have you been shown copies of any letters discussing that issue of whether you might be a spokesperson for Sevenson?
A. Well, I have a letter that offered the position or engaged me, I guess. You should have a copy of that if it was sent to you.
Q. So, in your understanding, your only role in this case from a witness standpoint is in regard to your expert report?
A. (Witness nods head affirmatively). As far as I know, yes.
Q. And you haven't been asked to speak on behalf of Sevenson?
A. Well, yeah, I have. I am right now.
Q. In terms of an expert?
A. As an expert witness, yeah.
Q. But in any other capacity?
A. No.
Q. Were you ever shown a copy of a notice of deposition to Sevenson that set forth a number of different subject matter areas on which Sevenson might be questioned?
A. I've gotten stacks of information from your firm and also this firm, so you should have copies of all of that. I'm not sure exactly what you're looking for, but if it's information that's been shared by both of the two firms, then I have looked at it.

Q. But bottom line, you're not speaking for Sevenson as a representative witness apart from this expert report?

A. I don't know what a representative witness is, but I'm retained to be an expert witness.

Q. And that's the extent of your involvement?

A. Yeah. As far as I know. I guess I don't understand the difference, but...

Q. I want to show you first what we understand to be a copy of your report. To save paper we copied it on two sides.

A. I don't blame you.

Q. The charts are probably not completely copied. We have additional copies here, but we're not really going to talk about the charts at this point. But let's go ahead and mark this Exhibit 1, which also includes the cover letter, I believe, from Sevenson counsel.

(Exhibit No. 1 marked for identification.)

MR. SZANYI: You want the letter attached to it, right?

MR. GRAHAM: Yeah.

Q. Are you aware of a prior litigation involving these patents against a company called IT Corporation?

A. As part of this process we're going through, I saw some of the litigation in the documents and depositions from early

things. I don't know what -- I don't know what all transpired legally between IT and Shaw, but I know that Shaw acquired IT, and what was in some of the depositions I read, I saw that.

Q. Are you aware of the fact that there are two separate cases, one involving IT and one involving Shaw?

A. I didn't know there were two cases involved.

Q. I notice from your report that at one time you were employed by a company called OHM. OH Materials or OHM?

A. OH Materials, correct.

Q. During what time period were you employed with --

A. That was in '84, '85. Somewhere in that time frame.

Q. For a couple of years or what?

A. Couple years. '84, '85. In that time frame.

Q. What was your position with OHM?

A. I started out as a field chemist, and then I -- that was when I worked out of the Findley office, and then I actually worked for the Grand Rapids office. I still lived in Grand Rapids, but they had a Grand Rapids office and I worked out of that.

Q. In what capacity?

A. Field chemist in treatment services. I think it might have been a manager of treatment services that was on a business card probably.

Q. What kind of work did you do with OHM?

A. Let's see. The work I did, we did a lot of lab pack operations. We did -- we worked on some sites in New Jersey where we were characterizing -- that was mostly lab pack work. We did -- I'm trying to think of what else we did. We did some water treatment and a former chromium waste -- another waste site in Kalamazoo. That was the big one primarily. More of water treatment-type things.
Q. What's lab pack?
A. A lot of times people would take household chemicals--paint cans, pesticides, herbicides, solvents, paints--and they'd just -- they accumulated in a building or a facility, and then because of the hodgepodge of materials, all of them had to be sorted and classified based on the waste type, and then containerized for transportation and disposal. So a lab pack is basically a container that holds other smaller containers of similar compatibilities within that.
Q. What do you do with it?
A. With the lab pack? That's how it's transported. It could be in a drum or it could be in a fiber pack, which is then incinerated, or the drum could be taken to another different type of facility that would actually unpack it and then blend the materials together and treat it and dispose it.
Q. How do you treat it?
A. It depends on what the waste is. We didn't do the treatment on that. We sent that to people that did that type of thing.

Q. Who would you send it to?
A. Oh, jeez, I don't remember.
Q. Did you ever deal with a company called RMT?
A. Yeah. They were actually a suitor for MAECORP. Did we ever work with them under contract capacity? I don't recall. I don't think we did. I know they were very interested in acquiring MAECORP at the time that Sevenson and IT were looking at us.
Q. Are you aware of who owns OHM now?
A. Not anymore. It's gone through so many different hands. I know they integrated with Rust, and Rust got integrated with U.S -- or Rust got integrated with Waste Management. Waste Management was acquired by U.S. Waste. I don't know what happened to the old OHM anymore. I haven't followed that.
Q. So if I told you OHM was owned by Shaw now, would you have any basis to dispute that, any knowledge?
A. I wouldn't have any knowledge to know which way those assets and resources and all went.
Q. While you were with OHM, what work did you do with lead, heavy metals?
A. The only one I can -- that I really, that was a treatment of metals was a plating waste material and had hexavalent chromium in it. It was in a water material and we converted the hexavalent chrome to a trivalent form and precipitated it out and the waters were discharged to a sanitary sewer.

Q. Was that the New Jersey...?
A. No. That was in Kalamazoo.
Q. What treatment agent was used to precipitate the chromium?
A. I believe we used -- oh, we also had cyanides present too, I think. I may be wrong on that, but we were using -- I think we had cyanides present. We were using -- I'm trying to think what we used. Been a long time. We used reducing agents and polymers to precipitate the chromo, reduced it to -- from hex chrome to trivalent so it was insoluble, and from there on it precipitated out as a metallic hydroxide, and then the solids were run through a filter press and they were disposed off site, and the water went to a sanitary sewer.
Q. Did you use phosphates?
A. No.
Q. During your time with OHM, did you use phosphates in any treatments?
A. No.
Q. Who did you work for at OHM?
A. Jim Miller.
Q. Who else?
A. Well, it's like any construction company. When you're on a project, you work for that superintendent or project manager. When I was primarily assigned to Michigan, I worked for Jim. Sometimes the project manager. Mostly Jim Miller.

Q. Do you know where Mr. Miller is now?
A. Mm-hm (answers affirmatively).
Q. Where?
A. He's in Michigan.
Q. Who does he work for?
A. Catskill.
Q. (Makes gesture for witness to repeat himself.)
A. Catskill.
Q. What do they do?
A. Remedial contracting.
Q. What part of Michigan?
A. Near Kalamazoo.
Q. Do you know the name of the town?
A. Otsego. Well, that's where Catskill is. Otsego, Michigan. O-t-s-e-g-o.
Q. What types of technologies does Catskill use?
A. I have no idea.
Q. During your time with OHM did you have any dealings with IT?
A. No.
Q. Who did you work for after OHM?
A. I went to work for a company by the name of Mid America Environment Services.
Q. How long were you with them?
A. Well, they're -- I was there -- actually Mid America Environment Service became MAECORP, and I'm not sure how that

legally and financially transpired, but it became MAECORP was the successor company, and I worked for them until I went to work for Sevenson.

Q. So mid America was in existence in the mid '80s?

A. I went to work for them in -- I'd have to look in what I wrote on my -- because I had to look it up then too, but it was in the mid, late '80s.

Q. I think your report says you were manager of technical services in 1985 until MAECORP was formed from MAES?

A. That's correct.

Q. Who did you report to at MAECORP?

A. It varied. Jim Miller some of the time and Phillip Newton some of the other times.

Q. So you worked for -- is this the same Jim Miller that you mentioned?

A. Same Jim Miller, mm-hm (answers affirmatively).

Q. With OHM?

A. That's correct.

Q. So he went to work for Mid America also?

A. He went to work for Mid America.

Q. Did he also work for MAECORP?

A. He did.

Q. Do you know how long he worked for MAECORP?

A. He left MAECORP before I did and before Sevenson. I don't know the exact timing on that.

Q. Was it before the MAECORP bankruptcy?
A. Before -- when he left?
Q. Yes.
A. Yes.
Q. Do you know why he left?
A. I think we were going through, as they called it back then, size reduction, cost reduction. I don't know all the issues. I wasn't privy to all of it, but we parted ways, or MAECORP and Jim Miller parted ways.
Q. I notice the company MAECORP and then a lot of the names for some of the things that MAECORP had, MAECTITE or MAEPRIC and so forth, use this MAE prefix. What does that refer to?
A. It came from Mid-America Environment and MAECORP, so we just -- seemed like a natural name to apply to it.
Q. On page 3 of your report --
A. This doesn't have page numbers, so you'll have to...
MR. SZANYI: Looks like some of the sentences were cut off in the copies as well.
THE WITNESS: You can just give me the section and I can probably find it.
Q. Yeah. It's 3.1, Qualifications.
A. Okay.
Q. In the third paragraph, there is a mention of, the technology, it says, was trademarked as the MAECTITE Chemical Treatment Technology.

A. Mm-hm (answers affirmatively).
Q. What do you mean by "MAECTITE Chemical Treatment Technology"?
A. It's a chemical treatment technology that is used to treat soils and waste. Best way to put it.
Q. Well, apart from what it's used on, what is the technology itself?
A. Well, it's a process that's used primarily to stabilize and chemically render metals nonleachable, so they pass the RCRA Toxicity Rule.
Q. And how was that accomplished?
A. How was what accomplished?
Q. The rendering of the metals nonleachable. How did you do it?
A. We utilized chemicals that would react with the lead and the properties of the waste that we had at any given time, and blended it and mixed it in through a variety of different ways to do it, and then sampled and tested it to make sure it passed the leachability criteria.
Q. What chemicals were you talking about?
A. We used phosphoric acid, we used gypsum. Those are the primary two we used.
Q. What else?
A. Those are the two that we used, for the most part.
Q. It says, "Dr. Pal was instrumental in the realization of the importance of sulfate," et cetera.
A. Mm-hm (answers affirmatively).

Q. What do you mean by that?
A. Well, we were working on this lead issue on a project, and Dhiraj's background is in soil chemistry. He's written a pretty good textbook, I guess, on -- I think the guy's name was Overland, if I'm not mistaken. But Dhiraj is a big proponent and advocate of calcium and sulfates as gypsum in soils, improving their integrity and structural ability. So when we were looking at the leachability of lead and what it would cost to take this material to a hazardous waste landfill, we felt that there was a better way to do it that would save quite a bit of money. So we looked at ways to render lead nonleachable.
Q. So you're talking about rendering it nonleachable before you transport it?
A. Correct. So it would not be a hazardous waste when it was disposed.
Q. And Dr. Pal was a proponent of the sulfate?
A. Gypsum.
Q. Or gypsum?
A. Soluble sulfates, yes.
Q. Do you know what the composition of cement is?
A. It's a huge mixture of lots of different things. It's got silicates, it's got oxides, it's got sulfates. It's got all kinds of things in it. Sand. It's different types. Type 1, Type 2, Type 3.

Q. But you know that cement has gypsum in it?
A. It does. Different types have different amounts.
Q. It goes on to say that you contributed -- I think you said the phosphatic component. What do you mean by that?
A. Phosphates are needed to render it nonleachable. So we used phosphoric acid to be one of the reagents, key reagent, to affect the leachability of the lead.
Q. Why do you need phosphates?
A. Why do you need phosphates?
Q. Why did you think you needed phosphates?
A. Because gypsum by itself didn't work, and we were looking for another additive that we could decrease the solubility of lead in the extraction, which is acetic acid, base solution.
Q. When you say "the extraction," what are you talking about?
A. When we first started back early on, we were using the EP TOX procedure, and that procedure uses acetic acid as a leaching fluid or a solvent, so we were looking to find a way to decrease the solubility of lead in acetic acid.
Q. Just in case whoever's reading this transcript doesn't know what or why that would be important, can you explain why it was important to have the lead be of reduced leachability?
A. Sure.
Q. In regard to this acetic acid.
A. Yes. Under RCRA regulations, there are four ways that waste can be considered hazardous, and one of those ways is called

the toxicity rule. The toxicity rule under RCRA calls for subjecting solid waste to this leaching procedure. And you then look at the level of the constituents in that leached fluid or the extraction fluid, and if it's above a certain level for any given analite or species, then it would be considered a hazardous waste. And the reason they went after acetic acid is that if it was a nonhazardous waste and put into a nonhazardous landfill, it would be subjected to prolonged exposure to acetic acid, which is a byproduct of LeachAid fluids within a landfill. So they wanted to make sure that the material that was being tested would not leach and contribute to potential mobility of the metals in the landfill itself and possibly leak from the landfill.

Q. Why would it be a concern to have it leach?

A. Background water. So a soluble state, it will move through the soils if there's a leak in the bottom of the landfill and get into the ground water surrounding the landfill.

Q. Why would that be a bad thing?

A. Why would it be a bad thing? Well, people -- usually landfills are rural areas, and people in those areas and communities use wells as their water source. So it's protecting the ground water. It's also to minimize the amount of constituents and contaminants in LeachAid. So if you had metals in your LeachAid in a landfill, that has to be handled as a separate issue.

Q. What part of this testing was an attempt to address the effect of acid rain, if any?
A. None. It's irrelevant to what we were doing.
Q. Why is that?
A. Because we were trying to render waste and make soils nonhazardous when it's put into a landfill situation.
Q. Nonhazardous by this --
A. RCRA Toxicity Rule.
Q. Now, you go on to say that you contributed incidental parallel benefits, such as aqueous, a-q-u-e-o-u-s, reagent forms, et cetera. Can you explain what you mean by that?
A. Yeah. We had long known -- everybody had known that when you use cement or other dry additives, it's very dry. It causes a dust situation, and when you're working on a remedial construction site, dust is a primary method for which contaminants can be migrated or exposed to people in the area. So when you have dust control, it adds cost to the project. You have to add additional water trucks and water systems or demisting systems, misting systems to keep dust from being generated, and if you have a dry additive versus an aqueous or wet system, you have a blending issue also. It's harder to blend the additives. So when you have a wet process, you get facilitated mixing, you have less control needs for dust problems; overall costs on the project are a lot less.

Q. How about in terms of the ability of the materials to react?
A. If you add a dry material with a dry material, they won't react. They may be a dry mixture, but they haven't -- maybe a dry mixture that hasn't reacted, but when you have water present, it helps facilitate any reactions that actually take place within a system.
Q. And that's been a well-known fact in chemistry for decades, at least?
A. For wet soil, water, I would say yes.
Q. And certainly prior to the invention that you talk about here, you and Dr. Pal, it was known that you needed water present for these reactions to occur?
A. I would say yes. I will say that one of the problems with too much water is it increases the mass of the material that you have to transport and dispose, because in those types of materials, like cements, they tend to hydrate the water and incorporate it in the mass, so any water you add typically stays within it.
Q. In your patents that are involved in this case, there is a discussion of the fact that the technology here is applicable to waste water. Is that correct?
A. It could be.
Q. What do you do there with the excess water?
A. I've never treated water with it, with the technology.
Q. Do you know if it will work on water?

A. Yeah. After some lab work we did, it works.

Q. If you're applying it to a water stream, you certainly would have a huge excess of water present; correct?

A. If I was applying it to a water, there would be an excess? You wouldn't want to -- yeah, if it was a small volume, you wouldn't need to drain it. It would be cost uneffective for small quantities. It's better to take the water and blend it back, even a large quantity, add it back into the soils. It just depends on the site and the conditions you have to work with, or what you can do with the water and how much you're generating.

Q. You had mentioned before that too much water could be a problem.

A. Too much water can be a problem, yes. You have to manage it.

Q. Then how do you deal with the amount of water present when you're treating an aqueous stream that would contain leachable lead?

A. How would I do it? Probably just charge it to the sanitary sewer.

Q. So the amount of water that's present in an aqueous stream that contains leachable lead is not too much water to affect the reaction?

A. I don't understand your question.

Q. Well, I'm trying to understand, you said that if there was too much water, that could be a problem.

A. Well, it's a problem --

MR. SZANYI: Object to the form. He said that with respect to cement. Object to the form. Go ahead.

THE WITNESS: Too much water -- if you bring too much water on the site, it probably adds to the cost of your job, and you may have to figure out another way to deal with -- manage that water. Whatever water you don't -- any water that's brought on the site you have to manage in some portion. Either it's going to go off site through a treatment system, a water treatment system, or it's going to be incorporated into the solids that are going off site. Sometimes you can reinject it back into the ground. It just depends on the site-specific permits and conditions. I mean, rainwater, for example.

Q. You also mention in that paragraph that at MAECORP, the technology was applied to a variety of projects, and you mention soil sludges, et cetera. What is your definition of soil?

A. Of soil?

Q. Yes.

A. It's a solid material that's made by natural processes, through weathering of rock and other geologic materials.

Q. Would you agree that it's a particular material?

A. It can be.

Q. Are you aware of a soil that's not particular in nature?