A. Crushed rock is an aggregate material based from soil, so I guess that would be considered a soil. You can have hard chunks of clay that I wouldn't call particular.

Q. But it would still be soil?

A. Still soil.

Q. How about sludges? What is your definition of a sludge?

A. It's generated by a precipitation mechanism where there's solids that have settled out from an industrial process typically. Some type of engineered process.

Q. Is the sludge particular in nature?

A. Not in its normal state. It could be particular if it's dried.

Q. Does it contain particulates?

A. Well, particulates, I would say, are typically associated with dust and air emissions. That's sort of where particular comes in. That's my assumption. You look at particle size --

Q. Well, let's talk about particles. Would sludge contain particles?

A. As sludge, no. Dried sludge, it could. And if it dries and hardens into an aggregate or glomerate or if it's friable. If it's friable, then it probably -- those components that make up the material are fines, particular-type fines, as a particle. I won't say a particle particulate, but a particle.

Q. So, in your understanding, when a sludge is in the wet state, it does not contain particles?
A. I don't know. I kind of tend to look at particles as something that's more, you know, friable, I guess. Not always. I guess it depends on how you're looking at it. You know, sludge has fines in it that precipitate out and form a material that's sometimes cohesive, sometimes not. It just depends on the nature of it. Particle usually is a distinct-sized object.
Q. So you would not classify the fines in sludge as particles?
A. Yeah, they could be particles, because there are small pieces within that, I would say, yes.
Q. And the same with soil?
A. Mm-hm (answers affirmatively). There's particles in soil.
Q. What's the difference between applying this technology to the sludge and applying it to the soil?
A. What's the difference? Well, sludges have different chemistry than soils, so you have to look at what's in the sludge versus what's in the soil. There are different competing things in each material. Every material run-in has different constituents that compete for reaction site and reactives that would be used.
Q. Let's talk about a soil that contains leachable lead.
A. Okay.
Q. And a sludge, say, from a smelting operation--

A. Mm-hm (answers affirmatively).
Q. --or a furnace that contains leachable lead. What would be the difference in applying the technology to those two?
A. You're saying from a smelter operation versus a soil?
Q. Yeah. They both contain leachable lead.
A. Well, the biggest thing is PH. Typically from the smelting operation, PH is alkaline, and it's been done intentionally through an engineering process.
Q. So how would you approach that?
A. How would I approach it? I would use -- to do what? To render the lead nonleachable?
Q. Yes.
A. Oh, I'd run some treatability studies and optimize the phosphoric acid with that, and possibly supplement it with additional sulfate.
Q. You may or may not need sulfate?
MR. SZANYI: Additional.
THE WITNESS: Additional.
Q. Okay.
A. And that's a function of lots of things. You know, what's present there already, what's not present, you know, what the buffering capacity of the materials are. All kinds of different things affect proper dosing of the reagents.
Q. Now, you made a point there to talk about additional sulfate.
A. Mm-hm (answers affirmatively).

Q. What do you mean by that?
A. Well, a lot of times the sulfates are already present in the material. They are reactive and available for reaction with the process. Phosphoric acid contains sulfates as well, so sometimes that's enough, sometimes it's not. Sometimes you have to have more. We don't care -- we look at the application of the two reagents to tie the lead up. I mean, optimize on various dosing and ratio formations.
Q. And you're not particularly concerned about where the sulfate comes from?
A. As long as it's reactive, no.
Q. So the sulfate could already be in the material you're treating?
A. It can be.
Q. It can be in the phosphoric acid?
A. It is.
Q. Always; correct?
A. Well, I should say -- yes. I would say yes, it is.
Q. And it could be added as an additional component?
A. That's correct. Sulfate has to be reactive. It has to be available for reaction. It can't be a nonreactive state.
Q. What is a nonreactive form of sulfate?
A. The one that comes to mind is anhydrite. That's a big version that's usually generated under high temperature, and it's fully dehydrated. There's no water associated with it,

so it's not typically soluble and nonreactive.
Q. And when you take that -- what did you call it? Anhydrous?
A. Anhydrite.
Q. Anhydrite, sulfate.
A. Sulfate or sulfite?
Q. Well, whatever you're talking about.
A. I'm talking about anhydrite.
Q. Anhydrate?
A. Ite. I-t-e. Anhydrite.
Q. Okay. What form of sulfate is that? Calcium?
A. It's a calcium sulfate.
Q. What happens chemically when that material is brought into contact with water?
A. Typically it's insoluble, but you have to look at the PH of which it's blended.
Q. Explain how the PH would affect the solubility.
A. PH affects solubility because it helps disassociate different salts.
Q. In the case of this calcium material, what PH conditions would favor the solubility?
A. Of anhydrite?
Q. Yeah.
A. I don't know. I've never looked at it. I know what gypsum is, because that's a soluble form. And soluble sulfate and ion and anti-ionic form, I know what that does. Typically I

would say calcium sulfate, when it's in an anhydrate form and it's not dihydrate or other hydrate form, it's nonreactive and it's probably not very reactive with phosphoric acid by itself. You need to make sure that there's sulfate, so phosphoric acid with sulfate typically would work. Or you have to supplement if the lead levels are really high.

Q. Now, when you say, won't react very much, it will react to some degree; correct?

A. I don't know that. I would say probably not.

Q. So you would say not one ion would disassociate in a mixture?

A. It might. I don't know. I know calcium sulfate as dihydrate does, and I know that it's -- when it's in phosphoric acid it's disassociated already, so it's soluble and reactive.

Q. So your testimony is that this anhydrite form is completely totally one hundred percent insoluble in water? Not one ion would be released into the water under any circumstances?

A. I don't know if I'd have an answer for that. I don't know.

MR. SZANYI: Excuse me. Did you say in hydrate form?

MR. GRAHAM: Anhydrite.

MR. SZANYI: How are you spelling that?

MR. GRAHAM: She probably doesn't know.

MR. SZANYI: These words sound close, and the answer depends on the correct spelling of the word, so maybe you could spell it.

MR. GRAHAM: Well, it's his word. He can spell it.

THE WITNESS: Well, it's from the technologies out there that are talked about. It's A-n-h-y-d-r-i-t-e. And from what I've learned from other reading and other technologies that are out there, patents, is that it's a nonreactive species. It's formed during high temperatures.

Q. I'm just trying to find out, when you say "nonreactive," are you talking about in an absolute sense or are you saying that there is a small amount that you believe is insufficient?

A. I would say that at the time we developed this technology it would be a nonreactive ingredient.

Q. Completely--

A. Nonreactive.

Q. --nonreactive?

A. Nonsoluble.

Q. So, if you were to look at the solubility constant for that material --

A. For anhydrite?

Q. Yes.

A. And a neutral PH, it would probably be insoluble.

Q. Now, what does insoluble mean? Is it a matter of degree?

A. No.

Q. Or is it absolute?

A. I would -- I would say it would be an absolute issue. I mean, it's based on the solubility product.

Q. If this anhydrite that you're talking about had a solubility constant of say 10 to the minus 50, do you know what I'm talking about?

A. Very insoluble.

Q. Very insoluble? Wouldn't that mean to a chemist that that tiny amount would be soluble?

A. Again, it depends on the condition in which it was at.

Q. Well, the solubility is given --

A. You could certainly have some soluble components to that. It probably wouldn't be absolute if you put it on a total KSB level and looked at it from that perspective. Look at a molecular formula and chemical formula, you would probably have some dissolution of it, but you'd have to have some extreme conditions for that to happen.

Q. What would be those conditions?

A. Temperature, extremely high PH. There may be some other constituents present that would tend to react with the sulfate and the calcium in a very strong manner, other competing ions that would react to those two, help facilitate the disassociation.

Q. On the next page, it's a continuation of your 3.1.

MR. SZANYI: Just keep it in mind that there are sentences missing from the bottoms of the pages.

MR. KRESSIN: What I would suggest, when we get a break, we'll make a copy of one that's clean and substitute it, if that's all right with everybody.

MR. GRAHAM: Yeah, because I don't believe that is the next page that you're looking at.

THE WITNESS: Well, just give me the section on the report.

MR. SZANYI: I have a copy that you can look on, because mine has page numbers on it.

THE WITNESS: Okay. Let's do that. We can track back and forth.

MR. GRAHAM: Yeah, which would be Page 4 of 23.

MR. SZANYI: Off the record for a moment.

(Discussion off the record.)

MR. SZANYI: Exhibit 1, for the record, is an attachment A, which is a CV or resume, and it does not have the tables attached as Exhibit B, and in this form as Exhibit 1 today. Does its look like the right thing with all the pages?

THE WITNESS: Mm-hm (answers affirmatively).

Q. All right. Now, there's a mention at the top of this Page 4

of patent issuance by the USPO in foreign countries. What foreign countries are you referring to there?

A. Well, I haven't seen all of them, but I believe there's one in the U.K.

Q. Well --

A. Possibly, I think there might be one in Canada as well. I just -- I don't -- I understand there's some -- I don't know if they took the U.K. to the European Union or not.

Q. Then what is the basis for your statement "foreign countries"?

A. Well, Canada and the U.K., that's foreign countries.

Q. And where did you get the information that led you to believe that there were patents in the U.K.?

A. Well, one of them I had a letter on and I think you've got a copy of that and some of the information I gave a long time ago to you, and just from what people have told me.

Q. About an issued patent?

A. I thought there was one, yes.

Q. Who owns Wilder Construction?

A. Who owns Wilder?

Q. Yes.

A. Employee-owned, but we also have a large investor by the name of Granite Construction Company.

Q. Did you say employee-owned?

A. We have employee ownership, and we also have a substantial

majority stockholder by the name of Granite Construction Company.

Q. What interest does Sevenson have in Wilder?

A. None that I know of.

Q. Any of the owners of Sevenson have any ownership interest in Wilder?

A. None that I know of.

Q. How about vice versa?

A. None that I know of.

Q. Is there any connection between the Granite Company and Sevenson?

A. I wouldn't know. Granite's publicly traded.

Q. On down on that page, you talk about Wilder purchasing what you call MAECTITE reagent, and you say, "For instance, technical grade phosphoric acid..."

MR. SZANYI: Whereabouts are you? I'm sorry. Okay. I found it.

Q. What is technical grade phosphoric acid?

A. There's different grades out there. There's food grade, reagent grade, technical grade.

Q. Has that always been referred to as the MAECTITE reagent?

A. That was one of the reagents that we would use, called it a MAECTITE reagent. You mentioned earlier MAEPRIC. We also called it that.

Q. So if you see a reference to MAEPRIC reagent or MAECTITE

reagent, that would be a reference to technical grade phosphoric acid?
A. It could be one of them. It could be others.
Q. You mean other grades?
A. Well, other reagents.
Q. What other reagents?
A. Gypsum would be a good one.
Q. Why would Wilder purchase this reagent from Sevenson?
A. Because we wouldn't want to infringe on the technology.
Q. What do you mean by that?
A. Well, if we use a technology that's unauthorized and owned by others, you're infringing on the technology, and we know that -- I know that this technology works and it's very competitive compared to other technologies out there to treat lead.
Q. Do you know if Sevenson has a patent on phosphoric acid?
A. Has a patent on phosphoric acid? To do what with it? To use it or to make it?
Q. On the acid itself.
A. On the acid itself? As an additive? I mean, there's claims that talk about phosphoric acid being used as a reagent.
Q. How about the acid per se? Do you know --
A. As far as manufacturing it?
Q. Yes.
A. I wouldn't know.

Q. Do you know if companies that make and sell phosphoric acid have to make some kind of arrangement with Sevenson to be able to do that?
A. Do they have to manufacture it per Sevenson's use, being per Sevenson's authorization?
Q. Yes.
A. I wouldn't think so.
Q. Why not?
A. Why not? Because they're manufacturing -- I don't know. They're manufacturing phosphoric acid. That's their business.
Q. Phosphoric acid's been made for decades.
A. I wouldn't know how long.
Q. Long before--
A. Me.
Q. --our time; correct?
A. Mm-hm (answers affirmatively).
MR. SZANYI: You have to say yes.
THE WITNESS: Oh, yes.
Q. And these various grades that you're talking about have been available on the market for at least since long before these Sevenson patents came along; correct?
A. Yes.
Q. What I'm trying to understand is why would Wilder not buy this acid from some other company?

A. Buy it right from the manufacturer?
Q. Yes.
A. Well, if we weren't treating lead, we probably would. If we weren't using it as a treatment reagent to render metals nonleachable, we probably would use it for that, for something else, but we're typically not in that type of business, so we wouldn't buy it for anything. Farmers use it, but, you know, that's a nutrient source.
Q. So because of the Sevenson patents, at least Wilder feels that it needs to buy the phosphoric acid to treat lead from Sevenson?
A. Yes.
Q. Do you know if that's generally been the way Sevenson has done business as far as the acid?
A. I don't know how they've done it since I've left.
Q. How about when you were there?
A. They never sold it to anybody.
Q. Pardon?
A. They never sold it to anybody, as far as I know, at the office I was.
Q. Never sold what?
A. Reagents.
Q. How did the people get the reagents?
A. How did they get the reagents? They provided the service to go treat the waste. They bid on the project and they treated

it and that was what they were contracted to do.
Q. So the customer would not buy the acid to do the treatment themselves during your time period?
A. There might have been one case up in Canada where they sold some drums of material in Canada.
Q. Sold some drums with what kind of material?
A. Phosphoric acid.
Q. But other than that, to your knowledge, the projects and so forth have involved Sevenson coming on the side with its own acid and performing the process?
A. That's correct.
Q. During your time of employment with OHM and MAECORP and this predecessor and Sevenson and Wilder, have you ever been an independent consultant in this environmental business?
A. Independent consultant?
Q. Or have you always been employed for somebody?
A. Oh, there was -- when I lived in Petosky, Michigan, before OH Materials, I was trying to get an environmental company going and more sampling services, but I've never consulted with respect to advising people on things what to do.
Q. So what I'm trying to understand, your working in the environmental business has always been as an employee for a company?
A. Pretty much, yes. Well, let me take that back. I guess you could say that I did do some work on some of these patents

with Sevenson, so I was paid to help when I went and looked over some of the patent applications since I've come to Wilder. That was couple years ago, and I think you've got copies of those letters to.

Q. That was a continuation of what you were doing?

A. Yeah. I basically looked over the patents just for -- just as a sanity check for them, I guess.

Q. What kind of patents were you looking over?

A. I can't remember. I'd have to go back and look at the letters and see which ones they applied to.

Q. Do you know what the language "continuation in part" means?

A. Legally, no. You're extending something. You're extending something, you're continuing, you're modifying it or improving it. As far as what it means legally, I don't know. I don't know what it means.

Q. Do you know what a divisional patent or a patent application is?

A. No.

Q. Do you know what a continuation patent is?

A. Is that the same as a continuation of part?

Q. I'm just asking you if you know.

A. No.

MR. SZANYI: I guess not.

Q. On what patents are you named other than the Sevenson patents involved in this case?

A. Other than the ones named in the case, I don't know. I'd have to go look at them all. The only ones I know that I actually have my name on as inventor is as co-inventor related to this technology.

Q. Over on Page 7 in Section 4 where it talks about material relied upon, Number 4.1.5 says, "Proposed interrogatory responses of Sevenson."

A. Mm-hm (answers affirmatively).

Q. What is that?

A. That was a document that I had that I looked at.

Q. How did you get it?

A. It was provided to me by Webster Anzani.

Q. At what time?

A. I don't know. You have a copy. You have the cover letter. I'd have to look at that package.

Q. So your understanding is you supplied us with a copy of these proposed interrogatory responses?

A. I don't know if I actually gave you the copy of that, but I had -- the letter that had the list on it, I believe you've gotten that. It should have been included in the information that I sent you. I think I sent it to --

Q. Mike Bradford?

A. I believe so, yes. I think that was the first package we sent off. I can't remember. Might have been in the second. I just don't remember.

Q. The documents 4.1.8 and 4.1.9, settlement statements that you reviewed, did you sign any kind of nondisclosure--
A. I did.
Q. --form with regard to that?
A. I think I did to this whole everything I'm looking at.
Q. Do you know what the term "prior art" means?
A. Legally I don't know what the legal definition of it is, but I have a fairly good understanding of it, I think.
Q. What prior art did you review in connection with your report? Well, tell me what your understanding is of prior art and then tell me what prior art you reviewed.
MR. SZANYI: Let me object to the form of the question, the two questions, and also, do you want him to tell you about the prior art he reviewed in connection with his report or in connection with when he was preparing all these patents?
MR. GRAHAM: The report.
*THE WITNESS:* In preparation of the report, I think -- I believe I've listed all of those. I can't remember if I put them in the expert testimony or not, the actual report.
Q. If you would, tell me first what your understanding is --
A. Prior art? It's what's taught by preceding patents that are -- that have been issued prior to what somebody else has invented and basically technology that's been patented in the

past.
Q. Anything else?
A. Well, common knowledge, if it's available through public sources.
Q. Have you discussed the definition of prior art with any of the attorneys in this case?
A. As to what the actual definition is? No.
Q. Have you discussed whether particular documents may or may not be prior art to the patents?
A. No. I saw some information that you folks provided and -- well, I provided, so I'm assuming that each of you think what we submitted was prior art, so that's --
MR. SZANYI: Don't make assumptions.
THE WITNESS: Okay.
Q. Did you talk to any attorneys to--
A. No.
Q. --decide whether you believe something to be prior art or not?
A. No.
Q. If you could, look at your report and tell me which of the items or documents or items of information listed here you believe might be prior art.
MR. SZANYI: That he believes might be prior art?
THE WITNESS: To what?

Q. To the Sevenson patents.
A. To the Sevenson patents, what our prior art?
Q. Yes.
MR. SZANYI: Object to the form.
Q. Is there anything in here you think might be prior art?
MR. SZANYI: Did I object to the form of the question?
THE REPORTER: Yes.
MR. SZANYI: I did?
THE REPORTER: Yes.
MR. SZANYI: Okay. It was a long pause. I didn't remember.
Let me just state that my objection is based upon, you know, the legal definition of prior art and whether he's able to do that, but go ahead.
THE WITNESS: Based on what I think prior art is, no, there's nothing here that's prior art.
MR. SZANYI: Can we take a moment to use the restroom?
(Recess 10:16 to 10:26 a.m.)
////////////////

EXAMINATION (Continuing)

BY MR. GRAHAM:

Q. We are talking to you about prior art, and my understanding is that you don't believe that any of the information you reviewed, in the course of giving your opinion, you would classify as prior art under your definition?

A. That's correct.

Q. Let's go ahead and mark as Exhibit 2 a copy which has got your color coding for the charts that I believe were attached to the written portion of your paper.

(Exhibit No. 2 marked for identification.)

A. Look through it all?

Q. Well, make sure it's--

MR. SZANYI: It definitely looks correct.

Q. --complete. Tell me how you came about creating those charts.

A. For me, it makes more sense to present it in a form that's visual as well as just reading it textually, so it helped me to look at it and look at the changes from claim to claim, and different pieces of the process.

Q. What prior reports or other reports did you look at as examples to go by for this?

A. For this format?

Q. Yeah.

A. None.
Q. How about for the written part of your report?
A. For the written part of my report? I mean, this up here?
Q. Yes. Exhibit 1.
A. Didn't have anything to look at.
Q. No examples?
A. Hm-mm (answers negatively).
Q. Did you talk to the attorneys about how to arrange the information and so forth?
A. Just as far as generic outlines.
Q. What did they tell you they wanted you to do?
A. They wanted me to take a look at the information I looked at here and offer an opinion on it.
MR. SZANYI: I think he means in terms of format.
THE WITNESS: Oh, as far as format?
MR. SZANYI: Wasn't that the question?
MR. GRAHAM: Yeah. It was actually broader than that, but we can break it down, format and then content.
THE WITNESS: Well, my understanding was that they wanted to make sure that I included my resume, and we talked about my past and what I've done, talked about the history of the technology that Sevenson has, and then they said to review the information, which I listed here, and then

offer an opinion on it.
Q. What kind of opinion?
A. Whether or not Shaw infringed on this technology, on these patents.
Q. Did they give you any information to study about what is or is not infringement?
A. By a legal definition or just --
Q. Yes.
A. No. The only thing they gave me is what you see listed here.
Q. Well, how did you know whether your conclusion about infringement would be arrived at consistent with the law?
A. I don't know. I didn't offer legal opinion. I just offered my opinion as to whether they used what Sevenson is claiming is theirs, based on what I saw from the depositions' information that I reviewed.
Q. So in doing this opinion, you did not take into consideration any basic legal principles concerning what is or is not infringement?
A. (Witness shakes head negatively).
Q. Is that a no?
A. That's correct. I did not. I just did it based on what I read in the information in this and what I did with respect to what Sevenson's patents cover and teach.
Q. Let me ask you, do you know what claim construction is?
A. No.

Q. Ever heard of that?
A. Well, I did learn it by reading the expert report from Surgi, but that's the first time I ever read anything about it.
Q. So when you did your report, you didn't know anything about claim construction?
A. Correct.
Q. And as a result of that, did not take claim construction into consideration in rendering your opinion?
A. I did not. Unless I did it without knowing. I don't know.
MR. SZANYI: That's a good answer.
Q. Might be kind of hard to do. What is your understanding of the process used by Shaw that is alleged to infringe in this case?
A. Well, there was lots of -- every one here you see that is in yellow are all examples where they did, based on my review. The simplest and most easy form is they took a waste that had TCLP lead in excess of regulatory limits and they mixed phosphoric acid with it, and it rendered the material nonhazardous and they disposed of it off site. Also, I don't know this, but I highly suspect, and I would say that if we ran testing on it, it rendered the radionuclides nonleachable as well.
Q. Where did you get the information about Shaw's process?
A. I read it in these documents listed in this report.
Q. The settlement letters?

A. I would say I looked at all of them, so wherever it was stated in there, I probably saw it there. Treatability study, I saw some interrogatory or--Semenak, is that how you pronounce it, Semenak--deposition and Eaton deposition.
Q. Did you talk to anybody at Sevenson about this opinion?
A. About my opinion?
Q. Yes.
A. Not about my opinion. I talked to them about some of the patents and making sure that, you know, of all the reports we had here.
Q. Did you talk to him about whether the Shaw process or the process used by Shaw infringed the Sevenson patents?
A. Not directly in that nature.
Q. In what regard did you talk to them about it?
A. I just said that they used the MAECTITE technology and it was a phosphoric acid. Prayphos phosphoric acid.
MR. KRESSIN: You used a term there, and I'm sure she didn't get it. Something phosphoric acid.
MR. GRAHAM: You used a trade name.
THE WITNESS: Prayphos?
MR. KRESSIN: Prayphos.
THE WITNESS: P-r-a-y -- I don't know how to spell it. It's a manufacturer's name. Prayphos. It's P-r-a-y --
MR. KRESSIN: Yeah. I know what you were

talking about. She wouldn't.

THE WITNESS: Oh.

Q. So your opinion was essentially because they were using phosphoric acid to treat material to reduce the leachability of lead below the regulatory limits, that they were infringing the Sevenson patents?

A. That's correct, and based on the Prayphos component that they used, they add sulfate as well.

Q. What phosphoric acids are you aware of that people have used that do not contain sulfates?

A. What phosphoric acids am I aware of that do not contain sulfates? I would say that there is possibly some very costly analytical-grade phosphoric acid that you can get in small quantities that have had all the sulfates removed.

Q. Do you know that for sure?

A. And I don't know that for a fact, but I could certainly look that up in a reagent laboratory supply company.

Q. If I told you that this Mr. Rice and the Sevenson people told us that there was no phosphoric acid that was completely free of sulfate, would you disagree with that statement?

A. For the acids that they purchased, I would agree with that.

Q. How about for the acids that they've used since the MAECORP days, would that be true?

A. I don't know what they purchased in recent years, but since Sevenson and since I started with them, they've always used

an industrial or technical grade.

Q. What is green acid?

A. Green acid comes from -- it can be technical grade. They have different names for it. I-Grade. There's different -- depending on how you purchase it, from the manufacturer, but it's usually made in Idaho. It comes from that phosphate formation.

Q. What's brown acid?

A. That's typically from North Carolina. I think another better term is amber. It's a brown color. And that has just a different formation, so it gives it a different color.

Q. How about black acid?

A. Black acid typically comes -- from what I know, and I've never purchased any myself, but I think it comes out of Florida. I'm not certain on that.

Q. All these are phosphoric acids that contain some amount of sulfate?

A. That's correct.

Q. What is your understanding of the typical sulfate content of the technical grade phosphoric acid?

A. It ranges all over the place, depending on the formation of the process generated and how it's operated.

Q. Well, then, what is it in your understanding that would cause someone to designate a particular acid as technical grade if the sulfate content can vary, as you say, all over the map?

A. I'm not sure exactly how they do it as a manufacturer, but my impression of it is based on the content of the phosphate, P-205, and then the level of impurities. Other impurities could be anything.

Q. I think in the Sevenson patents, there's a discussion, I believe, that was initially put in one of the patents--which we'll get to--about the content of technical grade phosphoric acid. Do you recall that?

A. I do. I don't remember what the percent was. I'd say 70, 75. I'd just have to guess without looking at it. 70, 75 percent P-205, again, but I'd have to go back and look at it specifically. I used to know that, but it's been so long since I've worked on that one.

Q. Let's make Exhibit 3 a copy of what I'm going to call the 367 patent, but for the record, it's a copy of U.S. Patent 5,732,367.

(Exhibit No. 3 marked for identification.)

The front part of that patent, front page, that contains a portion, I believe, in Box 63 entitled, "Related U.S. Application Data."

A. Okay.

Q. Do you see that?

A. Mm-hm (answers affirmatively).

Q. There's an indication of the previous patent that the 367 patent is a continuation-in-part of. Do you see that?
A. I'm looking at Box 63, Continuation-in-part of Serial Number 31,461, March 15th, '93, and then it lists other patents which are then a continuation of one then to another and to another. Is that what you're looking at?
Q. Right.
A. Okay.
Q. Let's mark Exhibit 4 a copy of what I'm going to call the 982 patent, which is, for the record, U.S. Patent Number 5,527,982.

(Exhibit No. 4 marked for identification.)

This previous patent that's referred to in that related data section of Exhibit 3 --
A. 0367 followed 982?
Q. Yeah. Is that your understanding?
A. My numbering system up top is the way I understand it.
Q. My reading of those two patents is that the 367 patent included disclosure of what's referred to in there as technical grade phosphoric acid.
A. Okay.
Q. And that there is no mention of that particular grade in the previous patent, the 982 patent. Is that your understanding

also?

A. I'd have to go back and look at it. Am I to be looking at 5,569,155 too?

Q. I'm sorry. Did I give you two?

A. Yeah, I think. I believe the 367 is where TGPA is actually mentioned.

Q. For the first time?

A. Yeah, as a specific kind of acid.

MR. SZANYI: Well, comparing these two, it's the first time.

THE WITNESS: Yeah, comparing the two.

MR. SZANYI: Exhibits 3 and 4, right? You're comparing Exhibit 3 with Exhibit 4?.

THE WITNESS: That's correct.

Q. And Exhibit 4 is the predecessor of Exhibit 3?

A. Correct.

Q. Now, there is some discussion in Exhibit 4, I believe, in some of the examples of using phosphoric acid.

A. Okay.

Q. The references to phosphoric acid in the 982 patent, what type of phosphoric is being referred to there?

A. I don't know. I'll have to go look at the timing when the studies were done. I think if you -- some of the earlier patents before this one might even have some of the same data in there. Based on the timing, it could have been white

acid, it could have been green or amber acid or technical grade.

Q. Are those all considered technical grade?

A. White acid is typically a food grade.

Q. Just white acid, or do all those types of acids you mentioned have some amount of sulfate in them?

A. Correct.

Q. Why did you not mention technical grade phosphoric until you filed the application of Exhibit 3?

A. I don't know the answer to that. I don't know if we really realized the significance of it. It's primarily a cost issue.

Q. But during the years previous to the filing of the application of Exhibit 3, MAECORP was using technical grade; correct?

A. '96. Is that the filing date we're looking at here?

MR. SZANYI: June 14, 1996.

THE WITNESS: Yes.

Q. Is that a yes?

A. Yes.

Q. And certainly at least a year before that date, they were using technical grade, prior to June 14 of '95?

A. I don't know when the date of that job was we did. I would say we did, but I don't know if we realized when it became innovative to us. I don't know if we knew exactly when that

time frame -- at what point we realized that it was an improvement.

Q. But you were using it?

A. We were using it.

Q. More than a year before that date?

A. Yeah. I'd have to go back and look at the actual date to give you -- on the job we did.

Q. What job was it?

A. I think it was -- when we first realized that we bought a cheaper grade of acid was in -- I think it was the job we did in South Dakota. South Dakota or Wisconsin. I can't remember. One of those two.

Q. The discussion in the 982 patent, I'd like you to focus on this discussion in Column 16 in the 982 patent.

A. Column 16? So --

MR. SZANYI: Wait until he tells you which paragraph.

Q. Beginning of Line 44, continuing to Line 56.

A. Wait a minute.

MR. SZANYI: The first two paragraphs.

THE WITNESS: 44. Okay.

Q. And these follow Table 7.

A. Okay.

MR. SZANYI: Table 7 under Example 5; correct?

MR. GRAHAM: Yes. I believe that's what the information shows.
Q. Did you write that language?
A. I don't know if I did or Dhiraj did. I think it's in some earlier patents as well, but I'd have to go back and look at them.
Q. What's your interpretation of that language?
A. What's my interpretation? Well, for that example, where you had an untreated material that had an EP TOX result of 221 milligrams per liter and a TCLP result of 704 milligrams per liter, that the reagents we use in those doses that none of them with phosphoric acid alone got up below the five milligram per liter for TCLP. EP TOX did but not for TCLP.
Q. Where does it say in this language that this only applies to this particular set of tests?
A. Well, because you've got Example 5 and then there's another Example 6.
Q. But where in the language does it say that these observations only apply to this test?
A. To which test? The ones we ran in Table 7?
Q. Yes.
A. Well, we introduced Table 7 above it and then we had the data and then it's reviewing the data. And then we went on to another one in Example 6.
MR. SZANYI: These are also one through

four?

THE WITNESS: I would imagine there are. So these are a series of examples. All of these examples or what the results we got from each of these different things are what generated the technology.

Q. If you look over beginning at Column 20 of the 982 patent through Column 22 --

A. These are claims.

Q. 31 claims. I believe in your chart --

A. Can I open to those?

Q. Well, this is just sort of to orient you to talk about some things. I think you've talked about what you've referred to as a one-step treatment versus a two-step treatment or three-step treatment or that sort of language.

A. Okay.

Q. Is that correct?

A. We talked about a one-step and a two-step.

Q. Looking at Claim 1 in the 982 patent, would you say that this is what you would call a one-step claim?

A. I'm going to look it up here so I understand it cleaner.

Q. As far as the treatment.

A. It's a one-step using phosphoric acid.

Q. Where does it say in Claim 1 "one-step with phosphoric acid"? From what language do you make that interpretation?

A. Because you're mixing a mixture, which is the phosphoric