MR. SZANYI: 12:30? He's got to leave, so what time are you leaving?

MR. PEREL: 2:00-ish.

MR. SZANYI: Do you want to eat at 12:30? That's like half the day.

MR. GRAHAM: Okay. I just need to go to the bathroom.

THE WITNESS: Oh, do you want to do it now?

(Recess 11:54 a.m. to 12:04 p.m.)

EXAMINATION (Continuing)

BY MR. GRAHAM:

Q. I guess you're still looking at the 982 patent claims?

A. Yes.

Q. Claim 12, is that a claim that would be like what we've talked about before, a two-step claim, two treatment steps?

A. Well, again, it's -- this one in this case, you've got phosphate as a first sequence of -- and sulfate for the second mixture as the second one, so again, it's -- if you were to go -- this is probably one- or a two-step where it's done at the same time where you add a supplemental sulfate, or if the mixture that you're adding contains sulfate and phosphate, or phosphate and sulfate. So that could be one

step as well.
Q. Claim 12 you're saying could be done in one step?
A. You know, that's probably more of a distinct two-step.
Q. Than what?
A. Well, I'll have to take a look at it and see with all of the different scenarios how it would fit in there. You've got two different mixtures that are generated in this one. You're adding -- first up the first mixture you're generating is a phosphate, is waste plus phosphate, and then you're mixing that with a sulfate, so that's two different mixing steps.
Q. Now, are you also saying that that could include a situation where somebody had mixed the phosphate with the lead or metal bearing material 10 years ago, and then they come along and mix it with a sulfate, in your view, would that be carrying out the two steps?
A. It could. You'd have to add additional sulfate, for example, because there wasn't enough in the phosphoric or phosphate that was added.
Q. I'm sorry?
A. Well, let's say you had a phosphoric acid and it was spilled onto a firing range, or a farmer was in the field and -- this is hypothetical. You've got a firing range out there, he's been plinking cans before he's dumped his fertilizer. You've got phosphates there, and the lead in it isn't -- it's still

leaching because there's not enough sulfate, so if you mix some gypsum with it, it would probably tie it out. So that would be an example where you could see the two things happening. You've got the phosphate as the first mixture and you're adding sulfate to the second mixture.
Q. So sulfate could be added as fertilizer--
A. Could be.
Q. --years earlier?
A. Yes. It may not -- as fertilizer, it might not have tied up the lid, so all you may have to do is add a little sulfate to it and that's all it would take to finish it off so it would pass the TCLP.
Q. Why would the phosphate not have tied up the lid?
A. Well, the phosphate needs sulfate to work, and it might not have been enough phosphate or sulfate in the phosphoric fertilizer.
Q. You say phosphate needs sulfate to work?
A. Phosphate and sulfate need to be present to make lead nonleachable in the acid in the TCLP extraction.
Q. If your theory there on the fact that sulfate has to be present for the phosphate to work turned out to be incorrect, would that change your conclusion about these claims?
A. No. That's what we teach. We teach you have to have sulfates present.
Q. And that's foundational to your patents?

A. Mm-hm (answers affirmatively).
Q. And if that's not a correct premise, then that would undercut your patents totally; correct?
MR. SZANYI: Object to the form.
THE WITNESS: I wouldn't know. All I know is what we've talked in the past and what we're teaching is sulfate/phosphate system, and that the ratios of those are going to vary based on the chemistry of the whole system, including the soil and the waste or material you're processing.
Q. Where do you teach in your patents how to vary the ratio of the two depending on the type of system you're treating?
A. Well, I just happened to glance right down, Column 19 of 982, Number 58, talking about bench studies. "Those skilled in the art are knowledgeable of such bench studies, which are usually carried out as precursors to full-scale treatment." It talks about bench scales where we talk about optimizing up or down. Go up a few lines, treatability -- this is Line 54. Treatability studies are designed to optimize the amount and grade of gypsum powder or sulfate compound needed during Step 1 and the amount of concentration of the phosphoric or phosphate needed in Step 2.
Q. So you don't teach--
A. That's just an example.
Q. --a specific way to ingest phosphates, sulfates? You just

kind of leave it up to people to figure out?
A. It's usually done by cost and efficiency for the whole application of the process in the field.
Q. And that's based on what people with your skill already know?
MR. SZANYI: Object to the form.
THE WITNESS: Well, what's based on what we already know? And the best way to handle it --
Q. How to adjust them up and down.
A. Well, it's processed --
Q. If you don't teach them how to do it, how else are they going to figure out how to do it except based on what they know from experience?
A. Well, they're going to have to run some treatability studies and run a different sequence of doses.
Q. Well, that's trial and error, right?
A. Mm-hm (answers affirmatively).
MR. SZANYI: Yes?
THE WITNESS: Yes. I'm sorry. I thought you meant about the application appeal and how it's applied. That's construction and, you know, heavy equipment use.
Q. Basic things that people know about that do this kind of stuff, right?
A. Well, can be.
Q. The point is, your patents don't say, "In this situation you need to move the sulfate down and the phosphate up over here,

and in this other situation you need to move the phosphate up and the sulfate down"? There's no specific thing that teaches a matrix like that; correct?

A. That's correct. If you're practicing it, then you follow your instincts based on the results of the treatability study, and you can take that to the next level of study. It's like any treatment regime or process.

Q. Going back to the 936 patent --

A. Number 5?

Q. Pardon?

A. Number 5?

MR. SZANYI: Exhibit 5.

Q. Yes. I mean, I have this way of just referring to them as -- just referring to them by the last three numbers.

A. That's fine.

Q. We talked a minute ago about the claims in this patent--

A. Okay.

Q. --and the two steps and so forth. Do you remember that?

A. Yes.

Q. Where in this patent does it teach that phosphoric acid by itself would be effective to reduce the leachability of lead?

A. Let's see. I think we were talking -- EP TOX data, TCLP, and we were using that as the phosphoric acid, and this was the patent that was done in '91 and started in '90. Based on EP TOX, we came back and redid it, but at the time phosphoric

acid reduced the EP TOX test. Now, as far as the TCLP test -- let's see. Well, I guess the best example is that we treated the material in Column 14, Example 1. Column 14, Table 6, row 11-ish.

Q. I think you're looking at the 9 --

A. 936.

Q. Are you looking at the 936?

A. Yeah.

Q. Where does it say --

A. It says we treated it with our process and we took it from 542 milligrams per liter down to two.

MR. KRESSIN: What column are you in?

THE WITNESS: Column 14.

Q. Where does it say that that was done using a single step with phosphoric acid?

A. I'm just saying, we treated it and that's what we got using our technology. That's what we show that we reduced it to. SWA -- I don't know if we called it all specific -- we just used phosphoric in that. We used phosphate and sulfate and that's how we got to where it is.

Q. Where does it say that?

A. That's what we're teaching. That's the result of -- that's what we did. That's the result by doing that.

Q. Well, I'm not asking you what the result was. I'm saying where in Example 2 does it say that you used phosphoric acid

by itself to achieve these results?
A. It may not.
Q. What words?
A. The process of the present invention, which is a sulfate and a phosphate.
Q. Okay. What does that terminology, "The process of the present invention," mean in relation to this patent?
A. I'm sorry. I was looking. Say that again. I apologize.
Q. What does the language, "The process of the present invention," mean in relation to this patent?
A. Sulfates and phosphates.
Q. Where does it indicate that that could be one step, using phosphoric acid by itself?
A. Well, again, it goes back to what we talked about earlier, that if it's all added in one reagent -- well, wait. This is a two-step -- this was the mixing solid waste with leachable lead and taking the first mixture and you're generating a second mixture, so two-step. Two steps have to be done.
Q. So that's what it's talking about in Example 2 when it says, "The process of the present invention"?
A. I don't know if this was a battery soil or not, and that is what we were working with way back when, so...
Q. I'm sorry?
A. We were working with battery casings soils way back then. I don't know the timing on it. It probably doesn't come out

and say that what was used specifically was phosphoric acid by itself.

Q. Where does it imply that?

MR. SZANYI: Object to the form.

THE WITNESS: I don't know.

Q. If it does.

A. I don't know. I'd have to look and see if it does.

Q. Okay.

A. Again, we teach sulfate/phosphate. That's what we're teaching. Again, it doesn't matter where it comes from.

Q. Isn't it a fact that in the 936 patent, the only mention of phosphoric acid by itself in one step is in Table 3, Item Roman Numeral 2B followed by the two paragraphs that indicate that phosphoric acid alone is insufficient to meet the regulatory requirements?

A. Yeah. For TCLP. It did pass the EP TOX. But when you supplemented the phosphoric with another phosphate -- I'm sorry, sulfate form, it did work.

Q. Correct. But not phosphoric by itself?

A. In this step, it did not.

MR. SZANYI: In this step?

THE WITNESS: In this example.

Q. Does it say it anywhere else in this patent?

A. Say what?

Q. That phosphoric acid by itself is effective?

A. Well, it does for the EP TOX.
Q. How about TCLP?
A. In a single step? We're just adding phosphoric acid? I don't believe it does. Don't know. I mean, this Table 6 could very well...
Q. Where in Table 6?
A. Any one of them. All examples in Table 6 passed the TCLP after treatment.
Q. You're saying any one of these could have been phosphoric acid by itself?
A. Yeah.
Q. How would somebody know that?
A. How would they know it was not? I mean, it doesn't teach either way here. It just shows that the process using sulfates and phosphates renders it nonleachable.
Q. Well, in light of the sentence over in Column 11, at the beginning of line 58 --
A. That was effective to the EP TOX component.
Q. Well, did it not say it wouldn't work for TCLP?
A. I just said it's for the EP TOX. Single-step in 1 revealed it was most effective for leachable lead. However, neither of them worked for TCLP.
Q. Right. Given that, are you saying that somebody would interpret Table 6 over here to be phosphoric acid by itself?
A. No. I'm saying that it doesn't say one way or the other

whether it was with acid or without -- or by itself. Could have been with supplemental sulfate with it. Doesn't say one way or the other, so I don't know. But it had sulfate and it had phosphate; thus it passed.

Q. Before, we talked about the language, "The process of the present invention," at the beginning of Example 2.

A. The process of the present invention, okay.

Q. And I think we agreed that that was talking about the two-step process, and --

A. No. We agreed that it talked about -- the present step of this invention was sulfate and phosphate. That's correct. As far as a two-step portion, okay. I didn't know that it was two different mixing steps. Okay. That's correct.

Q. So, comparing the 936 patent and the 982 patent--

A. 936 to 982.

Q. --the 936 being--

A. Yeah. We just looked at it. Number 5?

Q. --Number 5, and 982 being Exhibit 4.

A. Okay.

Q. The 982 patent contains the first disclosure that you were able to identify of the effectiveness of phosphoric acid by itself for meeting the TCLP?

A. To where it was clearly identified, yes.

Q. How about something other than clearly identified? You're qualifying your answer, and I'm trying to understand why are

you trying to qualify it by saying "clearly identified"?
A. That's where it comes out right here in the abstract and says very clearly that "The present invention disclosed the process comprising a single-step mixing of one or more treatment additives."
Q. That's in the 982 patent?
A. That's where I'm reading it.
Q. And it doesn't say anything like that in the 936 patent, does it?
A. No. It talks in the 982 -- or 936 patent about "employs the use of a sulfate compound in the first step and a phosphate reagent, such as phosphoric acid, in the second."
Q. Right. So, I'm trying to figure out what changed between the 936 and the 982, and I think, it seems to me, and you can tell me if I'm wrong, but it is the addition of disclosure in the 982 patent about what you say is using phosphoric acid by itself in a single step. Because being effective --
A. That may be true. I'd probably have to go back and lay them out side by side and see what the changes are.
MR. SZANYI: Object to the form.
THE WITNESS: I don't know what the changes were. I'd have to go back and compare the two.
Q. Well, we need to figure this out, so if you need to take time to compare them...
A. Well, then, I suppose you guys should go to lunch, and I'll

be here working on it.

Q. Okay. That's fine.

A. I haven't reviewed this patent in many years.

MR. SZANYI: I don't understand the question. Every change between the 936 and 982?

MR. KRESSIN: That wasn't a question. That was his answer.

MR. GRAHAM: That's what he said he wanted to do.

MR. SZANYI: I'm trying to understand what you're asking him to do. Are you asking him to do something?

MR. GRAHAM: He's the inventor named on these things, and he should know this.

Q. But the first -- my understanding from reading these, and I just want you to tell me if I'm wrong, is that the first disclosure of using phosphoric acid by itself as being effective for the TCLP is in the 982 patent that mentioned in the 936 of phosphoric acid by itself was negative in regard to TCLP.

A. (Witness nods head affirmatively).

Q. And I'm just asking you if I'm correct there?

A. As phosphoric acid, yes. I already said you were there.

MR. GRAHAM: Do you want to go to lunch then?

MR. SZANYI: No. If that answers your question, then let's keep going. I'd like to go until 2:00 because Nelson has to leave for the rest of the day and I'd like to have him sit as long as he can, if you don't mind.

MR. KRESSIN: Wait a minute. Can you go until 2:00, or do you need a break in the meantime?

THE REPORTER: I'm fine, thank you.

MR. SZANYI: And we'll break at 2:00 and he'll leave. Is that okay? He's riveted to the deposition and it would be terrible to make him leave at this point.

(Discussion off the record.)

Q. What I wanted to talk about now for a minute is what's called the Reexamination Certificate for this 936 patent, which we'll mark Exhibit 6. You may already have a copy of it.

A. It's attached to 936?

Q. Yeah. It actually is a part of the patent, I think, officially, now, but...

(Exhibit No. 6 marked for identification.)

(Discussion off the record.)

Q. Are you familiar with this certificate?

A. I am.

Q. When was the first time you saw it?

A. When was the first time I saw it?
Q. Or knew about it.
A. That that certificate was issued?
Q. Yeah.
A. Oh, I think the patent office gave us notice it was maybe issued, or whatever they do, back in -- I would say about -- around or after the time of issuance there, back in '96.
Q. It says on here that the reexamination request was filed January 13 of '94.
A. The request.
Q. Right.
A. It was dated on January of '94. Okay.
Q. See that?
A. Mm-hm (answers affirmatively).
Q. Tell me what you recall happened in regard to this reexamination request being filed? What's your recollection of that?
A. I don't remember all the details, but from what I remember --
Q. This is one of those questions like, what were you doing on 9/11, or something.
A. Yeah. As you know, MAECORP was -- or may know, MAECORP's assets were acquired from the U.S. Bankruptcy Court by Sevenson roughly in the spring or May-ish--maybe a little before that, I don't know the exact date--of '93. Right after this issuance of this reexamination -- Patent Number

936 was issued in March of '93. So it was after that. And during the bankruptcy, we had a patent law firm that had been worked -- I was doing some work for MAECORP and they weren't paying their bills, and I don't know all the bankruptcy regulations and laws, but supposedly the patent information that had gone through with all the files and patents were tied up in that, and I'm not sure how it came to be, but Sevenson was unable to get into that information, and I don't know for what reason, but it wasn't until -- when they filed this March of '94, when this request came in we couldn't get the information from the law firm that had it under the MAECORP. And I don't know how they ended up getting it, but it ended up we got it and we pulled a -- filed a--what is it --affidavit. I put an affidavit together and it was filed. And then I don't know if I ever saw a response from the patent office to that affidavit, but 982, I think, was the next number that came sequentially after it was issued -- I don't remember, June of '86 -- or June of '96 that patent was issued, but our filing for this patent was submitted back in '93 before the -- right about the time '93 -- 936 was issued. Does that make sense? So the 982 application was submitted in March right about the time MAECORP was going bankrupt, and about the time 936 was issued. So this 982 patent was in process. It was being evaluated by the patent office and then we got the notice of this reexamination. We submitted

a -- what's the word? Legal term for a document that you sign. I just said it a minute ago.

MR. SZANYI: Affidavit.

THE WITNESS: Affidavit. And then this was issued, so what happened to the affidavit and with this reexamination certificate within the patent, I don't know. But this -- basically a patent was issued, so it was not of importance to do anything more with that.

Q. It was what?

A. This patent was issued.

MR. SZANYI: 982.

THE WITNESS: 982 was issued, based on an application we submitted about the time the original 936 -- I mean, the filing for that was submitted a couple days before this was issued. This was 592. It's filed on 15 March, and this 936 patent was issued 19 March. So the 982 application was filed way before the reexamination challenge, or whatever they called it, was filed, and once we did our -- got the files freed up from the lawyers that had the patent information or got it from the a patent office--I'm not sure what they did there--we filed the affidavit, and then this patent was issued and that's the last I know of what happened to the 936 reexamination. But I do know that the reexamination that was filed on this, the challenge, was based on the O'Hara patent, and the 92 patent application

considered that, so the patent examiner awarded 982 in view of O'Hara. So O'Hara was picked up, and O'Hara was the one patent that was used as a challenge against this one, 936.

Q. When you were filing these patent applications, did the lawyers ever talk to you about prior art?

A. Well, only the -- only that he had looked at old patents and see what we use, and you can see that we worked them into the text here in some of these earlier ones. In the 936, for example, we went through a lot of these patents, talked about other patents that were -- we talked about them, that we -- Falk and Hemwall and Webster and Stanforth were all patents that we discussed and looked at and we submitted our application. So to that, we understood that we had to teach something different than what the other patents taught.

Q. Did they talk to you about what's referred to as the duty of disclosure?

A. No. I don't remember those terms.

Q. Did they ever come to you and say, "Hey, if you know of anything that's real close to what people have done before or if MAECORP has been practicing this for a couple years and they're just now filing, we need to tell a patent office about that so they can make an assessment based on that information"? Did you ever have any discussions like that with the attorney?

A. No. We had an attorney, they basically went and did the

patent searches. I guess they were looking for prior art patent searches, and we were writing up our -- what we did and what we discovered and basically sent it to them and they kind of did the -- we wrote some of this, but they are the ones who finished it and sent it in.

Q. So they didn't talk to you about that kind of thing, about disclosing information?

A. Yeah. They wanted to know everything we talked about who we told it to and what we knew.

Q. Pardon?

A. They asked us if -- everybody we talked to and when we did it and who we used, and they wanted to know everything that we did about it. Timing, who we disclosed it to, who we talked to about it, about what we invented.

Q. Oh, they did?

A. A lot of what we did.

Q. Was that in the form of letters? Was that ever --

A. Oh, God, I don't remember. Gosh, I don't remember at all. I don't remember. I think we had -- it's so long ago, I don't remember.

Q. When you filed for the 982 patent in March of '93, did they ask you if you'd ever used phosphoric acid by itself successfully for TCLP?

A. Did they ever ask us if we did?

Q. Yeah.

A. We said we did.
Q. Did they ask you how long before March '93?
A. I don't know if they asked us, but we probably put it in the information that we did it with.
Q. What if you didn't? What if it's not in the information that was supplied to the patent office?
A. I don't know. It's been so long, I don't know. I don't know.
MR. SZANYI: You've answered it.
Q. Do you recall a specific question from the attorney prosecuting the 982 application, which I guess was Kevin McDermott, about how long MAECORP or Sevenson had been using phosphoric acid by itself--
A. Well, again--
Q. --in a single step?
A. --we filed this in March of '93. That was before Sevenson was involved, so Kevin McDermott wasn't even involved in this process. He came in after Sevenson and took over the patent that had already been filed before Sevenson acquired the assets.
Q. So it would have been a previous attorney that filed these?
A. That's correct.
Q. Did that previous attorney ask you?
A. I have no recollection.
Q. Who was that attorney; do you remember?

A. (Witness shakes head negatively). There were two firms we were dealing with, and I don't remember which one was which.
Q. I guess what you're saying is, you don't recall a discussion about that?
A. I don't remember.
Q. Now, you had mentioned that the 982 patent was filed March 15, '93, and you pointed out that the reexamination request was not submitted until January 13, '94, which is almost a year later.
A. Different patent.
Q. The reexamination request was filed almost a year after the 982 patent was applied for; correct?
A. Nine months, yeah.
Q. Now, as of the time of the filing of the 982 patent in March of '93 --
A. As of the time of the filing of the 982 in March of '93?
Q. Yeah.
A. Okay.
Q. Were you aware of the O'Hara patent that formed the basis for the reexamination request?
A. No. Well, I don't know that. It's shown here as -- the patent examiner shows it on 982. Whether I knew it or not, I don't remember. Is it listed in here as one that we looked at?
Q. Well, I don't see it.

A. The patent examiner did, so he must have felt it was okay.
Q. I'm sorry?
A. The patent examiner looked at it and had no problem with it.
Q. No problem with what?
A. Issuing 982 based on O'Hara. Two different systems anyway.
Q. What makes you think that he didn't have any problem with it?
A. Well, it's listed here, and their patent's been issued, so I'm assuming that the patent examiner reviewed O'Hara in light of what we taught.
Q. Did you ever have any communications with the patent examiner in these cases in --
A. Me personally?
Q. In an interview or talk to them on the phone or whatever?
A. No.
Q. The reexamination certificate was issued in March of '96 by Examiner David Corbin. Do you see that?
A. I do.
Q. And the 982 patent was issued in June of '96 by Examiner Suchfield.
A. Okay.
Q. Do you see that?
A. Mm-hm (answers affirmatively).
Q. Do you have any basis to believe that Examiner Suchfield and Examiner Corbin got together and talked about whether the 982 patent should be issued?

A. I would have no knowledge on that.
Q. When you received the 936 patent in March of -- well --
A. Of '93.
Q. Of '96.
A. That's the reexamination certificate. We got the patent --
Q. The reexamination certificate issued in March of '96. Did you notice the outcome of the reexamination as described on the back of the page?
A. Yeah. Yes.
Q. What was your conclusion or reaction to that?
A. That -- and I'd have to go back to look specifically at the reasons that they cancelled them and their opinion as to why they did, but we felt that they were wrong.
Q. Wrong in what regard?
A. In that they were cancelled for the wrong reasons. We taught differently than what they were claiming.
Q. What taught differently than --
A. Our patents taught differently than what O'Hara taught. And that affidavit that I wrote, it's pretty clear about that.
Q. Do you know who filed the request for reexamination?
A. The request? Is that the challenge?
Q. Yes.
A. Who filed the challenge? I believe it was Wheelabrator, but I don't remember her name specifically.
Q. What makes you think it was Wheelabrator?

A. Barry? I don't -- I'm just trying to recall. I'd have to go back and look at the paperwork on it.

Q. If I told you that the identity of the requester was not disclosed in the reexamination request, would you have any basis to dispute that? Do you know differently?

A. I thought I saw -- do I know differently? For a fact? No. I thought it was an employee of Wheelabrator, and I don't know why I know that or why I think that. I can't remember. I don't know if there's a document that has his name on it or not, or the company's name. I know -- if I'm not mistaken, the O'Hara patent is owned by Wheelabrator, if I'm not mistaken about that.

Q. Has Sevenson taken the position with regard to the reexamination that the subsequent issuances of the 982 patent and others was essentially a repudiation of what had happened in the reexamination?

A. A what of it?

MR. SZANYI: Object to the form.

Q. A repudiation or somehow a reversal of the position of the patent office?

A. I don't know what they think about that.

Q. You don't know if Sevenson's published any materials taking a position on that?

A. Well, not that I know of. I left -- all of this was issued in March of '96, and this is June of '96, and I left in

January of '97, so I don't know what they ended up formulating for the -- you know, after that period.

Q. What's your understanding of the effect of this reexamination certificate in light of the issuance by the patent office of the 982 and subsequent patents?

A. My opinion is these bring back a lot of the claims and what we teach. It shows that we teach something different than what O'Hara teaches, and therefore the patent was issued. Because 982 was issued in light of O'Hara, in view of O'Hara and what O'Hara teaches. And the patent office made that determination.

Q. And so, in essence, you think maybe the patent office changed its mind, in terms of what they did in the reexamination, later?

A. I have no reason to believe that the reexamination and this issuance are even connected one way or the other, other than in this case, this patent examiner looked at O'Hara and felt that it was okay. I don't know anything different, I don't think. I don't know what the timing is.

Q. If you could look at Page 12 of your report--

A. Page 12.

Q. --the third -- well, the second full paragraph, beginning, "The use of phosphate treatment..."

MR. SZANYI: Second full paragraph?

THE WITNESS: Yeah. There's Wheelabrator

right there.

Q. How did you know that to put that in the report if you now say you weren't sure about it?

A. I didn't say that I don't know what their position is on it. This is what I think happened and that's based on when I was still there.

Q. You said here as a fact that Wheelabrator challenged the validity of the claims.

A. Okay. Challenged. Okay.

Q. What's your basis for your factual statement there?

A. I've seen their name somewhere on some document. That would have to be why. That's based on what I've known from since I was at Sevenson and worked on the challenge or the affidavit. It wasn't until a few months ago that this all of a sudden came back to enliven my life.

Q. You go on to say, "It should also be noted that all of Sevenson's phosphate claims were reinstated after further patent application prosecution and the USPO's patent examiner conducted a thorough review of Wheelabrator's patents and overturned the challenge."

Are those your words?

A. Those are my words, but I don't know if it's necessarily overturned the challenge, but in 982 -- maybe "overturned" is the wrong word there. Because 982 was issued, based on the O'Hara patent, and the patent office's review of that, I

would assume that it would be an overturning or an overruling, but maybe that's not the official way it needs to be worded. I don't know. But I'm assuming that the patent office awarded 982 because of what we teach and it being different than what O'Hara teaches. And that's my opinion on that. Whether or not they overturned the challenge, I don't know.
Q. Well, you said it here.
A. Well, it's my opinion.
Q. What's that based on?
A. Based on the issuance of this patent.
Q. The 982?
A. Yeah. But I don't know the timing on it. I'm just assuming that because they issued it and they did it with O'Hara, where the original reexamination cancelled those claims. So maybe I didn't use the right words there from a legal perspective, but because 982 was issued validates that there's something different taught.
Q. Have you done any legal research to determine if that's a correct position legally?
A. No. I'm not a lawyer.
Q. Well, you said that they overturned the challenge.
A. Overcame it might have been a better word. Or maybe issued in view of everything or maybe independent. I don't know. That's just how I would look at it.

Q. Well, let me ask you to look at something that I understand is a Sevenson advertising piece of some type, which we'll mark Exhibit 7.

(Exhibit No. 7 marked for identification.)

For the record, there's Bates -- what I'll call Bates Numbers SH043226 through SH043232. I'll ask you if you recognize that.

MR. SZANYI: Do you want him to just kind of flip through it?

Q. Have you seen that before?

A. I have not seen that one, that I remember. I have not seen that one. I've seen something similar to this. That might be the same.

MR. SZANYI: Don't say this one or that one. You've got to give him numbers.

THE WITNESS: Oh, I'm sorry. I don't recall seeing SH043226, 43227, 43228. 43229 looks somewhat familiar. I don't know if I've seen 43230. Yeah, I can't say I've seen all these. No, I can't say that.

Q. Anyway, I wanted to ask you about, I guess, the second page of this.

MR. SZANYI: 227?

MR. GRAHAM: 227.

Q. And in particular, the section under "Brief History." It starts out and it says, "The original patent details the basic MAECTITE concept and establishes a validity date of March 16, 1990, for the invention." Do you know what is meant by the language, quote, "the basic MAECTITE process concept," closed quote?
A. I don't know what they mean by it, but I would say that it has to do with their family of patents and technology and to treat heavy metals so they don't leach.
Q. The next sentence says, "The idea for using phosphatic reactions..." et cetera, "is established here for the first time." What does that mean?
A. I don't know.
Q. Do you see any mention about sulfate in there?
A. No.
Q. It goes on, it says, "Patents 3 and 4 resulted in another firm's challenge of the original patent," and it says, "Number 3 affirms the use of sulfate reagents. Number 4 is a continuation in part of the original patent," which I think it is the 936, and Number 4 referring to the 982 patent we talked about before. And it says, quote, "Affirming the use of phosphates, re-establishing the original patent's validity, and confirming the original file date of March 16, 1990." What does that mean?
A. I don't know. Other than they're saying that -- what it says

here -- let's see. Number 4 is 982, right?
Q. Yes.
A. And look at 982 and it goes back to Patent 936. It's a continuation of part of 936.
Q. Which we talked about earlier?
A. That's consistent with what that says here. Reaffirming the -- re-establishing? Well, since 982 was issued after the reexamination issuance, that what was taught in 936 plus the net effect of this were --
Q. This being the reexam certificate?
A. The reexam -- I'm sorry. That's correct. The reexam which were affirmed sulfates and cancel everything out. And again, my opinion is that 982 brings back the phosphate side of the system.
Q. Brings it back?
A. Well, here it cancelled it and here it brought it back, and it's still a continuation of part of what was 936 and from before.
Q. Now, those two claims that are mentioned on the back of the reexam certificate where it says, "The patentability of Claims 5 and 6 is confirmed."
A. Okay.
Q. See that?
A. Yes.
Q. What are Claims 5 and 6?

A. Five is a treatment process of Claim 1, wherein such sulfate is formed in the form of a liquid mixed with solid waste, and 6 is where a sulfate is supplied in the form of liquid with sub solid waste. Claim 2 is where the sulfate is selected from, and Claim 1 is -- gets back to talking about mixing a solid waste with leachable lead and with sulfate in the first mixture, and then phosphate with the second.
Q. So basically the Claims 5 and 6 are talking about applying the sulfate in a liquid form?
A. The treatment for Claim 1 wherein sulfate compound is supplied in the form of a liquid, that one's correct. And where Number 6 says, wherein sulfate is supplied to Number 2 in the form of a liquid, and Number 2 is wherein the sulfate is selected from a group consisting of calcium sulfate, gypsum, sulfuric acid or alum.
Q. How would you apply alum in the form of a liquid?
A. Add water to it.
Q. How about gypsum?
A. How would you do it with gypsum? Probably -- you could add water to it again or you could have it in phosphoric acid.
Q. You could add gypsum to phosphoric acid?
A. Yeah. There's calcium in there and there's sulfate in there as an impurity. It could be -- sulfuric acid could be there. I mean, it's -- there's all sorts of different sources for, again, sulfate.

Q. So the claims 5 and 6 here that said that the patentability was confirmed could include the sulfate that is an impurity in phosphoric acid?
A. I would assume so, yes.
Q. Since phosphoric acid is a liquid, and the sulfate that would be in there as an impurity would be in the form as a liquid?
A. Correct.
Q. Now, in the O'Hara patent, did they not use phosphoric acid?
A. They did use phosphoric acid, but they did it in the presence of high PH.
Q. Would that alter the effectiveness of the sulfate impurities that would naturally be included with the phosphoric acid?
A. It could.
Q. How?
A. I don't know. I just look at the reaction mechanics. I mean, when you teach a lead fixation technology with phosphate hydroxide, it's a totally different system than a sulfate/phosphate system.
Q. I'm sorry?
A. There's two different reaction chemistries that are taking place. One is a sulfate/phosphate, which we teach. The other is a hydroxide/phosphate, which O'Hara teaches. Two different systems. They exclude anything below a neutral PH, therefore they have to have alkalinity to make it work.
Q. Where do your claims -- say the claims in the 936 patent, 5

and 6, where are there any limitations in those claims in terms of the PH?

A. We don't limit PH. We teach -- we don't teach PH at all. O'Hara teaches --

Q. O'Hara claims would encompass all PH's?

A. Correct. We're a more universal system. We're broader. And it's different chemistry. It's a hydroxide chemistry, phosphate/hydroxide. It's a phosphate/sulfate chemistry, and there's a distinct difference.

Q. Where do Claims 5 and 6 exclude the presence of a hydroxide?

A. Where do they exclude it? We don't teach it. We teach sulfate.

Q. But where do they exclude the presence of a hydroxide?

A. Well, when you have a low-PH material.

Q. Where do they say that you have to have a low-PH material?

A. We don't. We don't teach PH. We don't teach and we don't suggest there is a required PH to be done, where O'Hara does. We don't care -- we don't teach whether it's a PH of 12, 14, or one or two. It makes no difference to us.

Q. Right. So, once again, where do Claims 5 and 6 exclude the presence of a hydroxide?

A. We don't teach the exclusion of hydroxide. We teach sulfate.

Q. So the treatment of a material containing a hydroxide would be encompassed within the scope of Claims 5 and 6 since they don't exclude --

A. Say that again. I'm sorry. I lost the first part.
Q. A material containing hydroxides would be encompassed within the scope of Claims 5 and 6 because those claims don't exclude any such materials?
A. If you're talking of the union of the set or the intersection of the set, if there was sulfate present with the hydroxide, yeah, that probably would work. But sulfate is what we teach. We don't care about hydroxide content.
Q. Could be there or could not be there? Still would fall under --
A. We don't acknowledge it one way or the other. We don't care.
Q. So what you're saying is your claims don't exclude that? Could be there, could not be there? It would still be under the scope --
A. We don't even exclude it or include it. It's just irrelevant. We don't care.
Q. Well, the point being you don't exclude it, from what I'm trying to understand --
A. We don't include it either, where O'Hara clearly does. He limits it to a PH of seven or higher, and that means hydroxide presence.
Q. Do you know if the comments that you have made in your report about the overturning of the challenge and these comments in Exhibit 7 about confirming or re-establishing the validity, do you know if any of those comments, yours or these here,