resulted from consultation with counsel?
A. They did not.
Q. In advance?
A. They did not. I was trying to reconstruct it on how I remember it when I wrote that. Like I said, I had not seen this before. And I don't remember the legal reason as to why or if the reexamination was ever carried further. All I know is that 982 was issued, and it was one of those things, once it was issued, off we went and do what we do, so that's what we did.
Q. In this Exhibit 7 at the bottom, the same page we've been looking at, the MAECTITE Treatment Process.
A. At the bottom?
Q. Yeah. There's a paragraph that says, "What it means."
MR. SZANYI: I'm sorry. What page are you on? 227?
MR. GRAHAM: Yes. 227.
THE WITNESS: Okay.
Q. Do you see that, "What it means"?
A. Yes.
Q. And it says, Patents 3, 4 and 5 affirm Sevenson's title through the use of phosphates in any commercially available form for reducing the toxic leachability of RCRA heavy metal: below regulatory standard. Do you agree with that statement
A. Do I agree with that? Patent 3 is 98 -- that's the

reexamination, right? Four is 982, 5, 155. I would be interested in knowing when 155 was filed. It looks like it was issued in October of '96, so it was probably -- because of how long it takes the patent office, that was probably filed for before the challenge also. But I may be wrong.

MR. SZANYI: 155 was filed May 12th, '95.

THE WITNESS: May 12th of '95, and the reexamination challenge was '94, so it was filed afterwards, right, but before the issuance of the reexamination. When was the reexamination? That was March of '96. So that was filed -- the 155 was filed prior to the reexamination issuance. That was issued in March of '96 and 155 was filed prior to that, May, but after the challenge. And before, I remember our affidavit was September, maybe. When was our affidavit filed? Do you know when that was?

MR. SZANYI: My recollection is September '94.

THE WITNESS: And this was filed before that, right?

MR. SZANYI: No. After.

THE WITNESS: You asked me if it was affirmed, Sevenson's title to use the phosphates. I mean, that's a marketing language there, but are they considered the owners and patent owners of that technology? I would say yes.

Q. So, you agree with this statement about what Patents 3, 4 and 5 mean? Is that right? Do I understand you correctly?
A. Well, I agree that the patents that they have issued under 3, 4 and 5 is theirs and it's their technology. Whatever's covered there. You're talking entitled to use phosphates in any commercially-available form, I would say what are you going to use it for? If you're talking about reducibility, leachability, I would say yes.
Q. Well, the underlying language, quote, "phosphates, in any commercially-available form," what does that mean?
A. Well, to me, as a contract that would use this technology, that means I can buy that. That's going to be a bulk chemical that can be bought in large-scale quantities, rail car or truck. Something like that. So I would say that would be a commercially-available. There's all kinds of weird chemicals you can't buy in great quantities, but I would say commercially-available. So for somebody who would use this technology, as a user of that technology, I would say that I can get it in bulk, and because of that pricing, it's realistic compared to other options.
Q. What does commercially-available form distinguish from? What does it not include, is what I'm trying to understand?
A. I don't know.
Q. In terms of phosphates.
A. Basically it says you can use it in any commercially form --

commercially-available form. If it's not commercial, then it could be included as well, but this is just specifically saying about commercially-available.

Q. Now, so this is basically saying they covered the use of all phosphates for this reducing lead leachability?

MR. SZANYI: Object to the form. It says all commercially-available phosphates. That's different than all phosphates. Object to the form of the question.

MR. GRAHAM: Well, use of phosphates in any commercially-available form.

MR. SZANYI: That's different than all phosphates, so I object to the form of the question.

Q. Okay. Tell me, is it different than saying all phosphates?

A. Yes. It's more restrictive.

Q. How is it more restrictive?

A. Because there's other phosphates out there that may not be commercially-available.

Q. Like what?

A. Phosphates that might be in the ground when you move onto the site for the first time.

Q. But I thought you said those would be included in the claim, in the coverage of the claim?

A. Well, that's what Patents 3, 4, and 5 are, so if there's phosphates on a job site when you move there, and all you have to do is add sulfate to it, they're entitled to that.

That's what their technology patents cover, is phosphate and sulfates to reduce TCLP lead and heavy metals.

Q. So phosphates that might be fertilizer that are formed or put on the ground 10 years ago would be included in this reference to phosphates in any commercially-available form?

A. This is a marketing document, but I think this is worded more tightly than it should be. They're limiting themselves here.

Q. How would you say it?

A. I wouldn't. It's not my technology.

Q. Pardon?

A. It's not my technology.

Q. Well, you said it's worded too tightly. How should it have been worded to be consistent with your understanding of the scope of the patents?

A. I wouldn't care to do that, because that's their business that they're offering to sell, and I don't know what they would intend to use it for.

MR. SZANYI: Can I ask you a quick question? This PO4S on the left here, is that on the document, or did somebody add that?

MR. GRAHAM: I have no idea where that came from.

Q. Is it your understanding that the claims that issued in the patents after the 936 patent, the one that was reexamined, is it your understanding that those claims are broader than the

claims that issued in the 936 patent which we talked about before that required two steps?
A. What do you mean by "broader"?
Q. They covered more stuff, more variations.
A. I don't know. I'd have to look.
Q. Could you?
A. Sure. You're talking between 936 to 982?
Q. Yeah.
A. After the reexamination certificate?
Q. No. Before.
A. Well, let's look at the first one. You've got 20 claims in 936, and 982 there are 31 claims, so just on that fact, they're broader.
Q. How about the claims in the 123 patent?
A. 123 patent.
Q. You may not have that in front of you yet. We'll mark it Exhibit 8.
(Exhibit No. 8 marked for identification.)
A. Okay. Now that I've got them both in front of me, what was the question? I'm sorry.
Q. Do you think the claims in the 123 patent are broader than the claims that were in the 936 patent before the reexam?
A. So, broader, again, means it covers more applications, uses,

discloses more, teaches more?
Q. Right.
A. Covers more? Again, without reading them specifically, I would say that it probably is broader, probably something else disclosed or improved upon.
Q. How about the two, what I think we've sort of called in this case, the Rad patents, the 367 and 608?
A. 367 and 608?
Q. So we'll mark these two.
(Exhibits Nos. 9 and 10 marked for identification.)

Do you think the claims in those two, I guess what we're calling Rad patents, are broader than the claims in the 936 patent?
A. Again, do they cover more things?
Q. Yeah.
A. Yeah. They added more knowledge. Although the 367 patent has fewer claims than 936. So, with that one I'm going to have to take a look at it and see what it talks about specifically.
I would say that 367 -- well, let me look at this here. I haven't looked at these two from that perspective, so this would take me a while to dig through to see if it's broader or not.

Q. Maybe you can think about that over lunch, and we can go onto something else and come back to that, if you'd like.
A. Sure.
MR. SZANYI: That's fine.
(Discussion off the record.)

Q. In regard to the last two patents, which we call the rad patents --
A. 608 and 367?
Q. Right. Do you recall filing a declaration in one of those cases to remove a reference that was cited by the examiner? Do you recall that happening?
A. There may have been something that I signed while I've been at Wilder. I don't know. I may have.
Q. Let me show you--
A. Do you have something to refresh my memory maybe?
Q. --two documents which we'll mark as 11 and 12. Just for the record, the one that will be marked 11 carries Numbers SH041035 through SH041046. And the one we're marking Exhibit 12 carries Numbers SE103061 through SE103072.
(Exhibits Nos. 11 and 12 marked for identification.)
(Discussion off the record between the witness and his counsel.)

MR. SZANYI: What would you like him to do? Just read every line of this or...?

Q. Well, I first wanted to know if he remembered signing the document, I guess, of Exhibit 12, or I'm sorry, 11.

A. Should we go through each one?

Q. Well, no. First is the declaration of prior invention that you signed on February 22nd, 1999.

A. Mm-hm (answers affirmatively). I did sign it. I don't remember doing it. I remember these letters in here.

Q. Do you remember the circumstances that surrounded your signing this declaration?

A. The first two pages of Exhibit 11? Is that your question?

Q. What were the circumstances, in your understanding?

A. For signing the --

Q. Yeah.

A. Exhibit 11 on the first two pages of that? Circumstances? No. Probably in conjunction with the rad patents.

Q. Do you recall that an effort was being made to overcome a prior art rejection based on this patent, the 5818 patent to wall, by proving the date of invention before the filing date of that patent? Do you recall that?

A. I don't recall.

Q. At this point, was Mr. McDermott the counsel that was handling the cases by 1999?

A. I would believe so, yes.

Q. What discussions did you have with him about the correctness of these statements?
A. These statements one through eight?
Q. Yes.
A. I don't know, but I wouldn't have signed it if I didn't feel at the time they were correct.
Q. Do you now have a different feeling about whether they're correct?
A. I haven't read this one in a while, so let me look at it. No. It's still pretty clear.
Q. Well, you understand that this relates to the two rad patents, right?
A. It appears to.
Q. The one that's actually involved in the prosecution at this time, which is --
A. It has to do with the reduction of leachability and solubility of rad, radionuclides and radioactive substances.
Q. Right. Paragraph 5, in particular, says --
A. Paragraph 5?
Q. Yeah.
A. Prior to January 31st?
Q. Right. "We submitted a proposal to the Westinghouse Savannah River Company for use of the present invention to treat radioactive soil," and then it refers to a copy of the proposal and a response from Westinghouse.

A. Okay. So that would be --
Q. Exhibit C.
A. Right here. SH041040?
Q. Right.
MR. SZANYI: You're missing a page in there.
THE WITNESS: I am?
MR. SZANYI: Well, missing a page that's in 12, there's an actual letter.
THE WITNESS: 3067.
MR. SZANYI: They're not the same.
MR. KRESSIN: Those are two different declarations, aren't they?
MR. GRAHAM: No. Well, one's unsigned and the other's signed.
THE WITNESS: He's got pages I don't have in mine. I don't have any of those pages. I've got Devin Gray, United Engineers and Constructors. I have Sevenson to Argonne, Cherri Langenfeld. I've got part of the Westinghouse Savannah River Corporation for preproposal, and then it goes to the same thing, and then it goes to the same thing, and then there's Westinghouse.
MR. SZANYI: There's the letter.
THE WITNESS: That's the letter?
MR. SZANYI: It's just in a different

order.

THE WITNESS: Okay.

MR. GRAHAM: The copy that came back from the patent office, I think, was in a different order than the one that was produced by Sevenson.

THE WITNESS: I'm not surprised.

MR. SZANYI: Okay.

MR. GRAHAM: But I think that the documents themselves are the same.

THE WITNESS: Okay.

Q. So, the Paragraph 5 says, "We submitted a proposal for Westinghouse for use of the present invention to treat radioactive soil," and then it refers to Exhibit C.

A. And Exhibit C was the --

Q. The bid.

A. Right. Preproposal for WSRC.

Q. Right. And then the responses from Westinghouse, I think, are both part of Exhibit C. Correct?

A. Okay.

Q. Now, in Paragraph 5 it's a proposal for use of the present invention. What is it referring to there when it says "the present invention"? What are you referring to when you say that?

A. Well, I'm going over to Exhibit C, and it talks about metals, treatment using the MAECTITE and Chromtite technologies to

render mixed RCRA hazardous and radioactive soils non-hazardous.

Q. Right. So what is that?

A. Well, MAECTITE is -- Chromtite's a little different, but MAECTITE is the phosphate/sulfate system for leachable heavy metals. Chromtite is for handling hexavalent chromium, which, that's a reduction step at that, so we were looking to see if we could see if our technologies, MAECTITE and Chromtite, would be suitable or applicable to see if it would work on radionuclides and radioactive substances.

Q. The reference to MAECTITE is a reference to the use of this technical grade phosphoric, like is in Claims 1 --

A. No. It was in reference to using sulfate and phosphate. We didn't know what was going to be done.

Q. Take a look at the 367 patent, which is Exhibit 9.

A. Exhibit 9, okay.

Q. Look at the claims.

A. Okay. What claims are we looking at now?

Q. Take a look at Claim 1.

A. Okay.

Q. Claim 1 of the 367 patent.

A. Claim -- which number was it? I'm sorry.

Q. Claim 1 of the 367 patent, which is the first of the rad patents, which had already been applied for, by the way, at the time this declaration was filed.

A. When was it issued, just so I know.
Q. Issued March.
A. Issued in March of '98, and this --
Q. It was filed June 14 of '96. This declaration was signed in '99.
A. '99. And the proposal, I was trying to figure out when the proposal went in, just so I get an idea where it was. I don't know. It doesn't say.
Q. The date was covered over. Although, I think if you look at the unsigned version, which is the one that was not filed in the patent office, the date is still on there.
A. That was '94.
MR. SZANYI: May 18, '94, is the date of the Westinghouse letter.
THE WITNESS: Correct. To me.
Q. Right. So looking at Claim 1 of the 367 patent, which is the beginning of Column 34 at the bottom--
A. Yes.
Q. --the first step is contacting the host material with a single reactant comprising a source of a sulfate ion and a phosphate ion to form a mixture, said mixture containing insoluble Apatitic-structure mineral species.
Do you see that?
A. Mm-hm (answers affirmatively). Yes, I do.
Q. And then it goes on in Claim 4 and 5 and says that the single

reactant is technical grade, phosphoric acid. Do you see that?

A. Yes.

Q. Now, in the Westinghouse proposal, it talks in the title about the MAECTITE technology. Then over in the technology summary, which is on the second page of the proposal, it says the MAECTITE treatment technology is patented and owned by Sevenson. The process utilizes one or two proprietary reagents. Do you see that?

A. Mm-hm (answers affirmatively).

MR. SZANYI: Yes?

THE WITNESS: Yes.

Q. Now, what would be the one reagent? What form of the process would use only one reagent?

A. What form?

Q. Yes.

A. Phosphoric acid.

Q. So is that not referring to the same process as Claim 1 of the 367 patent, which talks about a single reactant comprising the source of sulfate ion and phosphate ion?

A. It could be, but again, we don't know if it works back here when this was submitted. We're saying that we wanted to use our technology for heavy metals and chromium to see if it works on radioactive materials. We didn't know at the time.

Q. But what you were wanting to do was the same thing that's

called for in Claim 1 of the 367 patent; correct?
A. It could be. I mean, we're just -- part of this letter here was a marketing letter.
Q. But it does talk about one reagent?
A. It talks about one or two proprietary reagents.
Q. Right.
A. To convert lead.
Q. But it says the process either uses one or two reagents.
A. Correct.
Q. And the form of the process that uses one reagent would be like Claim 1 of the 367 patent that says a single reactant comprising a source from sulfate and phosphate?
A. That could be. It could be a different one.
Q. It would include that, though?
A. It would include that. That's correct.
Q. Now, as of '94, when this proposal was done to Westinghouse, Sevenson and previously MAECORP had used technical grade phosphoric in five projects to treat lead?
A. Yes.
Q. If we look at the other rad patent, which is a 608, which I believe has been marked as Exhibit 10, and look at, for example, Claim 1 of that 608 patent.
A. Oh, I've got 936. Not 608.
MR. SZANYI: Number 10?
MR. GRAHAM: Yes.

THE WITNESS: Number 1 of 608?

Q. Right.

A. Okay.

Q. Is this one of those two-step claims like one of those two-step claims that we talked about before, two treatment steps?

A. This 608?

Q. Yes.

A. Claim 1, comprising of the steps of contacting the material with... Yeah, you form two mixtures.

Q. Now, looking over at, again, the proposal to Westinghouse.

A. Okay.

Q. In that second page--

A. Mm-hm (answers affirmatively).

Q. --that we were talking about that statement that says, "The process utilizes one or two proprietary reagents."

A. Okay.

Q. Now, there where it says "two proprietary agents," would that be like Claim 1 of the 608 that talks about a two-step treatment process?

A. Well, we're talking two different things here. One is you're talking reagents. The other you're talking about the steps.

Q. Yeah.

A. They're not the same.

Q. But the two steps, would that include -- or by necessity you'd have to be using two reagents if you were going to do

two steps under like the 608 patent; correct?
A. Under 608, if we were to follow 608, you would have to use two steps or two reagents?
Q. Well, both.
A. Well, they're different. Let's say you treat some material and it fails and you go back and retreat it again, just add some more of the same additive, you're using the same additive with one reagent, but you've got two steps. Or you could treat material with one additive to get one mixture and then add a second additive to it, and that's two steps with two different additives. Or you could add two additives at the same time in one. So they're all...
Q. But this statement over in this Westinghouse proposal about two proprietary reagents --
A. Yeah, just use --
Q. Just talk about one form of this two-step -- one form of this two-step -- not that that's the only way you could do the two-step thing.
A. I guess I'm not following your question. I'm sorry.
Q. The discussion and the proposal about two proprietary reagents --
A. Uses one or two.
Q. Yeah. The two proprietary reagents would be one way of carrying out this two-step process of Claim 1 of the 608 patent?

A. That would be one way of doing it.
Q. Right. And I didn't say that would be the only way that you say that you could do it.
A. That's correct.
THE WITNESS: Can we take a break?
MR. SZANYI: Can we take a break now?
MR. GRAHAM: Okay.
(Recess 1:58 to 3:06 p.m.)

EXAMINATION (Continuing)

BY MR. GRAHAM:

Q. I wanted to go back to something we'd talked about this morning. I want to show you copies of two letters which we'll mark together as one exhibit. They have numbers 101450 and 101452. We'll mark them collective as 13.
(Exhibit No. 13 marked for identification.)

Do you recognize these?
A. I do indeed.
Q. Can you tell me why there are two letters that seem to relate to the same thing?
A. One's a quote, and I think he probably -- I'm just guessing. I don't remember why it was, but my guess is it is a quote,

but we were also given the authorization to use it. It might have been something that was required from South Tacoma Field project's documents. I don't remember.

Q. What does it mean when it says "our quote to provide the MAECTITE reagent delivered is 2.75 a gallon"?

A. That's how much we pay per gallon. From this quote, that's what we would've paid had we got the job and we bought -- and we used the MAECTITE onsite and we bought it from them.

Q. Did you get the job?

A. Did not.

Q. What is the MAECTITE reagent?

A. In this case, it would have been MAEPRIC or phosphoric acid.

MR. KRESSIN: Isn't that the same thing?

MR. GRAHAM: Yeah.

MR. KRESSIN: No.

MR. GRAHAM: Oh, I'm sorry. Yeah, I think you previously said MAEPRIC--

THE WITNESS: Phosphoric acid.

MR. GRAHAM: --is phosphoric.

Q. The other letter, the one that is not a quote necessarily, says Sevenson hereby authorizes Wilder Construction to utilize the MAECTITE treatment process.

A. Mm-hm (answers affirmatively).

Q. The language authorizes. What is that about?

A. Just -- when I read it, that tells me that Sevenson's okay

with Wilder using the technology.

Q. I had asked you earlier if Wilder had a license, had ever received a license from Sevenson to use this technology, and you said no. Do you or is it your position that their authorization of Wilder to use the treatment process would not be considered a license?

A. That's what I read it as. That's how I -- a license to me is something that's continuous and you're going to pay this and all terms and conditions are laid out, and that's not -- to me, this is authorization to use it.

Q. Okay. When it says "to use the MAECTITE treatment process," what would that be?

A. To utilize the family of patents to treat lead.

Q. If you read it in conjunction with the other letter, would that be to use that phosphoric acid solution?

A. Mm-hm (answers affirmatively). That's correct.

Q. Why would this authorization be contingent on Wilder purchasing your chemicals from Sevenson and using personnel with experience?

A. Well, I can't answer the question from Sevenson other than how I would have answered it if I were Sevenson when I was there, but basically, Sevenson would not want somebody to use this technology that did not know how to use it, so that its reputation would be tarnished or harmed or that it was improperly used. So under this authorization letter, we're

allowed to purchase it, and we had to have somebody with previous experience to do it, to provide supervision on the job site.

Q. But if you had done this project, you would have had to have bought your chemicals from Sevenson?

A. That's correct. Which is what we do.

Q. And that's for what reason?

A. Well, they're the ones that are -- it's their technology.

Q. Well, what I'm trying to understand, if you're authorized to use it, why do you have to buy your chemicals from Sevenson?

A. Probably don't, but I don't know why they put that on there. It's easy for me to do it. I call them up and tell them, and they give us a price and we get the job, they arrange for it, transport it right to our doorstep, so then I don't have to do that.

Q. But when you say you probably don't, you mean from your perspective?

A. I mean, if I can talk to them, I could probably buy it from them and then we pay them a fee, but that's not how -- this is easier to do it this way.

Q. From your standpoint?

A. For me it's easier to do it this way, and for them it's easy to do it. They keep control of technology and we're able to use it and we provide experienced people onsite to do it, and they know all the vendors and sources of the additive that we

would use, and consenting to let us use the technology.

Q. Are you aware of anybody who has used the MAECTITE treatment process that did not obtain their chemicals from Sevenson?

MR. SZANYI: Other than Shaw? Other than this case you're talking about, I assume, right?

MR. GRAHAM: Any situation.

THE WITNESS: Am I? I've had my suspicions. I don't know for fact, though.

Q. What are your suspicions?

A. I just -- I don't know if that -- is that something I should answer? It's not --

MR. SZANYI: Well, I can't stop you from answering that. If you have some reason that I don't know about, then let us know.

THE WITNESS: I don't have anything in writing other than what people have told me, so I don't know. Maybe I shouldn't answer that because I don't know for a fact. I have suspicions on it, but is that important to you? I don't know.

Q. It might be, yes.

A. Well, this job right here is a prime example. South Tacoma Field Superfund Site. We didn't get it. Somebody else did.

Q. Who did?

A. I'd have to go back and look.

Q. Who do you think got it?

A. RCI.
Q. What do you think they used to treat the material?
A. Phosphoric acid.
Q. Did they get it from Sevenson?
A. No. Not that I know of.
Q. Have they been sued by Sevenson?
A. I don't know the answer to that.
Q. Who else do you know that's used phosphoric acid to treat lead-containing material?
A. That's the only one since I've been out here, that I'm aware of.
Q. How about before you got out here?
A. I don't know of any hard data that would show the point one way or the other. There's, again, suspicions, and I don't know. I suppose there would be presumptions, so...
Q. How about RMT?
A. Using phosphoric acid?
Q. Yes.
A. Well, they were using phosphoric acid on hydroxides again. They had high PH materials, just like the -- you know, the O'Hara material. Wheelabrator uses a high PH material. That's a different system. That's the hydroxide/phosphate system, and again, this is a sulfate/phosphate system. So they're similar, but it's more similar to the Wheelabrator O'Hara thing.

Q. Would their phosphoric acid have had sulfates in it?
A. Yes. When you say RMT, I'm assuming you mean Stanforth?
Q. I'm talking about the company RMT.
A. Well, I think they own the Stanforth patent, if I'm not mistaken.
Q. Well, I'm not intending to refer to any patent. I'm talking about their commercial activity.
A. No. They use a mag oxide viral blend, mag oxide triple super phosphate, I believe, and then they also use, based on the General Motors thing, they use phosphoric acid there, Defiance, Ohio. I'm sure they've done others like that.
Q. Going back to the declarations that, I believe, were Exhibits 11 and 12.
A. 11. What was 12? Okay.
Q. The fifth paragraph that talks about the Westinghouse--
A. Mm-hm (answers affirmatively).
Q. --says that you submitted a proposal to Westinghouse for use of the present invention to treat radioactive soil. Do you see that?
A. Mm-hm (answers affirmatively).
Q. Now, when it says "use of the present invention," what's it talking about?
A. MAECTITE.
Q. Which is what?
A. Phosphate/sulfate.

Q. Phosphoric acid?
A. Well, that could be one option. Anyway, that has phosphate or sulfate. It also probably includes Chromtite in there, so it might have something to do with a reducing agent as well.
Q. And the next paragraph, which it talks about submitting a proposal to FERMCO for using the present invention to treat low-level radioactive waste.
A. Mm-hm (answers affirmatively).
Q. When it refers to the present invention, what's it talking about?
A. Same as Item 5.
Q. The MAECTITE or MAEPRIC?
A. Well, the phosphate/sulfate. If they meant MAEPRIC, that might have been what it was -- we don't know what it was going to be until we did study work with it.
Q. But it would include the MAEPRIC solution?
A. That would be one of the possibilities.
Q. Now, Paragraph 7 says, "From the conception and reduction to practice of the present invention prior to January 31, 1995..."
A. Mm-hm (answers affirmatively).
Q. Do you see that?
A. Yes.
Q. What did you mean by "reduction to practice"?
A. Well, I would assume that it means that the time it was

actually used. From the time you thought of the idea to the time you actually used it and made sure it worked. It hasn't been used for radioactives, that I know of, on a full-scale basis. Maybe Sevenson has since I've left, but I don't know that. But we did demonstrate through lab testing on an invention engineering scale and it worked.

Q. Before January 31 of '95?

A. I believe it was after that.

Q. So is this a false statement?

A. From a conception -- prior to 31 until the patent application was filed in June of '96. So from the conception and reduction to the practice of the present invention prior to January 31st, I don't know. I mean, it's from the conception and reduction prior to January 31st, '95. I'd have to go back and look at the dates and when we did our lab work first, first time we looked at it and got some results.

Q. Was this statement true or false?

A. Well, I wouldn't have signed it if it was false, so I guess I can't remember the dates as we speak here today.

Q. So as of January 31, 1995, the invention had been reduced to practice?

A. It would have been in a laboratory if those dates are correct, and I'm assuming they are.

Q. And the proposals of Paragraphs 5 and 6, let's just talk about the one at Paragraph 5 to Westinghouse.

A. Mm-hm (answers affirmatively).
Q. That was a specific bid to carry out work using the invention; correct?
A. In response to a solicitation they had, I believe it was an R & D type thing to see -- you know, they're looking at evaluating technologies, and we didn't know if it would work or not at this time. Again, I don't remember the date of that. We just had an inkling that it might work. We didn't know for sure.
Q. This was an offer to use it, though?
A. To --
Q. For money.
A. An offer for them to use it? No. It was an offer to apply it and we would use it.
Q. Right.
A. Yeah. Basically -- for $10,000, it basically -- the lump sum cost of 65,000, that's basically lab work.
Q. But it was still an offer for you to use this for them in exchange for money?
A. It's a study. The objective -- read the objective. We wanted to demonstrate and we wanted to confirm, and we wanted to generate a full-scale estimate on our project -- generate an estimate for full-scale use of it. So this was an R & D type thing and we were proposing to see if this technology -- if they'd accept this technology to be used to see if it

works. And then if it did, we could prepare a full-scale proposal for -- and priced for a full-scale operation.

Q. So you're saying that the language in Paragraph 5 of the affidavit is untrue?

MR. SZANYI: Object to the form.

THE WITNESS: Five -- "Prior to January 31, 1995, we submitted a proposal to the Westinghouse Savannah River...for the use..." Yeah, I mean -- yeah, that's true.

Q. Is that true or false?

A. Proposal for the use of it to see if it would work. Yes, we did do that.

Q. Where does it say anything in that paragraph about seeing if it'll work?

A. Demonstrate.

Q. In Paragraph 5?

A. Paragraph 5? It says for the use of it. It doesn't mean it's going to work or not. We don't know if it's going to work. They can use the invention to treat it, but we don't know if it's going to work. If you look at the proposal, we're trying to demonstrate that it doesn't.

Q. So then the Paragraph 7 is false?

MR. SZANYI: Object to the form.

THE WITNESS: Well -- so 7 is false?

MR. SZANYI: Seven he said was in a lab

test. Why -- you didn't listen to what he said.

MR. KRESSIN: Well, frankly, he hasn't answered the question.

MR. GRAHAM: He won't answer the question.

MR. SZANYI: I disagree.

THE WITNESS: What's the dates of the Savannah River?

Q. I'm not asking you about the dates.

A. I have to know what the dates are because I have to tell the timing of when this was done.

Q. This paragraph says it was done before January 31 of '95.

A. Okay. "From the conception...prior to..." we submitted a proposal to Westinghouse. Okay. Well, I guess we did know. So we must have done lab work in our proposal that we submitted, had some data and some lab work that we had done that showed it worked when we submitted for Westinghouse. Was it going to work on their material? Maybe that's what we were trying to demonstrate, that it would.

Q. Now, when these documents were presented to you for signature, were the dates covered over like they are in Exhibit 11?

A. I have no clue. I wouldn't think so. My experience with them, if you see something like that, it's been highlighted, and then when you photocopy the highlights, sometimes they

don't show through.

Q. Well, I can represent to you that this certified copy from the patent office, the dates are redacted from the document. They were covered up.

A. What does redacted mean?

Q. Covered up.

MR. SZANYI: You certify you've seen the one that's on file at the patent office?

MR. GRAHAM: Yes.

MR. SZANYI: In the patent office? You went to Washington and looked at it?

MR. GRAHAM: No. We have a certified copy of the document.

MR. SZANYI: Well, a certified copy of it doesn't mean that they didn't copy a highlighted original and it came out like this. Unless you've looked at the original with your own eyes, you can't certify that.

So I object to the form of that, and you don't have to believe that's true; unless he's telling you under oath that you saw the original, I'll believe you.

MR. GRAHAM: I can guarantee you that the document says "filed in the patent office" and had the dates redacted.

MR. SZANYI: Unless you've seen it you can't guarantee it.

MR. GRAHAM: Well, I don't think that they're going to require that.

THE WITNESS: I submitted a proposal in '85 or '86 to the USEPA, and we had to give three quotes on every material we provided, and we highlighted it and sent it out for photocopying, and every single one of them was blacked out. So I don't know. I'd have to go look at copies of -- I just don't know. I see a receipt of March 8th, 1999 on here, and I see a February 26th, '99, so there are dates on the one to Devin Gray.

Q. I think that would be the patent office stamp date. It says "Group 17." That's the patent office group that examined this.

A. I mean, these are photocopies of the originals. No one has the originals except the people that are recipients of the letters.

Q. Well, you can see that the other copy of this that we got from Sevenson did have the dates on them.

(Discussion off the record between the witness and his counsel.)

Q. You don't recall if the dates were marked over when you received it to sign?

A. (Witness shakes head negatively). I haven't a clue. I can't remember. That's a photocopy of my writing back in -- that's my writing back there. 3/7/95, that was a memo probably.

MR. SZANYI: You've answered his question.

Q. I'll show you another declaration that you've signed in the patent office that was filed in the patent office that we'll mark Exhibit 14.

(Exhibit No. 14 marked for identification.)

Just for the record, it's Bates Numbers SH039865 through 39879. Do you recognize this?

A. I do.

Q. What is this?

A. It is the affidavit that I had prepared as part of the reexamination effort that we talked about earlier.

Q. Did you write this or was it drafted for you by a lawyer?

A. I wrote -- I wrote it and I think -- well, it's all my language in there pretty much. I think I had some input from Dhiraj and Chisick as well.

Q. Let's make the next one, which I guess will be 15, a copy of the O'Hara patent.

/////////////////

(Exhibit No. 15 marked

for identification.)

For the record, it's U.S. Patent 4,737,356.
Is this the patent that you were discussing in your declaration?
A. Yes.
Q. Do you recall the process disclosed in the O'Hara patent?
A. Do I recall it?
Q. Yes. Generally.
A. Generically, yes.
Q. What's your recollection of --
A. It's the addition of lime and phosphate to stabilize lead to pass, I think it's EP TOX, and it has to be between a PH of seven and a half and 12.
Q. On Page 7 of your declaration, you start out in Paragraph 11 by saying that the amount of calcium sulfate present in the flue gas would depend on the refuse material that's burned, since the refuse is usually the sole source of the sulfate. What do you mean by that?
A. Just what it says. You're looking at -- the sole source of the sulfate is from within the FGSP.
Q. What else are they burning?
A. Well, besides garbage, it could be anything. Whatever they're burning in there. This is municipal incinerator ash, so it's waste. They've burned it and the sulfur that's