indicates that Step 1 was not needed for the composite sample and that Step 2 was critical in lead fixation." Do you see that?

A. Yes.

Q. Do you recall this particular project?

A. I remember the project. I don't remember the details of it.

Q. Do you have any reason to dispute what's stated here in regard to the fact that this ended up being a single-step treatment?

A. Well, back then, my guess is that we were still looking at gypsum and phosphoric, and when you say Step 1 is not needed and Step 2 is, it was probably phosphoric alone. That's my best guess, and I'd have to see the treatability data.

Q. Well, if we have no further information with regard to this particular project at this time, do you have any reason to dispute the correctness of this, that --

A. Yeah. I would -- it states that they needed Step 2, and I would say that that's probably phosphoric acid.

Q. And that would have been a phosphoric acid in a single step that contained phosphate and sulfate ions?

A. That's my best guess at this time. Might have been the other way around, but I don't think so.

Q. Turn to the next page at the end of the -- which is PAL0073, it says, "The optimum dose of treatment chemical in a single step was determined and recommended for full-scale

treatment."
A. Where are you reading now?
Q. At the last paragraph at the end.
A. Okay.
Q. Is that also a single-step using phosphoric acid?
A. Which job is this one? New Hampshire? I remember this one. This says New Hampshire, but it also says down there PRP Superfund site in Virginia. What was your question again?
Q. This indicates it was a single-step process; correct?
A. Probably phosphoric, but I don't know the answer to that. I assume it was.
Q. Did you ever use any treatment chemical in a single step in the MAECTITE treatment process other than phosphoric acid?
A. Sometimes we'd just use gypsum.
Q. You think this was gypsum?
A. That's what I don't know the answer to. That's why I said I wasn't certain.
Q. How would I determine?
A. I would need to get the results from what they did in the lab. I don't believe this ever went to full-scale, so those project results -- same thing with the one back here. Where was it? Which one were we talking about, another one that was single-step back here?
Q. This previous page. It says Step 1 was not needed and Step 2 was critical?

A. Yeah. Again, I don't know. Okay.
Q. On Page 70, PAL0074, in the last paragraph, there's a reference to the MAEPRIC concentrate?
A. Yes.
Q. What is that?
A. That's phosphoric acid as it's delivered to the job site.
Q. If you look at Page 77, the next to last paragraph that talks about all treatment, the second to the last sentence of that paragraph, says, "All treatment operations in the hot zone took place in Level C protective equipment." Do you see that?
A. Yes.
Q. What's a hot zone?
A. Contaminated work area on a contaminated piece of property in a project site.
Q. Contaminated with what?
A. Whatever the contaminants were on the job site. I would assume lead, but I don't know that. Probably lead.
Q. Any radioactive material?
A. No. That doesn't mean radioactive. No, this means -- hot zone is an exclusion zone where people cannot go without personal protective equipment. Level C is respiratory protection.
Q. What is D008 soil?
A. It's a hazard classification associated with a waste product

that leaches lead in excess of five milligrams per liter. It's toxic -- toxically hazardous. Its toxicity causes it to be hazardous, and that's the classification that the EPA puts on that waste. D008 is a characteristically hazardous waste for lead.

Q. Mr. Yost, did you have an opportunity to review the documents that we sent to you to look at?

A. I read a lot of them. I didn't get to read all of them.

Q. Did you read the RMT documents?

A. I did.

Q. Tell me what you understand the RMT process to have been in those documents.

A. RMT. You're talking the General Motors, Defiance?

Q. Yes.

A. They use phosphoric acid to render a slurry of scrubber product ash material to a nonhazardous level as defined by EP TOX. And the PH of that material was all alkaline again, so very similar to O'Hara. I was curious, though, that they did have an awful lot of leachable lead in their total leads in their sediment stuff, but when they looked at their water that was separated from the material, it didn't show any results, so it's very possible they could have washed a lot of the lead out into the water that they generated. Can't show that it didn't do that.

Q. Did you understand from reading the RMT report that the

treatment included treatment of sludge from a basin?

A. Yeah, and it was a scrubber product sludge, cupola top, which, if you look at the PHs, it's all hydroxides again, and it was EP TOX.

Q. Do you understand that in the project they also treated the first foot of soil from the basin?

A. They said they dug it up. They said there was some clay in there, but I never saw any -- everywhere I saw results in the lab, data for that said that the soils were not impacted, so I don't know. I didn't see any specific data on soil. But if it had leachable lead and they used phosphoric acid at a high PH, it probably rendered it nonhazardous by EP TOX.

Q. This would be, as far as looking at the claims like we did before with the --

A. Again, with respect to O'Hara, as I said, it's very similar to O'Hara. They use high PH, it was an ash product material. The only difference would be the water content, and therefore their hydroxide system of phosphate, which is very similar to O'Hara, which I'm surprised O'Hara didn't look at that, but that's a different issue.

Q. Where does it say in the RMT material that it was a high-PH material?

A. In the lab data.

Q. Was that from the addition of lime?

A. It was in the raw data there that was there. The lowest PH I

saw that had a failing TCLP lead was 8.3.
Q. I'm sorry?
A. The lowest I think I saw was around a PH of eight. And the source of all that lead was from a scrubber ash and their cupola operations, and that is typically an alkaline material. So it's a scrubber gas product, same as O'Hara.
Q. But once again, there's nothing in the claims of the asserted patents that would exclude their application to a material that contains some lime or hydroxide component?
A. Whose asserted patents? Whose --
Q. Sevenson patents.
A. There's nothing -- say that again, now.
Q. We went through the claims before. Remember some examples, Claim 1, Claim 12 of the 982 patent, and we looked at the O'Hara patent, and we talked about whether the O'Hara process would infringe.
A. Okay. In my opinion it would. If Sevenson makes that claim, that's up to them.
Q. Now, the RMT process, I assume, would be the same?
A. I would say the same, if it was my opinion, because again, they're hydroxide. They're not -- they're not -- the O'Hara patent and if you want to look at the RMT patents, which are Stanforth, they teach hydroxide and phosphate.
Q. I'm not talking about the RMT patents.
A. I know, but what I'm saying is that those are two patents

that are similar to each other which are far different than what Sevenson teaches.

Q. I'm talking about what RMT did in this project. We can mark these project materials as a collective exhibit.

A. They treated their lead --

MR. GRAHAM: One second.

THE WITNESS: They treated their lead --

MR. SZANYI: Wait. She can't do two things at once.

(Exhibit No. 20 marked for identification.)

THE WITNESS: I'm trying to get done so we can get out of here.

MR. SZANYI: We're going to get out of here no matter whether we're done or not, so don't worry about it.

Q. What were you saying about hydroxides?

A. Both O'Hara and RMT's technologies and what their project in Defiance, Ohio, is, show that lead can be rendered nonleachable under EP TOX using phosphates and hydroxide. That's what they both show, and that's what they did in those projects. The Sevenson patents, again, don't care what the PH is, and they have a phosphate/sulfate system. There is a place there where the two can overlap. Now, whether that's infringement or not, I think it is and they probably think it

is towards this patent, but that's not my call whether it is or isn't.
Q. Now, the RMT project, though, that was done at Defiance--
A. Yes.
Q. --they did not add any alkaline to the material; correct?
A. It was already in it.
Q. And they treated it in a single step with phosphoric acid; correct?
A. Yes. If I remember, they pumped it into the pipe of a flue they were pumping.
Q. Where do your claims talk about the manner in which the material is contacted?
A. It doesn't. I'm just talking about that's where it was added. You asked about where they put it and I said that's where they add it.
Q. My question is, if the RMT process was carried out today, would it not infringe at least those claims that we talked about before that the O'Hara patent would infringe?
A. Say that one more time.
Q. If the RMT process that's described that took place at Defiance was carried out today, would it not infringe the claims that we talked about of the 982 and the other patents of the same reasons that we talked about for the O'Hara patent?
A. In my opinion, they would. They'd passed -- they'd passed

the leachability test. They added sulfate and they added phosphate.

Q. And that's all it takes?

A. That's all it takes. But they also use the O'Hara patent, which was -- which was what they reported and showed in the data that it was hydroxide and it was phosphate.

Q. Now, we also sent you, I believe, a report on a New Hampshire--

A. Yes.

Q. --project. Did you have a chance to read that?

A. I did.

Q. This is what we'll mark Exhibit 21. Interim Report of Eighmy.

(Exhibit No. 21 marked for identification.)

A. Eighmy? Is that how it's pronounced?

Q. I think you pronounce the E-i-g-h-m-y as Eighmy [A-me].

What is your interpretation of the process that was used in that project?

A. Again, I can't remember all the details on it, but I believe he was looking at municipal incinerator ash material that was amended and unamended with phosphates and he subjected it to the various run-on/run-off solutions of water, and I can't remember all that was done to it. I'd have to go back and

look at it in great detail, but again, it was an ash material and the PH was elevated, so he was following the Wheelabrator or O'Hara patents, and I believe also he was looking at, if I'm not mistaken, the EP TOX, but I'd have to go back and look.

Q. Once again, the claims that we looked at don't contain any limitations that would exclude a material on the basis of its PH; correct?

A. O'Hara's claims do exclude PH ranges.

Q. No. I'm talking about the Sevenson claims.

A. They don't include or exclude.

Q. And so, like the RMT process, the process described by Eighmy, which uses a phosphoric acid that contains sulfate impurities, would infringe the claims of the Sevenson patents for the same reasons we talked about?

A. That's my opinion, yes. I mean, that's -- they don't know they did because they're in hydroxide. Going back to the RMT, I don't know if you got that comment. I think this one -- and I don't remember reading the part of what happened here, but under the RMT work in Ohio, it's very possible because the fluid content was so high that some of that lead was carried out in the water, versus staying in the solid, the total lead out of the solids, it wouldn't necessarily be leachable, so that couldn't be determined from that data. And I didn't get to read that about this in here. Again, I

don't remember.

Q. Did you notice also in the Eighmy report in the description of the test cell that the bottom of the cell contained a layer of sand?

A. Well, the drainage material, I remember, let the fluids out.

Q. It was collected and then tested, for collection of the LeachAid?

A. Yeah. It's usually to let water flow out of it. They pull the water through the sand and they put a tap in it, I understand it, and pull the water through it.

Q. Correct.

A. That was put in there, and then they put the treated material on top and the untreated material on top. Just a very -- didn't treat it necessarily.

Q. Well, let me ask you, would not some of the phosphoric acid from the treated material infiltrate the sand?

A. Could have. I don't know that it did or didn't.

Q. So you couldn't dispute, if someone else testified that it did, you have no basis to dispute that?

A. If they had data that showed it would, I would believe it more.

Q. Well, the treated material is sitting on top of sand and water is percolating down through there carrying leachable lead, are you saying that at least one molecule of it did not infiltrate the sand?

A. If it contained leachable lead, it would have gotten in the sand.

Q. Along with the phosphoric acid?

A. If the phosphoric acid was leaching out, yes. If phosphoric acid wasn't leaching, no, it wouldn't.

Q. Well, did you also have an opportunity to review the Nriagu papers that we sent to you?

A. Not entirely, but I did. Briefly. I didn't finish them all and I read a couple of them.

Q. Had you seen these before?

A. No, I had not.

Q. What was your impression of these papers?

A. They were very interesting. He had some good information about the formation of lead phosphate compounds and solubility products, and his conclusion was that that technology was critical and important for natural situations and natural settings and possibly could lead to the formation of work within the human bodies. And our patents, I understand, are being generated that are leading to that. They're precipitating and forming invetro -- precipitating cartilage and joints out of a phosphate system. The other thing he taught was PH was again the solubility issue on what forms were soluble and what were not in natural systems.

Q. Does he not teach that lead phosphates are highly stable in acidic environments?

A. Yes.
Q. Does he not also teach --
A. Acidic environments meaning low PH, which means low hydroxide and high hydronium ion. He doesn't teach in hydronium ion and the acetate ion, which is acetic acid.
Q. Does he not mention specifically highly acidic solutions?
A. Highly acidic is alkaline. Low acid is acid. He does mention both. But he doesn't talk about TCLP fluid, which is the acetate. Looking at hydronium ion and acetate versus hydronium ion, he didn't talk about it. Chlorides, for example, he said lead phosphate chlorides are very stable, so that would be hydrochloric acid. He doesn't get into that. He doesn't teach that. He teaches chloride, but he doesn't teach acid other than acidity. He doesn't teach which acids.
MR. SZANYI: I think our seven hours are up.
MR. GRAHAM: What do you show?
THE COURT REPORTER: Let me look back at our breaks.
(Discussion off the record.)
MR. SZANYI: I just want to say on the record, we just had a discussion with the court reporter, who said we started at 8:55, went until 5:10. We took three breaks. One for 10 minutes, the next one for 10 minutes, the next one for an hour and eight minutes. That's an hour and

28 minutes of break. Is that correct?

THE COURT REPORTER: Yes.

MR. SZANYI: Okay. And so now that means we have 13 minutes left, but I'm saying go ahead and take 20 minutes until 5:30 and then we're going to end and stop. That will be more than seven hours. So go ahead.

MR. GRAHAM: And we're going to finish the deposition.

(Exhibit No. 22 marked for identification.)

Q. So we've got Exhibit 22, which is the Nriagu papers here that we sent you to look at. Did you have an opportunity to review these?

A. I looked at them; it's got enough for the intense chemistry and formulas in here that I didn't really sit down and digest what they were saying.

Q. Did you look at the solubility charts?

A. Briefly.

Q. Do you know how to interpret those?

A. To some degree.

Q. Figure two on Page 321 that has the solubility of various lead phosphates--

A. Mm-hm (answers affirmatively).

Q. --as a function of PH. How do you interpret that?

A. That as the PH increases, the solubility decreases.
Q. How about Figure 1 on the previous page?
A. Figure -- I'm looking at Figure 2 a second. I can't make a general statement because you've got two different curves here on that, so as one drops the other increases.
Q. So you're not able to draw any conclusions from --
A. Well, it depends on a specific mineral.
Q. Does Nriagu not teach that lead phosphates are highly stable in the environment?
A. In the environment? Yes, he does.
Q. Does he not also teach a manner of rendering lead materials nonleachable is to reacting with phosphates?
A. Nonleachable is defined by what solvent? Water? Yes, he does.
Q. On Page 323, again, we're talking about the Nriagu document that is Chapter 10, Formation and Stability of Base Metal Phosphates in Soils and Sediments. Page 323.
A. Okay.
Q. Beginning Figure 3, depicts the phase relationship for uranium-bearing lead phosphates. Do you see that?
A. Yes.
Q. How do you interpret that?
A. Depicts the phase relations of uranium-bearing -- talking about uranium phosphate and its phase relations and various PH arrangements. He 's teaching PH, very similar to what I

suppose O'Hara and RMT teach.
Q. If you move down the page to the end of the paragraph before the last paragraph --
A. There's "UO2 phosphates very stable."
Q. Yeah. The sentence beginning, "The great stabilities of UO2 bearing phosphates, it is here suggested that the formation of these compounds may be one of the processes which demobilize uranium in sedimentary environments."
A. I don't see that. In soils and sediments. Okay.
Q. Do you see that?
A. My eyes jumped. Bearing phosphates hitherto not been considered in the dis -- something of forms of uranium in soils and sediments.
Q. And then the next sentence?
A. "It is here suggested that the formation of these compounds may be one of the processes which demobilize uranium in sedimentary environments."
Q. Does that not teach that a way to immobilize or reduce the leachability of uranium radioactive materials is to react them with phosphates?
A. No. It says, "The great" -- I don't know what that word is after "the great." "Stabilities of uranium-bearing phosphates have not been considered...suggest that the formation of these compounds may be a process which demobilizes." So that could naturally; it could be

otherwise. But it's under natural conditions, thus natural PHs in soils and sediments. It doesn't talk about TCLP. It's natural conditions, which are sedimentary environments.
Q. Is that--
A. Sediments and soils.
Q. --not the aim of treatment of uranium-bearing materials for leachability, to try to put them in a stable form in the environment so that they won't leach?
A. That's what he's doing. That's not what we did.
Q. So you're not trying to make them so they're nonleachable when they are placed in the environment?
MR. SZANYI: Object to the form.
THE WITNESS: Well, we're talking about in a landfill condition. Look at our fluids that we were teaching to, they weren't natural waters. Well, we did talk about ground waters, I guess.
Q. Right.
A. We basically did it and showed that it does work.
Q. Did he not foretell that here?
A. Uranium-bearing phosphates. Again, it's in sediments and soils, so... He didn't talk about ground water. He didn't talk about acidic PHs. He didn't talk about de-ionized water. So it's a different setting, different solubility, different chemistries. The fluids are different that you're using as a solvent. If you go up above, he talks about

natural waters.

(Exhibit No. 23 marked
for identification.)

Q. Let me have you look at another document that's been marked 23.
A. Can I add one more thing on this?
Q. Sure.
A. He doesn't teach anything about using sulfates and phosphates to generate -- he just talks about phosphates, so we actually did it and we had to use sulfates to make it happen.
Q. Okay. If he did talk about sulfates, would that change your view of what he teaches?
A. No, because it's still in natural waters and natural sediments.
Q. If he teaches the stability of sulfates and phosphates, lead sulfates and lead phosphates through a range of PHs?
A. Well, again, the PHs are not what we teach. We teach in the presence of the TCLP fluids, which is of acetic acid. We talk about -- and I can't remember. I'd have to go through all the patents.
Q. So you say that Nriagu doesn't predict what you say is your invention because he doesn't mention sulfates, lead sulfates?
A. He doesn't mention soluble sulfates.

Q. Okay.
A. Doesn't mention --
Q. You don't think he does?
A. My opinion.
Q. I just don't want you to say that we've agreed with you, because I happen to know what's in there. Maybe you didn't see it, but it's in there.
A. I haven't read it, so I don't know.
Q. But secondly, you say he doesn't talk about the stability of these materials at low PHs?
A. No. I said PHs are relevant. I was talking about the acetic acid that's used in the TCLP test. He's also talking about the natural waters, sediments and when to use the word, sediments and soils and sedimentary conditions. In that one sentence he's talking about in soils and sediments, so those -- you know, that doesn't have an acetic acid.
Q. So he would have to mention the acetic acid--
A. Well, that's --
Q. --to predict --
A. To look at the solubility.
Q. --what you say your invention is?
A. Yeah. The PH -- a PH of two of acetic acid and a PH of two of hydrochloric and a PH of two of citric acid, you're going to have different solubilities. Assuming you're putting that same compound equivalent to all three of them, you're going

to have different solubility of those. So it depends on what acid and what the ions are.

Q. Those PH logs or tables that he has, if it turns out that those were with acetic acid PH, how would that change your opinion?

A. I'd have to look at the fluid he used and what test he used to see what it did, because again, we're look at the TCLP TOX test.

Q. As I understand it, there are two types of TCLP fluids?

A. Yes.

Q. And one uses a PH of approximately five?

A. 4.93 maybe.

Q. Right.

A. Something like that.

Q. And the other uses a PH of a much lower PH?

A. 2.8.

Q. So why would you not be able to look at the PH charts in Nriagu and determine or predict the solubility of the lead phosphates from those tables?

A. Well, that's why nobody can predict results of the TCLP or the EP TOX test because it's also the physical tumbling associated with it. It's the filtration of it, the size of the filtration and the particle that's filtered out and left in the fluid. It's the duration. It's the relativity of the weathering that's assembled as it's simulated in the test.

Q. Okay.
A. So it's not the same. It's different.
Q. Exhibit 23 to --
A. I've got one here. Disclaimer. Is that what I'm looking at now?
Q. Yeah. It's the Kim paper.
A. Page 23?
Q. Did you read that?
A. Did I read this one? I don't know if I read this one or not. I remember the name. Can I look at it for a few seconds just so I can get familiar with what it says if I did read it.
I don't remember reading this in detail. I saw it, but I don't know if I read it. I kind of went on because I looked at what it was saying and I just didn't have time to dig into it. Something for Department of Energy. I'd have to take a look at it and spend some time to really understand it, but maybe I can answer it.
Q. Well, the two rad patents we've talked about, the 367 and 608, I don't remember what their exhibit numbers were, but what I wanted to ask you is if this process would infringe those claims or the process that's talked in this paper, which, as I understand it, and you can tell me if you have a different interpretation, teaches radioactive materials with phosphates, including phosphoric acid--
A. Well, I don't know what the results are.

Q. --would render the material nonleachable?
A. I don't have the answer to that, because I see they leached it here with tap water and calcium chloride. How they did another test, I don't know.
Q. Well, where in your rad patents do they talk about how much the leachability has to be decreased?
A. I don't think we did.
Q. So why would this paper not infringe the claims of those rad patents?
A. I'm just saying that they use the tap water and a calcium chloride solution, and I don't know that they reduce leachability in other fluids like what we looked at. We looked at ground water. We looked --
Q. Where in the claims of those two patents does it require that you read the leachability of a particular fluid?
A. I don't know. I'd have to look. I don't know what it says. It just reduces the leachability. I think. Is that what it says?
Q. Correct. If you look at Page 5 --
A. When was this? I don't have a date on this.
MR. SZANYI: There's no date on this one.
MR. KRESSIN: I looked at the conference and it was done in 1991, so...
THE WITNESS: Well, they did say here that it's fairly high in mobility under neutral acidic soil

conditions.
Q. If you would look at Page 5, perhaps it would help. The page numbers are written at the bottom. The section that begins, "Effective phosphate solution PH." It talks about using a phosphoric acid.
A. It's buffered at PHs 6, 7 and 8. That's in that paragraph?
Q. Yes. "Using phosphoric acid."
A. Well, right there they're saying phosphoric acid is buffered at 6, 7 and 8, so it's got to have hydroxide in it to get the PH up that high, so again, they're teaching somewhere to what falls into O'Hara and RMT.
Q. And where did the claims in the rad patents exclude a process that would be carried out at these PH values?
A. They don't. That's what these folks teach here. We teach no PHs. It's irrelevant. PH is moot.
Q. This thing goes on to say, "The treatments of the phosphate solutions at all PH levels reduce the leachability of 90Sr in comparison with the untreated control soil column."
A. Where are you looking? I'm sorry. Where are you reading from?
Q. In the middle of the paragraph.
A. Page 5?.
Q. Yes.
A. I'm assuming it means all PH studies that they ran it at, 6, 7, 8 and 9.

Q. All right. It says, "The treatments of the phosphate solutions at all PH levels reduced the leachability of 90Sr in comparison to the untreated control soil column."
A. Okay.
Q. "Soil columns treated with phosphate solution at higher PH had lower leachability." Do you see that?
A. That supports the hydroxide culture as well.
Q. Once again, where in your rad claims would one find this process to be excluded?
A. Where would we find it to be excluded? Again, we don't include it either.
Q. Would this phosphoric acid that was used here not inherently include both phosphate and sulfate ions?
A. It would, but this includes hydroxide.
Q. Where do your claims exclude hydroxide?
A. Where do they exclude hydroxide?
Q. In the rad patents.
A. We don't exclude it, but we're not including it. We teach sulfate and phosphate.
Q. So one would not --
A. They're teaching hydroxide here, again, with phosphate.
Q. One would not avoid those claims or escape infringing those claims by adding a hydroxide; correct?
A. Well, what they're doing here is they've understood that hydroxide is important or they wouldn't have changed the PH.

If they felt sulfate was important, they would have had it analyzed for that and looked at different ratios, so they are talking phosphate with hydroxide presence, is what they're teaching. That's what they're talking about. Now, whether it's an infringement or not on our patent, as you asked, I would say it would be if they had phosphoric acid, but that's my opinion.

Q. As I understand this, and you can tell me if I'm wrong, they have soil that contains strontium-90, a radioactive material, and they're treating it with phosphoric acid to reduce the leachability. Correct?

A. Not totally correct, because they're also adding hydroxide to it.

Q. I didn't say that was the only thing they were doing.

A. You have to look at it. You can't exclude that.

Q. How does that affect whether it reduces the leachability?

A. The higher the hydroxide content is consistent with what Nriagu said and the other folks we looked at, O'Hara and the others, that constituents that are typically considered by the culture of engineers and treatment people is that metallic hydroxide and also radionuclide hydroxides are fairly insoluble. That's the culture. That's a consistent theme that most engineers and treatment people look at. We're one of the first to show phosphate and sulfate difference than hydroxide. This shows hydroxide. They

isolated hydroxide by affecting the PH enduring it. So they've isolated at different levels and they've showed that -- they treated with the phosphate. The more hydroxide you add, the more insoluble it becomes.

Q. But Sevenson and you are taking a position in this case that any phosphoric acid that would be used would contain some amount of sulfate; correct?

A. That's correct.

Q. And this process that's described in this paper used phosphoric acid; correct?

A. That's correct.

Q. And treated soil containing radioactive material; correct?

A. That's correct.

Q. And the result was a reduction in the leachability of the radioactive material; correct?

A. It did, but it also had PH changes and high PH.

Q. And where --

A. They're teaching hydroxide/phosphate chemistry. That's what they're teaching here. They're not teaching anything about sulfates.

Q. Where in the claims of the rad patents does it say that you cannot increase the PH?

A. We don't teach PH one way or the other. It's not what we teach. These people are teaching PH. O'Hara's teaching PH. RMT folks are teaching PH. We teach sulfate/phosphate. We

don't care what PH is.

Q. So your claims don't exclude any process based on what the PH was?

A. We don't care what the PH is.

MR. SZANYI: That's it. What time do you have now?

THE COURT REPORTER: 5:36.

MR. SZANYI: Okay. Do you agree we've gone for more than seven hours?

THE COURT REPORTER: Yes.

MR. SZANYI: Can we put this on the record then? It's now 5:36 and we started at 8:55, which means we've gone for eight hours and 40 minutes. We've taken three breaks according to the court reporter's calculations for one hour and 28 minutes, so we're over seven hours, and Ms. Court Reporter, do you agree?

THE COURT REPORTER: Yes.

MR. SZANYI: Are you putting your response down on that transcript?

THE COURT REPORTER: Yes.

MR. SZANYI: All right. We're all done. Thanks very much.

MR. GRAHAM: Well, I'm not done until I'm through.

MR. SZANYI: Well, you are through for

today, because more than seven hours have transpired.

MR. GRAHAM: Well, let the record reflect,

MR. SZANYI: I'm not finished talking right now. More than seven hours have transpired according to the court reporter. We stayed for an extra 10 or 15 minutes because you were in the middle of a document and I didn't want to stop you, out of courtesy to you. We told you ahead of time that we were going to spend seven hours today. You knew that. If you wanted more time --

MR. GRAHAM: And I told you right then--

MR. SZANYI: I haven't finished talking.

MR. GRAHAM: --I wasn't agreeing to that.

MR. KRESSIN: Let him finish.

MR. SZANYI: Let me finish talking, please. And if you wanted more than seven hours for this deposition, the time to arrange that was prior to today by calling the magistrate or making a motion or asking for additional time, and that never transpired. We've now gone for more than seven hours and we're done. If you wanted more time, the time to get that was before we came to Seattle, and you can't reach the Court because it's now almost 9 p.m. in Buffalo.

MR. KRESSIN: Okay. And just for the record, we told Mr. Szanyi before this deposition started

this morning when he could have called the magistrate and filed an objection to us going more than seven hours by half an hour or a few minutes to get this thing concluded, that that may occur, and he didn't take it upon himself at that point to call the magistrate to object to us going more than seven hours.

MR. SZANYI: I told you at the beginning of the day I was not allowing more than seven hours. There was no --

MR. KRESSIN: I told you our position as well.

MR. SZANYI: Well, there was no --

MR. KRESSIN: Our position was totally clear.

MR. SZANYI: And so was mine.

MR. KRESSIN: You know that Mr. Yost was appearing here wearing two hats.

MR. GRAHAM: And note for the record that Mr. Yost and Mr. Szanyi have left the deposition before we have declared it to be finished.

(Signature reserved.)

(Deposition adjourned at 5:38 p.m.)

I, **KARL W. YOST**, do hereby declare under penalty of perjury that I have read the foregoing transcript of my deposition; that I have made such corrections as noted herein, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _______ day of _________________, 2004, at _______________(City), ___________________________ (State).

______________________________________

**KARL W. YOST**

STATE OF WASHINGTON ) I, Kellie A. Smith
) ss CCR SMITHKA225J5 a
County of Pierce ) duly authorized Notary Public in and for the State of Washington residing at Tacoma, do hereby certify:

That the foregoing deposition of **KARL W. YOST** was taken before me and completed on **October 7, 2004**, and thereafter was transcribed under my direction; that the deposition is a full, true and complete transcript of the testimony of said witness, including all questions, answers, objections, motions and exceptions;

That the witness, before examination, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth, and that the witness reserved the right of signature;

That I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel and that I am not financially interested in the said action or the outcome thereof;

That I am herewith securely sealing the said deposition and promptly delivering the same to Attorney **MARK S. GRAHAM**.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 21st day of October, 2004.

KELLIE A. SMITH NOTARY PUBLIC COMMISSION EXPIRES 8-09-08 STATE OF WASHINGTON

Kellie A. Smith

**Kellie A. Smith, CCR**
Notary Public in and for the State of Washington, residing at Tacoma.