**Exhibit 22**

**IN THE UNITED STATES COURT**
**OF FEDERAL CLAIMS**

| | |
|---|---|
| **SEVENSON ENVIRONMENTAL SERVICES, INC.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**THE UNITED STATES,**<br><br>**Defendant.**<br>**and**<br><br>**SHAW ENVIRONMENTAL, INC.,**<br><br>**Defendant-Intervenor.** | **Case No.: 05-1075C**<br>**Judge Thomas C. Wheeler** |

ADDITIONAL DECLARATION OF GARY M. PIERZYNSKI, Ph.D.

I, **Gary M. Pierzynski, Ph.D.**, state and declare as follows:

1. I am a professor of Soil and Environmental Chemistry in the Department of Agronomy at the Kansas State University, located at 2004 Throckmorton Plant, Manhattan, Kansas 66506-5501.
2. I am over 18 years of age and am competent to make this Declaration. I make this Declaration based on my own personal, scientific and expert knowledge and experience. If called as a witness, I could truthfully and competently testify to the matters stated in this Declaration.
3. This is an addition to my Declarations made on June 27, 2007 and July 27, 2007.

**There is nothing "separate and distinct" about Prayphos P5.**

4. I understand that the patents at issue ('982, '367, '123, '608, '485) claim a "first component" for supplying compound(s) of sulfate that is "separate and distinct" from a "second component" for supplying compound(s) of phosphate. This understanding is consistent with this Court's claim construction of March 28, 2007.

5. I have reviewed Sevenson's Motion for Partial Adjudication and Motion in Opposition. Sevenson is arguing that the phosphate ions and the sulfate impurities in the Prayphos P5 phosphoric acid are "separate and distinct compounds." It is true that the Prayphos P5 phosphoric acid contains sulfate ions and phosphate ions that are chemically-distinct species. This is what I understand Sevenson to be arguing in its Motions.
6. However, the phosphate ions and sulfate ions that comprise Prayphos P5 are not "separate and distinct" as taught by the patents, and as this Court has ordered in its claim construction.
7. All commercially produced phosphoric acid made by the wet chemical process contains some level of sulfate and other impurities, i.e., the purchased acid are liquid solutions containing different chemical species. Phosphoric acid is not "separate and distinct" from its sulfate impurities, because as impurities these sulfate ions are by their nature *unseparated* until separated.
8. As I have previously indicated, Prayon carries out several additional steps to purify its phosphoric acid. These steps include using a mixed organic solvent to extract impurities such as sulfate, fluorine, and arsenic; using flocculating agents, filtration and centrifugation to separate the calcium sulfate by-product and other impurities; using additional precipitation additives to reduce the fluoride, arsenic, and heavy metal concentrations; then further solvent extraction steps. These steps remove unwanted impurities, such as sulfates, and therefore increase the concentration of the desired chemical species, such as phosphate.
9. The purification steps are examples of chemical separation processes. These processes physically separate chemical species. Prior to undergoing chemical separation processes, chemical species are *unseparated*.
10. Contrary to Mr. Yost's assertion that the sulfate impurities are "separate and distinct" because they can be separated, I believe that the fact that they are "impurities" and can be "separated" shows that when present in Prayphos P5 they are *unseparated*.
11. A very simple analogy is with air. Air is approximately composed of nitrogen (78%), oxygen (20.95%), argon (0.93%), carbon dioxide (0.038%), and trace gases (approx. 1%). Air is a combined source of nitrogen, oxygen, argon, carbon dioxide, and the trace gases. Each of these gases, including the trace gases, is a chemically-distinct species.

They are subject to different measurement techniques, and have different chemical properties. However, air cannot simultaneously be a source of nitrogen and a "separate and distinct" source of the trace gases.

12. If a hypothetical claim required a "first component" for supplying nitrogen that is "separate and distinct" from a "second component" for supplying argon, then air could serve as the "first component" *or* the "second component." However, air cannot simultaneously be the "first component" *and* the "separate and distinct" "second component."

13. The molecules of the various gases in air are certainly chemically-distinct species. However, they are not "separate and distinct," as they are inter-mixed. It is possible to separate the chemically-distinct gases in air, for example by cold-temperature distillation. Until such a separation process occurs, these gases remain *unseparated* and therefore not "separate and distinct."

14. For the same reason, commercially purchased phosphoric acid is not two "separate and distinct" components. It is a single component. It cannot simultaneously serve as a "first component" for supplying sulfate that is "separate and distinct" from a "second component" for supplying phosphate. Neither can the chemically-distinct ions, such as sulfate ions, $SO_4^{2-}$, and phosphate ions, $PO_4^{3-}$.

15. After studying the patents, any person of ordinary skill in the art would understand that phosphoric acid is a potential "second component." There are numerous references to phosphoric acid as a member of the "group two treatment chemicals." The only variation is in the case of the two patents dealing with radioactive materials ('367 and '608). As I discuss below, these patents teach that only phosphoric acid with extremely high levels of sulfate are sufficient to reduce the leachability of radioactive materials.

16. The '367 and '608 disclose that "Technical grade phosphoric acid ("TGPA") that contains up to 70% (by weight) phosphate (as $P_2O_5$) and sulfate ($SO_4^{-2}$), typically as sulfuric acid in the range of 2.5% to 7% (by weight) as an impurity, is a source of both a sulfate ion and a phosphate ion and can, therefore, be used as a single reactant." A person of ordinary skill in the art would know that the term "TGPA" does not have a precise range of sulfate impurities across the industry. However, a person of ordinary skill in the art would read the disclosure of 2.5% to 7% (or 25,000 ppm to 70,000 ppm) as

a teaching that the claimed process required a considerable sulfate impurity presence. A sulfate impurity concentration of 25,000 ppm is well-above the typical amount in a technical grade phosphoric acid. This is why a person of ordinary skill in the art would understand the term "TGPA," as disclosed and used in the patents, to require at least 25,000 ppm of sulfate impurities.

17. Further, a person of ordinary skill in the art would not conclude that the use of purified phosphoric acid was protected under the '982, '123, and '485 patents because the patent claims were clear in identifying that an additional sulfate component was necessary, and neither the specification nor the claims referenced any variation in the level of phosphoric acid purity.

**One molecule of sulfate is insufficient for the reactions taught in the patents to proceed.**

18. Mr. Yost offers a domino analogy at paragraph 57 of his Declaration. This analogy describes the properties of dominos, not crystallization or mineral formation. This analogy represents the extreme case of a perfect distribution of lead, phosphate, water, and other important chemical species within the contaminated soil. It certainly does not prove that one ion of sulfate is sufficient.

19. First, the patents teach to sets of reactions, the first consuming sulfate ions to produce sulfate minerals, and the second consuming phosphate ions to produce phosphate minerals. There is no teaching of a catalytic reaction in any of the patents. In a catalytic reaction, the reaction proceeds (consumes the reactive species) without consuming the catalyst. Catalysis is the acceleration (increase in rate) of a chemical reaction by means of a substance, called a catalyst, which is itself not consumed by the overall reaction. Given the reaction equations in Sevenson's patents, the reactions consume sulfate and therefore sulfate is not a catalyst.

20. I have reviewed all of the patents at issue, and in none of the patents do the inventors disclose sulfate acting as a catalyst. In fact, the reactions disclosed in the patent show that sulfate is not a catalyst, but in fact a reactant that forms moderate soluble $PbSO_4$ and insoluble or low solubility sulfate-substituted apatitic minerals.

21. If one wanted to use dominos to illustrate crystal formation, the scene would be quite different that a million dominos lined up close enough to touch one another if one fell.

Consider a square with an area of 100,000 square feet and 1,000,000 dominos (an average of 10 per square foot) on end distributed throughout the area. Each domino represents a lead, sulfate, or phosphate ion. The distribution of dominos would not be entirely random or uniform as clusters of ions may exist (such as a piece of elemental lead) and there would not be equal numbers of all three reactants. If one lead and one sulfate ion were to combine to initiate crystal formation, additional lead, sulfate and phosphate ions would need to move toward that site to continue crystal growth unless the reactants were in such close proximity that crystal growth could continue without ion movement. The latter scenario is extremely unlikely given that the lead concentration of the contaminated soils were relatively low. Thus, falling dominos do not reflect crystal growth.

22. Another shortcoming of the domino analogy is that fact that there would be soil particles mixed in with the dominos. The soil particles themselves could serve as nucleation sites for lead phosphate crystal formation. Thus, numerous crystals would form and there would not be a single, large crystal as implied by the domino analogy.

23. Both of these arguments further illustrate the improbability that a single sulfate ion or low levels of sulfate could make a meaningful contribution to the reduction of lead leachability in soils via phosphoric acid additions as claimed by Sevenson. The single or few sulfate ion(s) would need to initiate one crystal, be released from that crystal, and then be transported to a new site within the soil containing the necessary reactants to form another crystal innumerable times.

24. Mr. Yost also proposes a water analogy at paragraph 58 of his Declaration. This example also serves to explain the need for nucleation sites, where two reactive species can meet and react to form crystal structures. The example of pure water attempting to freeze, however, is a far cry from the immobilizing reactions that occur in soil. This is because there are numerous nucleation sites in soil for crystal growth.

25. The use of ice crystal formation as an analogy for the formation of the lead-sulfate-phosphate crystals in not appropriate. In this case, a liquid comprised of water molecules is converting to a solid. The water molecules are in close proximity to one another and simple orient themselves properly to continue crystal growth one crystal growth has been

initiated by a "seed". The lead-sulfate-phosphate system is not a liquid converting to a solid. Further, the "seed" that starts the process is retained within the crystal and only participates in the formation of one crystal. Thus, any extrapolations to a single sulfate ion acting as a seed or catalyst for multiple crystal formation is incorrect.

26. The patents do contain some examples of phosphoric acid, applied to contaminated soil as a single treatment chemical in a single step, failing to reduce the TCLP level to below regulatory standards. Example 5 in the ''982 patent explains that "Single application of the phosphoric acid … was short of meeting the regulatory threshold of 5.0 mg/l by TCLP Test criteria for lead." The patents also contain some examples showing that phosphoric acid, alone, did reduce the TCLP level to an acceptable level. For example, Table III of the '982 patent shows that a 15.1% solution of phosphoric acid yielded a TCLP level of 3.6 mg/l. Since these phosphoric acids inevitably contained some amount of sulfate impurities, surely more than one molecule, yet in some instances phosphoric acid failed to meet the TCLP level, Sevenson's contention that only one molecule of sulfate is needed is inconsistent with the teachings of the patents.

27. Further, one of ordinary skill in the art would know that it is impossible to add merely one ion of sulfate to a contaminated soil. Reading the patents, though, one of ordinary skill in the art would understand that the "first component" is a treatment additive such as those the patents list as "group one treatment additives."

28. The patents at issue reference a phosphoric acid of undefined purity which did not work at times. As phosphoric acid has sulfate impurities, this suggests that since phosphoric acid does not always work, there must be a minimum amount of sulfate ions necessary to carry out the reactions defined in the patents. One ion simply is not enough.

**The person of ordinary skill in the art would not read these patents and think in terms of distinct chemical species.**

29. The hypothetical person of ordinary skill in the art would not read these patents and think in terms of pure chemical species.

30. Pure chemical species are rare in the fields of environmental chemistry and soil chemistry. Persons of ordinary skill in these fields, and nearly all of the related chemical fields, know that a chemical such as phosphoric acid will always have some impurities.

31. Similarly, persons of ordinary skill in the art understand that available treatment additives have impurities in them. It is understood that in most cases, the impurities have no significant impact on the stabilization treatment process. This happens to be the case with Prayphos P5, as a sulfate concentration of 350 ppm is negligible from a chemical reaction point of view.

32. When developing or working with treatment processes, the person of ordinary skill in this art would: (1) review existing lists of reagents to remove contaminants of concern from water, (2) review solubility coefficients (Ksp) for pure compounds, and (3) review literature for commonly existing minerals that are stable in the environment, such as in river bed or in the ocean. This simple review would reveal the presences of insoluble minerals that could possibly be used for precipitation and immobilization, e.g., $PbCO_3$, $PbSO_4$, $Pb(OH)_2$, $Pb(CO_3)(OH)$, $Pb_3(PO_4)_2$, and other various minerals from apatite family which ranges from the calcium apatites to pyromorphite ($Pb_{10}(PO_4,AsO_4)_6Cl_2$) and the full range of substituted apatitic minerals where various cations (e.g., Fe) and anions (e.g, $SO_4$) substitute in for Ca, Pb, $PO_4$, $AsO_4$ in the end members.

33. Further, one of ordinary skill in this art knows that it is impossible to add a single molecule to a soil pile, or any other contaminated media. From any practitioner's perspective, adding a single molecule simply makes no sense. Although the patents reference treatment additives that can supply one ion of sulfate or phosphate, the person of ordinary skill in the art would understand that such references are describing how many ions appear in the chemical formula, not a single molecule. For example, sulfuric acid, $H_2SO_4$ would supply one sulfate ion, $SO_4^{2-}$, whereas aluminum sulfate, $Al_2(SO_4)_3$, supplies three sulfate ions.

**There is no scientifically-guaranteed reason that the processes taught in and claimed by Sevenson's patents will cause a decrease in volume.**

34. In paragraph 67 of his Declaration, Mr. Yost states that the "MAECTITE® technology teaches that volume will be reduced." Assuming that he is referencing the processes disclosed in the patents at issue, there is no guarantee that treated soil will experience a decrease in volume.

35. The patents teach that volume decreases "through: (i) the evolution of carbon dioxide during the chemical decomposition of carbonates and bicarbonates, upon reaction with the acidic component in gypsum and phosphoric acid, and (ii) hardening and chemical compaction as a result of the synthesis of new minerals which result in changes in interstitial spaces and interlattice structures."

36. The patents never teach what method someone practicing the claimed invention should use to measure volume, nor do they teach a minimum cure time. The claims require that a treated soil be cured only long enough to allow the TCLP level to fall below 5.0 mg/l. Thus, so long as the treated soil reached 5.0 mg/l, a person of ordinary skill in the art would thus be free to choose a method to measure soil volume change so long as the measured samples had a TCLP level below 5.0 mg/l.

37. In their March, 1999 Treatability Study Final Report, Kiber noted that the phosphate-based treatments did not require a cure time (page G000125). I understand this to mean that the samples treated with phosphoric acid solutions reached acceptable TCLP lead levels during the mixture development. In other words, the TCLP level of these samples was below 5.0 mg/l, as required by the patents. This means that the cure time had been met, and a person of ordinary skill in the art would be in a position to measure volume change at that moment.

38. There are several possible ways to measure volume change. Two examples of potential volume changes that a person of ordinary skill in the art might consider are the change from in-ground volume to post treatment piles after the pugmill, and the change from volume of soil after the screening grid to the volume when packed into the shipping containers. Depending on where the volume is measured, if it was measured, the volume would increase or decrease irrespective if phosphoric acid was used in the treatment. Potential volume measurements include but not limited to: nuclear density gage or pushing cores for *in situ* density, measuring the size and density of soil piles or soil in shipping containers to determine the volume of piles, etc. Notably, the patents do not teach what method or apparatus the practitioner should use.

39. A pocket penetrometer could be used to measure changes in volume under limited circumstances. The penetrometer can be used to measure changes in bulk density of a

material in a pile. If one runs the pile through a process such as grinding or compaction, and assume no loss of mass, a change in bulk density would be an indirect measure of a change in volume. If there is a loss of mass, such as the dissolution of carbonates, then the penetrometer is not useful for measuring changes in volume.

40. Soil piles may experience a volumetric change after heavy metal stabilization depending on a number of factors, such as the soil's initial moisture content, the amount of liquid reagent added, and the amount of surface drying a pile may experience. Soil piles may undergo volumetric expansion. For example, there is a geotechnical optimum moisture level at which all particles in a given soil will orient in the most compact arrangement possible, i.e. the highest density possible. Moisture acts as a lubricant in achieving this arrangement. However, if moisture is present in excess of this level, density will decrease and volume will increase.

41. Most importantly, there is no guarantee that a pile of treated soil will release excess moisture by the time the TCLP level has reached 5.0 mg/l. This is the fundamental reason that Mr. Yost's opinion is wrong. If the TCLP level of a soil pile reached 5.0 mg/l prior to releasing moisture added during treatment, then the volume of that soil pile will increase.

42. I also understand that volume of the soil treated for lead at the Colonie site was never measured after the phosphoric acid amendment. The only evidence of volume change is found in the Kiber reports, which suggest a volumetric *increase*. Given the possibility that TCLP levels of the treated soil fell below 5.0 mg/l before releasing excess moisture, there is no way one can prove that it is more likely than not that the soil volume *decreased*.

43. It is also possible that there was very little carbonate in the Colonie soil. In a soil with a very low carbonate content, adding phosphoric acid would release very little carbon dioxide, which the patents teach is a main source of volume reduction.

**There is no scientifically-guaranteed reason that the processes taught in and claimed by Sevenson's patents actually caused a decrease in the concentration of leachable radioactive materials at the Colonie site.**

44. Sevenson stated in its Opposition that "it is a scientifically proven fact that the treatment method employed at the Colonie Site reduced the amount of hazardous radioactive materials in the treated soil." Science does not prove that there was any decrease in amount or concentration of leachable radioactive substances at the Colonie site.

45. First, the *amount* of hazardous radioactive materials never changed. If the Colonie treatment process immobilized any radioactive material, the *amount* of that material does not change, but the *form* of the radionuclide may change from one that is extracable with the TCLP process to one that is insoluble in the TCLP process.

46. Second, Sevenson has not offered any proof that the phosphoric acid used to treat heavy metals in the Colonie soil decreased the concentration of any radioactive substances. In Mr. Yost's *opinion*, the Government reduced leachability of radioactive substances. Depleted metallic uranium is not a leachable species.

47. Depending on the speciation of uranium, the solubility and leachability of U varies. As an example, $U_3O_8$ and $UO_2$, both common oxides of U have low solubilities. Similarly, the solubility of U metal is low. Addition of phosphoric acid should thus have little impact on soil contaminated with these forms of U. The leachability depends on the speciation; therefore, without any evidence of a decrease in the concentration of leachable radionuclides, it is not a foregone conclusion that the Colonie treatment decreased the leachability.

48. Third, Mr. Yost stated that some of the lead present in the soil was "unavoidably radioactive." The decay of the uranium, U isotopes produces a radioactive and a stable isotope of lead, Pb. One argument against significant amounts of radioactive Pb is that the half-lives of the U isotopes are very long (> 1,000,000 years) and the half-lives of the radioactive Pb isotopes are relatively short (<10.6 hours). Therefore little radioactive Pb would be present. Even if 2000 lbs of U were released within the approximately 60 years since the U was introduced at the site, the amount of U decaying at such a slow rate, and therefore the formation of radioactive Pb, is therefore infinitesimally small.

49. Long before the introduction of radiological materials to the Colonie site it was an active metals foundry/mill works. Lead was used in the casting operations and the equipment was cleaned and degreased using acids. It is important to acknowledge the non-

radiological work onsite as it is the cause of much of the contamination at the site. The isotopes of lead that would have been used in the casting operations would not have been radioactive. Therefore, leachable lead contamination from these processes is not radioactive.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 13, 2007, at Manhattan, KS.

Signed Gary M. Pierzynski, Ph.D.